**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF FLORIDA<br>Office of the Secretary of State<br>500 S. Bronough Street<br>Tallahassee, FL 32399-0250,<br><br>            Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA and ERIC H.<br>HOLDER, JR., in his official capacity as Attorney<br>General of the United States,<br><br>          Defendants. | Civil No. 1:11-cv-01428-CKK-MG-ESH |

## SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

The State of Florida, by and through its Secretary of State Kurt S. Browning, seeks a declaratory judgment that recently-enacted changes in the Florida Election Code are entitled to preclearance under Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c ("VRA"). The changes have neither the purpose nor will they have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority. Alternatively, the State of Florida seeks a declaratory judgment that the preclearance obligation of Section 5 and the coverage formula of Section 4(b) of the VRA, 42 U.S.C. § 1973b(b), are unconstitutional, as well as a permanent injunction enjoining their enforcement. Subjecting Florida counties and other jurisdictions covered exclusively under the language minority provisions of the VRA to preclearance is not a rational, congruent, or proportional means of enforcing the Fourteenth and/or Fifteenth Amendments and violates the Tenth Amendment and Article IV of the U.S. Constitution.

# I. PARTIES

1.     Plaintiff, the State of Florida, is a State of the United States of America and brings this action on behalf of itself and its citizens.

2.     Kurt S. Browning, in his official capacity as the Secretary of State of Florida, is the chief elections officer of the State of Florida.  Secretary Browning has the responsibility, *inter alia,* to obtain and maintain uniform implementation of the election laws, to ensure compliance with federal election laws, and to require the supervisors of elections to perform their official duties.

3.     Defendants are the United States of America and Eric H. Holder, Jr., in his official capacity as Attorney General of the United States.  Attorney General Holder is charged with certain responsibilities related to Section 5 on behalf of the Department of Justice ("DOJ"), including the defense of Section 5 declaratory judgment actions brought in the United States District Court for the District of Columbia ("DDC").

# II. BACKGROUND

## A. The Voting Rights Act

4.     In 1965, Congress enacted the VRA to enforce the substantive guarantee of the Fifteenth Amendment.  *See* Pub. L. No. 89-110, 79 Stat. 437 (1965).

5.     Section 2 of the VRA enforced the substantive guarantee of the Fifteenth Amendment by outlawing any "voting qualification or prerequisite to voting, or standard, practice, or procedure . . . imposed or applied . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color."  *Id*. § 2, 79 Stat. at 437.  This prohibition applies nationwide.  *Id*.

6.     Other provisions of the VRA apply only to certain jurisdictions pursuant to a geographic "coverage formula" established by the statute.

7.     Section 4(b) set forth a formula under which "covered" jurisdictions would be subjected to the "preclearance" obligation of Section 5.  Section 4(b) covered "any State or any political subdivision of a state which . . . the Attorney General determine[d] maintained on November 1, 1964, any [prohibited] test or device, and with respect to which . . . the Director of the Census determine[d] that less than 50 percentum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 percentum of such persons voted in the presidential election of November 1964."  *Id.* § 4(b), 79 Stat. at 438.

8.     Under Section 4(b)'s formula, seven States (Alabama, Alaska, Georgia, Louisiana, Mississippi, South Carolina, and Virginia), forty counties in North Carolina, as well as several counties in Arizona, Hawaii, and Idaho, became "covered" jurisdictions.

9.     Section 5 required these covered jurisdictions to "preclear" any new law or any change to an existing law involving "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964."  *Id.* § 5, 79 Stat. at 439.  The covered jurisdictions could obtain "preclearance" by submitting the proposed change to DOJ or by filing a declaratory-judgment action before a three-judge panel of the DDC.  *Id.*

10.     Preclearance could be granted by DOJ or the DDC only if the voting change "[did] not have the purpose and [would] not have the effect of denying or abridging the right to vote on account of race or color."  *Id.*

11.     Section 5 was originally a "temporary provision[] . . . expected to be in effect for only five years."  *Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 129 S. Ct. 2504, 2510 (2009).  In 1970, however, Congress reauthorized the VRA for another five years.  *See* Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, 84 Stat. 314 (1970).

12.     In 1975, Congress reauthorized the VRA for another seven years.  Act of Aug. 6, 1975, Pub. L. No. 94-73, 89 Stat. 400.

13.     In reauthorizing the VRA in 1975, Congress extended Section 4(b)'s coverage formula—and thus Section 5's preclearance obligation—to any jurisdiction that had maintained a prohibited "test or device" on November 1, 1972, and had voter registration on that date or turnout in the 1972 presidential election of less than 50 percent.  *Id.* § 202, 89 Stat. at 401.

14.     In 1975, Congress also extended Section 5's preclearance obligation by expanding the definition of "test or device" to include the provision of election materials only in English by jurisdictions in which more than five percent of the voting age citizens were members of "a single language minority."  *Id.* § 203, 89 Stat. at 401-02.

15.     In 1982, Congress reauthorized the VRA for another twenty-five years.  Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, 96 Stat. 131 (1982).

16.     In 2006, Congress again reauthorized the VRA for another twenty-five years. Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577 (2006) ("2006 Reauthorization Act").

17.     In reauthorizing the VRA in 2006, Congress imposed preclearance requirements under the same coverage formulas adopted in 1965, 1970, and 1975.

