**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STATE OF FLORIDA,

               Plaintiff,

    v.

UNITED STATES OF AMERICA and
ERIC H. HOLDER, JR.,
in his official capacity as Attorney General,

               Defendants, and

KENNETH SULLIVAN, *et al.*,

               Defendant-Intervenors.

No. 1:11-cv-1428-CKK-MG-ESH

**<u>APPENDIX</u>
(Volume 12)**

| | |
|---|---|
| Daniel E. Nordby | William S. Consovoy* (D.C. Bar No. 493423) |
| Ashley E. Davis | Brendan J. Morrissey (D.C. Bar No. 873809) |
| FLORIDA DEPARTMENT OF STATE | J. Michael Connolly  (D.C. Bar No. 995815) |
| R.A. Gray Building | WILEY REIN LLP |
| 500 S. Bronough Street | 1776 K Street, NW |
| Tallahassee, FL 32399-0250 | Washington, DC  20006 |
| Tel: 850-245-6536 | Tel.: (202) 719-7000 |
| | Fax: (202) 719-7049 |

Dated: April 16, 2012                            *Counsel of Record*

## <u>TABLE OF CONTENTS</u>

| Appendix Vol. | Tab | Description | Dkt. No. | Appendix Page Nos. |
|---|---|---|---|---|
| 1 | 1. | Florida's Second Amended Complaint | 54 | 1 |
| 1 | 2. | Memorandum Opinion dated October 28, 2011 | 56 | 48 |
| 1 | 3. | Defendant-Intervenors' Answer | 57 | 60 |
| 1 | 4. | United States' Answer | 58 | 82 |
| 1 | 5. | Notice of Ancillary Proceedings | 69 | 108 |
| 1 | 6. | Second Notice of Ancillary Proceedings | 70 | 112 |
| 1 | 7. | First Set of Revised Jointly Stipulated Facts | 78-1 | 117 |
| 1 | 8. | Selected Pages of the Federal Register (Ex 1) | 78-2 | 126 |
| 1 | 9. | Chapter 2011-40, Laws of Florida (Ex 2) | 78-3 | 129 |
| 1 | 10. | Letter from Florida dated July 29, 2011 (Ex 3) | 78-4 | 218 |
| 1 | 11. | Letter from DOJ dated August 8, 2011 (Ex 4) | 78-5 | 220 |
| 1 | 12. | Pre-HB 1355 Versions of Selected Florida Statutes (Ex 5) | 78-6 | 222 |
| 1 | 13. | Post-HB 1355 Versions of Selected Florida Statutes (Ex 6) | 78-7 | 248 |
| 1 | 14. | Redline Comparing Pre-HB 1355 and Post-HB 1355 Versions of Selected Florida Statutes (Ex 7) | 78-8 | 274 |
| 1 | 15. | Pre-HB 1355 Version of Rule 1S-2.042 (Ex 8) | 78-9 | 292 |
| 1 | 16. | Post-HB 1355 Version of Rule 1S-2.042 (Ex 9) | 78-10 | 296 |
| 1 | 17. | Redline Comparing Pre-HB 1355 and Post-HB 1355 Versions of Florida Rule 1S-2.042 (Ex 10) | 78-11 | 300 |
| 1 | 18. | 2011 Florida Department of State Legislative Proposal Relating to Election Laws (Ex 11) | 78-12 | 306 |
| 1 | 19. | March 7, 2011 Version of HB 1355 (Ex 12) | 78-13 | 317 |
| 1 | 20. | March 29, 2011 Version of SB 2086 (Ex 13) | 78-14 | 332 |
| 1 | 21. | Transcript of April 1, 2011 House Government Operations Subcommittee Hearing (Ex 13A) | 78-15 | 380 |
| 1 | 22. | April 1, 2011 Version of HB 1355 (Ex 14) | 78-16 | 468 |
| 1 | 23. | Transcript of April 4, 2011 Senate Rules Subcommittee on Ethics and Elections Hearing (Ex 15) | 78-17 | 602 |

| Appendix Vol. | Tab | Description | Dkt. No. | Appendix Page Nos. |
|---|---|---|---|---|
| 2 | 24. | April 4, 2011 Version of SB 2086 (Ex 16) | 78-18 | 631 |
| 2 | 25. | Transcript of April 14, 2011 House State Affairs Committee Hearing (Ex 17) | 78-19 | 680 |
| 2 | 26. | April 14, 2011 Version of HB 1355 (Ex 18) | 78-20 | 790 |
| 2 | 27. | Transcript of April 15, 2011 Senate Rules Committee Hearing (Ex 19) | 78-21 | 939 |
| 2 | 28. | April 15, 2011 Version of SB 2086 (Ex 20) | 78-22 | 1005 |
| 3 | 29. | Transcript of April 20, 2011 House Floor Debate (Ex 21) | 78-23 | 1146 |
| 3 | 30. | Transcript of April 21, 2011 House Floor Debate (Ex 22) | 78-24 | 1335 |
| 3 | 31. | April 21, 2011 Version of HB 1355 (Ex 23) | 78-25 | 1425 |
| 3 | 32. | Transcript of April 26, 2011 Senate Budget Committee Hearing (Ex 24) | 78-26 | 1583 |
| 4 | 33. | April 26, 2011 Version of SB 2086 (Ex 25) | 78-27 | 1644 |
| 4 | 34. | Transcript of May 4, 2011 Senate Floor Debate (Ex 26) | 78-28 | 1811 |
| 4 | 35. | Amendment to SB 2086 (bar code 316406) (Ex 27) | 78-29 | 1900 |
| 4 | 36. | Amendment to HB 1355 (bar code 404618) (Ex 27A) | 78-30 | 2055 |
| 4 | 37. | Transcript of May 5, 2011 Senate Floor Debate (Ex 28) | 78-31 | 2209 |
| 5 | 38. | Amendment to HB 1355 (bar code 167836) (Ex 29) | 78-32 | 2263 |
| 5 | 39. | Transcript of May 5, 2011 House Floor Debate (Ex 30) | 78-33 | 2419 |
| 5 | 40. | April 5, 2011 FSASE Public Statement (Ex 31) | 78-34 | 2552 |
| 5 | 41. | April 18, 2011 FSASE Memorandum (Ex 32) | 78-35 | 2554 |
| 5 | 42. | April 29, 2011 FSASE Public Statement (Ex 33) | 78-36 | 2558 |
| 5 | 43. | May 2, 2011 Press Release from Senator Rich (Ex 34) | 78-37 | 2561 |
| 5 | 44. | May 6, 2011 Press Release from Senator Diaz de la Portilla (Ex 35) | 78-38 | 2563 |
| 5 | 45. | May 25, 2011 Letter from Representative Baxley (Ex 36) | 78-39 | 2565 |
| 5 | 46. | June 21, 2011 Letter from the Democratic Caucus of the Florida House of Representatives  (Ex 37) | 78-40 | 2568 |
| 5 | 47. | July 22, 2011 Letter from Tampa Mayor Bob Buckhorn (Ex 38) | 78-41 | 2571 |
| 5 | 48. | Florida's Notice of Witness List | 80 | 2574 |

| Appendix Vol. | Tab | Description | Dkt. No. | Appendix Page Nos. |
|---|---|---|---|---|
| 5 | 49. | United States' and Defendant-Intervenors' Joint Notice Concerning Witness Testimony | 81 | 2577 |
| 5 | 50. | Joint Status Report | 83 | 2591 |
| 5 | 51. | Second Set of Jointly Stipulated Facts | 90 | 2595 |
| 5 | 52. | Transmittal of HB 1355 (Ex 1) | 90-1 | 2603 |
| 5 | 53. | Directive 2011-01 (Ex 2) | 90-2 | 2763 |
| 5 | 54. | Memorandum from Jennifer Kennedy (Ex 3) | 90-3 | 2766 |
| 5 | 55. | Filing of Emergency Rule 1SER11-01 (Ex 4) | 90-4 | 2773 |
| 5 | 56. | Publication of Emergency Rule 1SER11-01 (Ex 5) | 90-5 | 2793 |
| 5 | 57. | Notice of Development of Rulemaking regarding Rule 1S-2.042 (Ex 6) | 90-6 | 2796 |
| 5 | 58. | Notice of Proposed Rule regarding Rule 1S-2.042 (Ex 7) | 90-7 | 2799 |
| 5 | 59. | Notice of Correction regarding Rule 1S-2.042 (Ex 8) | 90-8 | 2804 |
| 5 | 60. | Filing of Emergency Rule 1SER11-02 (Ex 9) | 90-9 | 2806 |
| 5 | 61. | Notice of Change regarding Rule 1S-2.042 (Ex 10) | 90-10 | 2826 |
| 5 | 62. | Publication of Emergency Rule 1SER11-02 (Ex 11) | 90-11 | 2828 |
| 5 | 63. | Filing of Rule 1S-2.042 (Ex 12) | 90-12 | 2834 |
| 5 | 64. | Press Release regarding the Voter Promoter School District Campaign (Ex 13) | 90-13 | 2855 |
| 5 | 65. | Memorandum from Gisela Salas (Ex 14) | 90-14 | 2870 |
| 5 | 66. | Directive 2012-01 (Ex 15) | 90-15 | 2873 |
| 6 | 67. | Deposition Transcript of Penelope Townsley (Ex 16) | 90-16 | 2876 |
| 6 | 68. | Deposition Transcript of Harry Sawyer (Ex 17) | 90-17 | 3059 |
| 6 | 69. | Deposition Transcript of Jennifer Edwards (Ex 18) | 90-18 | 3318 |
| 7 | 70. | Deposition Transcript of Lucretia Strickland (Ex 19) | 90-19 | 3480 |
| 7 | 71. | Deposition Transcript of Earl Lennard (Ex 20) | 90-20 | 3568 |
| 7 | 72. | Deposition Transcript of Jeffery Ussery (Ex 21) | 90-21 | 3893 |
| 8 | 73. | Deposition Transcript of Maria Matthews (Ex 22) | 90-22 | 4005 |
| 8 | 74. | Deposition Transcript of Gary Holland (Ex 23) | 90-23 | 4286 |
| 8 | 75. | Deposition Transcript of Chris Cate (Ex 24) | 90-24 | 4489 |

| Appendix Vol. | Tab | Description | Dkt. No. | Appendix Page Nos. |
|---|---|---|---|---|
| 9 | 76. | Deposition Transcript of Pierce Schuessler (Ex 25) | 90-25 | 4608 |
| 9 | 77. | Deposition Transcript of David Stafford (Ex 26) | 90-26 | 4972 |
| 10 | 78. | Deposition Transcript of Deirdre Macnab (Ex 27) | 90-27 | 5210 |
| 10 | 79. | Deposition Transcript of Charles Stewart III (Ex 28) | 90-28 | 5462 |
| 11 | 80. | Deposition Transcript of M.V. Hood III (Ex 29) | 90-29 | 5676 |
| 11 | 81. | Deposition Transcript of Paul Gronke (Ex 30) | 90-30 | 6013 |
| 12 | 82. | Deposition Transcript of Gisela Salas (Ex 31) | 90-31 | 6261 |
| 12 | 83. | Deposition Transcript of Bucky Mitchell (Ex 32) | 90-32 | 6555 |
| 12 | 84. | Deposition Transcript of Kurt Browning (Ex 33) | 90-33 | 6771 |
| 13 | 85. | Rule 30(b)(6) Deposition Transcript of the State of Florida (Ex 34) | 90-34 | 6901 |
| 13 | 86. | Deposition Transcript of Lester Sola (Ex 35) | 90-35 | 7108 |
| 13 | 87. | Deposition Exhibits 1-20 (Ex 36) | 90-36 | 7225 |
| 13 | a. | Deposition Exhibit 1 (Ex 36) | 90-36 | 7226 |
| 13 | b. | Deposition Exhibit 2 (Ex 36) | 90-36 | 7228 |
| 13 | c. | Deposition Exhibit 3 (Ex 36) | 90-36 | 7230 |
| 13 | d. | Deposition Exhibit 4 (Ex 36) | 90-36 | 7232 |
| 13 | e. | Deposition Exhibit 5 (Ex 36) | 90-36 | 7234 |
| 13 | f. | Deposition Exhibit 6 (Ex 36) | 90-36 | 7263 |
| 13 | g. | Deposition Exhibit 7 (Ex 36) | 90-36 | 7269 |
| 13 | h. | Deposition Exhibit 8 (Ex 36) | 90-36 | 7271 |
| 13 | i. | Deposition Exhibit 9 (Ex 36) | 90-36 | 7275 |
| 13 | j. | Deposition Exhibit 10 (Ex 36) | 90-36 | 7278 |
| 13 | k. | Deposition Exhibit 11 (Ex 36) | 90-36 | 7279 |
| 13 | l. | Deposition Exhibit 12 (Ex 36) | 90-36 | 7281 |
| 13 | m. | Deposition Exhibit 13 (Ex 36) | 90-36 | 7285 |
| 13 | n. | Deposition Exhibit 14 (Ex 36) | 90-36 | 7294 |
| 13 | o. | Deposition Exhibit 15 (Ex 36) | 90-36 | 7295 |
| 13 | p. | Deposition Exhibit 16 (Ex 36) | 90-36 | 7296 |
| 13 | q. | Deposition Exhibit 17 (Ex 36) | 90-36 | 7303 |

| Appendix | | Description | Dkt. | Appendix |
| Vol. | Tab | | No. | Page Nos. |
|---|---|---|---|---|
| 13 | r. | Deposition Exhibit 18 (Ex 36) | 90-36 | 7314 |
| 13 | s. | Deposition Exhibit 19 (Ex 36) | 90-36 | 7315 |
| 13 | t. | Deposition Exhibit 20 (Ex 36) | 90-36 | 7317 |
| 13 | 88. | Deposition Exhibit 21-40 (Ex 37) | 90-37 | 7318 |
| 13 | a. | Deposition Exhibit 21 (Ex 37) | 90-37 | 7319 |
| 13 | b. | Deposition Exhibit 22 (Ex 37) | 90-37 | 7322 |
| 13 | c. | Deposition Exhibit 23 (Ex 37) | 90-37 | 7324 |
| 13 | d. | Deposition Exhibit 24 (Ex 37) | 90-37 | 7368 |
| 13 | e. | Deposition Exhibit 25 (Ex 37) | 90-37 | 7369 |
| 13 | f. | Deposition Exhibit 26 (Ex 37) | 90-37 | 7379 |
| 13 | g. | Deposition Exhibit 27 (Ex 37) | 90-37 | 7383 |
| 13 | h. | Deposition Exhibit 28 (Ex 37) | 90-37 | 7384 |
| 13 | i. | Deposition Exhibit 29 (Ex 37) | 90-37 | 7385 |
| 13 | j. | Deposition Exhibit 30 (Ex 37) | 90-37 | 7387 |
| 13 | k. | Deposition Exhibit 31 (Ex 37) | 90-37 | 7388 |
| 13 | l. | Deposition Exhibit 32 (Ex 37) | 90-37 | 7390 |
| 13 | m. | Deposition Exhibit 33 (Ex 37) | 90-37 | 7391 |
| 13 | n. | Deposition Exhibit 34 (Ex 37) | 90-37 | 7394 |
| 13 | o. | Deposition Exhibit 35 (Ex 37) | 90-37 | 7395 |
| 13 | p. | Deposition Exhibit 36 (Ex 37) | 90-37 | 7397 |
| 13 | q. | Deposition Exhibit 37 (Ex 37) | 90-37 | 7407 |
| 13 | r. | Deposition Exhibit 38 (Ex 37) | 90-37 | 7415 |
| 13 | s. | Deposition Exhibit 39 (Ex 37) | 90-37 | 7423 |
| 13 | t. | Deposition Exhibit 40 (Ex 37) | 90-37 | 7425 |
| 13 | 89. | Deposition Exhibits 41-80 (Ex 38) | 90-38 | 7427 |
| 13 | a. | Deposition Exhibit 41 (Ex 38) | 90-38 | 7428 |
| 13 | b. | Deposition Exhibit 42 (Ex 38) | 90-38 | 7430 |
| 13 | c. | Deposition Exhibit 43 (Ex 38) | 90-38 | 7433 |
| 13 | d. | Deposition Exhibit 44 (Ex 38) | 90-38 | 7436 |

| Appendix | | Description | Dkt. No. | Appendix Page Nos. |
|---|---|---|---|---|
| Vol. | Tab | | | |
| 13 | e. | Deposition Exhibit 45 (Ex 38) | 90-38 | 7438 |
| 13 | f. | Deposition Exhibit 46 (Ex 38) | 90-38 | 7443 |
| 13 | g. | Deposition Exhibit 47 (Ex 38) | 90-38 | 7457 |
| 13 | h. | Deposition Exhibit 48 (Ex 38) | 90-38 | 7458 |
| 13 | i. | Deposition Exhibit 49 (Ex 38) | 90-38 | 7460 |
| 13 | j. | Deposition Exhibit 50 (Ex 38) | 90-38 | 7461 |
| 13 | k. | Deposition Exhibit 51 (Ex 38) | 90-38 | 7464 |
| 13 | l. | Deposition Exhibit 52 (Ex 38) | 90-38 | 7467 |
| 13 | m. | Deposition Exhibit 53 (Ex 38) | 90-38 | 7470 |
| 13 | n. | Deposition Exhibit 54 (Ex 38) | 90-38 | 7472 |
| 13 | o. | Deposition Exhibit 55 (Ex 38) | 90-38 | 7473 |
| 13 | p. | Deposition Exhibit 56 (Ex 38) | 90-38 | 7475 |
| 13 | q. | Deposition Exhibit 57 (Ex 38) | 90-38 | 7483 |
| 13 | r. | Deposition Exhibit 58 (Ex 38) | 90-38 | 7486 |
| 13 | s. | Deposition Exhibit 59 (Ex 38) | 90-38 | 7489 |
| 13 | t. | Deposition Exhibit 60 (Ex 38) | 90-38 | 7491 |
| 13 | u. | Deposition Exhibit 61 (Ex 38) | 90-38 | 7493 |
| 13 | v. | Deposition Exhibit 62 (Ex 38) | 90-38 | 7499 |
| 13 | w. | Deposition Exhibit 63 (Ex 38) | 90-38 | 7502 |
| 13 | x. | Deposition Exhibit 64 (Ex 38) | 90-38 | 7504 |
| 13 | y. | Deposition Exhibit 65 (Ex 38) | 90-38 | 7507 |
| 13 | z. | Deposition Exhibit 66 (Ex 38) | 90-38 | 7508 |
| 13 | aa. | Deposition Exhibit 67 (Ex 38) | 90-38 | 7512 |
| 13 | bb. | Deposition Exhibit 68 (Ex 38) | 90-38 | 7514 |
| 13 | cc. | Deposition Exhibit 69 (Ex 38) | 90-38 | 7519 |
| 13 | dd. | Deposition Exhibit 70 (Ex 38) | 90-38 | 7520 |
| 13 | ee. | Deposition Exhibit 71 (Ex 38) | 90-38 | 7521 |
| 13 | ff. | Deposition Exhibit 72 (Ex 38) | 90-38 | 7523 |
| 13 | gg. | Deposition Exhibit 73 (Ex 38) | 90-38 | 7524 |

| Appendix | | Description | Dkt. | Appendix |
| Vol. | Tab | | No. | Page Nos. |
|---|---|---|---|---|
| 13 | hh. | Deposition Exhibit 74 (Ex 38) | 90-38 | 7525 |
| 13 | ii. | Deposition Exhibit 75 (Ex 38) | 90-38 | 7535 |
| 13 | jj. | Deposition Exhibit 76 (Ex 38) | 90-38 | 7538 |
| 13 | kk. | Deposition Exhibit 77 (Ex 38) | 90-38 | 7541 |
| 13 | ll. | Deposition Exhibit 78 (Ex 38) | 90-38 | 7545 |
| 13 | mm. | Deposition Exhibit 79 (Ex 38) | 90-38 | 7547 |
| 13 | nn. | Deposition Exhibit 80 (Ex 38) | 90-38 | 7549 |
| 14 | 90. | Deposition Exhibits 81-95 (Ex 39) | 90-39 | 7553 |
| 14 | a. | Deposition Exhibit 81 (Ex 39) | 90-39 | 7554 |
| 14 | b. | Deposition Exhibit 82 (Ex 39) | 90-39 | 7558 |
| 14 | c. | Deposition Exhibit 83 (Ex 39) | 90-39 | 7560 |
| 14 | d. | Deposition Exhibit 84 (Ex 39) | 90-39 | 7564 |
| 14 | e. | Deposition Exhibit 85 (Ex 39) | 90-39 | 7566 |
| 14 | f. | Deposition Exhibit 86 (Ex 39) | 90-39 | 7569 |
| 14 | g. | Deposition Exhibit 87 (Ex 39) | 90-39 | 7572 |
| 14 | h. | Deposition Exhibit 88 (Ex 39) | 90-39 | 7574 |
| 14 | i. | Deposition Exhibit 89 (Ex 39) | 90-39 | 7578 |
| 14 | j. | Deposition Exhibit 90 (Ex 39) | 90-39 | 7586 |
| 14 | k. | Deposition Exhibit 91 (Ex 39) | 90-39 | 7588 |
| 14 | l. | Deposition Exhibit 92 (Ex 39) | 90-39 | 7589 |
| 14 | m. | Deposition Exhibit 93 (Ex 39) | 90-39 | 7591 |
| 14 | n. | Deposition Exhibit 94 (Ex 39) | 90-39 | 7592 |
| 14 | o. | Deposition Exhibit 95 – Weaver Declaration (Ex 39) | 90-39 | 7669 |
| 14 | 91. | Deposition Exhibits 96-100 (Ex 40) | 90-40 | 7706 |
| 14 | a. | Deposition Exhibit 96 | 90-40 | 7707 |
| 14 | b. | Deposition Exhibit 97 – Stewart Declaration (Ex 40) | 90-40 | 7759 |
| 14 | c. | Deposition Exhibit 98 (Ex 40) | 90-40 | 7836 |
| 14 | d. | Deposition Exhibit 99 (Ex 40) | 90-40 | 7851 |
| 14 | e. | Deposition Exhibit 100 (Ex 40) | 90-40 | 7867 |

| Appendix | | Description | Dkt. No. | Appendix Page Nos. |
| Vol. | Tab | | | |
|---|---|---|---|---|
| 14 | 92. | Deposition Exhibits 101-105 (Ex 41) | 90-41 | 7877 |
| 14 | a. | Deposition Exhibit 101 – Gronke Declaration (Ex 41) | 90-41 | 7878 |
| 14 | b. | Deposition Exhibit 102 (Ex 41) | 90-41 | 7910 |
| 14 | c. | Deposition Exhibit 103 (Ex 41) | 90-41 | 7920 |
| 14 | d. | Deposition Exhibit 104 (Ex 41) | 90-41 | 7941 |
| 14 | e. | Deposition Exhibit 105 (Ex 41) | 90-41 | 7963 |
| 14 | 93. | Deposition Exhibits 106-114 (Ex 42) | 90-42 | 7971 |
| 14 | a. | Deposition Exhibit 106 (Ex 42) | 90-42 | 7972 |
| 14 | b. | Deposition Exhibit 107 (Ex 42) | 90-42 | 7999 |
| 14 | c. | Deposition Exhibit 108 (Ex 42) | 90-42 | 8029 |
| 14 | d. | Deposition Exhibit 109 (Ex 42) | 90-42 | 8058 |
| 14 | e. | Deposition Exhibit 110 (Ex 42) | 90-42 | 8059 |
| 14 | f. | Deposition Exhibit 111 (Ex 42) | 90-42 | 8062 |
| 14 | g. | Deposition Exhibit 112 (Ex 42) | 90-42 | 8064 |
| 14 | h. | Deposition Exhibit 113 (Ex 42) | 90-42 | 8066 |
| 14 | i. | Deposition Exhibit 114 (Ex 42) | 90-42 | 8071 |
| 14 | 94. | Deposition Exhibit 115 (Ex 43) | 90-43 | 8077 |
| 15 | 95. | Deposition Exhibit 116 (Ex 44) | 90-44 | 8109 |
| 15 | 96. | Deposition Exhibit 117 (Ex 45) | 90-45 | 8141 |
| 15 | 97. | Deposition Exhibits 118-130 (Ex 46) | 90-46 | 8207 |
| 15 | a. | Deposition Exhibit 118 (Ex 46) | 90-46 | 8208 |
| 15 | b. | Deposition Exhibit 119 (Ex 46) | 90-46 | 8210 |
| 15 | c. | Deposition Exhibit 120 (Ex 46) | 90-46 | 8212 |
| 15 | d. | Deposition Exhibit 121 (Ex 46) | 90-46 | 8216 |
| 15 | e. | Deposition Exhibit 122 (Ex 46) | 90-46 | 8218 |
| 15 | f. | Deposition Exhibit 123 (Ex 46) | 90-46 | 8219 |
| 15 | g. | Deposition Exhibit 124 (Ex 46) | 90-46 | 8225 |
| 15 | h. | Deposition Exhibit 125 (Ex 46) | 90-46 | 8227 |
| 15 | i. | Deposition Exhibit 126 (Ex 46) | 90-46 | 8235 |

| Appendix | | Description | Dkt. No. | Appendix Page Nos. |
|---|---|---|---|---|
| Vol. | Tab | | | |
| 15 | j. | Deposition Exhibit 127 (Ex 46) | 90-46 | 8253 |
| 15 | k. | Deposition Exhibit 128 (Ex 46) | 90-46 | 8255 |
| 15 | l. | Deposition Exhibit 129 (Ex 46) | 90-46 | 8257 |
| 15 | m. | Deposition Exhibit 130 (Ex 46) | 90-46 | 8259 |
| 15 | 98. | Deposition Exhibits 131-140 (Ex 47) | 90-47 | 8263 |
| 15 | a. | Deposition Exhibit 131 (Ex 47) | 90-47 | 8264 |
| 15 | b. | Deposition Exhibit 132 (Ex 47) | 90-47 | 8265 |
| 15 | c. | Deposition Exhibit 133 (Ex 47) | 90-47 | 8267 |
| 15 | d. | Deposition Exhibit 134 (Ex 47) | 90-47 | 8269 |
| 15 | e. | Deposition Exhibit 135 (Ex 47) | 90-47 | 8272 |
| 15 | f. | Deposition Exhibit 136 (Ex 47) | 90-47 | 8274 |
| 15 | g. | Deposition Exhibit 137 (Ex 47) | 90-47 | 8278 |
| 15 | h. | Deposition Exhibit 138 (Ex 47) | 90-47 | 8287 |
| 15 | i. | Deposition Exhibit 139 (Ex 47) | 90-47 | 8299 |
| 15 | j. | Deposition Exhibit 140 (Ex 47) | 90-47 | 8301 |
| 15 | 99. | Mitchell Deposition Exhibits 1-18 (Ex 48) | 90-48 | 8335 |
| 15 | a. | Mitchell Deposition Exhibit 1 (Ex 48) | 90-48 | 8336 |
| 15 | b. | Mitchell Deposition Exhibit 2 (Ex 48) | 90-48 | 8337 |
| 15 | c. | Mitchell Deposition Exhibit 3 (Ex 48) | 90-48 | 8343 |
| 15 | d. | Mitchell Deposition Exhibit 4 (Ex 48) | 90-48 | 8344 |
| 15 | e. | Mitchell Deposition Exhibit 5 (Ex 48) | 90-48 | 8350 |
| 15 | f. | Mitchell Deposition Exhibit 6 (Ex 48) | 90-48 | 8352 |
| 15 | g. | Mitchell Deposition Exhibit 7 (Ex 48) | 90-48 | 8353 |
| 15 | h. | Mitchell Deposition Exhibit 8 (Ex 48) | 90-48 | 8355 |
| 15 | i. | Mitchell Deposition Exhibit 9 (Ex 48) | 90-48 | 8357 |
| 15 | j. | Mitchell Deposition Exhibit 10 (Ex 48) | 90-48 | 8358 |
| 15 | k. | Mitchell Deposition Exhibit 11 (Ex 48) | 90-48 | 8360 |
| 15 | l. | Mitchell Deposition Exhibit 12 (Ex 48) | 90-48 | 8361 |
| 15 | m. | Mitchell Deposition Exhibit 13 (Ex 48) | 90-48 | 8362 |

| Appendix Vol. | Tab | Description | Dkt. No. | Appendix Page Nos. |
|---|---|---|---|---|
| 15 | n. | Mitchell Deposition Exhibit 14 (Ex 48) | 90-48 | 8368 |
| 15 | o. | Mitchell Deposition Exhibit 15 (Ex 48) | 90-48 | 8371 |
| 15 | p. | Mitchell Deposition Exhibit 16 (Ex 48) | 90-48 | 8372 |
| 15 | q. | Mitchell Deposition Exhibit 17 (Ex 48) | 90-48 | 8374 |
| 15 | r. | Mitchell Deposition Exhibit 18 (Ex 48) | 90-48 | 8375 |
| 15 | 100. | Sola Deposition Exhibits 1-4 (Ex 49) | 90-49 | 8376 |
| 15 | a. | Sola Deposition Exhibit 1 (Ex 49) | 90-49 | 8377 |
| 15 | b. | Sola Deposition Exhibit 2 (Ex 49) | 90-49 | 8437 |
| 15 | c. | Sola Deposition Exhibit 3 (Ex 49) | 90-49 | 8440 |
| 15 | d. | Sola Deposition Exhibit 4 (Ex 49) | 90-49 | 8442 |
| 15 | 101. | Florida's Responses to the United States' Interrogatories (Ex 50) | 90-50 | 8445 |
| 15 | 102. | Florida's Responses to the Defendant-Intervenors' Interrogatories (Ex 51) | 90-51 | 8663 |
| 15 | 103. | United States' Responses to Florida's Interrogatories (Ex 52) | 90-52 | 8723 |
| 15 | 104. | United States' First Amended Responses to Florida's Interrogatories (Ex 53) | 90-53 | 8748 |
| 16 | 105. | Defendant-Intervenors' Responses to Florida's Interrogatories (Ex 54) | 90-54 | 8762 |
| 16 | 106. | Florida's Responses to the United States' Requests for Admission (Ex 55) | 90-55 | 8818 |
| 16 | 107. | Florida's Responses to the Defendant-Intervenors' Requests for Admission (Ex 56) | 90-56 | 8831 |
| 16 | 108. | United States' Responses to Florida's Requests for Admission (Ex 57) | 90-57 | 8841 |
| 16 | 109. | Defendant-Intervenors' Responses to Florida's Requests for Admission (Ex 58) | 90-58 | 8858 |
| 16 | 110. | Supplemental Declaration of Professor Charles Stewart III (Ex 59) | 90-59 | 8883 |
| 16 | 111. | State of Florida's Submission Letter to DOJ dated June 9, 2011 (Ex 60) | 90-60 | 8911 |

| Appendix | | Description | Dkt. No. | Appendix Page Nos. |
|---|---|---|---|---|
| Vol. | Tab | | | |
| 16 | 112. | State of Florida's Second Letter to DOJ dated July 25, 2011 (Ex 61) | 90-61 | 8918 |
| 16 | 113. | Declaration of Ashley Davis, Florida Department of State | N/A | 8940 |
| 16 | a. | Vote Sequence 278 for HB 1355 on April 21, 2011 (Ex A) | N/A | 8944 |
| 16 | b. | Vote Sequence 10 for HB 1355 on May 5, 2011 (Ex B) | N/A | 8946 |
| 16 | c. | Vote Sequence 563 for HB 1355 on May 5, 2011 (Ex C) | N/A | 8948 |
| 16 | d. | List of Florida Senators in 2011 by Name and County (Ex D) | N/A | 8950 |
| 16 | e. | List of Florida Representatives in 2011 by Name and County (Ex E) | N/A | 8953 |
| 16 | f. | Staff Analysis of CS/CS/HB 1355 dated April 18, 2011 (Ex F) | N/A | 8958 |
| 16 | g. | Final Bill Analysis of CS/CS/HB 1355 dated June 29, 2011 (Ex G) | N/A | 8977 |
| 16 | h. | Florida Senate Committee on Ethics and Elections' Interim Report 2011-118 dated October 2010 (Ex H) | N/A | 8994 |
| 16 | i. | Letter from John Tanner of the Department of Justice dated September 6, 2005 (Ex I) | N/A | 9001 |
| 16 | j. | Staff Analysis of HB 1567 dated April 21, 2005 (Ex J) | N/A | 9015 |
| 16 | k. | Email from Wren Fowler, VR Systems (Ex K) | N/A | 9034 |
| 16 | 114. | Expert Report of M.V. Hood III | N/A | 9036 |

Exhibit 31

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CASE NO. 1:11-cv-1428-CKK-MG-ESH

STATE OF FLORIDA,

    Plaintiff,

v.

UNITED STATES OF AMERICA and
ERIC H. HOLDER, JR., in his
official capacity as Attorney
General,

    Defendants,

FLORIDA STATE CONFERENCE OF
THE NAACP, et al.,

    Defendant-Intervenors,

KENNETH SULLIVAN, et al.,

    Defendant-Intervenors,

NATIONAL COUNCIL OF LA RAZA
and LEAGUE OF WOMEN VOTERS
OF FLORIDA,

    Defendant-Intervenors.

_____/

DEPOSITION OF GISELA SALAS, PH.D.

    Taken in the above-styled cause, pursuant to

Notice, at the law offices of Ausley McMullen, P.A., 123

South Calhoun Street, Tallahassee, Florida, on the 27th

day of February, 2012, commencing at approximately 8:28

a.m., reported by Mary Clarke Corkery, Court Reporter

and Notary Public.

MARY CLARKE CORKERY, COURT REPORTER

1                    A P P E A R A N C E S

2    FOR DEFENDANT-INTERVENORS:

3                          ALEC W. FARR, ESQ.
                           Bryan Cave LLP
4                          1155 F Street NW
                           Suite 700
5                          Washington, DC 20004

6    FOR DEFENDANTS:

7                          ERNEST MCFARLAND, ESQ.
                           U.S. Department of Justice
8                          950 Pennsylvania Avenue, NW
                           Washington, DC 20530
9
     FOR PLAINTIFF:
10
                           ASHLEY DAVIS, ESQ.
11                         Florida Department of State
                           500 South Bronough
12                         Tallahassee, FL 32399

13   ALSO APPEARED:

14                         FARRAH R. BERSE, ESQ.
                           ZACHARY A. DIETERT, ESQ.
15                         Paul, Weiss, Rifkind, Wharton &
                           Garrison, LLP
16                         2001 K Street, NW
                           Washington, DC 20006-1047
17
     ALSO APPEARED VIA PHONE:
18
                           LEE ROWLAND, ESQ.
19                         JONATHAN BRATER, ESQ.
                           The Brennan Center for Justice
20

21

22

23

24

25

     ───MARY CLARKE CORKERY, COURT REPORTER───

1                         I N D E X

2      WITNESS:                                         PAGE:

3      GISELA SALAS, PH.D.

4          Examination by Mr. Farr                         7
           Examination by Ms. Berse                      133
5          Examination by Mr. McFarland                  271
           Examination by Ms. Davis                      280
6          Further Examination by Mr. Farr               285

7      ACKNOWLEDGMENT OF REPORTER                        292
       CERTIFICATE OF NOTARY                             293
8

9              EXHIBITS MARKED FOR IDENTIFICATION

10                                                    PAGE:

11         DOS 109 - Memorandum dated May 31, 2011        73
                     to Supervisors of Elections from
12                   Dr. Gisela Salas

13         DOS 110 - Letter dated September 2, 2011       87
                     to Maria Guerreros from Dr. Gisela
14                   Salas

15         DOS 111 - Letter dated May 25, 2011 to         97
                     Governor Scott from Representative
16                   Baxley

17         DOS 112 - String of e-mails dated May 26, 2011  104

18         DOS 113 - 1SER11-01 (1S-2.042) Third-Party     137
                     Voter Registration Organizations
19
           DOS 114 - 1SER11-02 (1S-2.042) Third-Party     138
20                   Voter Registration Organizations

21         DOS 115 - PowerPoint presentation from         148
                     December 2011 relating to
22                   Third-Party Voter Registration
                     Organizations (3PVROs)
23
           DOS 116 - PowerPoint presentation from         151
24                   February 2012 relating to
                     Third-Party Voter Registration
25                   Organizations (3PVROs)

       ─────MARY CLARKE CORKERY, COURT REPORTER─────

EXHIBITS MARKED FOR IDENTIFICATION CONTINUED

PAGE:

DOS 117 - Affidavit of Dr. Gisela Salas          156
          dated January 24, 2012

DOS 118 - Question/Answer Fact Sheet regarding   159
          Third-Party Voter Registration
          Organizations

DOS 119 - Question/Answer Fact Sheet regarding   164
          Third-Party Voter Registration
          Organizations

DOS 120 - Indian River County Supervisor         165
          Of Elections' website information
          regarding Third-Party Voter
          Registration Organizations dated
          February 16, 2012

DOS 121 - Osceola County Supervisor of           166
          Elections' website information
          regarding Third-Party Voter
          Registration Organizations undated

DOS 122 - Calhoun County Supervisor of           166
          Elections' website information
          regarding Third-Party Voter
          Registration Organizations dated
          February 16, 2012

DOS 123 - Volusia County Supervisor of           182
          Elections' website information
          regarding Third-Party Voter
          Registration Organizations
          revised September 2011

DOS 124 -Fact Sheet for School District as       218
          Third-Party Voter Registration
          Organizations for all counties
          excluding Collier, Hardee, Hendry,
          Hillsborough, and Monroe

DOS 125 - Defendant's Responses to Plaintiffs'   231
          First Set of Requests for Admission
          to Defendants

*MARY CLARKE CORKERY, COURT REPORTER*

EXHIBITS MARKED FOR IDENTIFICATION CONTINUED

PAGE:

DOS 126 - Affidavit of Cynthia Slater dated          233
          February 10, 2012

DOS 127 - West's F.S.A. 97.053 Effective             239
          June 5, 2008


EXHIBITS REFERRED TO FROM PREVIOUS DEPOSITIONS

PAGE:

SOE 1 - FSASE document dated April 29, 2011          118

SOE 5 - West's F.S.A. 97.055 effective               221
        January 1, 2009

SOE 6 - Document to Supervisors of Elections          70
        from Jennifer Kennedy dated
        May 19, 2011 regarding Governor's
        Signing of CS/CS House Bill 1355

SOE 7 - Memo from Kurt S. Browning to                 64
        Supervisors of Elections dated
        May 19, 2011 regarding Directive
        2011-01

SOE 33 - String of e-mails dated May 23, 2011        109
         through June 9, 2011

DOS 38 - DE 98-13 dated August 19, 1998               83
         Exhibit D - Absentee Voting

DOS 39 - Memo to Supervisors of Elections             85
         from Maria Matthews dated
         December 24, 2007 regarding
         Pending DOJ Pre-clearance/Court
         Action on Chapter law 2007-30

DOS 51 - String of e-mails dated May 20, 2011        171
         through May 26, 2011

DOS 66 - String of e-mails between Amber             274
         Marconnet to David Stafford dated
         April 13, 2011

*MARY CLARKE CORKERY, COURT REPORTER*



EXHIBITS REFERRED TO FROM PREVIOUS DEPOSITIONS CONT'D

PAGE:

89 - 1S-2.042 Third-Party Voter                138
     Registration Organization

92 - String of e-mails dated June 2, 2011    278
     through June 14, 2011

**MARY CLARKE CORKERY, COURT REPORTER**

D E P O S I T I O N

Whereupon,

GISELA SALAS, PH.D.

was called as a witness, having first been duly sworn to

speak the truth, the whole truth, and nothing but the

truth, was examined and testified as follows:

EXAMINATION BY MR. FARR:

Q.   Good morning.

A.   Good morning.

Q.   Could you state and spell your full name for the

record, please?

A.   Certainly.  Gisela Salas, G-I-S-E-L-A S-A-L-A-S.

Q.   Doctor Salas, I introduced myself off the record.

I'll introduce myself again on the record.  My name is

Alec Farr.  I represent two of the Defendant Intervenors

in the case that the State of Florida has brought

against the United States and Attorney General Eric

Holder seeking to obtain preclearance to four set of

voting changes in Florida's new election law.

There are also some other counsel here with me,

and I'd ask them to identify themselves for the record?

MS. BERSE:  Good morning, Doctor Salas.  I'm

Farrah Berse from Paul Weiss and we represent the

Plaintiffs in the Florida action.

MR. DIETERT:  I'm Zachary Dietert, also from

*MARY CLARKE CORKERY, COURT REPORTER*

1     Paul Weiss, representing the Plaintiffs in the

2     Northern District of Florida action.

3          MR. MCFARLAND:  Ernest McFarland.  I'm

4     representing the United States in the Washington,

5     D.C. matter.

6   BY MR. FARR:

7     Q.  Doctor Salas, have you ever been deposed before?

8     A.  Yes.

9     Q.  How many times?

10    A.  The one that I recall -- I recall one time.  I'm

11  not certain if I have been deposed more than once, but I

12  definitely --

13    Q.  Generally, what was the nature of that matter?

14    A.  That had to do with the case of Miriam Oliphant

15  in Broward County.

16    Q.  Well, you may have had these procedures explained

17  to you then, but I'm just going to do it again for the

18  record.

19        I'll be asking you a series of questions to which

20  you have to provide answers under oath.  Everything that

21  we say is being taken down by the court reporter sitting

22  to your right.  Do you understand that?

23    A.  Yes.

24    Q.  It's important in responding to my questions that

25  you give verbal responses just as you're doing.  It's

**MARY CLARKE CORKERY, COURT REPORTER**

1 difficult for the court reporter to record a nod of the

2 head or a shake of the head or something that doesn't

3 constitute a word, like, uh-huh or an huh-uh.  So could

4 you try to do that for me?

5  A. Yes.

6  Q. If at any time one of my questions is unclear,

7 please let me know and I'll attempt to clarify it for

8 you.  Otherwise, I will take your answer.  And that's

9 important because if you don't indicate that you don't

10 understand the question, the record may be unclear.  Can

11 you try to do that for me?

12  A. Yes.

13  Q. If at any time you need a break, just let me

14 know.  I'll try accommodate you as long as there isn't a

15 question pending; okay?

16  A. Yes.

17  Q. And it's important that when -- you're doing a

18 great job.  It's important that we try not to step over

19 each other when we speak.  It's completely human nature

20 when you're having an ordinary conversation to

21 anticipate where somebody is going and break in and make

22 it move, but that's difficult for the court reporter as

23 well.  So can you try to do that for me?

24  A. Yes.

25  Q. Now, do you understand that the oath that you

*MARY CLARKE CORKERY, COURT REPORTER*

1  just took is the same oath that you take in a court of

2  law?

3     A.  Yes.

4     Q.  Do you understand that the penalties of perjury

5  apply if you don't answer my question fully and

6  truthfully?

7     A.  Yes.

8     Q.  Is there any reason today other than the rain --

9  and I hope that isn't a reason, but is there any reason

10  why this is not a good day to take your deposition for

11  that purpose?  And, by that, I mean do you have a head

12  cold?  Are you on any medication?  Is there any reason

13  why you can't answer my questions fully and truthfully?

14     A.  No.

15     Q.  All right.  Doctor Salas, tell me just a little

16  bit about the case involving Miriam Oliphant.  What sort

17  of case was that?

18     A.  Miriam Oliphant was the Supervisor of Elections

19  in Broward County and she was removed by the Governor

20  and there were some ethics violations as well as some

21  questions with regards to what she had done with public

22  records in the office.

23     Q.  I understand.

24        Was there some civil case in which you were

25  deposed that was related to that?

─*MARY CLARKE CORKERY, COURT REPORTER*─

1    A.   I believe it was ethics.  I'm not certain whether

2  it was also a civil matter at that point.

3    Q.   Okay.  Was transcripts taken of your testimony?

4    A.   Yes.

5    Q.   And what did your testimony concern?

6    A.   Mostly with regards to what our findings were in

7  her office when I had become an employee as Deputy

8  Supervisor of Elections under Doctor Brenda Snipes.

9    Q.   And, roughly, what year did you give your

10  testimony?  Do you recall?  Or what year specifically?

11    A.   I was employed there in 2003.  So I believe it

12  was in 2003.

13    Q.   Okay.  What did do you to prepare for your

14  deposition today?

15    A.   Basically, came in.

16    Q.   Okay.

17    A.   I just -- it's just a normal day of work for me.

18    Q.   Understood.

19    A.   Yeah.

20    Q.   Did you review any documents to prepare for your

21  deposition today?

22    A.   Not really, other than I did go over the

23  affidavit that I had previously given.

24    Q.   That's the affidavit that you swore out in the

25  case that concerns the constitutionality of the

*MARY CLARKE CORKERY, COURT REPORTER*

1    third-party voter --

2        A.   Third-party, correct.

3        Q.   Did you review anything else?

4        A.   No.

5        Q.   Did you speak to counsel in preparation for this

6    deposition?

7        A.   Only cursory information on what a deposition

8    consists of.

9        Q.   Who did you speak to about that?

10       A.   Ashley Davis.

11       Q.   And that's Ms. Davis who is representing you in

12   the deposition today?

13       A.   Yes.

14       Q.   When did you speak to Ms. Davis?

15       A.   I do not recall the exact date, but it was

16   approximately a week ago.

17       Q.   All right.  Yeah, you keep looking at her.  I'm

18   afraid -- and she smiles.  I'm afraid she can't answer

19   for you.

20       A.   Yes, I know.

21       Q.   I'd be happy to depose her, but not today.

22       A.   I would have to check my calendar.

23       Q.   I understand.  It's not that important.

24            Did you speak to anybody else about your

25   deposition today?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.  No.

2    Q.  Did you speak to Ms. Davis about the substance of

3    any of the questions you might be asked today?

4    A.  No.

5    Q.  Did you speak to her about how to answer any of

6    the questions that you might get?

7    A.  No.

8    Q.  All right.  Doctor Salas, just as a preliminary

9    housekeeping matter, I'm going to talk to you about some

10   terms that I'm sure are going to come up in this

11   deposition, and I just want to make sure we're on the

12   same page with respect to making a clear record.

13        Are you familiar with the term HB 1355?

14   A.  House Bill 1355, yes.

15   Q.  What is that?

16   A.  That is a bill that subsequently became law in

17   May of 2011, and it affected a number of changes to the

18   election laws in the State of Florida.

19   Q.  All right.  Very good.

20        And that's the law that was signed by the

21   Governor on May 19, 2011?

22   A.  That is correct.

23   Q.  All right.  So, going forward in this deposition,

24   if I refer to HB 1355, we'll be on the same page about

25   what that constitutes?

—MARY CLARKE CORKERY, COURT REPORTER—

1     A.   Absolutely.

2     Q.   And you testified about this already, but, within

3   HB 1355, there were four sets of voting changes;

4   correct?

5     A.   There were, correct.

6     Q.   That are the subject of this case; correct?

7     A.   Correct.

8     Q.   There were many changes, four of them are the

9   subject of the preclearance case; right?

10     A.   Right.

11     Q.   And one of those four sets of changes concerns

12   third-party voter registration organizations; correct?

13     A.   That is correct.

14     Q.   Another constitutes a situation in which a voter

15   moves between counties and attempts to change their

16   address on election day and must use a provisional

17   ballot in that circumstance?

18     A.   Correct.

19     Q.   Another constitutes the time period for early

20   voting; correct?

21     A.   Yes.

22     Q.   And another concerns constitutional initiative

23   petitions; correct?

24     A.   That is correct.

25     Q.   So, over the course of the deposition, if I speak

*MARY CLARKE CORKERY, COURT REPORTER*

1    in terms of the four sets of changes, you'll know what I

2    mean?

3        A.   Yes, sir.

4        Q.   All right.  Very good.

5            Just very briefly, ma'am, because I've looked you

6    up on the web and I'm pretty sure that I know the

7    answers to some of this already, but I'd just like to go

8    through your educational background a little bit.

9            I understand that in 1977 you got a degree in

10   Criminal Justice from Florida International University?

11       A.   Correct.

12       Q.   Did any of your academic work with respect to

13   that degree have anything to do with election law?

14       A.   No, it did not.

15       Q.   Okay.  And I also understand that in 1985 you got

16   an MBA from the University of Miami?

17       A.   That is correct.

18       Q.   Did any of your academic work in your MBA have

19   anything to do with election law?

20       A.   No.

21       Q.   I also understand that you achieved a Ph.D. from

22   Lynn University in 2008; is that right?

23       A.   That is correct.

24       Q.   What was your dissertation on?

25       A.   Volunteer motivation, satisfaction,

*MARY CLARKE CORKERY, COURT REPORTER*

1    organizational commitment, and intention to leave.

2    Q.   Okay.  Did any of that have to do with election

3    law?

4    A.   Not, not law.  I did, I did actually reference --

5    talk about poll workers as being semi-volunteers, and

6    that is partially what drew my interest to volunteerism

7    and that is the reason that I went in that direction on

8    my dissertation.

9    Q.   Did your dissertation include volunteerism with

10   respect to registering voters and grassroots voting

11   drives?

12   A.   I don't recall referencing anything in my

13   dissertation on that, but it's possible that I reviewed

14   some material that had to do with that.

15   Q.   Is your dissertation available anywhere?

16   A.   Yes, it is.

17   Q.   Is it available from Lynn University?

18   A.   UMI, uh-huh.

19   Q.   Okay.  And what discipline, as a general matter,

20   did you get your Ph.D.?  Is it Political Science or --

21   A.   Well, it's a Doctor of Philosophy in Corporate

22   Global Leadership -- Organizational Leadership.

23   Q.   All right.  And I'd just like to walk through

24   your professional background as well, if I could take

25   the time.

─MARY CLARKE CORKERY, COURT REPORTER─

1    Your first job after getting the Criminal Justice

2  degree in 1977 was where?

3    A.   It was with Miami-Dade County.

4    Q.   And what was your position with Miami-Dade?

5    A.   I was a Program Analyst with the Criminal Justice

6  Counsel.

7    Q.   And what were your duties in that position?

8    A.   Basically, research having to do with juvenile

9  programs that were available at the time in Miami-Dade

10 County.

11   Q.   And how long were you in that position?

12   A.   Probably less than a year.

13   Q.   All right.  So, roughly, late 1977 or early '78

14 you took another position?

15   A.   Yes.  All within Miami-Dade County.  I was

16 employed by Miami-Dade County until 2003.

17   Q.   All right.  Can you walk me through the positions

18 you had in that period?

19   A.   Certainly.  From the Criminal Justice Planning

20 Council, I went to the County Manager's Office, Division

21 of Citizen Services, and I remained there until

22 approximately 1981, I believe.  At that point, I went to

23 the Miami-Dade Police Department, and I remained there

24 until 1985.  From there, I became a Productivity

25 Analyst, Office of Productivity Analysis.  I was

**MARY CLARKE CORKERY, COURT REPORTER**

1 probably there a couple of years.  I can't remember

2 exactly the year that that office was dissolved and I

3 went to the Personnel Department as an Employee

4 Suggestion Program Coordinator.  Then I began in

5 Elections in 1988 and remained there through the

6 beginning of 2003, and then I went to the Medical

7 Examiners Department.

8    Q.  Okay.

9    A.  And I was Deputy Chief of Special Services

10 through December of 2003.  And, from there, I went to

11 the Broward Supervisor of Elections Office --

12    Q.  Okay.

13    A.  -- as Deputy Supervisor of Elections.

14    Q.  Very good.  Let me stop you there and just walk

15 through the Miami-Dade positions real quick.

16    A.  Okay.

17    Q.  The position at Division of Citizen Services, I

18 assume that didn't have anything to do with election

19 work?

20    A.  It did not.

21    Q.  Police officer, I assume, had nothing to do with

22 election law; correct?

23    A.  Yeah.  I was an administrative officer, yes.

24    Q.  And Productivity Analyst, same thing?

25    A.  Correct.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.  All right.  Personnel department, same thing?

2    A.  Correct.

3    Q.  All right.  So your first work in elections was

4    starting in 1988; is that right?

5    A.  That is correct.

6    Q.  And what position did you hold?

7    A.  Assistant Supervisor of Elections.

8    Q.  And what were your duties as Assistant Supervisor

9    of Elections in Miami-Dade?

10   A.  I was Director of Public Services Division and I

11   was primarily responsible for everything dealing with

12   campaign financing, candidate qualifying, financial

13   disclosure, public information.

14   Q.  Anything else?

15   A.  After some reorganization, I was also over poll

16   workers training and recruitment.

17   Q.  Did you have exposure in that position to the

18   work of third-party voter registration organizations?

19   A.  At that time, that law did not exist, so --

20   Q.  Right.

21   A.  We did not have anything like that other than

22   people just coming to the front counter and asking for

23   information on voter registration.

24   Q.  Okay.  And was Florida doing any early voting

25   between 1988 and 2003?

*MARY CLARKE CORKERY, COURT REPORTER*

     1    A.   Not during that time period.

     2    Q.   During the time that you were Assistant SOE of

     3  Miami-Dade, were there any, any problems with how

     4  elections were administered in your county that you can

     5  recall?

     6    A.   Well --

     7    Q.   That got national news, for example?  Let's start

     8  there.

     9    A.   That's a pretty generic question.

    10    Q.   Yes, it is.

    11    A.   You know, I guess I'd have to say define

    12  problems.

    13    Q.   Sure.

    14         Was there not a circumstance in the 2002

    15  Miami-Dade election in September in which polling places

    16  opened late, poll workers abandoned their posts, and you

    17  were interviewed on the NewsHour by Jim Lehrer about it?

    18    A.   Yes, I was.

    19    Q.   Can you describe that for me, please?

    20    A.   With regards to what transpired on that date?

    21    Q.   Yes, please.

    22    A.   I was also the Public Information Officer for the

    23  department as Assistant Supervisor, so I was interviewed

    24  by news media, you're correct.  There were, I believe,

    25  65 polling places that did not open on time and -- the

*MARY CLARKE CORKERY, COURT REPORTER*

 1  reason being that poll workers were just not sure of

 2  procedures and, I guess, they really didn't understand

 3  the importance of having the doors open to the public

 4  and allowing people into the polling place at

 5  seven o'clock as required by law.  So there was some

 6  confusion.

 7     Q.  Okay.  Were there any other problems that

 8  occurred during your tenure with Miami-Dade that were

 9  that order of magnitude and got that kind of attention?

10     A.  That is probably the one that was the greatest

11  order of magnitude.

12     Q.  Understood.

13         And did Florida undertake any changes to its

14  elections law to address the kind of problems that you

15  experienced?

16     A.  Well, most of the problems that occurred, I would

17  say were related to the new technology and electronic

18  voting, and this is probably the first time that that

19  type of electronic voting took place on such a large

20  order of magnitude.  Laws have changed since then and,

21  of course, Florida went to paper ballots --

22     Q.  Uh-huh.

23     A.  -- after that, so -- I mean years after that.

24     Q.  Okay.  But, as you sit here today, do you recall

25  any way in which Florida election law was changed in

*MARY CLARKE CORKERY, COURT REPORTER*

1    response to the experience that you had in 2002?

2        A.   Well, I would say that the greatest change was

3    the fact that they changed it, the type of voting that

4    there was.  It went from tech -- from the -- just the

5    technology of the electronic voting to where there were

6    paper ballots in the precincts.

7        Q.   Any other changes that you can recall as a result

8    of that incident?

9        A.   I mean, there's been a number of election law

10   changes.

11       Q.   I understand.  But as a result of that incident,

12   that's really what I'm asking, the causal link between

13   the two, if you can think of one.

14       A.   No.

15       Q.   Okay.  You testified that, roughly, December 2003

16   you went on to Broward County?

17       A.   That is correct.

18       Q.   And there you were a Deputy Supervisor of

19   Elections; correct?

20       A.   Yes.

21       Q.   And what were your duties as a Deputy SOE in

22   Broward?

23       A.   Primarily, I was responsible for all operations

24   within the Supervisor of Elections' office.

25       Q.   And what operations were you supervising?

*MARY CLARKE CORKERY, COURT REPORTER*

 1    A.   Everything that the Supervisor of Elections would

 2   be responsible for constitutionally.  I would need to

 3   make certain that everything was followed per law,

 4   including all the logistics of the setup for the polling

 5   places.  At the time we also had early voting sites, we,

 6   of course, had the preparation of the ballots.  So just

 7   general operations of everything within the office.

 8    Q.   All right.  Would it be fair to say that in that

 9   position you were responsible for all aspects of the

10   Supervisor of Elections' operation in Broward?

11    A.   Yes.  Operations, correct.

12    Q.   Were there any notable concerns with any of the

13   elections that you supervised during that period?  Do

14   you recall any incidents that got attention?

15    A.   No.  Everything really ran pretty smoothly in

16   Broward County during the time period I was there.

17    Q.   Okay.  Was there not an incident in the 2004

18   election where a number of absentee ballots were lost on

19   the order of 14,000 to 58,000?

20    A.   There was an incident where they did go to the

21   post office and the ballots were not delivered as they

22   should have been.  But they were dropped at the post

23   office.

24    Q.   Okay.  Were there any changes made to Florida's

25   election law in response to that incident?

     1    A.   Specific changes, I cannot recall.  I mean, I
     2  can't enumerate them for you, but I know that it is an
     3  area of concern for all supervisors.
     4    Q.   All right.  What has been done to address that
     5  kind of problem by Supervisors or by the Florida
     6  Legislature?
     7    A.   Like I said, I can't specifically say what that
     8  is.
     9    Q.   How long were you in the position with Broward
    10  County?
    11    A.   I was there until September of 2005.
    12    Q.   And where did you go next?
    13    A.   Marion County as Deputy County Administrator.
    14    Q.   And that is a position that isn't focused solely
    15  on elections; correct?
    16    A.   Correct.
    17    Q.   What were your duties in that position?
    18    A.   Actually, the position had nothing to do with the
    19  elections.  I was second in command to the County
    20  Administrator of Marion County.  So, primarily, we were
    21  responsive to the Board of County Commissioners and just
    22  general county administration.
    23    Q.   Okay.  And how long were you in that position?
    24    A.   I was there until October 2007.
    25    Q.   And at that time did you retire from government

## MARY CLARKE CORKERY, COURT REPORTER

 1  service?

 2     A.  Yes, I did.

 3     Q.  And so did you have any job between 2007 in the

 4  government until May of 2011?

 5     A.  After leaving Marion County, I focused on

 6  obtaining my doctorate, which I was able to successfully

 7  achieve in 2008, and after that the only government

 8  position that -- I guess you can consider it government.

 9  I was a long-term substitute teacher at Marion Technical

10  Institute and I taught World History and Leadership.

11     Q.  Is Marion Technical Institute, is that a college

12  level institution or a high school?

13     A.  No.  High school.

14     Q.  So you're an American hero?  You're a teacher?

15     A.  Tenth grade -- yes.  Yes.  Tenth grade.  Thank

16  you.  Yeah, for six months I experienced that.

17     Q.  Now, I understand that you are presently a family

18  mediator; is that right?

19     A.  I am a certified family court mediator, yes.

20     Q.  And how long have you been in that position?

21     A.  Well, I got certified about two years ago.  I

22  just renewed my certification.

23     Q.  All right.  And starting in May of 2011, I

24  believe you became Director of the Department of State,

25  Division of Elections; correct?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   That is correct.

2    Q.   Can you describe for me how you took that

3    position?

4    A.   I saw that there was a vacancy and was interested

5    because of my passion for elections and I applied for

6    the position.

7    Q.   When did you learn that there was a vacancy?

8    A.   Oh, my gosh.  Good question.  Very close to the

9    time that the application period was drawing to an end.

10   I cannot recall exactly the date.

11   Q.   Okay.  Well, I'll represent --

12   A.   Probably about a month before that.

13   Q.   Okay.  About a month before you were hired or a

14   month --

15   A.   Correct.  Yes.

16   Q.   Okay.  And do you recall the date that you

17   started work?

18   A.   Yes.  It was the week that House Bill 1355 was

19   signed.  I believe I started on the 16th.

20   Q.   And did you have to interview for the position?

21   A.   Yes, I did.

22   Q.   When did the interview process begin?

23   A.   It was in April.

24   Q.   And at the time you were being interviewed, did

25   the Secretary of State's Office have a director of the

*MARY CLARKE CORKERY, COURT REPORTER*

1   Division of Elections?

2       A.   Jennifer Kennedy was acting director.

3       Q.   Had you worked with Ms. Kennedy before?

4       A.   No.

5       Q.   Who did you interview with for the position?

6       A.   I had a phone interview with Jennifer Kennedy and

7   with Secretary Browning.

8       Q.   Can you describe what you discussed in the phone

9   interview?

10      A.   Basic questions that would be asked during an

11  interview such as why did you apply for the job, you

12  know, describe your experience.  Just very basic

13  questions.

14      Q.   Do you know how many other candidates there were

15  for the position?

16      A.   No, I do not.

17      Q.   When did you learn that you had been selected?

18      A.   I was called to a second interview with Secretary

19  Browning and Ms. Unger in the Governor's office, and I

20  do not recall exactly the date.  I would have to look at

21  my calendar but it was a couple of weeks prior to

22  actually starting in my position and just several days

23  after that I learned that I had the position.

24      Q.   And did you know Ms. -- strike that.

25           Do you know Ms. Unger's position in the

*MARY CLARKE CORKERY, COURT REPORTER*

1  Governor's office?

2     A.   I'm not certain of her title.  I know that she is

3  one of the assistants or chiefs for the Governor's

4  office.

5     Q.   Is she an Assistant Chief of Staff or --

6     A.   I'm not certain exactly, but, yes --

7     Q.   Something like that?

8     A.   Something along those lines, yes.

9     Q.   And what was discussed in this interview?

10    A.   Once again, an overview of my background in

11 elections.

12    Q.   Anything else?

13    A.   Not really, no.

14    Q.   Was HB 1355 discussed in either of your

15 interviews?

16    A.   No.

17    Q.   Were the four sets of voting changes discussed in

18 either of your interviews?

19    A.   No.   The only, the only reference to that would

20 have been that there were some changes coming, and I

21 stated, yes, I was aware of that, because, you know,

22 when you're going into an interview of this magnitude,

23 of course, you want to do a little bit of research.  So

24 I had, of course, become aware of what was going on with

25 regards to election laws.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.  So were you specifically aware going into those

2  interviews of the four sets of changes that are the

3  subject of the preclearance case?

4    A.  Not in specific, no.

5    Q.  Okay.  So were you aware, for example -- I just

6  want to drill down on this.  Were you aware, for

7  example, of the change that was going to be made with

8  respect to the third-party voter registration regime?

9    A.  No.

10    Q.  Or the time period for early voting?

11    A.  Not specifically.

12    Q.  Okay.  Did you have any reaction to any of the

13  changes that you had read about based on your

14  understanding of Florida election law and your

15  experience as an Assistant Supervisor of Elections?

16    A.  Well, based on my previous experience, I know

17  that any time that there are changes you really -- you

18  know, an elections official needs to look at the impact

19  to the organization, forms, and logistics, you know, how

20  they are going to go about making those changes within

21  the organization.

22    Q.  Okay.  And had you given some thought to that,

23  about how you would implement those changes or what the

24  impact of those changes would be when you went into

25  these interviews?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   No.   The bill was a rather large bill, so it was

2    really hard to really conceptualize that at that point

3    in time.

4    Q.   Okay.   At that point in time, did any of the

5    changes strike you as being particularly noteworthy?

6    A.   I was pretty much just looking at the bill with

7    regards to what I could recall was in the law in the

8    past and what I perceived as a change, but I really

9    wasn't looking at the total impact at that point in

10   time.

11   Q.   I understand.

12        Did any of the changes that you read about going

13   into those interviews before you had spoken to anybody,

14   did any of them strike you as odd?

15   A.   No.

16   Q.   Okay.

17   A.   I mean --

18   Q.   None of them struck you as unusual that Florida

19   was bothering to make any of these changes at that time?

20   A.   Throughout the years, there's always been changes

21   to the election laws, so it did not strike me.

22   Q.   Okay.   So were the changes discussed in any of

23   your interviews for the position in any kind of detail?

24   A.   No.

25   Q.   And you say you believe you started May 16th of

*MARY CLARKE CORKERY, COURT REPORTER*

1   2011 in the position?

2     A.  Yes, sir.

3     Q.  Okay.  And can you, just for the record, describe

4   what the duties of the Director of the Division of

5   Elections are?

6     A.  Overall, oversight of making certain that

7   everything that deals with election laws in the State of

8   Florida is carried out by the Supervisors of Elections

9   and, in our office primarily, ensuring that anything

10  that deals with statute that has dates related to

11  compliance are met.  Also, we have the Florida Voter

12  Registration System that is in place.  So that is a

13  great part of our office.  We also have the section that

14  deals with voting standards, voting system standards

15  certification, that is one of the bureaus, as well as

16  the candidates election record section that I oversee.

17    Q.  Any other major parts of your duties?

18    A.  I deal with the Secretary of State's Office, and,

19  of course, the Secretary of State is the chief election

20  official for the State of Florida, so --

21    Q.  Is that who you report to?

22    A.  I report to the Secretary of State's Office, yes,

23  so I have a chain of command that goes to the Secretary.

24    Q.  You're a direct report to the Secretary?

25    A.  I'm a direct report to -- I have a Deputy

*MARY CLARKE CORKERY, COURT REPORTER*

1    Secretary that I report to, and then there's the Chief

2    of Staff, and then the Secretary.

3        Q.   Who is the Deputy Secretary you report to?

4        A.   John Boynton.

5        Q.   What is Mr. Boynton's exact title?

6        A.   Deputy Secretary.

7        Q.   Does he have any portfolio, like, Deputy

8    Secretary in charge of X?

9        A.   Of Corporations and Elections and Administration.

10       Q.   Now, you spoke a little bit about the Secretary

11   being the chief election officer of the State of

12   Florida; correct?

13       A.   Correct.

14       Q.   Had you worked with Secretary Browning prior to

15   taking this position in May of 2011?

16       A.   Not directly, but Secretary Browning was, of

17   course, Supervisor of Elections in Pasco County.

18       Q.   Uh-huh.

19       A.   And from being an Assistant Supervisor and Deputy

20   Assistant of Miami-Dade and Broward, I knew him from

21   Florida Supervisor Association meetings as well as he

22   was very involved with the legislative changes, so he

23   would be in contact with the Supervisors of Elections'

24   offices throughout the years.

25       Q.   Now, when you say he was very involved with

*MARY CLARKE CORKERY, COURT REPORTER*

1    legislative changes, you mean across the time period in

2    which you worked with him when he was a Supervisor?

3        A.   Correct.   He was with a legislative committee

4    with the Florida Supervisor of Elections' Association,

5    FSASE.

6        Q.   Right.

7             And were you a member of FSASE at one point?

8        A.   I was not because Assistant Supervisors could not

9    actually be members at that time.

10       Q.   And what's the purpose of FSASE?

11       A.   That is the Florida Supervisor of Elections'

12   Association for the state, and they pretty much are an

13   organization that is instrumental in helping the

14   Supervisors, you know, continue to be informed and they

15   provide, like, a very good support network for the

16   Supervisors to ensure that they are, they are able to

17   meet their mandates that are constitutionally required.

18       Q.   Does the FSASE, in your experience, also interact

19   with the Legislature about election law changes?

20       A.   Yes.

21       Q.   And do they express their opinion about changes

22   and try to give guidance to the Legislature about the

23   advisability of changes that are coming up?

24       A.   I believe they do have an attorney and a lobbyist

25   that works with them, yes.

*MARY CLARKE CORKERY, COURT REPORTER*

1      Q.   And when you had worked with Secretary Browning,

2    had you seen Secretary Browning being involved with

3    that?  You said he was very involved in legislative

4    changes.

5      A.   He was involved with the committee, correct.

6      Q.   Okay.  And do you recall what changes he was

7    particularly involved with?

8      A.   It was throughout the years going back to, like,

9    1989 when I first met him.

10     Q.   And, in your experience, has an election law been

11   passed in Florida just about every year?

12     A.   Yes.

13     Q.   At least one?

14     A.   There, there would be some changes.  Not

15   necessarily every year, but I know that there were

16   always changes throughout the period of time that I was

17   involved with elections.

18     Q.   Okay.  And, to your knowledge, was Secretary

19   Browning involved in the legislative process every time

20   an election law came up?

21     A.   I'm not sure that he was every time, but, you

22   know, throughout the years, I, I knew that he pretty

23   much, you know, kept in touch with what was going on.

24   He was very involved.

25     Q.   And I take it from your testimony that he was

*MARY CLARKE CORKERY, COURT REPORTER*

1    pretty visibly involved in that sort of thing; is that

2    right?

3        A.   He was visibly involved with the association.

4        Q.   In terms of the duties of the Secretary and the

5    Division of Elections, would you agree that the

6    Secretary and the Division of Elections is responsible

7    for the uniform interpretation and implementation of

8    Florida's election laws?

9        A.   Yes.

10       Q.   And is it also true that the Division operates

11   and maintains Florida's statewide voter registration

12   system?

13       A.   Yes.

14       Q.   Could you describe for the record what the FVRS

15   is?

16       A.   The Florida Voter Registration System is a data

17   base comprised of all of the voter registration

18   applications from all of the counties in the State of

19   Florida.

20       Q.   Do you recall when it was first launched?

21       A.   I believe it was 2005 or 2006, in that time

22   period.

23       Q.   And what, what is the purpose of the FVRS?

24       A.   It provides a data base of all of the voter

25   registration systems -- I mean, of all the voter

*MARY CLARKE CORKERY, COURT REPORTER*

1  registration applications within the State of Florida.

2      Q.  Okay.

3      A.  Like you've said, it's a uniform system that has

4  certain items that are required by law.

5      Q.  Would you agree that it has been an effective

6  tool to prevent voter registration fraud?

7      A.  That's kind of a broad question.

8      Q.  Can you answer it?

9      A.  Can it be used as a tool?  I think if you look at

10 it with regards to looking at eliminating duplication of

11 records and providing uniformity, it can be a tool.

12     Q.  Okay.  Are there any ways in which it would not

13 be effective as a tool?

14     A.  It's primarily a data base.  Like I said, if

15 you're looking at it from the standpoint of just records

16 -- and that's, that's why I say, you know, the

17 generality of saying, like, I believe you said,

18 preventing election fraud --

19     Q.  Actually, I said voter registration fraud.

20     A.  Voter registration fraud.  I mean, it's a data

21 base.

22     Q.  Uh-huh.

23     A.  So I mean, that alone doesn't prevent voter

24 registration fraud.

25     Q.  Well, sure, but does it allow the detection of

*MARY CLARKE CORKERY, COURT REPORTER*

1   voter registration fraud?

2       A.   It could allow, it could allow the detection of

3   voter registration fraud, yes.

4       Q.   And how could it be used in that way?

5       A.   Like I said, by looking at duplication of records

6   and ensuring that certain aspects of the record are -- I

7   guess, that they are looked upon with regards to -- I

8   mean, part of what we do with the FVRS is look at the

9   felons, deceased, you know, and, like I said,

10  duplication of records, that sort of thing, so it

11  provides a mechanism where you could make sure that you

12  have clean voter rolls.

13      Q.   Right.  I mean, if somebody within the Secretary

14  of State's Office in responding to a press inquiry were

15  to say the statewide voter registration data base has

16  been a very effective tool to prevent voter registration

17  fraud, would you disagree with that statement?

18      A.   No.

19      Q.   All right.  So it is a very effective tool for

20  preventing that kind of registration fraud?

21      A.   It can be, yes.

22      Q.   Have you seen it being used for that in your

23  tenure as Director?

24      A.   In my tenure as Director, we have done what every

25  -- everything that we can to ensure that we are

*MARY CLARKE CORKERY, COURT REPORTER*

1  utilizing it to ensure that there is no duplication and

2  that there are not individuals on the rolls, you know,

3  that --

4     Q.  Shouldn't be there?

5     A.  Yeah.  We -- that we report them to the

6  Supervisor's office because, under FVRS, it is not the

7  Division who is actually responsible for deleting a

8  record or altering a record.  It is actually the

9  Supervisor of Elections in the different counties.

10    Q.  And maybe it doesn't work with the timing, but

11 was FVRS in place when you were an Assistant Supervisor

12 of Elections?

13    A.  No.

14    Q.  It wasn't.

15        Was -- is -- strike that.

16        Is having FVRS in place to serve as an effective

17 tool to prevent voter registration fraud, is that a

18 positive development in terms of detecting that kind of

19 fraud?

20    A.  It can be.

21    Q.  How did you do it before there was FVRS?

22    A.  It was an individual -- on an individual county

23 basis.

24    Q.  And what sort of things did the counties do to

25 prevent that kind of fraud?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   It was done internally county by county.  So this

2   provides a uniform mechanism where everything goes into

3   one place so it, it does provide that oversight for,

4   like, elimination of duplication of records.

5    Q.   All right.  And so that was a positive

6   development that it moved to FVRS?

7    A.   Yes.

8    Q.   That made the system better in terms of detecting

9   that kind of voter registration fraud?

10   A.   Yes.

11   Q.   I've seen it said in certain press releases

12  concerning HB 1355 that prior to that law being passed

13  it was too easy, quote, for bad actors to game Florida's

14  Voter Registration System.  Do you agree with that

15  statement?

16   A.   For bad actors to -- I'm sorry?

17   Q.   To game Florida's Voter Registration System.

18       Would you agree with that statement?

19   A.   Like, in other words, to play?  I mean, I'm not

20  sure what that means.

21   Q.   I assume to commit fraud.

22   A.   Yeah.  Yeah.  I mean, I'm not certain what they

23  meant by that, but --

24   Q.   Does that strike you as being a fair statement,

25  that it was too easy to commit voter registration fraud

—MARY CLARKE CORKERY, COURT REPORTER—

1    prior to HB 1355?

2       A.   Well, I would say, because of the fact that each

3    county was an individual record, now you have it as one

4    record, it is easier to detect duplication of records.

5       Q.   Okay.  And did HB 1355 do anything to improve

6    that situation?  It was already in place before; right?

7       A.   That was in place, yeah.  That did not affect it.

8       Q.   All right.  So if someone were to make the

9    statement that prior to HB 1355 it was too easy for bad

10   actors to game the registration system, you'd disagree

11   with that, wouldn't you?

12      A.   Yeah.  It's just a strange statement, so, you

13   know, I would have to kind of think about that.  I just

14   -- it doesn't make sense to me.  I'm sorry.

15      Q.   I understand.  I understand.  I didn't make it.

16   I'm asking for your reaction as the Director of

17   Elections.

18      A.   Yeah.

19      Q.   Did you believe prior to HB 1355 being passed

20   that voter registration fraud was a big problem in

21   Florida?  With the FVRS in place, do you think that was

22   a large problem?

23      A.   Well, I know that Florida has always been under

24   the microscope, so to speak, so House Bill 1355 was

25   trying to implement positive changes that would

_MARY CLARKE CORKERY, COURT REPORTER_

A6301

1   hopefully make it -- you know, solidify the way that we

2   do business with regards to voter registration.

3     Q.  I understand.  But my question really was, is it

4   your view that prior to that bill being passed voter

5   registration fraud with FVRS in place was a problem that

6   needed to be addressed?

7     A.  I mean, I was -- I had a little bit of a

8   disconnect with elections for a few years.  So, between

9   2005 and 2011, I really couldn't tell you everything

10   that was going on with regards to elections.

11     Q.  Okay.  So you can't really tell me what kind of

12   problem it was before HB 1355, if it was any problem at

13   all, can you?

14     A.  Correct.

15     Q.  Okay.

16     A.  Because it was several years for me.

17     Q.  All right.  And you -- in response to one of my

18   questions, you said what HB 1355 was trying to do

19   because Florida was under a microscope.  Do you actually

20   have any knowledge about what the purpose of HB 1355

21   was, given that you began working after it had been

22   passed?

23     A.  No.

24     Q.  Okay.  Just going -- circling back to just the

25   duties of the Director, is part of your duty to oversee

*MARY CLARKE CORKERY, COURT REPORTER*

1    the process by which citizens propose constitutional

2    amendments by initiative?

3        A.   That is one of the aspects that is done in my

4    office.  Just with regards to, like, the number of years

5    --

6        Q.   Uh-huh.

7        A.   -- that a signature is valid?

8        Q.   Yes.

9        A.   I haven't been involved in that area a great deal

10   since I've been there.

11       Q.   Okay.  And did you have any involvement in that

12   prior to taking the job in May of 2011?

13       A.   No, I did not.

14       Q.   Okay.  Are you aware of whether the shelf life,

15   for want of a better term, of elections on

16   constitutional initiative petitions was perceived to be

17   a problem in Florida before HB 1355 was passed?

18       A.   No.

19       Q.   All right.  And does your division have

20   responsibility for the registration and oversight of

21   third-party voter registration organizations?

22       A.   Yes.

23       Q.   All right.  And can you describe what you do in

24   that capacity?  What oversight do you exercise?

25       A.   The Division is primarily responsible for -- we

*MARY CLARKE CORKERY, COURT REPORTER*

1  have a data base where the information is kept on

2  third-party voter registration information.  When

3  someone wants to register as a third-party, they are

4  required to file a form with our office and we have an

5  individual that is primarily responsible for making sure

6  that all of that -- the information on third-party is

7  kept up to date and, you know, we have a procedure in

8  place that deals with how we deal with the rule that was

9  enacted on the third-party.

10     Q.   Okay.  Prior to HB 1355 being passed, are you

11 aware of any perception that third-party voter

12 registration organizations were problematic in the State

13 of Florida?

14     A.   Once again, that's something that was not in

15 existence way back when I was in the elections field and

16 I really was not aware of what was going on with that

17 during that time period before I took office.

18     Q.   So, no, you're not aware of any problems before

19 you took over in May of 2011?

20     A.   Correct.

21     Q.   Are you aware of any problems prior to HB 1355

22 being passed with the length of time that early voting

23 was being made available?

24     A.   No.

25     Q.   Were you aware of any problems prior to HB 1355

*MARY CLARKE CORKERY, COURT REPORTER*

1   being passed with the situation of voters moving

2   intercounty and attempting to change their address on

3   election day?  Are you aware of that being perceived as

4   a problem?  And, by that, I mean fraud arising from that

5   situation.

6       A.  No.

7       Q.  All right.  As you sit here today, based on your

8   knowledge, are these four changes kind of a solution in

9   search of a problem?  Are you aware of any problems that

10  existed that these changes addressed?

11          MS. DAVIS:  Objection; vague and

12      speculative.

13  BY MR. FARR:

14      Q.  Okay.  Can you answer?

15      A.  Okay.  Can you reword the question, please?

16      Q.  Okay.  I'll try.

17          You've testified that you're not aware of any

18  problems in those four areas --

19      A.  Uh-huh.

20      Q.  -- prior to taking over as Director of Elections,

21  the Director of the Division of Elections.  So what I'm

22  asking you is, do these four changes strike you as a

23  solution in search of a problem?

24          MS. DAVIS:  Same objection.

25          MR. FARR:  You can answer.

*MARY CLARKE CORKERY, COURT REPORTER*

1          THE WITNESS:  Okay.  I mean, obviously,

2     there were things that they were trying to

3     address, but I was not active in the elections

4     community for several years so I am not aware of

5     the history that was going on during that time

6     period.

7          With regards to change of address on

8     election day, that is not a new thing.  That's

9     something that has gone on for years, and there

10    used to be a procedure in place, like, I know in

11    the counties where I worked, Miami-Dade and

12    Broward, for change of address.

13 BY MR. FARR:

14   Q.  Right.  And there was a procedure in place that

15 you operated under for many years; correct?

16   A.  There was a procedure, yes.  But, like I said,

17 I'm not certain what transpired between 2005 and 2011,

18 so I could not speak to that.

19   Q.  Okay.  So would it be fair to say that you can't

20 testify with respect to what the Legislature's purpose

21 was with respect to any of the four sets of changes?

22   A.  Correct.  Yeah.

23   Q.  And would it be fair to say that you can't

24 testify about whether there, in fact, were problems that

25 needed to be addressed by these four sets of changes?

─────*MARY CLARKE CORKERY, COURT REPORTER*─────

1    A.  Correct, because I do not have knowledge.

2    Q.  Do you have any knowledge about the origin of HB

3    1355?

4    A.  No.

5    Q.  Do you have any knowledge about the origin of the

6    four sets of changes?

7    A.  No.

8    Q.  Do you have any knowledge about who wrote the

9    four sets of changes?

10   A.  No.

11   Q.  Do you have any knowledge about the legislative

12   process that occurred to get them passed?

13   A.  In general, just -- I understand the legislative

14   process, but not --

15   Q.  No.  The specific one.

16   A.  Not specifically to this bill, no.

17   Q.  Do you have any knowledge about the

18   communications, if any, that existed between the

19   Secretary of State's staff and legislators or their

20   staff concerning this law?

21   A.  No.

22   Q.  And you testified that you really don't know what

23   the purpose of the four sets of changes were in the

24   minds of the Legislature?

25   A.  Correct.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   Do you have any knowledge about whether these

2    four sets of changes originated with third parties and

3    were proposed to the legislators by third parties?

4    A.   No.

5    Q.   Do you have any knowledge whether the Secretary

6    of State's Office prior to your going to the Director of

7    Elections' position was in favor of these four sets of

8    changes?

9    A.   No.

10   Q.   Do you have any knowledge about what the reaction

11   to the four sets of changes was by the FSASE?

12   A.   Not until I began in my position.

13   Q.   Okay.  Well, we'll talk about that.

14   A.   Yes.

15   Q.   But in terms of what their reaction was during

16   the legislative process?

17   A.   No.

18   Q.   And you don't have any knowledge of whether the

19   four sets of changes were needed?

20   A.   No.

21   Q.   Do you have -- again, I'm just closing up a loop

22   on this.  Do you have any knowledge about the

23   information the Legislature had before it concerning the

24   prevalence of any kind of election fraud that needed to

25   be addressed by these four sets of changes?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   No.

2    Q.   And if I were trying to determine any of these

3    things that we just went through, would you be a witness

4    that would have knowledge about that?

5    A.   No.

6    Q.   Okay.  In Florida's initial disclosures in this

7    case -- and I'll represent to you that an initial

8    disclosure is something that a litigant files with the

9    court and serves on the other side that lists who their

10   witnesses are going to be and who people are with

11   knowledge.  In Florida's initial disclosures in this

12   case, the State of Florida listed you as the only

13   individual likely to have discoverable information that

14   Florida may use to support its claims and defenses in

15   this case.  Were you aware of that?

16   A.   I know that, as Director, my name went on

17   documents, but that would be normal in such a -- this

18   type of proceeding, I would imagine.

19   Q.   But given the testimony that you just gave me,

20   does it strike you as odd that you were the only person

21   they listed as a person with knowledge about this law?

22   A.   Perhaps.

23   Q.   Have you ever discussed that with Ms. Davis or

24   any of the lawyers working this case?

25   A.   No.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   Is that news to you?  Is that the first time

2  you've heard that, sitting here today?

3    A.   Like I said, I don't see it as unusual just based

4  on the fact that I am the Director.

5    Q.   Okay.

6    A.   So I, I would accept that my name would be on

7  there because I am the Director.

8    Q.   All right.  But wouldn't there be other people

9  within the Secretary of State's Office, for example,

10  that would have more knowledge about these issues that

11  we've discussed than you, just as a factor of when you

12  were hired?

13    A.   It's unknown to me, but yes.

14    Q.   Okay.  Do you have any knowledge whatsoever about

15  how HB 1355 was passed?

16    A.   No.

17    Q.   Okay.  Did you have any role in the preparation

18  of Florida's responses to interrogatories in this case?

19  Do you remember signing a document called interrogatory

20  responses?

21    A.   Yes.  Uh-huh.

22    Q.   Did you have any role in preparing the responses?

23    A.   With regards to, like, the third-party or --

24    Q.   Yeah.  Anything.

25    A.   -- with regards to --

*MARY CLARKE CORKERY, COURT REPORTER*

A6310

1    Q.  Well, let's start with just generally.  Did you

2  have any role in assembling the information that was

3  provided in response to the interrogatories?

4    A.  Well, I worked with legal counsel.

5    Q.  Okay.  What legal counsel did you work with?

6    A.  Dan Nordby.

7    Q.  Okay.  Anybody else?

8    A.  No.

9    Q.  Did you actually write the responses or did he

10  write the responses?

11    A.  No.  Like I said, I worked with him.

12    Q.  My -- well, strike that.

13      In terms of working with you, did he just provide

14  you with a draft of them and ask if what he had written

15  was right?

16    A.  He provided the information and we went over it

17  and I agreed that it was correct.

18    Q.  All right.  And you certified that they were true

19  to the best of your knowledge; correct?

20    A.  Correct.

21    Q.  Was any of it based on when you made that --

22  strike that.

23      When you made that certification, was any of it

24  based on your personal knowledge or did you have to go

25  research it?

**MARY CLARKE CORKERY, COURT REPORTER**

1    A.  It was pretty straightforward.

2    Q.  All right.  Was there, was there anything that

3    you certified that you said to Mr. Nordby, I just don't

4    have this information, kind of like you did with me?

5    A.  I mean, the information that was provided is what

6    it was.

7    Q.  All right.  But none of it struck you as

8    something that you didn't have the ability to certify?

9    A.  I cannot recall.

10    Q.  Did you have to speak to anybody after reading

11    the interrogatory responses to be in a position to

12    certify that they were true and correct?

13    A.  I did not speak with anyone.

14          MR. FARR:  We've been going about an hour.

15      Do you want to take our first break or do you want

16      to soldier on?  I'm happy to if you want to, but I

17      --

18          THE WITNESS:  I'm okay.  I mean, unless

19      anybody else wants to.

20          MR. FARR:  No.  I'm good.  Let's soldier on.

21          MS. DAVIS:  Probably reassess in about half

22      an hour.  We'll reassess --

23          MR. FARR:  That's fine.  That's fine.

24    BY MR. FARR:

25    Q.  All right.  So I just need to clarify a couple of

**MARY CLARKE CORKERY, COURT REPORTER**

1   things on the record, but I think I already know the

2   answer about this.

3        You don't know anything about where the four sets

4   of voting changes came from; correct?

5        A.   Correct.

6        Q.   And yet in the responses to interrogatories,

7   which you certified, there are some statements about the

8   purpose and I just want to ask you about that.

9        Do you agree that none of the four sets of voting

10  changes were adopted for partisan political reasons?

11       A.   I would not think that they are for partisan

12  political reasons.

13       Q.   But you don't really know whether they are or

14  not, do you, as you already testified to me?  You don't

15  know what the purpose is, do you?

16       A.   The history prior to, I -- during that time

17  period, like I said, I just -- I don't have knowledge.

18       Q.   And can you explain to me, then, why you felt

19  comfortable certifying that that was true in response to

20  the interrogatories, that they weren't adopted for

21  partisan political reasons?

22       A.   Well, I believe that that's true.  I mean --

23       Q.   What's that belief based on?

24       A.   Just being neutral, non -- not partisan political

25  reasons, you know, just they were a matter of fact.

1    Q.   Okay.  How would a partisan political change in

2    the election law manifest itself such that you could

3    tell the difference between the two?  Do you follow me?

4    A.   I understand what you're saying, yes.

5    Q.   So how would I know whether this, for example,

6    third-party voter registration change was a partisan

7    change or non-partisan change?

8    A.   I think that it was just to make things better.

9    Q.   Well, I understand.  Better for whom, could be

10   the question, and I'm just trying to understand your

11   certification that it wasn't for partisan reasons.  I

12   mean, what investigation did you do to confirm that?

13   A.   I believe that it was not for a partisan reason.

14   I mean, that's just a belief.

15   Q.   Based on what?

16   A.   (Indicating.)

17   Q.   Sort of throwing your hands up like that isn't an

18   answer.

19       What is it based on?

20   A.   I don't have a basis.

21   Q.   Okay.  So you didn't have a basis when you

22   certified that that was the case, that it wasn't

23   partisan --

24   A.   Well, I believe that it was a neutral event.  I

25   mean, I do not believe that it was partisan in nature.

*MARY CLARKE CORKERY, COURT REPORTER*

1    I mean, I agree with that statement.

2       Q.   But how do you know since you already testified

3    to me you have no understanding or knowledge about how

4    this bill was passed or the legislative process or the

5    purpose?  So how did you know that that was the case

6    when you made that certification in answers to

7    interrogatories?

8       A.   I agreed with the statement.

9       Q.   Okay.  But, again, I'm just trying to understand

10   why, ma'am.  Why did you agree with the statement?

11      A.   I can't provide you an answer.

12      Q.   Okay.  There was also a statement that Florida

13   made about the law that any cost savings resulting from

14   the four sets of voting changes would be minimal and you

15   certified that as well.  Do you agree with that

16   statement?

17      A.   Cost savings would be minimal?

18      Q.   Uh-huh.

19      A.   I don't see really where there would be cost

20   savings.

21      Q.   Okay.  To any of the four sets of changes?

22      A.   So, therefore, I would agree that they would be

23   minimal.

24      Q.   Okay.  Can you explain to me in any more detail

25   why that would be so, that there wouldn't be any cost

*MARY CLARKE CORKERY, COURT REPORTER*

1  savings?

2     A.   Just from an administrative point of view, I just

3  cannot see where there would be savings.

4     Q.   Okay.

5     A.   I mean, just a logical premise.  I mean, what

6  basis is there that there would be savings?

7     Q.   I don't know.  I'm asking.

8     A.   Right.  So that's my answer.

9     Q.   If someone were to justify 1355 and the four sets

10 of changes as a cost saving measure, you wouldn't agree

11 with that statement, then, would you?

12    A.   I don't, I don't see the basis for it being a

13 cost savings measure, no.

14    Q.   Understood.

15        Are you familiar at all with the -- well, strike

16 that.

17        First, in your experience, does the Department of

18 State make legislative proposals to the Florida

19 Legislature concerning election law changes they think

20 should be made?

21    A.   In the brief time period that I have been there,

22 I really am not familiar with that going on.

23    Q.   Understood.

24        So working as an Assistant Supervisor of

25 Elections didn't put you in a position to see that?

*MARY CLARKE CORKERY, COURT REPORTER*

```
 1      A.  No.

 2      Q.  Okay.  Are you familiar at all with a 2011 DOS

 3  legislative proposal that was made before HB 1355 was

 4  passed?

 5      A.  No.

 6      Q.  And you don't know anything about the legislative

 7  process in terms of the blow by blow of how it went

 8  through the House and how it went through the Senate;

 9  correct?

10      A.  No.

11      Q.  And you're not familiar with any communications

12  that Secretary of State, for example, might have had

13  with legislators or their staff?

14      A.  No.

15      Q.  Are you familiar with any communications that the

16  Secretary of State's personnel may have had with

17  legislators or their staff?

18      A.  No.

19      Q.  Are you familiar with any questions or concerns

20  that the Secretary of State's Office had with respect to

21  HB 1355?

22      A.  No.

23      Q.  Are you familiar with any concerns that any

24  individual Supervisors of Elections had with respect to

25  HB 1355 before it passed?
```

*MARY CLARKE CORKERY, COURT REPORTER*

1      A.   No.

2      Q.   How about FSASE?  Are you familiar with their

3   position on the four sets of changes, for example,

4   before they were passed?

5      A.   No.

6      Q.   And you don't know what third-party individuals

7   or groups might have been involved in the process

8   concerning HB 1355 or the four sets of changes?

9      A.   No.

10      Q.   Have you heard anything about that since coming

11   to the Secretary of State's Office?  It's a slightly

12   different question.  I mean, since coming to the office,

13   have you heard about anything third-party groups being

14   involved in HB 1355 being passed?

15      A.   No.  Not being involved in the passage, no.

16      Q.   Okay.  Have you heard that any third-party groups

17   may have been the originators of the four sets of

18   changes?

19      A.   No.

20      Q.   Have you heard of a group called ALEC?  And I

21   always hesitate to say that since it's my name, but it's

22   an acronym, A-L-E-C.  Have you ever heard of that?

23      A.   Huh-uh.

24      Q.   Have you ever heard of any involvement by the

25   Republican Party of Florida on the four sets of changes?

─────MARY CLARKE CORKERY, COURT REPORTER─────

1     A.   No.

2     Q.   Do you know who Bucky Mitchell is?

3     A.   Yes.

4     Q.   Who is Bucky Mitchell?

5     A.   He used to work at the Division as General

6     Counsel, I believe.

7     Q.   Are you aware of whether Mr. Mitchell had any

8     involvement in creating the four sets of changes?

9     A.   No.

10    Q.   Now, Governor Scott, as I think you testified,

11    signed HB 1355 into law on May 19, 2011; is that right?

12    A.   That is correct.

13    Q.   All right.  So you were on the job approximately

14    three days when he signed the bill?

15    A.   That is correct.

16    Q.   What steps did DOS or the DOE take after the

17    signing to implement HB 1355?

18    A.   A number of steps were already in transition when

19    I came on board.

20    Q.   Uh-huh.

21    A.   So there had been ground work set prior to me

22    coming in.

23    Q.   Okay.  Can you describe the ground work that you

24    inherited, if you will?

25    A.   Well, House Bill 1355 required a number of

*MARY CLARKE CORKERY, COURT REPORTER*

 1    changes to IT, or Technology, that needed to be

 2    implemented.

 3        Q.   Uh-huh.

 4        A.   So pretty much we were looking at how those

 5    changes were going to be made and just making certain

 6    that everything that was affected by the House bill was,

 7    was changed with regard to our ability to logistically

 8    implement what was required by the bill.  So that was

 9    kind of already in the works, you know, being looked at

10    by the IT team and, you know, like, how, how it was

11    going to affect us and what we were going to do to make

12    it happen.

13        Q.   Is there any other ground work that had been laid

14    for any of the changes in HB 1355 that you inherited

15    when you came to the position?

16        A.   Third-party was probably one of the larger

17    portions and they had already kind of started looking at

18    the forms that would be necessary to implement it as

19    well as, you know, what procedure would be put in place

20    to be able to do what the law required.

21        Q.   What sort of procedures had they already

22    established for implementing the law?

23        A.   I'm trying to recall the number of the form, but

24    the form that is required to be filed by third parties,

25    and also, like, notification to the third parties that

───MARY CLARKE CORKERY, COURT REPORTER───

1  existed as to the changes in the law, that was kind of

2  in the works.  And I wasn't involved firsthand on that

3  because I did have a Bureau Chief at the time that was

4  over the voter registration section.

5    Q.  Okay.  Who is that Bureau Chief?

6    A.  It was Peggy Taff.

7    Q.  So was Ms. Taff involved in laying this ground

8  work?

9    A.  I'm not sure what exactly was her involvement,

10  but she was the supervisor of the individual that, that

11  was working with that.

12    Q.  And do you know who that individual was?

13    A.  Well, the person in the office that was doing the

14  actual work that was basically clerical work --

15    Q.  Okay.

16    A.  -- was Suzie Still, but it was also -- you know,

17  everything was done with, with our General Counsel's

18  Office, and that was Gary Holland who primarily did the

19  work on the third-party.

20    Q.  Had any ground work been laid with respect to

21  implementing the early voting change when you took over

22  as Director?

23    A.  Well, the early voting would mostly be on the

24  Supervisor side, so it wasn't really our office that

25  needed to do anything other than we put the early voting

*MARY CLARKE CORKERY, COURT REPORTER*

1    sites, like, on our website for convenience.

2       Q.  Had any ground work been laid to implement the

3    moving voters change?

4       A.  Once again, that's something that's mostly done

5    at the Supervisor's level, and I know that they -- you

6    know, the -- there was a rule that kind of talks to or

7    speaks to polling place procedures that was implemented,

8    and that was -- Maria Matthews was the attorney working

9    on that.

10      Q.  And when you say the rule, the rule is that any

11   voter attempting to move intercounty and change his

12   address on election day must vote a provisional ballot

13   instead of a full ballot?

14      A.  Correct.

15      Q.  Could you tell me, based on your experience as an

16   Assistant Supervisor of Elections, what was the

17   procedure before that change if an intercounty mover

18   attempted to do just that?

19      A.  From county-to-county, I cannot recall, honestly.

20      Q.  You don't even recall what it was in the counties

21   you worked with?

22      A.  I mean, from another county, I really cannot

23   recall.

24      Q.  Okay.

25      A.  I mean, like, within the county, yes, I can

*MARY CLARKE CORKERY, COURT REPORTER*

1    recall.  Out -- you know, coming in from another county,
2    I really can't remember.
3         Q.  All right.  And based on your experience, though,
4    in handling that situation as an Assistant Supervisor of
5    Elections, do you recall that being thought of as a big
6    loophole in Florida's election law that could lead to
7    fraud?
8              MS. DAVIS:  Objection; vague and
9         speculative.
10             You can answer.
11             THE WITNESS:  Yeah.  I -- mostly for changes
12        of address on election day, we're mostly concerned
13        with the in-county voters.  I really -- I mean,
14        honestly, I cannot recall from one county to the
15        other.
16   BY MR. FARR:
17        Q.  And when you say, when you say that -- if I could
18   just -- I think -- I'm not sure you even finished your
19   sentence.
20        A.  Right.
21        Q.  If you're being responsive to my question, you
22   can't recall the situation of intercounty movers being
23   perceived as a problem by Supervisors of Elections in
24   terms of rampant fraud?
25        A.  Well, once again, from the standpoint of

*MARY CLARKE CORKERY, COURT REPORTER*

1    speculation -- I mean --

2      Q.  Well, it's actually not speculation.  I'm asking

3    you based on your knowledge now.  I realized I asked you

4    before what was the legislators' purpose in this.  I'm

5    actually now asking something else.  Based on your

6    experience which I have testified about, did you see

7    that as a problem?  Did you experience that as a

8    problem?  Did you think it was a problem?

9      A.  I cannot really recall that it was something that

10   we really talked about as a major problem.

11          MR. FARR:  Okay.  Why don't we take our

12       break.  It's been about an hour and-a-half.

13          MS. DAVIS:  Sure.

14          (Whereupon, a short recess was taken.)

15   BY MR. FARR:

16     Q.  Doctor Salas, during the break, did it occur to

17   you that any of the testimony that you've given up to

18   now needs to be changed, amended, or augmented in any

19   way?

20     A.  No.

21     Q.  Okay.  We were discussing before the break steps

22   that the Department of State and the Division of

23   Elections took to implement HB 1355.  Do you recall a

24   number of directives issuing from the Secretary of

25   State's Office?

───*MARY CLARKE CORKERY, COURT REPORTER*───

1    A.   Yes.

2    Q.   Okay.  How many directives were there?  Do you

3  recall?

4    A.   There was a directive.

5    Q.   Just one?

6    A.   Uh-huh.

7    Q.   Do you know who the author of that directive was?

8    A.   The Secretary.

9    Q.   Secretary Browning?

10    A.   Yes.

11    Q.   I'm going to show you what we've previously

12  marked as Exhibit 7 in the set of depositions that we've

13  had in this case and ask you to look at that.  Do you

14  recognize that document?

15    A.   Yes.

16    Q.   Is this the directive you were discussing?

17    A.   Yes.

18    Q.   I have some questions about it.

19        Were you involved in writing this directive?

20    A.   No.

21    Q.   Who did write it, to your knowledge?

22    A.   I am not certain.

23    Q.   And why did the Secretary himself issue this

24  directive?

25    A.   The Secretary's office, like I stated before, the

*MARY CLARKE CORKERY, COURT REPORTER*

 1    Secretary is the chief election official in the State of
 2    Florida, and he can write directives by his authority.
 3        Q.   To your knowledge, is it unusual in any way for
 4    the Secretary himself to issue a directive of this
 5    nature?
 6        A.   Not to my knowledge.
 7        Q.   But you don't know whether it's a commonplace
 8    practice either?
 9        A.   Directives such as this did not exist during my
10    previous tenure as an election official.
11        Q.   Okay.  Do you know why -- well, strike that.
12             Are you familiar with this?  Have you read it
13    before?
14        A.   This directive, yes.
15        Q.   Do you know why Secretary Browning specifically
16    addressed the changes to the early voting regime and the
17    question of moving voters in this directive?
18        A.   Specifically, I imagine that it is because this
19    is something that there were questions about or he
20    wanted to provide clarification on to the Supervisors of
21    Elections.
22        Q.   So were these the two most controversial changes
23    among the Supervisors of Elections?
24        A.   I don't know that they were controversial per se,
25    but I could see from an administrative standpoint or a

*MARY CLARKE CORKERY, COURT REPORTER*

1   logistical standpoint where perhaps clarity needed to be

2   given or provided to the Supervisors.

3       Q.   Would it be fair to say that, from the

4   perspective of logistics and organization, those were

5   the two most significant changes of the four changes?

6       A.   Significant in terms of logistics on the -- from

7   the standpoint of Supervisors, yes, as those are things

8   that would require the Supervisors' attention.

9       Q.   Do you know why this directive didn't distinguish

10  between covered and non-covered counties?

11      A.   No.

12      Q.   Okay.  Do you think it would have been better

13  from the perspective of practice to distinguish between

14  the covered and non-covered counties?

15      A.   Well, at that point in time, I don't know that

16  there was really a need for distinction.

17      Q.   Are you aware of what covered versus non-covered

18  county means?

19      A.   You're talking about preclearance counties versus

20  non-preclearance counties; correct?

21      Q.   Correct.

22      A.   Okay.  Yeah.

23      Q.   This directive didn't only go to the non-covered

24  counties; it went to all the counties?

25      A.   Correct.

**—MARY CLARKE CORKERY, COURT REPORTER—**

Q.   Do you know why the Secretary didn't distinguish between the two?

A.   Well, at the time the bill was becoming law -- I mean, it isn't automatically precleared like the law would be considered law for all, I would imagine.

Q.   Is that your understanding of how preclearance works?

A.   Well, my understanding is, like, when it got precleared, everything got precleared except for the four provisions that we're talking about.

Q.   Right.

A.   But on May 19th, I don't know that, you know, that there was preclearance that had transpired at that point in time.

Q.   Right.  And that's exactly the reason for my question.

A.   Right.

Q.   Given that the four sets of changes, including the two specifically referred to there, had not been precleared --

A.   Right.

Q.   -- in the covered counties, is it odd that the Secretary would send this directive to all of the counties?

A.   At the time, like I said, it did not strike me as

*MARY CLARKE CORKERY, COURT REPORTER*

A6328

1    odd because of the fact that I had just begun my

2    position and I really didn't -- I didn't see the need

3    for two different types of directives to be issued at

4    that point in time.

5    Q.  Prior to taking the position as director of the

6    division, did you know really anything about

7    preclearance versus non-preclearance required counties?

8    A.  I knew a little bit about it, but I did not work

9    in a preclearance county.

10    Q.  Right.

11    A.  So I knew that it existed, but I was not

12    affected.

13    Q.  Well, you say you weren't affected.  In your

14    experience, when election law changes were made, did

15    they immediately go into effect in non-covered counties

16    such as yours or was there a period in which they were

17    law but they weren't implemented while preclearance was

18    sought and other things were done?

19    A.  I believe there was a period where we knew it

20    came into law, but there was a period until we knew it

21    was actually implemented.

22    Q.  Correct.

23    A.  Yes.

24    Q.  And was that the standard procedure every time

25    there was an election law change, that there was a

*MARY CLARKE CORKERY, COURT REPORTER*

1    period in which it had been made law but it wasn't

2    implemented?  Right?

3        A.  If I recall, we started to move towards the

4    change, so, logistically, from an organizational

5    standpoint, we started to look at which forms needed to

6    be amended, which procedures needed to be amended, and

7    we would work towards that, that goal.  I mean, we would

8    almost take it as law from the time that it was signed

9    and then it was, like, okay, it's been implemented.

10       Q.  I understand.

11       A.  Yeah.

12       Q.  But, just to go to my question, it was not

13   implemented immediately; correct?

14       A.  It depended also on the date that the law became

15   effective because sometimes the law would become

16   effective immediately, other times it might have been a

17   July 1st or an October 1st date, you know, January 1st

18   date, whatever, so --

19       Q.  Prior to this particular piece of legislation, do

20   you actually recall any election law changes that were

21   immediately implemented in the non-covered counties

22   before they had been precleared by the Department of

23   Justice or through a lawsuit?

24       A.  I can't recall details at this time.

25       Q.  But you did testify that you remember that,

*MARY CLARKE CORKERY, COURT REPORTER*

1   generally speaking, there was a period in which you knew

2   the law had been passed but it wasn't implemented

3   immediately; right?

4     A.   And I'm, I'm just trying to recall the reason

5   why, if it was because it had a date that perhaps

6   implementation occurred later --

7     Q.   Uh-huh.

8     A.   -- or if we were waiting for something.  You

9   know, I was not Supervisor of Elections.  I was down the

10   chain one, so --

11     Q.   Understood.  Understood.

12     Do you recall any other, prior to becoming

13   Director, any other election law changes that were made

14   implemen -- strike that -- that were implemented

15   immediately upon signing as this one was?

16     A.   I cannot recall.

17     Q.   I'll turn your attention to another document

18   that's been used in this case.  This is Exhibit 6.  Do

19   you recognize this document?

20     A.   Yes.

21     Q.   What is it?

22     A.   It is a memorandum to the Supervisors of

23   Elections from Jennifer Kennedy with regards to House

24   Bill 1355.

25     Q.   Now, you were on the job as of the date of this

*MARY CLARKE CORKERY, COURT REPORTER*

1     memorandum; correct?

2       A.   Correct.

3       Q.   Why did Ms. Kennedy sign it?

4       A.   Because I was new as director.  I do believe that

5     there were points that they felt needed coverage and

6     Jennifer Kennedy had been the acting director prior to

7     me taking my position.

8       Q.   Okay.  Were you involved in preparing this

9     memorandum?

10      A.   No, I was not.

11      Q.   Do you know whether this memorandum was issued in

12    addition to Secretary Browning's directive or was it

13    something that superseded the Secretary's directive?  Do

14    you understand the relationship between the two?

15      A.   I would not say it superseded.  I would say it

16    was at the same time.  So it was further clarification

17    as to the changes or significant changes in the bill.

18      Q.   Okay.  Do you know why it was -- why the changes

19    referred to in this memorandum were needed, why it had

20    -- this memorandum had to be issued to give this

21    guidance?

22      A.   I think it was a point of clarification just as

23    an overall, like, a synopsis of the changes that had

24    occurred within the law.

25      Q.   Let me turn your attention to the last page,

──MARY CLARKE CORKERY, COURT REPORTER──

 1    which is page six.  Do you see the section there that

 2    speaks of third-party voter registration organizations?

 3        A.   Yes.

 4        Q.   Do you know why the bullet point under that is

 5    fraud prevention?

 6        A.   No, I do not.

 7        Q.   And, again, going back to your prior testimony,

 8    were you aware of any perception in Florida prior to

 9    this change being passed that third-party voter

10    registration fraud was a significant issue in the state?

11        A.   I guess, I can clarify from the standpoint of

12    when I was with Broward Supervisor of Elections' Office.

13        Q.   Uh-huh.

14        A.   I don't know that we really called them

15    third-party voter registration organizations, but there

16    were a number of organizations that were doing voter

17    registration drives at the time.

18        Q.   Uh-huh.

19        A.   And they would come with boxes of voter

20    registrations usually, like, right at the time of the

21    book closing.

22        Q.   Uh-huh.

23        A.   Which really caused a lot of strain on the

24    Supervisors' offices and their ability to get the voters

25    on the rolls right at the book closing.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   Uh-huh.

2    A.   So there were a number of organizations,

3   specifically down in Broward, that were doing that.  And

4   this is going back to 2004, so --

5    Q.   Understood.  But, in your experience, prior to

6   this bill being passed, was fraud by such organizations

7   a problem?  Not just a burden that they imposed on you

8   by coming with these voter registrations, but was fraud

9   a perceived problem?

10    A.   I mean, I can't speak to it directly.

11    Q.   So, no, not in your experience; correct?

12    A.   Not in my experience.

13    Q.   I want to show you what will be a new exhibit.

14         MR. FARR:  So this will be Number 109.

15    Let's mark this as Exhibit 109.

16         (Whereupon, DOS Deposition Exhibit Number

17   109 was marked for identification.)

18         MS. DAVIS:  Can I have a copy?

19         MR. FARR:  Oh, sure.

20         (Laughter.)

21         MR. FARR:  Sure.  I've got plenty.

22         MS. DAVIS:  Thank you.

23   BY MR. FARR:

24    Q.   Doctor Salas, have you seen Exhibit 109 before?

25    A.   Yes.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   What is it?

2    A.   It is a memorandum to Supervisors of Elections

3    dated May 31st, regarding initiative petition changes

4    signed by me.

5    Q.   Okay.  And, again, I'm just trying to get a sense

6    of this.  Why did you, rather than Secretary Browning or

7    Ms. Kennedy, send this particular directive?

8    A.   Well, by this point in time, I had been director

9    for a couple of weeks, and, in my official capacity as

10   director, I do send memos and information to the

11   Supervisors of Elections periodically.

12   Q.   Were the initiative petition changes that are the

13   subject of this memorandum, was that a particular thing

14   that you focused on in your first couple of weeks of

15   work?

16   A.   Not that I focused on it, but it came to my

17   attention that we should go ahead and send out some

18   clarification regarding the certification of the

19   initiative petitions.

20   Q.   And how did that come to your attention?

21   A.   I don't recall directly, but it would have been

22   with conversations probably with Ms. Kennedy.

23   Q.   Did Ms. Kennedy tell you there was confusion

24   about the nature of this change amongst Supervisors of

25   Elections or anyone else?

─MARY CLARKE CORKERY, COURT REPORTER─

1    A.   I cannot recall the specifics of my conversations

2  at that point.

3    Q.   Okay.  You say in the first paragraph here, the

4  last line:  One major change involved constitutional

5  initiative petitions and s. 100.371 Florida Statutes.

6  Why did you describe the change as a major change?

7    A.   Well, because it does affect the shelf life of

8  the signatures from four years to two years and it could

9  be something that would be a major change.

10    Q.   All right.  Major in what sense?

11    A.   Just from the logistics point of view for

12  certification of petitions from the Supervisors'

13  offices.

14    Q.   Okay.  Just because the time period was shorter?

15    A.   Because it went from four years to two years,

16  yes.

17    Q.   So what did the Supervisors of Elections have to

18  do to implement that change?

19    A.   I am not certain, speaking for the Supervisors of

20  Elections, what they would have to do in their offices.

21    Q.   Okay.  We've been talking about how HB 1355 and

22  the four changes were made immediately applicable on

23  signing at least in the non-covered counties; correct?

24    A.   Uh-huh.

25    Q.   And I've been talking to you a little bit about

*MARY CLARKE CORKERY, COURT REPORTER*

1   your experience.  I just want to make sure I've got the

2   record clear on this.  In your experience, was there, as

3   far as you can recall, always a delay between a law

4   being signed and it actually being implemented?

5       A.   Once again --

6       Q.   Can you recall?

7       A.   -- I cannot recall specifically.  I mean, I just

8   do recall that there would be different implementation

9   dates and they were usually set out by the law.

10      Q.   And I believe you testified earlier you can't

11  recall one where the law specified as the implementation

12  date the date of signing?

13      A.   Correct.

14      Q.   Okay.  In your experience, is that sort of delay

15  between when it becomes law and when it becomes

16  implemented, does that exist for any particular reason?

17      A.   Really, I do not know the reason because -- I

18  mean, I have seen laws where they might be effective

19  July 1st, another law might be effective October 1st,

20  and the other would be January 1st.  So how that

21  determination is made by the Legislature, I have never

22  really known the basis for it.

23      Q.   Okay.  Do you know whether the delay in

24  implementation is to allow time for the Department of

25  State to issue rules or revise policies?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.  I don't know that that is the purpose of the
2  delay.
3    Q.  You just don't know one way or the other?
4    A.  No.
5    Q.  So I could suggest a bunch of particular reasons
6  and it would be speculation for you to tell me what it
7  is; right?
8    A.  Speculation, right.
9    Q.  You could say that sounds like a good reason, but
10  I really don't know?
11    A.  Yes.
12    Q.  Okay.  But you would agree with me that, at least
13  based on your experience, this law is unusual in that it
14  was made effective immediately upon signing?  In your
15  experience?
16    A.  Yes.  I just cannot recall another law that was
17  effective immediately off the top of my head.
18    Q.  Okay.  And you don't know why this law was made
19  immediately effective upon signing, do you?
20    A.  No.
21    Q.  Do you know or have you heard since taking the
22  job that there was any particular pressure on, on the
23  law to be effective that immediately?
24    A.  No.
25    Q.  Now, Florida law, as I believe you already

*MARY CLARKE CORKERY, COURT REPORTER*

1   testified when we were talking about what the purpose of

2   your department is, Florida law requires the uniform

3   implementation of election law; correct?

4       A.   Correct.

5       Q.   All right.  And does that mean, in your

6   understanding, that laws relating to elections and

7   voting have to be uniform across the state?

8       A.   Well, theoretically, yes.  However, I am aware of

9   the preclearance counties.

10      Q.   I understand.

11      A.   So, therefore, the preclearance counties are

12  subject to preclearance by the Department of Justice and

13  until that transpires it does not go into effect in

14  those counties.

15      Q.   Correct.

16           And if there's a situation in which a change is

17  immediately implemented in the non-covered counties and

18  it can't be implemented because the preclearance process

19  isn't complete, during that period, Florida law is not

20  being implemented uniformly, is it?

21      A.   I understand your point, yes.

22      Q.   That's a yes.

23           Do you believe that that's the reason why, prior

24  to this law going into effect, Florida law was not made

25  immediately applicable in the non-covered counties so

*MARY CLARKE CORKERY, COURT REPORTER*

1   that it could be applied uniformly?

2       A.   It would only be speculation on my part.

3       Q.   Does it trouble you that Florida law is not being

4   implemented uniformly at this time?

5       A.   From the standpoint of logistics, it just -- we

6   just have to be aware that we have certain counties that

7   are under preclearance rules and we just have to be

8   careful in, in how we communicate with them to ensure

9   that we get the proper message out so that they can

10  apply the laws as they should.

11      Q.   But does it trouble you as one of the -- well,

12  strike that.

13          Does it trouble you as the officer who leads the

14  division that's responsible for ensuring uniform

15  application of Florida laws that it's not being done

16  uniformly now?

17      A.   Well, logistically, it would be easier to have

18  everything under one law.  That -- definitely,

19  logistically, that would be the way to go.

20      Q.   In terms of doing your job, wouldn't it have been

21  easier if this law had not been made immediately

22  applicable in the non-covered counties upon signing and

23  they had just waited until the preclearance process was

24  complete?

25      A.   Well, I understand preclearance does take some

*MARY CLARKE CORKERY, COURT REPORTER*

1   time, so my -- I know that that is a process that could

2   take months.

3      Q.  But in terms of -- yeah, but in terms of carrying

4   out your mandate of ensuring uniform application of the

5   Florida law and the logistics issues that you discussed,

6   wouldn't it have been easier if they had just waited to

7   implement the law in the non-covered counties?

8      A.  Well, unfortunately, I don't know that the State

9   of Florida laws really provide for that preclearance

10   option.  I mean, there is nothing in the law that says

11   laws will not become effective until they are

12   precleared.  So it is a process and --

13      Q.  Well, there's something in federal law that says

14   that; right?  Laws will not become effective until --

15      A.  It is the federal law, but it is not the State of

16   Florida law, so -- I mean, that could really have an

17   effect on how we do business, I guess, within the state.

18      Q.  But Florida law requires election laws to be

19   applied uniformly; correct?

20      A.  That is what the law says.

21      Q.  Right.  And you testified earlier they're not

22   being applied uniformly now because of the preclearance

23   issue; correct?

24      A.  Well, they are being applied uniformly within the

25   preclearance counties and applied uniformly within the

*MARY CLARKE CORKERY, COURT REPORTER*

1  non-preclearance counties.

2      Q.   Right, but not everywhere within the state;

3  correct?

4      A.   There's -- yes, they are under different

5  mandates, but they are applied uniformly within those

6  counties.

7      Q.   I understand.  But across the state, there are

8  different mandates; correct?

9      A.   For those four provisions.

10     Q.   Right.  And wouldn't it have been easier simply

11  to not implement them in the non-covered counties while

12  awaiting preclearance?

13     A.   From a logistics standpoint, if you were under

14  one set of rules, you know, certainly that might make

15  things easier, but the law does allow us to move forward

16  in the non-preclearance versus the preclearance.

17     Q.   It doesn't just allow it, it requires it;

18  correct, ma'am?

19     A.   If I am not mistaken, if the law has been passed,

20  then you must move forward with it.  I mean, there's

21  nothing that says you can say, okay, we're just going to

22  wait until everything gets precleared.  I mean, I'm not,

23  I'm not really savvy in that.  I think it's kind of a

24  legal question, so I would, you know, really defer to my

25  legal counsel to get clarification on that.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   I think I understand.

2         Have you heard since becoming Director of

3    Elections that the Secretary of State's Office had in

4    the past taken the position that when a law could not be

5    made immediately applicable in the non-covered counties

6    that they would wait to apply it in the covered count --

7    in the non-covered counties until preclearance had been

8    obtained?

9    A.   No, I was not aware of that.

10   Q.   And have you heard that the Secretary of State's

11   Office, Office of General Counsel, had actually opined

12   that to do otherwise, to apply the law immediately in

13   the non-covered counties and not apply it in the covered

14   counties, would actually potentially be a violation of

15   Florida law?

16   A.   No, I was not aware of that.

17   Q.   Have you heard of Division of Elections' opinion

18   98-13?

19   A.   I would have to look that up.

20   Q.   Have you ever heard of it before?

21   A.   Well, I mean, I'm aware of the Division of

22   Elections' opinions, but not specifically by that

23   number.  I mean, I would have to look at it in order to

24   refresh my memory on what it says.

25   Q.   Okay.  I may be able to help with that.  Just one

*MARY CLARKE CORKERY, COURT REPORTER*

1    sec.

2        Let me show you what's been previously marked as

3    Exhibit 38 in this litigation, and this is -- and

4    there's been prior testimony about this Division of

5    Elections opinion 98-13 from August 19, 1998.  Are you

6    familiar with this?  And please take your time to look

7    it over.

8        A.   (Witness reviews document.)

9        Let me get to the bottom.

10       Q.   Well, let me, let me suggest something to you as

11   potentially the bottom line.  If you look -- because

12   there are a bunch of things.  What I really asked you

13   about is on the second page --

14       A.   Okay.

15       Q.   -- last paragraph, which says -- it says:  As a

16   result, with respect to your second questions and for

17   the reasons set forth below, it is the opinion of the

18   Division of Elections that all 67 Florida counties

19   should instruct absentee voters, issue absentee ballots,

20   count voted absentee ballots, canvass absentee ballots,

21   and require polling place identifications pursuant to

22   the 1997 Florida Election Code, and not penalize persons

23   who are determined to have witnessed more than five

24   absentee ballots as provided in subsection (3).  To do

25   otherwise, in our opinion, has the potential to cause

*MARY CLARKE CORKERY, COURT REPORTER*

1   widespread voter confusion, affect the integrity of the

2   elections process, impair uniform application of the

3   election laws and could violate Federal and State laws

4   and both the Florida and United States Constitutions.

5       Do you see that?

6   A.  Uh-huh.

7   Q.  Were aware prior to today of this opinion?

8   A.  I kind of recall this opinion.

9   Q.  Yeah.

10  A.  Yes.

11  Q.  And the opinion of the Secretary of State's

12  Office at that time was that a change should not and

13  could not be implemented in the non-covered counties --

14  A.  Uh-huh.

15  Q.  -- prior to preclearance; correct?

16  A.  Correct.

17  Q.  And that's inconsistent with what Florida is

18  doing in this instant; correct?

19  A.  It would be.

20  Q.  And do you know the reason for that

21  inconsistency?

22  A.  I do not.

23  Q.  Has that ever been shared with you by anyone?

24  A.  No.

25  Q.  I want to call your attention to something else,

*MARY CLARKE CORKERY, COURT REPORTER*

1    which is Exhibit 39 in this case.  I'll show that to

2    you.  Do you recognize that document?

3        A.   No, I've never seen it before.

4        Q.   Just for the record, who is Maria Matthews?

5        A.   She is an Assistant General Counsel with

6    Department of State.

7        Q.   I just want to call your attention to the first

8    paragraph of this document.  It discusses that, on

9    October 26, 2007, the U.S. Department of Justice, DOJ,

10   precleared all but four sections of the 2007 election

11   legislation.  DOJ requested extensive supplemental

12   information as to these four sections.  Under Florida

13   law, that request triggered another 60-day review from

14   the date the response was received.  That means DOJ

15   could take until January 25, 2008 to issue its

16   determination.  Therefore, the changes in those four

17   sections relating to voter registration and voting

18   cannot be implemented in any county until DOJ preclears

19   them.

20        Did I read that correctly?

21        A.   That is correct.

22        Q.   And that's consistent with the policy established

23   by Division of Elections' opinion 98-13, is it not?

24        A.   That is.

25        Q.   But it's inconsistent with what Florida is doing

*MARY CLARKE CORKERY, COURT REPORTER*

 1   with respect to the four sets of changes in HB 1355,

 2   isn't it?

 3       A.   It is different.

 4       Q.   And do you know the reason for that difference?

 5       A.   I do not.

 6       Q.   Does the difference trouble you as the officer

 7   responsible for the division that ensures implementation

 8   uniformly of Florida's election law?

 9       A.   Like I said previously, we have advised

10   Supervisors to apply the law in accordance with what

11   General Counsel has advised us at this time.

12       Q.   And you don't know the reason for this change in

13   policy?

14       A.   No, I do not.

15       Q.   Let me -- have you, in fact, advised any

16   organization with respect to this duality, if you will,

17   that exists in Florida right now that they have certain

18   obligations in the covered counties and certain

19   obligations in the non-covered counties?

20       A.   Advised in what respect?

21       Q.   In any respect.  Do you recall as you sit here?

22       A.   We have letters which are basically form letters

23   that we utilize to send to the counties, and we do have

24   some that we send to preclearance counties, others that

25   we send to the non-preclearance counties, and we also

*MARY CLARKE CORKERY, COURT REPORTER*

1   will look at the organization as to whether or not they

2   are operating in a preclearance county only, a

3   non-preclearance -- non-preclearance counties or, you

4   know, whether they have combination of both.

5       Q.   And you've authored such letters; is that right?

6       A.   Actually, I have signed such letters.  They have

7   really come from our General Counsel's Office.

8       Q.   Understood.  I'm going to show you one such

9   letter, I believe, or memo.

10              MR. FARR:  Let's mark this as Exhibit 110.

11              (Whereupon, DOS Deposition Exhibit Number

12  110 was marked for identification.)

13  BY MR. FARR:

14      Q.   I'm going to show you Exhibit 110.

15           Ms. Salas, do you recognize this document?

16      A.   I recognize, yes, this letter.

17      Q.   And what is it?

18      A.   It's, it's basically a form letter that is used

19  in this particular case.  This one is addressed to Ms.

20  Maria Guerreros from National Council of La Raza.

21      Q.   Uh-huh.

22           And is it correct that you instructed NCLR

23  concerning the requirements for submitting voter

24  registration applications under the third-party voter

25  registration law and that you advised her that they are

─────MARY CLARKE CORKERY, COURT REPORTER─────

1    different in the covered and non-covered counties?

2        A.   Activities in preclearance county and activities

3    in non-preclearance counties, correct.

4        Q.   And you said that this is something that the

5    General Counsel's Office created for you?

6        A.   Correct.

7        Q.   All right.  And this creates, in a sense, you

8    know, a different set of rules; right?  Depending on

9    whether they're operating in a preclearance county or a

10   clearance county, a clear county, or a non-covered

11   county, we call it?

12       A.   Correct.  There's different procedures, slightly

13   different procedures.

14       Q.   All right.  And just going back to this duality

15   that now exists, you really have -- do you have any

16   knowledge as to what the reason is for the rush in

17   applying this law in the non-covered counties?

18       A.   I do not have the background information.

19       Q.   All right.  Did you have any involvement -- well,

20   strike that.

21           First, did NCLR respond to this at all?

22       A.   I am not aware.

23       Q.   Are you aware that third-party voter registration

24   organizations have announced that as a result of this

25   change they will not be able to operate in Florida?

1    A.   I have heard that.

2    Q.   Okay.  Have you investigated that at all or

3  spoken to any of the representatives of those

4  organizations at all?

5    A.   I have not.

6    Q.   Do you know whether anyone has, to try to address

7  their concerns about this change?

8    A.   I am not aware.

9    Q.   Did you have any involvement with regard to any

10  public statements that Secretary Browning made

11  concerning HB 1355 after it was signed into law?

12    A.   Do I have involvement?

13    Q.   Did you have any involvement?

14    A.   No.

15    Q.   Did you have any involvement, for example, in any

16  Ovid pieces that he published about the law?

17    A.   No.

18    Q.   Did you have any role with respect to the

19  administrative preclearance process?

20    A.   No.

21    Q.   Did you have any communications with anybody in

22  the General Counsel's Office about that?

23    A.   No, other than just being briefed on where we

24  were in the process.

25    Q.   Okay.  Are you aware that the four sets of

*MARY CLARKE CORKERY, COURT REPORTER*

A6350

1  changes were withdrawn from the administrative

2  preclearance process and a lawsuit was filed?

3      A.   Yes.

4      Q.   Do you know the reason for that change of

5  approach by Florida?

6      A.   Just because they, if I'm not mistaken, they

7  wanted to make sure that everything got precleared as

8  soon as possible, you know, that it -- that everything

9  cleared and those were the areas that seemed to have

10 some questions related to them and that is the reason

11 why they were separated --

12     Q.   Okay.

13     A.   -- so as not to hold up the rest of the process.

14     Q.   Do you know why the State felt litigation would

15 be faster than the administered process with DOJ?

16     A.   I really don't know the specifics.

17     Q.   That was never discussed with you or shared with

18 you?

19     A.   Not the specifics, no.

20     Q.   All right.  I just want to make sure that I have

21 clear on the record a couple of things I believe you've

22 told me before.  You're not aware of any incidents of

23 voter registration fraud or misconduct in Florida

24 related to third-party voter registration organizations,

25 are you?

─────MARY CLARKE CORKERY, COURT REPORTER─────

1    A.   Not specifically, no.

2    Q.   Okay.  Well, generally, are you aware of any?

3    A.   I mean, I have heard what I have heard in the

4    news and what have you, but I don't have specific

5    information.

6    Q.   And when you say you have heard what you heard in

7    the news, is that, like, the stuff about ACORN, or what

8    have you heard in the news?

9    A.   ACORN would be one of the organizations, yes.

10   Q.   What else have you heard in the news?

11   A.   Just the general statements that it lends itself

12   to voter fraud.

13   Q.   Okay.  But you've never experienced or seen that

14   in Florida professionally, have you?

15   A.   I mean, I cannot give you specifics.

16   Q.   Right.  But you haven't seen it, have you?

17   A.   I have not had a specific incident myself that

18   I've been related -- involved in.

19   Q.   Are you aware, in your experience, of any

20   instances of untimely submission of completed voter

21   registration applications by such organizations?

22   A.   Like I said previously, going back to Broward

23   back in 2004, I am aware of organizations holding voter

24   registration applications and then bringing them in all

25   at the same time, probably because it was easier for

―――MARY CLARKE CORKERY, COURT REPORTER―――

A6352

1    them logistically, but it imposed a burden on the

2    Supervisor's office with regards to processing of

3    applications and also -- I mean, that's, that's the kind

4    of thing that, if, if third-party registration

5    organizations were to hold applications for a long

6    period of time, it could lend itself to being lost

7    and --

8        Q.   Right, but that's --

9        A.   -- misplaced.

10       Q.   But that's just speculation on your part that it

11   could be lost?  You haven't experienced that, have you?

12       A.   Well, I have not firsthand experienced it, but I

13   can tell you that they were holding applications for a

14   period of time prior to bringing them to the office.

15       Q.   I understand that.  Actually, my question was,

16   have you had any experience with instances where such

17   organizations held voter registration applications

18   longer than the ten days that the old law provided?

19       A.   I'm not certain what the law was back in 2004, so

20   I could not speak for that.

21       Q.   Okay.  Have you had any experience with such

22   organizations trying to submit applications after book

23   closing?  I understand your testimony to be before book

24   closing and close to book closing they come in with a

25   lot, but do you have any experience with them trying to

―――MARY CLARKE CORKERY, COURT REPORTER―――

1   submit them after book closing, missing the deadline,

2   under the old law?

3     A.  Not from a firsthand basis, I cannot recall.

4     Q.  All right.  And you aren't aware of any gaps or

5   loopholes in the third-party voter registration

6   organization law before HB 1355, are you?

7          MS. DAVIS:  Objection; vague.

8          MR. FARR:  Well --

9          MS. DAVIS:  You can answer.

10         MR. FARR:  You can answer.  I mean, gaps or

11       loopholes in the law that you're aware of.

12         THE WITNESS:  I am not aware of any, but

13       also, given the time period that I was out of the

14       elections profession --

15         MR. FARR:  That you wouldn't be --

16         THE WITNESS:  -- I was not aware, no.

17   BY MR. FARR:

18     Q.  Okay.  Are you aware -- well, strike that.

19         You are aware or you have heard that certain

20   third-party voter registration organizations said that

21   they will stop registering people as a result of this

22   law; right?

23     A.  Yes.

24     Q.  Does that concern you at all?

25     A.  People have other methods by which they can

*MARY CLARKE CORKERY, COURT REPORTER*

1  register to vote.  They can obtain registration forms

2  themselves from Supervisors' offices, from the Division,

3  they can get them online.  So there's other methods by

4  which they can obtain voter registration applications.

5      Q.  But would you agree that third-party voter

6  registration organizations have been effective in

7  registering people that were not registering before or

8  do you have any knowledge about that at all?

9      A.  Well, I mean, historically, there's been numerous

10  organizations and individuals that have assisted in

11  voter registration processes, but nothing really

12  precludes an individual from assisting a person to

13  register to vote or giving them an application.  They

14  would not have to be registered as a third-party

15  organization to do that.

16      Q.  Right.

17      A.  It would only be if they are collecting that they

18  would have to register as a third-party.

19      Q.  I understand.  But does it concern you that

20  organizations like the League of Women Voters of Florida

21  and NCLR are saying that in response to this law they

22  will discontinue operations in the state?

23      A.  Well, I do not believe that they understand the

24  law.

25      Q.  And what's that based on?

──MARY CLARKE CORKERY, COURT REPORTER──

1    A.   Just the fact that they would be -- under the

2   law, they would be able to still assist people to

3   register to vote, provide them with forms, without even

4   being registered as a third-party organization.

5    Q.   Do you understand the nature of their concerns

6   with the law?  Do you know what their problems with it

7   are?

8    A.   I do not know specifically.

9    Q.   One aspect -- well, strike that.

10       First, are you aware that African-Americans and

11   Hispanics register to vote via such groups at a higher

12   rate than other voters?  Are you aware of that?

13    A.   I have heard that in the news and other

14   documents.

15    Q.   But it's not something you have any specific

16   knowledge about?

17    A.   Not firsthand knowledge, no.

18    Q.   Do you know how -- well, strike that.

19       One aspect of the law change is that voter

20   registration applications must now be submitted within

21   48 hours of being signed; correct?

22    A.   Correct.

23    Q.   Do you know why 48 hours was chosen by the

24   Legislature as the time period as opposed to 72 hours or

25   four days or anything like that?

*MARY CLARKE CORKERY, COURT REPORTER*

 1    A.   No.

 2    Q.   Do you think it was needed for the time period to

 3  be shortened from ten days to two days, that that was

 4  something that needed to be done in any way?

 5    A.   Once again, it would only be my speculation.

 6    Q.   Now, help me understand the change.  It's

 7  correct, isn't it, that in order to submit a voter

 8  registration application by mail and use the postmarked

 9  date on the submission date, that's one thing the law

10  provides; right?  It uses the postmark date if you

11  submit it by mail --

12    A.   Correct.

13    Q.   -- to determine the 48 hours?

14         Is that right or not?  I don't know.

15    A.   Okay.  Postmark date, I think it is, if it is

16  clear, if I'm not mistaken, like, the postmark date has

17  to be legible.

18    Q.   Okay.  And does a third-party voter registration

19  organization or anyone who uses the mail have any

20  control over whether a post office's postmark is clear?

21    A.   If they went to the counter and asked that it be

22  postmarked in their presence.

23    Q.   Right.  But, typically, is that what happens?

24    A.   If someone was really trying to make certain that

25  they were compliant with something that required the

*MARY CLARKE CORKERY, COURT REPORTER*

1   postmark, that would possibly be the way to do it.

2      Q.   But in your experience as someone who just uses

3   the mail in Florida, is that typically what people do,

4   ask for a postmark to be stamped in their presence?

5      A.   Like I said, if it's something that the law

6   requires.

7      Q.   But it's not something people typically do, is

8   it?

9      A.   It may not be typical.

10     Q.   Have you ever seen postmarks even in official

11  correspondence at the Secretary of State's Office where

12  the date is illegible?

13     A.   Yes.

14     Q.   Okay.  If I showed you, for example, a letter

15  from Representative Baxley to Governor Scott thanking

16  him for signing HB and the date was illegible, would

17  that surprise you?

18     A.   It's a possibility.

19     Q.   Okay.  Let me just show you one such letter.  I

20  just want to ask you how the law would be -- how the

21  law would deal with it.

22             MR. FARR:  Let's make this Exhibit 111.

23             (Whereupon, DOS Deposition Exhibit Number

24  111 was marked for identification.)

25  BY MR. FARR:

*MARY CLARKE CORKERY, COURT REPORTER*

1     Q.   Doctor Salas, can you take a look at Exhibit 111.

2   Are you familiar with this letter?

3     A.   No.

4     Q.   Okay.  I guess, my question is, if I turn to the

5   second page and I look at the -- which is, I'll

6   represent to you, the cover of the letter.  It's the

7   envelope.  I can't read the postmark.  Can you?

8     A.   No.

9     Q.   And, based on the date stamp on the front -- if

10   you turn to the letter itself, there's a date stamp, you

11   know, received by.  Do you see that?  It's actually on

12   the letter itself.  If you turn -- it seems to have been

13   date stamped as --

14     A.   Up on the top?

15     Q.   Yeah, received by the Governor's Office on May

16   31st, 2011.

17     A.   Right.

18     Q.   And we've already established we can't see the

19   postmarked date on the letter.  So, I guess, my question

20   is, if this was a voter registration application that he

21   sent on May 25th, 2011, and they weren't received until

22   May 31st, 2011, and the postmark was unclear, would he

23   have violated the 48-hour limit?  Is that your

24   understanding of how the law would work?

25     A.   It would be the date received.

**MARY CLARKE CORKERY, COURT REPORTER**

1    Q.   Yeah.

2    A.   So the 31st.

3    Q.   So, other than taking all of their applications

4  to the post office and asking for them to be date

5  stamped in their presence, is there anything else you

6  can think of that a third-party voter registration

7  organization could do to comply with the law?

8    A.   They can take them to any Supervisor of

9  Elections' Office within the 48 hours.

10    Q.   I mean using the mail.  Is there anything else

11  they could do to avoid this issue?

12    A.   If they wanted to utilize the mail, then they

13  would need to ensure that it had a proper postmark.

14    Q.   Okay.  Are you aware that under the old law some

15  third-party voter registration organizations used the

16  ten-day period between receiving the application and

17  submitting it to the Supervisor of Elections to review

18  it for accuracy and compliance with the law?

19    A.   No.

20    Q.   Well, if they did, do you think that would be a

21  good thing to avoid problems with getting people

22  registered?

23    A.   Right now the law does not require that they

24  review them for completion.

25    Q.   Well, I understand.

**MARY CLARKE CORKERY, COURT REPORTER**

1    A.   It just requires them to turn them in.

2    Q.   Do you believe, based on your understanding of

3    how such groups work, if you have one, will the

4    reduction in time to submit those applications reduce

5    their ability to conduct such quality control?

6    A.   If they were sitting one-on-one with an

7    individual, they could probably ensure that the blanks

8    were being filled in.

9    Q.   All right.  But do you --

10    A.   And they can do that even without being a

11    third-party organization.  They don't have to be a

12    third-party organization to assist.

13    Q.   All right.  But you understand that these

14    organizations attempt to register people in very large

15    numbers?

16    A.   And actually collect, correct.

17    Q.   So won't this reduction in time impair their

18    ability to conduct quality control and potentially lead

19    to problems, based on your understanding of how they

20    work?

21    A.   Like I said, they have the ability if they wanted

22    to ensure quality control to do it up front on an

23    individual basis with the individuals that they were

24    assisting.

25    Q.   Do you have any idea of the magnitude of the

**MARY CLARKE CORKERY, COURT REPORTER**

1  burden that that would put on them to accomplish their

2  registration goals in the numbers that they have in the

3  past?  Have you made any study of that?

4      A.  I don't have those type of numbers.

5      Q.  What is the effect on Supervisors of Elections if

6  such organizations continue to attempt to register

7  voters in the numbers that they have been in the past

8  and some of those registrations are incomplete,

9  additional incomplete forms being turned in?  What's the

10  effect on the Supervisors of Elections?

11      A.  The burden would be on the Supervisors to ensure

12  the completion of the application.  So they would have

13  to contact the voters to ensure that they have all the

14  necessary required information.

15      Q.  So it creates an additional burden on the

16  Supervisors; correct?

17      A.  They, they would have the burden of ensuring the

18  completion, but that could also happen if an individual

19  was going online, getting an application, and turning it

20  in on their own.

21      Q.  I understand.  But, as you said, the effect of

22  additional incomplete voter registrations being turned

23  in is that the Supervisors then have to undertake the

24  burden of going forward and verifying the information;

25  correct?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   Well, it would be the Supervisors who would have

2  to ensure that they would be complete.  But they would

3  have to do that anyway.  Even if they were being double

4  checked by the third parties, the Supervisor would still

5  have to be ensuring the completeness of each

6  application.

7    Q.   But if an application was complete in terms of

8  all the boxes being filled out, what does the Supervisor

9  have to do, if anything?

10   A.   Well, they would register the individual if it is

11 complete, correct.

12   Q.   If registration applications are being turned in

13 incomplete; right?  It's only then that the Supervisor

14 has to go to the voter and undertake this additional

15 burden; correct?

16   A.   That is correct.

17   Q.   They don't double check every application that's

18 turned in that's complete, do they?

19   A.   Well, they would check to make sure that the

20 boxes that are required are filled in, so -- regardless

21 of where it comes from.

22   Q.   Right.  But it's a little different; right?

23 Because if the boxes are filled in, they don't go to the

24 voter to double check the information.  If the boxes are

25 incomplete, that's when they do undertake the burden to

*MARY CLARKE CORKERY, COURT REPORTER*

1    attempt to complete them; correct?

2        A.   Right, it would be their burden to ensure that

3    they get the information so that the voter is

4    registered.

5        Q.   Understood.

6            Did you have any role in the development of the

7    Department of State's new third-party voter registration

8    rule?

9        A.   Not per se, no.

10       Q.   Let me show what you what we'll mark --

11       A.   I mean, I was present at the rule hearing.

12       Q.   Okay.  And what happened at the rule hearing?

13   Could you describe that for me, please?

14       A.   There was discussion from different Supervisors

15   and people that were there.  I really don't recall the

16   specifics.

17       Q.   Would it be fair to say that some of the

18   Supervisors had concerns about the new 3PVRO change?

19       A.   There were some concerns expressed.  I can't

20   recall the specifics.

21       Q.   Do you recall generally what the concerns were?

22       A.   I know that there is a transcript -- I mean -- or

23   there's a recording.  If we needed to go back, we could

24   listen to that.

25       Q.   Okay.  Do you recall what the concerns were even

*MARY CLARKE CORKERY, COURT REPORTER*

1   in a general way as you sit here?

2       A.  I really can't recall specifics.

3           MR. FARR:  Let's mark what will be, I guess,

4       Exhibit 112.

5           (Whereupon, DOS Deposition Exhibit Number

6   112 was marked for identification.)

7   BY MR. FARR:

8       Q.  Doctor Salas, please take a look at Exhibit 112

9   and tell me, have you seen this exchange of e-mails

10  before?  Do you recognize it?

11      A.  Uh-huh.

12      Q.  Can you tell me why you sent the first e-mail to

13  Jennifer Kennedy and Gary Holland at 11:15 on May 26th?

14  What was the reason for that?

15      A.  Well, like the memo says, I received a number of

16  e-mails regarding the compliance of the emergency rule.

17      Q.  Okay.  But what was the purpose of sending this

18  communication to those two particular individuals?

19      A.  Just sending it to Jennifer and Gary?

20      Q.  Yes.

21      A.  E-mail was written and -- I mean, it's, it's

22  general protocol that if we are sending out a

23  communication, I would normally have it reviewed by

24  Legal as well as the Secretary's office for approval.

25      Q.  Okay.  And it appears that Ms. Kennedy had a

**MARY CLARKE CORKERY, COURT REPORTER**

1    change to your proposed draft; correct?

2        A.   Yes.

3        Q.   You had written, I understand that this is a

4    burdensome mandate to both supervisors and the division

5    alike.  You wrote that; correct?

6        A.   And I can't remember actually if I wrote it or if

7    it was -- if there was another exchange in between Gary

8    and myself.  I really cannot recall.

9        Q.   Do you know why you or somebody wrote that

10   language?

11       A.   Perhaps I may have written that.

12            Well, I mean, just from a logistics standpoint,

13   this was a new law, a change in law, and any time that

14   you do have something that you're doing different, you

15   know, it is, it is going to be burdensome to get the

16   project underway.  So I was probably trying to be

17   sympathetic with the Supervisors in knowing that they

18   were going to have to go through a change.

19       Q.   Do you know why Ms. Kennedy deleted that

20   language?

21       A.   Like I said, it's, it's pretty much protocol for

22   her to review things that I write and make edits and --

23   before it goes out.

24       Q.   But do you know why she made that change?

25       A.   I guess she didn't want that language to be in

1  the e-mail.

2      Q.  Did she not think this change was a burdensome

3  mandate for both Supervisors and Division alike?

4      A.  I would view it as Ms. Kennedy likes to keep

5  things very simple and straightforward and things that

6  are subjective and opinionated usually get edited out.

7      Q.  I see.

8          Was there any particular reason why this opinion,

9  on your part, that I assume was based on your experience

10  as an Assistant Supervisor of Elections was deleted by

11  her?

12     A.  Like I said, I just -- you know, if you were to

13  review other e-mails, you would see that things that are

14  like, subjective, opinionated will normally receive an

15  edit.

16     Q.  Okay.

17     A.  And it's pretty much her style, her protocol.

18     Q.  But would it be fair to say that at least as of

19  this time, May 26, 2011, you actually believed that this

20  third-party rule change was a burdensome mandate to both

21  Supervisors and the Division alike?

22     A.  Well, like I said, having to file something that

23  was a zero report on a daily basis, I can understand

24  from the Supervisor of Elections' standpoint how it's

25  one additional mandate that you would have to be

───*MARY CLARKE CORKERY, COURT REPORTER*───

1    required to do.  So, just from a logistics standpoint,

2    having to have an individual assigned to doing that --

3        Q.  Right.  And other aspects of the change, as you

4    already testified, are burdensome as well on the

5    Supervisors?

6        A.  But it's a logistical thing.  But, you know,

7    Supervisors have to do what they have to do to comply

8    with the law.  That is their constitutional job.

9        Q.  Understood.

10           You know, we've been talking about this issue of

11    uniformity.  Do you know what Florida is going to do if,

12    in fact, as a result of this litigation the four sets of

13    changes are not cleared?

14        A.  I really do not know.

15        Q.  Has that been discussed at all?

16        A.  We haven't really discussed it.  I mean, just

17    from an administrative standpoint, I would imagine that

18    if something were not precleared, then the old law would

19    prevail.

20        Q.  Okay.  And would the old law prevail in the

21    non-covered counties?  Do you think the non-covered

22    counties would stop implementing the new law to comply

23    with Florida's requirement of uniformity?

24        A.  That is something that our legal counsel will

25    have to address and advise us on.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.  Do you have any view about, as the Director of

2    the Division of Elections, what should be the outcome in

3    that eventuality?

4    A.  It would be speculation on my part and I'm not an

5    attorney.  I mean, I --

6    Q.  Well, if it were to happen, what would be your

7    view of what would be the better practice?

8    A.  If it were not precleared, I would imagine that

9    all would revert to the old law, but -- I mean, like I

10   said, that is speculation on my part and I am not an

11   attorney.

12   Q.  Okay.  Are you aware that some of the Supervisor

13   of Election offices are concerned about how difficult it

14   will be to require -- to comply with these new

15   requirements?  Are you aware of those concerns amongst

16   the Supervisors?

17   A.  No.

18   Q.  Have you seen any e-mails from them about that

19   subject, for example?

20   A.  Not recently.

21   Q.  Have you ever seen e-mails from them about it?

22   A.  With regards to implementation of third-party?

23   Q.  Yes.

24   A.  I have gotten some e-mails with concerns of,

25   like, individuals that have turned in applications as a

─MARY CLARKE CORKERY, COURT REPORTER─

1  non-registered third-party, that sort of thing, and, of

2  course, Supervisors are always concerned about that and

3  how it's going to be dealt with.

4      Q.  Okay.  Let me just show you Exhibit 33 in this

5  case, which appears to be an e-mail from Lyle Roberts to

6  Peg Reese.  Do you know who Lyle Roberts is?

7      A.  @hcsoe?

8      Q.  Uh-huh.

9      A.  Is that Hillsborough?  I'm not sure who Lyle is.

10     Q.  Do you know who Peg Reese is?

11     A.  No.

12     Q.  Okay.  Mr. Roberts writes, you know, Peg, I can't

13 say anything you don't know already.  This will be a

14 nightmare to implement, manage, track and report.  And,

15 I guess, my question to you is, just to close the loop

16 on this, were you aware that individuals within

17 Supervisor of Election offices had this view of the

18 third-party voter registration change?

19     A.  No.  I mean, I -- and I do not know these

20 individuals.  I imagine they're, what, Hillsborough?

21     Q.  The e-mail address would lead me to believe that,

22 but I can't testify to that.

23     A.  Yeah, that's what I'm thinking, but --

24     Q.  Has your office --

25     A.  It says Hernando actually.  Sorry.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.    Yeah.

2          Has your office done anything to address concerns

3    such as these?

4    A.    Well, the concerns of the issuance of third-party

5    number --

6    Q.    Uh-huh.

7    A.    -- we have a procedure in place.

8    Q.    Okay.

9    A.    So we try to expeditiously process all

10   third-party applications as soon as they come in and as

11   soon as possible.

12   Q.    Okay.

13   A.    So we do address that.

14         And I see that there are questions as to who,

15   like, actually reports.  I believe that's always

16   addressed in procedures, like, who reports the

17   numbers --

18   Q.    Uh-huh.

19   A.    -- like, where they're dropped off.

20         If they ask for applications only and they're

21   asking if whether or not they have to ensure that

22   they're a third-party organization --

23   Q.    Uh-huh.

24   A.    I mean, anybody can actually get a form.

25   Q.    Uh-huh.

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.    Like I said, you don't have to be a third-party.

2    Q.    Uh-huh.

3          Had any individual at a Supervisor of Elections'

4    office expressed a similar sentiment to you that this

5    law is going to be a nightmare to implement?

6    A.    I really do not recall --

7    Q.    Okay.

8    A.    -- that I got this type of correspondence from

9    them.  But whenever we have gotten questions, we have

10   tried to facilitate responses to them and we've done --

11   we have put together, like, a PowerPoint that takes you

12   through the entire third-party organization process and

13   explains it in a very simple fashion that can also be

14   used by the third-party organizations in order to train

15   their staff.  It can be used by the Supervisor offices

16   to train their staff.  I mean, really, once you read

17   through the law and you understand what is required, it

18   is not difficult to follow the rules.

19   Q.    Unless you find the 48-hour compliant part

20   difficult to comply with.  Would that be fair to say?

21   A.    But you can get it to any Supervisor of

22   Elections' office or you can get it into a post office

23   and ensure that it has a postmark on it.

24   Q.    I understand your testimony about that.

25   A.    Yes.

**MARY CLARKE CORKERY, COURT REPORTER**

 1    Q.   Are you familiar with the Voter Promoter Program?

 2    A.   Yes.

 3    Q.   What is it?

 4    A.   The Voter Promoter is to try to get the schools

 5  to -- on board so that they will register as third

 6  parties and that way, like, the teachers and what have

 7  you will be able to register students.

 8    Q.   What was the need for that program?

 9    A.   I think under the auspices of being a third-party

10  voter registration organization, the fines are limited

11  to the organization per peer rather than for an

12  individual.

13    Q.   Uh-huh.

14    A.   And it was just to prevent there being, you know,

15  like, mistakes being made by individuals that were

16  registering specifically students.

17    Q.   Yeah.  Well, particularly, in this case, to

18  prevent public school teachers from violating this law;

19  correct?

20    A.   Correct.  Exactly.

21    Q.   Is there any reason why it wasn't expanded to

22  other groups that attempt to do this kind of

23  registration, like Boy Scout troops or anybody like

24  that?

25    A.   Really, any organization could do that.  I mean,

1    I think that was just -- it was geared to that, but any

2    organization can actually register all their affiliates

3    so that way they're compliant under the law.

4        Q.   Okay.  But was this particular program with

5    respect to school teachers put in place because there

6    was any kind of problem or outcry with respect to its

7    effect on teachers?

8        A.   Well, yes, there were a couple of teachers that

9    were affected.  So it kind of was brought to light by

10   those specific incidents.

11       Q.   I'll turn your attention to the early voting

12   change.  Was early voting -- and when I say early

13   voting, I'm going to talk about what's changed under the

14   law, early in-person voting; right?  Not any other kind

15   of early voting.  Early in-person voting.

16            Was early in-person voting something you had

17   experience with when you were working as an Assistant

18   Supervisor of Elections?

19       A.   In Broward.

20       Q.   Okay.  And, in your experience -- well, strike

21   that.

22            In your experience, how long was the period of

23   early in-person voting when you were an Assistant

24   Supervisor of Elections?

25       A.   It was, like, two weeks prior.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   And, in your experience, was there usage of the

2  first week of early voting by voters?

3    A.   That depended on the location, but, yes, there

4  was usage.

5    Q.   And was there significant usage?

6    A.   Once again, it depended on the location, but -- I

7  mean, some areas were more significant than others, yes.

8    Q.   But there was significant usage in some areas in

9  Broward; correct?

10    A.   It was used, yes.

11    Q.   So would you disagree with a statement if it was

12  made that the first week of early voting was a waste of

13  money?

14    A.   I don't have the distribution of the number of

15  people who actually used it.  You know, I would have to

16  do an analysis of where it was used and when and by whom

17  in order to make that statement.

18    Q.   Understood.  But you're aware there was

19  significant usage, at least in certain locations, in the

20  first week; correct?

21    A.   I mean, there was usage.  And when you're in a

22  county such as Broward, that's a large county, you know,

23  numbers are going to be greater than other counties that

24  are small counties, for sure.  But, like I said, I

25  really would have to analyze the first week versus the

*MARY CLARKE CORKERY, COURT REPORTER*

1  second week to be able to make such a conclusion.

2     Q.  And you haven't done such an analysis yourself?

3     A.  I have not.  I have not.

4     Q.  Are you aware of whether your division has made

5  any such analysis?

6     A.  I have not seen any actual, like, a chart or

7  anything that would show me all of those numbers.  I

8  know that numbers exist, but I haven't personally taken

9  part in --

10     Q.  Okay.

11     A.  I've looked at numbers here and there, but, you

12  know, I couldn't speak to them right now.

13     Q.  Are you aware whether the Florida Legislature had

14  any such numbers in front of it when it was considering

15  whether to make this change?

16     A.  I do not know that.

17     Q.  Are you aware of the racial makeup of voters who

18  typically vote during the first week of early in-person

19  voting?

20     A.  I do not have that those -- that information.

21     Q.  Do you believe that the elimination of the first

22  week of early voting will result in longer lines at

23  polling places during a shortened early voting period?

24     A.  No.

25     Q.  No?

**MARY CLARKE CORKERY, COURT REPORTER**

1    A.  No.

2    Q.  What's the basis for that statement?

3    A.  The number of hours still remains the same.

4    Q.  Okay.  Why will that not lead to longer lines if

5  the same number of hours conceivably -- and we'll get to

6  that in a minute -- is in place but it's over a shorter

7  number of days?

8    A.  If the same number of hours is available, it

9  doesn't necessarily need to lead to longer lines.

10   Q.  But you haven't done any study of that one way or

11 another?

12   A.  I have not done an analysis, no.

13   Q.  And does the law, in fact, mandate the same

14 number of hours?

15   A.  No.  It does give some variance or options to the

16 Supervisors as to implementation, and that is, I think,

17 primarily done because each county does vary in their

18 needs.  I mean, you cannot consider a small rural county

19 the same way that you would consider a metropolitan

20 county with high numbers of registered voters who would

21 be utilizing early voting.

22   Q.  Are you aware that on April 27, 2011, the

23 Secretary said that the reduction in the number of early

24 voting days and hours that had been proposed by Senator

25 Diaz de la Portilla at that time, quote, appeared to be

*MARY CLARKE CORKERY, COURT REPORTER*

1   problematic to him because if the 2008 turnout repeats

2   itself in 2012 when you have fewer hours you are

3   literally funneling a larger amount of people into a

4   smaller amount of time?

5       A.   I'm not aware of the statement.

6       Q.   Do you disagree with that statement, that if the

7   2012 turnout is like the 2008 turnout it could be

8   problematic because you'll be funneling a larger amount

9   of people into a smaller amount of time?

10      A.   I mean, the statement does make sense, if you

11  look at it in those terms.

12      Q.   And you don't know why the Legislature decided to

13  eliminate the first week of early voting, do you?

14      A.   I do not.

15      Q.   Where it was offered -- and I know it wasn't

16  offered in the covered counties, but where it was

17  offered, was there significant usage of early in-person

18  voting on the final Sunday before election day?

19      A.   Once again, I would have to look at those numbers

20  to be able to make that statement.

21      Q.   Is it correct that the early voting change gives

22  Supervisors of Elections discretion to offer as few as

23  48 hours of early voting?

24      A.   If I recall correctly, it is as few as six per

25  day.

**MARY CLARKE CORKERY, COURT REPORTER**

1    Q.   Uh-huh.  So, over the period, if you do the math,

2  it would be 48; correct?

3    A.   Yes.

4    Q.   Do you have an opinion about whether this change

5  in the early voting time period was required in any

6  way -- was necessary to address some issue that Florida

7  had under the old law?

8    A.   I am not aware of the circumstances.

9    Q.   Are you aware that prior to passage the FSASE

10  expressed concerns about limiting the early voting

11  period?

12    A.   I am not.

13    Q.   Okay.  Let me look -- I'll show you what's been

14  previously marked in this case as Exhibit 1.  I take it

15  you have never seen this release by FSASE before?

16    A.   I have not.

17    Q.   All right.  I'll just ask if you -- about a

18  couple of things that the FSASE says in here.  If you

19  look at the fourth line of the first paragraph, it says:

20  During the last two general elections, early voting has

21  been a tremendous success in Florida and the voters have

22  responded by voting in significant numbers during the

23  time allotted -- allocated.

24          Would you agree with that statement?

25    A.   Yes.

**MARY CLARKE CORKERY, COURT REPORTER**

1     Q.   And then it says:  The Florida State Association

2   of Supervisors of Elections believes that maintaining

3   the 15-day time frame best serves the voting public.

4        Do you disagree with that statement by the FSASE?

5     A.   I would presume that they have made some sort of

6   analysis.

7     Q.   Do you have any reason to disagree with that

8   statement?

9     A.   From a logistics standpoint, 15 days is a long

10  time for Supervisors to have dedicated staff to man the

11  early voting sites.  So, once again, I would say that an

12  analysis of the early voting period would probably speak

13  to the effectiveness of the 15-day period better than

14  speculation.

15    Q.   Okay.  So, sitting here, you don't have a basis

16  to disagree with this statement by the FSASE, do you?

17    A.   I do not have a basis to agree or disagree.

18    Q.   Understood.

19        If you could turn your attention to the second

20  page, there's a reference -- just turn it over.  I did

21  double-sided to save some trees.  There's a paragraph

22  that says Section 37.

23    A.   Okay.

24    Q.   And Section 37 is the early voting change in the

25  law; is that right?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   Yes.

2    Q.   Is that correct?

3         And here the FSASE says, in the second paragraph,

4    while this may be workable -- and that's the shortening.

5    While this may be workable with respect to primary

6    elections, not having 15-day timeframe for the General

7    Election could result in crowding and confusion at early

8    voting sites and on Election Day at the precincts.

9    Maintaining 15 days for the General Election is

10   imperative to a smooth General Election in the state.

11        Do you have any reason to disagree with that

12   statement by FSASE?

13   A.   I don't have reason to disagree.

14   Q.   Okay.  So, reading this, does it cause you to

15   question what's the reason for this early voting change

16   when the Supervisors of Elections of the state through

17   their organization were arguing against it?

18   A.   Well, once again, without having the numbers of

19   what the breakdown is in early voting throughout the

20   state, it's really difficult to render any conclusions.

21   Q.   Does it concern you that the Legislature was --

22   went forward with the voting change despite these kinds

23   of objections being raised by the FSASE?

24   A.   I could not speak for the Legislature as to what

25   reasoning they had.

**MARY CLARKE CORKERY, COURT REPORTER**

1    Q.   Okay.  But you can speak for yourself.  Does it

2    concern you that they went forward in the face of these

3    concerns raised by the FSASE?

4    A.   They may have been presented with other

5    documentation that is not before us right now and that

6    is what they based their information on.

7    Q.   If there was no such documentation that was

8    before the Legislature that addressed these issues that

9    the FSASE raises, what would your answer be then?  Would

10   you be concerned that they went forward on the basis of

11   no information that these concerns by the FSASE were not

12   well-founded?

13   A.   Well, while the time frame did go from the 15-day

14   period to the seven-day period, the number of hours

15   remained constant, and, from a logistical standpoint, it

16   might be more cost effective for Supervisors to actually

17   conduct business in seven days rather than 15 days

18   because of costs involved in utilizing facilities and

19   other elements that, you know, would really affect them

20   budgetarily.

21   Q.   But I could have sworn that you certified

22   responses to interrogatories by the State that any cost

23   savings from this bill would be minimal; isn't that

24   right?

25   A.   They could be minimal, but, once again, you know,

**MARY CLARKE CORKERY, COURT REPORTER**

1   I'm just speculating at this point in time.

2      Q.   Right.  Can you answer my question?  If it were

3   to be shown in this case that there was no documentation

4   before the Florida Legislature that addressed these

5   concerns about overcrowding and reducing the amount of

6   time of early voting, would it concern you that the

7   Legislature went forward with this change despite these

8   objections by the FSASE?  Wouldn't that concern you as

9   an elections official?

10     A.   Well, I would imagine -- and, once again, this is

11  just pure speculation on my part -- that the Legislature

12  would be -- would listen to the FSASE organization that

13  is before them and what their beliefs are, but they may

14  have had other information that I'm not privy to and

15  that is what they based their decision on.

16     Q.   Okay.  Can you just not answer my question?

17  Would it concern you if it were shown in this case that

18  they had no countervailing information and they just

19  went forward for some unknown reason?  Would that

20  concern you?

21     A.   Well, they did not cut the number of hours.  It

22  would concern me if they would have cut the number of

23  hours.  They actually gave flexibility to the

24  Supervisors, which I think is a good thing, because it

25  -- early voting would be very different in a small rural

1  county than it is in a large metropolitan county.

2      Q.  Uh-huh.

3      A.  The number of people turning out, the way that

4  they turn out would be different.  So giving the

5  Supervisors the use of their discretion to make

6  decisions as to the number of hours that they would like

7  to be open on a particular day to better serve the needs

8  of their community, I think was actually something that

9  was beneficial to the Supervisors.

10     Q.  Understood.  But just so we're clear, what the

11  law says, the 96 total hours isn't mandated?

12     A.  Correct.

13     Q.  There's discretion that provides significantly

14  less time than that?

15     A.  That is correct.  And that's what I'm saying,

16  that could actually benefit some of the small rural

17  counties because they would know what is best for their

18  citizens.

19     Q.  Uh-huh.  But, again, based on the State's

20  position in this case, cost savings isn't a

21  justification for this change, is it, because cost

22  savings would be minimal?

23     A.  Apparently, that was information that was given

24  at that time, yes.

25              MR. FARR:  Okay.  Why don't we take our

*MARY CLARKE CORKERY, COURT REPORTER*

1     second break.  I'll look at where I am.  I think

2     we're going to close from my part.  So that's more

3     for you than it is for anybody else.

4          (Whereupon, a short recess was taken.)

5     BY MR. FARR:

6     Q.   Doctor Salas, did it occur to you during the

7     break that any of the testimony you've given up to this

8     point needs to be amended, changed, clarified?

9     A.   No.

10    Q.   Okay.  If I could direct your attention, again,

11    to Exhibit 1 in front of you.  You have it on the page

12    that I want you to look at.  If I could turn your

13    attention to Section 26.  Section 26, that is the moving

14    voters change; is that right?

15    A.   Yes.

16    Q.   And this is FSASE's comment on that change.  I

17    just wanted to direct your attention to a couple of

18    things they say.  They say:  This will result in

19    thousands of additional provisional ballots, which are

20    required to be canvassed by noon on the 3rd (primary) or

21    4th (general) day after the election, and significant

22    delays at the polls.  There are no reports of widespread

23    abuse or double voting.  This will significantly delay

24    election results.

25         First, do you have any reason to disagree with

*MARY CLARKE CORKERY, COURT REPORTER*

1  that statement that there are no reports of widespread

2  abuse or double voting that this change addresses?

3     A.  I do not have any information that would cause me

4  to think either way.

5     Q.  All right.  And do you disagree with any of their

6  other statements that this change will significantly

7  delay election results and lead to thousands of

8  additional provisional ballots?

9     A.  Thousands of additional provisional ballots would

10  be a logistical mandate for the Supervisors to process,

11  but, once again, I don't have numbers that would confirm

12  or deny whether or not there would be thousands.

13     Q.  Okay.  And, again, you don't know the reason why

14  the Legislature apparently went forward in the face of

15  these kinds of objections from the FSASE?

16     A.  I do not know.

17     Q.  Now, you're familiar with the FVRS; correct?

18  You're familiar with that system; right?

19     A.  Yes.

20     Q.  And would you agree that, using FVRS, Supervisors

21  would be able to detect double voting, albeit perhaps

22  after election day?

23     A.  There would have to be systems in place in order

24  to interface with FVRS to detect double voting.

25     Q.  And the Supervisors, under the old law, had those

*MARY CLARKE CORKERY, COURT REPORTER*

1    systems, did they not?

2        A.  FVRS does not necessarily tie into voter history

3    when -- in counties where you're using precinct

4    registers.

5        Q.  Okay.

6        A.  Because they would have to actually enter in the

7    information.

8        Q.  All right.  But, based on your understanding,

9    didn't Supervisors of Elections have a mechanism by

10   which to detect double voting just using the FVRS?

11       A.  FVRS.  Well, each individual Supervisor of

12   Elections has procedures in place as to what -- how

13   their precinct workers would handle someone coming to

14   the polling place that is not on a precinct register.

15   That is something that's left to the individual

16   Supervisors of Elections to address procedurally.

17       Q.  And, based on your understanding, didn't

18   Supervisors have such procedures to detect that kind of

19   double voting, albeit perhaps after election day?

20       A.  They should have those type of procedures in

21   place on an individual county basis.

22       Q.  And double voting of that type is a criminal

23   penalty in Florida, is it not?

24       A.  As far as I know.

25       Q.  Is it correct that Florida voters prior to HB

*MARY CLARKE CORKERY, COURT REPORTER*

1  1355 had been able to make address changes at the polls

2  for nearly 40 years?

3      A.  There were procedures in place for making an

4  address change.

5      Q.  All right.  And, again, you don't know why the

6  State made this --

7      A.  I don't know the time period, but yes.

8      Q.  Okay.  And you don't -- well, certainly during

9  your tenure; correct?

10     A.  Correct.

11     Q.  And you don't know the reason why the State made

12 this change, do you?

13     A.  I am not aware.

14     Q.  And do you think this change was needed in any

15 way to address any problem that existed under the old

16 law?

17     A.  I am not aware.

18     Q.  Members of the military and their family are

19 exempt from this change, are they not?

20     A.  Yes.

21     Q.  Do you know why the military in particular was

22 exempted from this change?

23     A.  I do not know the reasoning behind it.

24     Q.  Do you know, for example, why other groups such

25 as college students weren't exempted from the change?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.  I do not know.

2    Q.  Have Supervisors of Elections, to your knowledge,

3  beyond this FSASE memo that we've looked at, have they

4  expressed concerns with the burden placed on them by

5  processing all these provisional ballots?

6    A.  Procedurally, they have spoken out about the

7  change of address change, yes.

8    Q.  For example, they've said things along the lines,

9  have they not, that requiring all these voters to vote a

10  provisional ballot will be confusing and frustrating to

11  an innocent voter who just happened to move and did not

12  let us know ahead of time.  I mean, have you heard that

13  concern expressed?

14    A.  That could be a typical concern.  I haven't heard

15  that one specifically.

16    Q.  Okay.  Have you heard Supervisors express the

17  view that there was no problem with updating names and

18  addresses of voters at the polling location either

19  electronically through EVID machines or by a simple

20  phone call to the main office?

21    A.  And that would be something procedural on the

22  part of the Supervisors, so it could be something a

23  Supervisor would say.

24    Q.  And if that statement was made, you'd have no

25  reason to disagree with that, would you?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   I'm not familiar with the specific statement, but

2    -- I mean, it sounds like something a Supervisor could

3    say.

4    Q.   Okay.  And you have no reason to disagree with

5    that statement, do you, that there was, under the old

6    law, no problem with updating names and addresses of

7    voters at the polling location either through EVID

8    machines or by a simple phone call?

9    A.   Like I said, I could not attest to the "no

10   problem."  That would be something that an individual

11   Supervisor may have said.

12   Q.   Okay.  Does this change create additional

13   opportunities for human error in terms of processing

14   moving voters like this?

15   A.   I guess there could always be the possibility of

16   human error when you're dealing with a procedure because

17   there is always the human aspect that is involved with

18   poll workers.

19   Q.   Sure.  But with respect to processing all these

20   provisional ballots that are going to be generated by

21   the change, doesn't that create an additional

22   opportunity for human error that didn't exist under the

23   old law?

24   A.   With increased numbers, logistically, you know,

25   you could probably look at it from a statistical

*MARY CLARKE CORKERY, COURT REPORTER*

 1    standpoint that numbers could increase.  But, once

 2    again, not knowing the numbers, it's hard to draw a

 3    conclusion.

 4        Q.   Understood.  And certainly your office hasn't

 5    done any study of that, have they?

 6        A.   I have not seen any.

 7        Q.   I want to turn your attention to the

 8    constitutional initiative petition change.  Again, I

 9    believe you testified you don't know why this change was

10    made; correct?

11        A.   Correct.

12        Q.   And you certainly don't know, I guess, why the

13    signature shelf life was reduced to two years from four

14    instead of three or one; is that right?

15        A.   Correct.

16        Q.   As somebody who has worked in election law in

17    Florida for many years, do you think this change was

18    needed?

19        A.   I am not familiar with the basis for it.

20        Q.   Okay.  But did you personally think this kind of

21    change was needed?  Is that something that has ever

22    occurred to you?

23        A.   I don't have a personal opinion on that.

24        Q.   Did the Department of State receive any

25    complaints about this under the old law, to your

*MARY CLARKE CORKERY, COURT REPORTER*

1    knowledge, that, I guess, for example, that, you know,

2    signatures were stale if they were around for as long as

3    four years?

4        A.  I'm not aware of any complaints.

5        Q.  Do you know what the effect of this change will

6    be on minorities in Florida?

7        A.  I do not.

8        Q.  Do you know what effect the change will have on

9    people's ability to put citizen initiative -- initiated

10   constitutional amendments on the ballot?

11       A.  I do not.

12       Q.  Do you have an opinion whether it will make it

13   harder for low income groups and organizations to get an

14   initiative on the ballot?

15       A.  I do not.

16       Q.  Are you aware of any analysis by the Secretary of

17   State's Office or the Division of Elections on that

18   issue?

19       A.  No.

20       Q.  Are you aware of any information that the

21   Legislature may have had before it on that issue?

22       A.  No.

23       Q.  Do you agree with me that such organizations

24   would have to expend -- I think you did say that -- more

25   time and energy resources to get all of their signatures

*MARY CLARKE CORKERY, COURT REPORTER*

1  together in two years than they may have had to expend

2  in four years?

3      A.  I don't know the cost element that would be

4  associated with it whether a time period would make a

5  difference or not.

6      Q.  Okay.  What purpose does the reduction serve?

7  Can you even tell me that?

8      A.  I really don't know the reasoning behind it.

9      Q.  Are you personally aware of any problems that

10  have been caused or created by changing the shelf

11  lifetime?  Are you aware of anything like that?

12      A.  No.

13      Q.  Are you aware of the ballot initiatives that were

14  on the 2010 Florida ballot?  Do you know anything about

15  prior constitutional initiatives?

16      A.  Specifically, no.

17      Q.  Okay.  Even generally?

18      A.  I don't really recall right now.

19      Q.  Are you familiar with any initiative petitions

20  that made it onto the ballot where the requisite number

21  of signatures was gathered in more than two years --

22      A.  No.

23      Q.  -- but less than four?

24          So you don't know?

25      A.  Huh-uh.

**MARY CLARKE CORKERY, COURT REPORTER**

1    Q.  All right.  So, based on historical practice, you

2    really have no information about what the effect of this

3    law might have been on prior initiatives that either

4    passed or didn't pass?

5    A.  No.  And I have not looked at the record.

6          MR. FARR:  Okay.  Just one moment.  I

7    believe I pass the witness.  That's it for me.

8          MS. BERSE:  Let's take, like, five minutes.

9    Let me look at my notes one more time.

10          (Whereupon, a short recess was taken.)

11   EXAMINATION BY MS. BERSE:

12   Q.  Good morning, Doctor Salas.

13   A.  Good morning.

14   Q.  I introduced myself a little earlier, but, again,

15   my name is Farrah Berse.  I'm from Paul Weiss and we

16   represent the Plaintiff in the Florida action regarding

17   the constitutionality of the third-party voter

18   registration organization changes to the law.

19          Doctor Salas, as the Director of the Division of

20   Elections, you're responsible for overseeing the

21   activities of third-party voter registration

22   organizations; is that correct?

23   A.  Yes.

24   Q.  And if I use the term 3PVRO today, you'll

25   understand that I'm referring to third-party voter

*MARY CLARKE CORKERY, COURT REPORTER*

1  registration organizations?

2      A.  Yes.

3      Q.  Okay.  And you're also responsible for overseeing

4  investigations of 3PVRO activities that may result in

5  fines or other penalties for the Division of Elections;

6  is that correct?

7      A.  Yes.

8      Q.  Okay.  Who actually conducts those

9  investigations?

10      A.  Well, preliminary information is gathered by my

11  staff, my staff member that deals with third-party

12  organizations, and usually we will try to make sure that

13  we have all the information that is required by law, and

14  if some phone calls are necessary to the Supervisor's

15  office to get additional documentation or information,

16  then that staff member will do that and gather the

17  information before it gets to me.

18      Q.  Is there a particular staff member that's

19  responsible for these investigations?

20      A.  Well, there was a particular staff member.

21  Actually, there's, there's been several.  To begin with,

22  it was Brenda Milton, then it was Suzie Still, and now

23  it is Virgie Madrigal.

24      Q.  Is that Ms. Madrigal?

25      A.  Madrigal.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   Madrigal?

2    A.   Yes.  M-A-D-R-I-G-A-L, I believe.

3    Q.   And what is her position?

4    A.   I believe her actual job description or her title

5    is a Regulatory Specialist, if I'm not mistaken.

6    Q.   And does she report to you?

7    A.   No, she does not.  She reports to one of the

8    supervisors in the Bureau of Voter Registration Systems.

9    I believe she reports to Joe Morgan who reports to the

10   Bureau Chief now who is Doctor Chris Sharp.

11   Q.   Ultimately, the decision whether to refer a

12   matter to the Attorney General is up to the Secretary of

13   State; is that correct?

14   A.   That is correct.

15   Q.   That's not your ultimate decision?

16   A.   No.

17   Q.   Do you make a recommendation?

18   A.   My recommendation is based upon whether or not

19   the third-party organization actually did not meet the

20   criteria that is required by law, and then it goes to

21   Legal who also looks at the matter to see if there is

22   substantive information that where there could be a case

23   that is pursued, and then it goes to the Secretary who

24   makes that decision.

25   Q.   And so do you make an actual recommendation, yes,

**MARY CLARKE CORKERY, COURT REPORTER**

1    I think this is a matter that should be referred; no,

2    it's not a matter I think should be referred?

3        A.   Preliminary decision is just based upon, yes,

4    there is -- like, in other words, the third-party is

5    outside of the scope of what is required by law.  I

6    mean, it is just very on the face of the documentation.

7        Q.   And so beyond reporting whether you believe the

8    3PVRO has violated the law or the rules, do you make any

9    recommendation as to whether you think the matter should

10   be referred?

11       A.   I only provide the facts.  I really do not get

12   into actual recommendations.

13       Q.   Once a referral is made to the Attorney General's

14   Office, do you play any further role in deciding what

15   penalties should be assessed?

16       A.   No.

17       Q.   And as the Director of the Division of Elections,

18   you're also responsible for overseeing the Division's

19   rule making as it pertains to 3PVROs; is that correct?

20       A.   Yes.  I work with the attorneys with that regard.

21       Q.   And this includes the forms that are created to

22   implement the rules; is that right?

23       A.   Correct.

24       Q.   There have been three sets of rules that have

25   been implemented with respect to HB 1355; is that right?

———MARY CLARKE CORKERY, COURT REPORTER———

1    A.   There was the emergency rule for the third-party.

2    Then there was the rule.  There was also the rule that

3    had to do with the polling place procedures.

4    Q.   Let me show you a couple of documents and make

5    sure we're talking about the same version.

6    A.   I'm trying to think of -- are you talking

7    specifically now on the third-party?

8    Q.   Yes.  Let me show you a couple of documents and

9    make sure we're talking about the same version.

10   A.   Okay.

11              MS. BERSE:  I'll have this marked as 113.

12              (Whereupon, DOS Deposition Exhibit Number

13   113 was marked for identification.)

14   BY MS. BERSE:

15   Q.   Do you recognize this, Doctor Salas?

16   A.   It is one of the rules --

17   Q.   The original --

18   A.   -- with regards to the third-party.

19   Q.   The original set of rules, the emergency rules

20   that were implemented?

21   A.   Yes.  This is the one that was effective May

22   2011.

23   Q.   Let me show you another version that we'll mark

24   as Exhibit Number 114.

25              (Whereupon, DOS Deposition Exhibit Number

*MARY CLARKE CORKERY, COURT REPORTER*

 1   114 was marked for identification.)

 2   BY MS. BERSE:

 3       Q.   Do you recognize these rules, Dr. Salas?

 4       A.   Yes.

 5       Q.   And what are these?

 6       A.   This one has -- okay.  The forms are effective,

 7   are effective June 2011.  So this appears to be the

 8   revised version.

 9       Q.   It superseded what we looked at in what's marked

10   as Exhibit 113; is that right?

11       A.   Well, superseded in -- with regard to -- this is

12   the one that is effective August 19, 2011.  The

13   preclearance counties would have still been under the

14   old rule.  So this would be for non-preclearance

15   counties.

16       Q.   Okay.  And let me show you what's been previously

17   marked as Exhibit 89.  Do you recognize this as the

18   current version of the rules that's in effect with

19   respect to the 3PVROs?

20       A.   I'm sorry?  I was looking for the effective date

21   on this.

22       Q.   I can direct you to the third page.  At the very

23   end, it says, amended November 2nd, 2011.

24       A.   Okay.  I see it.

25            Okay.  That's correct.

*MARY CLARKE CORKERY, COURT REPORTER*

1   Q.   Okay.  Were you involved in the rule making

2   process for the first version, the emergency version --

3   A.   No.

4   Q.   -- Exhibit 113?

5   A.   I was not.

6   Q.   How about the second version that we've marked

7   Exhibit 114?

8   A.   Well, by that point in time, yes, I was already

9   director.

10   Q.   And what was your involvement in the rule making

11   process?

12   A.   Pretty much I was involved in just being copied

13   on correspondence and changes and also in speaking with

14   the attorney procedurally with regards to, like, the

15   forms and that sort of thing.  But everything was pretty

16   much also in the works, already with Legal, from prior

17   to my coming in.  So it was, like, it was getting worked

18   already.  I was present at the hearing.

19   Q.   Do you recall generally what topics were

20   discussed at the hearing?

21   A.   Just in general.  And I cannot recall as to who

22   made any statements.  I know that there were Supervisors

23   there as well as other representatives.  I believe there

24   were representatives from a couple of the third-party

25   organizations, but I really couldn't name them

*MARY CLARKE CORKERY, COURT REPORTER*

1   specifically.  But there is a record of the rule

2   hearing.

3      Q.   And even if you don't recall the specifics, do

4   you recall generally what topics were discussed at the

5   hearing?

6      A.   I mean, pretty much the hearing is pretty formal

7   where it is just kind of noted, like, what are the

8   changes that transpired from the prior version, and

9   that's discussed, it's open for discussion, and, you

10  know, it's just the open discussion of how the rule was

11  going to be implemented.  I think that -- I can't recall

12  if the first one was where we still had discussion on

13  that zero reporting, if that came up.  I really can't

14  recall specifics.

15     Q.   With respect to this second version, Exhibit 114,

16  do you recall -- strike that.

17        Were there any specific concerns that had been

18  raised that 114 was created to address?

19     A.   I am not certain what the changes were between

20  one and the other.  I'd have to kind of study the

21  document.

22     Q.   Do you recall any of the changes that were made

23  from the first version to the second version?

24     A.   I'm not certain if this is the one that addressed

25  the zero reporting.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   Do you recall any changes that were made either

2  from version one to version two or version two to

3  version three just generally?  Do you have a

4  recollection of what changes were made?

5    A.   I know that that was one of the things that was

6  changed because the Supervisors had a concern with that

7  zero reporting.  So I know that that was change in

8  procedure that took place.

9    Q.   Do you recall whether any changes were made to

10  the rules regarding clarifying the ability to submit

11  applications by mail?

12    A.   I don't recall.  Once again, I would have to

13  actually go through the document to compare one with the

14  other to see what the actual changes were.

15    Q.   Okay.  And focusing on the current version of the

16  rules that are in effect, Exhibit 89, those became

17  effective in November of 2011; is that right?

18    A.   Yes.

19    Q.   And were you involved in the rule making for this

20  final version?

21    A.   On the same basis as I was previously, yes.

22    Q.   Do you recall any particular questions or

23  concerns that were raised by anyone that you tried to

24  address with these third set of rules?

25    A.   I do not recall.

**MARY CLARKE CORKERY, COURT REPORTER**

1    Q.   Okay.  You started as the Director of the

2   Division of Elections a few days, I believe you said,

3   before the Governor signed HB 1355; is that right?

4    A.   Correct.

5    Q.   When you started on the job, did you, did you

6   read HB 1355?

7    A.   Yes.

8    Q.   Did you have any questions about it?

9    A.   Well, I mean, when you have a new document like

10  that, of course, you have -- questions come to mind as

11  to how things are going to be logistically implemented.

12  So, certainly, just in my mind, I did.

13   Q.   Did you ask anyone any of those questions?

14   A.   I didn't really sit down and have any

15  discussions.  It was more of as I went along different

16  items or different portions of the bill became addressed

17  in particular, you know, things that needed to have

18  attention with regards to any IT changes and -- that

19  were perhaps required by our website or by FVRS.

20   Q.   Do you recall any of the questions that came to

21  mind, what those were?

22   A.   I mean, from the third-party standpoint, just the

23  logistics of implementation, just how it was going to

24  work in terms of the data base and the interface with

25  the website and that sort of thing.

─────*MARY CLARKE CORKERY, COURT REPORTER*─────

1    Q.   Was there any part of HB 1355 with respect to the

2    3PVROs that when you read it you didn't understand what

3    it meant?

4    A.   Because it was something that was new to me, I

5    pretty much had to kind of become familiar with it and

6    digest it in terms of the forms and what the actual

7    process was going to be in place in-house and that sort

8    of thing.  So it was pretty much a learning experience

9    for me.

10   Q.   Do you recall whether there were any particular

11   parts of it that stood out to you as something you

12   weren't quite sure what was meant by the language?

13   A.   I mean, once I read it and I actually, you know,

14   was hands-on with the forms -- and, you know, to me, the

15   forms are pretty easy to follow, if you read them.  I

16   felt comfortable once I read through everything and kind

17   of digested it.

18   Q.   And when you say once you read through

19   everything, is that just 1355 or were there any other

20   materials that you had to read through?

21   A.   No.  1355 and then, of course, the rule, and just

22   looking to see how we did business in-house with regards

23   to the website and what have you.

24   Q.   Did you receive any training with respect to 1355

25   and how it applies to 3PVROs?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.  No.

2    Q.  Did anyone provide you with any written materials

3  that you reviewed other than a copy of 1355?

4    A.  No.  1355 and the rule.

5    Q.  Have you been told anything about the

6  justifications for the 3PVRO changes that became

7  effective with 1355?

8    A.  No.

9    Q.  To your knowledge, was the Division of Elections

10  asked by anyone to provide information concerning any

11  instances of fraud involving voter registration

12  applications that occurred under the prior version of

13  the law?

14    A.  I am not aware.

15    Q.  Okay.  And, to your knowledge, was the Division

16  of Elections asked whether they believed that the prior

17  version of the law was adequate to prevent fraud

18  concerning voter registration applications?

19    A.  I am not aware.

20    Q.  To your knowledge, was the Division of Elections

21  asked by anyone whether, under the prior version of the

22  law, third-party voter registration organizations were

23  hoarding voter registration applications?

24    A.  I am not aware.

25    Q.  To your knowledge, was the Division of Elections

*MARY CLARKE CORKERY, COURT REPORTER*

1    asked by anyone whether, under the prior version of the

2    law, any 3PVROs failed to promptly turn in completed

3    applications?

4        A.   I'm not aware.

5        Q.   To your knowledge, was the Division of Elections

6    asked for any information concerning the ability of

7    elections officials to fulfill their obligations when

8    the deadline was ten days?

9        A.   I'm not aware.

10       Q.   To your knowledge, was the Division of Elections

11   asked by anyone there -- strike that.

12            To your knowledge, was the Division of Elections

13   asked whether a shorter deadline would be helpful for

14   elections officials?

15       A.   I'm not aware.

16       Q.   Okay.  Are you aware of any fines being imposed

17   under the prior version of the law for the inadvertent

18   submission of applications beyond the ten-day deadline?

19       A.   No.

20       Q.   Are you aware of any fines being imposed under

21   the prior law for the intentional or willful submission

22   of applications after the deadline?

23       A.   No.

24       Q.   Doctor Salas, what is your understanding of what

25   a voter registration drive is?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   My understanding would be if an individual or a

2  group or organization were to have voter registration

3  applications on hand and disseminate them to whoever

4  wanted them -- I mean, pretty much that alone can

5  constitute a drive, dependent upon who is conducting the

6  drive.  They may provide additional assistance, answer

7  questions, or, you know, assist people with actually

8  filling in the applications.

9    Q.   Any other activities that you're aware of that

10  take place at voter registration drives?

11    A.   Well, that in itself could constitute a drive.

12  If the element of collection of those voter -- completed

13  voter registration applications is added, then, under

14  the law, the individual or group would have to be a

15  third-party organization in order to collect them and

16  then that would trigger having to follow the mandate of

17  the law.

18    Q.   Have you ever personally participated in a voter

19  registration drive?

20    A.   No, I can't think of really having done such a

21  thing.  I mean, going out to schools, that kind of

22  thing, but I wouldn't call it a drive.  It was more

23  informational than, than really participating as a -- in

24  a drive.

25    Q.   Are you aware of how frequently 3PVROs include

──MARY CLARKE CORKERY, COURT REPORTER──

1  that collection component in their voter registration

2  drives as opposed to holding a drive without collection?

3      A.  Statistically, I really do not have that

4  information.

5      Q.  Are you aware of any 3PVROs that conducted voter

6  registration drives prior to the passage of 1355 where

7  they did not collect the forms?

8      A.  Just drives in general, if you could call it a

9  drive.  I mean, I know of organizations such as, like,

10 realtors that would have registration application forms

11 available for, like, new residents and that sort of

12 thing.  But I wouldn't consider that a drive.  It's more

13 like availability of forms.

14     Q.  So are you aware of any particular group that

15 conducted drives without collecting the forms prior to

16 1355?

17     A.  Not, not on an individual basis.

18     Q.  Are you aware of any groups that have conducted

19 voter registration drives without collecting forms under

20 the current law?

21     A.  Once again, I just don't know of any individual

22 groups or organizations at this time.

23     Q.  Let me show you a document that we'll mark as

24 Exhibit 115.

25          (Whereupon, DOS Deposition Exhibit Number

─MARY CLARKE CORKERY, COURT REPORTER─

1    115 was marked for identification.)

2    BY MS. BERSE:

3        Q.   Doctor Salas, do you recognize this presentation?

4        A.   Yes.

5        Q.   What is this?

6        A.   This is a PowerPoint presentation that was put

7    together for information on third-party voter

8    registration organizations and we utilized it for

9    training in-house as well as put it on our website to

10   facilitate an understanding of the third-party voter

11   registration organization law.  It can be used by anyone

12   and, you know, specifically it was done to assist

13   third-party registration organizations as well as

14   Supervisors of Elections so that they could refer

15   third-party organizations to our website and have this

16   available so that they could train their staff.

17       Q.   Who drafted this presentation?

18       A.   It was Alex Mosca who is our NVRA Coordinator.

19   It was done under my direction and in coordination with

20   Gary Holland in our legal office.

21       Q.   Did you review this presentation before it was

22   made publically available?

23       A.   Yes.

24       Q.   And at the time you believed it to be accurate;

25   is that fair to say?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.  Yes.

2    Q.  If you can turn -- I apologize.  It doesn't have

3  any page numbers, but the seventh page from the end.

4    A.  (Witness complies.)

5         MS. DAVIS:  Ms. Berse, our copy -- well, my

6      copy is double-sided.  Yours is -- Doctor Salas'

7      is single-sided, so --

8  BY MS. BERSE:

9    Q.  Seven from the end, the title --

10    A.  Voter Registration Drive?

11    Q.  The title of the page says, 3PVRO Voter

12  Registration Drives.

13         MS. DAVIS:  Okay.

14         THE WITNESS:  Uh-huh.

15  BY MS. BERSE:

16    Q.  This page of the presentation lists several

17  things that can take place at voter registration drives;

18  is that correct?

19    A.  Yes.

20    Q.  And the first bullet point says that the 3PVRO

21  receives applications from the Division of Elections or

22  a Supervisor; is that right?

23    A.  Yes.

24    Q.  And the next step is a 3PVRO distributes the

25  application?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   Yes.

2    Q.   The third bullet point says that the 3PVRO

3  ensures applicants filling out forms and then it lists

4  several things.  The first is, write clearly, provide

5  all relevant information, sign the form with original

6  signature, make sure all appropriate boxes are marked.

7        Did I read that correctly?

8    A.   Yes.

9    Q.   And when this presentation was, was published, it

10 was understanding that third-party voter registration

11 organizations in connection with voter registration

12 drives may ensure that applicants filled out forms

13 completely and accurately; is that correct?

14   A.   Right, it could be one of their functions.

15   Q.   Okay.  The next bullet point says that the 3PVRO

16 ensures that the date and time of completion is printed

17 on the reverse side of the form; is that right?

18   A.   Correct.

19   Q.   And then the next bullet point says that the

20 3PVRO forwards the applications to the Division of

21 Elections or Supervisor of Elections within 48 hours; is

22 that right?

23   A.   Yes.

24   Q.   And at the bottom of this slide, it says:

25 Combined, these actions are called a voter registration

*MARY CLARKE CORKERY, COURT REPORTER*

1   drive.

2        Did I read that correctly?

3   A.   Yes.

4   Q.   And that was your understanding at the time that,

5   these activities combined, could all constitute a voter

6   registration drive; right?

7   A.   Correct.  Like, in other words, they distribute

8   and they assist a person in filling them out and they

9   collect and they forward.

10  Q.   This presentation has been revised; is that

11  correct?

12  A.   We have -- it has been a work in progress.  We

13  continue to try to make our products better as we

14  sometimes find that perhaps things need to be reworded.

15  Q.   Let me show you what I'll ask the reporter to

16  mark as Exhibit 116.

17        (Whereupon, DOS Deposition Exhibit Number

18  116 was marked for identification.)

19  BY MS. BERSE:

20  Q.   Do you recognize this presentation, Doctor Salas?

21  A.   Yes.

22  Q.   This is a version of the presentation that is

23  dated, on the cover page, February of 2012; is that

24  right?

25  A.   Yes.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   Do you recall that the presentation was revised

2    earlier this month?

3    A.   I know it was revised, but I did not see what the

4    revision was.

5    Q.   Whose idea was it to revise the presentation?

6    A.   I believe Alex worked with General Counsel's

7    Office to make a revision.

8    Q.   Did you have any discussions with anyone

9    regarding the changes that were made?

10   A.   I know that one of the changes that was made was

11   the name of Virgie Madrigal at the end because I had

12   specifically asked that he revise that.  So I am not

13   sure what other changes were made at the time.

14   Q.   Did you have any discussions with Alex Mosca

15   concerning why he wanted to make revisions to the

16   presentation at that time?

17   A.   Like I said, we pretty much, with all our forms

18   and documents that are in-house, were constantly trying

19   to make things better, so -- we look for any areas of

20   opportunity for improvement that, that we can do, so

21   there may have been an area for opportunity.

22   Q.   Do you know if there's anything specific that

23   prompted revisions to this presentation?

24   A.   Other than the fact that we needed to change the

25   contact person, I am not certain what other revisions

**MARY CLARKE CORKERY, COURT REPORTER**

1   were made specifically.

2      Q.   Okay.  I'd like to direct your attention to the

3   equivalent page, again, the seventh page from the end of

4   this presentation, and it's also titled, 3PVRO Voter

5   Registration Drives.

6      A.   Okay.

7      Q.   Do you see that?

8      A.   Yes.

9      Q.   If you could, look at the third bullet point

10  down.  It says:  3PVRO can assist applicants become

11  registered by having the applicants:  Write clearly,

12  provide a physical residence address (not a PO box),

13  provide all required information, and sign the form with

14  original signature.

15         Did I read that correctly?

16     A.   Yes.

17     Q.   Do you know why this bullet point was changed so

18  that it no longer says that the 3PVRO ensures applicants

19  filling out the form, write clearly, provide all

20  relevant information, sign the form, and make sure all

21  appropriate boxes are marked?

22     A.   I do believe that this is a better rendition or a

23  more clearly worded document.  As I said before, when I

24  originally talked about voter registration drives, I

25  said they can assist, and I think this, this really

─────MARY CLARKE CORKERY, COURT REPORTER─────

1   makes it a clearer statement rather than ensures because

2   the law doesn't say they have to ensure.

3       Q.   Did you discuss this particular change with

4   anyone before this presentation was revised or after it

5   was revised?

6       A.   I did not.

7       Q.   Another change that was made to this page is the

8   last bullet point is no longer there that said that the

9   actions listed on this page collectively constitute a

10  voter registration drive.  Do you see that?

11      A.   Yes.

12      Q.   Do you have any understanding as to why that

13  change was made?

14      A.   I do not, but I can see that that is -- it really

15  does provide clarity to the PowerPoint presentation, the

16  way that it is presented right now.

17      Q.   Have you had any discussions with anyone

18  concerning that particular bullet point?

19      A.   I did not.

20      Q.   Have you had any discussions with anyone as to

21  any of the changes to this slide in this presentation?

22      A.   I did not.

23      Q.   Do you have an understanding as to whether 3PVROs

24  typically help potential voters fill out their

25  applications?

## MARY CLARKE CORKERY, COURT REPORTER

1    A.   Just from my recollection of organizations such

2   as the League of Women Voters, I would say that in years

3   past -- and this is before the days of third-party --

4   one of the things that they did in order to assist

5   people to get registered to vote, they would, you know,

6   assist them in filling in the blanks, you know, just by

7   providing guidance.

8    Q.   And that's something that 3PVROS are allowed to

9   do; is that right?

10    A.   Yes.  Actually, anyone can do that.  You do not

11   have to be a 3PVRO.

12    Q.   They're allowed to check the form for completion;

13   is that right?

14    A.   They can, yes.

15    Q.   They can check the form for accuracy to the

16   extent they have the information available to do that;

17   is that right?

18    A.   Yeah.  The law does not require that they do so

19   and it does not say they should keep it and make sure

20   that it's complete.  I mean, that's not their function

21   under the law.

22    Q.   But they're certainly entitled to do so if they

23   can do so and comply with, with the other provisions of

24   the law; is that right?

25    A.   Any individual can assist a person in filling out

*MARY CLARKE CORKERY, COURT REPORTER*

1    a form.

2      Q.   Let me show you a copy of your affidavit that was

3    submitted in this matter, which we'll just mark for the

4    record as Exhibit 117.

5           (Whereupon, DOS Deposition Exhibit Number

6    117 was marked for identification.)

7    BY MS. BERSE:

8      Q.   Do you recognize this affidavit, Doctor Salas?

9      A.   Yes.

10     Q.   This is something you submitted in connection

11   with the Florida case; is that right?

12     A.   Yes.

13     Q.   Can I ask you to turn to paragraph 25, please.

14     A.   (Witness complies.)

15          Yes.

16     Q.   I'd just like to direct your attention to the

17   last sentence of that paragraph.  3PVROs therefore have

18   no authority to check applications for accuracy and

19   completeness, and follow up with voters, and certainly

20   do not have any access to FVRS in order to "register"

21   applicants as Plaintiffs allege.

22          Did I read that correctly?

23     A.   That is correct.

24     Q.   What did you mean when you said the 3PVROs have

25   no authority to check applications for accuracy and

─────*MARY CLARKE CORKERY, COURT REPORTER*─────

1   completeness?

2     A.  The law does not provide that they do so.

3     Q.  The law does not require that they do so; is that

4   right?

5     A.  Correct.

6     Q.  But they certainly can?

7     A.  Well, any individual can, if they're assisting

8   somebody fill something out, they could assist, but it

9   does not require them to.

10     Q.  Okay.  Other than the change to the contact

11   information listing Ms. Madrigal and the particular

12   slide that we've already looked at, are you aware of any

13   other changes made between the December and February

14   versions of that presentation?

15     A.  I am not.

16     Q.  It's your understanding that an individual or an

17   entity can hand out voter registration applications

18   without registering as a 3PVRO; is that right?

19     A.  Yes.

20     Q.  And I think you testified that an individual or

21   an entity can assist a new or existing voter with

22   completing the applications without having to register;

23   is that right?

24     A.  Correct.

25     Q.  In fact, they can help them fill it out

*MARY CLARKE CORKERY, COURT REPORTER*

1    accurately and completely and they don't have to

2    register?

3        A.  Correct.

4        Q.  Can a 3PVRO -- strike that.

5            Can an individual talk to a new potential voter

6    about the importance of registering to vote without

7    having to register as a 3PVRO?

8        A.  Yes.

9        Q.  In fact, it's your understanding that potential

10   -- that an individual can speak with a potential voter

11   about anything having to do with voting or registration

12   as long as they don't actually collect or solicit to

13   collect an application; is that right?

14       A.  Correct.

15       Q.  Do you know if that view is shared by all

16   Supervisors of Elections?

17       A.  If they are cognizant of the law and understand

18   it, I would imagine that they would have that view, but

19   I cannot speak for them.

20       Q.  Have you done anything to ensure that Supervisors

21   of Elections understand that that's your interpretation

22   of the law?

23       A.  Well, we facilitated the PowerPoint and placed

24   that on the website, so we have tried to educate the

25   Supervisors and provide materials such as the PowerPoint

**MARY CLARKE CORKERY, COURT REPORTER**

1  that they could utilize with their staff for training

2  purposes.

3    Q.  Anything other than making the documents like the

4  PowerPoint available?

5    A.  Personally, I have not done anything other than

6  that.  The Supervisor or FSASE conference, Gary and

7  Maria spoke on the changes for House Bill 1355.  So, of

8  course, third-party was part of the presentation at that

9  time.

10   Q.  And was it your view -- going back to when you

11  first read 1355, was it your view from that initial

12  reading that registration was only necessary if the

13  individual organization was going to engage in

14  collecting or soliciting to collect registration forms?

15   A.  That was -- yes.  That was my reading when, when

16  I first read it, yes.

17   Q.  Would it surprise you to learn that information

18  has been made available by the Division of Elections or

19  by individual county Supervisors that are inconsistent

20  with that understanding?

21   A.  I am not aware of any materials, but it is

22  possible.

23       MS. BERSE:  Let me ask the court reporter to

24     mark the next exhibit as Exhibit 118.

25       (Whereupon, DOS Deposition Exhibit Number

**MARY CLARKE CORKERY, COURT REPORTER**

1    118 was marked for identification.)

2    BY MS. BERSE:

3        Q.   Do you recognize this document, Doctor Salas?

4        A.   This is the printout from the questions and

5    answers from the website.

6        Q.   This is a document that's been made available on

7    the Division of Elections' website; is that right?

8        A.   Yes.

9        Q.   If I could direct your attention to the fourth

10   question on the page:  Should I register if I am only

11   handing out voter registration applications?  Do you see

12   that?

13       A.   Yes.

14       Q.   Okay.  Did you have any involvement in drafting

15   this document?

16       A.   No.

17       Q.   Do you know who did?

18       A.   I know it was put together by the General

19   Counsel's Office.  I'm not certain specifically as to

20   who did it.

21       Q.   Okay.  Did you review it before it was made

22   publically available?

23       A.   I do not recall if it was already online when I

24   first started.  I know there was something on there.  So

25   I really do not recall.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.  So, in looking at this question, it says:
2  Distributing voter registration applications by itself
3  does not make a person a third-party voter registration
4  organization, but if the person says anything at the
5  time of distribution such as asking the persons to
6  complete the applications and send them in or making any
7  kind of plea about completing the application, then it
8  becomes soliciting which would make the person a
9  third-party voter registration organization.
10       Did I read that correctly?
11    A.  Yes.
12    Q.  Is that consistent with your understanding of the
13  conduct that requires registration?
14    A.  It's my understanding that an individual can
15  actually hand out and can answer questions.
16    Q.  So this is inconsistent with your understanding
17  as to the types of conduct that requires registration?
18    A.  Well, it has the word soliciting in, in the
19  statement.  I would say if they are actually soliciting,
20  then they are attempting to have the person turn them in
21  somewhere.  So perhaps from a legal standpoint, that
22  makes a difference.
23    Q.  Well --
24    A.  That would be something I would have to discuss
25  with legal counsel.

**MARY CLARKE CORKERY, COURT REPORTER**

1    Q.  Let's break this down a little bit.  What is your

2   understanding as to whether registration is required if

3   the person says -- if the person distributing the form

4   asks the person, meaning the potential voter, to

5   complete the application and to send them in -- the

6   application in herself?

7    A.  If they were simply giving the person an

8   application and asking the individual to send it in

9   themselves, I would say that they would not have to

10   register as a third-party, if that's all they were

11   doing.

12    Q.  And what is your understanding as to whether

13   registration is required before an individual can

14   encourage a potential voter to complete a form?

15    A.  If you are encouraging people to register to vote

16   and you are simply making a public statement, I do not

17   believe that makes you a third-party.

18    Q.  Okay.

19    A.  That's my understanding.

20    Q.  Okay.  Do you have any understanding of what the

21   next sentence here was meant to convey?  It says:  Be

22   careful about what you say and do.

23    A.  I did not write the document so I could not

24   interpret that.

25    Q.  Are you aware that this fact sheet has been

*MARY CLARKE CORKERY, COURT REPORTER*

1    changed?

2       A.   I know that there have been updates made to the

3    website, yes.

4       Q.   In fact, this document has been changed at least

5    twice; is that right?

6       A.   I'm not certain to the number of times that it

7    has been changed.

8       Q.   Do you know whose idea it was to change this

9    document?

10      A.   I could not tell you on an individual basis other

11   than the legal counsel that I deal with for third-party

12   is Gary Holland.

13      Q.   Did you have any discussions with, with anyone

14   concerning whether changes should be made to this

15   third-party voter registration fact sheet?

16      A.   No.

17      Q.   Did you review any of the versions of the fact

18   sheet before they were made available?

19      A.   I've gotten e-mails, I believe, on certain

20   things, but I do not recall specifically.  When I first

21   started, I was pretty much inundated with a lot of new

22   information, so I really can't recall specifically if I

23   saw this as an e-mail or if I just looked at it on the

24   website.

25      Q.   Let me show you what we'll mark as Exhibit 119.

**MARY CLARKE CORKERY, COURT REPORTER**

1          (Whereupon, DOS Deposition Exhibit Number

2     119 was marked for identification.)

3     BY MS. BERSE:

4          Q.    Do you recognize this?

5          A.    Once again, it's questions that are made

6     available on the website with regards to third-party

7     voter registration organizations.

8          Q.    If I can direct your attention to the same

9     question:  Must each person helping me -- actually,

10    that's not exactly the same question.  I take that back.

11    Should I register if I am only handing out voter

12    registration applications?  Sorry.  It's the one, two,

13    three, fourth question.  And do you see, Doctor Salas,

14    that the answer to this question has changed from the

15    first version?

16         A.    Yes.

17         Q.    Do you know who drafted the new language?

18         A.    No.

19         Q.    Have you had any discussions with anyone

20    concerning the new language?

21         A.    I don't recall specifically.

22         Q.    Would it surprise you to learn that there are

23    county Supervisors who are still publishing information

24    from the old version of this fact sheet even as late as

25    today?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   It could be possible that they have not updated

2  their information.

3    Q.   Let me show you what we will mark as Exhibit 120.

4         (Whereupon, DOS Deposition Exhibit Number

5  120 was marked for identification.)

6  BY MS. BERSE:

7    Q.   I'll represent to you this is a printout from the

8  Indian River County Supervisors of Elections' website.

9  Have you ever seen this before?

10   A.   I have not.

11   Q.   If you could take a look at the second page.  The

12 second question says:  Should I register if I am only

13 handing out voter registration applications?  Do you see

14 that?

15   A.   Yes.

16   Q.   And it contains the information that was

17 available on the old version of the fact sheet.  Do you

18 see that?

19   A.   Yes.

20   Q.   And that information is -- strike that.

21        So were you aware prior to today that Supervisor

22 Swan was publishing information that's inconsistent with

23 your view of what type of conduct requires registration?

24   A.   No.

25   Q.   Let me show you what we will mark as Exhibit 121.

*MARY CLARKE CORKERY, COURT REPORTER*

1          (Whereupon, DOS Deposition Exhibit Number

2     121 was marked for identification.)

3     BY MS. BERSE:

4       Q.   I'll represent to you this is a printout from the

5     -- is it pronounced Osceola?

6       A.   Osceola.

7       Q.   -- Osceola County Supervisor of Elections'

8     website.

9       A.   Uh-huh.

10      Q.   Have you seen this before?

11      A.   No.

12      Q.   And do you see that the fourth question on this

13    handout, should I register if I am only handing out

14    voter registration applications, contains the

15    information that was available on the old version of the

16    fact sheet?

17      A.   Correct.

18      Q.   And were you aware prior to today that the

19    Osceola County Supervisor was making publically

20    available this interpretation of the law?

21      A.   No.

22      Q.   Okay.  Let me show you what we'll mark as

23    Exhibit 122.

24          (Whereupon, DOS Deposition Exhibit Number

25    122 was marked for identification.)

*MARY CLARKE CORKERY, COURT REPORTER*

1    BY MS. BERSE:

2        Q.   And I'll represent to you this is a printout from

3    the Calhoun County Supervisor of Elections' website.

4    Have you seen this before, Doctor Salas?

5        A.   No.

6        Q.   If you can take a look at the first paragraph.

7    It says:  If you are considering handing out Florida

8    voter registration applications to potential voters,

9    even if your intent is for the potential voter to

10   independently return the form to the Supervisor of

11   Elections' Office without your assistance, you may be

12   considered to be a third-party voter registration

13   organization under Florida law.

14           Did I read that correctly?

15       A.   Yes.

16       Q.   Is that consistent with your understanding of

17   what the law requires?

18       A.   No.

19       Q.   Okay.  And were you aware prior to today that the

20   Calhoun County Supervisor was making her -- this

21   interpretation available to the public?

22       A.   No.

23       Q.   If you go a couple paragraphs down, Supervisor

24   Laramore says on her website that the new laws for

25   third-party voter registration organizations are very

───*MARY CLARKE CORKERY, COURT REPORTER*───

1   strict.  Do you see that?

2       A.  Yes.

3       Q.  Do you have any understanding what she meant by

4   that?

5       A.  No.

6       Q.  Have you received any questions from Supervisors

7   of Elections about how to interpret or implement any

8   provisions of HB 1355?

9       A.  Once again, specifically, I cannot recall.  I may

10  have gotten some e-mails with questions, but right now I

11  cannot recall.

12      Q.  You don't recall any specific questions?

13      A.  No.

14      Q.  Do you recall any general subjects that you've

15  received questions on?

16      A.  Just in general, you know, like, what do I do if

17  I got applications in late, you know, just the process,

18  like, how do I get them to your office, who do I direct

19  them to, that sort of thing.

20      Q.  Any other general topics?

21      A.  I can't think of any right now.

22      Q.  Okay.  You've testified that it's your

23  understanding that registration is only required if an

24  individual is going to collect or solicit to collect

25  forms; is that right?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.    Correct.

2    Q.    What do you understand solicit to collect mean?

3    A.    Meaning that they make themselves available to

4    take them if the person were to give them to them.

5    Q.    Can you give me an example of conduct that would

6    be soliciting to collect that isn't also collecting?

7    A.    Physically collecting, physically collecting to

8    me would be to go around a room and physically take from

9    each individual a completed voter registration

10   application.  Soliciting to collect would be, you know,

11   giving out the forms and saying, I am here and available

12   to collect the forms from you and I will take them back

13   to the Supervisor of Elections' Office regardless of

14   whether someone actually physically gives them to them

15   or not.  They're making a public statement that they are

16   there soliciting, in other words, and physically

17   available to collect.

18   Q.    So it's your understanding that registration is

19   required if that statement is made even if the

20   individual never collects a single form?

21   A.    Even if they weren't to actually get one in hand.

22   If they are overtly saying, I'm available to take the

23   forms back from you, I think that would constitute a

24   third-party organization.

25   Q.    If an individual or an organization wants to set

**MARY CLARKE CORKERY, COURT REPORTER**

1  up a table and have forms available to distribute and

2  they had a sign that says, register here, would you

3  consider that could be solicitation?

4      A.  Only if they were taking the forms back with

5  them.  If they made the statement, you have to return

6  them to the Supervisor's office, if they clarified that

7  and were just simply giving out the forms, then I would

8  say that they weren't.  But if they are saying, register

9  here, I think that would be subject to interpretation.

10  It could be construed as, you know, you're available to

11  actually accept them.  So if you make yourself open to

12  where you're accepting the forms for, in other words,

13  collection, then you would be a third-party.

14      Q.  How about if an individual were to distribute

15  forms and say, I can help you get registered to vote,

16  would that conduct alone require registration, in your

17  view?

18      A.  Not if they are taking -- if they, they are

19  telling the individual that they're responsible for

20  getting the form to the Supervisor's office.  They could

21  actually assist the individual with filling in the

22  blanks if they had questions.

23      Q.  Would such an individual have to make an

24  affirmative statement that you need to turn this in

25  yourself in order to avoid the registration

─────*MARY CLARKE CORKERY, COURT REPORTER*─────

1    requirements?

2    A.   I would say so.  That's just my personal opinion.

3    Q.   Okay.  Do you know if that opinion is shared by

4    the Secretary?

5    A.   I could not speak for the Secretary.

6    Q.   Do you know if that interpretation is shared by

7    the Attorney General?

8    A.   I could not speak for the Attorney General.

9    Q.   Do you know if that interpretation would be

10   binding on your successor after you left the position?

11   A.   Like I said, I'm speaking from my understanding

12   of the law.

13   Q.   Okay.  Let me show you a document that's been

14   previously marked as Exhibit 51.

15           MS. DAVIS:  If I could interrupt before we

16       get to it.  It's 12:16 now.

17           MS. BERSE:  Yes.

18           MS. DAVIS:  If we could, once you finish

19       your line of questioning, if we could take a lunch

20       break.

21           MS. BERSE:  That's fine.  Yeah, let me

22       finish with this document.

23           MS. DAVIS:  Absolutely.

24   BY MS. BERSE:

25   Q.   Do you recognize this document, Doctor Salas?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   Was I copied on this or was -- yes, I was.

2    Q.   Take a look at the e-mail.

3    A.   Yes, I was copied.

4    Q.   Do you recall receiving this e-mail?

5    A.   Yes.  This is near the time when I first began at

6    the Division.

7    Q.   This -- the e-mail -- I'm looking at the top

8    e-mail in the chain --

9    A.   Yeah, the top one.

10   Q.   -- that was sent by Gary Holland.  Who is Mr.

11   Holland?

12   A.   He is one of the Assistant General Counsels.

13   Q.   Okay.  It was sent to Mark Anderson.  Do you know

14   who Mr. Anderson is?

15   A.   Yes.

16   Q.   Who is he?

17   A.   He is Supervisor of Elections in Bay County.

18   Q.   Okay.  And this was cc'd to Chris Chambless?

19   A.   Yes.

20   Q.   Who is he?

21   A.   He is the Supervisor of Elections in Clay County.

22   Q.   Okay.  And Peggy Taff is cc'd?

23   A.   She was the Bureau Chief for Voter Registration.

24   Q.   And Brenda Milton?

25   A.   Was her assistant who at the time was doing the

*MARY CLARKE CORKERY, COURT REPORTER*

1    third-party -- was involved with the third-party voter

2    registration organizations.

3        Q.  It was also copied -- is it Toshia?

4        A.  Toshia.

5        Q.  Toshia Brown?

6        A.  Yes.

7        Q.  And who is Ms. Brown?

8        A.  She was acting as Peggy Taff's assistant.

9        Q.  Okay.  And you were also copied?

10       A.  Yes, I also got copied.

11       Q.  Okay.  If you take a look at the third sentence

12   of Mr. Holland's e-mail, he says:  It depends upon what

13   the group does and says when the group distributes the

14   form.  If the person distributing the applications

15   encourages or requests someone to complete the form and

16   send them in to you, the group for whom the registration

17   agent is working or volunteering must register and the

18   forms you provide to them must have an ID number on

19   them.

20            Did I read that correctly?

21       A.  Yes.

22       Q.  Is that consistent with your understanding of

23   what conduct requires registration?

24       A.  Once again, it has to do with that definition of

25   soliciting.  And the sentence prior to that, he

*MARY CLARKE CORKERY, COURT REPORTER*

1  references if a group solicits or collects, so I think

2  if they were publically making the statement where they

3  are soliciting even if they are not actually physically

4  in possession of the forms.

5     Q.  Do you believe it to be soliciting to collect a

6  form if all the volunteer does is encourages or requests

7  a potential voter to complete the forms and send them in

8  themselves?

9     A.  It says, if the group is doing -- is doing does

10  not amount to solicitation or collection, it need not

11  register as a third-party registration organization and

12  the forms given to them should not have an ID number on

13  them.

14     Q.  Just going back to my question, do you understand

15  it to be soliciting to collect if an individual

16  encourages or requests someone else to complete a form

17  and send it in on her own?

18     A.  Like I said, I'm not -- while I'm not an attorney

19  so I cannot make a legal interpretation, I'm just

20  speaking as a lay person in my capacity.  My

21  interpretation would be that if a person is encouraging

22  them to return them to them in representation of an

23  organization or saying I will take the forms back from

24  you, even if they don't receive any forms back, they are

25  opening themselves up as a third-party even if they just

**MARY CLARKE CORKERY, COURT REPORTER**

1    happen not to get any in their possession.  If they are

2    simply giving out the forms and saying here's the things

3    that you need to do to fill in the blanks and make sure

4    you sign the form because if you don't fill in all the

5    boxes correctly then the form may be, you know,

6    considered incomplete, they're just there on the basis

7    of voter education to ensure completeness and just

8    speaking about the registration process, that doesn't

9    constitute them to be a third-party.  If they are saying

10   I'm here and I'm available to take these forms for you,

11   then even, like I said, if they don't have them

12   physically in their, in their possession, they are

13   soliciting the individuals to give them back to them.

14       Q.  All right.  So I want to make sure the record is

15   clear though.  The hypothetical is one where an

16   individual encourages someone else to fill out a form

17   and turn it on her own.  That's the entire conversation

18   that takes place.  Would you consider that to be

19   solicitation?

20       A.  No.

21       Q.  Have you ever discussed with Mr. Holland whether

22   he believes that conduct to be solicitation?

23       A.  I have not.  And, once again, like I said, this

24   is my lay interpretation and I would be subject to a

25   discussion with legal counsel.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   Okay.  Have you ever shared your interpretation

2  with Supervisors of Elections?

3    A.   I have not had that opportunity.

4    Q.   Do you know if that interpretation is shared by

5  the Secretary?

6    A.   Just in looking at the documents, how they were

7  revised on the website, it seems that my interpretation

8  is in line with what appears on the website currently.

9    Q.   Have you ever had any discussions with the

10  Secretary?

11    A.   I have not had any discussions with the

12  Secretary.

13    Q.   Do you know if your interpretation is shared by

14  the Attorney General?

15    A.   I have not had any discussions with the Attorney

16  General.

17          MS. BERSE:  I think we can take a lunch

18      break.

19          MS. DAVIS:  Perfect.  Off the record.

20          (Whereupon, a lunch break was taken.)

21  BY MS. BERSE:

22    Q.   Good afternoon, Doctor Salas?

23    A.   Good afternoon.

24    Q.   Are you familiar with the program run by Rock the

25  Vote called Democracy Class?

*MARY CLARKE CORKERY, COURT REPORTER*

1     A.   Not specifically.  I'm familiar with Rock the

2  Vote.

3     Q.   Have you heard of Democracy Class?

4     A.   No.

5     Q.   Okay.  Is it your understanding that an

6  individual has to register as a 3PVRO if that person is

7  going to return applications directly to Supervisor of

8  Elections rather than turning them back into the 3PVRO?

9           MS. DAVIS:  Objection; vague.

10          You can answer.

11  BY MS. BERSE:

12     Q.   Do you understand my question?

13     A.   Like, in other words, the registration agent is

14  not turning it into the 3PVRO, they would be -- the

15  registration agent would be going directly to the

16  Supervisor's office and dropping them off?

17     Q.   That's right.  Under those circumstances, does

18  the individual, the agent, have to separately register

19  as a 3PVRO?

20     A.   It is my understanding that the agent can be

21  under the auspices of the organization.

22     Q.   Okay.  Do you still have in front of you a

23  document we marked earlier as Exhibit 118, sort of one

24  of the new ones from earlier today?

25     A.   Yes.

**MARY CLARKE CORKERY, COURT REPORTER**

```
 1       Q.   Okay.  If you can take a look at the question --
 2   it's the fifth question down.  It says:  Must each
 3   person helping me register as a third-party voter
 4   registration organization?
 5            Do you see that?
 6       A.   Yes.
 7       Q.   And the answer says:  No, as long as the entity
 8   registered as a third-party voter registration
 9   organization is actually controlling those persons
10   (registration agents) helping to solicit or collect
11   voter registration applications, and the voter
12   registration applications are returned to the
13   controlling entity for delivery to the applicable
14   Supervisor of Elections or Division.
15            Did I read that correctly?
16       A.   Yes, you did.
17       Q.   And that's inconsistent with your understanding
18   of whether the individual must register; is that
19   correct?
20       A.   Yeah.  The question here that we're looking at
21   says:  Must each person helping me register to vote
22   register as a third -- must each person helping me
23   register as a third-party registration organization?  So
24   I believe this is just referring to, like, if you have
25   people in a room and somebody is just kind of helping.
```

*MARY CLARKE CORKERY, COURT REPORTER*

1    Maybe I'm misinterpreting that --

2    Q.   Referring to the answer here, it says that, each

3    person helping does not have to independently register

4    as long as the entity that's registered is actually

5    controlling those persons and the voter registration

6    applications are returned to the entity for delivery to

7    the Supervisor of Elections.

8         Did I read that correctly?

9    A.   Yes.

10   Q.   And that's not your understanding, though;

11   correct?

12   A.   Yeah.  We probably need to go back out -- back up

13   to, to what the original question was and how I answered

14   it.

15   Q.   Well, is it your understanding that if a

16   registration agent for a 3PVRO collects a completed form

17   and turns it in directly to an elections official --

18   A.   If they're a registration agent?

19   Q.   Correct.

20   A.   But this is talking about just people helping.

21   Q.   If I can direct you to the answer, and it says:

22   No, as long as the entity registered is actually

23   controlling those persons (registration agents.)

24        Let's put this aside for a moment.  Is it your

25   understanding that if a registration agent takes a

*MARY CLARKE CORKERY, COURT REPORTER*

 1 completed form and turns it in directly to an elections

 2 official --

 3     A.   That would be acceptable.

 4     Q.   -- that person has to separately register?

 5     A.   If I am understanding it correctly -- and, once

 6 again, I would probably refer to legal counsel if I had

 7 such a question come to me directly to ensure that my

 8 interpretation is correct -- my thinking at this point

 9 is that, if I am a registration agent of an organization

10 and I have voter registration applications in my

11 possession and I am collecting them, that I would be

12 able to go ahead and turn them in to a Supervisor of

13 Elections' office, get them into the mail or return them

14 to the Division, whichever is appropriate, and I could

15 be a registration agent for an organization.  It would

16 not mean that I have to be my own third-party voter

17 registration organization.

18     Q.   And what is your understanding based on?

19     A.   I'm just working through my understanding of the

20 law.

21     Q.   And is it based on anything other than reading HB

22 1355?

23     A.   No.  Just simply reading the law and just

24 thinking through the process.

25     Q.   Do you know if the Secretary shares your view?

*MARY CLARKE CORKERY, COURT REPORTER*

A.   I really do not know.

Q.   Do you know if the Attorney General shares your view?

A.   I do not know.

Q.   Do you have an understanding whether your interpretation is binding on the Secretary?

A.   I don't know that my interpretation would be binding.  I would not be making an actual interpretation unless I confirmed it with legal counsel.

Q.   Do you have an understanding as to whether your interpretation is binding on the Attorney General?

A.   I would imagine that the Attorney General would be able to render her own interpretation.

Q.   So do you have an understanding as to whether your view is binding on her at all?

A.   Like I said, my view would be within the purview of what our legal counsel would assist me in saying this is the correct interpretation of the law.

Q.   To the extent that county Supervisors are publishing information that indicates that registration agents need to turn forms in directly to the third-party voter registration organization rather than submitting them directly to elections officials, is it your belief that those county Supervisors are misinterpreting the law?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.  Well, it is apparent from the information that

2  you've provided to me earlier today that those

3  Supervisors that have information that is not consistent

4  with what now appears on our website have not updated

5  their information since our website was updated.

6    Q.  Have you made any efforts to ensure that county

7  Supervisors are publicizing only the most up-to-date

8  interpretations of the law?

9    A.  Not yet, but I certainly will look into that to

10  make certain that they are consistent.

11    Q.  Let me hand you while I ask the court reporter to

12  mark as the next exhibit --

13           MS. BERSE:  I don't recall what number we're

14      up to.

15           COURT REPORTER:  123.

16           BERSE:  123.  Thank you.

17           (Whereupon, DOS Deposition Exhibit Number

18  123 was marked for identification.)

19  BY MS. BERSE:

20    Q.  Have you seen this document before, Doctor Salas?

21    A.  No, I have not.

22    Q.  I'll represent to you this is a publication made

23  available through the website for the Supervisor of

24  Elections for Volusia County.

25    A.  Yes.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.    If I could ask you to turn to the third page of

2    the document.   There's a question in the middle that

3    says:   Must each person "helping" me register as a

4    third-party voter registration organization?

5        Do you see that?

6    A.    Yes.

7    Q.    And that contains the information that we just

8    looked at on the county fact sheet; is that right?

9    A.    Yes.

10   Q.    Okay.   Is it your understanding that third-party

11   voter registration organizations can turn in completed

12   applications to any Supervisor of Elections?

13   A.    Yes.

14   Q.    To the extent that there are publications

15   available on the Internet that indicate that completed

16   applications must be returned to the applicable

17   Supervisor of Elections or the Division, is it your

18   understanding that that information is incorrect?

19   A.    It is my understanding that they can turn in

20   their applications to any Supervisor of Elections

21   throughout the state.

22   Q.    And what is that understanding based on?

23   A.    It is based on the law.

24   Q.    And so to the extent someone is publishing

25   information, saying it has to be delivered to an

*MARY CLARKE CORKERY, COURT REPORTER*

1    applicable Supervisor, you understand their

2    interpretation to be incorrect?

3        A.   Well, I guess, their interpretation is based on

4    whatever is nearest, but perhaps their choice of words

5    is not the best.

6        Q.   If I could direct your attention to Exhibit 89

7    that we looked at earlier.  It's the final version of

8    the rules.

9        A.   Okay.

10       Q.   And attached to these rules are copies of

11   applicable forms; is that correct?

12       A.   Yes.

13       Q.   If I could ask you to turn to Form 119.  It's the

14   starts on the fourth page of the document.

15       A.   Yes.

16       Q.   Okay.  This is a form that has to be completed

17   before an individual or an entity or organization can be

18   registered as a third-party voter registration; is that

19   right?

20       A.   Yes.

21       Q.   Okay.  And, on this form, they can indicate

22   whether this is an original registration, an update, or

23   a termination; is that right?

24       A.   Correct.

25       Q.   And the third-party voter registration

*MARY CLARKE CORKERY, COURT REPORTER*

1    organization needs to list its name as well as its

2    permanent and mailing address; is that correct?

3         A.  Yes.

4         Q.  And the organization also has to designate a

5    registered agent in the State of Florida; is that right?

6         A.  Yes.

7         Q.  And that registered agent has to sign to indicate

8    acceptance of the appointment; is that right?

9         A.  Yes.

10        Q.  Okay.  The 3PVRO also has to list all the

11   counties in which it will operate; is that right?

12        A.  Yes.

13        Q.  And then it needs to list all of the

14   organization's officers; is that right?

15        A.  Yes.

16        Q.  Their name, title, and address?

17        A.  Yes.

18        Q.  Okay.  If you turn to the next page, the 3PVRO

19   also needs to list all of its registration agents; is

20   that correct?

21        A.  Yes.

22        Q.  And, for each person, they have to check whether

23   this is an initial appointment, an amended entry, or a

24   termination?

25        A.  Yes.

*MARY CLARKE CORKERY, COURT REPORTER*

A6446

1    Q.   And they have to list the person's name; is that
2    right?
3    A.   Yes.
4    Q.   And their permanent and their temporary address;
5    is that correct?
6    A.   Correct.
7    Q.   Okay.  This form needs to be submitted by e-mail
8    or fax; is that correct?
9    A.   Yes.
10   Q.   It can't be turned in in person to an elections
11   official?
12   A.   I do see where it says e-mail, and that's why I
13   was just double checking what the rule says.
14   Q.   If you'd like to take a look at your affidavit at
15   paragraph seven, that may refresh your recollection.
16   A.   Yes.
17        (Witness complies.)
18        Yes, e-mail or fax.
19   Q.   So a form cannot be turned in by hand to an
20   elections official?
21   A.   No.
22   Q.   And it can't be mailed in?
23   A.   Correct.
24   Q.   An affiliate of an organization which is to
25   collect applications or solicit to collect applications,

*MARY CLARKE CORKERY, COURT REPORTER*

1  does that affiliate need to fill out its own Form 119?

2     A.   I believe the affiliate can be under the auspices

3  of the third-party and they would be listed as

4  registration agents, if I'm not mistaken.  I know it

5  talks about it in here somewhere.

6     Q.   Let me direct your attention to paragraph six of

7  your affidavit.

8     A.   Yes.

9     Q.   If you look about halfway --

10    A.   Under the affiliates, yes, organizations that

11  collect or solicit to collect must also submit the Form

12  119.

13    Q.   So is it your understanding that affiliates have

14  to separately file their own Form 119?

15    A.   I know they can be a listed affiliate.

16    Q.   What does that mean?

17    A.   A listed affiliate.  That's what I'm saying, I

18  would have to seek clarification to ensure that it's not

19  a separate form, you know, or if it's listed on the form

20  as an affiliate.  So I just need to get clarification on

21  that.

22    Q.   And how would you get such clarification?

23    A.   I would contact our legal counsel that deals with

24  third-party voter registration organizations, which is

25  Gary Holland.

**MARY CLARKE CORKERY, COURT REPORTER**

1    Q.   So, sitting here today, do you have any

2    understanding as to whether affiliates need to submit

3    their own Forms 119 or can be just listed on the

4    umbrella organization's form?

5    A.   Well, when this affidavit was done -- I mean, we

6    talked about listed affiliates.  So, therefore, I was

7    looking at it as a, like, a listing on the actual

8    application form.  Like, in other words, you would have

9    the umbrella organization that applies as a third-party

10   voter registration organization and then they would list

11   all of their affiliates as voter registration agents.

12   Q.   So it's your understanding that -- take the

13   League of Women Voters of Florida, for example -- that

14   the League could file a Form 119 to register as a

15   third-party voter registration organization and list its

16   -- all of its 29 local leagues as registration agents on

17   its Form 119?

18   A.   That is my understanding.  That's my

19   interpretation personally.  I would have to double check

20   with legal counsel to ensure that I'm interpreting it

21   correctly.

22   Q.   And what did you mean in your affidavit when you

23   said that any of the 3PVRO affiliate organizations that

24   collect or solicit to collect voter registration

25   applications must also submit Form DS-DE 119 prior to

*MARY CLARKE CORKERY, COURT REPORTER*

1    collecting or soliciting to collect voter registration

2    applications?

3        A.   Well, they would be listed on the Form 119

4    because that is the appropriate form that you would use

5    to list the organization.

6        Q.   You didn't mean this to say that the affiliates

7    have to also submit a Form 119; is that right?

8        A.   I would need to seek clarification on that.

9        Q.   And who would you seek that clarification from?

10       A.   I would speak to Gary Holland, Assistant General

11   Counsel.

12       Q.   Doctor Salas, did you draft this affidavit?

13       A.   It was drafted with General Counsel and I went

14   over it with them.

15       Q.   Just to make sure the record was clear, did you,

16   yourself, draft any parts of it?

17       A.   I did not write it myself.

18       Q.   And did you review it before signing it?

19       A.   Yes, I did.

20       Q.   Did you make any corrections to it?

21       A.   No, I did not.

22       Q.   Did you have any questions about any of the

23   language that had been drafted for you?

24       A.   I did not.

25       Q.   After the Division of Elections receives a

*MARY CLARKE CORKERY, COURT REPORTER*

1    completed Form 119, the Division assigns the 3PVRO a

2    unique identification number; is that right?

3       A.   That is correct.

4       Q.   And a 3PVRO is not actually registered until that

5    number is assigned; is that right?

6       A.   That is correct.

7       Q.   How long does it take for the Division to assign

8    a number?

9       A.   It's usually done within a day or so --

10      Q.   Okay.

11      A.   -- of receiving the application.

12      Q.   Let me ask you to take a look at Exhibit 110 that

13   we looked at earlier today.

14      A.   (Witness complies.)

15      Q.   It was one of the new ones that was marked

16   earlier today.

17      A.   What does it look?

18      Q.   Like this (indicating).  It's a September 2nd

19   letter, 2001 letter.  We can give you another copy, if

20   it's easier.

21      A.   Yeah, I don't think I've seen that yet.  Sorry.

22      Q.   That's okay.

23           This is a letter from you to Maria Guerreros;

24   correct?

25      A.   Correct.

1    Q.   And this is the letter in which you're informing

2    Ms. Guerreros about the identification that's been

3    assigned to the National Council of La Raza; is that

4    right?

5    A.   Yes.

6    Q.   And this letter was sent on September 2nd?

7    A.   Uh-huh.

8    Q.   And it indicates in the first sentence that the

9    registration form was received from August -- on

10   August 30th; is that correct?

11   A.   That is what it says, yes.

12   Q.   So, in this instance, it took more than a day or

13   two to assign a number; is that right?

14   A.   Well, sometimes what happens is they will assign

15   the number and call the person.  And that is my

16   understanding from staff.  So they may actually get the

17   number, but the letter may take a day or so to

18   transition.  And I'm not sure what day of the week that

19   fell on, you know, if it might have been close to the

20   weekend or something.

21   Q.   Do you know whether the organization is always

22   called with its phone number -- with its unique

23   identification number?

24   A.   I do not know for a fact.  And I would have to

25   review our procedure to see what we have put in place.

**MARY CLARKE CORKERY, COURT REPORTER**

1    Q.   Okay.  Do you know if a letter is always sent?

2    A.   Letters are sent, yes.

3    Q.   Do you know whether there's any other method by

4    which the registration number is communicated to 3PVROs?

5    A.   I am not certain if the letter is e-mailed in

6    some instances.  And, once again, I would have to review

7    our procedures.

8    Q.   Okay.  But it's your understanding that a 3PVRO

9    cannot engage in any solicitation for collection until

10   it has in its possession its registration number; is

11   that right?

12   A.   Until it has received the number.

13   Q.   Let me just direct your attention to the second

14   page of the letter.  There is a bullet point that talks

15   about non-preclearance counties.  Do you see that?

16   A.   Uh-huh.

17   Q.   And a couple of sentences into that paragraph, it

18   says:  Prior to any of your registration agents

19   soliciting or collecting voter registration

20   applications, each registration agent must have Form

21   DS-DE 120 as applicable to the 2011 version of 3PVRO law

22   on file with the Division of Elections.

23        Did I read that correctly?

24   A.   Yes.

25   Q.   Is that consistent with your understanding as to

*MARY CLARKE CORKERY, COURT REPORTER*

1    whether registration agents must have Forms 120 on file

2    with the Division of Elections before they can engage in

3    solicitation of applications?

4        A.   Well, that is in non-preclearance counties.  I

5    need to look at the rule or the law, but if I recollect

6    -- from my recollection, they have ten days, if I'm not

7    mistaken, in which to get that form in.

8        Q.   I'll refer you to paragraph --

9        A.   Organization shall submit changes, blah, blah,

10   blah, within ten days.  That's not it.

11       Q.   Let me direct your attention to paragraph nine of

12   your affidavit and see if that refreshes your

13   recollection.

14       A.   Yes.  Within ten days using Form DS-DE 119.

15       Q.   I'm sorry.  I directed you to the wrong

16   paragraph.

17       A.   By completing and signing a one-page form, DS-DE

18   120.

19       Q.   Right, paragraph nine.  That's correct.

20       A.   Yeah.

21       Q.   Does that refresh your recollection that Form 120

22   -- that a registration agent has ten days to submit its

23   Form 120?

24       A.   They can begin to engage in voter registration

25   activities, collecting and soliciting to collect voter

*MARY CLARKE CORKERY, COURT REPORTER*

1  registration applications, before being registered with

2  the Division.  The addition of the registration agent

3  must be submitted within ten days using the Form DS-DE

4  119.

5      Q.  So it's your understanding that the language in

6  Exhibit 110, the letter that we looked at that went to

7  the National Council of La Raza, that that's incorrect;

8  is that right?

9      A.  We must have DS-DE 120 on file with the Division

10  of Elections.  So, yeah, I see.  Sorry.

11      Q.  That's okay.  Take your time looking at the

12  document.

13      A.  Yeah, 120 -- I mean, it seems to me like they

14  have ten days to get it in.  Once again, I would seek

15  clarification from legal counsel on this.

16      Q.  Exhibit 110, is that essentially a form letter

17  that the -- just the name of the organization and the

18  number are changed when that letter is sent out?

19      A.  This is Exhibit 110?

20      Q.  Correct.  This is the letter to the National

21  Council of La Raza.

22      A.  Correct.  That is the acknowledgment letter that

23  is sent out with the registration organization ID

24  number.

25      Q.  And do you know whether the language in that form

*MARY CLARKE CORKERY, COURT REPORTER*

1    letter has been changed since this one was sent out in

2    September 2011?

3        A.   Yes, I believe it has been revised.

4        Q.   Do you know in what ways it's been revised?

5        A.   I do not recall the specifics.

6        Q.   Do you know if that sentence that we looked at

7    about Form 120 has been revised?

8        A.   Not off the top of my head.  I would need to look

9    at a revised version.

10       Q.   Going back to Form 119 that we were looking at,

11   if a 3PVRO wants to add a new registration agent, is it

12   correct that it has ten days to submit a new Form 119 or

13   an updated Form 119?

14       A.   From the time that the person starts to collect

15   signatures or -- I mean, collect voter registration

16   applications.

17       Q.   And that's every time that a 3PVRO adds a new

18   registration agent?

19       A.   I believe so.

20       Q.   And, in those instances, the updated form has to

21   be submitted by e-mail or fax only; is that right?

22       A.   That is correct.

23       Q.   Okay.  And any change to the information

24   submitted on Form 119 also has to be updated within ten

25   days; is that correct?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.  Changes, I believe they do.

2    Q.  This would include any changes in the addresses

3    for registration agents; is that right?

4    A.  I believe so.  I would have to double check the

5    law, but I do believe it is within ten days.

6    Q.  So, if a registration agent changes his permanent

7    address, the 3PVRO has ten days to submit an updated

8    form by e-mail or fax; is that right?

9    A.  I believe so, yes.

10   Q.  And if the registration agent changes her

11   temporary address, the 3PVRO has to submit an updated

12   form within ten days by e-mail or fax; is that right?

13   A.  It would be updated in that manner, yes.

14   Q.  This would apply, for example, with students who

15   volunteer with 3PVROs who may move annually or even

16   every semester; is that right?

17   A.  It would apply to anyone.

18   Q.  If a 3PVRO lists its affiliates as registration

19   agents on its Form 119, does -- do the individual

20   volunteers who work with that affiliate also need to be

21   listed?

22   A.  That is something that I will have to seek

23   guidance on from legal counsel.

24   Q.  And so you don't know, for example, if -- take

25   the League of Women Voters.  If it were to fill out a

*MARY CLARKE CORKERY, COURT REPORTER*

1  form, list its 29 local leagues, whether every one of

2  the volunteers within every league has to be on this one

3  form, that's not something sitting here today you can

4  answer; is that right?

5      A.  Well, if I use the premise that was used for the

6  schools for the Voter Promoter Program, I think the idea

7  was that the individual schools could sign up and it

8  would cover the teachers in the schools.  But, once

9  again, I would like to seek clarification on that from

10  legal counsel.

11     Q.  If you could turn -- we're looking at the forms.

12  The next page -- it's part of Exhibit 89.  The next page

13  is Form DS-DE 120.  Do you see that?  It's attached to

14  -- it's also attached to your affidavit.  That's fine.

15     A.  Uh-huh.

16     Q.  And this is the Form 120 that individual

17  registration agents must sign before they can engage in

18  the solicitation of application; is that correct?

19     A.  Within the ten days, I believe, also.

20     Q.  Well, what is your understanding about when this

21  form must be executed by the registration agent?

22     A.  If I'm looking at our frequently asked questions,

23  the 120 Form is supposed to be filled out before

24  engaging in voter registration activities on behalf of a

25  3PVRO.

**MARY CLARKE CORKERY, COURT REPORTER**

1    Q.   Okay.  And then the 3PVRO has ten days to submit
2  it to the Division; is that correct?
3    A.   It must be submitted to the Division of Elections
4  within ten days of the registered -- registration agent
5  signing the form.
6    Q.   Okay.  And this form has to be submitted by
7  e-mail or fax; is that right?
8    A.   By e-mail or fax.
9    Q.   And this form also can't be mailed in?
10   A.   It does not state it on the form.
11   Q.   Sitting here today, do you know whether --
12   A.   I think it has to be electronic.
13   Q.   Take a look at Form 120.  At the top of the page,
14 the registration agent has to print his or her name; is
15 that right?
16   A.   Correct.
17   Q.   And also has to print the name of the 3PVRO with
18 which she's affiliated?
19   A.   Correct.
20   Q.   And has to print the 3PVRO's number if one has
21 been assigned by this point in time; is that right?
22   A.   Correct.
23   Q.   Okay.  And also has to list a permanent and
24 temporary address?
25   A.   Correct.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   And then has to sign and date at the bottom under

2    penalties of perjury; is that right?

3    A.   Correct.

4    Q.   Okay.  If you could take a look at the text in

5    the middle of the form, this is where it says:  I will

6    obey all state law and rules regarding the registration

7    of voters.  I understand the penalties for false

8    registration may include a term of imprisonment up to

9    five years and a fine up to $5,000.00 pursuant to

10   various sections of the Florida law.  Subsequent

11   convictions may result in greater penalties.  False

12   registration offenses include but are not limited to

13   offenses constituting a felony of the third degree such

14   as false swearing or submission of false voter

15   registration information -- and then it cites a

16   statute -- and giving anything of value that is

17   redeemable in cash to any person in consideration of

18   that person becoming a registered voter or altering a

19   voter registration application of another person.

20        Did I read that correctly?

21   A.   Yes.

22   Q.   As I had read, this statement indicates that

23   false registration offenses can include, among other

24   things, submission of false voter registration

25   information.  Do you see that?

1    A.   Yes.

2    Q.   What does it mean -- what do you understand it to

3    mean that the submission of false voter registration

4    information can be an offense?

5    A.   What do I --

6    Q.   What do you understand that to mean?

7    A.   What is false voter registration information?

8    Q.   What does it mean to submit false voter

9    registration as submitted in this paragraph?

10   A.   I would imagine it would be turning in something

11   that has been falsified as being a record that is not

12   true.

13   Q.   Okay.  Your understanding of this paragraph is

14   that it's putting registration agents on notice that

15   they could face imprisonment or fines if they commit

16   certain crimes; is that right?

17   A.   Right.

18   Q.   And one of those crimes is the submission of

19   false voter registration information?

20   A.   Yes.

21   Q.   Is it your understanding -- strike that.

22        What is your understanding as to whether

23   submitting a form that an applicant has filled out that

24   has something false, some piece of false information in

25   it, whether that is a crime if the registration agent

*MARY CLARKE CORKERY, COURT REPORTER*

1  turned it in but didn't know that the form was false?

2      A.  That would be for a court of law to decide.

3      Q.  Do you have an understanding as to whether that's

4  something that would fall within the crime of false

5  submission of voter registration submission?

6      A.  Once again, I think that would be for a court to

7  determine whether the person has submitted that and

8  knowingly submitted it.

9      Q.  Do you, sitting here today, though, have an

10  understanding as to whether submitting an application

11  that unbeknownst to you has false information in it

12  constitutes the submission of false voter registration

13  information as used in this paragraph?

14      A.   It would be up to a court of law to determine

15  whether that person actually submitted a voter

16  registration that was false.

17      Q.   Are third-party voter registration organizations

18  required to turn in all forms that are given to them?

19      A.   Yes.

20      Q.   Including ones that the registration agent may

21  know contains false information?

22      A.   Any forms that are received by them, they would

23  have to submit, yes.

24      Q.   Okay.  Were you involved in drafting this form?

25      A.   No.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   Do you know who was?

2    A.   No.

3    Q.   Have you had any discussions with anyone

4  regarding what information should be contained on Form

5  120?

6    A.   No.

7    Q.   Do volunteers who participate in voter

8  registration drives but don't -- but who don't actually

9  take custody of forms have to fill out this form?

10    A.   If they are assisting on a voter registration

11  drive, like, in other words, the organization is doing

12  it and they're just, like, picking up forms or something

13  like that?  Is that what you're asking?

14    Q.   If a particular volunteer is not going to take

15  custody of the form but is helping out at a drive, does

16  that volunteer need to fill out Form 120?

17    A.   I would say it would depend upon the capacity the

18  person is volunteering in.

19    Q.   Let me give an example.  If there's a volunteer

20  who is sitting at a table and says, let me help you fill

21  out this form and then as soon as you're done filling

22  out the form and I've looked at it, please give it to my

23  colleague who is sitting next to me who is a registered

24  registration agent, would that person have had to fill

25  out Form 120 in order to engage in that conversation?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   I am not certain.  So that would be a person I
2    would ask my legal counsel.
3    Q.   How about if a particular volunteer is not
4    interacting with potential registrants but is sitting at
5    a table and it has a placard that says, register here,
6    and that person is just helping with administrative
7    tasks for the organization, does that person have to
8    fill out Form 120 before they can participate?
9    A.   Once again, I would seek clarification on that.
10    Q.   3PVROs can get voter registration applications
11    from a number of different places; is that right?
12    A.   They could get them from the Division of
13    Elections or from a Supervisor of Elections' office,
14    yes.
15    Q.   They can also download forms from the Internet;
16    is that right?
17    A.   Yes.
18    Q.   If the 3PVRO gets applications from an election
19    official, those forms will come premarked with that
20    3PVRO's identification number; is that right?
21    A.   Yes.
22    Q.   If that 3PVRO instead says -- prints forms off of
23    the Internet, do they have to print their number on, on
24    every form that is used at the voter registration drive?
25    A.   They would have to put the number on it

*MARY CLARKE CORKERY, COURT REPORTER*

1   themselves, yes.

2      Q.   And does that number need to be put on every form

3   that potentially can get used or only once the form is

4   being ready to be submitted does it have to have the

5   number on it?

6      A.   I would imagine that any form that they are

7   utilizing to do as part of their drive that could

8   potentially be used by a person registering to vote

9   should have the number on it.

10     Q.   So it's your understanding whether or not a

11  particular form ever makes its way to an elections

12  official the 3PVRO is supposed to put its number on it?

13     A.   Yes.

14     Q.   Let's take a look at the next form, which is Form

15  123.  Do you have a copy of that?  It's attached --

16     A.   Yes.

17     Q.   Form 123 has to be turned in on a monthly basis

18  by all 3PVROs; is that correct?

19     A.   Correct.

20     Q.   The form has to be turned in no later than the

21  10th day of the month; is that right?

22     A.   That is correct.

23     Q.   And, again, it has to be submitted electronically

24  only is that right?

25     A.   Yes.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.  On this form, the 3PVRO has to list its name and

2  number; is that right?

3    A.  Yes.

4    Q.  Okay.  And it has to list what month this form is

5  applicable; right?

6    A.  Yes.

7    Q.  And then there's a box that can be checked if the

8  organization did not provide to or receive from a

9  registration agent any voter registration application

10  during that month; right?

11    A.  Correct.

12    Q.  If that's not the case, the 3PVROs then needs to

13  list the number of registration applications provided to

14  the organization's registration agents, both the number

15  of state forms and the number of federal forms; is that

16  right?

17    A.  Yes.

18    Q.  Okay.  And the entity has to also list the number

19  of blank applications received from the organization's

20  registration agents; is that right?

21    A.  Correct.

22    Q.  And, again, broken down into state and federal?

23    A.  Yes.

24    Q.  And then the organizational also has to list the

25  number of non-blank registration applications received

*MARY CLARKE CORKERY, COURT REPORTER*

```
 1   from registration agents?
 2       A.   Yes.
 3       Q.   And, again, also has to be broken down, the
 4   number of state forms and the number of federal forms?
 5       A.   Yes.
 6       Q.   With respect to those last two pieces of
 7   information that we just looked at, which are listed as
 8   numbers four and five on this form, are applications
 9   considered to be received from the organization's
10   registration agents if the registration agents turn the
11   forms in directly to the Supervisor of Elections?
12       A.   I'm thinking if it has the third-party's number
13   on it and they are turning it in directly -- I mean,
14   they are still accounting for their registration
15   applications so I would think that they would have to
16   have an accounting of what's being turned in with their
17   number on it.
18       Q.   Even though the 3PVRO did not receive those forms
19   from the organization's registration agents?
20       A.   I'm just kind of thinking through the process,
21   but I would -- once again, that's something that I would
22   seek legal advice on.
23       Q.   Sitting here today, do you have an understanding
24   of whether those forms need to be listed on Form 123?
25       A.   My thought is that it would be listed on there
```

*MARY CLARKE CORKERY, COURT REPORTER*

1    because it has the third-party organization number on

2    it.

3        Q.   Even if the form is not actually received by the

4    3PVRO?

5        A.   It's received by the agent on behalf of the

6    3PVRO, so it has that organization's number on it.

7        Q.   Let me direct your attention specifically to what

8    item number five asks for.  It asks to list the number

9    of non-blank voter registration applications received

10   from the organization's registration agents.  This is a

11   form that gets filled out by 3PVRO; correct?

12       A.   Yes.

13       Q.   Okay.  So is it your understanding that they need

14   to list on, on item number five the number of

15   applications turned in by their registration agents even

16   though they never received -- the entity never received

17   them from the agent?

18       A.   Yeah.  This is the entity receiving them.  I see

19   what you're saying versus being used by the entity.  I

20   guess, since it says received from, it wouldn't be on

21   there.  You're right.

22       Q.   Is that your understanding today?

23       A.   Now that I'm thinking about how the form is

24   worded, yes.

25       Q.   And what is that understanding based on?

**MARY CLARKE CORKERY, COURT REPORTER**

1    A.   What it says, "received from."

2    Q.   Just your reading?

3    A.   Just my reading of what the form is saying.

4    Q.   Have you discussed that with, with anyone?

5    A.   I have not.

6    Q.   Do you know whether the Secretary shares that

7    view?

8    A.   I do not.

9    Q.   Do you know whether the Attorney General shares

10   that view?

11   A.   I do not know.

12   Q.   Why is it important for the Division of Elections

13   to know how many forms registration agents turn in to

14   the 3PVRO, but not how many forms the registration agent

15   turns in directly to election officials?

16   A.   It's just the way that this was written in the

17   rule, and I'm not certain how the interpretation came

18   about from the law.

19   Q.   Were you involved in drafting this form?

20   A.   I was not.

21   Q.   Can an individual be registered as a third-party

22   voter registration organization?

23   A.   Yes.

24   Q.   Do individuals who are registered as 3PVROs need

25   to fill out Form 123?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   It would be a third-party voter registration

2    organization.

3    Q.   Can individuals have registration agents?

4    A.   If I was working as an individual as a

5    third-party voter registration organization and was

6    conducting a drive, I believe I could have other

7    individuals working with me.

8    Q.   So the term registration agent doesn't refer only

9    to individuals who are employed by or volunteers of

10   organizations?

11   A.   I would seek clarification from my General

12   Counsel on that as well.

13   Q.   Okay.  Do you know whether any individuals have

14   filled out and submitted Form 123?

15   A.   Firsthand, I cannot think of individuals' names,

16   but I do know -- I believe there are some on our list,

17   and I cannot see the small writing on there, I'm sorry,

18   but I know we have a list of organizations on there and

19   there are individuals on there.

20   Q.   Okay.  Do you have any idea with respect to

21   items, excuse me, to item two of Form 123, what an

22   individual is supposed to do with respect to item two

23   which refers specifically to organizations?

24   A.   Well, I think when it talks about the third-party

25   registration organization, if the individual -- you

**MARY CLARKE CORKERY, COURT REPORTER**

1   know, it talks about them being -- it can be a person

2   that is seeking to register -- I mean, it can be a

3   person in the definitions or in the -- when you look at

4   the frequently asked questions, it does define it as a

5   person.

6       Q.   A registration agent can download the federal

7   form off the Internet?

8       A.   Yes.

9       Q.   That's correct?

10      A.   Anyone can download forms from the Internet, yes.

11      Q.   And a registration agent could make multiple

12  copies of that federal form and hand out those forms at

13  a voter registration drive; is that right?

14      A.   Correct.

15      Q.   Is it your understanding those forms would not

16  need to be accounted for on Form 123 if the registration

17  agent turns them in -- downloads the forms themselves,

18  makes the copy themselves, and then turns them in

19  directly to elections officials?

20      A.   Well, if the person is acting as the organization

21  and they are receiving forms -- you're saying they're

22  downloading them, they weren't provided to them --

23      Q.   That's right.

24      A.   --They got them themselves?

25           I am not certain.  I would have to seek advice

*MARY CLARKE CORKERY, COURT REPORTER*

1    from General Counsel on that.

2       Q.   Okay.  If an individual wants to help her

3    grandmother register to vote, does that individual --

4    and then to turn in the form on behalf of her

5    grandmother, does that individual first have to register

6    with the State?

7       A.   No.  That would be a family member so that would

8    not fall under this definition.

9       Q.   Are all family members exempt or only certain

10   family members?

11      A.   I know that the law does define that.  The

12   spouse, child, or parent.

13      Q.   So, going back to my question, if an individual

14   wants to help her grandmother register to vote and then

15   turn in the form on behalf of her grandmother, is it

16   your understanding that that individual must first

17   register with the State before she can engage in that

18   conduct?

19      A.   It does say:  Except for the following are not.

20   It says:  A person seeking only to register to vote or

21   collect voter registration application from that

22   person's spouse, child, or parent, or a person engaged

23   in registering to vote or collecting voter registration

24   applications as an employee or agent of the Division of

25   Elections, Supervisor, etcetera.

*MARY CLARKE CORKERY, COURT REPORTER*

1  Q.  Just so the record is clear, if you wanted to
2  submit your grandmother's form, you do need to register?
3  A.  According to the fact sheet.  It does say it does
4  exempt the person's spouse, child, or parent.
5  Q.  Okay.  And this individual who wants to help her
6  grandmother register to vote could not do so until she
7  registered and received back from the Division of
8  Elections a unique identification number; is that right?
9  A.  Theoretically.
10  Q.  Okay.  And what do you mean by theoretically?
11  A.  She could, she could assist her in registering or
12  filling out the form.
13  Q.  But could not take custody of it or even offer to
14  take custody of it?
15  A.  Under the definition, she could not collect.
16  Q.  And could not even offer to collect; is that
17  right?
18  A.  Under this particular definition.
19  Q.  Are you aware of any other definition?
20  A.  I was going by the guide sheet, the factual guide
21  sheet.  I do not have the law in front of me.
22  Q.  Are you aware of any other guidance on whether
23  individual family members other than spouses, parents,
24  and children are exempt?
25  A.  No.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   Okay.  If this individual wanted to register in

2    order to collect her grandmother's application, would

3    she have to fill out a Form 123 every month?

4    A.   If a person is registered as a third-party, yes.

5    Q.   And for how long would she need to submit Form

6    123 on a monthly basis?

7    A.   Until they terminated.

8    Q.   Okay.  3PVROs have to update their Form 119

9    whenever a registration agent terminates her

10   relationship with the organization as well; is that

11   right?

12   A.   Correct.

13   Q.   What does it mean to terminate -- for a volunteer

14   to terminate her relationship with an organization?

15   A.   Just my own personal understanding of termination

16   is just that the person is going to cease engaging in

17   these type of activities.

18   Q.   Is a volunteer considered to have terminated her

19   relationship with an organization if she has been paying

20   yearly dues every year for several years and then misses

21   a payment?

22   A.   I don't know that that would have anything to do

23   with an individual being part of an organization.

24   Q.   Well, say -- take the League of Women Voters of

25   Florida.  Are you aware that its members pay dues?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   Okay.

2    Q.   Is that something you were aware of?

3    A.   No.

4    Q.   So I'll represent to you that the League of Women

5    Voters, that their members pay annual dues to the

6    organization.

7    A.   Uh-huh.

8    Q.   If a member has been paying dues every year for,

9    say, five years and then the next year doesn't pay dues,

10   is that volunteer considered to have terminated her

11   relationship with the League?

12   A.   I would imagine that would depend on the bylaws

13   of the League, whatever it takes to be a member in good

14   standing.

15   Q.   Does a 3PVRO have any obligation to ask its

16   registration agents to notify them, notify the entity

17   when they are terminating their relationship with the

18   organization?

19   A.   The registration agents -- when the registration

20   agents are terminating their relationship with the

21   3PVRO?

22   Q.   That's right.

23   A.   When a person is no longer engaged, I believe

24   they would have to say something.

25   Q.   Does a 3PVRO have an obligation to ask its

*MARY CLARKE CORKERY, COURT REPORTER*

1    registration agents to notify them -- to notify the

2    entity when this particular agent is terminating her

3    relationship with the organization?

4        A.   If a 3PVRO registration agent terminates his or

5    her employment or volunteer services, the agent must

6    immediately notify the 3PVRO which must file an amended

7    Form 119 or send an e-mail or a fax to the Division of

8    Elections reflecting the termination.

9        Q.   If a registration agent does not notify the

10   organization that she has terminated her relationship

11   with the, with the organization promptly, is the 3PVRO

12   responsible for obtaining that information in some other

13   form?

14       A.   What do you mean?  I'm sorry.

15       Q.   Well, let's take the League as an example.  If a

16   volunteer decides that she's never going to participate

17   in another voter registration drive but doesn't tell the

18   League that, does the League have some obligation, you

19   know, to seek out a volunteer who maybe hasn't

20   participated in a while to ask if that volunteer has

21   terminated her relationship?

22       A.   I'm unclear.

23       Q.   If -- are you aware that organizations like the

24   League of Women Voters rely on volunteers to staff voter

25   registration drives?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.  Yes.

2    Q.  Let's take an instance where there's a volunteer

3 who decides after a drive that she no longer wants to

4 participate in any voter registration drives but doesn't

5 tell the League that, just decides I'm not going to come

6 to any additional voter registration drives.  Would the

7 League have any other way of knowing that this person

8 has terminated her relationship if this volunteer

9 doesn't tell them?

10    A.  I would imagine not.

11    Q.  Let's say the volunteer doesn't show up for voter

12 registration drives for a year.  Does the League have an

13 obligation to ask this volunteer whether she has

14 terminated her relationship with the organization?

15    A.  I would imagine that would be according to

16 however the League chooses to follow their protocol with

17 the volunteers.

18    Q.  Do you believe they have an obligation under this

19 law which requires them to notify the Division of any

20 termination?

21    A.  I think termination pretty much needs to be

22 defined as to when is actual termination.  I mean, does

23 not engaging in an activity constitute termination or

24 does the person saying they're no longer going to be

25 affiliated constitute termination?

*MARY CLARKE CORKERY, COURT REPORTER*

1   Q.   What is your understanding under the law?

2   A.   I would think that it would be the person saying

3   that they are no longer going to engage in activities

4   would constitute termination.

5   Q.   And what is that interpretation based on?

6   A.   Just as long as you're not saying you're not

7   engaging in it, you would still be able to engage if you

8   have not notified that you've terminated your

9   relationship.

10   Q.   Is there any guidance that's been made available

11   to 3PVROs about what it means for a volunteer to

12   terminate her relationship with an organization?

13   A.   I don't recall if that is addressed in the

14   PowerPoint.  I can take a look.  Other than that, there

15   is guidance that is provided in the frequently asked

16   questions that talks about updating or withdrawing a

17   registration.  But that's for the third-party, not for,

18   not for an individual.

19   Q.   Does that frequently asked questions address what

20   it means for a volunteer to have terminated her

21   relationship with an organization?

22   A.   I can't see it offhand.

23   Q.   So are you aware of any guidance that's been

24   provided as to what it means for a volunteer to

25   terminate her relationship?

*MARY CLARKE CORKERY, COURT REPORTER*

     A.   It does have in the PowerPoint a change of
information.  There is a slide that talks about
termination of registration agents and simply says an
agent must notify -- immediately notify 3PVRO and the
3PVRO must file an amended DS-DE 119 or send e-mail or a
fax to the Division reflecting termination and the
third-party registration organization's ID number and
the name of the agent being terminated.

     Q.   But it doesn't provide any information about what
it means for a volunteer to terminate her relationship;
is that right?

     A.   There's not a definition in there that says
what's termination, what constitutes termination.

     Q.   Okay.  Let me show you a document that we'll mark
as Exhibit 124.

          (Whereupon, DOS Deposition Exhibit Number
124 was marked for identification.)

BY MS. BERSE:

     Q.   Do you recognize this document?

     A.   This is the fact sheet for school district as
third-party voter registration organizations.

     Q.   Is this a fact sheet that's made available by the
Division?

     A.   If I'm not mistaken, it is part of the website
for the Voter Promoter.

─────*MARY  CLARKE  CORKERY,  COURT  REPORTER*─────

1    Q.   Did you draft this document?

2    A.   No, I did not.

3    Q.   Do you know who did?

4    A.   I'm not certain.  I believe it came from Legal.

5    Q.   Did you review it before it was made public?

6    A.   I did not.

7    Q.   Have you ever reviewed it?

8    A.   I have seen it, but -- I mean, I have read

9    through it.

10    Q.   Okay.  Can I direct your attention to item number

11    four under the question that says, what must school

12    district do to register and function as a 3PVRO.  Item

13    number four says, must place date/time when they are

14    collected from the applicants on the bottom reverse side

15    of the voter registration applications.

16         Did I read that correct?

17    A.   Yes.

18    Q.   Is it your understanding that the 3PVRO has to

19    write the date and time when the form is collected on

20    the bottom reverse side of the application?

21    A.   Correct.

22    Q.   Let me direct your attention back to Exhibit 89

23    that we were just looking at, which is the final version

24    of the rule.

25    A.   Got it.

*MARY CLARKE CORKERY, COURT REPORTER*

1          MS. DAVIS:  The stack is growing larger and

2      larger.

3  BY MS. BERSE:

4      Q.   Take a look at the second page of the rules, at

5  -- towards the top, number (4)(b).  It says:  The

6  registration agent or the organization shall print the

7  date and time that the voter registration applicant

8  completed the application in a conspicuous space on the

9  bottom portion of the reverse side of the voter

10  registration it collects from a voter registration

11  applicant in a manner that does not obscure any other

12  entry.

13          Do you see that?

14      A.   Yes.

15      Q.   Which is correct, the rules or the Voter Promoter

16  fact sheet we were just looking at, as to whether the

17  date and time that is supposed to be written on the form

18  is the date and time of collection or the date and time

19  of completion?

20      A.   I would go with the rule.

21      Q.   Okay.  Are school districts that register as

22  3PVROs subject to different rules?

23      A.   Not to my knowledge.

24      Q.   Okay.  So it's your understanding that that fact

25  sheet is in error?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   It -- yes.

2    Q.   Okay.  Let me show you what we'll mark as

3    Exhibit 125 -- actually, I'm going to show you what's

4    been previously marked as Exhibit 5 instead, and if

5    you'd turn to the third page.  I'm looking at Section

6    97.0575 of the Florida Statutes.  Do you see that?  It's

7    the third page, 97.0575.

8    A.   05 -- yeah.

9    Q.   This is the law that we've been talking about as

10   it relates to 3PVROs; is that right?

11   A.   Yes.

12   Q.   If I could direct your attention to Section

13   (3)(a).  This starts by saying, a 3PVRO that collects

14   voter registration applications serves as a fiduciary to

15   the applicant.

16        Do you see that?

17   A.   Yes.

18   Q.   Okay.  The sentence then says that, 3PVROs shall

19   ensure that voter registration applications -- I'm

20   jumping ahead -- shall be promptly delivered to the

21   Division or Supervisor of Elections within 48 hours

22   after the applicant completes it or the next business

23   day if the appropriate office is closed for that 48-hour

24   period.

25        Do you see that?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   Yes.

2    Q.   Okay.  Have you received any questions from any

3    3PVROs about what that provision means?

4    A.   Not directly from a 3PVRO.  I mean, I have not.

5    Q.   Do you know --

6    A.   Not to say staff has not.

7    Q.   Do you know whether anyone in your office within

8    the Division has received any questions from 3PVROs

9    about what provision means?

10   A.   That's what I'm alluding to.  I mean, staff may

11   have gotten those types of questions.

12   Q.   Do you know whether staff has received any of

13   those questions?

14   A.   I know that staff has been in conversations with

15   all of the third-party voter registration organizations

16   and has attempted to provide clarity and let them know

17   that we're there to help them and assist them in

18   answering any questions they may have.  So they may have

19   gotten questions when we were reaching out to them.

20   Q.   Have you personally received any questions from a

21   Supervisor of Elections as to what that provision means?

22   A.   I do not recall.  I mean, I may have gotten an

23   e-mail or so, but I can't recall off the top of my head.

24   Q.   Okay.  Do you know whether any other individuals

25   working within your office have received questions from

*MARY CLARKE CORKERY, COURT REPORTER*

1    county Supervisors about what that provision means?

2        A.   They may have, but I'm not aware of the

3    specifics.

4        Q.   Okay.  The 48 hours is measured from the date and

5    time that is listed on the back of the application; is

6    that right?

7        A.   Correct.

8        Q.   And if there's no date or time listed on the back

9    of the application, is it correct that it's measured

10   from the date of the applicant's signature?

11       A.   Correct.

12       Q.   From what specific time on that day?

13       A.   I cannot speak to that.

14       Q.   Now, you've stated in your affidavit in

15   connection with this case that you interpret this

16   48-hour rule to mean that if the election officials'

17   office is closed when the 48-hour period ends, then the

18   application must be delivered on the next business day;

19   is that right?

20       A.   That is correct.

21       Q.   By what time on the next business day?

22       A.   Well, it would be obviously the 48 hours so it

23   would be at the opening of the office the next business

24   day.

25       Q.   Is it your understanding if a form is due at,

*MARY CLARKE CORKERY, COURT REPORTER*

1    say, three p.m. on a Sunday, that it has to be turned in

2    as soon as the office opens the next day?

3        A.   That's what I would imagine, yes.

4        Q.   What is that interpretation based on?

5        A.   Just personally that's what I am thinking, and,

6    once again, I would check with General Counsel to seek

7    their advice.

8        Q.   Have you had any conversations with anyone as to

9    when a form is due on the next business day?

10       A.   No.

11       Q.   Do you know what the Secretary's understanding is

12    of when the form is due if the office is closed at the

13    end of the 48-hour period?

14       A.   I do not know.

15       Q.   Do you know what the Attorney General's view is

16    of when a form is due if the office is closed at the end

17    of a 48-hour period?

18       A.   No, I do not.

19       Q.   What is your interpretation that the relevant

20    question is, whether the -- let me strike that.

21          In your understanding, the relevant question is

22    whether the election official's office is closed at the

23    end of the 48-hour period; right?  Is that correct?

24       A.   If it is -- yes.  If it is closed at the end,

25    then it would go to the next business day.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   So it doesn't matter whether the election

2  official's office was closed at other points during the

3  48-hour period as long as it's open at hour 48; is that

4  correct?  Is that your understanding?

5    A.   Okay.  Like if it's at hour 48 and the office is

6  open, then that would be the time that the --

7    Q.   Form is due?

8    A.   -- form would be due, yes.

9    Q.   Regardless of how many of the 48 hours the office

10  has been open?

11    A.   Correct.

12    Q.   Okay.  What is that understanding based on?

13    A.   Just simply counting out 48 hours.

14    Q.   What is it based on to say that the question is

15  whether the office is open at hour 48 when the law

16  itself says that the application is due the next

17  business day if the appropriate office is closed for

18  that 48-hour period?

19    A.   Well, that is if it's closed for the entire

20  48-hour period, yes.

21    Q.   Is it your understanding that the office has to

22  be closed for the entire 48-hour period?

23    A.   I'm thinking that perhaps you are alluding to

24  there being a holiday in between.

25    Q.   Well, is it your understanding that the office

*MARY CLARKE CORKERY, COURT REPORTER*

1  has to be closed for the entire 48-hour period in order

2  to get the grace period?

3      A.   The next business day to me would be if a 48-hour

4  period consisted of a Saturday and a Sunday.  I would

5  think if 48 hours consisted of a business day and a

6  holiday and the office is open the following day, then

7  it would be whatever -- if that 48-hour period coincided

8  with that holiday, then it would go to the next business

9  day in the morning.

10     Q.   Let me take a step back.  Do you understand --

11 what is your understanding as to whether the office has

12 to be closed for the entire 48-hour period in order to

13 be able to turn in the form the next day?

14     A.   I am thinking of the 48-hour period as being a

15 Saturday and a Sunday.

16     Q.   Let me give you an example.  Let's say a form is

17 collected on Wednesday at six p.m.  What is your

18 understanding as to when that form is due if it's going

19 to be turned in by hand?

20     A.   It would be due by six p.m. on Friday.

21     Q.   Okay.  Do you know whether the Supervisors'

22 offices are open at six p.m. on Friday?

23     A.   Not necessarily.  Each office has different

24 hours.

25     Q.   Well, I'll represent to you that the Leon County

*MARY CLARKE CORKERY, COURT REPORTER*

1  Supervisor's office here in Tallahassee is open from

2  eight a.m. until five p.m.

3     A.  Uh-huh.

4     Q.  So let's assume here in Tallahassee that someone

5  -- a 3PVRO collects a form Wednesday at six p.m.  What

6  is the latest time that that person can turn in the form

7  by hand and have it be considered on time?

8     A.  It would have to be due by Friday at six p.m.

9     Q.  And the office is closed Friday at six; correct?

10    A.  Correct.

11    Q.  So does the form have to be turned in by Friday

12 at five or can they turn in on the next business day?

13    A.  By the opening of the office on Monday --

14    Q.  Okay.

15    A.  -- if that is the next business day.

16    Q.  Okay.

17    A.  And, once again, that is one of those areas

18 that's really -- it's a bit gray, so I would seek

19 clarification from legal counsel on that.

20    Q.  Okay.  Let me give another example.  If a form is

21 collected by a 3PVRO here in Leon County at 8:05 a.m. on

22 a Saturday, when does that person have to turn in the

23 form by hand?

24    A.  By 8:05 on Monday.

25    Q.  So that person has a total of five minutes to

*MARY CLARKE CORKERY, COURT REPORTER*

 1   turn in the form by hand to be considered on time; is

 2   that correct?

 3       A.   For it to make the 48 hours would be the next

 4   business day, which would be Monday.

 5       Q.   So, just to make sure the record is clear, that

 6   person has a total of five minutes to turn in the form

 7   by hand?

 8       A.   If we were going by the clock of 48 hours, yes.

 9       Q.   And going by the clock of 48 hours is what the

10   rule requires; is that right?

11       A.   It does go by the clock, that is correct.

12       Q.   Let me ask you about a form that's collected

13   12 hours earlier, say, Friday night at eight o'clock.

14   When is that form due if it's going to be turned in by

15   hand?

16       A.   It would also be due on Monday morning.

17       Q.   And it's your understanding that it would be due

18   at eight a.m. on Monday morning?

19       A.   When the office opens.

20       Q.   If that form is turned in at 8:05 a.m., is that

21   form late?

22       A.   By the 48-hour definition, it could be construed

23   as late.

24       Q.   When you say it could be construed as late, is it

25   your understanding that it would be late?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   If it came to my office to my attention and was

2 submitted as late by a Supervisor, I would send it to

3 legal counsel to obtain their guidance.

4    Q.   Okay.  So you sitting here today are not sure

5 yourself?

6    A.   I would go ahead and submit it.

7    Q.   What do you mean you would submit it?

8    A.   I would submit the complaint as having been

9 received over the time limit.

10    Q.   Okay.  Speaking about this Friday night form

11 collected at eight o'clock, if that person doesn't want

12 to take the chance of being late because they can't show

13 up at eight o'clock on the dot on Monday morning, can

14 that person send it in by mail?

15    A.   They could send it in by mail, yes.

16    Q.   Okay.  When would it have to be postmarked by in

17 order to be considered timely?

18    A.   It would have to be postmarked within the

19 48 hours.

20    Q.   So by Sunday?

21    A.   Yes.

22    Q.   Do you get the grace period for Monday for mail?

23    A.   Not to my knowledge.

24    Q.   Okay.  Can you get mail postmarked on a Sunday?

25    A.   Not to my knowledge, unless the facility is open.

**MARY CLARKE CORKERY, COURT REPORTER**

1    Q.  Okay.  Do you know whether any of the post

2   offices, let's say, here in Tallahassee are open on

3   Sundays?

4    A.  I do not remember.

5    Q.  If I were to represent to you that they're not,

6   would that surprise you?

7    A.  No.

8    Q.  So that form collected Friday night at

9   eight o'clock, can it be postmarked on Saturday?

10   A.  If they could have it postmarked, yes.

11   Q.  Do you know whether the post offices here in

12   Tallahassee are open on Saturdays?

13   A.  Not to my knowledge.  I really do not know.

14   Q.  Okay.  If I represent to you that some of them

15   are for very limited hours, would that surprise you?

16   A.  No.  I do know of some facilities that are open

17   on the weekend.

18   Q.  Okay.  To recap, if a form is collected Friday

19   night, is it correct that the only option for turning

20   this form in on time is for the registration agent to

21   either make sure she is at the Supervisor's office at

22   eight a.m. exactly on Monday morning or to find one of

23   the post offices that is open for limited hours on

24   Saturday morning and watch to make sure that the form

25   has a clear postmark marked by the post office; is that

*MARY CLARKE CORKERY, COURT REPORTER*

1  correct?

2      A.  I would agree with that, yes.

3      Q.  Okay.  It's correct that, outside the context of

4  this litigation, the public has not been notified that

5  you interpret -- how you interpret this next business

6  day grace period; is that correct?

7      A.  Outside of what is available on the website and

8  what is in the law.

9      Q.  Does the website provide any information as to

10  what time on the next business day a form is due if the

11  office is closed at the end of the 48 hours?

12      A.  I'm not certain whether it makes that

13  clarification.

14      Q.  Okay.  Do you know whether that information has

15  been publicized anywhere outside of the context of the

16  litigation?

17      A.  I am not aware.

18      Q.  Let me show you a document that we will mark as

19  125?

20          (Whereupon, DOS Deposition Exhibit Number

21  125 was marked for identification.)

22  BY MS. BERSE:

23      Q.  Have you ever seen this document before, Doctor

24  Salas?

25      A.  This is the one that's responsive.  It says

*MARY CLARKE CORKERY, COURT REPORTER*

1    Browning, et al, but I think I'm also on that.  I know I

2    have seen something like this.

3        Q.   I'll represent to you this is in the Florida

4    action.  This is the Defendant's, which is Secretary

5    Browning, Attorney General Bondi, and yourself,

6    responses to the Plaintiff's first set of requests for

7    admission?

8        A.   Correct.

9        Q.   Do you know whether this is a document that

10   you've reviewed before?

11       A.   It does look like one that I reviewed.

12       Q.   Can I direct your attention to page two?  This is

13   item number three.

14       A.   Yes.

15       Q.   It says:  Admit that outside the context of this

16   litigation, the public has not been notified in writing

17   by Defendants that they interpret and apply the

18   Challenged Law "to mean that if the Election Official's

19   office is closed when the 48-hour period ends, then the

20   application must be delivered on the next business day."

21       And then it says, Response:  Admitted.

22       A.   It's in my affidavit, yes.

23       Q.   Do you have any reason to disagree with this

24   statement?

25       A.   No.

                 *MARY CLARKE CORKERY, COURT REPORTER*

1    Q.  Okay.  Doctor Salas, do you know who Cynthia

2  Slater is?

3    A.  No.

4    Q.  Okay.  Let me show you what we will mark as

5  Exhibit 126.

6        (Whereupon, DOS Deposition Exhibit Number

7  126 was marked for identification.)

8  BY MS. BERSE:

9    Q.  Have you ever seen this document before?

10    A.  Yes.

11    Q.  Does this refresh your recollection as to who

12  Cynthia Slater is?

13    A.  Actually, no, I have not seen this document.  I'm

14  sorry.  I was just looking at the top portion of it.

15    Q.  I will represent to you this is an affidavit that

16  was submitted in connection with this litigation by

17  Cynthia Slater who is a member of the Volusia County

18  NAACP.  In her affidavit, if you want to take a look at

19  page 13, paragraphs 49 through 53, as Ms. Slater refers

20  to them, talks about an incident in Okaloosa County.  If

21  I could ask you to just take a look at those paragraphs

22  for a minute and then I have some questions for you.

23    A.  (Witness complies.)

24        Okay.

25    Q.  Prior to reading this affidavit, have you heard

*MARY CLARKE CORKERY, COURT REPORTER*

 1    about this incident in Okaloosa County?

 2        A.   No.

 3        Q.   Do you have any reason to believe that the NAACP

 4    wasn't acting in good faith trying to comply with the

 5    48-hour requirement?

 6        A.   No.

 7        Q.   Any reason to believe that they just honestly

 8    didn't understand how the holiday impacted or did not

 9    impact their deadline?

10        A.   No.

11        Q.   Have you heard of any other instances like this

12    where groups have been accused of missing a deadline

13    because of a misunderstanding as to how the 48-hour rule

14    applies?

15        A.   No.

16                  MS. BERSE:  Why don't we take a break.

17                  MS. DAVIS:  Sure.

18                  THE WITNESS:  I should have said this on the

19            record.  I saw this top portion, but I just wanted

20            to make sure that, for the record, that you knew I

21            had not seen this.

22                  MS. BERSE:  Thanks.

23                  (Whereupon, a short recess was taken, and

24        Jonathan Brater joined the deposition via telephone.)

25    BY MS. BERSE:

                  *MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   Doctor Salas, I have a couple of additional

2    questions regarding how the 48-hour deadline is

3    interpreted.  If a form is collected on a Saturday

4    afternoon and Monday is a holiday, does -- can that form

5    be mailed in?

6    A.   It can always be mailed in.

7    Q.   Can it be mailed in and considered timely if it's

8    collected on Saturday afternoon and Monday is a holiday

9    where the office is closed and the post office is

10   closed?

11   A.   If it was postmarked.

12   Q.   Is it possible to get a document postmarked

13   between Saturday afternoon and Monday if Monday is a

14   holiday and the post office is closed?

15   A.   It would depend on where it is mailed.

16   Q.   Well, let's assume that it's in Tallahassee where

17   the post offices are closed on Saturday afternoons and

18   Sundays and federal holidays.  Would it be possible to

19   submit that form by mail?

20   A.   To meet the 48-hour requirement --

21   Q.   Correct.

22   A.   -- of the postmark?

23   Q.   Correct.

24   A.   I think consideration would be given to the

25   closing of the weekend schedule and the holiday schedule

*MARY CLARKE CORKERY, COURT REPORTER*

1    when looking at the totality of what occurred.

2        Q.   But that form would, in fact, be deemed untimely

3    when it --

4        A.   It would, in fact, be deemed untimely -- like, if

5    it was submitted to our office as untimely by the

6    Supervisor's office, we would put it through the chain

7    to the Secretary's office for the Secretary's

8    consideration.

9        Q.   Okay.  So, in order to ensure that a form

10   collected on a Saturday afternoon before a federal

11   holiday, in order to ensure that that form is turned in

12   timely, it has to be turned in by hand; is that correct?

13       A.   It would probably be the most effective method of

14   ensuring that it was timely.

15       Q.   And, in fact, it would be the only method of

16   ensuring that it was timely; is that right?

17       A.   It would be beyond the control of the person

18   placing it in the post office that is closed to get the

19   proper postmark on it if there were no post offices

20   available.

21       Q.   And, in fact, the only way that that person can

22   ensure that the form is timely is to turn it in the

23   minute the office opens ups on Tuesday morning; is that

24   right?

25       A.   It would be upon the opening of that Supervisor's

*MARY CLARKE CORKERY, COURT REPORTER*

1  office.

2     Q.  Okay.  If a form is collected at four p.m. on a

3  Wednesday, is it correct that the -- assuming there's no

4  holidays, is it correct that the 3PVRO has until four

5  p.m. on Friday to turn it in by hand?

6     A.  Yes.

7     Q.  So, literally, 48 hours?

8     A.  Yes.

9     Q.  If the form was collected, say, you know, just

10  over an hour later, at 5:05, on Wednesday, that form can

11  then be submitted until any time on Monday; right?

12     A.  It wouldn't be any time, I do not believe.

13     Q.  But it can be turned in until Monday when the

14  office opens; is that right?

15     A.  Because of the 48-hour rule, and 5:05 would be

16  the 48-hour.  If you wanted to go to the minute of the

17  law, then I think perhaps you could interpret it in that

18  manner.

19     Q.  Okay.  And if that Monday were a holiday, then

20  the form collected Wednesday at 5:05 p.m. can be turned

21  in any time until Tuesday morning when the office is

22  open; is that correct?

23     A.  If that were a fact and that was the

24  interpretation, then it would be the opening of the

25  following day.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.  Okay.  But if that same form is collected at 5:05

2    p.m. on Wednesday, if you wanted to turn it in by mail,

3    then you only have two days; right?  It has to be in the

4    mail by Friday?

5    A.  It would have to be postmarked.

6    Q.  If an individual registrant mails in her own form

7    to the county Supervisor and it is received within five

8    days of the book closing deadline, that person gets a

9    grace period; right?  Even if it doesn't have a clear

10   postmark?

11   A.  Within five days of the book closing date?

12   Q.  Correct.

13   A.  Like, that would be the, the -- I'm sorry.  That

14   would be -- the postmark that would be on there would be

15   five days prior to the book closing?

16   Q.  Let's assume that an individual mails in her own

17   form and it doesn't have a clear postmark.  If it's

18   received up to five days after the book closing

19   deadline, that form is considered to be on time; is that

20   right?

21   A.  I'm not certain.  I would have to double check

22   the law on that.

23   Q.  Okay.  Let me show you what we'll mark as Exhibit

24   127.

25                (Whereupon, DOS Deposition Exhibit Number

*MARY CLARKE CORKERY, COURT REPORTER*

1  127 was marked for identification.)

2  BY MS. BERSE:

3     Q.  This is a copy of Section 97.053.  Have you seen

4  this before?

5     A.  Yes.

6     Q.  Okay.  Take a look at section four of the second

7  sentence.  If an initial voter registration application

8  that has been mailed does not bear a postmark or the

9  postmark is unclear, the registration date is the date

10  the application is received by any Supervisor or the

11  Division, unless it is received within five days after

12  the closing of the books for an election, excluding

13  Saturdays, Sundays, and legal holidays, in which case

14  the registration date is the book closing date.

15     A.  Okay.

16     Q.  So the person essentially gets a five-day grace

17  period?

18     A.  Correct.

19     Q.  Is that five-day grace period given to 3PVROs to

20  submit?

21     A.  No.

22     Q.  Have you ever heard of a 3PVRO express a

23  preference to turn in applications by hand rather than

24  by mail?

25     A.  Not personally.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   Have you heard from others that 3PVROs have

2    expressed that preference?

3    A.   I haven't heard it firsthand.  I guess I've

4    thought about it personally.

5    Q.   And what did you think about it?

6    A.   I just -- in questioning how the law was

7    written -- I mean, it was just my thought whether or not

8    it could be done.

9    Q.   And do you have any understanding as to whether

10   3PVROs have a preference to turn in forms by hand?

11   A.   No, I do not.

12   Q.   Have you ever heard any county Supervisors or

13   other election officials say that they have a preference

14   for receiving forms by hand delivery rather than by

15   mail?

16   A.   No.

17   Q.   Never heard that?

18   A.   (Nods negatively.)

19   Q.   Would that surprise you?

20   A.   No.

21   Q.   In fact, as you testified earlier, there have

22   been instances where the post office has been suspected

23   of losing election-related mail; is that right?

24   A.   Yes.  We did speak about that earlier.

25   Q.   In your, in your affidavit submitted in

*MARY CLARKE CORKERY, COURT REPORTER*

1  connection with this case, you have stated that the

2  delivery deadlines, this 48-hour deadline that we've

3  been talking about, are important because election

4  officials are under statutorily prescribed deadlines in

5  which to verify and enter information from the

6  applications that they receive.  Do you recall that?

7      A.  Correct.

8      Q.  What deadlines are you talking about?

9      A.  The 13 days, the 13-day deadline by which voter

10 registration applications must be processed.

11     Q.  Okay.  And that 13-day deadline is triggered by

12 when the election official receives the application; is

13 that right?

14     A.  Yes.

15     Q.  It has nothing to do with when the application

16 was filled out?

17     A.  Correct.

18     Q.  Okay.  Are there any other deadlines that you

19 were referring to?

20     A.  I don't recall.  I would have to look at the

21 affidavit for clarification.

22     Q.  Okay.  If you'd like to take a look.

23     A.  I know it's in here somewhere, I think.

24     Q.  You're welcome to look at any part of it that

25 you'd like, but I think the section you're referring to

*MARY CLARKE CORKERY, COURT REPORTER*

1    starts around paragraph 22.

2        A.   Okay.   Thank you.

3             Okay.   I think -- oh.   That's me.   I'm blind.

4             Okay.   So paragraph 22?

5        Q.   You're welcome to look at whatever you'd like,

6    but that's the section where -- that starts the part

7    where you're talking about deadline.

8        A.   Right.

9        Q.   And just to make sure the record is clear, my

10   question is whether, other than the 13-day deadline that

11   you've mentioned, whether there are any other deadlines

12   that you were referring to?

13       A.   Well, there is the statutory duty to, within five

14   days after voter registration information, you know,

15   Supervisors must, must enter in the voter registration

16   information into FVRS.

17       Q.   And that five-day deadline, that's also triggered

18   by when the election official received the application;

19   is that right?

20       A.   Yes.

21       Q.   It has nothing to do with when the application

22   was completed?

23       A.   I believe that is when it was received.

24       Q.   Okay.   Any other deadlines?

25       A.   That is basically it for the processing of

*MARY CLARKE CORKERY, COURT REPORTER*

1    applications.

2    Q.   Okay.  Are there any other reasons other than

3    those deadlines that you believe the 48-hour deadline is

4    important?

5    A.   Well, at the book closing period, which is the

6    29th day prior to an election, it's important to get the

7    registration applications in to ensure that they are

8    processed.

9    Q.   And would they be able to be processed if they

10   were received ten days prior to the book closing?

11   A.   If they were received prior to the book closing,

12   yes.

13   Q.   Okay.  If a 3PVRO submits forms, let's say, three

14   months before the next book closing deadline --

15   A.   Uh-huh.

16   Q.   -- is there any connection between the date by

17   which those forms are turned in and an election

18   official's ability to get the voters registered for the

19   upcoming election?

20   A.   They should be able to process the forms in a

21   timely manner.

22   Q.   Okay.  Is there any reason that it's important

23   that forms submitted three months before a book closing

24   deadline be submitted within 48 hours of an applicant

25   completing the application?

1    A.   Well, that is the law for the third-party

2    registration organizations.

3    Q.   And is there any reason that that 48 hours is

4    important if it's three months before the book closing

5    deadline?

6    A.   It's important because that is the law.

7    Q.   Do you have any reason to believe that elections

8    officials wouldn't be able to comply with their

9    obligations if forms were turned in within three days of

10   being completed?

11   A.   I'm certain that the election officials would do

12   what was required by law.

13   Q.   How about five days?

14   A.   Once again, they, they would comply with their

15   constitutional mandates.

16   Q.   And how about ten days?

17   A.   Same answer.

18   Q.   And prior to the law being 48 hours, in fact, the

19   deadline was ten days; is that right?

20   A.   I believe it was, previously.

21   Q.   Okay.  And you're not aware of any instances --

22   when the law was ten days, you're not aware of any

23   instances of 3PVROs hoarding voter registration

24   applications, are you?

25   A.   I am not aware of such information.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   Are you aware of whether there were any

2   violations of the ten-day deadline?

3    A.   I am not.

4    Q.   Do you have any reason to believe that there were

5   forms turned in by 3PVROs after the book closing

6   deadline when the deadline was ten days?

7    A.   I do not have that information.

8    Q.   Do you know how many complaints, if any, were

9   filed against 3PVROs in 2010 for suspected fraud?

10    A.   Not off the top of my head, no.

11    Q.   Do you know if there were any?

12    A.   I am not aware.

13    Q.   Do you know the answer to that question for any

14   other year, say, between 2007 and the present?

15    A.   No.

16    Q.   You testified a little earlier that earlier in

17   your career when you worked in -- as an Assistant Deputy

18   -- was it an Assistant Supervisor?

19    A.   I was an Assistant in Miami and Deputy in

20   Broward, yes.

21    Q.   Okay.  That some of those experiences were prior

22   to the laws that created the right of third-party voter

23   registration organizations to register and to be 3PVROs;

24   is that right?

25    A.   Right.

**MARY CLARKE CORKERY, COURT REPORTER**

1    Q.   And, prior to that time, Supervisors of Elections

2  could deputize volunteers so that private citizens could

3  collect voter registration forms; is that right?

4    A.   Correct.

5    Q.   Is that something that was done in Miami-Dade

6  County when you worked there?

7    A.   It was done.  I did not have anything to do with

8  that process.

9    Q.   Okay.  But did you know at the time that it was

10  something that happened?

11    A.   Yes.

12    Q.   Okay.  Do you know what criteria was used to

13  determine who would be deputized?

14    A.   No, not off the top of my head.

15    Q.   Okay.  Did there come a time when you learned

16  that the deputy registrar system was no longer going to

17  be used in Florida?

18    A.   Yes, but I do not recall the time.

19    Q.   Okay.  Do you recall how you learned that?

20    A.   No, not specifically.

21    Q.   Do you recall what you were told?

22    A.   I know that they ceased to exist, but I really do

23  not recall the details.

24    Q.   Did the system, the deputy system, exist when you

25  were the deputy in Broward County?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   I do not recall how that aspect was done because

2  I was not directly responsible for that area of the

3  operations.

4    Q.   Okay.  Do you have an understanding as to

5  whether, under the current new law, Supervisors are

6  permitted to deputize volunteers?

7    A.   They can -- I mean, Supervisors can always

8  deputize, like, have Deputy Supervisors of Elections.

9    Q.   Do you know whether under the new law they're

10  permitted to deputize private citizens so those citizens

11  can collect voter registration applications without

12  having to register as a 3PVRO?

13    A.   I don't know that there's any prohibition.

14    Q.   Do you know if that's something that's going on?

15    A.   Not to my direct knowledge.

16    Q.   Okay.  Do you know whether any Supervisors have

17  deputized any private citizens under the current law?

18    A.   I am not aware.

19    Q.   Are there any criteria that Supervisors have to

20  follow in order to decide whether to deputize a private

21  citizen to collect voter registration applications?

22    A.   Well, generally, if it's an individual in the

23  office that's being deputized, they would be, like, a

24  registered voter, but I don't -- I'm not really aware of

25  criteria.

**MARY CLARKE CORKERY, COURT REPORTER**

 1     Q.   And, as the Director of the Division of
 2  Elections, is that something you think you would be
 3  aware of if there were any criteria?
 4     A.   I would have to research the law.
 5     Q.   Do you know whether Supervisors can refuse to
 6  deputize private citizens who want to hold voter
 7  registration drives?
 8     A.   Once again, I would have to research the law.
 9     Q.   Okay.  Do you know if -- once a private citizen
10  volunteer is deputized how long she's given the
11  authority to collect applications?
12     A.   No, I'm not aware.
13     Q.   Do you know whether that authority can be taken
14  away from her for any reason?
15     A.   I would have to research that.
16     Q.   Okay.  Is the -- do you know whether a
17  Supervisor's decision to deputize someone is binding on
18  that Supervisor's successor?
19     A.   Generally, when an individual changes office, it
20  goes -- I believe it goes with the constitutional
21  officer, but, once again, that would be something I
22  would have to research.
23     Q.   Okay.  Do you know whether an organization can be
24  deputized?
25     A.   I would have to check into that.

**MARY CLARKE CORKERY, COURT REPORTER**

1    Q.   Do you know whether deputized volunteers are

2    subject to any of the 3PVRO requirements that we've been

3    talking about, any of the forms or any of the deadlines?

4    A.   I don't know that they would fall under the

5    definition of a 3PVRO.  It does have a definition there,

6    so -- it says a person engaged in registering to vote or

7    collecting voter registration applications as an

8    employee or an agent of the Division of Elections, the

9    Supervisor of Elections.  Department of Highway Safety

10   and Motor Vehicles are an official registration agency

11   designated by NVRA or state law.

12   Q.   So it's your understanding that if a Supervisor

13   deputizes someone, that person is not subject to the

14   3PVRO rules that we've been talking about?

15   A.   It would be exempt, yes.

16   Q.   Okay.  Would you consider this to be a loophole

17   in the new law?

18   A.   I don't consider it to be a loophole.  I mean,

19   it's something that's set as an exception.

20   Q.   Okay.  Do you know whether your office has

21   received any questions from Supervisors of Elections as

22   to whether they can deputize individuals under the new

23   law?

24   A.   I do not recall.

25   Q.   The law sets forth specific fines that can be

*MARY CLARKE CORKERY, COURT REPORTER*

1  imposed for any untimely submission of applications; is

2  that correct?

3      A.  Yes.

4      Q.  And it says that the maximum aggregate fine that

5  can assessed against a particular 3PVRO for violations

6  committed within one year is $1,000.00; is that right?

7      A.  Correct.

8      Q.  You've also stated in your affidavit that the

9  violation of the 3PVRO's affiliates are included in the

10 maximum yearly aggregate fine; is that correct?

11     A.  Correct.

12     Q.  What is that understanding based on?

13     A.  It is -- well, it's based on conversations, I

14 believe, I had with legal counsel that clarified that

15 point, specifically when we were speaking with regards

16 to the Voter Promoter, the schools.

17     Q.  Okay.  In order for an affiliate to be included

18 within this cap, does that affiliate have to register

19 using its own Form 119?

20     A.  Like if you were doing it as a school, each

21 individual school?

22     Q.  Or let's talk about the League of Women Voters

23 and its 29 local leagues.  If the League of Women Voters

24 wants all of its 29 local leagues to be included in the

25 cap, do each of the local leagues have to file their own

―MARY CLARKE CORKERY, COURT REPORTER―

1  Form 119?

2     A.   Once again, I believe we spoke about that

3  previously and I believe I answered that I needed

4  clarification on that, whether or not they would be

5  listed as voter registration agents or if there would be

6  individual forms required.

7     Q.   Are there any penalties for violating any

8  provision of the third-party voter registration law

9  other than the deadline for the submission of

10  applications?

11     A.   Well, there were penalties that we spoke about

12  with regards to the falsification that is listed on the

13  Form 120.

14     Q.   Those are criminal felonies that can be committed

15  if someone submits false voter registration information.

16  Is that what you're referring to?

17     A.   Correct.

18     Q.   How about for failure to submit one of the

19  required forms or to update -- or the failure to update

20  your Form 119 on time?  Are there any penalties that can

21  be assessed?

22     A.   I'm not certain of the actual penalties.  I would

23  need to research that further.

24     Q.   And would that be your answer if I asked about

25  violations of any particular provision other than the

*MARY CLARKE CORKERY, COURT REPORTER*

1    timely submission of forms?

2        A.    Yes.

3        Q.    Okay.  Is your understanding that there can be

4    criminal penalties for failure to comply with various

5    aspects of the law, the 3PVRO law?

6        A.    Such as the submission of falsely -- false

7    documentation?

8        Q.    Put that aside.  Those are the criminal laws in

9    the State of Florida.  I'm talking specifically about

10   violations of the 3PVROs laws relating to registration

11   and compliance with forms and things like that.  Is it

12   your understanding there can be criminal penalties for

13   failure to comply?

14       A.    I am not certain the extent of the fines or

15   penalties that the Attorney General would be able to

16   actually look at other than civil enforcement.

17       Q.    Okay.  Is it your understanding that the Florida

18   Statutes state that a violation that doesn't otherwise

19   have a specified penalty can be subject to the penalties

20   associated with criminal misdemeanors in the first

21   degree?

22       A.    I am not aware of that.

23       Q.    Okay.

24       A.    I would have to research that further.

25       Q.    Okay.  Under the new law, if the Secretary

*MARY CLARKE CORKERY, COURT REPORTER*

1    believes that there has been a violation, then the

2    Secretary may refer that matter to the Attorney General;

3    is that right?

4        A.   Correct.

5        Q.   And then the Attorney General may institute a

6    civil action?

7        A.   Correct.

8        Q.   And you testified you're not sure exactly what

9    type of civil enforcement mechanisms are available to

10   the Attorney General; is that right?

11       A.   I am not certain, but it would be up to the

12   Attorney General.

13       Q.   If a delay in submitting forms were the result of

14   impossibility of performance or force majeure, is it

15   possible that that untimely delivery will still result

16   in a fine?

17       A.   I do not believe that it would, but that is

18   something that would be looked upon by the Secretary.

19       Q.   In fact, the law says that the Secretary may

20   waive the fines upon a showing of failure to deliver the

21   applications promptly based on force majeure or

22   impossibility of performance; right?

23       A.   Correct.  So it is up to the discretion of the

24   Secretary.

25       Q.   And if the Secretary is going to consider waiving

*MARY CLARKE CORKERY, COURT REPORTER*

1    that fine, then the 3PVRO has to establish impossibility

2    of performance or force majeure of an affirmative

3    defense; is that right?

4        A.   I believe so.

5        Q.   How does a 3PVRO go about making such a showing?

6        A.   I am not certain other than we do try to

7    establish the facts of what transpired or what led to

8    the untimely delivery of the applications, and that is

9    included as part of a package -- that information is

10   included to the Secretary.

11       Q.   And does that include speaking with the 3PVRO

12   about the circumstances?

13       A.   Generally, we would -- our office would just deal

14   with the respective Supervisor of Elections.  So the

15   respective Supervisor of Elections may speak to the

16   third-party to gather that information.

17       Q.   Is the respective Supervisor required to speak

18   with the 3PVRO to collect information relating to a

19   force majeure or impossibility of performance defense?

20       A.   We try to get as much factual -- gather as much

21   factual information as possible, so we do ask the

22   Supervisors to follow up on helping us collect that

23   information for the Secretary.

24       Q.   And is the Supervisor required to speak with the

25   3PVRO?

*MARY CLARKE CORKERY, COURT REPORTER*

1     A.   By law, I don't know that there is something that

2    says they are required.  I am not aware.  I would have

3    to research that further.

4     Q.   Are there any written policies or guidelines

5    within the Division that say that the Supervisor should

6    speak with the 3PVRO to get an understanding of the

7    facts?

8     A.   I don't know if that is actually included in our

9    policies in that manner.  It is just part of the

10   procedure that we utilize to gather the facts to pass on

11   the complaint.

12    Q.   Do Supervisors receive any training as to what

13   they should do to collect all of the relevant facts?

14    A.   We have not done any training to that degree, no.

15    Q.   Who makes the final decision whether the delay

16   was caused by force majeure or impossibility of

17   performance?

18    A.   It would be the discretion of the Super -- the

19   Secretary of State.

20    Q.   Okay.  Is a 3PVRO entitled to a hearing to

21   present any evidence of that defense?

22    A.   I am not aware of a hearing procedure.

23    Q.   Are there any circumstances under which a 3PVRO

24   could be fined even if the untimely delivery was found

25   to be the result of force majeure or impossibility of

*MARY CLARKE CORKERY, COURT REPORTER*

A6516

1    performance?

2        A.   Is there a possibility that they could be fined?

3        Q.   Yes.

4        A.   It would be up to the discretion of the Secretary

5    of State.

6        Q.   So he could impose a fine even if it were --

7        A.   Well, it states he may waive the fines.  So when

8    you use the word "may" --

9        Q.   Just so the record is clear because I think we

10   were talking over, talking over each other a little bit,

11   it's your understanding that the Secretary may waive the

12   fines and so there is the possibility that fines could

13   be imposed even if the delay was caused by force majeure

14   or impossibility of performance; is that right?

15       A.   Correct, since it says "may."

16       Q.   How does -- how do Supervisors of Elections

17   assess the timeliness of forms that are turned in if

18   there is no time or -- time and date stamp on the back

19   of the form?

20       A.   It would be the date received.

21       Q.   And you testified earlier you're not sure what

22   time on that signature date; is that right?

23       A.   If there is no, no date on it, no.

24       Q.   Again, I just want to make sure it's clear, if

25   there is no time and date stamp on the back, the

*MARY CLARKE CORKERY, COURT REPORTER*

1  signature date is used, and you've testified that you're

2  not sure what time on the signature date is used to

3  trigger the 48 hours?

4  A.  The 48 hours, correct, other than the time

5  received.

6  Q.  Let me ask you about a particular situation.

7  Assume for a minute that there's a 3PVRO that holds a

8  voter registration drive and has on its table a stack of

9  voter registration applications that are preprinted with

10  the 3PVRO's number on it, and let's say a potential

11  voter comes up to the table, starts filling out a form

12  and decides they're not done, they're going to take it

13  home with them because they need to leave, fills it in,

14  signs it, dates it later that night, but that person

15  mails it in two weeks later.  How would the Supervisor

16  of Elections know when that form arrives that the 3PVRO

17  had no control over when that form was submitted?

18  A.  If it came in as a single form, perhaps they

19  would research to see who turned in the form.

20  Q.  What would they do to research who turned it in?

21  A.  It would be up to the Supervisor of Elections to

22  determine how to research that information.

23  Q.  So there is -- is there any way that the 3PVRO

24  under those circumstances could make sure that the

25  Supervisor of Elections understood that it would have

*MARY CLARKE CORKERY, COURT REPORTER*

1  been impossible for the 3PVRO to turn that form in on

2  time?

3     A.  They could certainly get a statement to the

4  Supervisor with that information and that would be made

5  part of the facts of the complaint.

6     Q.  Are 3PVROs expected to keep track of all the

7  forms that potential registrants take from their tables

8  that are preprinted to make sure they write down

9  everyone's name and can notify the Supervisors that they

10  had nothing to do with those forms?

11     A.  Because of the laws, the way that they, they are

12  written, I would imagine that the third-party

13  organization would have some policies in place as to how

14  they control their forms.

15     Q.  How do Supervisors of Elections assess the

16  timeliness of applications where the signature date is

17  not the same as the date and time listed on the back of

18  the form?

19     A.  How do they control for that or how do they --

20  I'm sorry?

21     Q.  How do they assess whether a form is timely when

22  the dates are different?

23     A.  I think they would go by the date that's printed

24  on the back of a form.

25     Q.  And what is that understanding based on?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   The rule.

2    Q.   Can you show me specifically what part of the

3    rule that is based on?

4    A.   Something that talks about each organization

5    shall ensure that if a signed organization

6    identification number is recorded on the bottom portion

7    of the reverse side of any registration application.  I

8    know I have read it somewhere else and I apologize.

9    Q.   So, sitting here today, you're just not sure what

10   your interpretation is based on?

11   A.   A registration agent or the organization shall

12   print the date and time that the voter registration

13   applicant completed the application in a conspicuous

14   space on the bottom portion of the reverse side of the

15   voter registration application it collects from a voter

16   registration applicant in a manner that does not obscure

17   any other entry.

18   Q.   And does that provide any guidance as to what

19   Supervisors of Elections should do when the date and

20   time printed on the back does not match the signature

21   date?

22   A.   No.

23   Q.   So, sitting here today, do you have -- can you

24   point to anything that informs your interpretation over

25   which, which date governs?

*MARY CLARKE CORKERY, COURT REPORTER*

A6520

1      A.   When it was received -- I would put the date -- I

2   mean, I would take the date that is written by the

3   third-party as the date, according to the rule.

4      Q.   And what is that interpretation based on, the

5   idea that a Supervisor of Elections should use the date

6   written by the 3PVRO even if it's different from the

7   signature date?

8      A.   Like, in other words, you're -- what you're

9   trying to say is that the voter perhaps wrote another

10   date --

11      Q.   Let's say --

12      A.   -- that isn't the correct date?

13      Q.   Let's say the voter signed it and dated it, you

14   know, February 27th and the 3PVRO date on the back says

15   February 28th.

16      A.   Right.

17      Q.   When this form is received by the Supervisor of

18   Elections, you've testified that you believe they use

19   the date written by the 3PVRO to decide whether the

20   48 hours has been met; right?

21      A.   Right.

22      Q.   And what is your understanding based on, that the

23   3PVRO date written on the back should be used and not

24   the signature date?

25      A.   And that would be what goes -- that would be --

*MARY CLARKE CORKERY, COURT REPORTER*

A6521

1    the time that you are looking at for the 48-hour period

2    would be the date that the voter registration agent

3    wrote on the back -- I mean, based on the rule.  A voter

4    could also make a mistake, for instance, especially at

5    the turn of the year, the beginning of the year,

6    January 3rd, people are putting 2011 when indeed it is

7    2012.  If they were to do such a thing, you know, and

8    the correct date is on there, according to the voter

9    registration agent, I would not -- I think that we would

10   take into consideration that it is the change of the

11   year and that it was a mistake on the part of the voter

12   when they wrote in 2011 versus 2012.

13       Q.   Right.  I understand it's your testimony that if

14   the dates are different the Supervisor should rely on

15   the 3PVRO's date?

16       A.   That is what I would suggest that they do, yes.

17       Q.   And can you point to anything that says that that

18   is what they are supposed to do under those

19   circumstances?

20       A.   Simply the rule that it is requiring that the

21   voter registration agent shall put that date and time on

22   there.

23       Q.   Other than delays that are caused by

24   impossibility of performance or force majeure, are all

25   other late submissions referred to the Attorney General?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   I don't know that all late submissions are

2    referred to the Attorney General.  The Secretary does

3    have some discretion, especially, you know, first-time

4    offenders.

5    Q.   And do you know what criteria the Secretary uses

6    to decide whether to refer a late submission to the

7    Attorney General?

8    A.   It isn't specifically laid out in the rule.  I

9    know that the Secretary of State does have some

10   discretion.

11   Q.   Have you ever discussed this with the Secretary?

12   A.   No.

13   Q.   In your affidavit, you say that the Secretary

14   will carefully consider the facts and circumstances of

15   each incident before determining whether the matter will

16   be referred?

17   A.   And that is correct.

18   Q.   And you say -- and you list in your affidavit

19   some of the criteria that would lead the Secretary to

20   refer a violation to the Attorney General.  Do you

21   recall that?

22   A.   Yes.

23   Q.   Where did that information come from that these

24   are the criteria that the Secretary will consider?

25   A.   In speaking with our General Counsel.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   But you've never discussed it with the Secretary?

2    A.   No.

3    Q.   Okay.  Do you know whether he shares the view?

4    A.   No.

5    Q.   Do you know whether the criteria set forth in

6    your affidavit are binding on the Secretary?  If he

7    wanted to consider different criteria, can he do that?

8    A.   I would believe that it would be up to the

9    Secretary.  This was information provided by the General

10   Counsel's Office.

11   Q.   So that's all you know, is that the General

12   Counsel told you that certain criteria might be

13   considered by the Secretary?

14   A.   Correct.

15   Q.   Do you know whether these criteria are supposed

16   to be weighed in any particular way?

17   A.   Like one over the other, one would take precedent

18   over the other?

19   Q.   Correct.

20   A.   No, I do not.

21   Q.   Do you know whether there are any procedures in

22   place to ensure that these criteria are applied in the

23   same way with respect to all 3PVROs?

24   A.   I would imagine that the Secretary of State would

25   be consistent in his application of his methodology when

—MARY CLARKE CORKERY, COURT REPORTER—

1  reviewing complaints that come before him.

2      Q.  But you don't know that for sure?

3      A.  It would be up to the Secretary.

4      Q.  You're not aware of any procedures that are in

5  place, policies or guidelines, that would explain how

6  these criteria should be applied?

7      A.  I'm not aware of the specifics.

8      Q.  And other than by listing these criteria in your

9  affidavit in this litigation, these criteria have not

10 been made known to the public; is that correct?

11     A.  I am not certain of how that would have been

12 disseminated to the public.

13     Q.  Okay.  If the -- if your counsel represented in

14 the responses to the request to admit that these

15 criteria have never been made publically available,

16 would that surprise you?

17     A.  I am not aware of that.

18     Q.  Okay.  Once the Secretary decides to refer a late

19 submission to the Attorney General, do you know what

20 criteria the Attorney General uses to determine whether

21 a fine should be imposed?

22     A.  Once again, the same type of criteria where the

23 force majeure and impossibility of performance would be

24 something that they would look at.  Also the lack of

25 knowledge is another, and -- basically, the Attorney

1    General would be looking at the information presented by
2    the Department of State.
3        Q.   And how do you know that the Attorney General
4    would consider a lack of knowledge?
5        A.   I have -- in speaking with the General Counsel's
6    Office, that is something that was presented as
7    criteria.
8        Q.   Your affidavit says that lack of knowledge is one
9    of the criteria that would lead the Secretary not to
10   refer a violation to the Attorney General; is that
11   right?
12       A.   Right.
13       Q.   And did you also discuss with General Counsel
14   whether lack of knowledge specifically was a criteria
15   that the Attorney General would then use to decide
16   whether or not to impose fines?
17       A.   I'm just assuming that that would be the same
18   criteria that the Secretary would be looking at would be
19   taken into consideration by the Attorney General, but
20   I'm not aware of the details.
21       Q.   And that's just an assumption on your part?
22       A.   Yes.
23       Q.   How many untimely submissions have been referred
24   to the Division since the new law was passed?
25       A.   I do not recall.  I am not sure in my

*MARY CLARKE CORKERY, COURT REPORTER*

1    affidavit -- yeah, there were, there were two cases that

2    were referred to the Attorney General's Office for

3    enforcement.

4        Q.  And how many others were, if any, were brought to

5    the Division's or to the Secretary's attention and a

6    decision was made not to refer them to the Attorney

7    General?

8        A.  At this point, I really could not tell you

9    exactly how many.

10       Q.  Can you --

11       A.  It hasn't -- I mean, I guess, I would have to

12   define what is lot, but it is not very many.

13       Q.  More or less than a dozen?

14       A.  Yes, less than a dozen.

15       Q.  Okay.  Once the Secretary decides to refer an

16   untimely delivery to the Attorney General, does the

17   Secretary or the Division of Elections, to your

18   knowledge, have any further involvement in deciding what

19   fines, if any, should be imposed?

20       A.  No.

21       Q.  Do you know whether a third-party voter

22   registration organization can present any evidence to

23   the Attorney General?

24       A.  I am not certain of the procedure.

25       Q.  But do you know whether there are any procedures

*MARY CLARKE CORKERY, COURT REPORTER*

1    for doing that?

2       A.  I am -- once it leaves my office, I really am not

3    certain of the procedures.

4       Q.  Can you give me an example of a reason why the

5    Secretary under the new law has decided not to refer an

6    untimely submission to the Attorney General?

7       A.  First offense.

8       Q.  Any others?

9       A.  I am really not aware of the actual reasons.

10      Q.  Okay.  You testified that two cases have been

11   referred to the Attorney General since the law was

12   changed; is that right?

13      A.  Yes.

14      Q.  In one of those cases a number of the signature

15   dates were visibly altered; is that correct?

16      A.  Yes.

17      Q.  And altering the dates on forms is -- was

18   improper under the old version of the law as well; is

19   that right?

20      A.  Yes.

21      Q.  The other instance involved a 3PVRO with a

22   history of non-compliance under both the current and the

23   former law; is that right?

24      A.  Correct.

25      Q.  And that this 3PVRO failed to register under the

*MARY CLARKE CORKERY, COURT REPORTER*

1    new rule; is that correct?

2       A.   Right.

3       Q.   That alone is a violation of the rule; right?

4       A.   Correct.

5       Q.   And then that form -- that organization also

6    turned in the forms after 48 hours?

7       A.   Yes.

8       Q.   How late were they?

9       A.   One of them -- the application -- in the first

10   incident, the applications were delivered five months

11   late.

12      Q.   Okay.

13      A.   In the second incident, the individual went to

14   vote in the November 2008 general election and

15   apparently was not registered.

16      Q.   Okay.  Turning in forms five months late -- five

17   months after they were completed would have been a

18   violation of the old rule; right?

19      A.   I believe so.

20      Q.   Do you know whether the penalties under the prior

21   version of the law when the law was ten days, do you

22   know whether penalties were enforced?

23      A.   I really am not aware.

24      Q.   Do you have any knowledge as to whether anyone

25   was fined under the ten-day version of the law?

*MARY CLARKE CORKERY, COURT REPORTER*

1   A.  No.

2   Q.  Would it surprise you if you heard someone say

3   that the penalties existed under the old law but they

4   were not being enforced?

5   A.  I'm not aware of such a statement.

6   Q.  Would it surprise you if you heard somebody make

7   that statement?

8   A.  It's possible.

9   Q.  It's possible that statement could have been made

10  or it's possible that it would surprise you?

11  A.  I mean, sometimes laws are in place and they are

12  not enforced.

13  Q.  Do you know what percentage of 3PVROs who are

14  registered under the old law declined to register under

15  the new law?

16  A.  I don't have that statistical information in

17  front of me.  I don't know off the top of my head.

18  Q.  Do you know whether it's more or less than ten

19  percent?

20  A.  I really don't know.

21  Q.  No idea?

22  A.  No.

23  Q.  Okay.  Have you had any discussions with any

24  3PVROs as to why they declined to register under the new

25  law?

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   No.

2    Q.   Do you know whether anyone in your office has had

3    any discussions with any 3PVROs as to why they declined

4    to register under the new law?

5    A.   I'm not aware of such conversations.

6    Q.   Are you aware of any conversations 3PVROs may

7    have had with any county Supervisors as to why they were

8    not re-registering?

9    A.   Only hearsay from the news media.

10   Q.   Okay.  Do you know approximately what percentage

11   of applications turned in in Florida are submitted by

12   3PVROs?

13   A.   I do not know.

14   Q.   Do you have a ball park estimate?  More or less

15   than 20 percent?

16   A.   No.

17   Q.   No idea?

18   A.   No.

19   Q.   Do you know whether that percentage has decreased

20   since the passage of the new law?

21   A.   I am not aware of that information.

22   Q.   Don't know one way or another?

23   A.   No.

24       MS. BERSE:  Why don't we take a short break.

25       Let me look quickly through my notes, but I think

*MARY CLARKE CORKERY, COURT REPORTER*

1    I'm just about wrapping up.

2    MS. DAVIS:  Okay.

3    (Whereupon, a short recess was taken.)

4    MS. BERSE:  I have no further questions.

5    THE WITNESS:  Okay.

6    EXAMINATION BY MR. MCFARLAND:

7    Q.  All right.  Ernest McFarland with the Department

8    of Justice, and thank you for your patience.  And we've

9    covered a lot of ground today, so I will, to the best of

10   my ability, try not to go over any ground we already

11   covered.

12   Since House Bill 1355 has been enacted, have you

13   personally had any contact or communications with

14   members of the Florida Legislature or any members of

15   their staff regarding any of the four changes at issue

16   in the Washington, D.C. case?

17   A.  No.

18   Q.  In that same regard, have you had any

19   communications with any member of the Governor's office

20   regarding the four changes at issue in the Washington,

21   D.C. case?

22   A.  No.

23   Q.  Do you know if the Department of State currently

24   has a legislative package that it's presenting or has

25   presented to the Legislature that's in session now?

━━MARY CLARKE CORKERY, COURT REPORTER━━

1    A.   I'm not certain that it's actually -- that

2    there's actually a package per se by the Department of

3    State.

4    Q.   Okay.  Do you know if the Department of State has

5    any, any proposals that pertain to election laws

6    currently that it's proposed or submitted to the

7    Legislature to consider?

8    A.   No.

9    Q.   Do you expect that the decisions by some

10   third-party voter registration organizations to

11   discontinue their voter registration drives, do you

12   anticipate that will have any effect on Florida's

13   electorate?

14   A.   I really couldn't quantify the effect that it

15   would have.

16   Q.   Do you think it would have an effect?

17   A.   Without really having information on the effect

18   it had previously and, like, who is not engaging, it

19   would be difficult to come up with a number.

20   Q.   Okay.  Would you agree that third-party

21   registration groups such as the League of Women Voters,

22   prior to the enactment of the law, registered voters

23   during their drives?

24   A.   They were active participants in the voter

25   registration process, yes.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   And since House Bill 1355 was passed, are you

2    aware that the League of Women Voters suspended its

3    voter registration drive and those activities?

4    A.   Through news media reports, yes.

5    Q.   So, based on -- at least in the context of

6    Florida League of Women Voters, based on their

7    discontinuation of -- your previous answer of them

8    having registered voters before, now discontinuing their

9    registration drives, do you anticipate that their

10    discontinuation will have an effect on, on voter

11    registration?

12    A.   I'm not certain what their activities are at this

13    point in time, whether they are continuing to

14    disseminate information to potential electorate or if

15    they are just ceasing operation totally.  So I think it

16    would depend upon what the League actually does.

17    Q.   So if I represented to you that the League of

18    Women Voters has suspended its voter registration

19    activities altogether, do you anticipate that that would

20    have an effect on Florida's electorate?

21    A.   It could potentially affect perhaps people that

22    they come into contact with that were previously

23    unregistered.

24    Q.   And what would that potential effect be?

25    A.   It's hard to quantify that not knowing who they

*MARY CLARKE CORKERY, COURT REPORTER*

1    come into contact with and the numbers and not knowing

2    the history of what they were able to actually engage in

3    the process previously.

4        Q.  I'm going to turn your attention to what's

5    previously been marked as Exhibit 66.  I don't know if

6    we have that.

7            MR. MCFARLAND:  Do we have the exhibits over

8        there?

9            MR. FARR:  There should be a 66, yes.

10           MS. BERSE:  66.

11           MR. MCFARLAND:  Yeah.  Let me try to get to

12       it as well.

13           (Whereupon, the witness is handed Exhibit 66

14   and proceeds to review document.)

15   BY MR. MCFARLAND:

16       Q.  I'll represent that this e-mail was not addressed

17   to you.  Have you seen this e-mail before?

18       A.  No.

19       Q.  In particular, I want to bring your attention to

20   the chart that's contained on the first page.  And it's

21   an e-mail sent from Amber Marconnet?

22       A.  Uh-huh.

23       Q.  Do you know who that is?

24       A.  Yes.

25       Q.  Who is Amber Marconnet?

_MARY CLARKE CORKERY, COURT REPORTER_

1    A.   She is one of the staff members in the Division

2  Director's Office.

3    Q.   And what is her function in that office?

4    A.   She pretty much does special projects and -- one

5  of her functions, she does log all of the public

6  information requests.

7    Q.   Okay.  And the two lines -- David Stafford.  Do

8  you know who that is?

9    A.   Yes.

10   Q.   And who is that?

11   A.   He is the Supervisor of Elections for Escambia

12  County and he is currently the president of FSASE.

13   Q.   And you previously represented that, that FSASE

14  is what?

15   A.   The Florida Supervisors' association.

16   Q.   Okay.  And in the cc'd line, there's a Chris

17  Cate, Peggy Taff, and Pierce Schuessler.  Briefly, can

18  you tell me who those individuals are?

19   A.   Chris Cate is the Communications Director for the

20  Department of State, Peggy Taff was previously the

21  Bureau Chief For Voter Registration Services, and Pierce

22  Schuessler is the Legislative Liaison for the Department

23  of State.

24   Q.   Thank you for that.

25       I want to call your attention to the chart.  Have

*MARY CLARKE CORKERY, COURT REPORTER*

1    you seen this chart before?

2      A.   No.

3      Q.   You have not seen this chart.

4          If I represented to you that this chart was

5    generated in the Secretary of State's Office, would you

6    agree to that?

7      A.   It appears, yes, to have been from information

8    gathered from within the Division.

9      Q.   Do you know who in your division would have

10   prepared this chart?

11     A.   Well, the e-mail comes from Amber.  Looking at

12   the trail of e-mails, it appears that, it appears that

13   -- oh, let's see.  It was forwarded to Sue Elias to pull

14   the data.  So that means it came from our Information

15   Technology section.

16     Q.   And how do you know that?

17     A.   Because of the e-mail dated, let's see,

18   April 13th.  It says:  Your request has been logged in

19   as public records request and has been forwarded to Sue

20   Elias to pull the data.  It was duly noted that the

21   information is needed for pending legislation.

22          Sue Elias was an employee in the Information

23   Technology Division of, of Administrative Services.

24     Q.   So is it possible, then, that Ms. Elias or

25   someone that she works with in that division would have

*MARY CLARKE CORKERY, COURT REPORTER*

A6537

1    gathered this information in the chart?

2       A.   Would have actually run a report in order to come

3    up with these calculations.

4       Q.   Is it your belief that this information in this

5    chart is readily available from records of the

6    Department of State and particularly the Department of

7    Elections -- the Division of Elections maintains?

8       A.   The chart as it is right here would not be

9    readily available.  It would actually be a report that

10   would need to be run and generated.

11      Q.   But the information that the chart is based on

12   would be information that's available to the Division of

13   Elections?

14      A.   It would be available within the data set, but

15   you would actually have to create a report to generate

16   that information.

17      Q.   Do you know if this information is able to be --

18   is aggregated by county?

19      A.   I do not know.  That would be an Information

20   Technology question.

21      Q.   And who in Information Technology would you

22   believe would be able to answer that?

23      A.   The Chief Information Officer is Larry Altman,

24   and we can actually find that out through the Division

25   whether or not that would be a possibility if we could

## MARY CLARKE CORKERY, COURT REPORTER

1   generate that information.

2     Q.  Okay.  Thank you, Doctor.

3     A.  Uh-huh.

4     Q.  Just a follow up on one question to you with

5   respect to deputizing.

6     A.  Uh-huh.

7     Q.  And I'll call your attention to Exhibit 92.

8             MR. FARR:  We have some copies of it.

9             MR. MCFARLAND:  I thought we had a stack

10        down there.

11            MR. FARR:  Yeah.  It's not in there.

12            MS. BERSE:  92.

13            (Whereupon, the witness was handed Exhibit

14   92.)

15            MR. MCFARLAND:  I'll give you a moment to

16        read that.

17            (Whereupon, the witness reviews document.)

18   BY MR. MCFARLAND:

19     Q.  I'll represent to you that this is an exhibit

20   that was previously introduced, and it's an e-mail

21   string, if you will, that begins with Susan Bucher who I

22   understand is the Palm Beach County Supervisor of

23   Elections.

24     A.  Uh-huh.

25     Q.  And in particular on this chain is Mike Ertel --

*MARY CLARKE CORKERY, COURT REPORTER*

1    A.   Uh-huh.

2    Q.   -- who is the Seminole County Supervisor of

3  Elections, and it originates with an e-mail between Mr.

4  Ertel and Mr. Holland of the Secretary of State's

5  office.  In particular, I want to call your attention to

6  the first page, first paragraph where Mr. Holland is

7  explaining to Mr. Ertel about the statutory loophole.

8  Can you read that paragraph and tell me what you

9  interpret it to mean?

10   A.   Mike, you have discovered a statutory loophole.

11  By definition, an exception to being a third-party voter

12  registration organization is if a person is an agent --

13  employee or agent of the Supervisor of Elections.  So,

14  if you make the person your agent, then the third-party

15  voter registration law does not apply to that person.

16   Q.   Previously you had testified to one of the

17  counsel here that you were familiar or that you were

18  aware of deputizing as a practice.  If, in fact, a

19  Supervisor of Election in Florida did deputize a member

20  of a group, would that group have to comply with the

21  48-hour deadline that is currently included in the

22  third-party voter registration change?

23   A.   I would say the person who is deputized would be

24  exempt under this definition.

25   Q.   But would other members of that affiliated group

*MARY CLARKE CORKERY, COURT REPORTER*

1  be exempt from that 48-hour requirement?

2      A.  I don't know that it would apply to them, and

3  that would be a legal question.

4      Q.  So if a Supervisor of Election asked you about

5  that, what would your response as Director of Elections

6  be?

7      A.  My response would be that the individual who was

8  deputized would be exempt, according to the definition

9  that is provided here by Gary Holland.  However, the

10  organization would really be a different entity.  I

11  would not look at that as being one in the same with

12  that individual even if that individual is part of the

13  organization.

14      Q.  So if --

15      A.  But I would seek guidance from Mr. Holland.

16          MR. MCFARLAND:  Okay.  That's all the

17      questions that the United States has for you at

18      this time.  Thank you.

19          THE WITNESS:  Thank you.

20          MS. DAVIS:  If we could just take ten

21      minutes.

22          MR. FARR:  Sure.

23          (Whereupon, a short recess was taken.)

24  EXAMINATION BY MS. DAVIS:

25      Q.  Doctor Salas, I know there's been quite a bit of

*MARY CLARKE CORKERY, COURT REPORTER*

1   testimony today so forgive me if I just jump into a

2   question.  But if you find my question confusing or you

3   want me to back up, tell me, and I will back up and

4   provide a little bit more information before we get to

5   the actual question.  But I'm going to try to just jump

6   in there for a timesaving effect.

7      A.  Uh-huh.

8      Q.  If I understood correctly -- well, strike that.

9      If there were an inconsistency between the

10   third-party law and a posting on the Secretary of

11   State's website, what would control?

12      A.  Between the law itself and a posting on the

13   website?

14      Q.  Correct.

15      A.  The law itself would prevail.

16      Q.  Okay.  If the Department of State ever became

17   aware of an inconsistency between the law and a posting

18   on its website, what would happen?

19          MR. FARR:  Objection; calls for speculation.

20          Go ahead.

21  BY MS. DAVIS:

22      Q.  Has the Department of State ever become aware of

23   an inconsistency between the third-party law and a

24   posting on its website?

25      A.  It appears that there have been corrections made

*MARY CLARKE CORKERY, COURT REPORTER*

1    because of, perhaps, inconsistencies that were found,

2    and, yes, we would make a correction if we were to find

3    that there is an inconsistency between the website and

4    the actual law.  We would make that correction as soon

5    as possible.

6        Q.   Have the rules that have been implemented in

7    regards to third parties, have those rules changed since

8    May of 2011?

9        A.   There was an emergency rule that was passed and

10   then the new rule was enacted.

11       Q.   Okay.  Were there changes in between those two

12   versions of the rule?  If you'd like, you can look at

13   the two versions that have been provided to you

14   previously.

15       A.   I'm not certain as to the nuances of what

16   actually changed, but there were two versions prior to

17   the enacted version.

18       Q.   Were you present at the rule workshop for the

19   third-party rule?

20       A.   I was present at a workshop, yes.

21       Q.   Are you aware if there were comments perceived by

22   the Department of State during that workshop regarding

23   the third-party rule?

24       A.   There were individuals present that made comments

25   and there was a record taken as to the comments that

*MARY CLARKE CORKERY, COURT REPORTER*

1   were provided.

2      Q.   Are you aware of if any of those comments

3   provided were incorporated into a newer version of the

4   rule?

5      A.   I know that Maria Matthews took into account what

6   was agreed to at the workshop as to changes that should

7   be incorporated, but I do not recall the specifics of

8   what transpired.

9      Q.   To your knowledge, does the Department of State

10  attempt to incorporate comments that it receives

11  regarding rules into newer versions of a rule?

12     A.   Those comments are taken into consideration when

13  creating efficiencies to the way that the Department of

14  State does business.

15     Q.   Okay.   In your experience as an Assistant

16  Supervisor and a Deputy Supervisor, if it ever came to

17  your -- well, did it ever come to your knowledge that

18  any one, any one one registered voter voted twice in an

19  election?

20     A.   I cannot recall a specific incident.

21     Q.   In your experience as an Assistant and Deputy

22  Supervisor of Elections, if you were made aware of a

23  person who voted twice in the same election, what would

24  you have done?

25     A.   As an Assistant or a Deputy, I would have taken

*MARY CLARKE CORKERY, COURT REPORTER*

A6544

1    it to the attention of the Supervisor of Elections for

2    his or her action.  I would have gathered all the

3    information, pertinent information, and presented it to

4    the Supervisor.

5        Q.  In your experience as a Deputy and Assistant

6    Supervisor of Elections, would you find it to be

7    troublesome that a person voted twice in the same

8    election?

9        A.  Yes.

10       Q.  How so?

11       A.  Every individual is entitled to one vote.  That

12   is the law.  So I would suspect that if an individual

13   voted more than once it was done fraudulently.

14       Q.  Would there have to be widespread double voting

15   before you would want the Legislature to react?

16              MR. FARR:  Objection to the form.

17              Go ahead.

18              THE WITNESS:  I value the importance of

19          every vote, and I believe in the importance of

20          voting as a part of our democratic process.  So,

21          therefore, if I saw inconsistencies or I saw that

22          there were -- there was fraud occurring, it would

23          be an area of concern.

24   BY MS. DAVIS:

25       Q.  Are you a registered voter in the State of

*MARY CLARKE CORKERY, COURT REPORTER*

1    Florida?

2        A.   Yes, I am.

3        Q.   If you knew that one person voted twice in the

4    same election, would you want to try to prevent that

5    from happening again?

6        A.   Yes.

7        Q.   Why?

8        A.   Because I value the importance of each and every

9    vote and an election can actually be -- a person can

10   actually be elected by just one vote.  So, therefore, if

11   fraud is part of the process, it pretty much inter -- it

12   interferes with the process of democracy.

13               MS. DAVIS:  Okay.  Thank you.

14               And I apologize.  I tried not to look at you

15          as I was asking questions.  It's a little

16          uncomfortable.

17               And I have no further questions.

18               MR. FARR:  Does that mean I should turn my

19          head away when I ask the rest of my questions?

20               MS. DAVIS:  I don't want her to perceive

21          that I'm coaching her on her answer, so I was

22          trying not to look at her.

23               MR. FARR:  That's okay.

24   FURTHER EXAMINATION BY MR. FARR:

25        Q.   Doctor Salas, I'm just going to stay put, if

**_MARY CLARKE CORKERY, COURT REPORTER_**

1    that's all right with you.  I just have very few

2    questions on redirect.

3         Ms. Davis asked you some questions about the

4    workshop that you attended concerning the 3PVRO rule;

5    correct?

6    A.   Yes.

7    Q.   And you testified that some comments were taken

8    and that some changes might have been made to the rule

9    as a result?

10   A.   That is correct.

11   Q.   Do you know specifically what changes those were?

12   A.   I do not recall.

13   Q.   And do you recall even generally whether all the

14   comments that were received by the Department of State

15   from Supervisors were incorporated into a change or just

16   some?

17   A.   I'm certain that they would all have been

18   considered and listened to, but I am not certain that

19   all of them were incorporated.  I really would -- cannot

20   recall so I would have to review the transcripts of the

21   proceeding.

22   Q.   So, in other words, some discretion was exercised

23   by your department in terms of what comments from

24   Supervisors to take or not take?

25   A.   Correct, because some things are feasible and

*MARY CLARKE CORKERY, COURT REPORTER*

1   others are not.

2       Q.   Okay.  And do you know who exercised that

3   discretion?

4       A.   The rule is pretty much -- I mean, a lot of it

5   existed prior to my coming in as Director and legal

6   counsel will normally formulate the wording of the rule.

7       Q.   So would it have been Ms. Matthews or Mr.

8   Holland?

9       A.   Correct.

10      Q.   Okay.  And you have no knowledge, as you sit

11  here, about what comments they took and what comments

12  they didn't take?

13      A.   I could go back and review the record and I would

14  be able to see the comments of the Supervisors and then

15  review that with the rule to see what was taken into

16  consideration.

17      Q.   Okay.  But sitting here, you don't know?

18      A.   Sitting here, I don't know, no.

19      Q.   Ms. Davis asked you about being troubled if you

20  were, in fact, aware that a person had voted twice in an

21  election.  Do you recall that?

22      A.   Yes.

23      Q.   And you stated you would be troubled if you knew

24  that had happened?

25      A.   Yes.

*MARY CLARKE CORKERY, COURT REPORTER*

1    Q.   But you're not aware of whether it has or not;

2    right?

3    A.   I know that there have been occurrences

4    throughout the years, but right now I cannot speak to

5    one specific incident.

6    Q.   Is that -- when you say you know there have been

7    incidences, is that because just sort of generally you

8    think something like that must have happened or do you

9    actually recall specifically that that has, in fact,

10   happened?

11   A.   That has, in fact, happened.

12   Q.   Okay.  But you don't know how many times or under

13   the circumstances --

14   A.   I don't have the specifics, no.

15   Q.   And since you knew that it had happened, isn't it

16   fair to say that the old law allowed that to be

17   detected, the fact that you're aware of it?

18   A.   The old law allowed it to be detected?  In other

19   words, the manner in which votes were recorded, voter

20   history, precinct registers, absentee ballots,

21   etcetera -- I mean, there's mechanisms in place where

22   you could reconcile who has voted.

23   Q.   So, under the old law, you were able to detect

24   that kind of double voting fraud; correct?

25   A.   It has existed for some time, yes.

*MARY CLARKE CORKERY, COURT REPORTER*

```
 1      Q.  Ms. Matthews -- Ms. Matthews.  I'm sorry.  Wrong

 2  deposition.  Ms. Davis asked you further about that and

 3  you made a comment that even one person double voting

 4  like that could be troubling because a person can be

 5  elected by one vote; correct?

 6      A.  Correct.

 7      Q.  We all know in Florida that there can be close

 8  elections and there can be outcome determinative results

 9  just based on a few votes; correct?

10      A.  It is correct.

11      Q.  Isn't it also true that a person could fail to be

12  elected just because certain votes -- a small number of

13  votes don't count?

14      A.  If they don't count, there would be -- there

15  would need to be legitimate reason for those votes not

16  to count.

17      Q.  Right.  I understand.  But just as a general

18  matter, the same generality with which you testified in

19  response to Ms. Davis' question, isn't it true that even

20  just a small percentage swaying in the electorate can

21  make a difference in a closely contested election in

22  Florida?

23          MS. DAVIS:  Objection; misstating prior

24      testimony.

25          MR. FARR:  You can answer.
```

*MARY CLARKE CORKERY, COURT REPORTER*

1        THE WITNESS:  As an election official and as

2     a voter of the State of Florida, I believe, like I

3     stated before, in, in actually the -- every vote

4     is sacred.  I mean, there -- every vote is very

5     important so every vote should count --

6        MR. FARR:  All right.

7        THE WITNESS:  -- if it is, if it is

8     legitimately cast.

9  BY MR. FARR:

10    Q.  So would you agree with me that even if these

11 voting changes that are under consideration in our case

12 had a small impact on the electorate in terms of the raw

13 number of people who either were not registered because

14 a 3PVRO wasn't there to register them or whose vote

15 didn't count because they had to do a provisional ballot

16 because they moved on election day, even if a small

17 number of people don't get their votes in, that would

18 have an outcome determinative effect, wouldn't it, in

19 theory?

20    A.  Every vote is important.  I agree with that.

21        MR. FARR:  Thank you.  I've nothing further.

22        MS. BERSE:  I have nothing.

23        MR. MCFARLAND:  Nothing.

24        MS. DAVIS:  Nothing.

25        (Whereupon, the deposition was concluded at

*MARY CLARKE CORKERY, COURT REPORTER*

1   approximately 4:40 p.m., and the witness retained her

2   right to read and sign the transcript.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MARY CLARKE CORKERY, COURT REPORTER*

1      ACKNOWLEDGMENT OF REPORTER

2

3          I, MARY CLARKE CORKERY, Court Reporter and Notary

4    Public, at Tallahassee, Florida, do hereby certify as

5    follows:

6          THAT I correctly reported in shorthand the

7    foregoing DEPOSITION of GISELA SALAS, PH.D., at the time

8    and place as stated in the caption hereof;

9          THAT I later reduced my shorthand notes to

10   typewriting, or under my supervision, and that the

11   foregoing pages 7 through 291, all inclusive, contain a

12   full, true, and correct transcript of the deposition on

13   said occasion;

14         THAT I am neither of kin nor of counsel to any of

15   the parties involved in this matter, nor in any manner

16   interested in the results thereof;

17         THIS 28th day of February, 2012.

18

19

20            /s/_____
             MARY CLARKE CORKERY
21           COURT REPORTER

22

23

24

25

*MARY CLARKE CORKERY, COURT REPORTER*

<pre>
 1                    CERTIFICATE OF NOTARY

 2

 3    STATE OF FLORIDA
      COUNTY OF LEON
 4

 5         I, MARY CLARKE CORKERY, Notary Public in and for

 6    the State of Florida at Large, do hereby certify that

 7    the witness personally appeared before me and was by me

 8    first duly sworn to testify to the truth on the date and

 9    time indicated herein.

10         THIS 28th day of February, 2012.

11
                        /s/
12                      MARY CLARKE CORKERY
                        Notary Public in and for the
13                      State of Florida At Large.

14

15

16

17

18

19

20

21

22

23

24

25

         MARY CLARKE CORKERY, COURT REPORTER
</pre>

A6554

Exhibit 32

## ERRATA SHEET

| PAGE | LINE | CORRECTION |
|------|------|------------|
|      |      |            |

At the time of your deposition, you elected to read and sign the transcript. When reviewing your deposition, please make corrections on this sheet only, then sign and date below.

Please return errata sheet only to the following address:

Lisa C. Snyder
Court Reporter
4978 Charles Samuel Drive
Tallahassee, FL  32309

Signature: _Bucky Mitchell (Emmett Mitchell IV)_
Date: _3/28/12_
Deposition taken of Bucky Mitchell on the 28th day of February, 2012

In re:  State vs. USA, et al

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3               CASE NO. 1:11-cv-1428-CKK-MG-ESH

4
    STATE OF FLORIDA,
5
                Plaintiff,
6   vs.

7   UNITED STATES OF AMERICA and
    ERIC H. HOLDER, JR., in his official
8   capacity as Attorney General,
                Defendants.
9
    FLORIDA STATE CONFERENCE OF THE
10  NAACP, et al,
                Defendant-Intervenors,
11
    KENNETH SULLIVAN, et al
12              Defendant-Intervenors,

13  NATIONAL COUNCIL OF LA RAZA, and
    LEAGUE OF WOMEN VOTERS OF
14  FLORIDA,
                Defendant-Intervenors.
15  _____/

16

17             DEPOSITION OF BUCKY MITCHELL

18

19      TAKEN in the above-styled cause, at the offices of the

20  United States Attorney, for the Northern District of Florida,

21  111 N. Adams Street, 4th floor, US Courthouse, Tallahassee,

22  Florida, on the 27th day of February, 2012, commencing at 9:00

23  a.m.

24

25

              LISA C. SNYDER, COURT REPORTER

1                    A P P E A R A N C E S

2

3    Daniel T. O'Connor, Esq.
     BRYAN CAVE LLP
4    1155 F Street NW
     Washington, DC  20004
5    Attorneys for NCLR and
     League of Women Voters
6
     Catherine Meza, Esq.
7    US Department of Justice
     Civil Right Division
8    950 Pennsylvania Ave., NW
     Room 7161-NWB
9    Washington, DC  20005

10   Daniel E. Nordby, Esq.
     Assistant General Counsel
11   Office of the Attorney General
     R.A. Gray Building, Suite 100
12   500 S. Bronough Street
     Tallahassee, FL  32399-0250
13   Attorneys for State of Florida

14   Also present:  Harry O. Thomas, Esq.

15

16                      I N D E X

17                                        Page No.

18        Appearances and Index           2
          Exhibits                        3
19        Examination by Mr. O'Connor      4
          Examination by Ms. Meza         200
20        Examination by Mr. Nordby       206
          Certificate of Oath            214

21

22

23

24

25

                 LISA C. SNYDER, COURT REPORTER

1                             E X H I B I T S

2

3    Mitchell Exhibit No. 1 - Privilege log
     Mitchell Exhibit No. 2 - 1-25-11 email (Enwright)
4    Mitchell Exhibit No. 3 - 1-26-11 email (Pepper)
     Mitchell Exhibit No. 4 - 1-26-11 email (Pepper)
5    Mitchell Exhibit No. 5 - 2-3-11 email (Pepper)
     Mitchell Exhibit No. 6 - 2-9-11 email (Enwright)
6    Mitchell Exhibit No. 7 - 5-13-11 email (Fox/Roberts)
     Mitchell Exhibit No. 8 - 5-13-11 email (Fogt/Fox)
7    Mitchell Exhibit No. 9 - conversation notes 2-10-11
     Mitchell Exhibit No. 10- 4-1-11 email (Watkins)
8    Mitchell Exhibit No. 11- FSASE document 4-6-11
     Mitchell Exhibit No. 12- typed comments re: Ex.11
9    Mitchell Exhibit No. 13- SOE concerns/response
     Mitchell Exhibit No. 14- 4-12-11 email (Kirkland, et al)
10   Mitchell Exhibit No. 15- 4-20-11 email (Kirkland)
     DOS Exhibit No. 68        - 4-9-11 email (Kirkland)
11   SOE Exhibit No. 29        - 4-12-11 email (Charlotte County SOE)
     SOE Exhibit No. 11        - 4-13-11 email (Edwards)
12   SOE Exhibit No. 71        - 4-13-11 email (Fox)
     Mitchell Exhibit No. 16- notes re 4-14-11 hearing
13   DOS Exhibit No. 72        - 4-14-11 email (Fox)
     SOE Exhibit No. 1         - FSASE document
14   Mitchell Exhibit No. 17- handwritten notes
     Mitchell Exhibit No. 18- 4-25-11 email (Edwards
15   SOE Exhibit No. 21        - Matthews email
     DOS Exhibit No. 28        - DOE opinion
16   DOS Exhibit No. 39        - DOS memo 12-24-07
     DOS Exhibit No. 75        - 4-29-11 email (Fox)
17

18

19

20

21

22

23

24

25

---

                      LISA C. SNYDER, COURT REPORTER

 1    The witness, BUCKY MITCHELL after having been duly sworn

 2   was examined and testified as follows:

 3

 4                    EXAMINATION BY MR. O'CONNOR:

 5        Q.   Mr. Mitchell, I introduced myself off the record, but

 6   I'd like to now introduce myself on the record.  My name is Dan

 7   O'Connor.  I am an attorney with the law firm of Bryan Cave, in

 8   Washington, DC.  We represent the League of Women Voters of

 9   Florida, and the National Counsel of La Raza, in connection

10   with a preclearance case that's pending in the US District

11   Court, for the District of Columbia.

12              Would you please state and spell your full name

13   for the record?

14        A.   Emmett Mitchell, IV, E-m-m-e-t-t, M-i-t-c-h-e-l-l,

15   IV.  Nickname is Bucky, B-u-c-k-y.

16              MR. O'CONNOR:  Thank you.  I would like to have the

17        counsel here today identify themselves for the record.

18              MS. MEZA:  Catherine Meza, with the US Department of

19        Justice.

20              MR. NORDBY:  Daniel Nordby, representing the State of

21        Florida and Ken Detzner.

22              MR. THOMAS:  Harry Thomas, Radey, Thomas, Yon &

23        Clark, representing the witness.

24              MR. O'CONNOR:  Thank you.

25        Q.   Mr. Mitchell, is it your understanding you are here

─────────────────────────────────────────────
                  LISA C. SNYDER, COURT REPORTER

```
 1   testifying under oath just as you would if you were in a court
 2   of law?
 3       A.   Yes.
 4       Q.   Have you been deposed before?
 5       A.   I have.  It's been several years.
 6       Q.   What were the circumstances just briefly of that
 7   prior deposition?
 8       A.   On a preclearance case for the Department of State
 9   elections bill.
10       Q.   What were the issues just briefly that were in that
11   preclearance case?
12       A.   I don't recall.  It's been probably over 10 years.
13       Q.   At that time, were you employed by the Department of
14   State?
15       A.   I was.
16       Q.   Other than that deposition, approximately 10 years
17   ago, have you had your deposition taken at any other times?
18       A.   No.
19       Q.   Since it's been a little while since you have had
20   your deposition taken, I would like to go over a few of the
21   basic ground rules.  First, we have the court reporter here.
22   Her job today is to transcribe everything that is being said,
23   and as a result it's difficult for her to get head nods or
24   other non-verbal communications, which while very natural, is
25   difficult for the court reporter, so I would like to ask you to
```

LISA C. SNYDER, COURT REPORTER

```
 1   respond verbally to my questions, and I will do the same to the
 2   extent necessary for our communication.  Does that sound fair?
 3       A.   That's fine.
 4       Q.   If at any point during the deposition today if I ask
 5   something that isn't clear, or if you would like further
 6   clarification, please just ask and I will be happy to give you
 7   clarification.  Is it fair, then, that if you answer a question
 8   I can assume you have understood it?
 9       A.   Yes.
10       Q.   Is there any reason that you can't testify today
11   truthfully and honestly?
12       A.   No.
13       Q.   Is today as good a day as any to take your
14   deposition?
15       A.   Yes.
16       Q.   What did you do to prepare for today's deposition?
17       A.   Conferred with counsel for a few minutes, reviewed
18   the documents that I provided to you.
19       Q.   When you say conferred with counsel, who is the
20   counsel you conferred with?
21       A.   Harry Thomas.
22       Q.   When did that meeting occur?
23       A.   This morning.
24       Q.   Did you speak with anyone else about the deposition?
25       A.   I talked to Dan Nordby to find out how long the
```

LISA C. SNYDER, COURT REPORTER

1    deposition would take place.

2        Q.   Did you discuss anything else with Mr. Nordby?

3        A.   No.

4        Q.   Other than Mr. Thomas and Mr. Nordby, did you speak

5    to anyone else about the deposition?

6        A.   I spoke briefly to Chris Lunny, another attorney in

7    Harry Thomas' office.

8        Q.   I'm sorry.  The name was Chris?

9        A.   Lunny.

10       Q.   Can you spell the last name?

11       A.   L-u-n-n-y.

12       Q.   When did that conversation occur?

13       A.   Friday.

14       Q.   About how long did it last?

15       A.   30 minutes.

16       Q.   Just generally what was the topic of the

17   conversation?

18       A.   Just the documents that I provided to you, we briefly

19   discussed those.

20       Q.   You said you reviewed documents you produced, are

21   those the documents that were produced to Bryan Cave in

22   response to a third party document subpoena?

23       A.   Yes.

24       Q.   Did you review any other documents?

25       A.   No.

LISA C. SNYDER, COURT REPORTER

```
 1          Q.   Throughout the deposition today we will probably use
 2    a fair number of terms that I imagine we probably have a
 3    similar understanding of.  I just want to confirm for the
 4    record.  One of the terms is HB1355, or House Bill 1355; are
 5    you familiar with that term?
 6          A.   Yes.
 7          Q.   Can you describe what it means to you?
 8          A.   It's the numerical designation for the House election
 9    bill that was passed back in 2011.
10          Q.   Is it your understanding that House Bill 1355 is the
11    piece of election legislation that contains the four sets of
12    voting changes that are at issue in the preclearance case?
13          A.   Yes.
14          Q.   Are you aware of whether House Bill 1355 had a
15    companion bill in the Senate?
16          A.   I believe it did.
17          Q.   Do you recall the number of that bill?
18          A.   Actually, I don't.
19          Q.   Does Senate Bill 2086 sound familiar?
20          A.   That does.  That sounds familiar.
21          Q.   I will represent to you that Senate Bill 2086 is the
22    companion to House Bill 1355 during the 2011 legislative
23    session, with regard to election law changes.
24               Through the deposition, to the extent we refer
25    to House Bill 1355, will you understand that to mean both the
```

1   House Bill and the Senate Bill, as they were ultimately passed

2   by the legislature, and signed by the Governor?

3        A.   Yes.

4        Q.   If there is ever any confusion, or if you would like

5   to draw any distinctions between the two bills, please feel

6   free to do so, and I would love to drill down to that level of

7   detail as needed.

8        A.   Okay.

9        Q.   I made reference a moment go to four sets of voting

10  changes that are at issue in the preclearance case.  Do you

11  have an understanding as to which of the voting changes those

12  are?

13       A.   I believe I do.

14       Q.   Can you briefly describe them for me?

15       A.   There is a provision on constitutional amendment

16  provisions.  Provisions on early voting.  Provisions on change

17  of address at the polls.  And, provisions on third party voter

18  registration.

19       Q.   Sounds like your memory is pretty good.  Those are

20  the four sets of changes as I understand them as well.

21            Throughout the deposition today, to the extent I

22  refer to the four sets of voting changes, will you understand

23  that to mean the four sets of voting changes you just outlined?

24       A.   Yes.

25       Q.   I would like to ask you briefly about the document

LISA C. SNYDER, COURT REPORTER

1    subpoena that you received, and that you responded to.  I guess
2    first, is it correct that you received a subpoena for documents
3    from our office?
4        A.   Yes.
5        Q.   Did you respond to that subpoena?
6        A.   I did.
7        Q.   Did you produce all documents that were in your
8    possession, custody, or control that are responsive to that
9    subpoena?
10       A.   Yes.
11       Q.   Since you produced the documents, have you located
12   any additional documents that are responsive but haven't yet
13   been produced?
14       A.   No.
15       Q.   Did you withhold any documents from your production?
16       A.   There were some documents that we identified as
17   privileged, that we felt were responsive, but other than that
18   no.
19       Q.   I would like to show you a document that we will mark
20   as Mitchell Exhibit 1.
21            Mr. Mitchell, do you recognize the document
22   that's marked Mitchell Exhibit 1?
23       A.   Yes.
24       Q.   What is it?
25       A.   It's a privileged log that I created.

LISA C. SNYDER, COURT REPORTER

1      Q.   Is this a privileged log that details the documents

2  that you withheld from production pursuant to the subpoena on

3  the basis of privilege?

4      A.   Yes.

5      Q.   I'd like to ask you a few questions about this just

6  to understand what documents haven't been produced, and then

7  jump into the substance about the documents that have been

8  produced.  There are four entries on the privileged log; is

9  that right?

10      A.   Yes.

11      Q.   Does that reflect the fact that there are four

12  documents that you withheld from production?

13      A.   That there were four?  I'm sorry?

14      Q.   Is this a complete list of the documents that were

15  withheld from production?

16      A.   Yes.

17      Q.   I would like to ask about the first entry, which for

18  the record lists a date of January 11, 2011, a document type of

19  email from Mr. Mitchell to Andy Palmer, Frank Terraferma, Joel

20  Springer, and Jim Rimes, with a cc to law firm, and the notes

21  read, "Email to clients with attached first draft of proposed

22  2011 election bill.  Draft election bill attached to email",

23  and it asserts the privilege of attorney/client communication.

24  Did I read that correctly?

25      A.   Yes.

LISA C. SNYDER, COURT REPORTER

1          Q.   First I'd like to ask you to briefly identify the

2     individuals who are listed as the to on this priv-log.

3          A.   Andy Palmer, at the time was the Executive Director

4     of the Republican Party of Florida.

5               Frank Terraferma, also employed with the Party,

6     as I believe Director of House Campaigns.

7               Joel Springer, also employed with the Party as

8     Director of Senate Campaigns.

9               And, Jim Rimes is a political consultant that we

10    also represent.

11         Q.   With regard to these four individuals, is it your

12    position that you represent each of these four people?

13         A.   Yes.

14         Q.   In what capacity?

15         A.   Legal consulting, political consulting, general legal

16    guidance with regard to legislative matters and campaign

17    related matters.

18         Q.   You use the word we, that we represent these

19    individuals.  Who are you referring to?

20         A.   The Coates Law Firm.

21         Q.   Who makes up the Coates Law Firm?

22         A.   Myself, Richard Coates and Noreen Fenner.

23         Q.   Are each of those individuals attorneys?

24         A.   Richard is.  Noreen is not.

25         Q.   What is Ms. Fenner's position?

---

LISA C. SNYDER, COURT REPORTER

```
 1        A.    She is the office manager and legal assistant.

 2        Q.    So, the Coates Law Firm consists of yourself

 3   Mr. Coates and Ms. Fenner, and you and Mr. Coates are

 4   attorneys; is that right?

 5        A.    Correct.

 6        Q.    You mention Mr. Palmer, Mr. Terraferma and Mr.

 7   Springer, all of who whom were associated with the Republican

 8   Party of Florida; is that right?

 9        A.    Correct.

10        Q.    You mentioned Mr. Rimes, who was a political

11   consultant; is he affiliated with the Republican Party of

12   Florida at all?

13        A.    No, not to my knowledge.

14        Q.    Can you help me understand just a little bit.  It

15   sounds like you have at least two groups of clients that are

16   listed here; one that is connected with the Republican Party of

17   Florida, and another, Mr. Rimes, who is a political consultant

18   but not affiliated with RPOF.  Can you help me understand the

19   dynamic there, why those two sets of groups would receive a

20   single email?

21        A.    Jim is a political consultant that works for Enwright

22   Consulting, and we do work for him from time to time.  He is

23   interested primarily in changes to Chapter 106 of the election

24   code.

25        Q.    Chapter 106 of the election code, is it correct that
```

LISA C. SNYDER, COURT REPORTER

1    refers to campaign finance?

2         A.    That's correct.

3         Q.    With regard to the cc that's listed, law firm, can

4    you help me understand what that means?

5         A.    Sure.  I cc'd to Noreen and Richard Coates.

6         Q.    You listed law firm as a proxy for Mr. Coates and Ms.

7    Fenner; is that right?

8         A.    I did.

9         Q.    Law firm is listed on three of the four entries; is

10   that the same two individuals in each instance?

11        A.    It is.

12        Q.    Why would you cc Ms. Fenner and Mr. Coates?

13        A.    Just for information purposes at this point.

14        Q.    I would like to ask you about the notes affiliated

15   with first entry.  It references a first draft of proposed 2011

16   elections bill.  Can you help me understand what that means?

17        A.    Let's see, I am looking at the date here.  I think

18   these were just notes that I had taken during the meeting with

19   clients as we were discussing potential election legislation.

20        Q.    I want to make sure I am clear.  I am referencing the

21   first line in the log which refers to email to clients with

22   attached first draft, and then you mentioned notes to a

23   meeting.

24        A.    I am sorry.  I had jumped to item number two.

25        Q.    Let's go back up to number one.  In the notes with

LISA C. SNYDER, COURT REPORTER

A6570

1  regard to the first item, there is a reference to email to

2  clients with attached first draft.  Can you help me understand

3  what that references?

4      A.   It's just an email with probably just a greeting,

5  with an attached election bill that I had drafted.  I don't

6  know what else to add to that.

7      Q.   If there is no substance in the email, what was the

8  basis for withholding it from production?

9      A.   Well, it had an attached election bill that I

10  drafted.

11      Q.   Is it your position that that attachment potentially

12  had privileged information attached to it?

13      A.   Yes.

14      Q.   To your understanding, is the cover email, does that

15  contain any privileged information?

16      A.   I don't recall.  I don't recall if it does or not.

17      Q.   Okay.  If it doesn't, we would like to request that

18  you produce at least the cover email so we can see the date and

19  have a copy of the email; would you have an objection to that?

20      A.   I don't think so.  I would like to see it first.

21      Q.   Okay.  With regard to the attachment, why would that

22  attachment have been withheld?

23      A.   I think it's a document that I have produced, really

24  on my own, but that I am sharing with clients and asking for

25  their feedback, and didn't feel like it needed to be produced.

1    Q.   Okay.  With regard to Mr. Rimes, as opposed to

2 Mr. Palmer, Mr. Terraferma and Mr. Springer, those are two

3 separate clients; is that right?

4    A.   Repeat your question.

5    Q.   It sounds like there were four people that received

6 this email; three of whom are associated with the Republican

7 Party of Florida, one of whom is associated with Enwright

8 Consulting.  I am trying to understand, is it correct that the

9 three who were associated with the Republican Party of Florida,

10 in your view, is one client group, and the fourth person,

11 Mr. Rimes, is affiliated with Enwright Consulting.  Is that a

12 separate client group?

13    A.   I think that would be fair to say, yes.

14    Q.   Is there any relationship between those two groups?

15    A.   No.

16    Q.   Okay.  One question I have then is, if you are

17 sending an email to two different client groups, who are

18 unrelated to each other and don't share any attorney/client

19 communication with each other, what is the basis for

20 withholding the document on the basis of privilege, if

21 confidentiality is being waived since it is being sent to two

22 different groups at the same time?

23        MR. THOMAS:  Object to the form of the question.

24    A.   I don't know.  That was a decision I made sending the

25 document to two individuals that are clients.  I don't know

LISA C. SNYDER, COURT REPORTER

1 | what else to add.

2 | BY MR. O'CONNOR:

3 | Q.   Based on our discussion going through it today, do

4 | you feel that's a document you would be willing to produce to

5 | us?

6 | A.   Again, I would like to see the cover page.  I don't

7 | know.  I would like to go back and look at the draft.

8 | Q.   Okay.  I appreciate that.  If that's something you

9 | would be willing to do, that would be greatly appreciated.

10 | I would like to move to the second item on the

11 | privileged log.  References a date of January 28, 2011, and

12 | references handwritten notes.  I believe that you were starting

13 | to talk about this one earlier.  I would like to get more

14 | information.  Can you help me understand what this line item in

15 | the privileged log references?

16 | A.   Given the timeframe, I believe the notes were simply

17 | my notes that I had taken after meeting with Andy Palmer, Frank

18 | and Joel, after they had an opportunity to look at the election

19 | bill.

20 | Q.   With regard to the line item, it references a meeting

21 | with clients but there is no one identified, although you just

22 | listed three individuals, so help me understand who attended

23 | this meeting.

24 | A.   Andy Palmer, Frank Terraferma, Joel Springer, and I

25 | believe Mike Grissom.  At the time I believe he was Deputy

LISA C. SNYDER, COURT REPORTER