18.     Congress also added new provisions regarding the standard a covered jurisdiction must meet for obtaining preclearance.  *See* 42 U.S.C. § 1973c(b)-(d).

19.     The 2006 Reauthorization Act amended Section 5 to require covered jurisdictions to prove that a voting change does not have the purpose or effect of "diminishing the ability of any citizens of the United States on account of race or color, or [membership in a language

minority group] to elect their preferred candidates of choice." *Id.* § 1973c(b); *id.* § 1973c(d) (noting that this provision was enacted "to protect the ability of such citizens to elect their preferred candidates of choice").

20.     Before 2006, a covered jurisdiction could obtain preclearance under a more flexible standard: by proving through "the totality of the circumstances," *Georgia v. Ashcroft*, 539 U.S. 461, 480-85 (2003), that the change would not "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976).

21.     The 2006 Reauthorization Act further amended Section 5 to require a covered jurisdiction to prove that the voting change does not have "any discriminatory purpose." 42 U.S.C. § 1973c(c).  Prior to this amendment, Section 5 had been interpreted to permit preclearance of voting changes "enacted with a discriminatory but nonretrogressive purpose." *Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 341 (2000).

22.     This prior preclearance standard limited "the substantial federalism costs that the preclearance procedure already exacts" and avoided "raising concerns about § 5's constitutionality." *Id.* at 336.

### B.  Florida and the Voting Rights Act

23.     Florida is a "partially covered" state under the VRA because five Florida counties are subject to the preclearance requirements of Section 5.  Specifically, Collier, Hardee, Hendry, Hillsborough, and Monroe Counties have been designated as covered jurisdictions under Section 4 of the Voting Rights Act, 42 U.S.C. § 1973b(b).

24.     These five Florida jurisdictions are covered jurisdictions based on the Attorney General's determination that, on November 1, 1972, these jurisdictions provided materials and

information relating to the electoral process only in the English language; more than five percent of the citizens of voting age were members of a single language minority; and less than half of the voting-age citizens in these jurisdictions were either registered to vote or voted in the Presidential election of November 1972.

25.     Based on the same formula originally adopted in 1975 and still found in Section 4(b) of the Voting Rights Act, these five counties remain covered jurisdictions subject to the preclearance requirements of Section 5.

26.     To obtain preclearance, Florida must establish that the voting changes in the five jurisdictions do not have the "purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color . . . to elect their preferred candidates of choice," 42 U.S.C. § 1973c(b), even though Florida is itself not a covered jurisdiction, and even though the five Florida counties are covered only under the VRA's language minority provisions, *see id.*, (f)(2).

## C. The 2011 Florida Voting Changes

27.     On May 19, 2011, Committee Substitute for Committee Substitute for House Bill No. 1355, an omnibus bill revising the Florida Election Code, became law.  This law has been codified at Chapter 2011-40, Laws of Florida (the "Act").

28.     The Act contains revisions to Florida statutes governing third-party voter registration organizations (§ 97.0575, Fla. Stat.), state constitutional amendments proposed by initiative (§ 100.371, Fla. Stat.), election-day address changes (§ 101.045, Fla. Stat.), and early voting (§ 101.657, Fla. Stat.).  These provisions are collectively referred to as the "Four Voting Changes."

29.     On May 19, 2011, Secretary Browning issued Directive 2011-01 to the State supervisors of elections. The Directive described the changes made by the Act and provided guidance to the supervisors of elections as to their duties under the Act. *See* Exhibit A.

30.     On June 8, 2011, Secretary Browning submitted the Act to the United States Department of Justice for administrative preclearance.  On July 29, 2011, the Four Voting Changes were withdrawn from administrative preclearance, while the other 76 provisions of the Act were kept before the Department of Justice for preclearance.  On August 8, the Department of Justice precleared these 76 provisions of the Act.

31.     After holding a publicly-noticed rule development workshop and accepting extensive public comment from affected parties, the Florida Department of State adopted Rule 1S-2.042 on October 13, 2011.  *See* Third-Party Voter Registration Organizations, Fla. Admin. Code R. 1S-2.042 (2011) (Exhibit B). Rule 1S-2.042 is an administrative rule that implements the revisions to the Florida statute governing third-party voter registration organizations, which is one of the Four Voting Changes for which preclearance is sought in this action.  Except in the five covered counties, Rule 1S-2.042 will take effect on November 2, 2011.

32.     Among other things, Rule 1S-2.042 clarifies that the registration requirement applies only to those organizations that "solicit[] for collection or collect[] voter registration applications from Florida voter registration applicants." *Id.* The rule also outlines the process for the submission of completed voter registration applications, which will be accepted either in person or by mail. *Id.* Finally, the rule adopts various forms related to the registration and reporting requirements. *See* Exhibit B.

33.     Florida brings this action pursuant to 42 U.S.C. § 1973c and 28 U.S.C. § 2201, seeking a declaratory judgment that the Four Voting Changes neither have the purpose nor will

have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority, thereby allowing the State to uniformly enforce its elections laws.

### III.  JURISDICTION AND VENUE

34.    This Court has subject matter jurisdiction under Section 14(b) of the Voting Rights Act, as amended, 42 U.S.C. § 1973l, and under 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States. This Court has jurisdiction to render declaratory relief under 28 U.S.C. § 2201.

35.    Venue is proper in this Court pursuant to Section 5 of the Voting Rights Act and 28 U.S.C. § 2284. This action is properly determinable by a three judge district court in accordance with Section 5 and 28 U.S.C. § 2284.

### IV.  PRECLEARANCE ALLEGATIONS

36.    The Act, Chapter 2011-40, Laws of Florida, revises numerous statutes within the Florida Elections Code (Chapters 97-106 of the Florida Statutes).  The Act addressed a wide range of subjects, including registration of minor political parties, political advertisement disclaimers, and reporting of election results by supervisors of elections.

37.    The State of Florida seeks a declaratory judgment, pursuant to Section 5 of the VRA, related to the Four Voting Changes: Section 4 (addressing third-party voter registration organizations) together with Rule 1S-2.042, which administratively implements that statutory provision; Section 23 (addressing state constitutional amendments proposed by initiative); Section 26 (addressing change of residence); and Section 39 (addressing early voting).  This action is filed for the purpose of determining an actual controversy between the parties within the Court's jurisdiction, and to allow the State to uniformly enforce duly-enacted amendments to the Florida Election Code.

38.     As described below, each of the Four Voting Changes applies uniformly to all Floridians regardless of race, color, or membership in a language minority. These provisions were not adopted with the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

### A.  Section 4 (Third-Party Voter Registration Organizations)

#### (i)  Benchmark Practice — Third-Party Voter Registration Organizations

39.     Prior to 1995, only state officials and individuals deputized by supervisors of elections as registrars were permitted to collect voter registration applications in Florida. The Florida Legislature's first comprehensive regulation of third-party voter registration organizations came in 2005 with the enactment of section 97.0575, Florida Statutes. This statute, as amended in 2007, represents the "benchmark" practice for purposes of Section 5.

40.     Under the benchmark practice, a "third-party voter registration organization" is defined as "any person, entity, or organization soliciting or collecting voter registration applications" other than a person registering, or collecting an application from, that person's spouse, child or parent; or a person who registers to vote or collects voter registration applications as an employee or agent of the Florida Department of State's Division of Elections ("Division"), a supervisor of elections, the Department of Highway Safety and Motor Vehicles, or a voter registration agency. § 97.021(37), Fla. Stat.

41.     "Prior to engaging in any voter registration activities," the benchmark practice required each third-party voter registration organization to name a registered agent in the state and submit additional information to the Division. § 97.0575(1), Fla. Stat. Specifically, the benchmark practice required each third-party voter registration organization to submit to the Division a form containing:

> the name of the registered agent and the name of those individuals responsible for the day-to-day operation of the third-party voter registration organization, including, if applicable, the names of the entity's board of directors, president, vice president, managing partner, or such other individuals engaged in similar duties or functions.

§ 97.0575(1), Fla. Stat.

42.    Because each third-party voter registration organization that collected voter registration applications "serves as a fiduciary to the applicant," the benchmark practice required each organization to ensure that any application entrusted to the organization, "irrespective of party affiliation, race, ethnicity, or gender," is "promptly delivered to the division or the supervisor of elections." § 97.0575(3), Fla. Stat.

43.    The benchmark practice provided for fines on any third-party voter registration organization that failed to promptly deliver applications that it collected. § 97.0575(3), Fla. Stat. The applicable fines were $50 for each application received by a supervisor of elections or the Division more than ten days after the applicant delivered the completed application to the third-party voter registration organization; $100 for each application collected by a third-party voter registration organization before book closing for any given election for federal or state office and received by a supervisor of elections or the Division after the book-closing deadline for that election; and $500 for each application collected by a third-party voter registration organization that is not submitted to the Division or a supervisor of elections. § 97.0575(3), Fla. Stat. The amounts of these fines increased to $250, $500, and $1,000, respectively, for willful violations. § 97.0575(3), Fla. Stat. The benchmark practice did not impose any civil or criminal penalties on a third-party voter registration organization solely for failure to register with the Division. § 97.0575(2), Fla. Stat.

44.     The benchmark practice capped at $1,000 the maximum aggregate fine that could be assessed against any third-party voter registration organization (including affiliate organizations) for all violations committed in a calendar year. § 97.0575(3), Fla. Stat.   The benchmark practice required the Secretary of State to waive the fines upon a showing that the failure to deliver the application promptly was based upon force majeure or impossibility of performance and provided for a three-fourths reduction in the applicable fines for third-party voter registration organizations that had complied with the statute's registration requirements. § 97.0575(3), Fla. Stat.  Under the benchmark practice, the Division had authority to investigate violations of the third-party voter registration organization statute, assess civil fines imposed under the statute, and enforce the fines "through any appropriate legal proceedings." § 97.0575(4)(b), Fla. Stat.

45.     Finally, the benchmark practice required third-party voter registration organizations to submit a report to the Division of Elections on or before the 15th day after the end of each calendar quarter providing the date and location of any organized voter registration drives conducted by the organization in the prior calendar quarter. § 97.0575(1), Fla. Stat.

(ii)  Changes Sought to Be Precleared — Third-Party Voter Registration Organizations

46.     The benchmark practices described above are largely preserved by Section 4 of the Act, Chapter 2011-40. The third-party voter registration statute, as amended, continues to require third-party voter registration organizations to register with the Division of Elections "before engaging in any voter registration activities." § 97.0575(1), Fla. Stat. As under the benchmark, third-party voter registration organizations must promptly deliver voter registration applications that they collect. § 97.0575(3)(a), Fla. Stat. The applicable fines for untimely delivery of applications are unchanged, as is the maximum aggregate fine of $1,000 for all

violations committed by a third-party voter registration organization and its affiliates in a calendar year. § 97.0575(3), Fla. Stat.

47.     The principal change in Section 4 relates to the time period for third-party voter registration organizations to submit completed voter registration applications to the Division or a supervisor of elections. § 97.0575(3), Fla. Stat. Where the benchmark required completed applications to be submitted "promptly" and imposed a $50 fine for applications received more than ten days after they were collected, Section 4 imposes a $50 fine for applications received by the Division or a supervisor of elections more than 48 hours after the applicant delivers the completed voter registration application to the organization (or on the next business day, if the office is closed). § 97.0575(3)(a), Fla. Stat. Section 4 also removes the potential for a three-fourth reduction in fines for third-party voter registration organizations that have complied with the registration requirements but provides that force majeure or impossibility of performance is an affirmative defense to a failure to timely deliver a completed application. § 97.0575(3)(b), Fla. Stat. Under Section 4, the Secretary of State may waive the fines assessed against an organization upon a showing of force majeure or impossibility of performance, which is now an affirmative defense. § 97.0575(3)(b), Fla. Stat.

48.     Section 4 also assigns new administrative responsibilities to the Division and supervisors of elections regarding distribution of and accounting for voter registration applications (§ 97.0575(2), (5), Fla. Stat.), requires each registration agent of a third-party voter registration organization to provide a sworn statement stating that the agent will obey all state laws and rules regarding the registration of voters (§ 97.0575(1)(d), Fla. Stat.), requires voter registration forms provided to each third-party voter registration organization to contain information identifying the third-party voter registration organization to which the forms are

provided (§ 97.0575(2), Fla. Stat.), and requires supervisors of elections to provide information to the Division on voter registration forms provided to and received from each third-party voter registration organization. (§ 97.0575(2), Fla. Stat.)

49.     Finally, Section 4 shifts enforcement responsibility of the third-party voter registration statute from the Division to the Florida Attorney General. § 97.0575(4), Fla. Stat.  If the Secretary of State reasonably believes that a person has committed a violation of the statute, the Secretary may refer the matter to the Attorney General. § 97.0575(4), Fla. Stat. The Attorney General may institute a civil action for a violation of, or to prevent a violation of, the statute. § 97.0575(4), Fla. Stat.

### (iii)  Purpose and Effect — Third-Party Voter Registration Organizations

50.     The changes to the third-party voter registration statute contained in Section 4 were adopted to address Florida's legitimate interests in: 1) ensuring that all voter registration applications are properly and timely submitted; 2) holding third-party voter registration organizations accountable for the applications they collect; and 3) preventing instances of fraud. The changes were not adopted for the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority.

51.     The changes in Section 4 apply equally to every group meeting the definition of a third-party voter registration organization. Moreover, the benchmark requirement that each third-party voter registration organization ensure the prompt delivery of all voter registration applications they collect, "irrespective of party affiliation, race, ethnicity, or gender," — remains unchanged. § 97.0575(3), Fla. Stat. Section 4 therefore protects the right to vote of all Floridians and does not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

## B.  Section 23 (Constitutional Amendments Proposed by Initiative)

### (i)  Benchmark Practice — Constitutional Amendments Proposed by Initiative

52.     Under the benchmark practice, a constitutional amendment proposed by initiative shall be placed on the ballot for the general election provided the initiative is filed with the Secretary of State no later than February 1 of the year the general election is held. § 100.371(1), Fla. Stat. A petition is deemed to be filed on the date the Secretary of State determines that valid and verified petition forms have been signed by the constitutionally required number and distribution of electors. § 100.371(1), Fla. Stat. Each signature on an initiative petition must be dated and is valid for a period of four years following that date. § 100.371(3), Fla. Stat.

53.     The benchmark practice required the sponsor of the petition to submit signed and dated forms to the appropriate supervisor of elections for verification of the number of registered electors whose valid signatures appear. § 100.371(3), Fla. Stat. The supervisor of elections must verify the signatures within 30 days. § 100.371(3), Fla. Stat. A supervisor may verify that a signature is valid only if it is an original signature; accurately records the date on which the form was signed; accurately sets forth the elector's name, address, county, and voter registration number or date of birth; and if the elector is, at the time he or she signed the form, a duly-qualified and registered elector authorized to vote in the county in which his or her signature was submitted. § 100.371(3), Fla. Stat.

54.     The benchmark practice also provided a statutory procedure for an elector to revoke his or her signature within 150 days of the date on which he or she signed the petition. § 100.371(6), Fla. Stat. This signature revocation procedure, however, was invalidated by the Florida Supreme Court on state law grounds in *Browning v. Florida Hometown Democracy, Inc., PAC,* 29 So. 3d 1053 (Fla. 2010).

(ii)  Changes Sought to Be Precleared — Constitutional Amendments Proposed by Initiative

55.    The changes contained in Section 23 amend the benchmark practice by clarifying that the "appropriate" supervisor of elections to whom signed petitions must be submitted for verification is the supervisor of elections for the county of residence listed by the person signing the form. § 100.371(3), Fla. Stat. Section 23 provides that a signature on a petition form is valid for a period of two years following the date of the signature, rather than four years. § 100.371(3), Fla. Stat. Section 23 imposes a new obligation on local supervisors of elections by requiring each supervisor to notify a petition sponsor of misfiled petitions. § 100.371(3), Fla. Stat. Section 23 also amends the benchmark practice by adding a requirement that supervisors verify that a petition form sets forth the elector's city of residence. § 100.371(3), Fla. Stat.

56.    The changes in Section 23 also amend the benchmark requirement that a petition signer be a registered voter of the county where the petition was submitted for verification at the time the petition was signed. Under Section 23, the requirement has been broadened so that a signature may be verified if the elector is a duly-qualified and registered voter of the State of Florida (rather than the specific county) both at the time of signing and at the time of verification.

57.    Finally, Section 23 repeals the statutory provisions related to signature revocation that have been invalidated by the Florida Supreme Court. § 100.371(6), Fla. Stat.

(iii)  Purpose and Effect — Constitutional Amendments Proposed by Initiative

58.    The   changes   to   the   statute   governing   constitutional   amendments proposed by initiative contained in Section 23 were adopted for the purpose of 1) clarifying the signature verification responsibilities of county supervisors of elections; 2) repealing statutory language related to signature revocation that has been judicially invalidated; and 3) ensuring that constitutional   amendments   proposed   by   initiative   demonstrate   significant   contemporaneous

support for the proposed changes. They were not adopted with the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority.

59.     The changes in Section 23 apply equally to all Floridians proposing a constitutional amendment by initiative or signing a signature petition without respect to the race, color, or language minority status of the signatory. The changes will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

### C.  Section 26 (Change of Residence)

#### (i)  Benchmark Practice — Change of Residence

60.     Under the benchmark practice, a person may only vote in the election precinct or district in which the person has his or her legal residence and in which the person is registered to vote. § 101.045(1), Fla. Stat. An elector who has moved from the address listed on the person's voter registration record must provide notification of the move to the supervisor of elections. § 97.1031, Fla. Stat. An elector who has moved from the precinct in which the elector is registered, but who has not provided notification of the move to the supervisor of elections before the day of an election, may nonetheless be permitted to vote in the precinct to which he or she has moved provided the elector completes an affirmation of change of legal residence. § 101.045(2)(a), Fla. Stat.

61.     Under the benchmark practice, an elector who has completed an affirmation of change of legal residence may be permitted to vote in the precinct to which he or she has moved his or her legal residence. § 101.045(2), Fla. Stat. If the elector's registration can be verified, the elector is entitled to vote a regular ballot. § 101.045(2)(d), Fla. Stat. If the elector's eligibility to vote cannot be determined, he or she is entitled to cast a provisional ballot. § 101.045(2)(d), Fla. Stat. As an alternative to the affirmation of change of address, an elector may complete a voter

registration application that indicates the change of address of legal residence. § 101.045(2)(c), Fla. Stat.

62.     Upon receipt of the affirmation or application certifying a change of address of legal residence, the supervisor of elections shall, as soon as practicable, make the necessary changes in the statewide voter registration system to indicate the change in address. § 101.045(2)(d), Fla. Stat.

### (ii)  Changes Sought to Be Precleared — Change of Residence

63.     The changes contained in Section 26 preserve the benchmark practice for all electors whose change of residence is within the same county and for active uniformed services voters and members of their families. § 101.045(2), Fla. Stat. Section 26 amended the benchmark practice only for electors who have changed their legal residence, have not previously notified the supervisor of elections of the change of address, and whose change of address is from outside the county. § 101.045(2)(b), Fla. Stat. An elector in these circumstances may not change his or her legal residence at the polls and vote a regular ballot, but is entitled to vote a provisional ballot upon completion of the affirmation of change of legal residence. § 101.045(2)(b), Fla. Stat.

64.     The standards for canvassing a provisional ballot are unchanged by the Act. A provisional ballot "shall be counted unless the canvassing board determines by a preponderance of evidence that the person was not entitled to vote." § 101.048(2)(a), Fla. Stat. In determining whether a person casting a provisional ballot is entitled to vote, the county canvassing board shall review the information provided in the Voter's Certificate and Affirmation, any written evidence provided by the person casting the ballot, any other evidence presented by the supervisor of elections, and, in the case of a challenge, any evidence presented by the challenger. § 101.048(2)(a), Fla. Stat.

<u>(iii)  Purpose and Effect — Change of Residence</u>

65.     The changes to the statute governing change of residence provisions contained in Section 26 were adopted as an anti-fraud measure, to protect against the possibility of a single elector casting ballots in more than one county. They were not adopted with the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority.

66.     The changes in Section 26 apply equally to every elector regardless of race, color, or membership in a language minority. The only electors affected by the changes in Section 26 are those who (1) have changed their legal residence from one county to another county; (2) have failed to notify the supervisor of elections regarding the change of residence (in writing, by telephone, or by electronic means) at any time prior to election day; and (3) are not an active uniformed services voter or a member of his or her family.

67.     Even the limited number of electors affected by the changes in Section 26 will not have their right to vote denied or abridged on account of race, color, or membership in a language minority. Each such elector is entitled to cast a provisional ballot, which "shall be counted" by the canvassing board if the elector was registered and entitled to vote at the precinct where the person cast his or her vote. § 101.048, Fla. Stat. Because the canvassing board will have the elector's certificate and affirmation before it, Secretary Browning does not anticipate any need in the ordinary case for a voter to provide additional information regarding eligibility to the canvassing board (although the option remains available under section 101.048, Florida Statutes). An elector whose regular ballot would have been lawfully cast under the benchmark practice will therefore have his or her provisional ballot counted under the new statute.

68.     The rejection of a provisional ballot cast by an elector who was not registered, or who was not entitled to cast the ballot, or who had already voted in the election, does not amount

to a denial or abridgement of the right to vote. Section 26 does not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

### D.  Section 39 (Early Voting)

#### (i)  Benchmark Practice — Early Voting

69.     The benchmark practice for early voting in Florida was enacted by the Florida Legislature in 2005 and is codified at Section 101.657, Florida Statutes. Under the benchmark practice, each supervisor of elections shall allow an elector to vote early "as a convenience to the voter." § 101.657(1)(a), Fla. Stat. The supervisor of elections shall designate each early voting site no later than 30 days prior to an election. § 101.657(1)(b), Fla. Stat. Early voting must be provided at the main office of the supervisor of elections, and may be provided at a branch office, city hall, or permanent public library facility. § 101.657(1)(a), Fla. Stat.

70.     The benchmark practice generally provides for early voting to begin "on the 15th day before an election and end on the 2nd day before an election." § 101.657(1)(d), Fla. Stat. During the applicable period, the benchmark practice requires early voting to be provided "for 8 hours per weekday and 8 hours in the aggregate each weekend at each site" — a total of 96 hours of early voting. § 101.657(1)(d), Fla. Stat. Early voting sites may open no sooner than 7 a.m. and close no later than 7 p.m. on each applicable day. § 101.657(1)(d), Fla. Stat. All early voting sites in a county shall be open on the same days for the same amount of time. § 101.657(1)(c), Fla. Stat. Any person in line at the closing of an early voting site is allowed to vote. § 101.657(1)(c), Fla. Stat.

#### (ii)  Changes Sought to Be Precleared — Early Voting

71.     Section 39 preserves the option of early voting as a convenience to the voter and provides increased flexibility to supervisors of elections regarding the scheduling of early voting in each county. Under Section 39, early voting shall now begin on the 10th day before an

election that contains state or federal races (rather than the 15th day) and end on the 3rd day before the election (rather than the 2nd day). § 101.657(1)(d), Fla. Stat. Early voting shall be provided for no less than 6 hours and no more than 12 hours per day at each site. § 101.657(1)(d), Fla. Stat. Section 39 repeals the prior provision requiring that all early voting sites in a county be open on the same days for the same amount of time. § 101.657(1)(c), Fla. Stat. Section 39 also repeals the provision limiting early voting sites to operation between the hours of 7 a.m. and 7 p.m. § 101.657(1)(d), Fla. Stat.

72.   For elections not held in conjunction with a state or federal election, the statute provides supervisors of elections the discretion to provide early voting and to determine the hours of operation of early voting sites. § 101.657(1)(d), Fla. Stat.

### (iii)  Purpose and Effect — Early Voting

73.   The changes to the early voting statute contained in Section 39 were adopted to expand access to early voting and provide each supervisor of elections additional flexibility regarding the scheduling of early voting. The changes to the early voting statute contained in Section 39 were not adopted with the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority.

74.   Section 39 provides for expanded access to early voting in several ways. Most significantly, Section 39 mandates additional hours of weekend early voting. Under Section 39, weekend early voting is increased from 16 total hours to a minimum of 18 hours and as many as 36 hours. § 101.657(1)(d), Fla. Stat. By more than doubling the maximum number of weekend early voting hours, Section 39 provides for increased accessibility to the convenience of early voting.

75.   Section 39 also increases the maximum number of weekday early voting hours: from 8 hours to 12 hours. § 101.657(1)(d), Fla. Stat. This change provides additional early voting

opportunities for electors whose work schedules do not allow time to vote during the traditional 8 hour work day.

76.     If precleared, Section 39 will also mandate 6-12 hours of Sunday early voting in Florida's five counties covered by Section 5 of the Voting Rights Act. None of the covered counties offered Sunday early voting in the 2008 or 2010 primary or general elections.

77.     The changes to early voting contained in Section 39 will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority. Indeed, Section 39 will likely result in the greatest benefit to low-income residents in the covered counties who may have found it more difficult to vote early during the limited 8 hour window allowed under the benchmark practice.

## V.  CAUSES OF ACTION

### COUNT ONE: DECLARATORY JUDGMENT — THIRD-PARTY VOTER REGISTRATION

78.     The State of Florida realleges, adopts, and incorporates by reference paragraphs 1 through 77 above.

79.     The covered changes to section 97.0575, Florida Statutes, were adopted for the purpose of 1) ensuring that all voter registration applications are properly and timely submitted; 2) holding third-party voter registration organizations accountable for the applications they collect; and 3) preventing instances of fraud. The changes were not adopted for any discriminatory purpose.

80.     The covered changes to section 97.0575, Florida Statutes, when compared to Florida's existing or "benchmark" practices, do not lead to a "retrogression" in the position of racial minorities in that they do not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

81. The covered changes to section 97.0575, Florida Statutes, accordingly have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

82. The covered changes to section 97.0575, Florida Statutes, do not and will not prohibit any citizen of the United States from electing his or her preferred candidate of choice.

83. The covered changes to section 97.0575, Florida Statutes, apply uniformly to all Floridians regardless of race, color, or membership in a language minority.

84. The covered changes to section 97.0575, Florida Statutes, do not result in any discriminatory effect that is statistically significant.

85. Florida Rule 1S-2.042—the implementing regulation of section 97.0575, Florida Statutes—likewise has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

86. The State of Florida is entitled to a judgment that the covered changes to section 97.0575, Florida Statutes, and the section's implementing regulation, Florida Rule 1S-2.042, neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority under Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, and that Florida's covered jurisdictions may administer these covered changes without further delay.

WHEREFORE, the State of Florida respectfully requests that this Court:

A. Convene a three-judge district court to hear the matters raised in this Complaint;

B. Enter a declaratory judgment that the covered changes to section 97.0575, Florida Statutes, together with the section's implementing regulation, Florida Rule 1S-2.042,

neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority and may be administered by Florida's covered jurisdictions without impediment on account of Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c; and

C.     Award the State of Florida its costs and grant such other relief as the Court may deem just and proper.

## COUNT TWO: DECLARATORY JUDGMENT — CONSTITUTIONAL AMENDMENTS PROPOSED BY INITIATIVE

87.     The State of Florida realleges, adopts, and incorporates by reference paragraphs 1 through 77 above.

88.     The covered changes to section 100.371, Florida Statutes, were adopted for the purpose of 1) clarifying the signature verification responsibilities of county supervisors of elections; 2) repealing statutory language related to signature revocation that has been judicially invalidated; and 3) ensuring that constitutional amendments proposed by initiative demonstrate significant contemporaneous support for the proposed changes. The covered changes were not adopted for any discriminatory purpose.

89.     The covered changes to section 100.371, Florida Statutes, when compared to Florida's existing or "benchmark" practices, do not lead to a "retrogression" in the position of racial minorities in that they do not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

90.     The covered changes to section 100.371, Florida Statutes, accordingly have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

91.     The covered changes to section 100.371, Florida Statutes, do not and will not prohibit any citizen of the United States from electing his or her preferred candidate of choice.

92.     The covered changes to section 100.371, Florida Statutes, apply uniformly to all Floridians regardless of race, color, or membership in a language minority.

93.     The covered changes to section 100.371, Florida Statutes, do not result in any discriminatory effect that is statistically significant.

94.     The State of Florida is entitled to a judgment that the covered changes to section 100.371, Florida Statutes, neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority under Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, and that Florida's covered jurisdictions may administer these covered changes without further delay.

WHEREFORE, the State of Florida respectfully requests that this Court:

A.     Convene a three judge district court to hear the matters raised in this Complaint;

B.     Enter a declaratory judgment that the covered changes to section 100.371, Florida Statutes, neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority and may be administered by Florida's covered jurisdictions without impediment on account of Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c; and

C.     Award the State of Florida its costs and grant such other relief as the Court may deem just and proper.

## COUNT THREE: DECLARATORY JUDGMENT — CHANGE OF ADDRESS

95.     The State of Florida realleges, adopts, and incorporates by reference paragraphs 1 through 77 above.

96.     The covered changes to section 101.045, Florida Statutes, were adopted for the purpose of preventing fraudulent voting by a single elector casting ballots in more than one county. The covered changes were not adopted for any discriminatory purpose.

97.     The covered changes to section 101.045, Florida Statutes, when compared to Florida's existing or "benchmark" practices, do not lead to a "retrogression" in the position of racial minorities in that they do not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

98.     The covered changes to section 101.045, Florida Statutes, accordingly have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

99.     The covered changes to section 101.045, Florida Statutes, do not and will not prohibit any citizen of the United States from electing his or her preferred candidate of choice.

100.    The covered changes to section 101.045, Florida Statutes, apply uniformly to all Floridians regardless of race, color, or membership in a language minority.

101.    The covered changes to section 101.045, Florida Statutes, do not result in any discriminatory effect that is statistically significant.

102.    The State of Florida is entitled to a judgment that the covered changes to section 101.045, Florida Statutes, neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority under Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, and that Florida's covered jurisdictions may administer these covered changes without further delay.

WHEREFORE, the State of Florida respectfully requests that this Court:

A.      Convene a three-judge district court to hear the matters raised in this Complaint;

B.      Enter a declaratory judgment that the covered changes to section 101.045, Florida Statutes, neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority and may be administered by Florida's covered jurisdictions without impediment on account of Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c; and

C.      Award the State of Florida its costs and grant such other relief as the Court may deem just and proper.

### COUNT FOUR: DECLARATORY JUDGMENT — EARLY VOTING

103.    The State of Florida realleges, adopts, and incorporates by reference paragraphs 1 through 77 above.

104.    The covered changes to section 101.657, Florida Statutes, were adopted for the purpose of expanding access to early voting and providing each supervisor of elections additional flexibility regarding the scheduling of early voting. The covered changes were not adopted for any discriminatory purpose.

105.    The covered changes to section 101.657, Florida Statutes, when compared to Florida's existing or "benchmark" practices, do not lead to a "retrogression" in the position of racial minorities in that they do not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

106.    The covered changes to section 101.657, Florida Statutes, accordingly have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.

107.    The covered changes to section 101.657, Florida Statutes, do not and will not prohibit any citizen of the United States from electing his or her preferred candidate of choice.

108.    The covered changes to section 101.657, Florida Statutes, apply uniformly to all Floridians regardless of race, color, or membership in a language minority.

109.    The covered changes to section 101.657, Florida Statutes, do not result in any discriminatory effect that is statistically significant.

110.    The State of Florida is entitled to a judgment that the covered changes to section 101.657, Florida Statutes, neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority under Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, and that Florida's covered jurisdictions may administer these covered changes without further delay.

WHEREFORE, the State of Florida respectfully requests that this Court:

A.    Convene a three-judge district court to hear the matters raised in this Complaint;

B.    Enter a declaratory judgment that the covered changes to section 101.657, Florida Statutes, neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority and may be administered by Florida's covered jurisdictions without impediment on account of Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c; and

C.    Award the State of Florida its costs and grant such other relief as the Court may deem just and proper.

## COUNT FIVE: DECLARATORY JUDGMENT —
## SECTION 4(B) OF THE VRA IS UNCONSTITUTIONAL

111.    The State of Florida realleges, adopts, and incorporates by reference paragraphs 1 through 77 above.

112.    For several reasons, the formula set forth in Section 4(b) of the VRA is not an "appropriate" means of enforcing the Fourteenth and/or Fifteenth Amendments and thus violates the Tenth Amendment and Article IV of the Constitution.

113.    Triggering coverage based on voting practices and Presidential election data from 1964, 1968, and 1972 is not a rational, congruent, or proportional means of enforcing the Fourteenth and/or Fifteenth Amendments.

114.    The coverage formula differentiates between the States in violation of the doctrine of equal sovereignty without a constitutionally appropriate basis for subjecting some States to the preclearance obligation but not others.

WHEREFORE, the State of Florida respectfully requests that this Court:

A.    Convene a three-judge district court to hear the matters raised in this Complaint;

B.    Enter a declaratory judgment that Section 4(b) of the VRA is facially unconstitutional;

C.    Because Section 4(b)'s coverage formula is facially unconstitutional, issue a permanent injunction against Defendant Attorney General Eric H. Holder, Jr. enjoining the enforcement of Section 5; and

D.    Award the State of Florida its costs and grant such other relief as the Court may deem just and proper.

**COUNT SIX: DECLARATORY JUDGMENT —
SECTION 5 OF THE VRA IS UNCONSTITUTIONAL**

115.    The State of Florida realleges, adopts, and incorporates by reference paragraphs 1 through 77 above.

116.    For several reasons, the preclearance obligation of Section 5 of the VRA is not an "appropriate" means of enforcing the Fourteenth and/or Fifteenth Amendments and thus violates the Tenth Amendment and Article IV of the Constitution.

117.    Subjecting any jurisdiction covered exclusively under the language minority provisions of the VRA, and the five Florida counties in particular, to preclearance is not a rational, congruent, or proportional means of enforcing the Fourteenth and/or Fifteenth Amendments based on the evidence of language-minority discrimination in the legislative record when Congress reauthorized Section 5 in 2006.

118.    Requiring jurisdictions covered exclusively under the language minority provisions of the VRA to establish that the relevant voting changes do not interfere with the right to vote on account of race or color is not a rational, congruent, or proportional means of enforcing the Fourteenth and/or Fifteenth Amendments.

119.    Section 5's substantive standard violates the non-discrimination requirements of the Fifth and Fourteenth Amendments.  *See* 42 U.S.C. § 1973c(b)-(d).

120.    To the extent that Section 5 requires Florida to obtain preclearance for voting changes that were enacted by the State, apply uniformly across the State, and were not targeted at or sought by the covered jurisdictions, it is not a rational, congruent, or proportional means of enforcing the Fourteenth and/or Fifteenth Amendments.

WHEREFORE, the State of Florida respectfully requests that this Court:

A.      Convene a three-judge district court to hear the matters raised in this Complaint;

B.      Enter a declaratory judgment that Section 5 of the VRA is facially unconstitutional;

C.      Because Section 5 is facially unconstitutional, issue a permanent injunction against Defendant Attorney General Eric H. Holder, Jr. enjoining the enforcement of Section 5; and

D.      Award the State of Florida its costs and grant such other relief as the Court may deem just and proper.


Respectfully submitted,


Dated:  October 24, 2011               /s/ William S. Consovoy

Daniel E. Nordby                       William S. Consovoy* (D.C. Bar No. 493423)
Ashley E. Davis                        J. Michael Connolly  (D.C. Bar No. 995815)
FLORIDA DEPARTMENT OF STATE            WILEY REIN LLP
R.A. Gray Building                     1776 K Street, NW
500 S. Bronough Street                 Washington, DC  20006
Tallahassee, FL 32399-0250             Tel: (202) 719-7000
Tel: 850-245-6536                      Fax: (202) 719-7049


                                       * Counsel of Record