1    Executive Director of the party.

2         Q.   Where did the meeting take place?

3         A.   At the party's office.

4         Q.   When you reference the party, you are referring to

5    the Republican Party of Florida?

6         A.   Correct.

7         Q.   About how long did the meeting last?

8         A.   Two hours.

9         Q.   I don't want to get into the substance of the

10   communication to the extent it's privileged, but if you could

11   describe generally the topics that were discussed without

12   revealing the privilege, I would appreciate that.

13        A.   I think we went through the bill and those

14   individuals at the meeting expressed any thoughts about drafts

15   that I had prepared relating to those provisions, and we

16   discussed them.  I made notes, and if there were changes or

17   things we wanted to change in the draft, I would make a note of

18   that.

19        Q.   Before we leave this document, I would like to run

20   through the last two items here.  Number three is a February 4,

21   2011 email from yourself to Mr. Terraferma, cc law firm.

22             Under the notes it describes, "email notifying

23   recipients that I am working on a revised election bill and

24   waiting on feedback on some contents".  Did I read that

25   correctly?

---

LISA C. SNYDER, COURT REPORTER

1     A.   Yes.

2     Q.   With regard to this line item, there is a reference

3  to a revised election bill.  Is this the same election bill

4  that is referenced in the first line item, where there is a

5  first draft of proposed 2011 elections bill?

6     A.   It is.

7     Q.   There is a reference to waiting on feedback; whose

8  feedback were you waiting on?

9     A.   I am trying to recall.  I may have been waiting on

10  some feedback-- the email was to Frank Terraferma-- probably

11  feedback from Andy Palmer, Joel, and I guess potentially Jim

12  Rimes.

13     Q.   Is it your understanding that this feedback was with

14  regard to specific provisions in that draft elections bill?

15     A.   Yes.

16     Q.   We have been talking about this draft elections bill.

17  Does that draft bill relate to House Bill 1355, which

18  ultimately passed out of the legislature?

19     A.   Yes.

20     Q.   Does it relate to the four sets of voting changes

21  that are at issue in the underlying case?

22     A.   Uh, the reason I hesitate, I don't know if those four

23  sets were in that draft bill.

24     Q.   Okay.  We will go through that in more detail.  So

25  it's your understanding this draft bill relates to the bill

1    that ultimately passed as House Bill 1355?

2        A.   Yes.

3        Q.   But that it's unclear at this point which of the

4    changes that are in that draft bill ultimately became the four

5    sets of changes from House Bill 1355?

6        A.   Correct.

7        Q.   Okay.  I would like to ask you briefly about the last

8    line item, dated April 5, 2011, from yourself to Andy Palmer,

9    Frank Terraferma, with a cc to the law firm.  The notes

10   reference "Email identifying provisions in PCS for HB1355 that

11   recipients may wish to review".  Help me understand that email.

12       A.   Okay.  I had identified-- PCS, by the way, is a

13   proposed committee substitute.

14            I believe this would have been a bill that had

15   come out of one of the House committees, and I had simply

16   identified provisions that may have been changed in that PCS,

17   and asked Andy and Frank to take a look and see if they had any

18   concerns or thoughts about them.

19       Q.   With regard to the provisions that you identified,

20   did any of those relate to the four sets of voting changes?

21       A.   I don't believe they did, no.

22       Q.   Mr. Mitchell, would you briefly describe your

23   educational background?

24       A.   Sure.  Undergraduate degree from Auburn University,

25   1985.  Law degree from the University of Georgia, 1991.

LISA C. SNYDER, COURT REPORTER

1    Q.   Any additional education beyond law school?

2    A.   No.

3    Q.   Can you just briefly walk me through your

4    professional work history, following law school?

5    A.   I think for relevancy purposes, I worked at the

6    Department of State from 1994 to 2000 as an attorney, and as a

7    senior attorney in the Division of Elections.  At the time I

8    left I was a senior attorney in the Division.

9              After 2000, I briefly worked for the Department

10   of Education as an attorney.

11             Joined the House, Florida House in 2001, as a

12   senior attorney in the House Rules Ethics and Elections

13   Committee.

14             Staff Director for the House Ethics and

15   Elections Committee from 2003 or 2004, until 2008.

16             Then a senior attorney for House counsel 2008

17   and 2009.  Left the House in 2009.

18   Q.   Let me just walk back through that briefly.  So you

19   mentioned that from 1994 to 2000 you worked at the Department

20   of State.

21   A.   Correct.

22   Q.   I believe you mentioned two titles you held; first as

23   an attorney, and second as a senior attorney in the Division of

24   Elections?

25   A.   Uh huh (Indicating in the affirmative).

LISA C. SNYDER, COURT REPORTER

A6577

1      Q.   Can you roughly just breakdown the amount of time for

2  the six years between 1994 and 2000, what the breakdown was of

3  those two titles?

4      A.   Sure.  The attorney period from 2004, until I believe

5  19-- I am sorry.  1994 to 1997, I was in the General Counsel's

6  office.  Some time in 1997, I moved to the Division of

7  Elections.  There were two attorneys in the division at the

8  time, but they were treated separately from the General

9  Counsel's office.  I was there until November 2000.

10     Q.   With regard to your position in the General Counsel's

11  office, what generally was your role?

12     A.   Legal support for the various divisions in the

13  department, but it ranged from rule review for cultural affairs

14  and historical resources to contract review.  From time to time

15  we would assist with the Division of Elections.  It was a

16  variety of things related to the department.

17     Q.   Let's focus on elections issues.  What involvement

18  did you have when you were in the General Counsel's office of

19  the Department of State with election law issues?

20     A.   There may have been some legal support with

21  litigation on an as needed basis.

22     Q.   Did you play any role in connection with drafting

23  election legislation?

24     A.   No.

25     Q.   You said in 1997, you moved from the Department of

1   State General Counsel's office to the Department of State

2   Division of Elections office?

3       A.   Uh huh (Indicating in the affirmative).

4       Q.   I am sorry.  Is that correct?

5       A.   Yes.

6       Q.   You were a senior attorney in the Division of

7   Elections?

8       A.   Correct.

9       Q.   What were your responsibilities in that position?

10      A.   A lot of contact with the public, answering a lot of

11  legal questions with regard to the election code, drafting

12  legal opinions, formal opinions, informal opinions, assisting

13  candidates with questions when they would call.  Providing

14  input on election legislation, if asked.

15      Q.   Did you have any role in drafting election

16  legislation?

17      A.   I don't recall.  I don't think I did.  If I did it

18  was very minimal.

19      Q.   You said that you left the Division of Elections in

20  November of 2007.  What was the reason for your departure?

21      A.   Actually it was November of 2000.

22      Q.   I am sorry.  November of 2000.

23      A.   I had taken another job with the Department of

24  Education.

25      Q.   Other than assuming another job, was there another

LISA C. SNYDER, COURT REPORTER

```
 1    reason you left the Department of State?

 2         A.    No.

 3         Q.    You said that you were briefly with the Department of

 4    Education, was that from 2000 to 2001?

 5         A.    Correct.

 6         Q.    Just briefly, what was your role there?

 7         A.    I was the attorney for the Bureau of Student

 8    Financial Assistance, and provided a lot of legal guidance on

 9    student financial aid, some personnel issues, federal education

10    regulations, things like that.

11         Q.    You were there for approximately a year and then

12    left?

13         A.    Uh huh (Indicating in the affirmative).

14         Q.    Why did you leave that job?

15         A.    I had been asked to come to the House.  Been

16    recruited.

17         Q.    Who recruited you to come to the House?

18         A.    I don't recall.  I think there was a position open in

19    the Rules Ethics and Elections Committee, and because of my

20    background at the division I was asked if I wanted to come to

21    the House.

22         Q.    You accepted that position in 2001?

23         A.    Uh huh (Indicating in the affirmative).

24         Q.    I believe you said you were there until 2003 or 2004?

25         A.    With the House, I was there until 2009.
```

LISA C. SNYDER, COURT REPORTER

 1        Q.   I am sorry.  So you had different positions, but you
 2   were with the House from 2001 to 2009?
 3        A.   Correct.  Right.
 4        Q.   So, the first position you held was with the House
 5   Rules Ethics and Elections Committee; you were a senior
 6   attorney?
 7        A.   Correct.
 8        Q.   How long did you hold that position?
 9        A.   Two years, give or take.
10        Q.   Okay.  Does the House Ethics and Elections Committee,
11   does that committee still exist?
12        A.   No.
13        Q.   Has its role been subsumed into a different
14   committee?
15        A.   I would assume so, yes.
16        Q.   What committee is that, do you know?
17        A.   Probably the House State Affairs Committee.
18        Q.   In your role as a House senior attorney, what were
19   your responsibilities?
20        A.   Drafting legislation, preparing for meetings,
21   drafting amendments, giving committee members guidance on
22   drafting their own amendments.
23        Q.   Did that relate generally to election legislation?
24        A.   Yes.
25        Q.   Then in 2003 or 2004, you became Staff Director for

LISA C. SNYDER, COURT REPORTER

1    the House Rules Ethics and Elections Committee?

2         A.    Correct.

3         Q.    How did your responsibilities change when you assumed

4    that position?

5         A.    There was some supervisory responsibilities.  I

6    believe I had two analysts working for me, who did a lot of the

7    drafting, but I also did a lot of the drafting of legislation

8    and amendments.  As staff director, I would prepare the

9    committee meetings and prepare talking points for members,

10   prepare any kind of meeting materials that members required.

11        Q.    Then I believe you said in 2008 you assumed a

12   different title; you were a senior attorney for the House

13   Council?

14        A.    Correct.

15        Q.    Briefly, describe what that is?  What is the House

16   Council?

17        A.    There were several councils.  Every few years, when

18   there is a new speaker, they generally shake up the committee

19   and council structure.  This was a council on government

20   oversight and sunset review, I believe.  We were tasked with

21   looking at agencies, and their continuing functions, whether

22   those functions were being performed efficiently, and whether

23   there was a need for the agency, or whether there was a need

24   for the agency perhaps to be moved into another agency, or

25   subsumed by another agency.

LISA C. SNYDER, COURT REPORTER

 1        Q.   You were a senior attorney in that particular council

 2   office?

 3        A.   Right.  I think my title was-- it may have been

 4   senior analyst.

 5        Q.   You said you held that position from 2008 to 2009?

 6        A.   Uh huh.

 7        Q.   What happened after 2009?

 8        A.   I left the House and joined the Coates Law Firm.

 9        Q.   Is that where you work presently?

10        A.   It is.

11        Q.   What were the circumstances of your departure from

12   the House?

13        A.   Simply looking for a new position in the private

14   sector.  My tenure of the House had run its course, and I was

15   looking for something different.

16        Q.   With regard to the House council position, that you

17   held from 2008 to 2009, did you have any involvement with

18   election law issues in that position?

19        A.   No, not really.

20        Q.   Would it be fair to summarize your experience with

21   election law issues, having gathered that experience in your

22   position at the Department of State, between 1994 and 2000, as

23   well as with the House Rules Ethics and Elections Committee

24   from 2001 until 2008.

25        A.   (No audible response)

---

LISA C. SNYDER, COURT REPORTER

1        Q.    I'm sorry.  Is that a yes?

2        A.    Yes.  I am sorry.

3        Q.    Thank you.  So, would you consider yourself fairly

4    knowledgable about the Florida election code?

5        A.    Yes.

6        Q.    I would like to turn now to the four sets of voting

7    changes that are at issue in the preclearance case.  I think it

8    may be easiest to go through them one at a time, to the extent

9    we can, although there may be some overlap.

10            Why don't we start with the third-party voter

11   registration organization change.  When did you first discuss

12   the change to the third-party voter registration that was

13   ultimately enacted in connection with House Bill 1355?

14       A.    When you say ultimately enacted, are you asking me

15   when did I first discuss the final version of the bill?

16       Q.    I would like to go back further than that.  With

17   regard to the third-party voter registration organization

18   change, let's reference the changes that ultimately went into

19   law in connection with House Bill 1355.

20            It's my understanding there were a number of

21   changes to that provision throughout the legislative process,

22   and what I would like to do is go back as far as back in time

23   to the first conversation you had anyone with regard to

24   third-party voter registration, that ultimately was related to

25   the change concerning third-party voter registration occasioned

1   by House Bill 1355?

2       A.   Okay.  I may have had some conversations with

3   Republican Party staff about third-party voter registration,

4   back in January of 2011.

5       Q.   Do you believe that January of 2011 would have been

6   the first conversation.  There wouldn't have been anything in

7   2010?

8       A.   There may have been something prior to that, but I

9   don't recall.

10      Q.   And, so is it your-- I am trying to understand where

11  this starts, in terms of the timeline.  I am trying to get an

12  understanding if it's January 2011 forward, or earlier than

13  that.

14      A.   There may have been some conversations back in

15  November, late October 2010.

16      Q.   You said conversations with the Republican Party of

17  Florida staff, who are the individuals that you discussed that

18  with?

19      A.   Probably Andy Palmer.  That was probably it.  Maybe

20  Frank Terraferma.

21      Q.   These conversations would have been in approximately

22  the October, November, December, January period between the end

23  of 2010 and the beginning of 2011?

24      A.   Uh huh (Indicating in the affirmative).

25      Q.   Can you describe the conversations that occurred?

LISA C. SNYDER, COURT REPORTER

1        A.    I think those are probably privileged.

2        Q.    Help me understand that.  Did any of these

3    individuals, Mr. Palmer, Mr. Terraferma, approach you

4    requesting legal advice?

5        A.    With regard to the election bill they did, yes.

6        Q.    Without invading the province of the privilege, I am

7    interested in the conversations you had.  You said they

8    probably approached you with regard to the elections bill?

9        A.    Yes, with comments of the election draft that I had

10   presented to them.

11       Q.    So, referring back to the privileged log, these

12   communications reference the draft that you created and

13   subsequent conversations between yourself and those individuals

14   about the substance of that draft?

15       A.    Right.

16       Q.    Why did you originally prepare the draft election

17   bill that was subsequently discussed between yourself and these

18   individuals, with the Republican Party of Florida?

19       A.    That's a good question.  Our firm engages in a

20   practice before the Elections Commission, and before the Ethics

21   Commission, and from time to time we also help a lot of

22   political entities with their reporting before the Department

23   of State.

24              Typically, what I do before session begins is I

25   look at changes that I think would be beneficial to our clients

---

LISA C. SNYDER, COURT REPORTER

 1 | with regard to Chapter 106, campaign finance chapter.  So I
 2 | began drafting changes that I think would be beneficial that
 3 | may make a practice before the Elections Commission easier or
 4 | more transparent.  In this case, that's how this election bill
 5 | got started.
 6 |     Q.   Let me back-up a little bit.  You mentioned that the
 7 | Coates Law Firm practices before the Elections Commission, and
 8 | I believe you mentioned one other.
 9 |     A.   Ethics Commission.
10 |     Q.   I am not familiar with those commissions.  Can you
11 | describe what they are?
12 |     A.   The Ethics Commission is a constitutional commission
13 | that hears ethics complaints against public officials.  It's
14 | also responsible for housing financial disclosures of public
15 | officials; state, county local.
16 |          The Elections Commission is a nine member
17 | commission that accepts civil complaints filed typically
18 | against candidates for election law violations.  The election
19 | commission has jurisdiction over Chapter 104, Chapter 106 and I
20 | believe one or two provisions of Chapter 105.
21 |     Q.   We had discussed previously that Chapter 106 of the
22 | election code deals with campaign finance.
23 |     A.   Correct.
24 |     Q.   What does Chapter 104 relate to?
25 |     A.   Chapter 104 has a variety of criminal provisions

LISA C. SNYDER, COURT REPORTER

1   related to election code violations.

2       Q.   You mentioned a couple of chapters, I believe you

3   said Chapter 104, 106, and was it 105?

4       A.   Correct.

5       Q.   What does 105 relate to?

6       A.   Chapter 105 relates to non-partisan elections of

7   primarily school board candidates and judicial candidates.

8       Q.   So in connection with that practice, before both the

9   Elections Commission and the Ethics Commission, I believe you

10  said prior to a legislative session you will sit down and look

11  at the election code, and identify areas where you think there

12  are changes that would be beneficial to your clients; is that

13  right?

14      A.   Correct.

15      Q.   In connection with that, I believe you said that you

16  were looking for changes that would be beneficial, changes to

17  Chapter 106 that would be beneficial to your clients; is that

18  the focus, the campaign finance provisions?

19      A.   It is.

20      Q.   So, with regard to 2011, the draft that you prepared,

21  the four sets of changes that we are talking about, do any of

22  those relate to Chapter 106?

23      A.   I don't believe they do.

24      Q.   Help me understand that.  If your focus is on trying

25  to identify changes to Chapter 106 that might be interest to

LISA C. SNYDER, COURT REPORTER

1   your clients, why would you have been considering changes to
2   the third-party voter registration provisions?
3        A.   I think the way these election bills typically go, a
4   draft is prepared by House staff, and it typically picks up
5   different changes that will incorporate election
6   administration, like third-party voter registration, along the
7   way.  I don't recall specifically why the third-party voter
8   registration provisions were something that-- I don't think
9   that I had any interest in those.
10       Q.   It sounds like third-party voter registration is not
11  something that you focus on; is that fair to say?
12       A.   Sure.
13       Q.   If that's the case, then why would that third-party
14  voter registration change have been part of these draft bills
15  that you were preparing?
16       A.   It may have come out of a draft that I prepared after
17  meeting with the Republican Party staff.
18       Q.   Just help me unpack that a little bit.  Would it be
19  fair to say the Republican Party staff had asked you to look at
20  the third-party voter registration changes, and that's what
21  prompted you to do so, given that otherwise that wouldn't have
22  been something you would have focused on?
23       A.   Correct.
24       Q.   Do you recall anything about the communications with
25  Republican Party of Florida staff with regard to third-party

 1 │ voter registration changes that prompted you to look at that
 2 │ issue, and prepare draft language?
 3 │          MR. THOMAS:  Objection; I believe you are invading
 4 │     the privilege at this point, but this witness can better
 5 │     analyze that.
 6 │     A.    I think that's privileged.
 7 │ BY MR. O'CONNOR:
 8 │     Q.    Okay.  So that I can understand the privilege, who
 9 │ was the client who was communicating with you with regard to
10 │ the third-party voter registration changes?
11 │     A.    Andy Palmer.
12 │     Q.    At the time, in approximately January 2011, was
13 │ Mr. Palmer the Executive Director of Republican Party of
14 │ Florida?
15 │     A.    He was.
16 │     Q.    Let me make sure I understand this.  It sounds like
17 │ at the end of 2010, beginning of 2011, you had communications
18 │ with staff of the Republican Party of Florida, including
19 │ Mr. Palmer, during which those Republican Party of Florida
20 │ staff members requested that you look at the third-party voter
21 │ registration issue, and prepare some draft language; is that a
22 │ fair summary?
23 │     A.    I think so, yes.
24 │     Q.    What did you do then?
25 │     A.    I really don't recall.  The bill I presented to the

LISA C. SNYDER, COURT REPORTER

```
1    staff was probably 40 or 50 pages long.  I don't remember what
2    I did with regard to the third-party voter registration stuff.
3         Q.   You said that the bill you presented to the staff.
4    When you say staff, are you referring--
5         A.   RPOF staff.
6         Q.   You said that was 40 or 50 pages?
7         A.   Yeah, give or take.
8         Q.   Within that were the provisions regarding third-party
9    voter registration?
10        A.   I think so. I can't say for certain.
11        Q.   I would like to show you a document that we will mark
12   as Mitchell Exhibit 2.
13             Mr. Mitchell, while you are taking a look at
14   that, I will note for the record that this is an email from
15   yourself, dated January 25, 2011, to Jim at Enwright
16   Consulting, with a copy to Ms. Fenner, and the attachment is
17   titled third-party voter registration; is that correct?
18        A.   Yes.
19        Q.   Just so I am clear, the Jim at Enwright Consulting,
20   is that Mr. Rimes?
21        A.   It is.
22        Q.   And, the cc to Ms. Fenner, that's Noreen Fenner from
23   your office?
24        A.   Correct.
25        Q.   Do you recognize this document?
```

LISA C. SNYDER, COURT REPORTER

1    A.   I do.

2    Q.   What is it?

3    A.   It's a redraft of the third-party voter registration

4    language in 97.0575.

5    Q.   Do you recall preparing this?

6    A.   Vaguely.

7    Q.   What do you recall about it?

8    A.   Nothing.

9    Q.   We had been talking previously about communications

10   you had with staff of the Republican Party of Florida, with

11   regard to third-party voter registration, but is it the case

12   that Mr. Rimes, he is not affiliated with the Republican Party

13   of Florida; is that right?

14   A.   He is not.

15   Q.   Who is he affiliated with?

16   A.   Enwright Consulting.

17   Q.   What is Enwright Consulting?

18   A.   I believe they are a political consulting group, and

19   also a client.

20   Q.   What issues do they focus on?

21   A.   I think they actually help candidates with their

22   elections: state, local, federal.

23   Q.   Help me just briefly understand that.  In what

24   capacity are they helping candidates?

25   A.   From soup to nuts.  Helping then file their campaign

1   reports.  Helping with their political advertising,
2   fundraising.
3        Q.   Okay.  Why would you have sent this email to
4   Mr. Rimes, and attaching a document that's titled third-party
5   voter registration?
6        A.   I guess he had an interest in it, and I don't really
7   recall why.
8        Q.   I would like to focus on the attachment, which is the
9   next several pages in the document.  Is it draft legislation
10  that you had prepared?
11       A.   Yes.
12       Q.   Is it your understanding that this was prepared at
13  the request of the Republican Party of Florida, or was it
14  prepared by someone else?
15       A.   I believe this was prepared at the request of Jim
16  Rimes.
17       Q.   So I want to circle back.  Previously we had
18  discussed that you had a discussion with the staff of the
19  Republican Party of Florida, so help me understand that.  Let's
20  take it one more step back.  Is this the first draft of changes
21  to the third-party voter registration laws of Florida that you
22  prepared?
23       A.   Probably so.
24       Q.   I think you had just said that you think you may have
25  prepared this in response to a request from Mr. Rimes; is that

LISA C. SNYDER, COURT REPORTER

```
 1   right?
 2        A.   Right.  Correct.
 3        Q.   Help me understand that, because it seems like
 4   previously you had mentioned that this may have been prepared
 5   in response to a request from the Republican Party of Florida
 6   but now it sounds like it may have been prepared in response to
 7   a request from Mr. Rimes.
 8        A.   I may have had some conversations with Andy Palmer,
 9   and he may have directed me to speak to Jim Rimes about
10   third-party voter registration.
11        Q.   What do you recall about that conversation?
12        A.   Any conversation with Andy Palmer?
13        Q.   Yeah.  You had said that Mr. Palmer may have directed
14   you to speak to Mr. Rimes regarding third-party changes.
15             MR. THOMAS:  Privileged.
16        A.   I think that's probably privileged.
17   BY MR. O'CONNOR:
18        Q.   Okay.  Help me understand the timeline.  Is it your
19   view that you had a conversation with Andy Palmer, the
20   Executive Director of the Republican Party of Florida, and that
21   he directed you to talk to Jim Rimes at Enwright Consulting?
22        A.   That's my recollection, yes.
23        Q.   Do you recall that occurred in January 2011?
24        A.   Give or take, yeah.  It may have been occurred in
25   December.  And, then I prepared this draft in January.
```

LISA C. SNYDER, COURT REPORTER

 1       Q.   Okay.   Then did you have communications with
 2   Mr. Rimes concerning third-party voter registration?
 3       A.   I don't recall if I had any phone conversations with
 4   him.  Obviously, there was an email, but I don't recall the
 5   extent of the conversations with Jim about third-party voter
 6   registration.
 7       Q.   As a result of those communications, did you proceed
 8   to prepare the attachment that is attached to the email marked
 9   as Mitchell Exhibit 2?
10       A.   Yes.
11       Q.   Focusing on the attachment to Mitchell Exhibit 2,
12   what was the basis for the changes that you have laid out here
13   in this document?
14       A.   Specifically, I don't recall, Dan.  I think we were
15   trying to clean up some provisions that needed to be clarified.
16   If you go back and look through the draft, I don't think there
17   were any significant changes.  I don't recall specifically what
18   our purpose was.  I believe there is language here in the back
19   that talks about the creation of a database that would house
20   all of the third-party voter registrations.  I think that was
21   new.  I believe that would be a responsibility of the
22   supervisors of elections.
23       Q.   I would like to ask about, at the top of the draft
24   legislation here there is a section one, and there is a sizable
25   segment of text that's been stricken, and then replaced.  Do

                    LISA C. SNYDER, COURT REPORTER

1  you see that?

2      A.  Uh huh (Indicating in the affirmative).

3      Q.  Is it your understanding that the provisions that

4  were removed provided for the requirements that a third-party

5  voter registration organization needed to meet if they were

6  going to engage in voter registration activities in the State

7  of Florida?

8      A.  Right.

9      Q.  Why was that language deleted?

10     A.  I don't recall.  Note a lot of that language that's

11 deleted has been re-introduced in subsections A, B, C and D.

12     Q.  That's what I wanted to ask you about next.  There is

13 a sizable component of text that's been deleted, and then there

14 is text that's been added.  Do you know why these provisions

15 were taken out, and then to the extent they are related to the

16 provisions below, put back in but in a different form?

17     A.  I don't recall.

18     Q.  I would like to ask you about Section 1D, that refers

19 to a sworn statement from each registration agent.  Let me read

20 for the record what the provision is.  It says, "(d) A sworn

21 statement from each registration agent employed by or

22 volunteering for the organization stating that the agent will

23 comply with all state laws and rules regarding the registration

24 of voters on a form that provides notice of the criminal

25 penalties for false registration".  Did I read that correctly?

1      A.    Yes.

2      Q.    Why is that provision included in here?

3      A.    I don't recall.

4      Q.    Do you know why there is a provision that it would

5   require a sworn statement from the registration agent?

6      A.    I don't.

7      Q.    Do you know why that form would need to provide

8   notice of the criminal penalties for false registration?

9      A.    No.   I think it's putting registration agents on

10  notice that there may be criminal penalties, if they falsely

11  register.

12     Q.    Do you have a sense as to the affect of that addition

13  would be on third-party voter registration groups, and their

14  agents, if they had to sign a form that gives them notice of

15  criminal penalties?

16     A.    I don't, other than that what the language says

17  itself.   I think it puts them on notice that it's a serious

18  offense and they need to be careful if they are going to fill

19  out this sworn statement.

20     Q.    Do you think it makes it less likely that people

21  would volunteer to do voter registration activities if they

22  have to sign a form that swears that-- a sworn statement that

23  puts them on notice of criminal penalties?

24     A.    I don't think so.

25     Q.    That's based on your personal opinion?

LISA C. SNYDER, COURT REPORTER

1       A.   Yes.

2       Q.   I would like to focus on paragraph two on the next

3    page, and it adds a provision that reads, "A person who

4    intentionally violates the provisions of this section is guilty

5    of a misdemeanor", and it continues.  Did I read that

6    correctly?

7       A.   Uh huh.

8       Q.   Do you recall why that provision was added?

9       A.   I don't.

10      Q.   Let's focus on paragraph three.  The end of that long

11   paragraph there are a number of penalties that are listed.

12   There is a civil penalty of $250 for each violation, not to

13   exceed $5,000.

14      A.   Right.

15      Q.   Do you recall why those civil penalties were

16   incorporated?

17      A.   The third-party voter registration language that was

18   current law already had a fairly detailed scheme for penalties.

19   I don't know if this was much of a change.  There may have been

20   higher a ceiling of penalties here, maybe $5,000.  But, that's

21   all I recall.

22      Q.   Do you recall what the old penalties scheme was,

23   under the existing law, that has been deleted?  If it helps, a

24   couple of pages later there is--

25      A.   It's under sub three that was stricken.

LISA C. SNYDER, COURT REPORTER

```
 1        Q.    What were the old penalties or fines?
 2        A.    It looks like they were $50, $100 and $500, depending
 3   on when the registrations were collected.
 4        Q.    Was there a maximum aggregate fine of $1000?
 5        A.    I believe there was.  Uh huh (Indicating in the
 6   affirmative).
 7        Q.    I am sorry.  Is that a yes?
 8        A.    Yes.
 9        Q.    So, under the changes, those fines were deleted and
10   were replaced with these higher fines; is that right?
11        A.    Apparently so.  Yes.
12        Q.    Do you recall why that was?
13        A.    I don't.
14        Q.    I would like to focus on paragraph three that's been
15   deleted.  Do you see that?
16        A.    Uh huh (Indicating in the affirmative).
17        Q.    It reads, "A third-party voter registration
18   organization that collects voter registration applications
19   serves as a fiduciary to the applicant, ensuring that any voter
20   registration application entrusted to the third-party voter
21   registration organization, irrespective of party affiliation,
22   race, ethnicity, or gender, shall be promptly delivered to the
23   division or the supervisor of elections".  Did I read that
24   correctly?
25        A.    Uh huh.
```

LISA C. SNYDER, COURT REPORTER

1      Q.   Why was that provision deleted?

2      A.   I don't know.

3           If you look at the way this is drafted, the bulk

4  of subsection one was deleted, all of subsection two, and all

5  of subsection three, and all of four were deleted.  So I think

6  it was just part of a mass deletion of that section.

7      Q.   Why, in sort of the mass deletion of those

8  provisions, why would this draft that you prepared remove the

9  requirement that a third-party voter registration organization

10 serve as a fiduciary to an applicant?

11     A.   I don't recall.

12     Q.   I would like to focus on paragraph three, subsection

13 c.

14     A.   The stricken language?

15     Q.   Yes.  This is a section we were referencing earlier

16 talking about penalties.  There is a provision that is on the

17 very final sentence of this page, and goes to the next page, it

18 appears to delete the provision that provides that the

19 secretary shall waive fines if the failure to deliver a voter

20 registration application is based on force majeure or

21 impossibility.  Why is that provision stricken?

22     A.   I am trying to refresh my memory.  I don't recall,

23 Dan.  I don't know.

24     Q.   Okay.  So then with regard to this document, let me

25 make sure that I understand it, this is a document you prepared

```
 1   following a discussion with either Mr. Palmer at the RPOF, or
 2   Mr. Rimes at Enwright Consulting, or both; is that right?
 3        A.   Uh huh (Indicating in the affirmative).
 4        Q.   This document, Mitchell 2, reflects proposed changes
 5   to the third-party voter registration provisions of Florida
 6   law?
 7        A.   Right.
 8        Q.   And, is it your testimony that you don't really
 9   recall why these changes were made?
10        A.   I don't.
11        Q.   But you were the one who prepared this draft?
12        A.   Yeah.  I was probably instructed to put these into a
13   draft.
14        Q.   Instructed by whom?
15        A.   May have been Jim Rimes, or asked to put them in a
16   draft.  I don't know.  I didn't have much interest in this
17   provision, personally.
18        Q.   So you think it may have been Mr. Rimes who
19   instructed you to prepare this draft language that included
20   these changes?
21        A.   That may have been the case.  I don't recall.
22        Q.   You said that third-party voter registration is not
23   an area of the election code that you focused on?
24        A.   Correct.
25        Q.   How did Mr. Rimes communicate the changes that he
```

LISA C. SNYDER, COURT REPORTER

1  wanted you to embody in this draft language?

2      A.    I don't recall.

3      Q.    Do you recall if he gave you any documents, any

4  sample language that he wanted to see included?

5      A.    He may have given me some sample language.

6      Q.    Do you still have any of those communications, either

7  the sample language he gave you, or an email?

8      A.    I don't.

9      Q.    Do you recall referencing any document, or other

10  source of information, when preparing this draft of third-party

11  voter registration changes?

12      A.    I don't, no.

13      Q.    Do you recall if there was any third-party source

14  that provided the basis for these changes?

15      A.    No.

16      Q.    Okay.  Since third-party voter registration changes

17  is not an area that you focus on, do you think that you would

18  have had to have some guidance, or some type of listing of

19  changes that were desired in order to prepare this, as opposed

20  to sitting down yourself and saying, here is how I think this

21  change should be?

22      A.    Yes.  I must have gotten some kind of draft from Jim

23  Rimes, I would imagine, but that was the extent of my

24  involvement.  I think my clients, and House staff, were

25  expecting me to-- because of my former employment-- put these

 1  things in the proper format into an election bill, and this may

 2  have been an example of something that came to me, I was asked

 3  to put in an election bill draft, but I really had no interest

 4  in.  That's the best way I can explain it.

 5      Q.  Do you know why either Mr. Rimes or Mr. Palmer would

 6  want these changes to the third-party voter registration

 7  language of the Florida election code to be made?

 8      A.  No.  I mean, I think it was common knowledge, it was

 9  in the public realm there had been groups that were collecting

10  voter registration applications that often times failed to turn

11  them in, or turned them in late.  So, I imagine this was in

12  response to those public reports.

13      Q.  What are the public reports you are referring to?

14      A.  I guess this was probably the 2008 or 2010 election

15  cycles, just general articles about groups that weren't turning

16  in their voter registration applications.

17      Q.  Do you recall the name of any of these groups?

18      A.  I think ACORN was probably a group.

19      Q.  Were there any others?

20      A.  There may have been some articles with regard to the

21  League of Women Voters.  I don't know if there were any

22  instances of the League turning in applications late, but I

23  know they were probably quoted in the articles as having some

24  concerns.

25      Q.  The League was quoted in the articles as having

LISA C. SNYDER, COURT REPORTER

1    concerns with what?

2         A.   Voter registration regulations.

3         Q.   What is your view of what the League's concern was

4    with voter registration regulations?

5         A.   Just generally I think there was the feeling that the

6    League was going to stop registering applicants, but this was

7    back in 2008 or 2009, before this legislation was ever drafted.

8    Because we have had a voter registration law on the book for

9    years.

10        Q.   In connection with prior iterations of the

11   third-party voter registration--

12        A.   With the current law going back to 2008, 2009.

13        Q.   With regard to that prior law, there were concerns

14   that the League may suspend voter registration as a result of

15   those prior laws?

16        A.   There were quotes to that affect in newspaper

17   articles.

18        Q.   You mentioned the League as a potential third-party

19   group that had submitted voter registration forms late.  Do you

20   have any basis--

21        A.   No.  I don't know of any instances where they turned

22   in any late.

23        Q.   You had mentioned that there were reports in the

24   media about third-party groups potentially turning in voter

25   registration applications late, and you mentioned ACORN.  Were

LISA C. SNYDER, COURT REPORTER

A6604

 1   there any other organizations that you heard of turning in
 2   voter registration forms late?
 3        A.   Not that I specifically recall.
 4        Q.   Do you recall where, in what state those reports
 5   related to?
 6        A.   Florida.
 7        Q.   What about with regard to ACORN in Florida?
 8        A.   Simply that there were instances where voter
 9   registration applications weren't turned in at all, or turned
10   in late, and voters showed up at the polls and were not
11   registered to vote, and thought they were.
12        Q.   Is that the only instance where you had heard of
13   third-party groups turning in voter registration forms late in
14   Florida?  Is this reference to ACORN doing it some time in the
15   past?
16        A.   That's all I can recall, yeah.
17        Q.   Beyond that, do you have any information about why
18   these changes to third-party voter registration laws that were
19   embodied in this draft you prepared were requested?
20        A.   No.
21        Q.   Do you know what types of groups utilize third-party
22   voter registration organizations to register to vote?
23        A.   What types of group use the organizations?
24        Q.   Yes.  Do you have a sense of what types of Florida
25   residents use third-party voter registration organizations to

LISA C. SNYDER, COURT REPORTER

```
 1   register to vote?
 2        A.    From an applicant's perspective, or from the group's
 3   perspective?
 4        Q.    From the applicant's perspective.
 5        A.    What types of groups-- I think from an applicant's
 6   perspective, a variety of groups.
 7        Q.    Do you have any sense as to the characteristics of
 8   any of those groups?
 9        A.    No.
10        Q.    Have you ever heard that minority groups
11   disproportionately rely on third-party voter registration
12   organizations to register to vote?
13        A.    No.
14        Q.    With regard to who uses third-party voter
15   registration organizations, would it be fair to say since
16   that's not an area you focus on, it's not something you would
17   have much knowledge with regard to?
18        A.    That's true.  I guess for purposes of the law,
19   third-party voter registration groups encompass state agencies
20   that provide voter registration services like the Department of
21   Motor Vehicles, Department of Children and Families.  But, in
22   terms of private third-party voter registration groups, I don't
23   have any information about who their prospective voter might
24   be, or who their applicants are.
25        Q.    Are you aware that the League of Women Voters of
```

LISA C. SNYDER, COURT REPORTER

 1   Florida has suspended all its registration activities in the

 2   State of Florida as a result of the House Bill 1355?

 3           MR. THOMAS:  Object to the form of the question.

 4       A.   Only what I have read in the newspaper, media.

 5   BY MR. O'CONNOR:

 6       Q.   What have you read?

 7       A.   I have read that they have threatened to do that.  I

 8   don't know if they have.  I don't know.

 9       Q.   Do you think it would be a bad thing if the League of

10   Women Voters stopped doing voter registration?

11       A.   Probably.  Sure.

12       Q.   Why do you say that?

13       A.   I think probably the more responsible groups out

14   there that can register voters the better.  I don't have any

15   problem with that.  Like I said, I don't have any opinion one

16   way or the other about the third-party language, other than I

17   think if someone registers to vote, and their application

18   doesn't get turned in, I think that's a problem.

19       Q.   With regard to third-party voter registrations, were

20   you aware of any gaps or loopholes in third-party voter

21   registration law leading up to the 2011 regular session of the

22   Florida legislature?

23       A.   What kind of gaps?  I don't know if I understand what

24   you are asking.

25       Q.   The phrase, the words gaps and loopholes have been

                    LISA C. SNYDER, COURT REPORTER

```
1   used in connection with the third-party voter registration

2   changes.  My question is whether you were aware of such issues

3   with that law?

4       A.   No.

5       Q.   Other than the instance that you read about in the

6   media of ACORN turning in voter registration applications late,

7   are you aware of any other voter registration fraud, or

8   misconduct that was caused by private third-party voter

9   registration organizations?

10      A.   Not off the top of my head, no.

11      Q.   In the final version of the third-party voter

12  registration changes that were occasioned by House Bill 1355,

13  there is a provision that a voter registration application must

14  be turned in within 48 hours.  Are you familiar with that

15  provision?

16      A.   I am.

17      Q.   Going back to Mitchell Exhibit 2, is there any

18  requirement of 48 hours in your draft?

19      A.   No.

20      Q.   Why not?

21      A.   I think it was probably a change that was made during

22  the legislative process.  I had nothing to do with, at least in

23  terms of putting it in a bill draft.

24      Q.   Help me understand that then.  Is it the case that

25  with regard to all of the various drafts of the third-party
```

```
 1   voter registration change that you were involved with, none of
 2   them included a 48-hour requirement to turn around a voter
 3   registration application?
 4        A.   That's correct.
 5        Q.   Do you know what group, or what individual was the
 6   source of that 48 hour requirement?
 7        A.   I don't.
 8        Q.   We have established that 48 hour requirement was not
 9   included in any draft that you prepared; is that correct?
10        A.   Correct.
11        Q.   Is that because neither you, nor the clients that
12   were representing, believed that a 48 hour turnaround for voter
13   registration applications was needed?
14             MR. THOMAS:  Object to the form.  I think you got a
15             privileged issue as to what his clients may have believed,
16             or communicated to him about it.
17        A.   I mean, I can answer with my personal feelings, but
18   in terms of what my clients might have asked, I think there was
19   a 10 day provision in there under the current law, and I
20   personally felt like 10 days was fine.
21   BY MR. O'CONNOR:
22        Q.   Without getting into the substance, I would like to
23   ask whether you ever discussed with your clients, either at the
24   Republican Party of Florida, or Mr. Rimes, the 10 day
25   requirement under the old law, or the 48 hour requirement under
```

LISA C. SNYDER, COURT REPORTER

1  the new law, with regard to voter registration applications?

2      A.   I don't think I did.

3      Q.   Do you have any information as to why the requirement

4  to turn a voter registration application in under the new law

5  is 48 hours, as opposed to three days, or five days, or seven

6  days?

7      A.   I don't.  I don't.  I don't know if it was just part

8  of the legislative process.  I don't know who came up with the

9  48 hours.  I don't know if there were discussions that it be

10  two days at one point, or three days.  I am not privy to those

11  conversations.  I don't know.

12     Q.   Are you aware that under the old law that provided

13  for 10 days to turn in a voter registration application, that

14  some private third-party voter registration organizations used

15  that period of time to conduct quality control checks of voter

16  registration applications that they received?

17     A.   I wasn't aware of that.

18     Q.   Do you have any knowledge with regard to whether

19  private third-party groups will be able to continue to do

20  quality control checks, if under the old law they had 10 days

21  and now under the new law they have 48 hours?

22     A.   What do you mean by quality control check?

23     Q.   Reviewing a voter registration application to ensure

24  that it is filled out completely and correctly.

25     A.   I wasn't aware of that.  Forty-eight hours may be

1    enough time to do that.  I don't know.

2         Q.   You don't have any information one way or the other

3    as to whether it can be done?

4         A.   I don't.

5         Q.   Do you have any information as to whether the

6    reduction from 10 days to 48 hours to turn in a voter

7    registration application will result in more incomplete, or

8    incorrectly completed voter registration applications?

9         A.   I don't know.  I don't know.  I don't have any

10   evidence of that.

11        Q.   Do you know what a supervisor of election does if

12   they receive an application either incomplete or incorrectly

13   filled out?

14        A.   I don't recall the steps that they take.  I don't

15   recall if they contact-- if the application has been received

16   through a third-party group, if they contact the group or the

17   individual applicant.  I don't know.

18        Q.   Following the passage of House Bill 1355, the

19   Department of State issued a series of rules concerning

20   implementation of that provision.  Did you have any involvement

21   in that process?

22        A.   No.

23        Q.   Are you familiar with the rule that was promulgated

24   by the Department of State in connection with the new changes

25   to third-party voter registration occasioned by House Bill

1   1355?

2       A.   Yes.

3       Q.   Describe your familiarity with that rule.

4       A.   I know there are forms that must be filled out that

5   are promulgated, incorporated in that rule, that must be filled

6   out by the organization, identifying your registration agents.

7   There is a form that must be completed by the registration

8   agent.  And, I know if things change at any time for the

9   third-party group those amendments or updates need to be filed

10  with the Department of State.

11      Q.   Have you heard any concerns from supervisors of

12  elections about the burdens that will be associated with the

13  new third-party voter registration law, or the rule that was

14  promulgated pursuant to it?

15      A.   No.

16      Q.   How about from private third-party voter registration

17  organizations?

18      A.   No, I haven't heard anything.

19      Q.   How about with regard to the League of Women Voters?

20      A.   No.

21      Q.   You have testified previously that you at least read

22  that they were concerned with the new law, and were considering

23  suspending their voter registration application collection; is

24  that right?

25      A.   Right.

---

LISA C. SNYDER, COURT REPORTER

1      Q.   Would you characterize that as a concern related to

2   the new law?

3      A.   Several years ago, yes.

4      Q.   Oh, are you not familiar with anything more recent

5   than that?

6      A.   No.

7      Q.   With regard to the third-party voter registration

8   changes that were enacted in House Bill 1355, what do you

9   believe the purpose of those changes was?

10     A.   The only thing that sticks out with me is the

11  substantive change of turning in an application within 10 days,

12  versus 48 hours, which was the new requirement.  I believe the

13  Department of State already had rules in place for the old

14  voter registration law.

15          MR. O'CONNOR:  Mr. Mitchell, we have been going for

16          over an hour.  Would you like to take a break?

17     A.   We can take a quick break.

18                    Whereupon, a brief recess was taken at

19                    10:27.  Testimony resumed at 10:33.

20  BY MR. O'CONNOR:

21     Q.   We are back on the record.

22          Mr. Mitchell, over the break did anything occur

23  to you that you would need to put on the record, or clarify, or

24  explain any of your prior testimony?

25     A.   No.

---

LISA C. SNYDER, COURT REPORTER

```
 1        Q.   I would like to show you a few documents to help

 2   establish a timeline with regard to the third-party voter

 3   registration change, and then we can shift to some of the other

 4   changes.

 5               The document I am showing you will be marked as

 6   Mitchell Exhibit 3.  (Document shown to witness)

 7               While you are taking a look at that, I will note

 8   for the record that this is an email dated January 26, 2011,

 9   from yourself to Kirk Pepper, with a copy to Ms. Fenner and

10   Mr. Coates; is that correct?

11        A.   Right.

12        Q.   First, who is Kirk Pepper?

13        A.   I believe he was in the speakers's office.  I don't

14   recall his title, Speaker of the House.

15        Q.   He was a staffer in that office?

16        A.   Correct.

17        Q.   The title of this email is election bill, and the

18   body of the email reads, "Attached is the large election bill.

19   Several of the sections will need some tweaking-- we plan to

20   get together on Friday morning to discuss the contents.  I am

21   certain there will be changes to the bill after that meeting.

22   I will send a section by section explanation later today".  Did

23   I read that correctly?

24        A.   Uh huh.

25        Q.   What is the large elections bill you are referencing
```

LISA C. SNYDER, COURT REPORTER

1  here?

2      A.   For lack of a better word, it's a kitchen sink bill.

3  It's got everything from Chapter 106 changes, all the way down

4  to Chapter 97 or 98.  I don't recall if there was another bill

5  that was going to be offered in the House, but this was the 40

6  or 50 page bill I was referring to earlier in our deposition.

7      Q.   This is the bill that includes provisions that relate

8  to third-party voter registration changes; is that right?

9      A.   Yeah, I would assume they were included at this time.

10     Q.   Were there also changes with regard to constitutional

11 initiative petitions, and individuals who move between-- either

12 between or within counties and attempt to update their address

13 at a polling place?

14     A.   At this point, there may have been changes with

15 regard to changing your address at the polling place.  I don't

16 know specifically if the constitutional amendment changes were

17 in here at that point.  I don't know.

18     Q.   I would like to ask you more about this email.  There

19 is reference to, "we plan to get together on Friday morning to

20 discuss the contents".  Who is we?

21     A.   Probably me and Andy Palmer, and Frank Terraferma,

22 and Joel Springer, with Noreen Fenner present.

23     Q.   Are you inviting Mr. Pepper to attend as well?

24     A.   No.  It was for his information.

25     Q.   Why are you sending this email to Mr. Pepper?

1      A.   He had asked me to provide an election bill draft.   I
2   was doing it at his request.

3      Q.   Help me understand that.  I think your testimony was
4   you were preparing the draft at the request of two different
5   groups of clients, one the Republican Party of Florida, the
6   other Mr. Rimes; is that right?

7      A.   Correct.

8      Q.   I think you just testified that Mr. Pepper had asked
9   you for a draft of an election bill?

10      A.   Uh huh (Indicating in the affirmative).

11      Q.   How do those two different things fit together?

12      A.   Kirk had asked for a draft of the bill, some kind of
13   election bill, at some point in late 2010.  I had already begun
14   working on some changes to Chapter 106.  Probably along the way
15   there may have been some additional changes offered by the
16   Republican Party staff and Jim Rimes.  Those were put in a bill
17   and given to Kirk Pepper at his request.

18      Q.   Did the request from Mr. Pepper, did that precede
19   these discussions with the Republican Party of Florida staff,
20   and Mr. Rimes?

21      A.   I believe so, yes.

22      Q.   Why was he asking you for a draft elections bill?

23      A.   I guess because of my background, he knew there would
24   be some things I wanted to change to Chapter 106.  It was
25   probably a matter of convenience.  I had the drafting skills,

LISA C. SNYDER, COURT REPORTER

1   and it would save them some time.

2       Q.   When Mr. Pepper asked you for this draft, did he

3   communicate to you what he wanted to see included in the draft?

4       A.   No.   In fact, when the bill first was filed it was

5   about 15 pages long.

6       Q.   When you refer to the bill as initially filed, is

7   that a bill you had any involvement with?

8       A.   Un un (Indicating a negative response).   No.

9       Q.   Whose bill was that, who prepared that bill?

10      A.   I don't know.   I believe, you know, the sponsor of

11  the bill, Dennis Baxley, may have communicated with Kirk

12  Pepper, or someone, and it was drafted by House bill drafting.

13      Q.   When did that happen in terms of this timeline?   We

14  have discussed some communications with different Republican

15  Party of Florida staff, as well as Mr. Rimes in late 2010,

16  January 2011.   Help me with the timeline of that.

17      A.   I don't recall when 1355 was initially filed by the

18  sponsor, but I am pretty certain it was in 2011, prior to

19  session beginning.   Session would have begun some time in March

20  of 2011, so it may have been January or February when that bill

21  was filed by the sponsor.

22      Q.   That bill didn't relate to any of the drafting that

23  you were involved with?

24      A.   I don't think so, no.   I didn't have a hand in

25  drafting that smaller bill, no.

LISA C. SNYDER, COURT REPORTER

```
 1        Q.    Then Mr. Pepper had asked you for a draft of the
 2   elections bill in late 2010, or early 2011, and you sent him a
 3   draft here on January 26?
 4        A.    Uh huh (Indicating in the affirmative).
 5        Q.    The draft that you sent him didn't include any
 6   requests from him to include any substance on any particular
 7   provisions; is that right?
 8        A.    Not specifically that I can recall, no.
 9        Q.    How did he know you would be working on an elections
10   bill draft?
11        A.    I don't remember how the communication went down.  I
12   know Kirk, and I suppose the House leadership had asked that I
13   work on some kind of draft.  I have done it in 2009, 2010 and
14   again in 2011.
15        Q.    You said House leadership, you suppose House
16   leadership would have asked you to prepare a draft.  Who are
17   you referring to--
18        A.    I use that term loosely.  Kirk is probably who I need
19   to refer to in that regard.  He was in the speaker's office.
20        Q.    So, is the reason for this communication just the
21   general state of affairs that in prior years you had prepared
22   election bills, and that he expected you to be doing one for
23   the 2011 regular session?
24        A.    Uh huh (Indicating in the affirmative).
25              MR. THOMAS:  You need a yes.
```

LISA C. SNYDER, COURT REPORTER

1     A.   Yes.  I am sorry.

2  BY MR. O'CONNOR:

3     Q.   In this email you make reference to, I am certain

4  there will be changes to the bill after that meeting; what were

5  you referring to there?

6     A.   I don't recall specifically.  I don't know if I had

7  in my head there were going to be changes that I knew of.  I

8  just know there are always changes in an election bill, and

9  this year is no different.  The bill started off at 15 pages.

10  I think by the time it was over with it was close to 100.

11     Q.   I'd like you to take a look at what's going to be

12  marked as Mitchell Exhibit 4. (Document shown to witness)

13           Mr. Mitchell, while you are taking a look at

14  that, I will note for the record this is an email you sent on

15  January 26, 2011, to Kirk Pepper with a cc to Ms. Fenner.

16     A.   Uh uh.

17     Q.   Is that correct?

18     A.   Yes.

19     Q.   The body of the email states, "Here you go.  A

20  section by section is attached", and the attachment indicated

21  in the email is election bill section explanation 1-26-11.  Is

22  that right?

23     A.   Right.

24     Q.   The attachment here that's referenced is that the

25  section by section document that was referenced in the document

LISA C. SNYDER, COURT REPORTER

1   we were just looking at, Mitchell Exhibit 3?

2        A.   I believe it is.  Yes.

3        Q.   What is this section by section explanation, just

4   generally?

5        A.   It really is just an explanation of what each section

6   does.  There is no comments by anybody.  It's really just

7   almost, if you would, a title to the bill.  It's just what each

8   section accomplishes.  What we believe it accomplishes.

9        Q.   Did you prepare the section by section?

10       A.   I did.

11       Q.   I would like to ask you about a few sections listed

12  in this.  This is the attachment to Mitchell Exhibit 4.  I

13  would like to focus on section two.  Does this section refer to

14  the third-party voter registration changes that we were

15  discussing a little while ago?

16       A.   I think it does.

17       Q.   Does it outline a number of the changes that are

18  included in that draft bill?

19       A.   It appears that it does, yes.

20       Q.   Are a couple of the changes there that it removes the

21  aggregate fine cap of a thousand dollars?

22       A.   Yes.

23       Q.   Is another change occasioned by that language the

24  removal of the provision that fines would be reduced by

25  three-fourths if the third-party group complied with the

1    registered agent and group information filings?

2         A.   Yes.

3         Q.   And, is another change, number four listed that

4    registration agent who intentionally violates this section is

5    guilty of a misdemeanor?

6         A.   Uh huh (Indicating in the affirmative).  Yes.

7         Q.   I'd like to focus on section seven.  For the record,

8    that reads, "Provides that an initiative petition signature is

9    valid for two years rather than four years".  Did I read that

10   correctly?

11        A.   You did.

12        Q.   Is this provision related to the constitutional

13   initiative petition change that is one of the four sets of

14   voting changes that we discussed earlier?

15        A.   Yes.

16        Q.   Is the description here accurate, that a change that

17   was made that the signature shelf life was reduced from four

18   years to two years?

19        A.   Yes.

20        Q.   That was included in the draft that you sent to Kirk

21   Pepper on the 26th; is that right?

22        A.   Apparently so.  Yes.

23        Q.   Why don't we stick with that right now.  With regard

24   to the constitutional initiative change, help me understand

25   where that came from.

---

LISA C. SNYDER, COURT REPORTER

1      A.  That's been an issue that's been of interest to a

2  number of folks for years, and I think it's been proposed for

3  the last eight to 10 years in the legislature.  Florida Chamber

4  of Commerce, I think, was interested in it.  They proposed

5  through legislators a bill in some form for the last six or

6  eight years that had that provision in it.

7      Q.  You said there was a number of folks that were

8  interested, and you referenced Florida Chamber of Commerce.

9  What other groups?

10     A.  I don't know specifically.  I know the Chamber has

11 had what we called an amendment petition reform bill for years.

12 And, I think their feeling was that four years was too long.

13 The State of Florida at the time had one of the longest

14 petition validity periods of anybody in the country.  In fact,

15 there are very few that had two years.  And, I think they

16 wanted to see that period cut in half.

17     Q.  What other groups were interested in changing the

18 signature shelf from four years to two years?

19     A.  I don't know of any other.

20     Q.  Why was that provision included in the draft bill

21 that you prepared, as well as the section by section analysis

22 you prepared?

23     A.  Probably because it was easy to stick in our bill,

24 and it was a provision that related to election code.  I think

25 it's in Chapter 100.

LISA C. SNYDER, COURT REPORTER

1      Q.   Did anyone ask you to include that provision in this

2    draft legislation?

3      A.   No, I don't think so.

4      Q.   So that's something that when you were drafting the

5    bill you decided to include?

6      A.   Uh huh (Indicating in the affirmative).

7      Q.   Why?

8      A.   Just because I know it's something that has been

9    proposed for several years in other legislation.

10      Q.   So that isn't something you discussed with any of the

11    staff members of the Republican Party of Florida?

12      A.   No.

13      Q.   Is that something you discussed with Mr. Rimes?

14      A.   No.

15      Q.   Why does this draft change the initiative petition

16    signature shelf life from four years to two years?  Why two

17    years?

18      A.   I don't think there was any magic in it.  It was

19    something that had been proposed for several years, and two was

20    consistent with what some of the other states were doing.  It

21    was a little longer than some states, and it kind of put the

22    State of Florida in line with what other states were doing.

23      Q.   Do you recall having any discussions with anyone

24    about this particular change with regard to the signature shelf

25    life?

1      A.   No.

2      Q.   Other than the comments that had been, I presume

3  based on your testimony, floating around that four years was

4  too long for constitutional initiative petition signature shelf

5  life, was there any other reason to reduce the signature shelf

6  life from four years to two years?

7      A.   No.

8      Q.   Was there any problem with the four year provision?

9      A.   Not to my knowledge.

10      Q.   Okay.  Do you think changing the signature shelf life

11  provision from four years to two years will make it more

12  difficult for constitutional initiative petitions to succeed,

13  and ultimately place language on a ballot to be potentially

14  amended into the Florida Constitution?

15      A.   No.

16      Q.   Why not?

17      A.   I think the reality in Florida is that most people

18  pay to get their constitutional amendments on the ballot, and

19  they do so in about a six to nine month period before the

20  elections.

21      Q.   Okay.  So you said most use, you said, paid signature

22  collection?

23      A.   Uh huh (Indicating in the affirmative).

24           MR. THOMAS:  Yes?

25      A.   Yes.

LISA C. SNYDER, COURT REPORTER

A6624

1   BY MR. O'CONNOR:

2       Q.   You said that's the case for most initiative

3   petitions?

4       A.   That's my understanding.

5       Q.   Is there some subset of signature petitions that

6   don't use paid signature gatherers?

7       A.   Very few.

8       Q.   But, there are some?

9       A.   There are some.

10      Q.   Is it your experience that if a group is not using

11  paid signature gatherers that it will take them longer to

12  gather the requisite signatures?

13      A.   No, I don't think so.  I think two years is an

14  adequate time period.  I think personally that four years, over

15  a four year period people that may have signed petitions may

16  change their minds about issues over a four year period, and I

17  think that's personally too long.

18      Q.   Help me understand that.  Because, for example, when

19  you vote for president you cast a ballot and that person gets

20  elected and they are in office for four years.  Why would you

21  think that whether someone continues to support something-- why

22  that would be different in the constitutional initiative

23  petition context than voting for president?

24      MR. THOMAS:  Objection to the form of the question.

25  Ambiguous.

LISA C. SNYDER, COURT REPORTER

1   BY MR. O'CONNOR:

2       Q.   Do you understand my question?

3       A.   I think there are two different issues.

4   Constitutional amendment is not dealing with a specific

5   candidate, and it's going to be an issue that's going to be on

6   the ballot, and I just think four years is too long.  I think

7   it's a housekeeping problem, too, I think for supervisors and

8   the Department of State to have to maintain and track all these

9   various petition amendment groups that have to keep these

10  things circulating for four years.

11      Q.   What's the basis for that opinion?

12      A.   I mean, I think it's just common sense.  Obviously

13  they have got to maintain and track something for four years

14  versus two years.

15      Q.   Have you ever heard a supervisor of elections make

16  any statement to that affect, that four years was difficult for

17  them to comply with?

18      A.   Not from a supervisor, no.

19      Q.   Did you ever hear that from anyone else?

20      A.   Maybe from the Florida Chamber.

21      Q.   Does the Florida Chamber have any involvement with

22  the supervisors' duty to receive and review signatures, and

23  then keep track of how long they are valid for?

24      A.   No.

25      Q.   So, your statement that you thought two years was

LISA C. SNYDER, COURT REPORTER

 1   more appropriate than four years, that's based on your personal
 2   opinion?
 3       A.   I think two is fine.  I don't have a personal opinion
 4   about whether two is better than four.  I just think four is
 5   too long.  Like I said, I put this in the bill because it's
 6   something that's been proposed for several years.
 7       Q.   Did you do any investigation, or any study, with
 8   regard to whether two years would be in any way advantageous to
 9   four years?
10       A.   Not in this year, no.
11       Q.   In past years?
12       A.   I may have looked at the issue when I was a staff
13   director in the House, yeah.
14       Q.   Do you recall any specifics about that?
15       A.   I recall that the Florida Chamber and others probably
16   had a lot of information about that period of time being more
17   appropriate, but I don't know specifically.
18       Q.   When you say more appropriate, is that again because
19   it's consistent with their desire to have a shorter period of
20   two years?
21       A.   I think it was consistent with information gathered
22   from other states about their shelf periods.
23       Q.   In connection with the change to signature petitions
24   in House Bill 1355, that occurred in 2011, there was no
25   additional investigation that you did in connection with that

LISA C. SNYDER, COURT REPORTER

```
 1   change; is that right?
 2       A.   That's correct.
 3       Q.   Are you aware of any problems that have been created
 4   as a result of the decrease in the amount of time that an
 5   initiative petition signature is valid?
 6       A.   No.
 7       Q.   Are you familiar with amendment five and six to the
 8   Florida Constitution relating to fair districts?
 9       A.   Yes.
10       Q.   Can you briefly describe your familiarity with that?
11       A.   Only that they change the way redistricting is
12   conducted, should be conducted.
13       Q.   Did those provisions provide protection for minority
14   rights?
15       A.   They may have.  I don't know.  We will find out.
16       Q.   Do you recall whether the language that was included
17   in the constitution made reference to ensuring that minority
18   rights are protected in connection with the redistricting
19   process?
20       A.   I don't recall what the specific language says.
21       Q.   Are you aware of the length of time that it took to
22   collect initiative petition signatures to place amendments five
23   and six on the ballot?
24       A.   I am not.
25       Q.   With regard to amendments five and six, part of the
```

LISA C. SNYDER, COURT REPORTER

A6628

```
 1   language of those amendments provides that "districts shall not
 2   be drawn with the intent or result of denying or abridging the
 3   equal opportunity of racial or language minorities to
 4   participate in the political process or to diminish their
 5   ability to elect representatives of their choice".  Having
 6   heard that, does that refresh your recollection at all with
 7   regard to whether amendments five and six dealt with minority
 8   rights?
 9        A.   Sounds like they do.
10        Q.   Is it your understanding-- strike that.
11             Amendments five and six are fairly recent,
12   aren't they?
13        A.   Yes.
14        Q.   Do you recall roughly when they were placed on the
15   ballot?  Just within what year?
16        A.   2010.
17        Q.   I think I already asked you this, and if so I
18   apologize, I don't recall the answer.  Do you recall whether
19   amendments five and six received sufficient signatures within
20   two years to be placed on the ballot?
21        A.   I don't recall.
22        Q.   I will represent to you that the first initiative
23   petition signature in connection with amendments five and six
24   was received more than two years prior to the date that those
25   amendments were placed on the ballot.  Based on that, is it
```

LISA C. SNYDER, COURT REPORTER

1  your understanding that if amendments five and six were to come

2  up now, under the change to the initiative petition signature

3  shelf life occasioned by House Bill 1355, that amendments five

4  and six would not have qualified for the ballot?

5      A.    I don't know if they would have qualified or not.  If

6  certain petitions were thrown off, as the two year period

7  expired, I would assume the group would have to collect

8  additional signatures.

9      Q.    Are you familiar with any other initiative

10  petitions-- strike that.

11             Are you familiar with any other initiative

12  petitions where the petition was placed on the ballot based on

13  signatures that were collected in a longer than a two year

14  period?

15             MR. THOMAS:  Object to the form of the question.

16      A.    I am not familiar, no.  If you are asking me if I am

17  looking at any proposed amendment when I am changing this from

18  four to two years in the election bill, the answer is no.

19  BY MR. O'CONNOR:

20      Q.    Okay.  It's your testimony that this had been a

21  longstanding issue for the Florida Chamber of Commerce and that

22  when you were drafting the bill you thought it might as well be

23  included in the elections bill?

24      A.    Yeah.

25      Q.    Did you ever have any conversations with any

1  legislators or staff concerning the initiative shelf life
2  petition change?
3      A.   Not specifically.  I may have had a conversation with
4  Glenn Kirkland in the House about whether that provision was in
5  the bill, but nothing specific.
6      Q.   Help me understand that conversation.  You said may
7  have had a conversation with Glenn Kirkland about whether the
8  initiative signature petition change was in the bill.
9      A.   He may have asked me.  He may have said, is the
10 constitutional amendment shelf life change in the bill, and I
11 simply responded yes.
12     Q.   I would like to turn back to the document that was
13 previously marked Mitchell Exhibit 4.  This is the section by
14 section explanation of the draft language being circulated on
15 January 26.  I would like to focus on the attachment in section
16 eight, which reads, "Provides that only a name change
17 affirmation may be completed and presented at the polling place
18 on the day of the election".  Did I read that correctly?
19     A.   Uh huh (Indicating in the affirmative).
20     Q.   Does this relate to the change to election law that
21 was included in this draft bill related to people who change
22 their address and then attempt to update their address at a
23 polling place?
24     A.   It may have been the same section.  I don't know if
25 it's the same change though.

LISA C. SNYDER, COURT REPORTER

1        Q.    Why the hesitation there?  Were there other changes

2   to movers that were included in this draft bill?

3        A.    I am looking at the explanation.  It says a name

4   change.  I think you could change your name at the polling

5   place under this change, but I don't know what else section

6   eight of the bill did.

7        Q.    Okay.  Do you recall--

8        A.    This allows a name change.

9        Q.    Do you recall whether this draft bill changed the

10  provision of Florida election law that allowed someone to

11  change either their name, or their address, at a polling place

12  and still vote a regular ballot?  Where the change here limited

13  that only to someone being able to change their name at a

14  polling place?

15       A.    I don't recall.  If there had been a change of

16  address that was permitted under this section I would have said

17  so.  I think this just addresses the name change.

18       Q.    I would like to have you turn to the fourth page of

19  this attachment.  There is a reference to section 28, and the

20  description just says, "Provides an effective date".  Do you

21  recall what the effective date was that was included in the

22  draft elections bill you prepared?

23       A.    I think it was effective upon becoming a law.  Didn't

24  have a specific date.

25       Q.    Why would you have drafted the bill such that it

LISA C. SNYDER, COURT REPORTER

1   would be effective upon becoming law?

2       A.   I think there were provisions in Chapter 106 that we

3   wanted to have become effective as soon as possible.  That's

4   fairly standard drafting procedure, unless there is specific

5   provisions that legislators or staff want to take effect at a

6   later date.

7       Q.   How about with regard to elections bills?  Are you

8   familiar with prior elections bills having an effective date

9   such that the bill becomes effective upon signing of the law?

10      A.   That's fairly common for election bills.  There will

11  be provisions that may have a delayed effective date, if you

12  will.  There may be election provisions that a supervisor, or

13  the Department of State is afraid they can't implement in time

14  and they may make those changes in the legislative process.

15      Q.   I would like to show you a document that we will mark

16  as Mitchell Exhibit 5.  (Document shown to witness)

17               While you are taking a look at that, I will note

18  for the record this is an email from you dated February 3,

19  2011, to Kirk Pepper.

20      A.   Uh huh (Indicating in the affirmative).

21      Q.   Is that correct?

22      A.   Yes.

23      Q.   I would like to focus on the second page first and

24  work backwards through the email chain.  The first email that

25  is listed here is also on February 3 from yourself to Jim

 1   Rimes, Kirk Pepper, Frank Terraferma and Andy Palmer with a cc
 2   to Ms. Fenner and Mr. Coates.  It reads, "Just an FYI, I have
 3   got the redistricting staff in the House looking at the
 4   election reporting and census block language from the elections
 5   bill.  They are sending me some revisions soon".
 6                Can you help me understand what you are saying
 7   there?
 8        A.   I believe I had asked House redistricting staff to
 9   come up with some language as to how they wanted supervisors to
10   report just what it says, census block information for
11   redistricting purposes, to help them in their redistricting.  I
12   am not educated in the redistricting process, so I deferred
13   that to the House redistricting staff.
14        Q.   Why in connection with preparing this draft bill did
15   you reach out to the House redistricting staff?  What prompted
16   you to do that?
17        A.   I knew, during the course of their constructing maps,
18   that there may be information that the supervisors weren't
19   providing, that they needed, supervisors of elections.  I was
20   giving them an opportunity to add some language.
21        Q.   Were you instructed by anyone to reach out to the
22   House redistricting staff in this way?
23        A.   No.
24        Q.   When we say House redistricting staff, who is that?
25        A.   I believe it was probably Bob West, and Alex-- can't

LISA C. SNYDER, COURT REPORTER

1   recall his last name-- Alex Kelly.  He was the staff director.

2       Q.   And, with regard to the changes in the language that

3   they suggested, did they have anything to do with the four sets

4   of voting changes at issue here?

5       A.   No.

6       Q.   I would like to turn to the front page now and focus

7   on the email at the bottom, from Kirk Pepper to you.  He writes

8   back, "I heard.  That helps me immensely".  Is he referring to

9   having heard about your reaching out to the House redistricting

10  staff?

11      A.   I believe so, yes.

12      Q.   And, do you have any knowledge as to how that helps

13  him immensely?

14      A.   I don't.

15      Q.   I would like to ask you about the top email, also

16  February 3, 2011.  It's from you, and it reads, "I'm waiting to

17  hear back from Jenn Ungru on our third-party registration

18  language and I need to work on "registering at a new precinct

19  on election day/provisional ballot language. Monday?".

20           Did I read that correctly?

21      A.   Right.

22      Q.   Who is Jenn Ungru?

23      A.   I don't really know her very well.  I believe she has

24  done some political consulting in the past.  She may work for

25  the Governor's office now.

---

LISA C. SNYDER, COURT REPORTER

1          Q.   Do you recall what role she was working in at the
2     time you reference her here, February 2011?
3          A.   I don't know what her exact position was, no.
4          Q.   You said she was consulting in the past; was that
5     with any particular group?
6          A.   I don't know.
7          Q.   It sounds like you are not familiar with Ms. Ungru;
8     why were you waiting to hear back from her with regard to
9     third-party voter registration language?
10         A.   I think maybe a conversation I had with Jim Rimes,
11    maybe it had come from Jenn Ungru that she wanted to make some
12    changes to third-party voter registration, which is the genesis
13    of that draft I originally came up with.
14         Q.   Do you think Ms. Ungru may be the source for the
15    genesis for the changes to the third-party voter registration
16    changes that were set out in the draft we looked at earlier?
17         A.   I had heard from Jim Rimes that maybe she had issues
18    she wanted to address in the current third-party voter
19    registration group law.
20         Q.   What had you heard from Mr. Rimes?
21         A.   Nothing specific.
22         Q.   Just help me understand that then.  Mr. Rimes
23    suggested to you that Ms. Ungru might have some changes to
24    third-party voter registration?
25         A.   Yes.

                      LISA C. SNYDER, COURT REPORTER

1       Q.    So you reached out to her?

2       A.    I attempted to, yes.

3       Q.    Did you ever hear anything back?

4       A.    I did not.

5       Q.    So you never received any feedback from Ms. Ungru

6    concerning the third-party changes?

7       A.    No.

8       Q.    In discussing that with Mr. Rimes, did he indicate

9    the substance of Ms. Ungru's potential changes to the

10   third-party voter registration?

11      A.    He did not.

12      Q.    Did you have any other contact with Ms. Ungru beyond

13   what we have just discussed?

14      A.    I didn't.  I attempted to call her a couple of times,

15   but I never got a return phone call.

16      Q.    Just so I am clear, you don't have a sense as to

17   where she was working at the time, at this time February of

18   2011?

19      A.    May have been in the Governor's office.

20      Q.    Why do you say that?

21      A.    I was under the impression she was working in the

22   Governor's office.

23      Q.    Did you have any contact with anyone else in the

24   Governor's office concerning any of the four sets of voting

25   changes?

1        A.   No.

2        Q.   I would like to focus on the end of the sentence

3   where you state, "I need to work on registering at a new

4   precinct on election day/provisional ballot language".  Can you

5   help me understand what that means?

6        A.   I may have been referring to trying to address some

7   concerns that had arisen in committee meetings.  I think they

8   would have had pre-session committee meetings at this point.  I

9   don't know the timing, if the bill had been filed, or if I was

10  just changing the draft of the bill.  I don't recall.

11       Q.   So, you don't recall what specifically this refers

12  to?

13       A.   No.  I may have been trying to make sure that

14  whatever provisions in the new precinct language lined up with

15  the provisional ballot language that was current law.

16       Q.   With regard to the new precinct language, is that

17  referencing someone who changes their address and then is

18  attempting to update their address at a polling place?

19       A.   I think so, yes.

20       Q.   I would like to have you take a look at document we

21  will mark as Mitchell Exhibit 6.  (Document shown to witness)

22            While you are taking a look at that, I will

23  reference for the record it is a February 9, 2011, email from

24  you, Mr. Mitchell, again to a number of people; Jim Rimes, Joel

25  Springer, Andy Palmer, Frank Terraferma, Rich at Heffley and

```
1    Associates, Kirk Pepper, and then a copy to Ms. Fenner,
2    Mr. Coates, and Marc@lsifl.com.
3              Do you recall this email?
4    A.    Yes.
5    Q.    Let me confirm who all of the recipients are here.
6    Jim at Enwright Consulting, that's Mr. Rimes; is that correct?
7    A.    Yes.
8    Q.    Jspringer@rpof.org is Joel Springer; is that correct?
9    A.    Correct.
10   Q.    Andy Palmer is Andy Palmer?
11   A.    Uh huh (Indicating in the affirmative).
12   Q.    Frankt is Frank Terraferma?
13   A.    Right.
14   Q.    Who is Rich at Heffley Associates?
15   A.    That's Rich Heffley, political consultant.
16   Q.    In what areas does he typically consult?
17   A.    Candidates, some constitutional amendments, local
18   issues.
19   Q.    Does his consulting focus on any of the issues
20   relating to the four sets of voting changes?
21   A.    No.
22   Q.    Why is he included as a recipient of this email?
23   A.    Generally because he is concerned about Chapter 106
24   changes in his work with candidates.
25   Q.    So you have included him here to give him a heads-up
```

LISA C. SNYDER, COURT REPORTER

```
 1   about the current draft of the bill, because it concerns some

 2   changes to campaign finance in Chapter 106 election code?

 3        A.    Uh huh.

 4              MR. THOMAS:  Yes?

 5        A.    Yes.

 6   BY MR. O'CONNOR:

 7        Q.    And kpepper, is that Mr. Kirk Pepper?

 8        A.    It is.

 9        Q.    And, in the cc line we see Ms. Fenner, and

10   Mr. Coates, those are the two individuals who work with you at

11   Coates Law Firm; is that right?

12        A.    Uh huh (Indicating in the affirmative).

13        Q.    Yes?

14        A.    Yes.

15        Q.    Who is the last person listed there?

16        A.    Another political consultant, Marc Reichelderfer.

17        Q.    Can you spell that last name?

18        A.    I can try. R-e-i-c-h-e-l-d-e-r-f-e-r.

19        Q.    You said he is a political consultant?

20        A.    Yes.

21        Q.    In what areas does he consult?

22        A.    Primarily candidates; state, local, federal.

23        Q.    Why is he cc'd?

24        A.    For the same reason that Rich would have been cc'd;

25   he engages in this kind of work, and some of these changes
```

LISA C. SNYDER, COURT REPORTER

1  would have been important to him.

2      Q.  You say some of these changes.  Were any of the four

3  sets of voting changes that we are here today for relate to the

4  issues that Mr.-- I won't even pronounce it-- consult?

5      A.  No.

6      Q.  So, again his focus is on campaign finance in Chapter

7  106?

8      A.  Correct.  There are some changes that relate to

9  qualifying as a candidate, resign to run that he might have

10 been an interest in.  Those are in other sections, but nothing

11 related to the four provisions.

12     Q.  Okay.  With regard to the body of the email you

13 write, "Attached is a new version of the elections bill", and

14 you list some notable changes.  I would like to focus on number

15 five, which reads, "Force majeure/acts of God clause added for

16 third-party VR-groups -- no input from Jenn Ungru at this

17 point".  Can you explain to me what you are communicating

18 there?

19     A.  Yes.  As best I recall, I probably had added the

20 force majeure language that was not in that original version

21 that you and I discussed earlier, placed that in the

22 third-party voter registration section.

23     Q.  Do you recall why you did that?

24     A.  I thought it was a good idea.  I think there had been

25 some discussions of what a third-party group ought to be able

LISA C. SNYDER, COURT REPORTER

1   to do, if there is a fire, or a hurricane, or somehow
2   applications get damaged, in whatever period, 10 day period, 48
3   hour period, they ought to have some safe harbor within which
4   to turn in those applications if something happens to them
5   through no fault of their own.
6       Q.   Is that a conclusion you came to on your own, or is
7   that something that was discussed with someone else?
8       A.   No discussions with anybody.  I knew it was part of
9   the old law, and thought it was a very worthwhile addition.
10      Q.   You reference that you knew it was part of the old
11  law, and we discussed that before when we looked at the
12  original draft where the force majeure language has been
13  stricken.
14      A.   Uh huh.
15      Q.   Why was it removed in the original draft, but added
16  back in this draft?
17      A.   I don't know why it wasn't in the earlier draft.  I
18  don't recall anybody asking me to put it in this draft, other
19  than me doing it myself.
20      Q.   There is reference here to "no input from Jenn Ungru
21  at this point"; help me understand what you are communicating
22  there.
23      A.   I think I told you earlier that I tried to reach out
24  to her, and she may have had some issues with third-party voter
25  registration groups, and I was moving ahead.  I hadn't heard

1   anything from her.

2       Q.   When you say Ms. Ungru may have had some issues with

3   third-party voter registration groups, what are you referring

4   to?

5       A.   Nothing specifically.  I had heard word of mouth that

6   she might have some changes she wanted to make to the current

7   law.

8       Q.   But you never actually spoke with Ms. Ungru with

9   regard to the third-party voter registration changes?

10      A.   No.

11      Q.   Do you have any information as to whether she spoke

12  to anyone else involved in the process in order to communicate

13  whatever issues she had with the third-party voter registration

14  changes?

15      A.   I don't know.

16      Q.   I would like to ask you about the next paragraph here

17  which I will read, "One item to noodle on- early voting.  I

18  think if the SOE's had some additional flexibility with early

19  voting sites they could be easily sold on a shortened time

20  frame".  Did I read that correctly?

21      A.   You did.

22      Q.   SOE, is supervisors of elections?

23      A.   It is.

24      Q.   Help me understand why you were making this

25  statement.

---

LISA C. SNYDER, COURT REPORTER

1    A.    I think the supervisors over the years have wanted

2    more flexibility as to where they could locate their early

3    voting sites.  I think at the same time too there are some

4    supervisors that wanted a shortened time frame for early

5    voting, and I was really trying to be a go-between here, and

6    suggest a possible solution.  There are a number of supervisors

7    that really don't like the number of hours that are currently

8    provided.  It's very expensive for them, and they don't get lot

9    of additional turn-out from early voting.

10    Q.    Was early voting-- were changes to early voting

11    included in any of the prior drafts that you had put together

12    for the 2011 legislative session?

13    A.    No.

14    Q.    Why is early voting coming into the conversation now?

15    A.    I don't recall, but it comes up every year.

16    Q.    When you say--

17    A.    So I am throwing it out for consideration.

18    Q.    When you say it comes up every year, how so?

19    A.    Typically the supervisors bring it up, some of the

20    larger county supervisors want more flexibility with regard to

21    the locations.

22    Q.    Had you had any communications with anyone with

23    regard to this proposal or changes to early voting generally?

24    A.    No.

25    Q.    Do you recall receiving any response from any of the

LISA C. SNYDER, COURT REPORTER

1  recipients on this email with regard to this suggestion of
2  early voting?

3      A.   No.

4      Q.   I would like to ask you about the last paragraph
5  here, "We should try to get back together soon to discuss the
6  new bill and what will be done with affiliated/leadership
7  committees".  Help me understand what that means.

8      A.   That was simply a reminder to these folks that if
9  they wanted to do anything with affiliated party committees
10 they should be expecting to get back together in the new future
11 before session started.

12     Q.   When you say affiliated party committees, what does
13 that refer to?

14     A.   Committees within each party's structure where funds
15 would be placed to support House or Senate candidates.

16     Q.   So those are not committees within the legislature?
17 These are outside groups?

18     A.   Correct.  Within political party structure.  It's a
19 Chapter 106 provision.

20     Q.   With regard to the political party structure, is that
21 primarily the Republican Party of Florida and the Democratic
22 party?

23     A.   Yes.

24     Q.   So, is the suggestion here then to get together to
25 discuss how the political parties, the leadership of the

```
 1   political parties will decide how to move forward on these
 2   issues?
 3       A.   Yes.
 4           MR. THOMAS:  Object to the form of the question.  You
 5       say these issues.  Are you talking about one through five,
 6       or simply--
 7   BY MR. O'CONNOR:
 8       Q.   Let me ask it again.
 9           MR. THOMAS:  I'm just trying to clarify.
10           MR. O'CONNOR:  Sure.
11       A.   I understood you to mean the leadership committees.
12   BY MR. O'CONNOR:
13       Q.   With regard to the substance, I am interested in the
14   four sets of voting changes.  So, is it your sense that at
15   least some of the four sets of voting changes would be
16   discussed with the affiliated/leadership committees to decide
17   how to move forward?
18       A.   I am trying to think of the best way to answer.  I
19   think we were attempting to get back together to discuss the
20   new bill.  I don't recall at that point if this bill had any of
21   the four sets of voting changes in it.  This is prior to the
22   session beginning, but I know we wanted to get together before
23   session began in March.  This is three weeks out.
24       Q.   Based on the documents that are attached to this, but
25   which I don't have a copy of here for you, the third-party
```

LISA C. SNYDER, COURT REPORTER

1   voter registration change is included; is that right?

2        A.   It may in some form.

3        Q.   Based on number five, talking about the force majeure

4   provision being added, would it be your conclusion that the

5   third-party voter registration change is here?

6        A.   Yes.  It's my understanding that we probably included

7   that section that we looked at earlier in the deposition, that

8   draft, and then I had added this force majeure clause.

9        Q.   And we had looked at earlier in the summary, there

10  was a discussion of the constitutional initiative petition

11  signature shelf life being reduced from four years to two

12  years; would you expect that that change was still in this

13  draft?

14       A.   I would.

15       Q.   We discussed earlier there was a provision about name

16  changes at the polls.  Do you expect that that provision was

17  still in this draft?

18       A.   It may have been.  I don't know.

19       Q.   I would like to stick with the third-party voter

20  registration change, but jump ahead in time so hopefully we can

21  finish the third-party group and then move on to one of the

22  other substantive changes.

23            I would like to show you a document that we have

24  marked as Mitchell Exhibit 7.  (Document shown to witness)

25            While you are taking a look at that, I will note

LISA C. SNYDER, COURT REPORTER

A6647

1   for the record that this is an email dated May 13, 2011, from

2   Jonathan Fox to Dawn Roberts, with a cc to Patricia Gosney and

3   Allison Fogt, F-o-g-t.

4                   Have you seen this email before?

5        A.    No.

6        Q.    Do you know who these folks are?

7        A.    I know Jonathan Fox and Dawn Roberts.

8        Q.    Who is Jonathan Fox?

9        A.    Jonathan Fox is an attorney with the Senate, I guess

10   it's now the Ethics and Elections subcommittee.  At the time it

11   was I think Ethics and Elections Committee.

12       Q.    How about Dawn Roberts?

13       A.    She is also a Senate staffer, staff director, I

14   believe, for that committee.

15       Q.    I would like to focus on the bottom email from Ms.

16   Gosney, and it appears to be a communication from Senator Diaz

17   de la Portilla, sending it to Jonathan Fox and Allison Fogt,

18   referencing what appears to be an article that was published

19   May 13, 2011, and communicating that Senator Diaz de la

20   Portilla would like a draft response so that he could review.

21   Do you see that?

22       A.    Uh huh (Indicating in the affirmative).

23       Q.    Is that your understanding of that first email?

24       A.    What you have read to me, it is; yes.

25       Q.    I would like to focus on Mr. Fox's response then in

                        LISA C. SNYDER, COURT REPORTER

1   the middle of the page.  In the second paragraph Mr. Fox

2   writes, "This is something that you should probably run by Eric

3   Edwards in the Majority Office, as we weren't involved in the

4   substantive policy discussions with respect to early voting or

5   third party voter registration groups; neither Dawn, I suspect,

6   nor I, can offer much help on these fronts".  Did I read that

7   correctly?

8       A.   Uh huh.

9       Q.   First, who is Eric Edwards?

10      A.   He was a staffer in the Senate majority office.

11      Q.   Can you help me understand Mr. Fox's statement that,

12   neither he nor Dawn Roberts were involved in the substantive

13   policy discussions with respect to third-party voter

14   registration groups?

15      A.   I don't know what he is referring to there, other

16   than what it says on the paper.

17      Q.   How do you read that, when he references third-party

18   voter registration groups?

19      A.   The third-party voter registration changes that are

20   the issue here.

21      Q.   So, it's your understanding he is referring to the

22   third-party voter registration changes occasioned by House Bill

23   1355?

24      A.   Yes.

25      Q.   And, that those are the changes that started as a

LISA C. SNYDER, COURT REPORTER

1     draft that you had prepared back in January of 2011?

2         A.    Yeah.

3         Q.    And, so it sounds from the email that he is saying he

4     wasn't involved in the substantive policy discussions regarding

5     those changes; is that how you read this?

6         A.    That's how I read it.

7         Q.    Did you ever have any substantive discussions with

8     Mr. Fox about the third-party voter registration changes?

9         A.    No.

10        Q.    Do you know why Mr. Fox is referring Ms. Gosney to

11    Eric Edwards in the majority office with regard to her question

12    in the first email?

13        A.    I don't.  Having worked for the House, it was

14    probably their procedure to refer people to the majority

15    office, for the Senate press office to contact with the press,

16    or help senators with contact with the press.

17        Q.    With regard to the line concerning the substantive

18    policy discussions with respect to early voting, did you have

19    any substantive policy discussions with Mr. Fox concerning

20    early voting?

21        A.    No.

22        Q.    How about Ms. Roberts?  Any substantive discussions

23    with her concerning early voting?

24        A.    No.

25        Q.    How about with her concerning the third-party voter

                    LISA C. SNYDER, COURT REPORTER

1   registration groups?

2       A.   No.

3       Q.   From the very top email, I want to have you give me

4   your take on that.  It appears to be an email from Jonathan fox

5   stating that he just spoke with Allison in the majority office

6   who is preparing a response in Eric's absence.  Is it your

7   understanding from that email that this is Allison Fogt, who is

8   copied here in the email, that she will be handling this

9   request?

10      A.   I suppose so.

11      Q.   Okay.  I would like to have you take a look at what

12  will be marked as Mitchell Exhibit 8. (Document shown to

13  witness)

14           While you are taking a look at that, I will note

15  for the record that the top email in this chain is dated May

16  13, 2011, from Allison Fogt to Jonathan Fox.

17           Have you seen this email before?

18      A.   No.

19      Q.   I'd like to ask you about the first email in the

20  chain, which is May 13, 2011, dated at 1:06 pm, and the subject

21  is per our discussion.  It lists some contact information for

22  Tidewater Consulting.  Do you see that?

23      A.   I do.

24      Q.   What is Tidewater Consulting?

25      A.   That's a separate lobbying company of which Richard

1   Coates is a member, and others.

2        Q.   What is your affiliation with Tidewater Consulting?

3        A.   I have none.

4        Q.   Who are the other members of Tidewater Consulting?

5        A.   I think presently the members are Richard Coates,

6   Noreen Fenner, and Shelly Green.

7        Q.   Who is Shelly Green?

8        A.   Works in the Tidewater office as one of the officers

9   of the company.

10       Q.   What is her role or responsibility?

11       A.   She is the secretary of the company, and I believe

12  the vice-president.  She does some lobbying for various

13  clients.

14       Q.   Is it fair to say Tidewater Consulting is a lobbying

15  shop?

16       A.   Yes.

17       Q.   Does Tidewater Consulting lobby on election law

18  issues?

19       A.   No.

20       Q.   Did Tidewater Consulting have any involvement with

21  the four sets of voting changes?

22       A.   No.

23       Q.   That's what I would like to have you help me

24  understand.  If we look at Mitchell Exhibit 7, we have an email

25  at the top, Jonathan Fox, May 13, 2011 at 12:55 pm, and he

```
 1   mentions he just spoke with Allison in the majority office, who
 2   is preparing a response to Senator Diaz de la Portilla's
 3   request in Eric's absence.  Then I'd like to look at the next
 4   email, Mitchell Exhibit 8, at bottom in the chain, May 13, at
 5   1:06 from Jonathan Fox to Allison Fogt, "per our discussion",
 6   and he sends contact information for Tidewater Consulting.  Can
 7   you help me understand why Mr. Fox is sending Ms. Fogt contact
 8   information for Tidewater Consulting?
 9        A.   I don't know, unless it's related to another issue
10   they were lobbying on behalf of.  I don't know.
11        Q.   The phone number listed for Tidewater Consulting,
12   will that connect someone with either yourself or Mr. Coates?
13        A.   No.  It's a separate number.  We are all housed in
14   the same building, but it's a separate number.
15        Q.   Is it in the same general facility?
16        A.   Uh huh (Indicating in the affirmative).
17        Q.   Is there a centralized reception?
18        A.   There is.
19        Q.   Is the number that's listed here the number to the
20   central reception desk?
21        A.   Yes.
22        Q.   We have discussed your involvement in connection with
23   these changes thus far.  We haven't spent much time discussing
24   Mr. Coates' involvement.  What role did he play in connection
25   with the four sets of voting changes and the issues we have
```

LISA C. SNYDER, COURT REPORTER

A6653

1  been discussing?

2      A.   None.

3      Q.   Did you have any discussions with him?

4      A.   No.

5      Q.   Why not?

6      A.   As I said previously, our primary concern was a

7  addressing some changes that we wanted to take place in Chapter

8  106.

9      Q.   I appreciate that.  Why does the fact that you were

10 primarily concerned with changes to Chapter 106 explain the

11 fact that you didn't have any communication with Mr. Coates?

12     A.   Well, I had conversations with him about some of our

13 provisions in Chapter 106 that we wanted to change.

14     Q.   But, with regard to the four sets of voting changes?

15     A.   No conversations with Mr. Coates at all.

16     Q.   Okay.  Before we leave third-party voter registration

17 organization changes, is there any information or

18 communications with regard to that specific change that you are

19 aware of that we haven't discussed?

20     A.   No.

21     Q.   I would like to turn now to the change concerning

22 individuals who move and would like to update their address at

23 a polling place and vote at that polling place.

24          First of all, just so we are on the same page,

25 what is your understanding of the law in that regard following

LISA C. SNYDER, COURT REPORTER

1  the passage of House Bill 1355?

2      A.    I haven't looked at it recently, but my understanding

3  is that if you want to change your address at the polling place

4  on election day, you are moving from outside the county, you

5  have to vote a provisional ballot.

6      Q.    If a voter needs to change their address at a polling

7  place, and wants to vote a regular ballot, they can do so if

8  they are moving within a county, but if they have moved from a

9  different county, they must vote via provisional ballot?

10     A.    Correct.   That's my understanding.

11     Q.    When did you have your first discussion with anyone

12 concerning the change that ultimately became the movers change

13 that we just discussed?

14     A.    That's probably privileged.

15     Q.    I am asking about when.

16     A.    Probably back in October, November, 2010.

17     Q.    Who was that conversation with?

18     A.    RPOF staff.

19     Q.    RPOF staff?

20     A.    Republican Party staff.

21     Q.    Who in particular?

22     A.    It would have been with Andy Palmer, Frank Terraferma

23 and Joel Springer.

24     Q.    Do you recall whether this conversation was in

25 person, over the phone, email?

1      A.    In person.

2      Q.    How many conversations did you have with RPOF staff

3    concerning the movers change?

4      A.    Maybe two or three.

5      Q.    Over what period of time?

6      A.    Two months.

7      Q.    Is that two to three conversations with RPOF staff

8    over the two months between October, November 2010 and

9    January 2011?

10     A.    Yes.

11     Q.    Beyond the Republican Party of Florida staff, that we

12   just discussed, did you have any communication with anyone else

13   concerning the change that ultimately became the inter-county

14   mover change that we were discussing?

15     A.    I may have had some conversations with Glenn Kirkland

16   in the House about what was in the bill, preparing talking

17   points, what the actual language does or does not do.

18     Q.    How many times did you speak with Mr. Kirkland about

19   the inter-county mover change?

20     A.    Handful of times.  I couldn't tell you how many.  It

21   could have been five or six times.

22     Q.    With regard to those conversations, you said that it

23   largely was about what was in the bill, what the language did

24   or did not do; were these in the communications in the

25   character of you explaining to him what the change was, and

LISA C. SNYDER, COURT REPORTER

1    what the affect would be?

2         A.   What the change was, yes.  That's exactly what was

3    going on, or preparing talking points for any of the members

4    about what the changes do.  I don't specifically recall

5    preparing any talking points for the change of address

6    language.

7         Q.   Okay.  You said that you were explaining what the

8    change was; is that because the change was something that you

9    had drafted, and so you were in the best position to explain to

10   him what that change entailed?

11        A.   I think they were looking to me in the context of all

12   of the election changes, just as a source.  I don't think they

13   looked to me as someone that could better explain the change of

14   address changes.  I was asked to explain all of the changes in

15   the bill from time to time.

16        Q.   Is the reason you were asked because you had prepared

17   the draft language of those changes?

18        A.   Sure, yes.

19        Q.   So following-- well, back-up.

20             You ultimately prepared draft the language that

21   went into the election bill that related to changes of address

22   at polling places; is that right?

23        A.   Yes.

24        Q.   Was that prepared as a result of your conversations

25   with the RPOF staff that we discussed a moment ago?

---

LISA C. SNYDER, COURT REPORTER

1     A.    I believe so.

2     Q.    And, what did you use as the basis for the changes

3  that ultimately went into the draft language you prepared?

4     A.    Conversations with RPOF staff.

5     Q.    Were there any materials that were provided to you?

6     A.    No.

7     Q.    So, discussions with RPOF staff with regard to that

8  change formed the basis of the draft language that you

9  prepared?

10    A.    That's correct.

11    Q.    Beyond members of the legislature, or their staff, or

12 RPOF staff, what other third parties did you discuss the

13 inter-county mover change with?

14    A.    None.

15    Q.    Did you have any discussions with supervisors of

16 elections?

17    A.    I take that back.  I did have discussions with

18 supervisors, yes.

19    Q.    What discussions with supervisors did you have?

20    A.    I had called a few supervisors to find out how common

21 an occurrence it was to have people change their address on

22 election day.

23    Q.    When did those calls occur?

24    A.    Probably in January, February of 2011.  Maybe into

25 March when the session began.

---

LISA C. SNYDER, COURT REPORTER

```
 1        Q.   Which supervisors did you call?
 2        A.   I probably spoke with David Stafford.  I believe at
 3    the time he was the legislative liaison for the supervisors
 4    association.  I believe I spoke with the Pinellas County
 5    supervisor.  I may have talked to Bill Cowles, the Orange
 6    County supervisor.  That may have been it.
 7        Q.   You said the Pinellas County supervisor, what is his
 8    or her name?
 9        A.   It's her.  It escapes me.
10        Q.   Is it Deb Clark?
11        A.   Deb Clark.  Thank you.
12        Q.   Let's start with Mr. Stafford.  You referenced him as
13    someone you had spoken with.  What do you recall from your
14    conversation with Mr. Stafford?
15        A.   I don't recall the conversation with Mr. Stafford.
16        Q.   No recollection of it?
17        A.   No.  I just recall talking to him because he was the
18    contact point for the supervisors.
19        Q.   What do you recall of your conversation with Bill
20    Cowles, the Orange County supervisor?
21        A.   Not much.
22        Q.   What do you recall?
23        A.   I don't recall anything.
24        Q.   What do you recall from your conversation with Deb
25    Clark?
```

LISA C. SNYDER, COURT REPORTER

1          A.   I think she-- I am trying to recall exactly what she

2     told me.  I believe she had taken the position that there

3     weren't that many changes taking place.  She had a process in

4     place, and I believe she was giving them provisional ballots

5     for those that were changing their address on election day, but

6     I don't recall without looking at the notes.

7          Q.   Do you recall there were notes of this conversation?

8          A.   Yes.

9          Q.   Let me show you what we will be marked as Mitchell

10    Exhibit 9.  (Document shown to witness)

11               Mr. Mitchell, do you recall this document?

12         A.   Yes.

13         Q.   What is it?

14         A.   It's notes memorializing a conversation I had with

15    Deb Clark on February 10, 2011.

16         Q.   Who prepared these notes?

17         A.   I did.

18         Q.   You said these notes memorialized a conversation you

19    had on February 10, 2011 with Pinellas County Supervisor of

20    Elections Deb Clark?

21         A.   Right.

22         Q.   Looking over these notes, does this refresh your

23    recollection with regard to what was discussed with Ms. Clark?

24         A.   To some degree.  I need to read through them.

25         Q.   Why don't you take a quick look and tell me what you

                    LISA C. SNYDER, COURT REPORTER

1  recall from the conversation.

2      A.    This was my note taking, I guess, after speaking with

3  her-- really during the conversation with Deb, about how she

4  handles people that want to change their address on election

5  day.

6      Q.    This is obviously prior to the passage of House Bill

7  1355, so this is the status quo under the old law; is that

8  right?

9      A.    This is the way that Deb Clark, the supervisor in

10  Pinellas County handles it, yes.

11      Q.    Is it your understanding, from reading through these

12  notes, that if someone came to a polling place and wanted to

13  change their address, that they would be allowed to do so by

14  filling out a form and then vote that day via regular ballot?

15      A.    This is the process again that Pinellas County uses;

16  correct.

17      Q.    Why did you reach out to Ms. Clark to have this

18  discussion?

19      A.    If I recall, I don't know if it was Bill Cowles or

20  David Stafford suggested I contact Deb because, as you will

21  note down there three-quarters of the way down, she has a

22  liberal policy about issuing provisional ballots, so I wanted

23  to talk to her and find out if the way she processes these

24  changes of addresses is different than my understanding of the

25  law.

LISA C. SNYDER, COURT REPORTER

1      Q.   Having talked to her, what was your conclusion?

2      A.   The process looks fine.  It looks to me like she

3   would commonly issue a provisional ballot if she was uncertain

4   about someone's address.  Of course, the change of address

5   presumes, in item number one, that the precinct clerk is able

6   to contact the supervisor's office to confirm that the person

7   is indeed a registered voter in the State database.

8      Q.   If that person is able to confirm that the voter is

9   registered, then they are allowed to go through this process,

10   change their address, and vote?

11      A.   Right.  I think I also talked to her-- down here at

12   the bottom-- about returning absentee ballot requests where

13   they would be available to voters for two general election

14   cycles, rather than one election cycle.

15      Q.   What role did the information that you learned from

16   Ms. Clark play in connection with your drafting of the change

17   that ultimately became the inter-county mover change of House

18   Bill 1355?

19      A.   I don't know if it had much effect at all.  I really

20   wanted to familiarize myself with how the process works down in

21   the trenches with the supervisor.  It may have had some bearing

22   on the issuance of a provisional ballot in case someone

23   couldn't reach the supervisor's office to determine that that

24   person was indeed a registered voter in the database.  But,

25   other than that, just familiarizing myself with the process.

1         MR. O'CONNOR:  Let's go off the record.

2              Whereupon, a recess was taken at 11:52.

3              Testimony resumed at 11:59.

4    BY MR. O'CONNOR:

5         Q.   We are back on the record.

6              Mr. Mitchell, over the break did anything occur

7    to you that needed to be added to supplement or correct any of

8    your prior testimony?

9         A.   No.

10        Q.   I would like to ask you more about the change with

11   regard to individuals who move and want to update their address

12   at a polling place.  For shorthand, I will refer to it as the

13   movers change; is that fair?

14        A.   Sure.

15        Q.   As you originally drafted it, how broad was that

16   change?  Who would have been affected by it?

17        A.   I think the initial draft may have included anybody

18   that wanted to change their address within the county, or

19   outside of the county on election day.

20        Q.   So, it was anyone who had changed address but hadn't

21   updated it--

22        A.   I believe, yeah.

23        Q.   It didn't distinguish between people who moved inside

24   a county versus between counties?

25        A.   I don't think it did.

LISA C. SNYDER, COURT REPORTER

 1      Q.   Do you know why the change was originally drafted to
 2   cover anyone who moved but tried to update their address at a
 3   polling place?
 4      A.   I don't know.  I don't know why we didn't make a
 5   distinction.
 6      Q.   I think your answer suggests subsequently there was a
 7   distinction made?
 8      A.   Apparently so.  Yes.
 9      Q.   What is the distinction?
10      A.   I think the distinction, and the way the bill finally
11   came out, was that those voters that had come into the county
12   from outside a county could not change their address on
13   election day without voting a provisional ballot.
14      Q.   Why was that change made?
15      A.   I don't know.
16      Q.   Is that something you made the change of, during your
17   drafting process?
18      A.   I don't recall.
19      Q.   Do you recall having any discussions with anyone
20   about whether the change should apply to anyone who moves,
21   regardless of whether it's inside or between counties, versus
22   just those who move between counties?
23      A.   I don't.
24      Q.   So, no recollection of any conversations about why
25   the change was limited from everybody who moves to just people

1    who move between counties?

2         A.   No.

3         Q.   What was the purpose of the change as it was

4    originally drafted, where it applied to anyone who had moved

5    and tried to change their address at a polling place?

6         A.   I think I will invoke the privilege there.

7         Q.   What is the basis for that?

8         A.   I mean I think the intent probably came from

9    attorney/client privileged conversations.

10        Q.   Communications with whom?

11        A.   Republican Party staff.

12        Q.   During the drafting process with regard to the movers

13   change, were you aware of any instances of any voters in

14   Florida voting twice in a single election?

15        A.   Not specifically, no.

16        Q.   That type of election fraud has been referred to as

17   double voting, where a single elector cast a ballot, two

18   ballots in a single election.  Are you familiar with that term,

19   double voting?

20        A.   Yes.

21        Q.   Is that consistent then-- you were not aware of any

22   instances of double voting in Florida at the time you were

23   drafting the movers language for House Bill 1355?

24        A.   Not specifically, no.

25        Q.   Were you aware of any other types of fraud or

LISA C. SNYDER, COURT REPORTER

1    misconduct by voters who moved and attempted to update their

2    address at a polling place and vote that same day?

3         A.    No.

4         Q.    Are you familiar with the Florida Voter Registration

5    System?

6         A.    To some degree, yes.

7         Q.    Can you briefly describe what that is?

8         A.    I mean, it's a state-wide database that contains

9    registered voters in Florida.  It's put together and held by

10   the Department of State, with information that's provided to

11   the Department from supervisors of elections, and their voter

12   registration roles.

13        Q.    It is every one in the State of Florida that's

14   registered to vote?

15        A.    Correct.

16        Q.    Is it your view that the FVRS system is a fairly

17   robust system?

18        A.    Yes.

19        Q.    Is it your understanding that the FVRS system can

20   track a voter, such that if there were any instances of a voter

21   voting more than once in a single election, it could detect

22   that type of fraud?

23        A.    I think it's probably designed to do that.  I don't

24   know if it does.

25        Q.    You think it's designed to do that, while you may not

LISA C. SNYDER, COURT REPORTER

1  be a 100 percent certain you would expect that detection of

2  double voting is one of its capabilities?

3          MR. THOMAS:  Object to the form of the question.

4      A.   I think if it's used, it's a tool that a supervisor

5  or an election official could use to determine if somebody is

6  registered to vote in Florida.  Whether it's used on election

7  day on the chaos of conducting an election, I can't tell you

8  from county to county.

9  BY MR. O'CONNOR:

10     Q.   Prior to House Bill 1355, under the old law, it's my

11 understanding that a voter could appear at a polling place,

12 change their address, and vote a regular ballot; is that

13 correct?

14     A.   Yes.

15     Q.   Do you know how long that had been the law in the

16 State of Florida?

17     A.   I don't.

18     Q.   Is it your view that that had been the law for quite

19 some time?

20     A.   It is.

21     Q.   Do you have a sense generally whether it's 40 years,

22 or so?

23     A.   I have heard it's been a long time, but I have never

24 seen how long.

25     Q.   Decades?

LISA C. SNYDER, COURT REPORTER

1      A.   Perhaps, yes.

2      Q.   Comparing the draft language you had prepared

3 concerning the movers change, which would have prevented anyone

4 who changed their address at a polling place from voting via

5 regular ballot, to the final language, we have discussed one

6 change where an intra-county mover would be excluded and would

7 be permitted to vote a regular ballot, while an inter-county

8 mover would not; is that right?

9      A.   Right.

10     Q.   Is there a distinction made with regards to members

11 of the military?

12     A.   I believe in the final version of the bill there was,

13 yes.

14     Q.   And, what can you tell me about the source of that

15 change?

16     A.   Very little.  All I know, I think it originated from

17 the Senate, and that's the extent of my knowledge.

18     Q.   Is it fair to say you didn't have any involvement in

19 the distinction between members of the military who move

20 between counties, but are never the less permitted to update

21 their address at a polling place and vote a regular ballot?

22     A.   That's correct.

23     Q.   You said it came from the Senate?  Can you help me

24 understand that a little bit?

25     A.   I believe it was something that-- and I am just

```
 1   recalling, I don't know specifically who had an interest in it,
 2   but I think it was a senator that had an interest in providing
 3   an exception for military voters.
 4        Q.   Do you know why that exception was limited to
 5   military voters?
 6        A.   I don't.
 7        Q.   Do you know that exception was not expanded to
 8   include college students, for example?
 9        A.   No.
10        Q.   With regard to the movers change, had you heard
11   during the time from January 2011, until May of 2011, when
12   House Bill 1355 was passed, any concerns with regard to the
13   movers change?
14        A.   Yes.
15        Q.   What concerns did you hear?
16        A.   That the bill changed a decade-long procedure, and a
17   lot of supervisors were opposed to it.
18        Q.   Why were the supervisors opposed to it?
19        A.   I would have to speculate, I don't know.  So many of
20   the changes that are made in election bills are opposed because
21   they are a change in the way they have to do business.  I don't
22   know.
23        Q.   Did you have any direct communication with any
24   supervisors concerning the movers change?
25        A.   After the bill was passed?
```

LISA C. SNYDER, COURT REPORTER

1     Q.   Let's focus on the time from January 2011, up until
2    it was passed.
3     A.   I don't think I had any direct conversations with the
4    supervisors.  I may have responded to some comments that they
5    made at committee meetings, but, no, I didn't have any direct
6    conversation.
7     Q.   You just said that you responded to comments at
8    committee meetings.  What were you referring to there?
9     A.   I think you have the document.  I provided it.  House
10    staff asked me to respond to comments that were made by
11    supervisor of elections through their association.  I believe
12    it was after a House floor debate, or after a House committee
13    meeting.  I don't recall the context.
14     Q.   When you were responding to the supervisors'
15    concerns, was that based on concerns as communicated to you
16    through a document?
17     A.   Yes.
18     Q.   So there weren't any face-to-face, or over the phone
19    communications with supervisors?
20     A.   No.
21     Q.   I would like to have you take a look at a document
22    that we will mark as Mitchell Exhibit 10.  (Document shown to
23    witness)
24          Mr. Mitchell, have you seen this document
25    before?

                    LISA C. SNYDER, COURT REPORTER

1      A.   I don't think so.

2      Q.   For the record, I will note that it is an email dated

3   April 1, 2011, sent on behalf of Nancy Watkins to a number of

4   individuals, with the subject of legislative update.  I will

5   note that the email is signed Ron, and that the final person in

6   the to line is Ron Labasky.

7           Mr. Mitchell, do you know who sent this email?

8      A.   Looks like Nancy Watkins sent it.

9      Q.   Do you know who Ms. Watkins is?

10     A.   She is Ron Labasky's assistant, or was at the time.

11     Q.   Who is Ron?

12     A.   He is the general counsel and lobbyist for the State

13   Association of Supervisors of Elections.

14     Q.   Does this email appear to be sent by Ms. Watkins on

15   behalf of Mr. Labasky, to supervisors of elections?

16     A.   It looks like it.

17     Q.   Okay.  In the first line of the email it makes

18   reference to "HB1355 by Rep. Baxley was heard in the House

19   Government Operations Subcommittee today.  As we advised, a PCS

20   for HB1355 was made available yesterday morning.  The bill

21   expanded from 14 pages to 128 pages.  We were aware beforehand

22   that the bill would be substantially amended from a variety of

23   sources.  We have been working with staff, the sponsor and

24   chair".  Did I read that correctly?

25     A.   You did.

LISA C. SNYDER, COURT REPORTER

1     Q.   First of all, with regard to Representative Baxley,

2  is it your understanding that Representative Baxley was the

3  sponsor of House Bill 1355?

4     A.   Yes.

5     Q.   Do you have any information as how to Representative

6  Baxley came to be the sponsor of that bill?

7     A.   I don't.

8     Q.   There is reference to the bill expanding from 14

9  pages to 128 pages.  You had made reference before to the bill

10  as initially filed being relatively small, and then expanding.

11  Is this consistent with your experience concerning House Bill

12  1355?

13     A.   It is.

14     Q.   Is it also consistent that around April 1, in

15  connection with this House Government Operations Subcommittee,

16  that's where this first expansion of the bill occurred?

17     A.   Must be, yes.

18     Q.   In the next paragraph, Mr. Labasky notes that the

19  supervisors had presented our concerns on the bill, and then

20  the last line of the second paragraph reads, "I, along with Ion

21  Sancho, pointed out that the amendment to Section 101.045,

22  dealing with changes of address and names at the polling place,

23  is poor policy and legally improper".  Did I read that

24  correctly?

25     A.   Yes.

LISA C. SNYDER, COURT REPORTER

1        Q.    Who is Ion Sancho?

2        A.    He is the supervisor of elections for Leon County.

3        Q.    The change that's referenced here, concerning Section

4    101.045, dealing with changes of address and names at the

5    polling place, is that the movers change that we have been

6    discussing?

7        A.    I think it is.

8        Q.    Do you know why Mr. Labasky states that the change is

9    poor policy and legally improper?

10       A.    I don't.

11       Q.    I would like to have you now take a look at what we

12   will mark as Mitchell Exhibit 11.  (Document shown to witness)

13             Mr. Mitchell, have you seen this document

14   before?

15       A.    Yes.

16       Q.    What is it?

17       A.    Looks like concerns that the supervisors of elections

18   have as a body, with the election bill, House Bill 1355.

19       Q.    Does this appear to be a copy of that document that

20   you produced in the response to our document subpoena?

21       A.    No.  These are comments and concerns that the

22   supervisors have.  Those are my notes in the margins.

23       Q.    That's what I was getting to.  This specific copy of

24   that document, is this one you produced to us?

25       A.    Yes.

LISA C. SNYDER, COURT REPORTER

1        Q.    Just so we are clear, the document, for the record,

2    is a statement presumably from the Florida State Association of

3    Supervisors of Elections, dated April 6, 2011, concerning

4    committee substitute for HB1355, and it includes notes in the

5    margin, and those are your handwritten notes?

6        A.    Yes.

7        Q.    How did you come to receive this document?

8        A.    I believe someone from the House, the Florida House

9    staff probably sent it to me.  May have been Glenn Kirkland.

10       Q.    Why would Mr. Kirkland send it to you?

11       A.    To get my feedback, and see if there were changes

12   that the supervisors opposed that we could live with, maybe

13   changing to be consistent with what they would like to do.

14       Q.    So walk me through what you did when you received the

15   document.

16       A.    I think I read through each one of these sections

17   that the supervisors had an issue with, and simply made some

18   notes as to whether we could live with the change they were

19   suggesting, modify the change, or stay with the current law or

20   the current proposal in 1355.

21       Q.    I would like to go through each of the sections that

22   are listed.  Section one, is it fair to summarize that section

23   as providing additional authority to the Secretary of State to

24   issue directives to the supervisors of elections?

25       A.    Right.

1    Q.   And, is that a provision that was included in the

2    draft elections legislation that you had prepared?

3    A.   I think it was, yes.

4    Q.   And, then on the right side there is a note that I

5    believe reads, "okay to delete.  This is Joel's".

6    A.   Right.

7    Q.   Is that what you wrote there?

8    A.   I did.

9    Q.   When you said this is Joel's, who are you referring

10   to?

11   A.   Joel Springer.

12   Q.   Joel Springer is with the Republican Party of

13   Florida?

14   A.   Uh huh (Indicating in the affirmative).

15   Q.   He is the campaign director for--

16   A.   Senate campaigns.

17   Q.   So, your note here, is that memorializing the fact

18   that this change is something that Joel Springer had requested?

19   A.   Probably, yes.

20   Q.   Why did you write okay to delete?

21   A.   I felt like it was okay to delete this language from

22   the bill.

23   Q.   Why did you feel that way?

24   A.   I don't recall.  I mean I know it's an issue that's

25   come up several times.  I don't recall.

LISA C. SNYDER, COURT REPORTER

1     Q.   Okay.  With regard to section four, does that relate

2  to third-party voter registration changes?

3     A.   Let me read through it real quick.  I think the

4  supervisors really just had an issue with the maintenance of a

5  third-party voter registration database on the county level,

6  and wanted to remove that provision of the bill, and I just

7  made a note "could potentially delete".

8     Q.   So this comment relates to the third-party voter

9  registration change that was in the draft bill?

10    A.   Just the database, the supervisors' maintenance of a

11  database; correct.

12    Q.   Why did you write could potentially delete?

13    A.   I tended to agree with the supervisors.  I think they

14  said maintenance of a separate database by the supervisors

15  appears to be an unnecessary and unknown cost.  I agreed with

16  that.

17    Q.   Sections 10 and 19, I don't believe relate to any of

18  the four sets of voting changes.  Is that your understanding?

19    A.   That's correct; 10 and 19 don't have anything to do

20  with the four changes.

21    Q.   Let's move on to section 21.  Does this section

22  relate to the movers change that we have been talking about?

23    A.   It does.

24    Q.   I would like to read the language that was included

25  from the FSASE, for the record.  "This removes the ability of a

LISA C. SNYDER, COURT REPORTER

```
 1   voter to change their address or name at the polling place.
 2   This will result in tens of thousands of additional provisional
 3   ballots, which are required to be canvassed by noon on the 3rd
 4   (primary) or 4th (general) day after the election, and
 5   significant delays at the polls.  There are no reports of
 6   widespread abuse or double voting".  Did I read that correctly?
 7        A.   You did.
 8        Q.   You read this concern from the supervisors of
 9   elections?
10        A.   Uh huh (Indicating in the affirmative).
11        Q.   What was your reaction to it?
12        A.   I think I just put a note here, "provide any evidence
13   of double voting", question mark.
14        Q.   And what is the significance, why did you write that
15   note?
16        A.   I think that was just a statement made by the
17   supervisors, and I didn't know if it was true or not.
18        Q.   I guess we had talked before as to whether you had
19   heard of, or were aware of any instances of double voting at
20   the time you were going through this legislative process, and I
21   believe you testified you weren't; is that correct?
22        A.   Not specifically, no.
23        Q.   Why the reference to Leon County?
24        A.   I think I had heard there may have been some problems
25   in Leon County.  I don't recall where.  It may have been
```

```
 1   something I read.  People voting absentee and outside county,
 2   and then voting on election day in Leon County.
 3        Q.   Do you recall anything more about that?
 4        A.   No.
 5        Q.   Is it your understanding that supervisors were
 6   concerned that if the movers change were implemented, that
 7   there would be thousands of additional provisional ballots that
 8   would have to be canvassed in connection with an election?
 9        A.   That was their concern, yes.
10        Q.   So, having read through the document, and made the
11   notes, what did you then do with the information that was both
12   contained in the document from the FSASE, plus your notes?
13        A.   I think I probably formalized my notes or thoughts
14   and comments, and sent them back to Glenn Kirkland.
15        Q.   Did you revise any of the draft language concerning
16   the movers change in response to these concerns?
17        A.   I don't think I did.
18        Q.   I would like to show you now a document we will mark
19   as Mitchell Exhibit 12.  (Document shown to witness)
20             Mr. Mitchell, have you seen this document
21   before?
22        A.   Yes.
23        Q.   What is this document?
24        A.   This may be the typed up comments that I referenced
25   with regard to the previous exhibit.
```

LISA C. SNYDER, COURT REPORTER

1    Q.   So just I am clear, is it your understanding this

2    document includes your notes and comments based on your review

3    of the document that was marked as Mitchell Exhibit 11, but in

4    a formal form?

5    A.   Yes.

6    Q.   Does this document include both your comments as well

7    someone else's comments?

8    A.   It appears so, yes.

9    Q.   Who is the other person?

10   A.   Frank T.

11   Q.   Who is Frank T?

12   A.   Frank Terraferma.

13   Q.   He is with the Republican Party of Florida?

14   A.   He is.

15   Q.   The document suggests that Frank T's comments are

16   highlighted?

17   A.   Uh huh (Indicating in the affirmative).

18   Q.   The copy is a little difficult to see, but is it your

19   understanding that there are-- there is an entry that reads

20   section one, and it has some text, and then below that there

21   appears to be some, what used to be highlighted, and now is a

22   little grayed out, text.

23   A.   Right.

24   Q.   Is it your understanding that that first section is

25   your comment, and the section immediately below it is

LISA C. SNYDER, COURT REPORTER

1   Mr. Terraferma's comment?

2       A.   I think that's connect, yes.

3       Q.   So with regard to section one, that's consistent with

4   the notes that we saw on the prior exhibit where you believe

5   that Joel was the source of that change, that could be deleted

6   as an accommodation?

7       A.   Uh huh (Indicating in the affirmative).

8       Q.   Is that a yes?

9       A.   Yes.

10      Q.   I would like to ask you about Mr. Terraferma's

11  comments in that next paragraph at the end, he writes, "I am

12  not for removing this.  We need a uniform election code with

13  uniform implementation across all 67 counties".  Did I read

14  that correctly?

15      A.   Yes.

16      Q.   What do you understand Mr. Terraferma to be saying

17  there?

18      A.   That the election code needs to be applied uniformly

19  across counties.  There are 67 counties in Florida, and some

20  from time to time do things they want to do, and don't tend to

21  follow the election code.

22      Q.   Was it his view that all 67 counties in Florida

23  should apply the same election laws?

24      A.   Yes.

25      Q.   Do you share that view?

LISA C. SNYDER, COURT REPORTER

1          A.    Yes.

2          Q.    Is the reason you have that view because it's

3    problematic if different counties are applying different

4    election laws?

5          A.    Correct.

6          Q.    What is the problem?

7          A.    What is the problem?

8          Q.    With different counties in Florida applying different

9    election laws?

10         A.    I think you don't want to have election laws applied

11   differently from county to county.  I think you get into legal

12   concerns when you do that, if voters are treated differently

13   from one county to the next.  I think that's all he is alluding

14   to.

15         Q.    Let's focus on section four.  Is it correct to

16   conclude that section four and the text that follows it, that's

17   your comment, except for the final piece at the end which

18   reads, "Concur-- this was a Joel issue".

19         A.    Yes.

20         Q.    Do you understand that statement to mean that Frank

21   Terraferma is asserting that the third-party database, that the

22   supervisors were concerned about, is an issue that Joel

23   Springer had desired?

24         A.    It looks like it, yes.

25         Q.    I would like to look at the section that begins

LISA C. SNYDER, COURT REPORTER

A6681

1  section 21, and I would like to read for the record that
2  paragraph.  Before I do, can you confirm which text is yours
3  versus which text is that of Mr. Terraferma?
4      A.   Okay.
5      Q.   Is it correct that everything in the paragraph that
6  begins section 21 is your language, up until 2010 in the second
7  to last line, and that the next four or five words are
8  Mr. Terraferma's?
9      A.   Where do you want to say that Mr. Terraferma's
10  language begins?
11     Q.   I am asking you, but I think, from looking at it,
12  that Mr. Terraferma's language is "Concur as anti fraud
13  measure"?
14     A.   Yeah; I can barely make that out, but that looks like
15  his-- yeah.
16     Q.   Is it your understanding that everything else is what
17  you had written?
18     A.   Uh huh (Indicating in the affirmative).  Yes.
19     Q.   Okay.  At the beginning of that paragraph it reads,
20  "Section 21.  This was an issue that Joel really wanted to
21  retain.  I would suggest we try to come up with at least some
22  anecdotal evidence that there was abuse or double voting.  I
23  seem to recall that Leon County and some FAMU students were
24  mentioned".  Did I read that correctly?
25     A.   Yes.

1      Q.   Can you explain the statement, "This was an issue
2   that Joel really wanted to retain"?
3      A.   I can't.
4      Q.   First of all, who is Joel?
5      A.   Joel Springer.
6      Q.   Is it your view, from this, that that provision,
7   section 21, is an issue that Joel Springer wanted in the draft
8   legislation?
9      A.   Yes.
10     Q.   Do you know why he wanted it in there?
11     A.   I think that's privileged.
12     Q.   First of all, I'm interested in whether you know why
13  he did it?
14     A.   I believe I do, yes.
15     Q.   Okay.  And, is it your position that the substantive
16  reason why Joel Springer wanted this change is privileged?
17     A.   Yes.
18     Q.   And, what is the basis for that?
19     A.   Conversations with my client.
20     Q.   Next line, "I would suggest we try to come up with at
21  least some anecdotal evidence that there was abuse or double
22  voting".  Can you explain that to me?
23     A.   Sure.  This is in the context, I believe the bill has
24  gone through a committee meeting or two, and I am putting on my
25  former House representative staff hat here, and suggest that if

LISA C. SNYDER, COURT REPORTER

A6683

1   you have gotten questions at the committee level, you are going

2   to get them again on the floor, and you need to come up with

3   some kind of evidence when you get these questions again.

4        Q.   So you were suggesting that the proponents of this

5   bill should come up with some anecdotal evidence to support why

6   this change is appropriate?

7        A.   Right.

8        Q.   To confirm, you weren't aware of any evidence that

9   would support the change at the time this was drafted, or the

10  time this was going through the legislature; is that right?

11       A.   Correct.

12       Q.   I would like to ask you about the reference to Leon

13  County and some FAMU students.  Can you explain what you were

14  mentioning, or why you referenced that here?

15       A.   I am going back to maybe reading something in the

16  newspaper that alleged that there were students who had voted

17  absentee in their home county, and then attempted to vote in

18  Leon County on election day as well.

19       Q.   Do you recall whether the individuals that you

20  reference there were able to vote twice in that election?

21       A.   I don't know.

22       Q.   I would like to ask about Mr. Terraferma's comment at

23  the end of the paragraph, "Concur, as anti fraud measure".  Can

24  you help me understand what Mr. Terraferma is saying there?

25       A.   I don't know specifically what he was thinking of.

LISA C. SNYDER, COURT REPORTER

```
 1    My guess is that, the reality is if the supervisor can't
 2    determine whether someone is registered to vote in Florida on
 3    election day, that we don't want to have people vote on
 4    election day if we can't confirm that they voted absentee
 5    elsewhere.
 6        Q.   I would like to have you take a look at a document we
 7    will mark as Mitchell Exhibit 13.  (Document shown to witness)
 8             While you are taking a look at that I will note
 9    for the record this is a document that is titled SOE
10    concerns/response.  Do you recognize this document?
11        A.   I do.
12        Q.   What is it?
13        A.   I believe it's a document that Glenn Kirkland
14    prepared and sent out to me.
15        Q.   Before we get to the substance, is this a document
16    that was located in your files and produced pursuant to our
17    subpoena?
18        A.   It was.
19        Q.   And, you said Mr. Kirk prepared and sent it to you.
20    Why was Mr. Kirkland preparing this document?
21        A.   I think he was sending it to us so we would provide
22    feedback to him after the supervisors had provided feedback to
23    him.
24        Q.   Help me understand the document.  Under the initial
25    title there is a parenthetical, and it lists what appears to be
```

LISA C. SNYDER, COURT REPORTER

1  initials and then names.  Is it correct that throughout this

2  document AP is the initials for Andy Palmer?

3      A.    Correct.

4      Q.    And EM is the initials for yourself, Mr. Mitchell?

5      A.    Yes.

6      Q.    And FT is the initials for Frank Terraferma?

7      A.    Correct.

8      Q.    And, throughout this document, to the extent there is

9  a parenthetical with a set of initials, does that indicate to

10  you that that individual was the source of those comments?

11      A.    Yes.

12      Q.    I would like to ask you about a couple of sections

13  here, and understand the progression of the documents.  First

14  of all, do you know the date of this document?

15      A.    I don't.

16      Q.    Does it appear to you it would be dated after the

17  document we just looked at as Mitchell Exhibit 12?

18      A.    Probably so.  It looks like there is a reference on

19  the back of this document to general comments on the PCS, which

20  is the proposed committee substitute.  I would imagine this had

21  come out after at least one committee hearing on the bill.

22      Q.    So you think roughly this is early to mid April 2011?

23      A.    That would be fair to say.

24      Q.    With regard to section one, I think we talked about

25  that before; that was the provision in your draft bill that

LISA C. SNYDER, COURT REPORTER

1  provided the Secretary of State additional power to issue

2  directives to supervisors of elections; is that right?

3      A.   Yes.

4      Q.   I am interested in the comment at the end of the

5  first paragraph that reads, "Aside: Secretary of State has said

6  this could be dropped".  Did I read that correctly?

7      A.   Yes.

8      Q.   Can you help me understand what that means?

9      A.   I think that-- I can't put thoughts into Glenn

10  Kirkland's head, but I assume he has reached out to the

11  Secretary of State's office and they are in agreement that that

12  section can be dropped.

13      Q.   Is it your understanding that the comment in the

14  first paragraph there is Mr. Kirkland's statements?

15      A.   I think the language and right after the word section

16  one is probably a summary of the supervisors' concerns.

17      Q.   Do you know who prepared that summary?

18      A.   I don't.

19      Q.   With regard to the "aside", is it your view that's

20  Mr. Kirkland's language?

21      A.   I believe it is.

22      Q.   You believe Mr. Kirkland had discussions with the

23  Secretary of State with regard to whether this provision was

24  necessary or could be dropped?

25      A.   Yes.

LISA C. SNYDER, COURT REPORTER

A6687

1      Q.   Do you know whether it was ultimately included in the

2    final version of House Bill 1355?

3      A.   I don't believe it was.

4      Q.   I would like to look below section one, there is RPOF

5    and then (AP), and then some additional text; why is

6    Mr. Palmer's initials preceded by RPOF?

7      A.   I guess he is providing input on behalf of the RPOF

8    acting as the executive director of the RPOF.

9      Q.   Your initials here, and then Mr. Terraferma's

10   initials are as well.  In what capacity are you acting in

11   providing your comments?

12     A.   Here I am acting as a former House staffer that's

13   familiar with the election bills.

14     Q.   Are you also acting in your capacity as counsel for

15   the Republican Party of Florida in providing these comments?

16     A.   Yes.

17     Q.   How about with regard to Mr. Terraferma, what

18   capacity is he acting when he offers his comments?

19     A.   I don't know.

20     Q.   You don't know what capacity--

21     A.   I don't know how he is acting, no.

22     Q.   Why do you think his comments are included here?

23     A.   I mean, I think he is asked, as a staffer of the RPOF

24   perhaps, but I don't know why he is being asked.

25     Q.   There were a number of references to Joel Springer.

LISA C. SNYDER, COURT REPORTER

1    Why has Mr. Springer not been asked to provide comments that

2    are included in the document?

3         A.   I don't know.

4         Q.   Is it your view that Mr. Kirkland is the one who

5    collected these various comments and created this document in

6    this format?

7         A.   That's my understanding.

8         Q.   Okay.  I would like to ask you about the action

9    that's listed below section one, which reads, "Action: Staff is

10   revising language to make it seem like less of a power grab- if

11   we can't, we will give it to them.  Provide for "written"

12   direction".  Did I read that correctly?

13        A.   Yes.

14        Q.   Whose language is that?

15        A.   I would assume that's Glenn Kirkland, or someone from

16   the House staff.

17        Q.   The check mark that's next to it, who added that?

18        A.   That's me.

19        Q.   Why the check mark next to that?

20        A.   It really has no significance.  I think I am just

21   checking them off as I am reading through these concerns.  I

22   got tired of doing it.

23        Q.   With regard to the section four, that concerns the

24   third-party voter registration changes we have discussed

25   before; is that right?

LISA C. SNYDER, COURT REPORTER

1      A.    Yes.

2      Q.    It appears that all of the comments, including the

3   action items relate to that database that the supervisors were

4   going to be required to maintain; is that right?

5      A.    Right.

6      Q.    And, ultimately that was removed?

7      A.    Correct.

8      Q.    I would like to focus on Section 21 then.  It's on

9   the third page.  Section 21, does this provision relate to the

10  movers change that we have been talking about?

11     A.    It looks like it does, yes.

12     Q.    Is it your view that the first portion of the

13  paragraph next to section 21 is a summary of the supervisors of

14  elections opposition to that change?

15     A.    It is.

16     Q.    And, is it fair to say that the supervisors were very

17  opposed to the change?

18     A.    Yes.

19     Q.    With regard to the statement that, "it's a violation

20  of NVRA", can you help me understand that?

21     A.    I think the supervisors were suggesting that this

22  change was a violation of the National Voter Registration Act.

23     Q.    In what way?

24     A.    I don't know.

25     Q.    With regard to the concerns that are next listed by

1   the supervisors, it references a heavy burden on elections due

2   to the number of provisional ballots substantially increasing,

3   as well as cost increasing, and time to count votes increasing;

4   is that fair?

5      A.   Yes.

6      Q.   Those were all concerns that were presented by the

7   supervisors of elections with regard to the movers change?

8      A.   Yes.

9      Q.   With regard to the note that follows that concerning

10  numbers, is it your understanding that that's Glenn Kirkland

11  adding that comment?

12     A.   I believe it is.

13     Q.   I would like to ask you about the next indented

14  paragraph, which I will read for the record, "RPOF (AP) Section

15  21 needs to stay.  Even if there aren't massive cases of fraud,

16  it is a political nightmare where you can play havoc with voter

17  turnout universes if you can change thousands (or even

18  hundreds) of voters from one district to another on election

19  day".  Did I read that correctly?

20     A.   You did.

21     Q.   Is that a statement of Mr. Palmer's concern with

22  regard to the movers change?

23     A.   I think it is, yes.

24     Q.   Does that accurately describe Mr. Palmer's concern?

25     A.   I think it does.

LISA C. SNYDER, COURT REPORTER

1      Q.   Does that describe all of the concerns that
2   Mr. Palmer communicated to you with regard to the movers
3   change?
4      A.   Yes.
5      Q.   With regard to the statement that, "even if there
6   aren't massive cases of fraud", is it your understanding that
7   this change was not designed to reduce fraud, but had other
8   purposes?
9      A.   It's my understanding that there were other purposes,
10  yes.
11     Q.   And, from the preface to this language, it suggests
12  that Mr. Palmer didn't think that there were massive cases of
13  fraud, but that the change was still desired for a different
14  reason.
15          MR. THOMAS:   Object to the form of the question.
16  BY MR. O'CONNOR:
17     Q.   What is your understanding of that statement with
18  regard to the existence of fraud in connection with movers?
19     A.   Well, I think he suggested there, even if there
20  aren't massive cases of fraud, he doesn't know if there are or
21  not, but he does suggest there are other intentions for making
22  the change.
23     Q.   Do you know whether Mr. Palmer was aware of any
24  instances of fraud beyond those that-- strike that.
25          Do you know whether Mr. Palmer was aware of any

                    LISA C. SNYDER, COURT REPORTER

1   instances of fraud in connection with people moving in
2   connection with voting?
3       A.   I don't know.
4       Q.   You didn't discuss any with him beyond the instances
5   that you know of?
6       A.   I am going to invoke the privilege there.
7       Q.   With regard to the purpose behind the movers change,
8   is there any purpose that you are aware of that's beyond that
9   that is stated in this paragraph by Mr. Palmer?
10      A.   Well, I think he references to playing havoc with
11  voter turnout universes.  Is that what you are asking me about?
12      Q.   I am asking if you are aware of any purposes beyond
13  those that are stated in this paragraph?
14      A.   No.
15      Q.   Okay.  So, this is a fair statement of what the
16  purpose was, at least as viewed by Mr. Palmer in connection
17  with the movers change?
18      A.   It looks to be, yes.
19      Q.   With regard to the next paragraph, it appears this is
20  the same language we have seen before from the comments you had
21  provided; is that fair?
22      A.   It is.
23      Q.   Is there any change you see between this draft and
24  had other versions?
25      A.   I may have expanded on my earlier comments.  I think

LISA C. SNYDER, COURT REPORTER

 1   I said it didn't seem like there were that many people showing
 2   up on election day wanting to change their address, given my
 3   conversations with some of the supervisors, and I expressed my
 4   disbelief that there were tens of thousands of additional
 5   provisional ballots that would need to be processed because of
 6   the change.
 7       Q.   That was based solely on your conversation with
 8   supervisors?
 9       A.   Yeah.  And just gut feeling.  I thought that was a
10   number they had thrown out there to oppose the bill.
11       Q.   I would like to ask you about the action item at the
12   bottom of the page.  Who added that text?
13       A.   The action?
14       Q.   Yes.
15       A.   I think it's probably someone from the House staff.
16       Q.   Do you think that's Glenn Kirkland?
17       A.   It could be.
18       Q.   Sounds like you are unsure.  Is there anyone else in
19   the House staff it could be?
20       A.   I don't know who else it could be, but it's probably
21   Glenn.
22       Q.   That action reads, "We really need to hold this
23   provision.  Waiting on whether or not computers are present at
24   ALL polling locations.  Also waiting on total number of address
25   changes at the poll--FYI, we have them-need to make decision".

LISA C. SNYDER, COURT REPORTER

1          It seems like there might be a handful of

2    thoughts going on there.  Can you help me unpack that

3    paragraph?

4          A.   I will try.  Waiting on whether or not computers are

5    present at all polling locations, I would imagine there is some

6    thought as to whether a voter's registration can be confirmed

7    at a polling location on election day.

8          Then it looks like Glenn is saying that we need

9    to look at the number of address changes that have occurred in

10   the past, and that was probably at my suggestion.

11         Q.   I would like to ask you about that first sentence,

12   "Action: we really need to hold this position"; how do you

13   understand that?

14         A.   It looks to me like the House was going to retain

15   that language, at least at this point in the process.

16         Q.   Why was it written here that we really need to hold

17   this position?  What's your understanding of that?

18         A.   I don't know.

19         Q.   Moving back up to the paragraph that's preceded by

20   your initials, there is a statement, "this was an issue that

21   Joel really wanted to retain".  Joel again is Joel Springer; is

22   that right?

23         A.   Uh huh (Indicating in the affirmative).

24         Q.   And, is there any reason that Joel wanted to retain

25   this provision beyond that which is stated in the paragraph

 1  immediately preceding it by Mr. Palmer?

 2      A.   Not to my knowledge.  I think Mr. Palmer's comments

 3  summarize probably what Joel was thinking as well.  I don't

 4  know what Joel was thinking.

 5      Q.   I would like to ask you briefly on the second to last

 6  page, under the heading General Comments on the PCS.

 7      A.   Uh huh.  Yes.

 8      Q.   Down at the bottom there is a section that is

 9  preceded by your initials and it says, "per your request,

10  attached are", and it lists a number of numbered items.  I

11  would like to ask you briefly about the second point, "Some ECO

12  and misc changes to HB1355.  The language has been vetted by

13  several election lawyers on both sides of the aisle and is good

14  to go".  Did I read that correctly?

15      A.   You did.

16      Q.   Who are the several election lawyers that you are

17  referring to?

18      A.   A number of election lawyers that had an interest in

19  making sure that the Electioneering Communications Organization

20  law was clarified-- that's ECO.  Ron Meyer, Mark Harren, John

21  French, Lynn Hearn-- a number of election lawyers that were

22  familiar with the Electioneering Communications Organization.

23      Q.   Does that provision have anything to do with the four

24  sets of voting changes?

25      A.   Not at all.

LISA C. SNYDER, COURT REPORTER

```
 1        Q.   Then I will move along.
 2             I would like to ask you two more things about
 3   this document.  The paragraph on this page, there is a line
 4   that reads, "as there are a number of provisions from the
 5   Department of State that we'd like to remove or clarify", can
 6   you tell me what you are referring to there?
 7        A.   Where is that?
 8        Q.   Second to last paragraph.
 9        A.   Okay.
10        Q.   On the second to last page.
11        A.   Uh huh (Indicating in the affirmative).  What is your
12   question?
13        Q.   My question is, there is a reference to number of
14   provisions from the Department of State we would like to remove
15   or modify.
16        A.   Right.  If my memory serves me correctly, we were
17   looking at some Department of State reporting provisions that
18   we thought were onerous for Chapter 106 changes, with regard to
19   reporting for political committees, and Electioneering
20   Communication Organizations.
21        Q.   Did that have anything to do with the four sets of
22   voting changes?
23        A.   No.
24        Q.   Last question on this, the last line of that same
25   page we were looking at, reads, "All of the above changes have
```

LISA C. SNYDER, COURT REPORTER

```
 1    been submitted to the Senate for possible inclusion in SB2086
 2    or some other vehicle".  Can you help me understand that line?
 3         A.   I don't know.  Those are comments I believe from
 4    Glenn.  I would assume the changes that are outlined above are
 5    now going to be included in a Senate bill.
 6         Q.   You believe that's from Mr. Kirkland, not from
 7    yourself?
 8         A.   Right.
 9         Q.   Okay.  And there was reference to Senate Bill 2086.
10         A.   This may be from me.  I take that back.  This may be
11    from me.  I don't know.
12         Q.   Do you recall 2086 being targeted as a potential
13    companion bill for House Bill 1355?
14         A.   Yes.
15         Q.   The reference to some other vehicle, what does that
16    mean?
17         A.   Some other Senate bill.
18         Q.   Okay.  I would like to have you take a quick look at
19    a document which will be marked as Mitchell Exhibit 14.
20    (Document shown to witness)
21              While you are taking a look at that, I will note
22    for the record that this document is an email dated April 12,
23    2011, from yourself to Glenn Kirkland, Andy Palmer, Ms. Fenner,
24    Mr. Coates, and Mr. Terraferma.  Is that correct?
25         A.   Yes.
```

LISA C. SNYDER, COURT REPORTER

1        Q.    And, do you recognize this email?

2        A.    I do.

3        Q.    With regard to the first line, it references, "just a

4    few talking points to address supervisors' concerns".  Is that

5    in reference to the attachment to this document?

6        A.    It is.

7        Q.    Is that yet again a statement of the various concerns

8    that were expressed by the supervisors of elections, and the

9    response that you and others from the Republican Party of

10   Florida were providing?

11       A.    Yes.

12       Q.    Before we get to the attachment, I would like to ask

13   you about the second paragraph of the email, "I am working

14   under the assumption that we will "change the voter address on

15   election day" issue to allow folks to change their address if

16   moving within the county.  Voters outside the county must

17   complete a provisional".  Did I read that correctly?

18       A.    Yes.

19       Q.    Can you help me understand that statement?

20       A.    I am gathering that someone in the Florida House had

21   decided they wanted to amend the bill to allow people within

22   the county to change their address.  I don't know.  It didn't

23   come from me.

24       Q.    You said someone within the Florida House, and the

25   reason that you say that is because that distinction is not

LISA C. SNYDER, COURT REPORTER

1    something that you had put forward?

2         A.   Right.

3         Q.   Is that also not something that came from the

4    Republican Party of Florida?

5         A.   I don't believe it did.

6         Q.   Or from any of your other clients?

7         A.   Right.

8         Q.   Do you recall with any specificity who was the

9    proponent of that change with regard to intra versus

10   inter-county movers?

11        A.   No.

12        Q.   Do you know why that change was made, that

13   distinction between inter-county and intra-county?

14        A.   I don't.  I don't know the source of it.  I would

15   imagine-- this is from my election experience.  I would imagine

16   it's easier to verify if someone is registered to vote within

17   the county and to contact the local supervisor, than to attempt

18   to contact some outside supervisor of elections on election

19   day.  So, a precinct worker contacting their own supervisor to

20   verify that someone is registered within the county, I think

21   that's an easier process.

22        Q.   Why was that distinction not included in the original

23   draft language that you prepared on behalf of your clients?

24        A.   I don't know.

25        Q.   Is it your understanding that this change was

LISA C. SNYDER, COURT REPORTER

A6700

 1   ultimately included in the bill, and so the law, as it is now,

 2   under House Bill 1355, is that individuals who move within a

 3   county are permitted to vote a regular ballot, whereas movers

 4   from a different county must vote a provisional ballot.

 5        A.   That's my understanding, yes.

 6        Q.   I would like to ask you about the attachment to this

 7   email.  Is this document effectively an analogue to what we had

 8   previously seen concerning the other supervisors' concerns,

 9   except this one is limited to the movers change?

10        A.   Yes.  That and mailing absentee ballots.

11        Q.   So this document focuses on those two issues, and it

12   provide more detail than the others?

13        A.   Right.

14        Q.   Under the header name/address change on election day,

15   section 21, there is a reference at the end to a concern that

16   change would create unmanageable number of provisional ballots

17   to process.  Is that a fair reflection of one of the concerns

18   that was voiced by the supervisors of electric concerning this

19   change?

20        A.   That was a concern they raised.

21        Q.   I would like to ask you about the paragraph that's

22   numbered as two.  Do you know who provided the text of numbers

23   one, two and the following paragraph?

24        A.   That's probably me.

25        Q.   Okay.  Why do you say that?

LISA C. SNYDER, COURT REPORTER

1       A.   I look at that and I seem to recall that I tried to

2   make a determination of how many people were actually changing

3   their address on election day.

4       Q.   What is the source of that information?

5       A.   It may have been information I received from Ron

6   Labasky.

7       Q.   Do you have any recollection of that, or is that your

8   best guess as you sit here?

9       A.   That's my best guess.  I think it was probably from

10  Duval County.

11      Q.   So, the 13,000 reference, is it your understanding

12  that was Duval County's number of address and name changes on

13  election day in 2010?

14      A.   I believe.  I am not certain.

15      Q.   Help me understand a bit of a disconnect.  You had

16  testified earlier that the supervisors' concern that there

17  would be tens of thousands of additional provisional ballots,

18  you said you didn't think that was right, there wouldn't be

19  that number.  How do you square with the statement here that in

20  Duval County they had over 13,000 name and address changes on

21  election day in 2010 in that one county?

22      A.   I seem to recall this one stood out to me because it

23  didn't make sense, and I don't recall the explanation from the

24  Duval County supervisor, but there was aberration here, and I

25  don't recall what it was.

---

LISA C. SNYDER, COURT REPORTER

1      Q.   13,000, if that number was correct, does it seem

2  reasonable if the change went into effect that there would be

3  tens of thousands, given there was 13,000 in just one county?

4          MR. THOMAS:  Object to the form of the question.

5      A.   This language also says that 13,000 changed their

6  address or name on election day, so I don't know how many would

7  have changed their address on election day in 2010, state-wide.

8  BY MR. O'CONNOR:

9      Q.   Help me understand the sentence at the beginning of

10  paragraph two, "there is also the political justification".

11  What does that mean?

12      A.   I think that goes back to Andy Palmer's comments, and

13  the concern that a political party would have regarding

14  messaging and sending political mail to voters in one county

15  for months and months, only to have those voters change their

16  address at another county, and not be eligible to vote in that

17  county any longer, in the prior county.  I think I make

18  reference to that here at the end.

19      Q.   So, that's one of the--

20      A.   That's the political justification, that it's

21  difficult to reach out to perspective voters in one county, and

22  then have them change their address and move to another county

23  on election day, and no longer be able to vote for the

24  candidates that you have been messaging about for the last

25  three months.

LISA C. SNYDER, COURT REPORTER

1    Q.   I can appreciate that concern.  Why did that lead to

2   the proposal to prevent people who move between counties, and

3   want to change their address at election day, to require them

4   to vote a provisional ballot as opposed to a regular ballot?

5    A.   I think that may have been a compromise that was put

6   in the bill some time during the process.

7    Q.   Let's go back to the original language that you had

8   prepared on behalf of your clients, the Republican Party of

9   Florida, and Mr. Rimes.  If the political justification or

10   motivation is this concern about messaging people who move to a

11   particular location, who then move, why would you want to

12   require those people to vote a provisional ballot when they

13   move to a different location?

14    A.   I think you want to permit them to be able to vote

15   with a provisional ballot.  I think it represents a compromise

16   in the legislative process, as the bill is moving through

17   committees.

18    Q.   Under the old law they would have been able to vote

19   in the new county, and they would have been able to vote a

20   regular ballot.

21    A.   Right.

22    Q.   Why require them to vote via provisional ballot?

23    A.   I can't answer that.

24    Q.   What is your understanding of the process for casting

25   a provisional ballot?

LISA C. SNYDER, COURT REPORTER

```
 1        A.   I think if someone shows up on election day, and
 2   their eligibility to vote in that particular precinct is
 3   questioned, they are given a provisional ballot and given an
 4   opportunity to vote that provisional ballot, and provide
 5   evidence to support the validity of that provisional ballot
 6   within two days after the election.  It's a catch all.
 7        Q.   What is your understanding with regard to the rates
 8   at which provisional ballots are counted as opposed to regular
 9   ballots?
10        A.   I don't know.
11        Q.   I would like to have you take a look at a document we
12   will mark as Mitchell Exhibit 15.  (Document shown to witness)
13             Mr. Mitchell, while you are taking a look at
14   that, I will note for the record that this is an email dated
15   April 20, 2011, from you to Mr. Kirkland with a copy to Ms.
16   Fenner and Mr. Palmer.  Do you recognize this email?
17        A.   I do.
18        Q.   Does this refresh your recollection with regard to
19   the rate at which provisional ballots are counted?
20        A.   Yes.  I mean, I think these are numbers that were
21   provided to me by the supervisors of elections.
22        Q.   Do you believe these numbers to be correct?
23        A.   I suppose.
24        Q.   Do you have any reason to question them?
25        A.   No.
```

1    Q.   We will get to the substance in a minute, but you are
2    providing data to Mr. Kirkland with regard to the rates at
3    which provisional ballots are counted; is that right?
4    A.   Uh huh (Indicating in the affirmative).
5    Q.   Would you have provided that data to him if you had
6    doubts about its accuracy?
7    A.   No.
8    Q.   Just focusing on the email at the bottom, do you read
9    this email as Mr. Kirkland requesting from either you,
10   Mr. Palmer, or Mr. Terraferma, the number of provisional
11   ballots cast in the last election cycle, as well as the number
12   of how many were in fact counted?
13   A.   Yes.
14   Q.   Is your response in the top email that you don't have
15   numbers for the 2010 election cycle, but that for the 2008
16   general election 35,635 provisional ballots were cast, but only
17   17,312 provisional ballots were counted, meaning that
18   48.58 percent of the provisional ballots cast were counted; is
19   that accurate?
20   A.   It is.
21   Q.   Does that refresh your recollection with regard to
22   the rates that provisional ballots are counted as compared to
23   regular ballots?
24   A.   It does in this 2008 election, yes.
25   Q.   Did the fact that in the 2008 general election

LISA C. SNYDER, COURT REPORTER

1   provisional ballots were counted at just under 50 percent rate
2   play any role in connection with the change to the movers
3   provision that we have been talking about?
4       A.   Not to my knowledge, no.
5       Q.   With regard to the change to individuals who move and
6   update their address at a polling place, we talked about the
7   political justification for that move.  Given that provisional
8   ballots, at least in the last general election, were counted at
9   a little less than 50 percent, does it concern you that
10  requiring additional people to cast provisional ballots may
11  lead to some of those people having their vote not counted?
12      A.   I think it is possible, yes.
13      Q.   Based on the experience from the 2008 election, do
14  you think that there is at least a decent chance that some
15  significant proportion, perhaps up to 50 percent, might not
16  have their ballot counted?
17      A.   They may not.
18          MR. O'CONNOR:  Why don't we go off the record.
19                    Whereupon, a lunch break was taken at 1:06.
20                    Testimony resumed at 2:07.
21  BY MR. O'CONNOR:
22      Q.   Back on the record.  Mr. Mitchell, did anything occur
23  to you over break that needed to be added to supplement or
24  correct any of your prior testimony?
25      A.   It did not.

LISA C. SNYDER, COURT REPORTER

1    Q.   Before the break, we were talking about the movers
2  change.  I'd like to stick with that for a little bit.  I have
3  a few more questions on that, and then we can move off that to
4  the next subject.

5              I would like to have you take another look at a
6  different document than the one we have looked at before, but
7  it has very similar content and I would like to compare the two
8  and confirm that they are the likely same.

9              I'd like show you a document that has previously
10  been marked as Department of State Exhibit 68. (Document shown
11  to witness)

12             I just handed you a document that was previously
13  marked Department of State Exhibit 68.  It's an email dated
14  April 9, from Glenn Kirkland to, what appears to be his
15  personal email, Judy McDonald, and a cc to Alex Kelly, Jason
16  Peradda (phonetic), Sam Vergeez (phonetic), and Kirk Pepper.
17  Have you seen this email before?

18     A.   I don't think I have.

19     Q.   Okay.  With regard to the individuals listed here,
20  Judy McDonald; can you tell me who she is?

21     A.   Judy is a House of Representatives employee.

22     Q.   She is a staffer with the House?

23     A.   She is.

24     Q.   Alex Kelly, I think you mentioned him before.  Is he
25  with the House Redistricting Committee?

LISA C. SNYDER, COURT REPORTER

A6708

1    A.    He is.

2    Q.    Jason Peradda?

3    A.    I believe Jason is also with redistricting too.

4    Q.    How about Sam Vergeez?

5    A.    Sam, I think when this email takes place I think he

6    was in the House majority office, House employee.

7    Q.    Kirk Pepper, remind me of his title.

8    A.    I believe he was Deputy Chief of Staff in the House

9    speaker's office.

10    Q.    Okay.  According to the cover email, attached is the

11   summary of comment on the PCS as well as the SOE provision.  I

12   would like to ask you about the attachment to this document.

13              This appears to me, and I would like to get your

14   sense of it, as a copy of the document we had previously looked

15   at earlier in your deposition, collecting the various comments

16   concerning the PCS, as well as House Bill 1355, and the

17   supervisors' concerns.  Does that appear to be correct?

18    A.    It does look like-- it looks like it might be in a

19   slightly different version, but it does look like the same

20   sections and comments that we looked at earlier today.

21    Q.    I'd like to go to the page that has at the top

22   section 21, at the bottom the Bates label is State Affairs

23   Staff email 00317.  This is the section relating to the movers

24   change; is that right?

25    A.    Yes.

1      Q.   We have talked about this previously, so we won't
2   need to spend a lot of time here.  Just one question with
3   regard to the comment from RPOF and Andy Palmer.  I think you
4   testified previously that this sets out the reason why he
5   wanted this change incorporated into the draft legislation; is
6   that right?

7      A.   Yes.  I think so.

8      Q.   My question is this, with regard to that change, you
9   said this is the reason why he desired the change, why would
10  the draft legislation that you prepared require people who move
11  between counties to vote provisional ballot?

12     A.   I don't know why, or what the impetus was for that to
13  be included to allow voters to vote a provisional.  Are you
14  asking why there was that change that was made at some point in
15  the process?

16     Q.   We don't need to focus on the distinction.  I am
17  asking about why movers would be required to vote a provisional
18  ballot?

19     A.   I think I explained earlier, I think it was more
20  difficult to confirm whether voters that moved from one county
21  to another are actually registered to vote in the State of
22  Florida.

23     Q.   But, if it's possible to confirm it, because the
24  system that you had discussed with Supervisor Clark, for
25  example, if that is possible to confirm that person's

LISA C. SNYDER, COURT REPORTER

1   registration, why shouldn't that person be able to vote via

2   regular ballot?

3       A.   I don't know.

4       Q.   Given that it's unclear to you the reason why you

5   would require that type of mover to vote via provisional

6   ballot, does it concern you at all that you would be requiring

7   more people to vote via provisional ballot, given the facts we

8   discussed before the break, that in the 2008 general election

9   fewer than 50 percent of provisional ballots cast were counted?

10       MR. THOMAS:  Object to the form of the question.

11       A.   I think the way the bill was originally drafted you

12   weren't allowed to vote a provisional ballot at all.  And, what

13   I testified to earlier was that was a compromise to at leat

14   make certain that the people that were voting, or moving from

15   outside of the county would at least get a provisional ballot.

16   I think the provisional ballot aspect represented a compromise

17   with the supervisors of elections to make sure that those

18   individuals moving from outside the county did get an

19   opportunity to vote in some form.  That's all I know about the

20   provisional ballot component.

21   BY MR. O'CONNOR:

22       Q.   Was there ever any discussion of permitting a mover

23   to vote a regular ballot if the supervisor had been able to

24   confirm that they were a registered voter, and hadn't

25   previously voted?

LISA C. SNYDER, COURT REPORTER

```
 1        A.   No.  I mean, I think that was the state of the old
 2   law, it was just a matter of whether the supervisors were
 3   actually confirming that person was a registered voter.
 4        Q.   So, under the draft provision that you had prepared,
 5   is it your understanding that someone who moved and didn't
 6   update their address until they arrived at the polling place
 7   wouldn't be allowed to vote at all that day?
 8             MR. THOMAS:  Objection.  Asked and answered.
 9        A.   Yeah.  I think that was the initial way the bill was
10   drafted.
11   BY MR. O'CONNOR:
12        Q.   The compromise position was to allow that type of
13   person to vote a provisional ballot at the polling place?
14        A.   I believe so.
15             MR. THOMAS:  Same objection.
16   BY MR. O'CONNOR:
17        Q.   I would like to now have you take a look at a
18   document that's been previously marked as Supervise of
19   Elections Exhibit 29, which for the record is an April 12, 2011
20   email from the Charlotte County Supervisor of Elections, to a
21   variety of people.  Take a look at that and tell me if you have
22   seen it before.  (Document shown to witness)
23        A.   I don't think I have seen this.
24        Q.   Okay.  I would like to focus on the email below,
25   which according to the email above is an email that the
```

LISA C. SNYDER, COURT REPORTER

1    Charlotte County supervisor sent to certain members of the

2    Florida House of Representatives concerning House Bill 1355,

3    and the proposed amendment concerning voters who move and try

4    to update their address at a polling place.

5              In the first line of the second paragraph, the

6    Charlotte County Supervisor writes, "there is presently no

7    problem with updating names and addresses of voters at the

8    polling location, either electronically through our EViD

9    machines, or by a simple phone call to the main office within

10   checks state-wide database".  Did I read that correctly?

11        A.   Yes.

12        Q.   Do you have any reason to disagree with this

13   supervisor that there is no problem with the old system of

14   confirming someone's registration at the polling place?

15        A.   No.  Not with regard to Charlotte County, no.

16        Q.   Do you have any reason to disagree with the statement

17   with regard to any other county in the State of Florida?

18        A.   No.  But, I think that's what he is speaking to, is

19   Charlotte County.

20        Q.   I appreciate that clarification.  So that I am clear,

21   do you have any information about any other county that differs

22   from this, with regard to Charlotte County?

23        A.   I don't.

24        Q.   The next paragraph lists why the change that was

25   proposed was problematic, and first it would create additional

                    LISA C. SNYDER, COURT REPORTER

```
 1    work for the canvassing board, and then it goes on to list
 2    additional details concerning that burden.  Were you aware of
 3    the concern that the change being proposed with regard to
 4    movers would create additional burdens on supervisors of
 5    elections?
 6        A.    No.
 7        Q.    That's not something you had heard of before?
 8        A.    No.
 9        Q.    I would like to ask you about the second to last
10    paragraph, which reads, "It is to be expected that there will
11    be significant voter dissatisfaction with the new requirement
12    having to vote a provisional ballot, which voters are naturally
13    disinclined to do as opposed to voting a regular ballot".  Did
14    I read that correctly?
15        A.    You did.
16        Q.    Do you agree with that statement?
17        A.    I suppose so.
18        Q.    Why is that?
19        A.    I think any time you change the election procedures,
20    and people aren't accustom to it, they are going to get upset.
21        Q.    Is there anything beyond that?
22        A.    They may not like the provisional ballot.  I don't
23    know.
24        Q.    Why do you think a voter might not like a provisional
25    ballot?
```

LISA C. SNYDER, COURT REPORTER

1      A.   I think voters may think it's something different,

2  that it's not voting on election day.  I don't know.

3      Q.   Given this statement by this supervisor, as well as

4  your own opinion with regard to provisional ballots, what is

5  your view with regard to the consequence of the change

6  occasioned by House Bill 1355, concerning movers, and the

7  requirement that additional Florida voters vote via provisional

8  ballot?

9      MR. THOMAS:  Object to the form of the question.

10     Asked and answered.

11     A.   See if I understand your question.  Can you rephrase

12  your question for me?

13  BY MR. O'CONNOR:

14     Q.   You know what, we will move on.  I would like to ask

15  you about a document that's previously been marked as

16  Supervisor of Elections Exhibit 11. (Document shown to witness)

17        For the record, this is an email dated April 13,

18  from Jennifer Edwards, the Supervisor of Elections of Collier

19  County.  Have you seen this email before?

20     A.   I have not.

21     Q.   I would like to ask you about the second paragraph

22  which references section 21, and based on the subject

23  references House Bill 1355.  In the middle of the paragraph,

24  Ms. Edwards, the Collier County Supervisor writes, "This

25  proposal of requiring all these voters to vote a provisional

LISA C. SNYDER, COURT REPORTER

```
 1   ballot will be confusing and frustrating to an innocent voter
 2   who just happened to move and did not let us know ahead of
 3   time.  This change will also increase the lines at the polling
 4   places.  In the 2008 general election, 1,710 affirmations were
 5   completed on election day in Collier County, and 894 in the
 6   2010 general election.  For the last 40 years in Florida voters
 7   who have changed their address have been able to complete an
 8   affirmation and vote a regular ballot on election day.  We have
 9   not experienced any problems in Collier County".  Did I read
10   that correctly?
11        A.   You did.
12        Q.   Have you heard this concern during the time that
13   House Bill 1355 was under consideration?
14        A.   Just in the context of the supervisors' formal
15   concerns that were on that piece of paper we looked at earlier.
16        Q.   Are these consistent with the concerns you had heard
17   from other supervisors with regard to the problem of forcing
18   more people to vote via provisional ballot?
19        A.   Yes.
20        Q.   Did these concerns give you cause for concern?
21        A.   It really wasn't my job to be that concerned about
22   the supervisors of elections.  I think these concerns are
23   probably directed at the legislature.
24        Q.   Help me understand that.  What do you mean directed
25   to the legislature?
```

LISA C. SNYDER, COURT REPORTER

```
1        A.    I think the supervisors' concerns were, you know.
2   Circulated and forwarded to House staff, and House legislators,
3   and in turn the Senate, in their effort to lobby against
4   provisions of the bill, but they weren't lobbying me.
5        Q.    Fair enough.  Although I guess your draft was
6   proposing one change, and then there was-- that was amended to
7   some extent, and then there was a subsequent proposal and they
8   were expressing concern with regard to that amended proposal?
9        A.    Right.
10       Q.    The email we just looked at was from April 13, 2011.
11  I would like to continue forward in the timeline, and have you
12  take a look at a document that's been previously marked as
13  Supervisor Exhibit 71.  (Document shown to witness)
14            While you are taking a look at that, I will note
15  for the record this is an email from Jonathan Fox dated
16  April 13, 2011, to Dawn Roberts, with a cc to Dan Carlton.
17  Have you ever seen this email before?
18       A.    I think I have.
19       Q.    I would like to ask you first about the email that
20  starts at the bottom of the first page and continues on the
21  second page.  It's an email dated March 31, 2011, from you to
22  Dawn Roberts.  Is that correct?
23       A.    Uh huh (Indicating in the affirmative).
24       Q.    I am sorry.  Yes?
25       A.    Yes.  I am sorry.
```

1      Q.   In the content of the email, the body of the email,
2   you write, "pursuant to your request attached is proposed
3   language for SB 2086".
4      A.   Uh huh (Indicating in the affirmative).  Yes.
5      Q.   What request did you receive from Ms. Roberts?
6      A.   I think it was actually an ethics bill change
7   regarding blind trust provisions.
8      Q.   Is that a provision that was included in SB2086?
9      A.   It was not. I don't think it was.  I don't recall.
10  It was either an ethics provision that they were contemplating,
11  or Chapter 106 provision.  I don't recall.
12     Q.   So, is it your belief that the language that was
13  requested of you, and you were providing to Ms. Roberts, did
14  not relate to any of the four sets of voting changes?
15     A.   That's correct.
16     Q.   I would like to move forward in the email chain.  It
17  continues from the email of March 31 to April 13, and then
18  there are three emails on April 13.  I would like to ask you
19  about the second email in the chain, from Jonathan Fox to Dawn
20  Roberts, on April 13, 2011, at 5:37 pm.  In that email, I would
21  like to ask you about the last sentence of the first paragraph,
22  which states, "but it may be prudent to start thinking about
23  having Pat line up a budget sponsor and coordinating Coates and
24  co to prep the eventual sponsor".  Did I read that correctly?
25     A.   Yes.

LISA C. SNYDER, COURT REPORTER

A6718

 1       Q.   Can you help me understand what Mr. Fox is stating
 2   there?
 3       A.   I would imagine-- I don't know what the amendment
 4   they were referring to for proposed budget meeting, but I would
 5   imagine that if there is some amendment that they are asking
 6   really me to come up with some talking points for the
 7   amendment.
 8       Q.   You said they were asking you to come up with it, is
 9   that the reference to Coates and Co?
10       A.   That would be my assumption, yes.
11       Q.   When they reference Coates and Co, do you believe
12   that's a reference to you alone, or does that include anyone
13   else who works at your law firm?
14       A.   I think it's a reference to me alone.
15       Q.   Why do you think that?
16       A.   Because I am the only one really doing the work at
17   this point on drafting.  I was the one that drafted the
18   original bill.
19       Q.   So--
20       A.   I guess it could be inferred that Noreen was going to
21   help me.  I don't know if Richard Coates is involved in this
22   or, not.  But, I don't know what the amendment is.
23       Q.   I would like to ask you about the top email,
24   April 13, later in the afternoon/evening, which reads, "Nix
25   that.  Dan informs me that there may be a plan coalescing

1    around a strike-all for 2086 ed-rules that incorporated some of

2    Richard's major changes.  We are just trying to keep up at this

3    point.  LOL".  Did I read that correctly?

4        A.    Yes.

5        Q.    What is Mr. Fox referencing when he says that this

6    strike-all will incorporate some of Richard's major changes?

7        A.    I don't know.

8        Q.    Who do you believe he is referring to when he says

9    Richard?

10       A.    I don't know.  It could be Richard Coates.  I don't

11   know.  I know that Dan Carlton work on ethics issues from time

12   to time.

13       Q.    Are you aware of any other individuals named Richard

14   who were involved in the election bill in 2011?

15       A.    No.

16       Q.    Do you know why Mr. Coates, or Richard, if that

17   refers to Mr. Coates, why he would be referenced here, if you

18   were the only one from the Coates Law Firm who was working on

19   the elections bill?

20            MR. THOMAS:  Objection to the form of the question.

21       Just asking for sheer speculation out of this witness.

22       A.    I don't know.

23   BY MR. O'CONNOR:

24       Q.    Do you know whether Mr. Coates had any communications

25   with any members of the Florida legislature, or their staff,

LISA C. SNYDER, COURT REPORTER

1    with regard to either House Bill 1355, or Senate Bill 2086?

2         A.    I don't know.

3         Q.    I would like to have you take a look at document we

4    will mark as Mitchell Exhibit 16.  (Document shown to witness)

5              Do you recognize this document?

6         A.    I do.  It's notes I was taking while I was watching

7    this committee meeting.

8         Q.    So these are notes that you took while watching the

9    April 14, 2011, committee meeting concerning House Bill 1355?

10        A.    That's correct.

11        Q.    Were you at the committee hearing?

12        A.    I was not.

13        Q.    You were watching it on television?

14        A.    Correct.  Either television or on my computer.

15        Q.    I would like to ask you about the back page.  There

16   is a header, which I believe reads, main issues; is that

17   correct?

18        A.    Uh huh (Indicating in the affirmative).

19        Q.    Can you read for the record the two entries that you

20   have included underneath that heading?

21        A.    Sure.  "Main issues: 48 hour turnaround on VR

22   registration, applications the main problem.  Changing one's

23   address on election day".

24        Q.    Is it correct that these are the two main issues that

25   you felt came up during the April 14, 2011 House committee

1  hearing?

2      A.   These were concerns that were raised by members on

3  that committee, yes.

4      Q.   What do you recall about the concerns regarding the

5  48 hour turnaround?

6      A.   Specifically that perhaps it was too short a period.

7      Q.   What were your thoughts with regard to the concerns

8  that were raised by legislators concerning whether 48 hours was

9  a sufficiently long period of time?

10     A.   I don't mean this to be flippant, but I was just

11 identifying the issue.  I didn't care.  It wasn't an issue I

12 was concerned with.

13     Q.   48 hours was not something you had any interest in?

14     A.   I personally thought it might have been too short a

15 period, but I didn't really care.  I wanted to identify those

16 issues, because I knew they would come up again at floor

17 debate, or at the next committee stop.

18     Q.   Did you ever discuss with anyone your personal

19 opinion that 48 hours may be too short a period of time?

20     A.   I don't think I did.  Glenn Kirkland may have asked

21 me for some talking points or rationale for the 48 hour

22 turnaround.  But, I never offered him a compromise, or-- so I

23 may have had conversations with him, and just said that those

24 concerns were expressed at that committee meeting.  Again, I

25 didn't have any solution or resolution.

LISA C. SNYDER, COURT REPORTER

1       Q.   If 48 hours wasn't something you were interested in,

2  or hadn't put forward, why would Glenn Kirkland ask you for

3  talking points with regard to that issue?

4       A.   I think he was asking for talking points on what

5  those provisions would do.  Not for my personal opinion.

6       Q.   Okay.  So you never discussed with anyone your

7  personal opinion that 48 hours may be too short a period of

8  time for turning around voter registration applications?

9       A.   Not that I recall, no.

10      Q.   How about in regard to changes in address on election

11  day?

12      A.   I don't recall having any specific conversations with

13  Glenn, or anyone else about, you know, changing those

14  provisions, or allowing provisional ballots.  There may have

15  been some conversation about, in the context of the

16  supervisors' concerns providing the provisional ballot as an

17  option, but I believe that came from House staff, or

18  legislators.

19      Q.   I think you testified about this in the morning, but

20  the movers change was not really an area you had focused on, so

21  is it fair to say you didn't have much of an opinion about

22  the--

23      A.   To use a local term, I didn't have a dog in the hunt.

24  I didn't have a preference one way or the other.

25      Q.   It was something you had been asked to do by a

1    client, and you were complying with that request?

2        A.   Right.

3        Q.   I would like to ask you briefly about a document

4    previously marked Department of State Exhibit 72.  (Document

5    shown to witness)

6             For the record this is an April 14 email from

7    Jonathan Fox to Dawn Roberts, with a cc to John Shay.  Have you

8    seen this email before?

9        A.   Don't think so, no.

10       Q.   This email appears to discuss Senate Bill 2086, and

11   I'd like to ask you briefly about one of the sentences in the

12   first email.

13            The sentence reads, "You might also wish to

14   consider suggesting that Eric tap his "other sources" who

15   drafted some of the more controversial language to review the

16   draft, if he hasn't already.  He will likely get a more

17   thorough analysis with better spin right now".  Did I read that

18   correctly?

19       A.   Yes.

20       Q.   Do you know who Mr. Fox is referencing when he says

21   Eric?

22       A.   I think he is talking about Eric Edwards.

23       Q.   And, Eric Edwards is in Senate leadership?

24       A.   Majority office, I believe.

25       Q.   And do you know who Mr. Fox is referencing when he

LISA C. SNYDER, COURT REPORTER

```
 1    talks about the other sources who drafted some of the more
 2    controversial language?
 3        A.   I can't speculate.  It may be House staff.  May be
 4    me.  I don't know.
 5        Q.   Do you know why he thinks that Eric may get a more
 6    thorough analysis if he asks those other sources?
 7        A.   I don't know.
 8        Q.   Lastly, with the final phrase of the paragraph
 9    Mr. Fox says, "We are on the outside looking in on most of the
10    provisions in the strike-all that are likely to attract
11    attention".  Do you know what Mr. Fox means by that?
12        A.   I would imagine he is referring to any of the
13    controversial changes-- you know, the Senate staff watches
14    these committee meetings on television to know what to expect,
15    if the bill comes over to the Senate.  I guess he is referring
16    to any of the controversial provisions of the House Bill.
17        Q.   By saying we are on the outside looking in, is it
18    your understanding he is talking about he is in the Senate
19    versus what is happening in the House?
20        A.   I think so.
21        Q.   Is there any reason to believe he is referring to the
22    fact that the provisions are being drafted outside the
23    legislative staff?
24        A.   I mean, I don't think so.  I think at this point it's
25    getting late in the process, I think he is probably referring
```

LISA C. SNYDER, COURT REPORTER

 1   to the bill coming over from the House shortly, and the Senate

 2   having to deal with some of the same questions from its members

 3   that the House did.

 4        Q.   I would like to have you take a very quick look at a

 5   document previously marked as Supervisor of Elections Exhibit

 6   No. 1, which for the record is a document released on FSASE

 7   letterhead, dated April 29, 2011, and it references Senate Bill

 8   2086 at the top.  I would like to have you look at the second

 9   page, and the section that begins with section 26.  (Document

10   shown to witness)

11             That paragraph references the fact that this

12   provision of Senate Bill 2086 will remove the ability of a

13   voter to change their address at the polling place if they have

14   moved from one county to another.  Is it your understanding

15   that this is the analogue provision to the movers change from

16   House Bill 1355 that we have been discussing?

17        A.   I would assume it is.

18        Q.   Are the supervisors expressing the same concern that

19   that change will result in thousands of additional provisional

20   ballots, and that there are not reports of widespread abuse or

21   double voting?

22        A.   Yes.  That's what they are saying.

23        Q.   Had you seen this document before?

24        A.   I have not.

25        Q.   While we are talking about the Senate bill, do you

                    LISA C. SNYDER, COURT REPORTER

1   know who sponsored Senate Bill 2086?

2       A.    Senator Miguel Diaz de la Portilla.

3       Q.    Do you know why Senator Diaz de la Portilla was the

4   sponsor?

5       A.    I don't.

6       Q.    Does it surprise you that he was the sponsor of the

7   bill?

8       A.    I believe at the time he was the Chairman of the

9   Ethics and Elections Committee of the Senate.

10      Q.    Do you know whether he was a freshman at that time?

11      A.    I don't think he was.  I think he may have been in

12  his second year.

13      Q.    Is there anything that surprises you about the fact

14  that he was sponsoring the bill?

15      A.    No.

16            MS. MEZA:  Can we go off the record for a moment?

17                      Whereupon, a recess was taken at 2:42.

18                      Testimony resumed at 2:44.

19  BY MR. O'CONNOR:

20      Q.    Back on the record.  Mr. Mitchell, I would like to

21  now talk about the early voting change, and I think perhaps to

22  speed things along maybe we can just talk in general terms.

23  It's my understanding that the early voting change is not

24  something that was ever included in any of the draft language

25  you had prepared in connection with the 2011 legislative

1    session; is that right?

2        A.   That's correct.

3        Q.   Do you know where the idea came from for the changes

4    to early voting that were occasioned by House Bill 1355?

5        A.   I don't.  I assume it was someone, or a legislator in

6    the Senate.

7        Q.   Is it your understanding that change is something

8    that came from the Senate side as opposed to the House?

9        A.   I think.

10       Q.   What discussions did you have with anyone

11   legislators, legislative staff, or other third parties, with

12   regard to the change to early voting?

13       A.   I don't recall having any discussions with anybody

14   about early voting.

15       Q.   Did you have any opinion with regard to the

16   advisability of the change to early voting?

17       A.   I didn't.

18       Q.   Is that an issue that you had focused on previously,

19   or is that like the movers change, something that you weren't

20   all that involved with?

21       A.   We had focused on it years before, but it wasn't

22   something I had any interest in this year, 2011.

23       Q.   I would like to have you take a look at what we

24   previously marked as Mitchell Exhibit 6.  This was an email

25   dated February 9, 2011 from you.  We talked about this one

1  previously?

2      A.    Uh huh (Indicating in the affirmative).

3      Q.    There is a statement in here about an item to noodle

4  on concerning early voting, and I just don't recall your answer

5  before.  What prompted your inclusion of this statement in this

6  email?

7      A.    I think every year, and I am generalizing, every year

8  when an election bill is proposed there is talk of changing

9  early voting, and I simply threw that out there for discussion

10 to those people that were recipients of this email.

11     Q.    Based on the fact that there were no provisions

12 regarding early vote in any of the drafts you worked on, is it

13 fair to conclude none of the recipients of this email picked up

14 on early voting, or wanted to move forward with that as a

15 proposed change?

16     A.    That's my assumption, yes.

17     Q.    I would like to show you a document we will mark as

18 Mitchell Exhibit 17.  (Document shown to witness)

19           Mr. Mitchell, this appears to be a page of

20 handwritten notes.  Have you seen this document before?

21     A.    Yes.  These are my notes briefly memorializing a

22 meeting that took place with House and Senate staff, Glenn

23 Kirkland and Eric Edwards.

24     Q.    When did this meeting occur?

25     A.    Looks like it occurred on April 18, 2011.

LISA C. SNYDER, COURT REPORTER

1       Q.   Do you recall the purpose of this meeting?

2       A.   I believe it was simply to make sure that the House

3  and Senate staff were kind of on the same page, if you will,

4  with regard to passing the bill, and that the provisions that

5  every one wanted in the bill, from the Senate and House

6  perspectives, were included.  Trying to match up the bills and

7  make sure they have the same contents.

8       Q.   When you say the bills, you are referring to House

9  Bill 1355 and Senate Bill 2086?

10      A.   That's correct.

11      Q.   It appears from your notes this meeting lasted from

12  10 am to 2 pm.

13      A.   Uh huh (Indicating in the affirmative).

14      Q.   That seems like quite a long meeting?

15      A.   Yeah, four hours.

16      Q.   Is it your view that the group sat together and

17  compared both bills and went through them section by section?

18      A.   We did.

19      Q.   There is reference to DLP wants to retain EV changes

20  (not in HB); did I read that correctly?

21      A.   You did.

22      Q.   Could you explain what your note means?

23      A.   I believe that's a reference to Senator Diaz de la

24  Portilla wanting to retain early voting changes.

25      Q.   So, is that a topic that was discussed during the

```
 1   meeting then?
 2       A.   Not really any further than that.  That would have
 3   been conveyed by Eric Edwards in the Senate.
 4       Q.   That's your conclusion because Eric Edwards is a
 5   Senate staffer?
 6       A.   (Indicated an affirmative response).
 7       Q.   Do you recall any discussion beyond the simple fact
 8   that Senator Diaz de la Portilla wanted to maintain the early
 9   voting change?
10       A.   No, I don't recall any other discussions.
11       Q.   The next line down reads, "MH wants to keep ballot
12   rewrite language".  Who is MH?
13       A.   Probably Senate President Mike Haridopolos.
14       Q.   Does that have anything to do with the four sets of
15   voting changes?
16       A.   I don't recall.  I don't think it does.  There was a
17   separate bill that was moving around that may have been part of
18   Senate Bill 2086.  I don't recall.
19       Q.   It sounds like it didn't have anything to do with the
20   four sets of voting changes that we are talking about here.
21       A.   I don't believe it did.
22       Q.   The next line, "plan is to amend SB in Senate budget
23   committee to line it up with the House".  Did I read that
24   right?
25       A.   You did.
```

```
 1        Q.   Help me understand that statement.  Is that a
 2   communication that you received at this meeting with regard to
 3   the procedure that was anticipated?
 4        A.   That's correct.
 5        Q.   Is there any additional detail with regard to how
 6   that was going to be done?
 7        A.   No.  That was up to Senate staff.
 8        Q.   Okay.  Then the last line, which I believe reads,
 9   "me, NF and two above went through two bills, page by page to
10   get them" --
11        A.   Identical.
12        Q.   Is that a description of what you were doing at the
13   meeting?
14        A.   It is.
15        Q.   Me and NF, is that Noreen Fenner?
16        A.   Noreen Fenner.
17        Q.   And then two above, is that Mr. Edwards and
18   Mr. Kirkland?
19        A.   It is.
20        Q.   Other than just hearing Senator Diaz de la Portilla
21   wanted to retain the early voting change, was there any
22   discussion of the early voting issue?
23        A.   No.
24        Q.   I would like to show you what we will mark as
25   Mitchell Exhibit 18.  (Document shown to witness)
```

LISA C. SNYDER, COURT REPORTER

1          While you are taking a look at that, I will note

2    for the record that this is an email dated April 25, 2011, from

3    you to what appears to be Eric Edwards, then a cc to Glenn

4    Kirkland, Andy Palmer, Frank Terraferma, and Noreen Fenner; is

5    that right?

6          A.    That's correct.

7          Q.    Can you tell me what this email is referring to?

8          A.    I believe I am simply looking at the strike-all

9    amendment that was prepared by the Senate and providing my

10   comments.

11         Q.    Is this the strike-all that would have been offered

12   in connection with the Senate budget committee hearing that was

13   referenced in the previous exhibit?

14         A.    I believe it is.

15         Q.    I'd just like to ask you about the first line there,

16   "Section 37-early voting is not in HB and is a Senate issue.

17   Don't have a preference here".  Does that reiterate what you

18   had discussed before that early voting was an issue coming from

19   the Senate, and that neither you, nor your clients, nor

20   apparently the House, had any views on the early vote change?

21         A.    That's correct.

22         Q.    Do you know what the original early voting change, as

23   it was initially proposed by Senator Diaz de la Portilla, would

24   have entailed with regard to the actual early voting time

25   frames?

LISA C. SNYDER, COURT REPORTER

A6733

1       A.   I don't.

2       Q.   Is that something that you followed at all?

3       A.   Not that closely, no.

4       Q.   So then is it fair to say you didn't have any

5  involvement with the negotiations concerning the early voting

6  change, and whether it would be enacted as initially proposed

7  or subsequently amended?

8       A.   That's correct.

9       Q.   I would like to have you take another look at the

10 document previously marked Supervisor of Elections Exhibit No.

11 1.  We previously looked at this document in connection with

12 the movers change, and now I would like to ask you to take a

13 look in connection with the early voting change.

14            Again, this is a document from the FSASE, dated

15 April 29, 2011.  In the first paragraph they refer to early

16 voting having been a tremendous success in Florida.  Do you

17 agree with that statement?

18      A.   Sure.

19      Q.   What's the basis for that?  Why do you think so?

20      A.   I think it's an added convenience for the voters.

21 It's very popular.  That's what they are referring to.

22      Q.   Immediately below that there is a statement that,

23 "the Florida State Association of Supervisors of Elections

24 believes that maintaining the 15 day time frame best serves the

25 voting public".  Did I read that correctly?

LISA C. SNYDER, COURT REPORTER

1          A.    You did.

2          Q.    Do you have any reason to disagree with that

3     statement?

4          A.    Not as an opinion of the collective body of that

5     association, no.

6          Q.    How about you personally?  Do you have any reason to

7     disagree with that statement?

8          A.    No.

9          Q.    In the next paragraph the Association expresses some

10    concerns with regard to over-time and additional costs that the

11    changes to early voting will occasion.  Do you see that?

12         A.    I do.

13         Q.    And, do you have any information with regard to the

14    supervisors' concern that the change to early voting that had

15    been proposed in connection with 2086 would increase costs?

16         A.    No, I don't.  I don't agree with it.

17         Q.    I am sorry.  You disagree with the supervisor

18    statements here?

19         A.    Yeah.  I don't know if they are based on hard

20    evidence, but that's certainly what they said.

21         Q.    I would like to have you take a look at the second

22    page, and focus on section 37.  Section 37 states that, "not

23    having the 15 day time frame for the general election could

24    result in crowding and confusion at early voting sites and on

25    election day at the precincts.  Maintaining 15 days for the

LISA C. SNYDER, COURT REPORTER

1  general election is imperative to a smooth general election in

2  the state".  Do you have any reason to disagree with that

3  statement by the supervisors?

4       A.   Not as a statement from them, no.

5       Q.   Do you have any information with regard to the

6  relative usage by Florida voters with regard to the first week

7  of early voting, as compared to the second week of early

8  voting?

9       A.   I am sorry.  Do I have any opinion or evidence?

10       Q.   Any information?

11       A.   No.  It's my understanding that early voting during

12  any period is very strong at the beginning of the period, and

13  wanes in the middle, and then picks back up before the

14  election.  But, that's-- I don't have any hard numbers.

15       Q.   Okay.  Have you ever heard of anyone refer to the

16  first week of early voting as a waste of money?

17       A.   No, not specifically.  No.  I have heard there are a

18  lot of supervisors find it to be expensive in the smaller

19  counties.

20       Q.   Had you ever heard of anyone refer to the first week

21  of early voting as a throw away?

22       A.   No.

23       Q.   What's your opinion with regard to the statement that

24  the first week of early voting is either a waste of money or

25  throw away?

---

LISA C. SNYDER, COURT REPORTER

1          MR. THOMAS:  Object to the form.

2      A.    I don't have an opinion about it.

3  BY MR. O'CONNOR:

4      Q.    Are you aware of the racial make-up of voters who

5  utilize early voting?

6      A.    I am not.

7      Q.    Do you have a sense as to the affect that will be

8  caused by the elimination of the first week of early voting?

9      A.    No.

10     Q.    Do you agree with the supervisors that eliminating

11 the first week of early voting may result in crowding at

12 polling places?

13     A.    During early voting?

14     Q.    Yes.

15     A.    Early voting sites?  I imagine it's possibility, yes.

16     Q.    Are you aware that Secretary of State Browning stated

17 publically that he was concerned with the early voting proposal

18 that was put forth by Senator Diaz de la Portilla, because

19 eliminating the first week of early voting would force people

20 to go to early voting during only that remaining shortened

21 period of time?

22         MR. THOMAS:  Object to the form of the question.

23     A.    I am not aware Secretary Browning's comments in that

24 regard.

25 BY MR. O'CONNOR:

                  LISA C. SNYDER, COURT REPORTER

1      Q.   Do you have any information with regard to the usage

2  of early voting on the final Sunday before election day?

3      A.   No.

4      Q.   Do you have an opinion with regard to whether the

5  changes to early voting were needed?

6      A.   I don't.

7      Q.   So you don't have an opinion one way or the other?

8      A.   I don't.

9      Q.   Do you have any information with regard to what

10  affect the changes to early voting that were occasioned by

11  House Bill 1355 will have on minorities?

12      A.   I don't.

13      Q.   Do you have any information as to who drafted the

14  language with regard to the early vote change?

15      A.   I don't.

16      Q.   We have talked a lot about communications you have

17  had with legislative staff.  Did you have any communications

18  with legislators themselves concerning any of the four sets of

19  voting changes?

20      A.   No.

21      Q.   We have talked about a number of communications you

22  have had with legislative staffers; are there any

23  communications you had with other legislative staffers, beyond

24  those we have discussed today, that you had in connection with

25  House Bill 1355, or the four sets of voting changes?

LISA C. SNYDER, COURT REPORTER

1     A.   I don't think so.  I may have had a conversation with

2  one other staffer in the Senate majority office, when Eric

3  Edwards was out of the office.

4     Q.   Who is that?

5     A.   I believe his name is Tony Cortese, C-o-r-t-e-s-e.

6     Q.   Just briefly what did you discuss with Mr. Cortese?

7     A.   I don't recall.  I am telling you I may have had some

8  conversation with him in general about the election bill.

9     Q.   Do you recall if those communications had anything to

10  do with the four sets of changes that we have been discussing?

11     A.   I don't recall.

12     Q.   Beyond Mr. Cortese, any other discussions with any

13  other staffers?

14     A.   May have had some conversations with some of the

15  individuals you have identified on emails, maybe Judy McDonald

16  or Heather Williamson in the House, but I can't think of anyone

17  else.

18     Q.   Do you recall the substance of those communications

19  as they regard the four sets of voting changes?

20     A.   No.  It was general election bill discussion.  It

21  wouldn't have been regarding the four changes.

22     Q.   We talked about Jenn Ungru before, and how you

23  believed she was at the Governor's office.  Did you have any

24  communications with anyone else in the Governor's office

25  concerning the four sets of voting changes?

LISA C. SNYDER, COURT REPORTER

1       A.   I did not.

2       Q.   Did you have any communications with either Secretary

3  Browning, or anyone else within the Department of State,

4  concerning the four sets of voting changes?

5       A.   No.   Probably had a conversation with Pierce

6  Schuessler just about the election bill in general.

7       Q.   When you say about the election bill in general, what

8  do you mean by that?

9       A.   Probably the plan for passage, that the House bill

10  was going to go over to the Senate and how the Senate was going

11  to amend it, but no specifics.

12      Q.   Do you know what role, if any, the Department of

13  State played in connection with House Bill 1355, as regards to

14  the four sets of voting changes we have been discussing?

15      A.   I don't know.   I don't think they had much a role at

16  all.   I wouldn't know.

17      Q.   Is that unusual at all that the Department of State

18  wouldn't play much of a role with regard to fairly significant

19  changes to the election code, which were generating a fair

20  amount of interest and controversy?

21      A.   I didn't say they didn't have a role.   I just wasn't

22  familiar with their role during the process.   I believe in this

23  instance they were in a position of reacting to something that

24  had been proposed in the House.   But, I don't know if they--

25  they may have been more of a defensive posture, if you will, in

LISA C. SNYDER, COURT REPORTER

```
 1   talking about provisions of the bill.  I don't know how much of
 2   the bill was proposed by the House.  I don't think they
 3   proposed any of the four changes you are discussing.
 4        Q.   With regard to the four changes we have been talking
 5   about, is it your understanding those changes did not come from
 6   either the Department of State, or FSASE, or the supervisors?
 7        A.   I don't think they did.
 8             MR. O'CONNOR:  Why don't we go off the record.
 9                  Whereupon, a recess was taken at 3:06.
10                  Testimony resumed at 3:13.
11   BY MR. O'CONNOR:
12        Q.   Back on the record.  Mr. Mitchell, anything occur to
13   you over the break you need to supplement or amend your prior
14   testimony?
15        A.   No.
16        Q.   With regard to the administrative preclearance
17   process with regard to the four sets of changes, did you have
18   any involvement in that process at all?
19        A.   No.
20        Q.   Did you have any communications with anyone in regard
21   to that process?
22        A.   No.
23        Q.   I would like to ask you about the effective date of
24   House Bill 1355.  We talked about it a bit this morning.  I
25   believe you testified earlier this morning that the effective
```

LISA C. SNYDER, COURT REPORTER

 1  date you had specified in the draft legislation you prepared

 2  was immediately upon the bill becoming law?

 3       A.   I think so, yes.

 4       Q.   Do you know whether the House Bill, Senate Bill, had

 5  effective dates that were different than effective immediately?

 6       A.   I don't recall.  I don't remember.

 7       Q.   With regard to elections bills, generally, I think

 8  you testified this morning that elections bills, it's not

 9  uncommon for them to be effective immediately; is that correct?

10       A.   That's correct.

11       Q.   That's based on your prior experience in the House?

12       A.   Uh huh (Indicating in the affirmative).  Yes.

13       Q.   I would like to have a take a look at what's

14  previously been marked as Supervisor of Elections Exhibit 21.

15  (Document shown to witness).

16            This is email chain involving Maria Matthews.

17  Are you familiar with Ms. Matthews?

18       A.   I know her.

19       Q.   Is she an attorney with the Department of State?

20       A.   She is.

21       Q.   I would like to ask you to take a look at the second

22  page.  In an email dated May 24, 2011, from Ms. Matthews, she

23  writes in the first paragraph, "As you know based on the email

24  below HB 1355 became law May 19, 2011.  It's already been

25  assigned a Chapter number, 2011-40.  Unlike previous elections

 1   legislation, there was no prospective three or six month lead

 2   time for preclearance.  The bill became effective immediately

 3   with the exception of a few provisions".  Did I read that

 4   correctly?

 5        A.   You did.

 6        Q.   I'd like to ask you about Ms. Matthews' statement

 7   that House Bill 1355 is unlike previous elections legislation,

 8   in that it has an effect date immediately upon becoming law.

 9        A.   I don't know what she is talking about there.  I

10   think it's fairly common to either have an effective date

11   immediately, or a July 1 effective date.  I don't know what she

12   is referring to with three or six months lead time.

13        Q.   Do you think she is just wrong?

14        A.   No.

15        Q.   Is it just a difference of opinion then?  Do you

16   think it's somewhat common, and she thinks this bill is unlike

17   prior election legislation?

18        A.   I don't know.  I don't know.  Unless she is referring

19   to an election year like the 2012, where you would have three

20   months before an election takes place, from the time the bill

21   is passed to the time an election takes place in August or

22   November.  I am not sure what she is referring to.  I know

23   every bill that makes changes to voter laws has to be

24   precleared, and that usually takes that amount of time.

25        Q.   So, given that state-wide election laws have to be

                    LISA C. SNYDER, COURT REPORTER

1    precleared with regard to the five covered counties in Florida,

2    is it the case that elections bills will include a period of

3    time prior to a change becoming effective so that preclearance

4    can be pursued?

5        A.   No.  I think it's common to have them effective upon

6    becoming a law, and they are not enforceable until they are

7    precleared.

8        Q.   Help me understand that.  A law that has state-wide

9    applicability is not enforceable anywhere in the state until

10   it's precleared?

11       A.   I don't know.  You have to talk to the Department of

12   State about how they want to handle enforceability.

13       Q.   You mentioned that a law that is effective

14   immediately has to wait for preclearance?

15       A.   I think that's been the practice of the Department of

16   State, yes, to preclear a bill after it's become effective.

17       Q.   That's based on your experience having been a prior

18   attorney working with the Department of State?

19       A.   Correct.

20       Q.   Just help me understand that more.  Is it your

21   experience that if there was a state-wide bill, and it was to

22   become effective immediately, but hadn't yet received

23   preclearance, that it wouldn't go into effect anywhere in the

24   State?

25       A.   I don't know.  The Department's had different

1  positions on that over the years.

2      Q.   What was the position when you were in the

3  Department?

4      A.   I believe-- I am trying to recall the year.  I

5  believe one year, maybe 1998, the position was the bill would

6  not be enforced, even though it had already reached its

7  effective date, would not be enforced until it was precleared

8  in any county.

9      Q.   What was the basis for that conclusion?

10      A.   I don't know.

11      Q.   Did you play any role in the analysis of that issue?

12      A.   No, that was above my pay grade.  15 years ago, 17

13  years ago, whatever.

14      Q.   You referenced 1998; is there a reason that year

15  sticks out in your mind?

16      A.   No.  That was an election year because it was even

17  numbered year.  I believe there was an election bill that

18  passed in 1997, and just vaguely recall going through the

19  preclearance process in 1998 for that bill.

20      Q.   You said that the decision with regard to when a law

21  would be implemented, whether it was before or after

22  preclearance, was above your pay grade.  What did you mean when

23  you said that?

24      A.   That was a decision that wasn't mine to make in the

25  Department of State.

LISA C. SNYDER, COURT REPORTER

A6745

```
 1        Q.   Who made that decision?

 2        A.   I don't know.

 3        Q.   I would like to have you take a look at a document

 4   previously marked Department of State 28.  This is a copy of an

 5   opinion prepared by the Division of Elections, it's numbered

 6   98-13, and dated August 19, 1998.  (Document shown to witness)

 7                 Have you seen that document before?

 8        A.   Probably.

 9        Q.   What is it?

10        A.   It's a formal opinion from the Division of Elections.

11   I may have written it.

12        Q.   Why do you say that?  Is that because you were an

13   attorney with the Department of State at that time?

14        A.   Yeah.

15        Q.   Do you recall working on this issue?

16        A.   I don't recall.  I could have.  I don't recall

17   though.

18        Q.   Do you recall the conclusion that was reached in this

19   opinion?

20        A.   Not without reading it.

21        Q.   Let me direct you to page two.  I would like to focus

22   your attention to the third paragraph, the last two sentences.

23   For the record those read, "Application of new election laws

24   are contingent upon preclearance by the Justice Department

25   pursuant to the Voting Rights Act of 1965.  Thus the effective
```

LISA C. SNYDER, COURT REPORTER

1   date of any such laws are delayed until such preclearance is

2   obtained".  Did I read that correctly?

3        A.    You did.

4        Q.    What is your understanding of that statement of law?

5        A.    That they can't be enforced until they were

6   precleared, the provisions of whatever new election law.

7        Q.    That was the position of the Department of State?

8        A.    Yes.

9        Q.    Do you have any recollection of this issue, having

10  now looked at it a little bit more, or this opinion?

11       A.    About the opinion, or about the 2011 election bill?

12       Q.    I would like to focus on this opinion, the 1998

13  opinion.

14       A.    I don't have any opinion about this opinion.

15       Q.    I would like to focus again on page two, the last

16  paragraph, the last full sentence, which states, "To do

17  otherwise in our opinion has the potential to cause widespread

18  voter confusion, affect the integrity of the elections process,

19  impair uniform application of the election laws, and violate

20  Federal and State Laws in both the Florida and the United

21  States Constitutions".  Did I read that correctly?

22       A.    You did.

23       Q.    Do you have any reason to disagree with that

24  statement?

25       A.    No.

LISA C. SNYDER, COURT REPORTER

A6747

1      Q.   Do you think that statement is as true today as it

2   was when it was written in 1998?

3      A.   Yes.

4      Q.   I would like to ask you to turn to page six.  I would

5   like to have you take a look at the fourth paragraph, which

6   begins "the previous law".  I'd like to ask you about the last

7   sentence which reads, "Thus if the new provisions of sections

8   14, 16, 20, and 26 are applied in 62 counties, but not in the

9   five covered counties, the state will be applying a double

10  standard with regard to its absentee voting procedures".  Did I

11  read that correctly?

12     A.   You did.

13     Q.   Do you have any reason to disagree with that

14  statement?

15     A.   No.

16     Q.   Do you believe that statement is as true today as it

17  was in 1998?

18     A.   I can't speak to that.  I think it's consistent with

19  my earlier testimony that the Department made the decision that

20  it wasn't going to enforce these provisions in any county until

21  this bill was precleared.

22     Q.   Do you know whether House Bill 1355 has been

23  implemented in Florida's non-covered counties?

24     A.   I think it has.

25     Q.   Is that a deviation from the Department of State's

LISA C. SNYDER, COURT REPORTER

 1   prior practice as set-out in this 1998 opinion?

 2              MR. THOMAS:  Object to the form of the question.

 3         A.   I don't know if it's a deviation or not.

 4   BY MR. O'CONNOR:

 5         Q.   Well, in 1998 is it correct to state that the

 6   Department of State and the Division of Elections concluded

 7   that state-wide changes would not go into effect any where

 8   until they could go into effect every where in the State?

 9         A.   That's the conclusion of this opinion, yes.

10         Q.   Is it your understanding that that's, in fact, what

11   happened in 1998?

12         A.   Yes.

13         Q.   With regard to House Bill 1355 in 2011, is it your

14   understanding that the Department of State has implemented the

15   changes occasioned by that bill in the 62 non-covered counties,

16   but has not implemented those changes in the five covered

17   counties?

18         A.   That's my understanding.

19         Q.   Are those two things different from one another?

20         A.   Yes.

21              MR. THOMAS:  You mean they changed their opinion?

22   BY MR. O'CONNOR:

23         Q.   I would like to have you take a brief look at a

24   document that has been marked Department of State Exhibit 39.

25   This is a memorandum from the Department of State, Office of

                     LISA C. SNYDER, COURT REPORTER

1 | the General Counsel, by Maria Matthews, December 24, 2007.

2 | (Document shown to witness)

3 |          Have you seen that document before?

4 |     A.    Don't think so.

5 |     Q.    As I recall from your prior testimony, you were

6 | working for the Florida government, but not the Department of

7 | State in 2007; is that correct?

8 |     A.    I was working for the Florida House in 2007.

9 |     Q.    I would like to ask you about the bolded statement at

10 | the end of the first paragraph on the first page, which reads,

11 | "Therefore the changes in those four sections relating to voter

12 | registration and voting cannot be implemented in any county

13 | until DOJ preclears them". Did I read that correctly?

14 |     A.    Uh, which paragraph? Up at the very beginning? I am

15 | sorry. I was getting ahead. You did read it correctly, yes.

16 |     Q.    Is that position consistent with the position stated

17 | in the 1998 opinion?

18 |     A.    Yes.

19 |     Q.    Mr. Mitchell, let me know when you are done with that

20 | document and we can move on.

21 |     A.    Oh, I am sorry.

22 |     Q.    Thank you. One last document I would like to have

23 | you take a look at. This has been previously marked as

24 | Department of State Exhibit 75. For the record, it is an

25 | April 29, 2011 email from Jonathan Fox. (Document shown to

LISA C. SNYDER, COURT REPORTER

1    witness)

2              Have you seen this email before?

3         A.   Give me just a second.  I don't know if I have seen

4    this before or not.

5         Q.   Okay.  I'd like to ask you a little bit about it.  I

6    would like to start at the back, with the first email, which

7    appears to be a April 27th email from Gary Holland.  Are you

8    familiar with Mr. Holland?

9         A.   I am.

10        Q.   Is he an attorney at the Department of State?

11        A.   He is.

12        Q.   Does he appear to be asking a question about what the

13   effective date for Senate Bill 2086 will be?

14        A.   It appears he is.  He is saying will the effective

15   date of Senate Bill 2086 still be upon its signing into law.

16        Q.   Does it appear that, while the header has been cut

17   from this email, based on the way it was forwarded, that this

18   document was sent to Pierce Schuessler?

19        A.   I believe so.

20        Q.   And, if you look back on to the second page, does

21   that appear to be the beginning of the email that ends on the

22   third page, which is signed by Pierce Schuessler directed to

23   Eric, and lists a few lines of text?

24        A.   It looks like it's an email from Eric Edwards and

25   Pierce is responding with some comments there underneath that

LISA C. SNYDER, COURT REPORTER

A6751

1    paragraph two on the back of the first page, page two.  So yes
2    I agree with your characterization.
3         Q.   That it's an email from Mr. Schuessler to Mr.
4    Edwards?
5         A.   It looks like a response from-- yeah.  From an email
6    sent by Mr. Edwards to Pierce.
7         Q.   At the bottom of page two, it's my understanding that
8    the portion that begins, Eric, that's an email from Mr.
9    Schuessler to Mr. Edwards, which I think was then included in a
10   subsequent email sent along by Mr. Edwards; does that appear to
11   be correct?
12        A.   Yes.
13        Q.   I would like to ask about the final line on that
14   page, which reads, "As for the rest of the bill, see email
15   below, but July 1, 2011 effective date would be much
16   appreciated".  Did I read that correctly?
17        A.   You did.
18        Q.   Did it appear that Mr. Schuessler is asking Mr.
19   Edwards if Senate Bill 2086 could be made effective July 1,
20   2011?
21        A.   Yes.
22        Q.   Do you have any information as to why Mr. Schuessler
23   was making that request?
24        A.   No.
25        Q.   I would like to focus now on the first page of the

LISA C. SNYDER, COURT REPORTER

A6752

 1   email, at the very bottom appears to be an email from Eric
 2   Edwards to Jonathan Fox, Dan Carlton, with a cc to Dawn
 3   Roberts, on April 29, 2011.  The subject is final changes for
 4   2086.  Do you see that?
 5       A.   Uh huh (Indicating in the affirmative).  Yes.
 6       Q.   I would like to ask you about the comment from
 7   Mr. Edwards.  He references, "The first change is very
 8   important.  The second is requested by the Department.  I will
 9   take your recommendation on the second.  Thanks, Eric".  Did I
10   read that correctly?
11       A.   Yes.
12       Q.   Looking on the second page there appear to be two
13   changes, the first is numbered number one and the second is
14   numbered number two, and the language concerning effective date
15   appears to be under number two.  Does that appear to be
16   correct?
17       A.   Yes.
18       Q.   So with regard to Mr. Edwards' statement about the
19   second change being requested by the department, who is your
20   understanding of the department in Mr. Edwards' email?
21       A.   The Department of State.
22       Q.   Is it your understanding that he is asking for
23   recommendations from Jonathan Fox, with regard to whether the
24   effective date should be made July 1, 2011?
25       A.   Yes.

---

LISA C. SNYDER, COURT REPORTER

1     Q.   I would like to focus on the email immediately above

2   that, from Mr. Fox to Mr. Edwards, with a copy to Dawn Roberts,

3   dated April 29, 2011.  Here, again, we have two numbered

4   paragraphs, number one and number two.  I would like to focus

5   number two.  It concerns effective date.  Do you see that?

6     A.   Yes.

7     Q.   I would like to ask you about the second half of that

8   paragraph which I will read for the record, "But if you want to

9   yield to Pierce's suggestion to change the effective date of

10   the bill from upon becoming law to July 1, 2011, you wouldn't

11   need to make Gary's change.  Your call.  Just let us know ASAP

12   please.  You are the one who was originally adamant about

13   making it effective upon signing into law, remember.  Let me

14   know what you want to do with this issue".  Did I read that

15   correctly?

16     A.   You did.

17     Q.   Is your understanding from this that Mr. Fox is

18   stating to Mr. Edwards that Mr. Edwards is the person who was

19   originally "adamant" about making Senate Bill 2086 effective

20   upon signing into law?

21     A.   I don't know.

22     Q.   Do you have any information about Mr. Edwards'

23   position with regard to when Senate Bill 2086 should become

24   effective?

25     A.   I don't.

LISA C. SNYDER, COURT REPORTER

1    Q.   Are you familiar with the American Legislative

2  Exchange Counsel?

3    A.   ALEC?

4    Q.   Yes.

5    A.   Yes.

6    Q.   What is your knowledge with regard to ALEC?

7    A.   I know it's an educational organization that

8  legislators and legislative staff attend conferences from time

9  to time, and cross pollinate ideas about elections, and various

10 subjects, legislative subjects.  I don't know.  I never

11 attended a conference.

12   Q.   That was going to be my next question.

13   A.   No.

14   Q.   Have you ever received or reviewed any materials that

15 were provided by ALEC?

16   A.   I don't think so.  No.

17   Q.   Do you know whether any of the individuals associated

18 with the Republican Party of Florida, that were working in

19 connection with the draft changes to the election law, that you

20 prepared in 2011, had any involvement with ALEC?

21   A.   I don't know.

22   Q.   Do you know whether any of the four sets of voting

23 changes that are at issue in this case had any connection with

24 ALEC?

25   A.   I don't know.

---

LISA C. SNYDER, COURT REPORTER

1          MR. O'CONNOR:  Mr. Mitchell, I don't have any further

2     questions for you at this time.  Thank you for your time.

3          MS. MEZA:  Would you like to take a break or--

4          MR. MITCHELL:  No, let's keep going.

5          MS. MEZA:  I only have a few questions.

6

7                    EXAMINATION BY MS. MEZA:

8     Q.   I want to go back to your involvement in the

9     legislative process on behalf of your specific clients;

10    Mr. Palmer, Mr. Terraferma, Mr. Springer are all employees of

11    the Republican Party of Florida, and you are counsel?

12    A.   That's correct.

13    Q.   And, you, in collaboration with these individuals,

14    drafted a proposed elections bill during the 2011 legislative

15    session.  How were your proposals in this bill ultimately

16    incorporated in what was passed as HB1355?  It wasn't clear to

17    me whether there was a back and forth, whether you gave someone

18    your proposed bill.  How did that process work?

19    A.   I think I probably gave the House staff a draft, and

20    I think during my testimony with Mr. O'Connor, it was clear

21    that it became part of the House bill sometime when there was a

22    proposed committee substituted adopted by the House.

23               There was back and forth in terms of kind of

24    comments, and talking points and concerns that were expressed

25    during the process, if that's what you are referring to as far

                    LISA C. SNYDER, COURT REPORTER

1   as back and forth goes.

2        Q.   In terms of--

3        A.   Prepared the draft and submitted it to the House.

4        Q.   In terms of the actual drafting of the language, was

5   that initial draft the last time you proposed the language?

6        A.   Probably not.  I mean, I may have made some changes

7   at the House's request, Florida House's request, in response to

8   supervisors' concerns, but I can't recall specifically.

9        Q.   Were there a number of individuals, or one specific

10  individual in the House that you were in contact with, or

11  communication with?

12       A.   Probably Glenn Kirkland.  He was the point person in

13  the House.

14       Q.   In terms of Mr. Rimes, you said he was a political

15  consultant, and also your client.  Who was Mr. Rimes' working

16  on behalf of?

17       A.   Probably a variety of candidates, just general

18  clients, but he had more of a concern with Chapter 106

19  provisions, campaign finance.

20       Q.   Was his level of involvement or the nature of his

21  involvement the same as that of Mr. Palmer or Mr. Terraferma

22  and Mr. Springer?

23       A.   No.  Not at all.

24       Q.   Could you describe the nature of his involvement

25  throughout the process?

LISA C. SNYDER, COURT REPORTER

1      A.    I think he may have given some comments early on,

2   while I was producing the first draft, and after that I don't

3   think he was really too involved at all.

4      Q.    You testified that you had been involved in drafting

5   election bills in past legislative sessions, you noted 2010,

6   2009 and 2008; is that correct?

7      A.    Yes.

8      Q.    Was that in your capacity as general counsel of the

9   Republican Party, or--

10     A.    No.   That was in my capacity as staff director for

11  the House Ethics and Elections Committee.

12     Q.    The way your involvement in the draft-- well, strike

13  that.

14              One of the documents we looked at, and you

15  testified that Jenn Ungru, of the Governor's office, at some

16  point provided input; did anyone else, other than the

17  individuals you were working with, Mr. Palmer, Mr. Terraferma,

18  and so forth, provide input?

19          MR. THOMAS:  Object to the form of the question.

20      Misstates prior testimony.  I think he testified Ms. Ungru

21      did not provide any input.  He never got in touch with

22      her.

23  BY MS. MEZA:

24     Q.    Did anyone else provide input?

25     A.    No.

--------

LISA C. SNYDER, COURT REPORTER

1       Q.   So, outside of those four individuals, Palmer,

2  Terraferma, Springer, Rimes, no one else provided input into

3  the proposed draft you prepared?

4       A.   That's correct.

5       Q.   To your knowledge, was the draft bill you prepared

6  including changes to the third-party voter registration

7  provisions the first instance these changes were proposed?

8       A.   In preparation for that legislative session, the

9  first time they were proposed?

10      Q.   Yes.  The specific changes to the third-party voter

11  registration provisions, was your draft the first, to your

12  knowledge, was your draft the first time those changes were

13  proposed?

14      A.   That's the only draft I am aware of.  There may have

15  been others, but I don't know.

16      Q.   Did your discussions with Mr. Palmer and others

17  regarding these changes to third-party voter registration

18  provisions did they include any discussions regarding previous

19  changes to these provisions?

20         MR. THOMAS:  Objection; privileged.

21  BY MS. MEZA:

22      Q.   Did your drafting of the changes to third-party voter

23  registration provisions include any consideration of previous

24  changes to these provisions?

25      A.   No, ma'am.

LISA C. SNYDER, COURT REPORTER

1      Q.   To your knowledge, was your proposal regarding
2  changes to election day changes of address the first time in
3  the 2011 legislative session that a change to this provision
4  was proposed?
5      A.   I think so, but there could have been other drafts
6  offered by other members.  I don't know.  I say House members.
7      Q.   I just want to refer back to Exhibit 13.  This was
8  your response, as well as that of Mr. Palmer and Terraferma's
9  response to concerns raised by supervisors of elections.  If we
10  can go back to section 21, where you suggested that we should
11  try and come up with at least some anecdotal evidence that
12  there was abuse or double voting.  Do you recall if that was
13  ever done?  Did you come up with that evidence?
14      A.   I didn't.  That was my discussion to House staff.
15      Q.   Do you recall if they actually came up with that
16  evidence?
17      A.   I don't know.
18      Q.   At this point, was the examples or the possible
19  examples you cited in Leon County with some FAMU students, was
20  that the only possible instance of abuse or double voting you
21  had heard of?
22      A.   That's the only one I was aware of that I think I had
23  read about, yeah.
24      Q.   Do you recall where you read about it?
25      A.   I don't.  It may have been in the local newspaper.

LISA C. SNYDER, COURT REPORTER

1    The Tallahassee Democrat, or one of the news blogs.

2        Q.   Was there any reason you thought an example

3    concerning FAMU students would be more compelling than any

4    other anecdotal evidence?

5        A.   No, ma'am.  That was just the one I was aware of.

6        Q.   I would like to refer back to what was marked as

7    Exhibit 6.  Just to go back down to your statement regarding

8    early voting.  You state, "I think if the supervisors of

9    elections had some additional flexibility with early voting

10   sites they could easily be sold on a shortened time frame".  At

11   any point did you, or anyone else, propose that you eliminate

12   the change to early voting that was being proposed, instead of

13   trying to negotiate an additional change?

14       A.   No, ma'am.

15       Q.   Why not?

16       A.   The early voting is a recuring theme with election

17   bills for the last several years.  As I mentioned to Dan, in my

18   previous testimony, the supervisors for several years have

19   wanted additional flexibility with regard to where they select

20   their early voting sites, and I was simply throwing that out as

21   a consideration that if they were given some flexibility with

22   their sites, you could shorten the time frame and it might ease

23   up on their concerns.

24       Q.   But for other provisions you had suggested just

25   eliminating them all together.  Why didn't you suggest just not

LISA C. SNYDER, COURT REPORTER

1   including the proposed early voting change?

2        A.    In the House bill?

3        Q.    Yes.

4        A.    Again, I didn't really-- didn't have a thought about

5   early voting, and quite frankly, it's a controversial issue,

6   and I didn't want to involve it in the election bill.  Didn't

7   want to change it, at least in the House side.

8        Q.    Was that just your personal decision, or was there

9   discussions that you should not propose to eliminate the early

10  voting provision?

11       A.    I didn't have any discussion with the House about

12  early voting, changing it.

13             MS. MEZA:  Those are all of the questions I had.

14       Thank you so much.

15             MR. NORDBY:  Can we go off the record.

16                  Whereupon, a brief recess was taken.

17

18                  EXAMINATION BY MR. NORDBY:

19       Q.    Thank you, Mr. Mitchell, for your time here today.  I

20  have a few follow-up questions, and I may bounce around between

21  a few of the topics you have covered over the course of the

22  past several hours, so if you need any clarification as to what

23  I am talking about, please feel free to ask me.

24                  You testified at length this morning about the

25  process that you use to pull together a draft elections bill,

LISA C. SNYDER, COURT REPORTER

1    and send it over to the Florida House.  Do you recall that
2    testimony?
3        A.    Yes.
4        Q.    Is it fair to characterize that as that these were
5    proposals from you, and some of your clients, to the
6    legislature?
7        A.    Yes.
8        Q.    Is that process that you described this morning
9    uncommon in the Florida legislative process?
10       A.    I don't think so.
11       Q.    What do you base that on?
12       A.    Experience I guess as an employee of the House, and
13   what I had done in prior years in this capacity with the Coates
14   Law Firm.
15       Q.    So when you were an employee of the Florida House,
16   did you witness outside lobbyist, or interest groups, provide
17   draft language to the legislature for its considering?
18       A.    All the time.
19       Q.    That's not uncommon?
20       A.    It's not uncommon.
21       Q.    Is that something you had done before the 2011
22   legislative session as an outside attorney?
23       A.    Yes.
24       Q.    Were all of the changes that you proposed accepted
25   and incorporated into the bill as proposed?

LISA C. SNYDER, COURT REPORTER

1       A.   No, I don't think they were.

2       Q.   In fact, if you go through a few of them, the

3  third-party voter registration change that you had originally

4  proposed was changed in a few ways, from proposal to ultimate

5  enactment; was it not?

6       A.   It was.

7       Q.   And, the address change provision as proposed by you

8  was that changed before ultimate enactment?

9       A.   It was.

10      Q.   The early voting change was not something that had

11 come from you; is that correct?

12      A.   That's correct.

13      Q.   What about the constitutional initiative change?

14      A.   Like I said, I believe somewhere in the process there

15 was a constitutional amendment bill floating around that made

16 its way into the Senate bill, I believe.  I think I had the

17 shelf life provision in our original draft, from four to two

18 years, but again that was something we had put in the election

19 bill for the last four to six years.

20      Q.   Is that back and forward between House and Senate

21 typical of Florida's legislative process?

22      A.   Absolutely.

23      Q.   I am going to ask you about something that you

24 discussed in connection with Exhibit 6, earlier with

25 Mr. O'Connor.  There is a reference in this email that you

 1   wrote to affiliated/leadership committees.  Can you explain
 2   what an affiliated party committees is, in the context of
 3   Florida's campaign finance law?
 4        A.   I will do my best.  An affiliated party committee is
 5   a committee within a political party.  They are dedicated to
 6   electing members of the House, or members of the Senate.  As I
 7   explained earlier, they are typically in both the major
 8   parties.  There are individuals that are responsible for
 9   electing House candidates and Senate candidates, and up until
10   the adoption, many affiliated party committees, any money that
11   would go to the political parties was put in one big pot of
12   money.
13        Q.   Have any affiliated party committees been established
14   under the statute that would allow for their creation?
15        A.   Not to my knowledge.
16        Q.   What are you referring to in this email about what
17   will be done with affiliated/leadership committees?
18        A.   I believe at this point, this is February 2011, there
19   had been an affiliated party committee bill that had been
20   vetoed, and I guess I was throwing that out for consideration
21   as to whether that language that had been vetoed was going to
22   be included in the election bill, or if it was going to be a
23   stand-alone bill, a separate issue bill.
24        Q.   Does that discussion have anything to do at all with
25   the four changes?

1        A.    It does not.

2        Q.    I would ask you to turn to Exhibit 11, as previously

3    marked.  I will ask you to look at section 21.  Does section 21

4    refer to the change of address provision that was enacted in

5    House Bill 1355?

6        A.    That's correct.

7        Q.    The first line of this summary from the FSASE states,

8    "This removes the ability of a voter to change their address or

9    name at the polling place.  This will result in tens of

10   thousands of additional provisional ballots".  Do you know what

11   the basis for that statement of tens of thousands of

12   provisional ballots was?

13       A.    I don't have a clue, no.

14       Q.    I asked you a couple of questions about the

15   legislative process in Florida.  Based on your time as a

16   staffer for the Florida House, and as an attorney outside

17   participating in the process, did anything strike you as

18   unusual about the method in which 1355 was introduced, and

19   enacted?

20       A.    No.

21       Q.    How common is the use of a strike-all amendment as

22   part of the committee process?

23       A.    It's very common.  It happens probably with the

24   majority of legislation that's passed.

25       Q.    What about proposed committee substitutes to bills?

LISA C. SNYDER, COURT REPORTER

1    A.    Those are fairly common, too.  More particularly in

2    the Senate, but they are common in the House.

3         Q.    How common is it in the course of a committee meeting

4    for a member to call for a time certain vote?

5         A.    That's fairly common.

6         Q.    I want to ask you now about the Florida Voter

7    Registration System.  I believe you testified that you are

8    generally familiar with the system; is that correct?

9         A.    I am.

10        Q.    Do you know whether the voter history information

11   that is included in the Florida Voter Registration System is

12   updated in real-time over the course of election day?

13        A.    I think it's hoped one day that it will be, but I

14   don't believe it is.

15        Q.    So are you aware of any process under the prior

16   version of the change of address law whereby a supervisor of

17   elections in one county could verify whether someone had voted

18   in their prior county before arriving at the precinct in the

19   new county?

20        A.    I am not aware of a process, no.

21        Q.    Does the new law's provision for provisional ballots

22   help to address any concerns with regard to that change?

23        A.    I believe it's an attempt to do so, yes.

24        Q.    Other than the early voting change, is it fair to say

25   that you were fairly involved in at least the initial draft of

1  three of these four provisions?

2      A.   Yes, just with the initial draft.

3      Q.   Do you have any reason to believe that the changes

4  made to the constitutional initiative petition provision were

5  made for a racially discriminatory purpose?

6      A.   No.

7      Q.   Do you have any reason to believe that the changes to

8  the change of address provision were made for a racially

9  discriminatory purpose?

10     A.   No.

11     Q.   Do you have any reason to believe that the changes to

12  the third-party voter registration organization statute were

13  made for a racially discriminatory purpose?

14     A.   No.

15     Q.   Though you weren't involved with the initial purpose,

16  through the course of your discussions with Senate staff, and

17  others, do you have any reason to believe the changes to the

18  early voting provisions were made for a racially discriminatory

19  purpose?

20     A.   No.

21         MR. NORDBY:  No further questions.

22         MR. O'CONNOR:  Mr. Mitchell, I have no further

23     questions either.

24              Whereupon, the deposition concluded at

25              3:59.

LISA C. SNYDER, COURT REPORTER

1

2                        REPORTER'S CERTIFICATE

3

4    STATE OF FLORIDA
     COUNTY OF LEON
5

6            I, LISA C. SNYDER, Court Reporter, certify that I was

7    authorized to and did stenographically report the deposition of

8    BUCKY MITCHELL; that a review of the transcript was requested;

9    and that the transcript is a true and complete record of my

10   stenographic notes.

11           I further certify that I am not a relative, employee,

12   attorney, or counsel of any of the parties, nor am I a relative

13   or employee of any of the parties' attorney or counsel

14   connected with the action, nor am I financially interested in

15   the action.

16           DATED this 8th day of March, 2012.

17

18                        /s/_____

19                            Lisa C. Snyder
                              Court Reporter/Notary Public
20

21

22

23

24

25

_____
                 LISA C. SNYDER, COURT REPORTER

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF LEON

        I, the undersigned authority, certify that BUCKY

MITCHELL personally appeared before me and was duly sworn.


        WITNESS my hand and official seal this 8th day of

March, 2012.


                              /s/_____
                              Lisa C. Snyder
                              Court Reporter/Notary Public
                              COMMISSION EXPIRES: 3-31-2014
                              COMMISSION NUMBER: DD943683

LISA C. SNYDER, COURT REPORTER

A6770

Exhibit 33

1

2                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
3
                    CASE NO. 1:11-cv-1428-CKK-MG-ESH
4

5    STATE OF FLORIDA,

6              Plaintiff,
     vs.
7
     UNITED STATES OF AMERICA and
8    ERIC H. HOLDER, JR., in his official
     capacity as Attorney General,
9              Defendants.

10   FLORIDA STATE CONFERENCE OF THE
     NAACP, et al,
11             Defendant-Intervenors,

12   KENNETH SULLIVAN, et al
               Defendant-Intervenors,
13
     NATIONAL COUNCIL OF LA RAZA, and
14   LEAGUE OF WOMEN VOTERS OF
     FLORIDA,
15             Defendant-Intervenors.
     _____/
16

17                  DEPOSITION OF KURT BROWNING

18

19       TAKEN in the above-styled cause, at the offices of the

20   United States Attorney, for the Northern District of Florida,

21   111 N. Adams Street, 4th floor, US Courthouse, Tallahassee,

22   Florida, on the 28th day of February, 2012, commencing at 9:00

23   a.m.

24

25

                     LISA C. SNYDER, COURT REPORTER

```
1              A P P E A R A N C E S

2

3    Alec W. Farr, Esq.
     Daniel T. O'Connor, Esq.
4    BRYAN CAVE LLP
     1155 F Street NW
5    Washington, DC  20004
     Attorneys for NCLR and
6    League of Women Voters

7    Catherine Meza, Esq.
     Ernest A. McFarland, Esq.
8    US Department of Justice
     Civil Right Division
9    950 Pennsylvania Ave., NW
     Room 7161-NWB
10   Washington, DC  20005

11   Daniel E. Nordby, Esq.
     Assistant General Counsel
12   Office of the Attorney General
     R.A. Gray Building, Suite 100
13   500 S. Bronough Street
     Tallahassee, FL  32399-0250
14   Attorneys for State of Florida

15   Also present:  Julie Ebenstein, Esq.
                     ACLU
16

17             I N D E X

18                                          Page No.

19        Appearances and Index            2
          Exhibits                         3
20        Examination by Mr. Farr          4
          Examination by Mr. McFarland     117
21        Examination by Mr. Nordby        126
          Further Examination by Mr. Farr  126
22        Certificate of Oath              129

23

24

25
```

LISA C. SNYDER, COURT REPORTER

1                           E X H I B I T S

2      SOS Exhibit No. 128 – Kurt Browning's CV

3      DOS Exhibit No. 36  – 2011 DOS Legislative Proposal

4      SOS Exhibit No. 129 – Tampa Bay Times article

5          Exhibit No. 68  – Kirkland document

6          Exhibit No. 69  – April document

7          Exhibit No. 72  – April 14 document

8      SOS Exhibit No. 130 – SOS Communications

9          Exhibit No. 61  – Email (Fox/Roberts)

10         Exhibit No. 75  – Email

11     SOS Exhibit No. 131 – Email (Jakubik)

12     SOS Exhibit No. 132 – House Democratic Caucus letter

13     SOS Exhibit No. 133 – Buckhorn correspondence

14     SOS Exhibit No. 134 – Email (Ungru)

15     SOS Exhibit No. 135 – Email (Sola)

16         Exhibit No. 7   – Directive

17         Exhibit No. 42  – Concerns re: 1355

18

19

20

21

22

23

24

25

                        LISA C. SNYDER, COURT REPORTER

```
 1      The witness, KURT BROWNING, after having been duly sworn
 2   was examined and testified as follows:
 3
 4                    EXAMINATION BY MR. FARR:
 5      Q.   Good morning.  Could you please state your full name
 6   for the record, please?
 7      A.   Kurt Browning.
 8      Q.   And, Secretary Browning have you been deposed before?
 9      A.   Yes.
10      Q.   How many times?
11      A.   Maybe two or three.
12      Q.   I imagine in those prior depositions, somebody gave
13   you instructions about what the procedures are.  I will do it
14   any way for the record.
15            I would like to start by introducing myself.  I
16   introduced myself off the record.  I will do it again now.  My
17   name is Alex Farr, and I represent two of the
18   defendant-intervenors in this case, the League of Women Voters
19   of Florida, and NCLR.  There are several other counsel here and
20   I would ask them to identify themselves for the record, and who
21   they represent.
22            MR. O'CONNOR:  Good morning, Secretary Browning.  My
23         name is Dan O'Connor.  I am also with the law firm of
24         Bryan Cave, and also represent the League of Women Voters
25         of Florida and the National Counsel of La Raza.
```

LISA C. SNYDER, COURT REPORTER

```
 1            MS. EBENSTEIN:  Good morning.  I am Julie Ebenstein.
 2      I'm with the ACLU of Florida, representing the Sullivan
 3      Group, defendant-intervenor.
 4            MR. MCFARLAND:  Good morning.  Ernest McFarland,
 5      representing the United States of America.
 6            MS. MEZA:  I'm Catherine Meza with the U.S.
 7      Department of Justice.
 8            MR. NORDBY:  Daniel Nordby with the Florida
 9      Department of State, Representing the State of Florida and
10      the witness.
11 BY MR. FARR:
12      Q.   Secretary Browning, I will just go over some of those
13 procedures for you.  I will be asking you a series of questions
14 to which you have to provide answers under oath.  Everything we
15 say is being taken down by the court reporter sitting to your
16 right.  Do you understand that?
17      A.   Yes.
18      Q.   The court reporter is trying to make a stenographic
19 record of what we say so it's important that we avoid speaking
20 over each other.  It's very typical in human conversation to
21 anticipate where somebody is going and finish their sentence
22 for them.  In this context, that's going to be difficult for
23 the court reporter, so we will both have to work on that.  Can
24 you work on that for me?
25      A.   Yes.
```

LISA C. SNYDER, COURT REPORTER

1    Q.   If at any time one of my questions is unclear, let me

2    know and I will try to accommodate you.  Otherwise, I will take

3    your answer and that will be the record.  So, if one of my

4    questions is unclear would you please let me know?

5         A.   Yes.

6         Q.   If you need a break please let me know and we will

7    take a break; however, pursuant to the agreement we have with

8    counsel, we have a set time for this deposition, and so my

9    intention is to hopefully make the breaks a little shorter,

10   unless I can have an agreement with Mr. Nordby about how much

11   time we are going to take.  I will try to accommodate if you

12   need a break.  Okay?

13        A.   Yes.

14        Q.   You understand the oath that you took is the same

15   oath you take in a court of law?

16        A.   Yes.

17        Q.   You understand penalties of perjury apply; if you

18   don't answer my questions fully and truthfully?

19        A.   Yes.

20        Q.   Is there any reason why today you can't answer my

21   questions fully and truthfully, and by that I mean, do you have

22   a head cold, are you on any medication that would impair your

23   ability to understand me and to answer my questions?

24        A.   No.

25        Q.   Secretary Browning, I would like to start very

LISA C. SNYDER, COURT REPORTER

 1   quickly, what did you do to prepare for your deposition today?

 2        A.   I met with my General Counsel last evening, maybe

 3   half an hour, just to go over the process of the deposition.

 4        Q.   That General Counsel, of course, is Mr. Nordby?

 5        A.   Yes.

 6        Q.   You say the meeting lasted 30 minutes or so?

 7        A.   Yes.

 8        Q.   What did you discuss?

 9        A.   The process of the deposition, what to expect.

10        Q.   Did you discuss the kind of questions you would be

11   asked?

12        A.   At a high level.

13        Q.   What did you discuss with Mr. Nordby?

14        A.   The types of questions that would be asked, and that

15   we needed to tell the truth, and give the answers that you know

16   to be true.

17        Q.   What questions did Mr. Nordby suggest to you might be

18   asked?

19        A.   I don't recall the specific questions that he asked.

20   They were all in general terms.

21        Q.   In general terms, what were they?

22        A.   I really don't recall what-- I mean, they were just

23   general questions about what questions might be asked regarding

24   the sections that are involved with the suit, the challenge.

25        Q.   All right.  You don't remember anything specifically

```
1   about it?
2        A.   No, sir.
3        Q.   Did you review any documents?
4        A.   Yes.
5        Q.   What documents did you review?
6        A.   I reviewed my resume' that had been forwarded to you.
7   I reviewed the list of the communications.  I reviewed a
8   preparatory document, just about what to expect in a
9   deposition.  And a copy of the Order/Stipulation regarding this
10  deposition.
11       Q.   Are those all of the documents you reviewed in
12  preparation for the deposition?
13       A.   Yes.
14       Q.   What was this preparatory document on what to expect?
15  Was that a memo Mr. Nordby had written you, or what was it?
16       A.   It was a sheet that was prepared for, I guess, me as
17  respondent on general information how to answer questions, tell
18  the truth, basically something that would prepare me for my
19  deposition today with you folks.
20       Q.   Was it prepared specifically for you?
21       A.   I don't recall.
22       Q.   Did you speak to anybody else about your deposition
23  today?
24       A.   About my deposition today?  I had a call with Ashley
25  Davis Saturday night, to review the communications that they
```

LISA C. SNYDER, COURT REPORTER

```
 1   needed to provide to you.  That's it.
 2        Q.   Okay.  All right.  Did you speak to any other
 3   employees of the General Counsel's office about the deposition?
 4        A.   No.
 5        Q.   Did you speak to anybody who had been deposed already
 6   in this case about the kind of questions that might be asked?
 7        A.   No.
 8        Q.   Secretary Browning, I just want to go over some terms
 9   that are likely to come up in the deposition.  I am sure they
10   will be familiar to you, but I want to do this for the record.
11   You are familiar with the term HB1355?
12        A.   Yes.
13        Q.   What is that?
14        A.   It's House Bill 1355.
15        Q.   That was the new Florida election law passed by the
16   legislature, and signed by the Governor on May 19, 2011?
17        A.   That's correct.
18        Q.   Within HB1355, there are changes to Florida's
19   election law that are the subject of this preclearance case;
20   correct?
21        A.   Yes.
22        Q.   One is a change with regard to third party voter
23   registration organization procedures; correct?
24        A.   Yes.
25        Q.   One is with respect to the time period for early
```

LISA C. SNYDER, COURT REPORTER

1   voting; correct?

2        A.    Yes.

3        Q.    One has to do with a situation in which a voter moves

4   between counties and attempts to change their address on

5   election day, and if they do that they have to use a

6   provisional ballot; correct?

7        A.    Yes.

8        Q.    Another change has to do with constitutional

9   initiative petitions?

10       A.    Yes.

11       Q.    If in the course of this deposition I call those the

12  four sets of voting changes, will you understand what I mean?

13       A.    Yes, sir.

14       Q.    You mentioned earlier your CV being something you

15  reviewed.  I am going to show you what has been marked as SOS

16  Exhibit 128.  I would ask you to take a look at that, and tell

17  me is that the CV you reviewed? (Document shown to witness)

18       A.    Yes.

19       Q.    Is this your standard CV that you use professionally,

20  or is this something you prepared for this deposition?

21       A.    Professionally.

22       Q.    Is this the most recent CV that you have?

23       A.    Yes.

24       Q.    Is it accurate as to your education and your

25  professional career?

---

LISA C. SNYDER, COURT REPORTER

1      A.    Yes.

2      Q.    Just want to briefly ask you a couple of questions

3   about some of the specifics.  I understand that for 26 years

4   you were the supervisor of elections of Pasco County?

5      A.    Yes.

6      Q.    What are the duties, just for the record, of a

7   supervisor of elections?

8      A.    Supervisors of elections are responsible for

9   registering voters to vote, planning, conducting elections for

10   the respective county, providing absentee ballots, accessible

11   polling places, training poll workers.

12      Q.    Would you agree that the primary duty of a supervisor

13   of elections is ensuring to the extent that he or she can that

14   there is a fair election process in their county?

15      A.    Yes.

16      Q.    Would you agree that another primary duty of a

17   supervisor of elections is to ensure that voters have a process

18   by which their votes will be counted?

19      A.    Yes.

20      Q.    I understand as well that you were for a certain

21   period, a year, the President of the Florida State Associations

22   of Supervisors of Elections?

23      A.    Yes.

24      Q.    What is the FSASE?

25      A.    That's the Florida State Association of Supervisors

1   of Elections.

2        Q.    What is its function?

3        A.    It's an opportunity for supervisors, 67 supervisors

4   from around the state, to meet regularly to discuss elections

5   issues, best practices, how we manage our business within our

6   respective counties.

7        Q.    Is one of the functions of the FSASE to make

8   recommendations for improving Florida's elections law?

9        A.    Could you restate that?

10       Q.    Sure.   Is one of the functions of FSASE to make

11  recommendations to Florida's legislature to improve election

12  law?

13       A.    Yes.

14       Q.    And, I understand, for example, you were the

15  legislative committee chairman of FSASE at one point?

16       A.    Yes.

17       Q.    It seems you were in that position for several years;

18  correct?

19       A.    That's correct.

20       Q.    What were your duties in that position?

21       A.    To formulate the legislative priorities of the

22  Association, based on the will of the Association membership.

23       Q.    And, how did you, as legislative committee chairman,

24  determine what FSASE's position would be on new legislation?

25       A.    I didn't necessarily make that determination.   That

LISA C. SNYDER, COURT REPORTER

1    determination was made by the body.

2        Q.    How did the body express itself to you?

3        A.    We would have the-- the state would be divided into I

4    think 10 regions, each one having a supervisor member, which

5    would make up the legislative committee, and they would bring

6    ideas forward.  It would be debated and discussed and a vote

7    would be taken as to whether or not the Association wanted to

8    move it, or that committee wanted to move it to the full

9    association.  The full association would then have an

10   opportunity to vote it up or vote it down, and if it was voted

11   up then it became one of the items on our legislative agenda.

12       Q.    Did FSASE, in your experience, have a legislative

13   agenda every year with respect to election law?

14       A.    Generally, without exception.  There may have been a

15   year or two in my years there that we didn't actively pursue

16   legislative changes.

17       Q.    In your experience, when FSASE took a position with

18   respect to pending election law, was it generally taken on

19   board by the legislature and respected?

20       A.    Depends on what the issue was.

21       Q.    Can you recall circumstances under which FSASE's

22   recommendation with respect to an election law change was just

23   ignored?

24       A.    I think one of the primary things we had worked on

25   for a number of years was the elimination of the second primary

LISA C. SNYDER, COURT REPORTER

A6784

1   in Florida, and it went on for years, and it wasn't until

2   probably the mid 2000's when the legislature took it up and

3   passed it out.

4       Q.   Do you recall circumstances under which the FSASE

5   came out in opposition to a pending piece of legislation, and

6   that legislation was none the less passed without the FSASE's

7   comments being incorporated?

8       A.   I can't remember specific bills, but I know there

9   have been instances where the position of supervisors was

10  counter that of the legislature.  Certainly the legislature,

11  being the policy making body of the state, they are charged

12  with that responsibility, and they do what they feel is

13  necessary as the policy makers.  We were there to provide input

14  and information on what the impact of that was going to be

15  locally on our respective counties.

16      Q.   I understand.  But, do you remember specifically,

17  let's leave HB1355 out of it because we will talk about that in

18  a minute, do you remember specifically, as you sit here, any

19  bills in which the legislature put a bill out for review, FSASE

20  took a position that it opposed several of the changes, and the

21  legislature none the less passed the bill without accepting any

22  of FSASE's comments?

23      A.   Not specifically.

24      Q.   Would you say that the Florida supervisors of

25  elections are experts about Florida election law?

LISA C. SNYDER, COURT REPORTER

A6785

1                MR. NORDBY:  Objection.  Mr. Farr, I don't know which

2        of the areas within the scope that we have agreed to you

3        are going into here.  Certainly you are entitled to do a

4        little bit of background, but it seems like you are going

5        a little far afield from our stipulated scope.

6                MR. FARR:  I think it's within a couple of the

7        categories.  Do you really think it's not?

8                MR. NORDBY:  Can you tell me which ones?

9                MR. FARR:  Sure.  Do you have the stip?

10               MR. O'CONNOR:  We will note for the record that the

11       stipulation lists a number of categories, which are not

12       exclusive to the terms of the stipulation.  But within

13       those generally the--

14               MR. FARR:  I am getting into the topic of

15       communications with legislators and legislative staff.

16       But, I can move on and see where we are going.  I can ask

17       these same questions I am sure within that same context,

18       if you really want me to, but that's fine.

19  BY MR. FARR:

20       Q.    Just more about your background.  I understand you

21  were appointed by the Secretary of State and then Governor

22  Elect Charlie Crist in December 2006, as Secretary of State?

23       A.    I was appointed by Governor Charlie Crist, yes, to

24  serve as Secretary.

25       Q.    You served until April 2010, from December, 2006 to

                   LISA C. SNYDER, COURT REPORTER

1  April, 2010?

2      A.   Yes.  Actually January 7 to April 10.

3      Q.   And then you were appointed again by Governor Scott

4  in January 2011; correct?

5      A.   That's correct.

6      Q.   What were you doing in the gap of service for that

7  seven or eight month period?

8      A.   I was retired.

9      Q.   Okay.  Why did you decide to come out of retirement?

10     A.   I didn't like retirement.  I was asked by Governor

11 Scott if I would be interested in coming back and serving as

12 Secretary.

13     Q.   Who succeeded you in that period?

14     A.   There were two secretaries; Dawn Roberts was the

15 interim, and then for about a week there was Jennifer Kennedy.

16     Q.   Do you know why they were selected to work as interim

17 while you were out?

18     A.   They were both in the department.

19     Q.   So it was just a natural thing for them to step up?

20     A.   I don't know if I can answer that because I don't

21 know-- I wasn't in part of the decision making process as to

22 why they were chosen.

23     Q.   Were there any particular reasons why you came out of

24 retirement, other than not liking it?  Was there anything going

25 on that you thought you could help with, or anything that

LISA C. SNYDER, COURT REPORTER

1    concerned you that lead you to come out of retirement?

2        A.    No.

3        Q.    Why did you resign as of this month?

4        A.    To return to my family.

5        Q.    Any other reasons?

6        A.    I am currently running for Superintendent of Schools

7    in Pasco County, but that's not the reason I went home.  I went

8    home to be with my family.  It's a three and a half hour drive

9    from my home to Tallahassee, and I do that every Friday night,

10   going home, and every Sunday afternoon coming to work, and my

11   wife remains in my home county of Pasco County, and after five

12   years I just felt it was time to go home.

13       Q.    I understand you are running for a new position in

14   Pasco County.

15       A.    Yes.

16       Q.    What is that?

17       A.    Superintendent of Schools.

18       Q.    Is there any particular reason you picked that?

19       A.    My folks in Pasco have urged me and encouraged me to

20   do it.

21       Q.    Do you have any experience running a school system?

22       A.    I do not.

23       Q.    All right.  I would like to move on, because we do

24   have limited time, to HB1355.  Can you tell me who originated

25   the four sets?  Whose idea they were initially?

1      A.    The legislature.

2      Q.    Do you know who specifically within the legislature?

3      A.    No, sir.

4      Q.    Do you know whether the four sets of voting changes

5   originated with a third party?

6      A.    No, sir.

7      Q.    You just really have no idea whose idea these four

8   changes were?

9      A.    That is correct.

10     Q.    Is it correct that none of the four changes came from

11  your department?

12     A.    That is correct.

13     Q.    There has been testimony about this before, but in

14  2011 your department had a legislative proposal; correct?

15     A.    I believe it did.

16     Q.    Just to make a clean record, I am going to show you

17  something.  (Document shown to witness)

18           Secretary Browning, I am showing you what's been

19  previously marked as DOS 36.  I will represent to you there has

20  been prior testimony that this was the 2011 DOS legislative

21  proposal from your department.  Do you recognize it as such?

22     A.    Yes.

23     Q.    Did you have any input on the proposed election law

24  in that package?

25     A.    Yes.

---

LISA C. SNYDER, COURT REPORTER

1          Q.    Do you know what input you had?

2          A.    Not specifically.

3          Q.    What role did you play in creating this document, if

4     any?

5          A.    As the Secretary, everything that goes out of that

6     department is my responsibility, and before we would submit a

7     legislative package I am going to meet with staff and we are

8     going to review it, and make sure I am okay with it.  Then once

9     we get signed off on it, then we submit it.

10         Q.    Did your staff actually write the language in this

11    proposal, and then submit it to you as a final document?

12         A.    That's generally the way that it happens; yes.

13         Q.    What was on the agenda, if you will, for your

14    department when it created this proposal?  What were you guys

15    most concerned about?

16         A.    Generally the proposals of the department are

17    housekeeping in nature.  If this was the '11 proposal, we had

18    just come out of the 2010 elections, and as you go through an

19    election cycle you find things that don't work as well, or need

20    to be cleaned up, or you have archaic language in the code that

21    needs to be either deleted, or revised, and generally speaking

22    that's what the department's legislative proposals would

23    consist of, housekeeping issues.

24         Q.    You say generally speaking, the department has also

25    proposal changes to the election law when it felt it needed to;

LISA C. SNYDER, COURT REPORTER

1   correct?

2       A.   There have been occasions.

3       Q.   Going into 2011, did your department believe that

4   addressing problems with voting fraud in Florida was an issue

5   that should be in this proposal?

6       A.   I don't believe it was in the proposal.

7       Q.   Did DOS, going into the 2011 session, believe that

8   voter fraud was a problem in Florida that needed to be a

9   addressed with new legislation?

10      A.   It wasn't in our proposal.

11      Q.   So, is that a no, you didn't believe it was an issue

12  that needed to be addressed by new legislation?

13      A.   It wasn't an issue that rose to the level to place it

14  in our package.

15      Q.   That would certainly be the case just specifically

16  with respect to voting fraud arising from the activities of

17  third-party voter registration organizations; that wasn't in

18  your proposal?

19      A.   I don't recall that it was in the proposal.

20      Q.   Was that something you were discussing when you were

21  putting the proposal together as something that was a problem?

22  Did you perceive that to be a problem?

23      A.   I don't recall that as an issue of discussion.

24      Q.   Did you perceive the length of time for early voting

25  to be a problem that needed to be addressed by new legislation

LISA C. SNYDER, COURT REPORTER

A6791

1   in 2011?

2       A.   I don't believe we discussed the early voting length

3   of time.

4       Q.   Same with the issue of voters moving and attempting

5   to change their address on election day.  That wasn't something

6   you thought needed to be addressed with new legislation; was

7   it?

8       A.   No.

9       Q.   Same with the constitutional initiative petition and

10  shortening the shelf life of signatures.  That wasn't something

11  you thought needed to be addressed either; did you?

12      A.   No.

13      Q.   With respect to fraud, it wasn't something that was

14  in your proposal.  In fact, were you not on record around this

15  time as saying that the Florida electronic voter registration

16  system had virtually eliminated fraud?  Do you remember using

17  those words?

18      A.   I don't remember that.

19      Q.   Let me see if I can refresh your recollection.  I am

20  showing you what we will mark as Exhibit 129.  (Document shown

21  to witness)

22           Mr. Secretary, I am showing what we have marked

23  as Exhibit 129.  I will represent to you this a Tampa Bay Times

24  article that we got of the internet.  Do you recall this

25  article?

---

LISA C. SNYDER, COURT REPORTER

```
 1        A.    No.

 2        Q.    Okay.  If I could call your attention to the second

 3   page, about three paragraphs from the bottom there is a quote

 4   that's highlighted, it says, "Secretary of State Kurt Browning,

 5   who has served under two Republican Governors, has repeatedly

 6   said Florida's state-of-the-art electronic voter database that

 7   requires a four digit unique numerical match for every voter

 8   has virtually eliminated fraud".  Did I read that correctly?

 9        A.    That's correct.

10        Q.    Did you, in fact, make that statement?

11        A.    I do not recall making that statement.

12        Q.    Do you have any reason, as you sit here, to believe

13   you are just being misquoted there?

14        A.    Yes.

15        Q.    Really?  Why is that?

16        A.    Probably taken in the context that I would have even

17   come close to saying that, is implying that the Florida Voter

18   Registration System has moved Florida down the road of

19   eliminating or preventing fraud.  I do not believe that just

20   because we have a Florida Voter Registration System that it

21   virtually eliminates, or has virtually eliminated fraud.

22        Q.    How would you change that statement to make it more

23   accurate in your view?

24        A.    I would say that the Florida Voter Registration

25   database, or Voter Registration System has moved us further
```

LISA C. SNYDER, COURT REPORTER

1   down the road of detecting fraudulent voter registrations.

2        Q.   Would you agree it's a robust system for detecting

3   such fraudulent registration?

4        A.   It's not as robust as I think that it could be.   I

5   will leave it at that.

6        Q.   How could it be changed to make it better?  Very

7   briefly.

8        A.   I don't have specifics with me today on how it can.

9   I do know that with the current voter registration system,

10  using the voter verification component, I think goes a long way

11  to ensuring that folks are not registering twice, or three

12  times.  We did not have that prior to the Florida Voters

13  Registration System, much less the voter verification law in

14  2006, seven, eight.

15       Q.   All right.  Are there any types of voter fraud that

16  the Florida Voter Registration System, and the other law

17  changes that you were just kind enough to mention, do not

18  address at all?

19       A.   Regarding the voter registration side, only not the

20  voting side?

21       Q.   Voter registration side.  Let's start with that.

22       A.   The system is only as good as the information that's

23  given to us.  Florida requires the last four digits of the

24  social security number, which we use with Highway Safety, and

25  we want to make sure, or ensure, that those folks that are

LISA C. SNYDER, COURT REPORTER

1  registering, are, in fact, registering and registering one

2  time.  Prior to this, we did not have those tools to do that

3  with.

4       Q.    Now you have that tool?

5       A.    That tool is there.

6       Q.    With that tool in place, does it have any weakness

7  other than the information that's being fed into it?

8       A.    I think that is the weakness.

9       Q.    Okay.  Does it have any other weaknesses that you can

10  think of?

11       A.    I am not prepared, I don't think, to address that.  I

12  mean, I don't know technically what can, or lawfully could be

13  done to improve the accuracy of that voter registration system.

14       Q.    Would it be fair to say, and I am really just trying

15  to understand, would it be fair to say that you are not

16  comfortable with the statement of virtually eliminating fraud

17  because the data that could be put into the system could be

18  manipulated in some way, and that's why you are not comfortable

19  with that statement?

20       A.    Well, the data is not going to be manipulated within

21  the Florida Voter Registration System.

22       Q.    But it could be wrong going in, is that your concern?

23       A.    It could be.

24       Q.    And, then perhaps your other concerns are there may

25  be technical issues with it that you are not prepared to

LISA C. SNYDER, COURT REPORTER

 1  address today?  I am trying to understand.

 2      A.    Yes.

 3      Q.    Going back to the legislative proposal that was

 4  Exhibit 36, it's fair to say that none of the four sets of

 5  voting changes were in your proposal to the legislature at that

 6  time; is that right?

 7      A.    That's correct.

 8      Q.    Is it also correct that none of the four changes came

 9  from the FSASE?

10      A.    I can't answer that, because I wasn't the Secretary

11  then.

12      Q.    I understand.

13      A.    And, I don't recall what their legislative proposal

14  was.

15      Q.    Fair enough.  As you sit here, do you recall any

16  supervisor of elections saying that these four changes were

17  needed to address issues with Florida election law?

18      A.    I don't recall.

19      Q.    Are you aware of the FSASE having concerns with

20  respect to the four changes?

21      A.    I don't recall.

22      Q.    I will show you what's been previously marked as

23  Exhibit 1, which is a communication from the FSASE, concerning

24  SB2086, which I understand to be the Senate equivalent of

25  HB1355.  Do you recognize this document?

LISA C. SNYDER, COURT REPORTER

1          A.    I have never seen it.

2          Q.    As you sit here, you are not aware of the FSASE

3    having concerns with HB1355 and the four sets of changes?

4          A.    I was not made aware of their concerns in writing.

5          Q.    Were you made aware of their concerns in any other

6    way?

7          A.    There were probably phone calls that either staff had

8    received, or in casual conversation with other supervisors they

9    may have voiced their displeasure with the provisions in 1355.

10         Q.    Did you have such conversations yourself with

11   supervisors about their displeasure with 1355?

12         A.    I am pretty sure that this came up in conversations

13   that I had with supervisors.

14         Q.    Okay.  Do you recall any of those conversations

15   specifically?

16         A.    I do not specifically.

17         Q.    Do you recall that, as is indicated in this document,

18   that supervisor of elections and the FSASE were against

19   shortening the early voting period?

20         A.    I am sorry.  Your question again.

21         Q.    Do you recall in your conversations with supervisors

22   that supervisors of elections were against shortening the early

23   voting period?

24         A.    There were some that had indicated their concern

25   about a shortened early voting period.

---

LISA C. SNYDER, COURT REPORTER

1      Q.   Did you believe those concerns were ill founded?

2      A.   As a former supervisor, I did not subscribe to their

3  point of view.

4      Q.   Why not?

5      A.   I had been a supervisor, I know about early voting.

6           The current proposal under 1355 provided those

7  counties the maximum number of 96 hours of early voting, as did

8  the old proposal, under a lengthened period of time.  And,

9  certainly as the State's chief election official I wanted to

10  listen to what the supervisors had to say, although I had no

11  input as to what was going to happen to that proposal.  But,

12  certainly my style is to certainly listen to my stakeholders

13  out there, and my stakeholders are the supervisors.

14     Q.   But making that change wasn't something that your

15  department believed was such a problem that it should be part

16  of legislation when you proposed to the legislature?

17     A.   We did not make that recommendation to the

18  legislature.

19     Q.   Did you do anything as Florida's Chief Election

20  Officer to address the concerns the FSASE had with respect to

21  early voting?  Did you suggest any changes to the bill?

22     A.   I did eventually.

23     Q.   Could you describe those for us?

24     A.   Yes.  How far back do you want me to go?

25     Q.   Sure.  You testified that you made suggestions for

LISA C. SNYDER, COURT REPORTER

1  changes at one point.  Can you just describe that process for

2  us?

3      A.   I don't know if it was 1355 or 2086, I don't remember

4  which one.  I think it was 2086, because I was dealing with the

5  Senate, is that when the early voting proposal came out it was

6  more restrictive than what 1355 provides for.  I had gone to

7  the Governor's office, my Deputy Chief of Staff who is not my

8  Deputy Chief, but the Deputy Chief in the Governor's office,

9  who the Department of State coordinates activities with, or

10  that's their point of contact with the Governor's office.  I

11  went to the Governor's chief of staff, and asked specifically

12  to engage on the early voting piece.  I don't recall exactly

13  what 2086 provided for, but it was a more truncated period of

14  time, I believe it was shortening hours, than where 1355

15  eventually ended up.  At that point, they allowed me to be

16  engaged, and that's when I started having some discussions with

17  some key members of the Senate letting them know from my

18  experience as a former supervisor what that truncated early

19  voting period might cause.

20      Q.   What did you tell them it might cause?

21      A.   Well, I kind of used the 2008 election as a

22  benchmark.  We had, I believe it was like a little over

23  eight million people cast ballots in Florida in 2008 general,

24  of that, roughly half of those were cast by absentee and early

25  voting.  They were pretty evenly split, if I recall correctly.

LISA C. SNYDER, COURT REPORTER

1   I always looked at early voting as a safety valve or pressure

2   valve on election day.  Every voter that doesn't cast a ballot

3   prior to election day-- let me back-up.

4                Every voter that cast a ballot prior to election

5   day is going to relieve the pressure on election day

6   operations, and election day operations consist of a 12 hour

7   day, 7 A, 7 P.  The more voters you run through a polling place

8   on any given day you tend to have issues because it's a one day

9   activity.  So then we were looking, if it's all right to use

10  the term truncating early voting, and that means the 2086

11  version, the initial version.  In my former life, as a

12  supervisor, I saw that if we had that truncated provision in

13  place for let's say 2008, I think the opportunity for issues

14  would have been heightened.

15       Q.    So you believe the period was too truncated to be

16  workable under the Senate version, would that be fair to say?

17       A.    Yes.

18       Q.    That's because too many people would be fed through

19  the system in too few hours, if you use 2008 as a benchmark?

20       A.    Yes.

21       Q.    Who on the Senate staff did you speak to?

22       A.    I don't recall talking to staff.

23       Q.    Okay.  Which senators did you speak to?

24       A.    I talked to senator Gaetz.  I talked to Senator

25  Thrasher.  And I talked to Senator Diaz de la Portilla.

LISA C. SNYDER, COURT REPORTER

A6800

1   Q. Did any of those senators tell you who was pushing

2 that this change be made to early voting?

3   A. No.

4   Q. Is that something you asked?

5   A. No.

6   Q. Did you ever ask, in any of these conversations,

7 what's going on with this?  Why are you trying to do this?

8 Early voting works just fine.

9   A. No.

10   Q. Why not?

11   A. Well, at that point you have a legislative proposal

12 and the clock is ticking.  To me, it's immaterial who is

13 proposing it.  There is language out there, regardless of where

14 it came from, that is being considered by the whole body.  And,

15 my focus was how do we get that language crafted or fashioned

16 in such a way so it doesn't adversely impact the election

17 process for any given election cycle.

18   Q. Did it surprise you that these Republican senators

19 were so interested in shortening the early voting period?

20   A. No.

21   Q. Did they explain to you their reasons for doing it?

22   A. No.

23   Q. It never came up in conversation what the purpose of

24 the bill was?

25   A. No.

LISA C. SNYDER, COURT REPORTER

1    Q.   So in terms of discussing how you were going to have

2    input, the subject of what they were trying to accomplish just

3    didn't come up?

4    A.   When I went to the senators-- I go from the reference

5    point of my past experience.  If you use this set of criteria,

6    or rules, to conduct early voting, in my professional opinion,

7    these are some of the potential issues that we are going to

8    have.  That's the position I have always taken, when I have

9    dealt with the legislature.

10                 At that point, they were, not collectively but

11   individually, willing to listen, and I think when the

12   supervisors also started chiming in on it, they started pushing

13   away from that truncated 2086 position, and started moving more

14   towards the position that's in 1355 today.

15   Q.   What was Senator Gaetz's reaction to your

16   recommendations?  What did he say?

17   A.   I don't recall the conversation specifically.

18   Q.   What about Senator Thrasher?

19   A.   I don't recall the conversation specifically.

20   Q.   And, Senator Diaz de la Portilla, same thing?

21   A.   Same thing.

22   Q.   I want to make sure I understand.  Is it your

23   testimony that you just made a presentation, they listened, and

24   then shook your hand and that was it, or was there any kind of

25   give and take?

LISA C. SNYDER, COURT REPORTER

1    A.   Any time a Secretary goes in to talk to a member of
2  the legislature, particularly on an individual meeting, there
3  is certainly give and take, using your terminology.  There was
4  a discussion.  I don't remember specifically what questions
5  were asked, or what the conversation was, other than in general
6  terms, is that I was there to advocate for them to look at
7  moving off of the position that was on paper, in the proposed
8  legislation.

9    Q.   Did they attempt to defend the position that was on
10  paper in the proposed legislation at all, in a way that let you
11  know where they were coming from?

12    A.   I don't recall them doing that.

13    Q.   When you met with Senator Gaetz was anyone else in
14  the room?

15    A.   I believe Pierce Schuessler, my Legislative Affairs
16  Director, was in the room with me, and I believe that Senator
17  Gaetz's aid was in there.  I don't recall his name.

18    Q.   Did Senator Gaetz's aid give you any indication of
19  what the Senate's intent was with respect to this change?

20    A.   No.

21    Q.   When you met with Senator Thrasher was anybody else
22  in the room?

23    A.   Pierce Schuessler, my Legislative Affairs Director,
24  and I believe that was it.

25    Q.   How about when you met with Senator Diaz de la

LISA C. SNYDER, COURT REPORTER

A6803

1   Portilla?

2       A.   Pierce Schuessler, my Legislative Affairs Director,

3   and I believe that was the only person with me.

4       Q.   Were those the only members of the legislature that

5   you met with on this topic?

6       A.   Best I can recall.

7       Q.   Did you meet with any members of the House?

8       A.   I don't recall any meeting.  I don't recall any

9   meetings with members of the House.

10      Q.   What was the reaction of the three senators that you

11  meet with to your proposal?

12      A.   Open.  They were open to listening to my experience

13  and potential impacts of a truncated early voting period.

14      Q.   So I am clear, in what way were you recommending that

15  the early voting period in the Senate bill be adjusted to

16  reflect your concerns?

17      A.   I don't think that I gave specific, at that time,

18  specific proposals, but that they really needed to look at

19  expanding the period of early voting from what was in 2086.

20  And, as the process works, there were discussions and eventual

21  proposals were being floated out dealing with the hours on

22  early voting.

23      Q.   So it's fair to say that you thought the Senate

24  proposal was too truncated an early voting period; correct?

25      A.   That's correct.

---

LISA C. SNYDER, COURT REPORTER

1      Q.   I will represent to you that there has been evidence

2   in this case that Senator Diaz de la Portilla was the source of

3   the early voting change.  Have you ever heard that prior to

4   today?

5      A.   I don't recall.

6      Q.   Okay.  In your conversation with Senator Diaz de la

7   Portilla did that come up, that he was the source of it?

8      A.   I don't recall.  Other than the fact that he was the

9   bill sponsor.  I believe he was the bill sponsor.

10     Q.   So what he was trying to accomplish by that, in your

11  view, too truncated an early voting period, didn't come up; why

12  he thought that was appropriate to truncate it to that degree?

13     A.   I don't recall that conversation.

14     Q.   Did you have any conversations with legislators about

15  any of the other of the four sets of voting changes?

16     A.   Not to my knowledge.

17     Q.   So, no communications about the third party voter

18  registration change?

19     A.   In 2086 or--

20     Q.   Or in HB1355, either one?

21     A.   The early voting piece was the one that was causing

22  me the most concern.  I don't recall having the same types of

23  meetings with other members of either the House or the Senate

24  regarding those other three changes.

25     Q.   Again as you sit here, you can't shed any light on

LISA C. SNYDER, COURT REPORTER

1    where those other three sets of changes came from?

2        A.   No, sir.

3        Q.   Did anybody on your staff say to you that they

4    thought these other three changes were not a good idea, not

5    worth doing, was there any discussion about that?

6        A.   I don't recall any of those conversations with my

7    staff.

8        Q.   Might have happened, you just don't remember?

9        A.   I don't recall them happening.

10       Q.   Certainly nothing came up when HB1355, and the Senate

11   version, were under consideration that lead you to decide that

12   these four sets of changes were a good idea that your

13   department should get behind; did it?

14       A.   No.

15       Q.   In fact, you didn't publically support any of these

16   changes prior to passage?

17       A.   Not publically, no.

18       Q.   Did you support any of them privately?

19       A.   No.

20       Q.   Is there a reason for that?

21       A.   Well, as an agency head, that works for the Governor,

22   we were asked not to engage in the process without having

23   discussions with the Governor's office.  Not just on elections

24   issues, but on all issues, and that's what I did.  That's the

25   reason I went to the Deputy Chief of Staff in the Governor's

LISA C. SNYDER, COURT REPORTER

1  office and asked to engage on the early voting piece.

2       Q.   Who was that deputy chief that you asked to engage?

3       A.   Jenn Ungru.

4       Q.   What was Ms. Ungru's reaction to your request?

5       A.   After I made the argument about why I felt it

6  necessary to engage, she said, I believe, if I recall

7  correctly, that she would get back with me, and she did, and

8  she allowed me to go start the work.

9       Q.   Do you know what the Governor's position on this bill

10 was?

11      A.   I do not.

12      Q.   Had you ever discussed making voting changes like

13 this with the Governor prior to the bill being proposed?

14      A.   No.

15      Q.   What was Ms. Ungru's reaction to your making known to

16 her that you wanted to become involved?

17      A.   Certainly she wanted, I think as anyone would, they

18 wanted to make sure that they understood why I was wanting it

19 to move in that direction, and to advocate to the legislature,

20 and I think they yielded to my past professional life as a

21 supervisor.  That's where I was coming from when I went to

22 speak with Jenn Ungru, as well as the senators.  Certainly not

23 as the Secretary, but because as a supervisor, I knew firsthand

24 what the impact would be with the truncated 2086 version.  As

25 the State's chief election official, I saw in 2008, what might

```
 1   have happened had we had a truncated 2086 version during that
 2   election.
 3        Q.   That was the primary reason you think why they
 4   allowed you to advocate?
 5        A.   Yes.
 6        Q.   Did you discuss with her any of the other sets of
 7   changes?
 8        A.   No.
 9        Q.   I have heard it said in prior depositions that the
10   Department of State is a Governor's agency.
11        A.   Yes.
12        Q.   What does that mean?
13        A.   It means the Governor makes the appointment of the
14   Secretary.
15        Q.   So you serve at his pleasure, or her pleasure?
16        A.   That is correct.
17        Q.   So does that mean your department doesn't take
18   positions that the Governor hasn't taken first, or hasn't
19   instructed you to take?
20        A.   I think on major issues, major policy issues, that
21   would be correct, thus my visit to the deputy chief before I
22   went to the Senate to speak with the three senators about the
23   early voting provisions.
24        Q.   And, prior to your going to the deputy chief, were
25   you aware of any position the Governor's office had taken with
```

LISA C. SNYDER, COURT REPORTER

1  respect to election law changes?

2      A.   I don't recall.

3      Q.   In putting together the legislative proposal for 2011

4  was there interaction with the Governor's staff about that?

5      A.   Well, the 2011 proposal was probably put together in

6  my absence in that period of time that I was-- I am sorry.

7  Yes.  No.  I am sorry.  No.  That one was mine.  That one was

8  mine, because I was here during the legislative session in--

9  let me get my time straight.  I left in '10.  The proposal for

10 the 2011 session, which I was here for the session, was

11 probably, in all likelihood, put together in my absence over

12 the summer that I was gone.

13     Q.   So, you can't say whether there was any interaction?

14     A.   That's my point, yes.

15     Q.   During the legislative process there has been

16 testimony, I will represent to you, about various meetings that

17 occurred, and one thing we have heard is that in March of 2011

18 there was a meeting you had with the House reapportionment

19 staff.  Do you recall that meeting?

20     A.   Yes.

21     Q.   Why did you have such a meeting with the

22 reapportionment staff?

23     A.   They had set-up a meeting to discuss possible

24 reporting requirements that were going to be placed on

25 supervisor of elections, as it related to statistical data that

LISA C. SNYDER, COURT REPORTER

```
 1   the House and Senate would be using for redistricting purposes.
 2        Q.   Was that all that was discussed at the meeting?
 3        A.   To my knowledge.
 4        Q.   Who was present at the meeting?
 5        A.   I don't recall every one that was present.
 6        Q.   Was Mr. Schuessler present?
 7        A.   Yes.
 8        Q.   Was Jennifer Kennedy present?
 9        A.   Yes.
10        Q.   Was a House staffer named Alex Kelly present?
11        A.   I don't recall.
12        Q.   How about Jason Peradda?
13        A.   I don't recall.
14        Q.   And, a House committee staffer named Judy McDonald?
15        A.   Yes.
16        Q.   Do you recall whether, for example, the third party
17   voter registration change was discussed at that meeting?
18        A.   I don't recall.
19        Q.   Okay.  If I represent to you that there has been
20   testimony in that direction, would that help you?
21        A.   I don't recall having that discussion in that
22   meeting.  To the best of my recollection, that meeting was
23   about the statistical data that would be collected by
24   supervisors to aid the House and Senate in their redistricting.
25        Q.   How about the moving voters change?  Do you recall
```

LISA C. SNYDER, COURT REPORTER

1    that being discussed?

2        A.    No, sir.

3        Q.    Did you have any other meetings with House staff in

4    2011?

5        A.    None that I recall.

6        Q.    Did you have any other meetings with House members in

7    which the subject of the four sets of voting changes came up?

8        A.    None that I recall.

9        Q.    I am going to show you what's been previously marked

10   as Exhibit 68.  (Document shown to witness)

11             Mr. Secretary, I am showing you what's been

12   marked Exhibit 68.  Now this document I don't believe was ever

13   sent to you.  It doesn't appear as if you were an addressee,

14   but I wanted to see if I could ask you couple of questions

15   about it.

16             Who is Glenn Kirkland?  Do you know who that is?

17       A.    Other than Deputy Staff Director of the House

18   Majority Office, according to the email.

19       Q.    You have never spoken or worked with Mr. Kirkland?

20       A.    I may have spoken to him, but knowingly having worked

21   with him, no.

22       Q.    And Judy McDonald we already established is a House

23   staffer that you have met with?

24       A.    Yes.  I have known Judy for a number of years.

25       Q.    Who is Alex Kelly?

---

LISA C. SNYDER, COURT REPORTER

1    A.   I do not know.

2    Q.   Jason Peradda you don't know?

3    A.   No.

4    Q.   Sam Vergeez, do you know him?

5    A.   No.

6    Q.   Kirk Pepper?

7    A.   No.

8    Q.   I want to call your attention to a couple of comments

9    here.  Mr. Kirkland writes, "attached is a summary of comments

10   on the PCS as well as requested SOE provisions".  Do you know

11   what that refers to?

12   A.   No.

13   Q.   In another paragraph it says, "at this point I am

14   still somewhat out of the loop as to the requested DOS, but I

15   believe they have been working with Judy directly so she has a

16   record of their requests".  Do you know what that refers to?

17   A.   No, sir.

18   Q.   Was DOS making any requests with respect to HB1355 at

19   this juncture in the legislative process?

20   A.   I am sure we had requested from committee staff for

21   information.  I don't know what that information would have

22   been.  According to the date on this email, this would have

23   been midway through the legislative session, so I don't know

24   specifically that they were referring to.

25   Q.   who would have been working with the staff to provide

LISA C. SNYDER, COURT REPORTER

A6812

```
 1    such information?
 2        A.    Probably Pierce Schuessler, my Legislative Affairs
 3    Director.
 4        Q.    Would anybody else have been involved in that process
 5    to your knowledge?
 6        A.    (No audible response)
 7        Q.    That's a no?  You shook your head.
 8        A.    I'm sorry.
 9        Q.    That's all right.  I may not have given you this
10    instruction.  It's important that you give verbal responses to
11    my questions.  It makes it easier for the reporter.
12              If you could turn to the second page of this
13    document, it begins discussing some of the SOE concerns.  My
14    first question is, do you know who Andy Palmer is?
15        A.    Yes.
16        Q.    Who is he?
17        A.    Former, I believe, former Executive Director of the
18    Republican Party of Florida.
19        Q.    Who is Bucky Mitchell?
20        A.    Bucky is an attorney here in town.  Was with the
21    House staff prior to that.
22        Q.    Is he an attorney for the Republican Party of
23    Florida?
24        A.    I believe he is an attorney.  I believe Bucky is an
25    attorney, yes.
```

LISA C. SNYDER, COURT REPORTER

1        Q.    For the Republican Party of Florida?

2        A.    I don't know if it's for the Republican Party of

3   Florida.

4        Q.    Who is Frank Terraferma?

5        A.    I know Frank.  I don't know specifically what he

6   does.

7        Q.    If I said to you he was Republican Party of Florida's

8   Director of House Campaigns, would that sound right?

9        A.    Yes.

10       Q.    Why are these three individuals, to the extent you

11   know, reporting what the supervisors of elections concerns are?

12       A.    I do not know.

13       Q.    Do you know-- there is a reference to a person here,

14   if you look at the sections, the author of the document has a

15   section, and then it appears they have comments from those

16   three people, and there is a comment from BM, which is Bucky

17   Mitchell, according to the document, it says, "concerns are

18   legitimate and I don't think the language adds anything

19   substantive.  I believe Joel is the source on this one".  Do

20   you know who Joel would be in this context?

21       A.    I do not.

22       Q.    Is Joel Springer a person who might have been

23   involved in it?

24       A.    I do not know.

25       Q.    Do you know who Joel Springer is?

LISA C. SNYDER, COURT REPORTER

```
1        A.    No.

2        Q.    It's not a name you have ever heard before?

3        A.    I can't recall that name.

4        Q.    Do you know with respect to the third party voter

5   registration issue, which is section four, there is a comment

6   that, "SOEs do not like changes in the current process", that's

7   the last sentence of section four.  Do you know why that is?

8   Why they didn't like the changes that were proposed by HB1355?

9        A.    Not specifically, no, sir.

10       Q.    Do you know generally why SOEs were opposed to that?

11       A.    No.

12       Q.    Have you ever heard that prior to reading this

13  document that SOEs were opposed to the third party voter

14  registration change?

15       A.    I don't know.

16       Q.    Okay.  If you look at, let's see, I guess it would be

17  the fourth page of this document, there is a section, section

18  21 at the top.  Is section 21, to your knowledge the provision

19  in HB1355 concerning voters moving and changing their address

20  on election day, do you recall that?

21       A.    I don't recall that was the section.

22       Q.    Okay.  Well, I will represent to you that it is, and

23  in this document it says SOEs very opposed.  Do you recall the

24  SOEs being very opposed to that change?

25       A.    I didn't have any direct discussion with supervisors
```

1  about them being very opposed to that change.

2      Q.    That just wasn't something you heard about in this
3  process.

4              RPOF states that AP says "section 21 needs to
5  say, even if there aren't massive cases of fraud it is a
6  political nightmare where you can play havoc with voter turn
7  out universes if you can change thousands or even hundreds of
8  voter from one district to another on election day"; do you
9  know what that is referring to?

10      A.    This is the change of address provision, yes.  You
11  can go to your polling place on election day and change your
12  address, and under the old law you were allowed to vote a
13  regular ballot, and mark the ballot, and then put the ballot
14  through the scanner that's tabulated.  Under the provisions of
15  1355, you could still go to your polling place, when it's
16  determined that you are moving from out of county, then you are
17  required to vote a provisional ballot, which allows the
18  election official, after the fact, to verify you have not cast
19  a regular ballot in both your new county and your former
20  county.

21      Q.    Understood.  That's what the change accomplishes.  I
22  understand that.  Do you know who it was that was pushing that
23  this section had to stay, notwithstanding the objections of
24  supervisors of elections?

25      A.    I do not.

---

LISA C. SNYDER, COURT REPORTER

1        Q.    Isn't it true that the process under the old law
2    where moving inter-county voters could just cast a regular
3    ballot had been in place for about 40 years?
4        A.    I don't remember the number of years, but it had been
5    a lengthy period of time.
6        Q.    There was no sense, was there, that there was
7    widespread fraud on account of that provision?
8        A.    Not to my knowledge.
9        Q.    There was a mechanism by which, even if it was after
10   the election, you could detect that kind of double voting;
11   wasn't there?
12       A.    In most cases.
13       Q.    You don't know why someone would write that
14   supervisor of elections were very opposed to this change; did
15   you?
16       A.    No.  I didn't see it.
17       Q.    There also seems to be a comment from Mr. Mitchell
18   here, "this is an issue that Joel really wanted to retain".
19   Again, you don't know who Joel is?
20       A.    No.
21       Q.    He says, "I would suggest we try to come up with at
22   least some anecdotal evidence that there was an abuse or double
23   voting".  Do you know why Mr. Mitchell would say that?
24       A.    No.
25       Q.    Do you know of any anecdotal evidence of that kind of

                    LISA C. SNYDER, COURT REPORTER

1    abuse or double voting?  I guess not?

2        A.    No.

3        Q.    Let me show you very quickly Exhibit 69 in this case.

4    Keep that in front of you.  We may use them again.  Take a look

5    at Exhibit 69.  (Document shown to witness)

6              I recognize this isn't a document you created,

7    but according to this, this seems to suggest that-- I am sorry.

8    I will represent to you this was produced by Senator Thrasher's

9    office.  I believe you testified earlier that you did have a

10   conversation with Senator Thrasher; is that right?

11       A.    Yes.

12       Q.    Does this refresh your recollection at all of what

13   the time period for that meeting was?

14       A.    Other than it says April 11.

15       Q.    But you don't have a specific recollection of that?

16       A.    No.

17       Q.    Did you have one meet with Senator Thrasher, or more

18   than one?

19       A.    I recall two meeting with Senator Thrasher; one was

20   regarding 2086, and the other was dealing with a non-elections

21   issue regarding business filings.  The Department of State has

22   the Division of Incorporations, and there was an issue with

23   business filings that we discussed.

24       Q.    One meeting about elections issue?

25       A.    As I recall.

                    LISA C. SNYDER, COURT REPORTER

1    Q.   Let me show you what's been previously marked as

2  Exhibit 72.  (Document shown to witness)

3              Who is Jonathan Fox?

4    A.   He is the staff attorney for Senate Ethics and

5  Elections subcommittee.

6    Q.   Dawn Roberts you already testified you knew.  What

7  position did she hold as of April 14, 2011?

8    A.   She was the staff director for the-- I can't recall

9  what committee it is.  She is a staff director of the Senate.

10   Q.   I want to call your attention to one sentence in

11  this.  It's titled 2086 talking points, and about four lines

12  down there is a sentence that says, "you might also wish to

13  consider suggesting that Eric tap his other sources who drafted

14  some of the more controversial language to review the draft if

15  he hasn't already.  He will likely get a more thorough analysis

16  with better spin right now", and then there is a smiley face.

17   A.   Can you show me where that is?

18   Q.   Absolutely.  I am going to mark the exhibit, even

19  though it's bad form.

20            My apologies.  Four lines down.  April 14.

21  Jonathan Fox.  That's where it beginnings, "you might also wish

22  to consider suggesting that Eric tap his other sources".  Do

23  you know who the Eric is he is referring to?

24   A.   I do not.

25   Q.   Based on your knowledge of who people were in this

LISA C. SNYDER, COURT REPORTER

A6819

1  process, can you give me an estimate of who Eric might be?

2       A.   I don't have have a clue.

3       Q.   When it says, "Eric tap his sources who drafted some

4  of the more controversial language", do you know who drafted

5  some of the more controversial language in 2086?

6       A.   I do not.

7       Q.   Thank you, sir.

8            I believe you testified that you had a meeting

9  with Senator Diaz de la Portilla about the early voting change;

10  correct?

11      A.   Yes.

12      Q.   So the record is clear, you believed Senator Diaz de

13  la Portilla's initial proposal in SB2086 was too truncated a

14  period; right?

15      A.   That is correct.

16      Q.   Did you believe it was just too short a time period

17  for general elections; right?

18      A.   Yes.

19      Q.   And, is it fair that you thought that the Senate's

20  justifications for the early voting change weren't well

21  founded?  I will represent to you there has been some testimony

22  in that regard.

23      A.   I don't recall even thinking it was unfounded.

24  Again, my point of reference has always been if the proposal is

25  any bill, to me it's immaterial how we got there.  It's what we

LISA C. SNYDER, COURT REPORTER

1  need to do to fix it.

2      Q.    I understand.  You thought there was something that

3  needed to be fixed, at least in his initial proposal?

4      A.    That is correct.

5      Q.    Did you have any conversations with a Senator Gaetz,

6  G-a-e-t-z?

7      A.    Yes.

8      Q.    Did you have any conversations with him about this

9  change?

10     A.    Yes.

11     Q.    All right.  Can you describe that conversation?

12     A.    I had a meeting with Senator Gaetz.  I am trying to

13 remember what position he would have held that would have

14 warranted me going to Senator Gaetz.  But, yes, I did go to

15 Senator Gaetz and discuss with him my concerns with the 2086

16 early voting proposal.

17     Q.    What were his reactions to your concerns?

18     A.    He was open to having discussions.

19     Q.    Did he tell you at any time what he understood the

20 justification for this change to be?

21     A.    I don't recall.

22     Q.    That subject didn't come up?

23     A.    I don't recall.

24     Q.    It may have, but when you say, I don't recall, I am

25 trying to understand does that mean it may have come up, and

LISA C. SNYDER, COURT REPORTER

1   you don't remember, or you don't recall him saying that?  If

2   you see the difference.

3        A.   I don't recall having that discussion with him.

4        Q.   I am going to mark as Exhibit 130 a list that was

5   presented to us by your counsel, which I believe you testified

6   about already.  (Document shown to witness)

7             I'm showing you what's been previously marked as

8   Exhibit 130.  Do you recognize this?

9        A.   Yes.

10       Q.   How was this prepared?  I will back-up.  Did you

11  speak to counsel in terms of preparing this list?

12       A.   I spoke with counsel Saturday evening, last Saturday

13  evening.

14       Q.   Which counsel was that, Ms. Davis?

15       A.   Ms. Davis.

16       Q.   This is titled, "List of Kurt Browning's

17  communications", and then there is a number from one to 16.

18  Did you provide Ms. Davis with each of these entries?

19       A.   No.

20       Q.   Did she suggest to you that you had had these

21  communications and ask you to verify it?

22       A.   That is correct.

23       Q.   If you could take a look at the list, does the list

24  appear to be complete?

25       A.   As best I can tell, yes.

---

LISA C. SNYDER, COURT REPORTER

```
 1        Q.   Okay.  At least I don't see-- strike that.
 2             Let's go through them one by one.  Number one is
 3   a phone call, Tuesday, November 22, 2011, with Jackie Pons.
 4   Who is Jackie Pons?
 5        A.   Jackie Pons is the Superintendent of Schools, for
 6   Leon County.
 7        Q.   What did you discuss with Ms. Pons?
 8        A.   Mr. Pons.
 9        Q.   Mister.  I am sorry.
10        A.   That's all right.
11        Q.   What did you discuss with him?
12        A.   We were-- this was after 1355 had been signed into
13   law, and was the law, this was regarding the third-party voter
14   registration organizations, and there had been two instances
15   involving school teachers in Florida, and the Department wanted
16   to take a proactive stance with ensuring that the law was being
17   complied with, while at the same time minimizing the impact to
18   third-party voter registration organizations.
19        Q.   Is it fair to say that that third party voter
20   registration changed had swept up some school teachers at that
21   point, and your department was trying to address that issue?
22        A.   That's correct.
23        Q.   You came up with a program called the Voter Promoter
24   program?
25        A.   That's correct.
```

LISA C. SNYDER, COURT REPORTER

1        Q.   Why was that program not extended to other groups?

2   Like, for example, Boy Scout troops, or somebody else that does

3   voter registration?

4        A.   At this point our concern was the school teachers,

5   that are, as many of them are involved, high school teachers,

6   in registering students to vote.  It's a collective group of

7   folks that are actively, depending on the school district,

8   registering their high school students to vote.  So, we saw

9   that certainly as the first opportunity to do something to make

10  sure the law is being enforced, while at the same time

11  mitigating some of the liability that the third-party voter

12  registration organizations would assume.

13       Q.   All right.  Did you consider extending those

14  mitigations to other groups?

15       A.   Not at this point, we did not.

16       Q.   Did you consider it at any time?

17       A.   Not before the time that I left.

18       Q.   Has it been considered since you have left, to your

19  knowledge?

20       A.   I can't answer that.

21       Q.   Did you discuss anything else with Ms. Pons [sic]?

22  It's a 30 minute conversation.  During that conversation what

23  else did you discuss, if anything?

24       A.   We were talking with Superintendent Pons about the

25  program, of what we were proposing, and then we were also

LISA C. SNYDER, COURT REPORTER

1   discussing with him the opportunity to have a press event so

2   that we could get the word out that that's what we are doing,

3   working with a school district, and wanting to roll it out to

4   the other 66 school districts.  He was local.  He was open.

5   And, that's the reason we had the conversations with him.

6        Q.   So nothing else was discussed in that conversation?

7        A.   Not to my knowledge.

8        Q.   Number two, is a November 8, 2011 conversation with

9   Senator Montford.  Can you describe what occurred in that

10  conversation?

11       A.   That was a meeting that we had with Senator Montford

12  to discuss the Voter Promoter program.  Senator Montford is a

13  former school superintendent for Leon County.  He is also the

14  current State Senator for Leon County.  And, he also currently

15  represents the Florida Association of District School

16  Superintendents.  So, my Legislative Affairs Director, Pierce

17  Schuessler and I scheduled a meeting with him to discuss this

18  proposal, this program, trying to gain access to the

19  superintendents.

20       Q.   Number three, this is a meeting Wednesday, 4-27-2011,

21  with Senator Diaz de la Portilla.  Can you describe what

22  occurred in that meeting?

23       A.   I believe, if I recall correctly, that is the meeting

24  that I had with Senator Diaz de la Portilla regarding the

25  changes to 2086.

LISA C. SNYDER, COURT REPORTER

1          Q.    Did the information for this list, did this come from

2     your records or something that Ms. Davis had?

3          A.    I don't know.

4          Q.    Okay.  Did she, in the give and take that created

5     this list, did she ask you to verify these dates, or that this

6     meeting or conversation occurred?

7          A.    We didn't deal with specific dates and times.  I made

8     an assumption that my former staff would have been accurate

9     with the dates and times, based on the records in the office.

10    What she had asked me to do was verify that I, in fact, had a

11    conversation with Senator Diaz de la Portilla.

12         Q.    Did she ask you if you had any other conversations

13    with the Senator, that aren't reflected on this page?

14         A.    Yes.

15         Q.    And you said no?

16         A.    That is correct.

17         Q.    So, number three, as best you can recall, is the one

18    meeting you have already testified about; is that right?

19         A.    Yes.

20         Q.    Number four is a 2-15-2012 meeting with

21    Representative Baxley?

22         A.    Yes.

23         Q.    Can you tell me what occurred at this meeting?

24         A.    This meeting was at his request.  This was the last

25    week-- this is the day before I left the Department as serving

                        LISA C. SNYDER, COURT REPORTER

1    as Secretary.  He had been approached by a CNN reporter.  They

2    were doing a piece on election law changes in Florida, and he

3    wanted to know if I would be willing to talk to the CNN

4    reporter regarding the specifics of 1355.

5         Q.   What did you say?

6         A.   I said I would be more than happy to talk to the

7    reporter.

8         Q.   Have you done so?

9         A.   I have not.

10        Q.   When is that meeting going to be had with the CNN

11   reporter?

12        A.   It's not scheduled yet, but I would imagine it would

13   be some time the first of next month.

14        Q.   Did you discuss what the CNN reporter's questions

15   were likely to be?

16        A.   Not specifically.

17        Q.   Was there anything other than just you being

18   available to discuss specifics?

19        A.   Yes.  We talked about-- he discussed with me how the

20   reporter-- how he had dealt with the reporter from CNN, that

21   reporter had gone to Ocala, his home, and spent time with him

22   there, and asked if I would be willing to talk about the

23   specifics of 1355 with the reporter.

24        Q.   And, did he tell you what he had told the reporter

25   about the specifics of 1355?

LISA C. SNYDER, COURT REPORTER

1    A.   He told me that his conversation with the reporter

2  was more on a personal level, as far as who the person, Dennis

3  Baxley is.  Spent some time in his home.  Spent some time with

4  him at his church.  But did not get into specifics about the

5  bill with me in our conversation.  He did not get into those

6  specifics with me.

7    Q.   As best you can recall that conversation was about 15

8  minutes?

9    A.   Yes.

10   Q.   Did the information about how long these meetings and

11 conversations were, did that come from Ms. Davis, or from you?

12   A.   It was probably off my calendar.  As is my practice,

13 I will block a period of time and often times the meetings may

14 be shorter, often the meetings may be longer, but it will be a

15 block time on the calendar.

16   Q.   All right.  Do you have any reason to believe any of

17 the time periods stated in this are inaccurate?  Any of them

18 strike you as being wrong?

19   A.   I can't recall.

20   Q.   Number five, is a meeting on 4-11-2011 with Senator

21 Thrasher, 15 minutes.  Is that, to the best of your

22 recollection, the meeting with Senator Thrasher that you

23 already testified about?

24   A.   Yes.

25   Q.   Number six, is a 3PVRO meeting, Thursday, 1-26-2012,

LISA C. SNYDER, COURT REPORTER

1  in SOS conference room.  What does that refer to?

2      A.   We had-- it was my practice, as Secretary, under 1355

3  supervisor of elections are required, they shall report to the

4  Secretary the names of individuals that may have violated the

5  third-party voter registration-- possible violation, meaning

6  they turned them in late, the applications in late, they didn't

7  turn them in at all, or they turned them in after book closing.

8  They are required to turn that into the Secretary.  The law

9  goes on further to say that the Secretary may refer to the

10  Attorney General.  What we did is any time those complaints

11  would come to the department, it was my practice to sit down

12  with my counsel and review each one individually, and make the

13  determination, and that's what that meeting was on-- the number

14  six meeting was about.

15      Q.   So this was about, this was a meeting in which you

16  were reviewing complaints concerning third-party voter

17  registration organizations?

18      A.   Yes.

19      Q.   Do you recall which one it was?

20      A.   I do not.

21      Q.   What was the outcome of the meeting?  Did you make

22  recommendations?

23      A.   I did make recommendations at each one of those

24  meetings.

25      Q.   What was the recommendations you made with respect to

```
 1   the meeting in number six?
 2        A.   I don't recall what complaints were before me that
 3   day.
 4        Q.   Do you recall how many complaints were before you
 5   that day?
 6        A.   I do not.
 7        Q.   Can you ballpark for me?  Was it more than five, less
 8   than ten?
 9        A.   I can't tell you that.
10        Q.   Would the same be true with respect to seven, eight,
11   and nine?
12        A.   That is correct.
13        Q.   Who else was present in these 3PVRO meetings?
14        A.   My attorney-- my General Counsel, Dan Nordby.
15   Usually Jennifer Kennedy, the Assistant Secretary.  That I know
16   for certain.  I don't recall anybody being in the meetings with
17   us.
18        Q.   Do you know the outcome of any of your
19   recommendations?  First, who were your recommendations made to
20   under the law?
21        A.   The Attorney General.  Attorney General Pam Bondy.
22        Q.   And do you know what the outcome was with respect to
23   whether the Attorney General took up any of your
24   recommendations and prosecuted any of these individuals, or is
25   in the process of doing it?
```

LISA C. SNYDER, COURT REPORTER

1      A.   I don't recall.

2      Q.   If I wanted to find out that information, what

3   records would I look to?  Would I have to get that from the

4   Attorney General, or is that something that the General

5   Counsel's office would have?

6      A.   General Counsel's office.

7      Q.   And just to close out the record on this; six, seven,

8   eight and nine are all 3PVRO meetings of that type, where

9   complaints were reviewed by you and your staff, and you made

10  recommendations as a result?

11     A.   Yes.

12     Q.   In any of these meetings, did you make a

13  recommendation to the Attorney General that it was not worth

14  pursuing?

15     A.   Well, the way the law is written, the only ones that

16  she would get are the ones that we believe are worth pursuing.

17  She is not notified of those that are not going to be pursued.

18     Q.   All right.

19     A.   Or referred.

20     Q.   Do you recall in any of these meetings then-- thank

21  you for the clarification not recommending.  You had a

22  complaint and you didn't recommend anything should be done with

23  respect to it.

24     A.   I am sorry your question was?

25     Q.   Sure.  Do you remember in any of these meetings that

1  with respect to any of the complaints you had you did not make
2  a recommendation that they pursued?

3      A.  Yes.

4      Q.  Do you recall roughly what the percentage was between
5  the complaints that you did make a recommendation and didn't?

6      A.  There were many more that were not referred than were
7  referred.

8      Q.  What were some of the reasons why you did not refer
9  on the basis of the complaints?

10     A.  Is it appropriate to go down to number 11?

11     Q.  Sure.

12     A.  Number 11 was the meeting that was held in early
13 November to the discuss the new initiative, and what we did is
14 we set criteria in the department so that we would be treating
15 each one of these, and I think it's okay to call it a
16 complaint-- this referral to me by the supervisor.  So we would
17 have a uniform set of criteria by which to judge or review
18 these referrals.  So, what we did is we looked at what were
19 some of the things we needed to look at in order to make a
20 sound recommendation to the Attorney General.  First off, my
21 goal and role was not to get anybody, or catch anybody, with a
22 third party.  One of the things we looked at was did they have
23 knowledge of the law and ignore the law.  Had they been a prior
24 violator, if you will, was another criteria.  And, so what we
25 would do is look at each one of these, and if they did not have

1    knowledge of the law, for the first instance, first time

2    offenders if you will, they were waived off.  I would send them

3    a letter, drafted by my counsel, letting them know it had been

4    referred to us.  We would restate the law to them.  We would

5    provide them a website, or information in the letter, where

6    they could get the information they needed to be in compliance

7    with the law.  We would offer staff assistance in the letter to

8    them, if they had any questions to call.  And, then we would

9    notify them that this closed the issue.  Now, what would happen

10   is, if they came back in with another violation, or another

11   referral, then generally speaking that would have been one of

12   the criteria that would have tripped it over, because they had

13   knowledge of the law, they had been told once before by the

14   Secretary what the law was, and then there was another

15   violation that had been filed with us.  In all likelihood, that

16   would have been referred to the Attorney General's office.

17        Q.   Do you recall the identities of any of the

18   organizations you referred to the Attorney General's office?

19        A.   No.

20        Q.   Do you recall the identities of any of the

21   organizations where there was a complaint, but you made no

22   referral?

23        A.   No.

24        Q.   Specifically, none of the organizations that were

25   under review in any of these meetings are something you

LISA C. SNYDER, COURT REPORTER

A6833

1   remember?

2       A.   Not specifically.  I don't remember the names.  I

3   mean, sometimes we had one or two, and other times we may have

4   had three or four or five that we were dealing with.

5       Q.   All right.  Number ten on this list is an email from

6   yourself to Senator Montford.  Do you recall the subject this--

7   it just says, thanks.  Is that all the email said?

8       A.   It's my practice to certainly send a quick email

9   thanking a member for allowing me to speak with them.

10      Q.   Do you remember what you spoke with the Senator

11  about?

12      A.   About the third party, or the Voter Promoter.  That

13  was on the 9th.  I met with him--

14      Q.   Yeah; number 12.

15      A.   It was that, and looking forward to hearing from him

16  about the possibility of addressing the Florida Association of

17  District School Superintendents at a meeting in December.

18      Q.   About Voter Promoter?

19      A.   Yes.

20      Q.   Does number 12 refer to a different meeting, or the

21  same one that's in number two?

22      A.   I think what happened was, it was the same meeting.

23  It's the same meeting.  It was moved around on the calendar

24  quite a bit, trying to accommodate his schedule.

25      Q.   Number 13, appears to be another 3PVRO meeting?

LISA C. SNYDER, COURT REPORTER

1    A.    Yes.

2    Q.    Same testimony with respect to what occurred at this

3    meeting?  You were reviewing complaints?

4    A.    Yes.

5    Q.    And, who was present in this meeting, to the extent

6    you recall?

7    A.    My General Counsel, Dan Nordby, and probably my

8    Assistant Secretary Jennifer Kennedy.

9          MR. FARR:  Getting closer, Dan.  There is still

10        tomorrow.

11   BY MR. FARR:

12   Q.    Did you make any specific recommendations from this

13   meeting?

14   A.    I'm confident that I did.

15   Q.    You don't recall?

16   A.    I do not recall.

17   Q.    Number four is an email from Ombudsman to Kurt

18   Browning.  Who is Ombudsman?

19   A.    We have a general email address that emails come

20   into, and we call it the Ombudsman.  And that's one of the

21   email to come through that Ombudsman email address to me.

22   Q.    And, it says voter registration legislation; do you

23   recall what this email said, or what it was about?

24   A.    I do not.

25   Q.    Did Ms. Davis show you the email?

LISA C. SNYDER, COURT REPORTER

A6835

1      A.    No.

2      Q.    Did you ask to see it?

3      A.    No.

4      Q.    Number 15, Jenn Ungru, some time at the beginning of

5  the 2011 general session in re: EV Amendment; do you know what

6  that refers to?

7      A.    Best of my recollection, that was when I had

8  approached the Governor's office regarding my ability to engage

9  on the early voting proposal.

10     Q.    So, you testified about that earlier?

11     A.    Yes.

12     Q.    That's the one-- okay.

13           Then Senator Gaetz, sometime at the beginning of

14  the 2011 general session.  We have talked about that meeting.

15  Is that the same one?

16     A.    Yes.

17     Q.    Can you ballpark the date for me beyond that?

18     A.    My guess is that it was some time around the same

19  time that I had spoken with Senator Thrasher, or Diaz de la

20  Portilla.

21        MR. FARR:  We have been going over an hour and a

22     half.  If we could take short break, like 10 minutes.

23        MR. NORDBY:  Let's go off the record.

24              Whereupon, a brief recess was taken at

25              9:35.  Testimony resumed at 9:44.

LISA C. SNYDER, COURT REPORTER

A6836

1   BY MR. FARR:

2       Q.   Back on the record.  Mr. Secretary, during the break

3   did it occur to you that any of the testimony you have given up

4   to this time needs to be changed or amended or supplemented in

5   any way?

6       A.   No.

7       Q.   Just to close out the loop on Exhibit 130, are these

8   all of the communications with Florida legislators, legislative

9   staff, the Governor, Governor staff, and/or third parties

10  relating to the four sets of voting changes that you recall?

11      A.   To the best of my knowledge.

12      Q.   Just so we are clear though, this excludes

13  communications you had with your own staff about the four sets

14  of changes; correct?  When it says third party, you mean

15  outside your department?

16      A.   We called it the third-party voter registration

17  organization because it was dealing with third-party voter

18  registration issues, but I was meet withing my staff.

19      Q.   What I am trying to get at is, obviously you had

20  communications with your own staff.  When it says third party

21  here on the first page, it is meaning people that didn't work

22  for you?

23      A.   That's correct.

24      Q.   I do have one question.  Did you participate in any

25  of the workshops with supervisor of elections concerning the

1  four sets of changes?

2      A.   No.

3      Q.   Okay.  Did you meet individually with any supervisor

4  of elections, or speak with any supervisors of elections about

5  the four sets of changes?

6      A.   I had conversations with some of them, yes.

7      Q.   Those don't seem to be referred to here, so I want to

8  get to those if I could.  Do you recall how many conversations

9  you had with supervisors of elections about the four sets of

10  changes?

11      A.   The conversations I would have had with supervisors

12  would have been various and sundry topics.  It just wasn't

13  about necessarily the four changes in the 1355.

14      Q.   Understood.  My question, and the only reason I am

15  taking your time is about 1355, so did you have conversations

16  with supervisors of elections during this period about 1355?

17      A.   Which period are you referring to?  Is there a

18  specific period of time?

19      Q.   Sure.  The specific period of time that's covered by

20  this communications list.  I guess we are talking about when it

21  first became proposed in early 2011, up until the point where

22  you are resigning.

23      A.   I had conversations with supervisors; yes.

24      Q.   Which supervisors did you have conversations with?

25      A.   I am trying to think of who it was that I may have

```
 1   talked to.  I don't recall specifically the supervisors that I
 2   talked to about 1355.
 3        Q.   Do you recall even generally what you discussed with
 4   supervisors on that subject, 1355?  For example, do you recall
 5   any specific conversation where a supervisor raised a concern
 6   with you about any of the four sets of changes and you
 7   responded to that concern?
 8        A.   If there were any of the changes they talked to me
 9   about, it was about the early voting proposal.  I don't
10   specifically recall talking to them about the other three
11   changes.
12        Q.   Do you recall any supervisors raising concerns with
13   you about the early voting change and the length of time that
14   was being provided for early voting?
15        A.   Yes.
16        Q.   Do you recall what their concerns were?
17        A.   That we were-- that the legislature had cut the
18   number of days.
19        Q.   And, the supervisors who spoke to you about it didn't
20   agree with that cut?
21        A.   They had concerns.
22        Q.   What were their concerns?
23        A.   That the number of days had been shortened.
24        Q.   And, that as a result, what?  That there would be
25   longer lines, and it would be more difficult to force the same
```

LISA C. SNYDER, COURT REPORTER

1  number of voters through in a shorter number of days?

2          MR. NORDBY:  Object to the form.

3      A.   Yes.  That there wouldn't be substantial time to

4  process the number of voters they needed to-- that they would

5  anticipate in upcoming elections.

6  BY MR. FARR:

7      Q.   They still had that concern with respect to the form

8  in which it passed; correct?

9      A.   If I recall correctly, there were a couple of them

10 that did.

11     Q.   Do you recall which ones?

12     A.   I do not.  I am sorry.

13     Q.   No problem.  I would like to show you what's been

14 previously marked as Exhibit 61.  (Document shown to witness)

15          Mr. Secretary, I am showing you what's been

16 previously marked as Exhibit 61.  Again, this is an email that

17 has been produced to us by the Florida Senate, Mr. Fox and Ms.

18 Roberts are on the email at the very bottom, which appears to

19 attach a newspaper article or web blog concerning Florida

20 politics.  Mr. Fox writes in an email, apparently in reaction

21 to what was said on the web blog, "Looks like the Secretary

22 really", italics, "owns it, though I didn't draft that first

23 part about a mandatory 12 hours/day in Miami-Dade and Broward".

24 Do you know what Mr. Fox is referring to, that he really owns

25 it?

LISA C. SNYDER, COURT REPORTER

1      A.    He says, or it looks like that I really own it.

2      Q.    Yeah.  Correct.

3      A.    I don't know what Mr. Fox was referring to.

4      Q.    Okay.  If you turn to page two of the politics blog,

5  should be the third page, right at the beginning it says,

6  "based on the '08 turnout, it appears to be problematic to me,

7  Browning said on Wednesday, because if that turnout repeats

8  itself in 2012 when you have fewer hours, you were literally

9  funneling a larger amount of people into a smaller amount of

10  time", and then later at the bottom, "I have always looked at

11  it like a pressure valve, Browning said".  Are those accurate

12  quotations of statements you made in connection with the bill?

13      A.    Yes.

14      Q.    You also are quoted here as saying, "if we had not

15  had early voting in 2008 I would not have been standing up

16  there on that Wednesday morning crowing that we had a great

17  election yesterday".  Is that also an accurate statement?

18      A.    Referring that if we had not had early voting--

19  that's true.  If we had not had early voting at all, we would

20  not have been standing up there on Wednesday morning saying

21  what a great day we had yesterday, because we would have still

22  been counting ballots.

23      Q.    Is it fair to say from this that you believe that

24  early voting was an important pressure valve on the general

25  election; correct?

LISA C. SNYDER, COURT REPORTER

A6841

1        A.   Yes.

2        Q.   Based on this, do you have any clue what Mr. Fox was

3   talking about when he says, "the Secretary really owns it"?

4        A.   I haven't talked to Mr. Fox.  I don't recall, or I

5   don't know what he is referring to as me really owning it.  I

6   am not a member of the legislature.  I don't have the final

7   say.

8        Q.   Understood.  But, an executive official can express

9   an opinion about a pending piece of legislation; correct?

10       A.   As I have.

11       Q.   Right.  Would it be a fair statement by him that you

12  really owned this piece of legislation at that point, meaning,

13  for example, that you supported it?

14       A.   No.  If that's the context, what he may be meaning is

15  that because-- according to the headline, "Browning Gaetz cut

16  an early voting deal", because the secretary has come out now

17  and said we need to do something with this, I have now invested

18  myself in that piece of legislation.  So, he may be referring

19  here that it looks like now because we have "cut the deal" -- I

20  don't remember any deal that was cut.

21       Q.   That's what I was going to ask you.  Do you recall

22  any deal being cut?

23       A.   No.  Is that I now have ownership of what's in the

24  new proposal for 2086.

25       Q.   Is that a fair statement by him, that at that point

LISA C. SNYDER, COURT REPORTER

A6842

1   you did have ownership of the new proposal, or not?

2       A.   I disagree.  I am not a member of the legislature.  I

3   certainly had expressed an opinion, but I don't make the policy

4   for the state.

5       Q.   Let me show you what has previously been marked as

6   Exhibit 75.  (Document shown to witness)

7            Mr. Secretary, Exhibit 75, again is a series of

8   emails that were produced to us by the Florida Senate, and

9   again there is words from Mr. Fox.  If you look at the email in

10  the middle, there is an email from Mr. Fox to an Eric Edwards.

11  Does that refresh your recollection as to who Eric, in the

12  prior emails might have been?

13      A.   No, sir.

14      Q.   Do you know who Eric Edwards is?

15      A.   No, sir.

16      Q.   Wanted to call your attention to a comment that's

17  made in that email.  If you could look at it, in point two,

18  with respect to 97.0575, do you know what that refers to?

19      A.   Looks as though it refers to the third-party voter

20  registration organizations.

21      Q.   Mr. Fox writes, "regarding Gary's observation

22  regarding the retroactivity language involving third-party

23  voter registration groups, I agree that if we keep the

24  effective date of the bill "upon becoming law" then we should

25  make that change he is referencing, July 1, 2011, to "the

LISA C. SNYDER, COURT REPORTER

A6843

1   effective date of this act", but if you want to yield to

2   Pierce's suggestion to change the effective date of the bill

3   from "upon becoming law" to "July 1, 2011", you would need to

4   make Gary's change.  Your call".

5              Do you know what this is referring to?

6        A.   Not specifically, other than getting the effective

7   date from effective becoming law to July 1 of 2011.  I don't

8   know what the nuances are about why the change would need to be

9   made.

10       Q.   Do you not recall there being an issue about when

11  HB1355 would be made effective?

12       A.   Not specifically.

13       Q.   Do you even remember generally that was an issue?

14       A.   Any election law that is passed by the legislature,

15  we have always advocated for a later effective date, generally

16  a later effective date, because what it does is allows the

17  Department of State ample time to submit those changes to the

18  United States Department of Justice for preclearance.  My only

19  concern would have been, at that point in time, was the

20  effective date upon becoming law, because it would not have

21  given us time to have it pre-cleared before implementation.

22       Q.   Why is that a concern, just the fact that you

23  wouldn't have time to get preclearance before implementation?

24       A.   Because we have five counties that come under the

25  Voting Rights Act as it related to preclearance.  Since the act

LISA C. SNYDER, COURT REPORTER

1   was effective upon becoming law, we had 62 counties that were

2   operating under the 1355 provisions, and you had five counties,

3   preclearance counties, that were not subject to the 1355

4   because those sections had not been precleared.

5       Q.   Why is that a problem?  Just the duality that's

6   created there?

7       A.   Generally speaking, you don't want to have dual sets

8   or two sets of election law, or rules, or regulations to

9   conduct elections in Florida, or any place for that matter.

10  The Secretary is charged with uniformity, and we carry out that

11  as best we can, given the circumstances that are placed on our

12  plate.

13      Q.   Those circumstances are the fact that five of the

14  counties are covered and the rest are not?

15      A.   Yes.

16      Q.   As you sit here, based on your knowledge of Florida

17  election law, can you recall another election bill that was

18  made effective immediately in the non-covered counties upon

19  signing like this one?

20      A.   I can't recall any.

21      Q.   Did you ever ask anybody why this one was made

22  effective upon signing?

23      A.   Can I ask you a question?

24      Q.   You may.  If you don't understand my question--

25      A.   Restate the question.

LISA C. SNYDER, COURT REPORTER

1    Q.   Sure.  Do you recall responding to the fact that this

2   law was going to be made effective upon signing, that wait, no,

3   our practice is not to do that?  Was there ever communicated to

4   the legislature?

5    A.   I am sure that we had probably communicated-- I don't

6   know definitively, but as is our practice with election laws,

7   as I stated earlier, we prefer a later implementation date, and

8   we probably would have at least talked to committee staff about

9   the effective date of the bill.

10    Q.   Do you recall any those conversations, specifically?

11    A.   I do not.

12    Q.   Who would have been charged with having those

13   conversations about your preference at least that this law not

14   be made effective immediately upon signing?

15    A.   The person that probably would have conveyed that

16   message to the legislature would have been Pierce Schuessler,

17   my Legislative Affairs Director.

18    Q.   Would that have been at your direction?

19    A.   More or less.  I mean, we do some collaborative

20   decision making, and obviously some of those things don't rise

21   to the level of the Secretary.  It may have been in a meeting

22   where we were looking at legislative proposals, I may have

23   voiced some concern about the effective date, but that may have

24   been the last discussion I ever had about it.  But, then staff

25   may have-- they understand.  They understand the problems with

1   implementing, or the challenges implementing election law upon
2   becoming law.
3       Q.   The challenge is implementing it in a non-uniform
4   way; correct?
5       A.   Regarding preclearance.  The uniformity issue comes
6   into play as it relates to the preclearance issue.
7       Q.   Understood.  If a law is made effective immediately
8   upon signing, as this one was, then you have one set of rules
9   in the non-covered counties, and another set of rules in the
10  covered counties, while you are awaiting preclearance; correct?
11      A.   That's correct.
12      Q.   That's where we are and that's been a concern for you
13  in the past; correct?
14      A.   Yes.
15      Q.   That's why you prefer this later date; right?
16      A.   Yes.
17      Q.   Do you recall Mr. Schuessler ever coming back and
18  saying, yes, I have communicated that concern, and this is what
19  the legislature says is the reason for the immediate
20  implementation?
21      A.   I don't recall having that conversation with him.
22      Q.   Did anybody in your staff follow-up on that issue?
23      A.   I don't recall.
24      Q.   If I could call your attention to the second page of
25  this document, Exhibit 75, at the bottom there is an email,

LISA C. SNYDER, COURT REPORTER

A6847

1   it's a continuation from the prior from Eric Edwards to

2   Jonathan Fox, and it says at the bottom, "Eric, 980981 needs to

3   be effective July 1.  It's going to take the department time to

4   develop these databases, plus the data collected will only help

5   the next reapportionment, not the current one.  The House has

6   the 2012 date in the 1355".  Do you know what that refers to?

7        A.   As best I can recall, there were-- the database

8   information, or the data that was being requested of the

9   supervisors, that was going to be compiled into the Department

10  of State, was going to take time for us to develop the

11  structure in order to receive that data.  According to this,

12  they were looking at effective making it July 1 of this year,

13  2012, allowing ample time for the Secretary and the Secretary's

14  staff to develop the databases to receive that data.

15       Q.   Do you recall that issue coming up, or is that

16  handled below your level?

17       A.   Probably handled below my level.

18       Q.   If I could refer you back again, on the first page of

19  this document, another comment from Mr. Fox to Mr. Edwards,

20  whom you don't know, I realize that.  But, the second to the

21  last line, there is a sentence that says, from Mr. Fox, "You",

22  meaning Mr. Edwards, "You are the one who was originally

23  adamant about making it effective "upon signing into law"

24  remember".  Do you know what he was referring to there?

25       A.   I do not.

LISA C. SNYDER, COURT REPORTER

1      Q.   Do you recall discussing that with anyone, that a

2  gentleman named Eric Edwards was adamant about making this bill

3  effective upon signing into law, notwithstanding the concerns

4  your division had?

5      A.   I do not.

6      Q.   This is Exhibit 131.   (Document shown to witness)

7           Mr. Secretary, I am showing you what we have

8  marked as Exhibit 131.  Do you recognize this email?

9      A.   Yes.

10     Q.   Who is Rob Jakubik, the addressee?

11     A.   I do not know.

12     Q.   Do you know why you might have sent this email to

13 Mr. Jakubik?

14     A.   Unless it was an inquiry for information.  I don't

15 recall.

16     Q.   Does anyone besides you have control of your email

17 account, or did they when you were the Secretary?  Could

18 somebody have sent this without your knowledge?

19     A.   I don't know, technically, if they could have done

20 that.

21     Q.   Well, does your-- did you grant your secretary access

22 rights in Outlook or something?

23     A.   No.

24     Q.   I am trying to get to the bottom--

25     A.   Certainly.

1    Q.   -- of how it could be that you wouldn't even know who

2    this person was, and you sent him an email.

3    A.   I can tell from the email address that it's a state

4    employee because it's a MyFlorida.com account.  I get a lot of

5    emails from folks, and obviously this is regarding some

6    conversation I had with Mary Ann.  I am trying to remember who

7    Mary Ann is.

8    Q.   I was going to ask you that.  Is Mr. Jakubik somebody

9    who works for the Governor, for example?

10   A.   It may have been.  May have been somebody in OPB,

11   Office of Planning and Budgeting.  I don't recall.

12   Q.   Let's walk through the email.  Looking at this, do

13   you have any doubt that this is, in fact, your writing?

14   A.   It appears it's mine.

15   Q.   You write, "I wanted to follow back up with Mary

16   Ann", and you don't know who that is?

17   A.   I don't recall who Mary Ann is, no.

18   Q.   "Regarding a conversation we had this morning prior

19   to the agency heads meeting concerning the elections bill".

20   What is the agency heads meeting?

21   A.   Agency heads is a meeting where the Governor's

22   agencies meet monthly with him.  I think that my sentence

23   structure is incorrect.  The agency heads meeting was not

24   concerning elections bill 1355.  My conversation with Mary Ann

25   was regarding elections bill 1355.

LISA C. SNYDER, COURT REPORTER

1          Q.   Thank you for that clarification.  The agency heads

2    meeting is kind of like a cabinet meeting for the Governor?

3          A.   Yes.

4          Q.   Elections law HB1355 came up, but it wasn't the sole

5    focus of it?

6          A.   It did not come up.

7          Q.   It didn't come up at all?

8          A.   No, because we would not talk about something like

9    that, at that level.  That was probably a side conversation

10   that I had with Mary Ann.

11         Q.   You write to Mr. Jakubik, "It is my suggestion that

12   if the bill is to be signed, I would suggest that it be signed

13   sooner than later".  Do you recall expressing that view to Mary

14   Ann?

15         A.   Yes.

16         Q.   And, can you describe for us why you had that view?

17         A.   My concern was that we had some elections coming up.

18   I think the City of Miami election, which is a rather large

19   election, as you can only imagine, and looking at-- giving the

20   supervisor of elections time, if this bill is going to be

21   signed, sign it sooner so that they have time to plan and

22   prepare and train poll workers on how to accommodate these

23   changes, as opposed to doing it later, which is closer to the

24   election when you have already trained your poll workers, they

25   know what they are supposed to be doing, and then the Governor

1  signs a law and it's effective now, and now you have to go back

2  in and retrain poll workers, or make an attempt to retrain poll

3  workers, change your training materials, and those kinds of

4  things.  My point was, I would suggest it be signed sooner than

5  later.

6      Q.   At this point, was there any chance in your mind that

7  this bill might not be signed?  That it might not become law?

8      A.   I have no knowledge of that.

9      Q.   Just so we are clear, part of your concern was the

10 fact that you knew at this point that this bill was going to be

11 effective immediately upon signing; correct?

12     A.   That's correct.

13     Q.   That's in part what created the tension with the

14 upcoming Miami election?

15     A.   If I recall correctly, yes.

16     Q.   You also say in the second paragraph, "also my

17 suggestion is that there be no major bill signing ceremony, but

18 that it be signed with any other bills that may be signed that

19 day and then forward down to the Department of State for

20 filing".  Why did you express that view?

21     A.   Because at this point, 1355 had become a

22 controversial piece of legislation, and I was voicing my

23 concerns that I did not think there needs to be a bill signing

24 ceremony for this particular piece.  It needed to be treated

25 like any other piece of legislation that the Governor would

LISA C. SNYDER, COURT REPORTER

A6852

1   sign, and then forward to the Secretary for filing.

2       Q.   Why were you uncomfortable having a major bill

3   signing ceremony?  I'm trying to understand.  Just because it

4   was controversial?

5       A.   Because it was controversial.  Certainly the Governor

6   can do what he or she wants to do, when they want to do it.

7   Purely my suggestion because of the controversial nature of the

8   bill we just need to get the bill signed, get it filed so we

9   can start implementing the provisions of this thing since we

10  have elections coming up.

11      Q.   Would it be fair to say you didn't want there to be a

12  major bill signing ceremony to be a platform for people who

13  were opposed to the bill, to express their concerns about it,

14  or their agreement with it?

15      A.   No.  That wasn't a concern of mine, simply because

16  bill signing ceremonies are usually generally never platforms

17  for opposing parties to voice their displeasure.  They were

18  usually in a controlled environment.  Not a public thing.

19  Unlike, let's say, the budget where he may go around the state

20  signing the budget.  This was an elections law.  It was an

21  elections bill.

22      Q.   If you weren't concerned about people expressing

23  their displeasure about this bill, then why were you concerned

24  about their being a major bill signing ceremony?

25      A.   I voiced my concern that I did not think there needed

LISA C. SNYDER, COURT REPORTER

1   to be a bill signing ceremony because we wanted to get the bill

2   signed, and we wanted to get it down, and it was a

3   controversial bill.  Why draw further attention to this

4   un-needlessly.

5       Q.   At such a bill signing ceremony, would you have

6   expected to have been there as the Chief Election Officer of

7   the State?

8       A.   It's hard to say what the expectation would have been

9   of the Governor for me at a bill signing ceremony.

10      Q.   Is that what you were responding to, that the

11  Governor wanted you to be there and you didn't want to be

12  there?

13      A.   No.  He and I had no conversation about that at all.

14      Q.   How did you know there was the possibility of a major

15  bill signing with respect to this?

16      A.   1355 was a rather large proposal, and I guess for my

17  perspective it was a more preemptive strike with those in the

18  Governor's office, that may have thought about doing a bill

19  signing ceremony for this bill.  I had no knowledge of the

20  plans for a bill signing ceremony for 1355.  All I did was come

21  out and say, I don't think you need to be having a bill signing

22  ceremony for this bill.  Sign the bill.  Send it down to us

23  with the other bills.  Let us file it and let us implement it.

24      Q.   How would it have delayed your sending it down and

25  implementing it to have had a major bill signing ceremony?  I'm

LISA C. SNYDER, COURT REPORTER

1  just trying to understand.

2      A.   It depends on how soon they were going to schedule a

3  bill signing ceremony.  How quickly they were going to get it

4  done, having to fit in with the Governor's schedule.  It was

5  more of a preemptive strike on my part, because it had a

6  controversial nature to it, that my suggestion was,

7  unsolicited, that we don't-- you do not need to be having a

8  public bill signing ceremony.

9      Q.   You recall not having any information about the

10 Governor wanting to do such a ceremony before you sent the

11 email?

12     A.   That is correct.

13     Q.   You have that how?  I thought you didn't remember the

14 email.

15     A.   No.  I do remember the email.  I just don't remember

16 who Rob is.

17     Q.   Okay.  Other than the conversations that we have had

18 already discussed, do you recall any other communications that

19 you had with legislators about HB1355?

20     A.   Not that I can recall.

21     Q.   Was there any follow-up, for example, from this email

22 to Rob?  Do you recall anybody from the Governor's office

23 calling back, or emailing back and saying, actually the

24 Governor would like to have a ceremony?

25     A.   No.  None to my knowledge.

1          Q.    Was there a ceremony?

2          A.    There was not.

3          Q.    Other than the communications that we have discussed,

4     did you have any other communications about the four sets of

5     voting changes with legislators?

6          A.    None that I recall.

7          Q.    What about with legislative staff, about the four

8     sets of changes?

9          A.    None that I recall.

10         Q.    Other than what we have discussed, did you have any

11    communications with the Governor about HB1355?

12         A.    None that I recall.

13         Q.    So when you say that, I am trying to understand what

14    you mean by recall.  Do you mean could have been, you are

15    searching your recollections and you can't recall one?  Does

16    that suggest to you that you probably did, you just don't

17    remember them specifically?

18         A.    I had no conversations, to my recollection, with the

19    Governor regarding 1355, prior to it being signed.  In my

20    briefings with the Governor, I may have mentioned to him the

21    implementation of 1355, but we never got into the weeds, so to

22    speak, on what the provisions were and how they were being

23    implemented.

24         Q.    Okay.  Did you have any conversations with anybody on

25    the Governor's staff, about HB1355, or the four sets of

                    LISA C. SNYDER, COURT REPORTER

1  changes, prior to it being passed, other than what we have

2  already discussed?

3       A.   I don't recall anything other than what we have

4  already discussed.

5       Q.   Other than what we have already discussed, do you

6  recall any conversations with third parties about HB1355, or

7  the four sets of changes?

8       A.   I had a telephone call from Deidre McNabb.

9       Q.   When was that telephone call?

10      A.   I don't recall the date.

11      Q.   It was before passage?

12      A.   If I recall correctly, it was before passage.

13      Q.   Can you describe what you discussed with Ms. McNabb?

14      A.   It was more what she discussed with me.

15      Q.   Can you describe the conversation, please?

16      A.   I have known Deidre McNabb for a number of years, and

17 she called me to discuss her displeasure with the proposals

18 within 1355.  I don't recall any additional information I may

19 have given her, or could have given her.

20      Q.   Do you recall saying to Ms. McNabb in that

21 conversation that HB1355 and SB2086 weren't your bill?  Do you

22 recall saying that to her?

23      A.   I don't recall that.  I may have said that.

24      Q.   Is it correct that you told her that you hadn't

25 sought, or requested any of the four sets of changes; do you

1  remember telling her that?

2      A.    I may have told her that.  I don't recall saying

3  that.

4      Q.    You have no reason to believe you didn't say that?

5      A.    That's true.

6      Q.    Did Ms. McNabb ask you if you were aware of the

7  voting fraud in Florida that had been alleged as the reason for

8  the changes?

9      A.    I don't recall having that conversation with her.

10     Q.    Do you recall telling her that you weren't aware that

11 there had been fraud that would support the changes?

12     A.    I don't recall having that conversation with her.

13     Q.    You don't recall one way or the other?

14     A.    Yes.

15     Q.    Did Ms. McNabb ask you to fight against this bill?

16     A.    Knowing Deidre, she probably did ask me, and if that

17 was the case, I probably explained to her the position of the

18 Secretary, that being that I carry out the policies of the

19 Governor, and it's not such that the Secretary can go off on

20 his or her own and advocate for certain things without having

21 some coordination with the Governor's office.

22     Q.    At the time this conversation occurred, did you know

23 it to be the policy of the Governor that 1355 should become

24 law?

25     A.    I don't recall any conversations where they told me

LISA C. SNYDER, COURT REPORTER

A6858

1   1355-- the Governor wants 1355.  I don't recall.  Or 2086, for

2   that matter.  I don't recall any of those conversations.

3           The general policy was before you engage on any

4   issue, whether it's a corporations issue, historic preservation

5   issue, libraries issue, election issue, whatever, that

6   engagement needs to be coordinated through the Governor's

7   office.  That was the policy at the time.

8       Q.   Do you recall at the time you had this conversation

9   with Ms. McNabb, having already had the communication with the

10  Governor's staff about the early voting changes that you wanted

11  to weigh in on?

12      A.   I don't recall.  I don't recall where that

13  conversation fell in relationship to my conversation with the

14  Governor's office.

15      Q.   Do you recall telling Ms. McNabb that you had

16  concerns about the way the four sets of voting changes had been

17  added to the law?

18      A.   I don't recall that conversation.

19      Q.   Okay.  Do you remember telling Ms. McNabb that you

20  had concerns that the four sets of changes weren't in your

21  legislative proposal?

22      A.   I am sorry.  Could you ask the question again.

23          MR. FARR:  Could you read it back please, Madam

24      Reporter?

25              Whereupon, the question was read back by

LISA C. SNYDER, COURT REPORTER

1                     the court reporter.

2        A.   I probably shared with Ms. McNabb that those four

3   were not in my legislative proposal.

4   BY MR. FARR:

5        Q.   Do you recall what her reaction to that was?

6        A.   I do not.

7        Q.   Did you tell Ms. McNabb that as Secretary of State

8   you wouldn't put forward any additional elections legislation

9   that year, meaning 2011?

10       A.   I don't recall.

11       Q.   Do you recall how the conversation finished?

12       A.   Amicable.  I don't think she was happy with my

13  answers, or any comments that I had given to her that day.

14  Amicable.

15       Q.   Do you recall telling her that not only would you not

16  put forward any additional legislation that year, but you

17  wouldn't do it ever again because you were leaving the

18  position?

19       A.   No.  I would have never committed to future events.

20       Q.   Do you remember anything else about your conversation

21  with Ms. McNabb?

22       A.   No, sir.

23       Q.   Did you have any other conversations with Ms. McNabb,

24  or was there just the one?

25       A.   I think just the one.

---

LISA C. SNYDER, COURT REPORTER

1     Q.   Did you have conversations with any other third party

2   voter registration organization executives, or members about

3   HB1355?

4     A.   I don't recall any specific meetings regarding 1355.

5     Q.   Or about the four sets of changes?

6     A.   Right.  When I say 1355, I am including all of 1355

7   including those four sets.

8     Q.   Understood.

9     A.   I don't recall.  It's been my custom, my practice, to

10   meet with, prior to a legislative session to meet with the

11   stakeholders, which would be the ACLU, NAACP, League of Women

12   Voters, FPERG (phonetic), and there may be others.  And, it's

13   an opportunity for them to have face time with the Secretary,

14   leading into the session, as to what they are proposing, as

15   well as what we are proposing.  It's primarily an opportunity

16   for me to listen to them and see what their concerns are.  I

17   did that from the time I was here starting, in '07.

18     Q.   So did you have such meetings at the beginning of

19   2011 before that legislative session about your department's

20   package?

21     A.   I am confident that I did.  But, at that point in

22   time 1355 was not in existence.

23     Q.   Right.  So, obviously those meetings didn't concern

24   the four sets of changes because they weren't part of your

25   package?

LISA C. SNYDER, COURT REPORTER

A6861

1          A.    That's correct.

2          Q.    Did you ever have a meeting with any of those other

3    groups, those stakeholders as you called them, about the four

4    sets of changes?

5          A.    I don't recall any meetings specifically about those

6    four sets of changes with those stakeholders.

7          Q.    Other than Ms. McNabb reaching out to you in a

8    telephone conversation, did any of the others reach out to you,

9    as stakeholders, to express their concerns about the four sets

10   of changes?

11         A.    I don't recall any reaching out to me from those

12   folks.

13         Q.    Did you reach out to them?

14         A.    No.

15         Q.    Any particular reason why not?

16         A.    The policy of the Governor's office was to not engage

17   until coordinated with the Governor's office.  I didn't need to

18   reach out to them to know how unhappy they were.  I knew how

19   unhappy they were.  As the Secretary, and as the State's Chief

20   Election Official, I have a job to do, and that is to implement

21   that law.  And, that's what we were doing.  So, in a very

22   sterile environment it didn't make any difference at that

23   point, after it was signed into law, whether they voiced to me

24   their displeasure with it, or disdain with it, because it was

25   the law and we needed to implement it and we were going to do

LISA C. SNYDER, COURT REPORTER

A6862

1    it fairly.

2         Q.   Did it concern you that these stakeholders, as you

3    call them, did have such disdain with this law, this law that

4    your department had not been responsible for?

5         A.   I think as a government official, it's always been my

6    practice to be sensitive to what the public-- how the public

7    feels about certain things.  But, as an appointed Secretary,

8    you aren't in a position to be able to change what the

9    legislature, and what the Governor has done.  You have a

10   constitutional duty to implement the laws that the legislature

11   passes.

12        Q.   Understood.  So in that circumstance, I think what

13   you are telling me is regardless of what your personal feelings

14   might have been on the subject, you were bound by the nature of

15   your position to follow the Governor's policy and implement

16   whatever law the legislature passed; is that fair?

17        A.   Since the legislature passed it, and the Governor

18   signed it, I had no option.  I had a constitutional duty to

19   implement it.

20        Q.   Understood.  Before the legislature passed it, and

21   the Governor signed it, when there was still some opportunity

22   for that bill to not become law, you none the less felt

23   constrained by the nature of your position as an appointed

24   Secretary of State; correct?

25        A.   Yes.  And, thus as we have already discussed, I asked

LISA C. SNYDER, COURT REPORTER

1   to be engaged on the early voting piece, specifically, because

2   I knew what I felt would be the impacts, the negative impacts

3   if the truncated 2086 provisions had been adopted.

4        Q.   All right.  And, would it be fair to say with respect

5   to the other provisions you did not ask to become engaged in

6   that way?

7        A.   That is correct.

8        Q.   Is there any particular reason you chose not to get

9   involved?  Were they just not a focus for you, as much as early

10  voting was?

11       A.   They were all a focus.  I did not see the other three

12  provisions as being, as having the impact, the negative impact,

13  or adverse impact, on the process that the truncated 2086 early

14  voting provisions would have directly on an election day

15  process.

16       Q.   So, you viewed those Senate proposals on the

17  truncated early voting period as being so severe that you did

18  step outside of what would be your normal area and ask to

19  become engaged; is that fair?

20       A.   That is correct.

21       Q.   Besides third party organizations, like the

22  stakeholders that you mentioned, there were legislators who

23  were not in favor of 1355, and the four changes; correct?

24       A.   I believe that's the case.

25       Q.   Did you focus on that at all while HB1355 was being

LISA C. SNYDER, COURT REPORTER

1    considered?

2        A.    No.

3        Q.    I will represent to you, and maybe you have heard it,

4    that Senator Rich, in a press release, says, "this bill makes

5    it harder to register voters, harder to cast a ballot, and

6    harder still to have a ballot counted"; had you heard that

7    Senator Rich expressed that view?

8        A.    I know Senator Rich had voiced displeasure with the

9    bill.

10       Q.    Did you ever speak with Senator Rich about the

11   problems?

12       A.    No.

13       Q.    I want to show you a letter from the House Democratic

14   Caucus, and this is be 132.  (Document shown to witness)

15            Mr. Secretary, looking at Exhibit 132, have you

16   ever seen this before?

17       A.    I don't recall seeing it.

18       Q.    Had you heard about it, that the House Democratic

19   Caucus sent this letter to the chief of the voting section of

20   the Civil Rights Division?

21       A.    I may have seen it, but I don't recall seeing it.

22       Q.    In your experience, had the minority party ever taken

23   this step of directly writing to the chief of the voting

24   section of the Civil Rights Division about a piece of Florida

25   legislation?

LISA C. SNYDER, COURT REPORTER

1      A.    I don't know.

2      Q.    You don't know way one way or another, or you don't

3   remember another such instance?

4      A.    I don't remember any instance of them doing that.

5   Doesn't mean that they didn't do it.

6      Q.    I understand.  Did it come to your attention, as part

7   of the preclearance process that you initiated, that they had

8   taken this step?

9      A.    I don't remember that I knew about that.  I knew that

10   I had received a letter from Perry Thurston, Representative

11   Thurston.  I think I had received a letter from another

12   Democratic member, can't remember which one it was, voicing

13   their displeasure.

14      Q.    And, do you see in the first paragraph, the last

15   sentence where the Democratic Caucus writes, "the law has the

16   purpose or affect of denying or abridging the right to vote on

17   the account of race, color, or language minority group"?  Did I

18   read that correctly?

19      A.    Yes.

20      Q.    Did you ever discuss with any of these

21   representatives their belief that the law did, in fact, have

22   that purpose and affect?

23      A.    No, sir.

24      Q.    Was that communicated to you that the Democratic

25   legislators had that belief?

LISA C. SNYDER, COURT REPORTER

1          A.    I don't recall getting a copy of this letter.

2          Q.    The other letters that you referred to, did they

3     express that belief to you?

4          A.    In general terms, I am pretty confident that their

5     letter expressed those similar beliefs.

6          Q.    Did you respond to it in any way?

7          A.    I did not.

8          Q.    Is there a reason for that?

9          A.    Other than I chose not to respond to it.

10         Q.    Was it also that you didn't respond because of your

11    aforementioned constraint by the nature of the position you

12    had, you were just carrying out policy?

13         A.    I think in large part, yes.  And, also that every

14    time the Secretary reduces something to writing, it ends up

15    either being published in the newspaper, or shown as an exhibit

16    in a lawsuit, so I just chose not to respond to those letters.

17         Q.    All right.  Did you respond informally, orally, by

18    telephone, or any other way?

19         A.    I personally did not.

20         Q.    Did you cause any member of your staff to do so?

21         A.    I am not sure.  I am not sure.  I don't recall.  I

22    know there have been some instances on some issues, and I don't

23    recall if this was the case, under 1355, where I would dispatch

24    Pierce Schuessler, my Legislative Affairs Director, to follow

25    back up with a member based on something that was said in a

1    committee hearing on the House floor, in writing to the
2    department.  I don't remember whether or not that was the case
3    with this situation.
4        Q.   So in this instance, you don't recall whether you
5    instructed Mr. Schuessler to do that or not?
6        A.   That's correct.
7        Q.   I want to call your attention to a couple of
8    statements made by the caucus, and get your reaction.
9             In the last paragraph, there is a statement,
10   "minorities are historically more likely to move within a
11   voting cycle and will be disproportionately impacted by new
12   restrictions on their ability to change voter registration at
13   the polls".  First, did I read that correctly?
14       A.   Yes.
15       Q.   Is that a correct statement, to your knowledge?
16       A.   I don't know that minorities are historically more
17   likely to move within a voting cycle.  Nor will they be
18   disproportionately impacted by the new restrictions on their
19   ability to change voter registration at the polls.
20       Q.   You don't know that one way or the other?
21       A.   I haven't seen the data.
22       Q.   Right.  So, you don't know whether that is true
23   statement?
24       A.   That is correct.
25       Q.   Also in the paragraph above it says, "further the law

LISA C. SNYDER, COURT REPORTER

1  will reduce voter registration among minorities by making voter

2  registration drives by community groups unnecessarily

3  difficult.  It subjects registering groups to significant fines

4  if registrations are not submitted within 48 hours of receiving

5  them".  Do you have a reaction to that statement?

6      A.    I do.

7      Q.    What is it?

8      A.    First off, the fines were not changed in 1355.  The

9  fines have been there.  The only thing of major consequence

10 that was changed in 1355, as it related to third-party voter

11 registration organizations, is moving the submission of those

12 completed voter registration applications from 10 days to 48

13 hours.  That's it.

14     Q.    Understood.  Do you know under the old law of any

15 problems with third-party voter registration organizations

16 complying with the 10 day rule?  I mean, specific problems.

17 Not just conceivably what could have occurred.

18     A.    Yes.

19     Q.    Okay.

20     A.    My understanding was there was a school teacher in

21 west Florida, out in the panhandle, that under the old law, the

22 10 day law, had taken voter registrations, put them in a file

23 cabinet, and did not turn them in until after the books closed

24 for the 2010 election.  They stayed there all summer, based on

25 information I have been given.  That's even with the 10 days.

LISA C. SNYDER, COURT REPORTER

A6869

```
 1        Q.   Right.

 2        A.   I hope that answers your question.

 3        Q.   It does in a way.  My question more specifically

 4   would be, are you aware of any problems with the 10 day

 5   requirement that necessitated this change to 48 hours, like,

 6   for example, the example you just gave, that would have been a

 7   violation under the old law.  So you didn't need the new law to

 8   make that improper.

 9        A.   Sure.  Other than in '08, I know that we had-- there

10   was some instances in Florida that involved ACORN, and there

11   were actually some arrests made in Florida with ACORN folks,

12   that were working for ACORN.  That was regarding either the

13   failure to submit, or failure to submit timely voter

14   registration applications.

15        Q.   Do you recall, as you sit here, whether it was the

16   failure to submit, or the failure to submit timely?

17        A.   I don't recall, but it was one or the other.

18        Q.   Do you recall that it was, in fact, ACORN the

19   organization that turned these individuals in to the State of

20   Florida?

21        A.   I don't recall.  I had received a call from the

22   Commissioner from Florida Department of Law Enforcement, I

23   think the night before the arrests were going to be made, just

24   informing me that they were going to be made, in the event we

25   had any press inquiries.  At that point, we were out of the
```

LISA C. SNYDER, COURT REPORTER

A6870

1    loop on it because it was a law enforcement matter.

2        Q.   I guess my question is, do you know the reason for

3    the change from 10 days to 48 hours?  What's the purpose of

4    that change?

5        A.   I don't know specifically the purpose.

6        Q.   Do you think that was a change that needed to be made

7    to shorten the 10 day period?

8        A.   Any time that you can get voter registration

9    applications turned in more quickly, then I think the person

10   that is entrusted that form to that third-party voter

11   registration organization, is better off.  Because it is in,

12   it's been processed, and the voter has been notified they are

13   registered to vote.  Ten days is ten days, and 48 hours is 48

14   hours.  We want to make sure that organizations that are out

15   there registering voters to vote are not, not turning forms in,

16   in a timely fashion, so that they can be processed for any

17   upcoming election.

18       Q.   I understand.  It sounds like under the old law there

19   was no deadline.  There was a 10 day period; correct?

20       A.   That's correct.

21       Q.   Do you know why the 48 hours was selected as opposed

22   to 72 hours, or five days?

23       A.   No.

24       Q.   Do you know of any specific reason why 48 hours was

25   needed as opposed to five days or four days?

---

LISA C. SNYDER, COURT REPORTER

1    A.    That was a decision of the legislature.

2    Q.    Okay.  Certainly wasn't anything your department came

3    up with; right?

4    A.    That is correct.

5    Q.    And, as you sit here, do you know of any specific

6    violations by a third-party voter registration organization of

7    the 10 day period, meaning that they turned it in 11 days, but

8    it was still before book closing?

9    A.    I don't specifically recall any of those today.

10    Q.    In this particular communication, Exhibit 32, in the

11    second paragraph, the Democratic Caucus says, "because of the

12    increased over-time labor costs of providing more than 64 hours

13    of early voting over eight days, many supervisors of elections

14    will be unable to offer the full 96 hours that have been

15    previously available".  Do you have a reaction?

16    A.    I do.

17    Q.    What is it?

18    A.    I think it's unwarranted.  The way you get off, or

19    around the increased over-time labor costs is to divide the

20    period of time into shifts, so you are not paying over-time,

21    you are paying straight time.  Again, I go back to my

22    experience as a Supervisor in Pasco County, we let people work

23    their six to eight hours a day, and it kept us underneath the

24    over-time requirements.

25    Q.    Have you expressed that view to any of the

LISA C. SNYDER, COURT REPORTER

A6872

1  supervisors?

2      A.   I have expressed to supervisors in conversations I

3  have had with them, and probably recently at a conference they

4  held in Orlando in-- December.  It was December.  December of

5  '11.  It was a canvassing board workshop.

6      Q.   What was their reaction?  Did they indicate to you

7  that they thought that fixed the problem, or not?

8      A.   Depends on the supervisor.  They are all elected.

9  They have budgets to defend.  They are political animals.

10     Q.   So, it's fair to say that you have a personal belief

11  that staggering the workers in that way would work, but some of

12  the supervisors of elections disagree with you?

13     A.   That's a fair statement.

14     Q.   Are you aware, just going back to the third-party

15  voter registration organizations, that one of their concerns

16  with respect to the 48 hour period is that they, in fact, use

17  the 10 days under the old law to conduct quality control of the

18  applications that they collect?

19     A.   I am unaware of that.

20     Q.   Are you aware of-- strike that.

21          Do you know who the mayor of Tampa is?

22     A.   The current mayor?

23     Q.   Who is Bob Buckhorn?

24     A.   Bob Buckhorn is the current mayor.

25     Q.   Have you had any communication with Mr. Buckhorn

LISA C. SNYDER, COURT REPORTER

```
1    about 1355?

2         A.   No, sir.

3         Q.   Do you recall his position with respect to 1355?

4         A.   No, sir.

5         Q.   Are you aware that Mayor Buckhorn actually wrote to

6    the Attorney General of the United States, concerning 1355?

7    Did that ever come to your attention?

8         A.   I may have been aware of it, but I don't recall

9    seeing the correspondence.

10        Q.   Do you recall hearing that he had written to the

11   Attorney General of the United States, "this new law, which is

12   already being enforced in Florida, has made it harder for all

13   voters, but especially racial minorities to register to vote,

14   cast a ballot, and have that vote counted"?

15        A.   No, sir.

16        Q.   We will mark this as Exhibit 133.  (Document shown to

17   witness)

18             Mr. Secretary, I am showing you what's been

19   marked as Exhibit 133.  I will represent to you this is a

20   communication from Mayor Buckhorn to Eric Holder.  Have you

21   ever seen this before?

22        A.   I have not.

23        Q.   Thank you.  That's all I.

24             Have.  Have you seen any other communications,

25   such as Mayor Buckhorn's letter, in which other politicians in
```

1   Florida, other mayors, other legislators have written to the

2   Department of Justice concerning 1355?

3       A.   Other than the two I have already stated, which was I

4   think Representative Thurston, and there is one other State

5   Representative I believe that sent a letter to me.

6       Q.   Did any other mayors send letters to you?

7       A.   I don't recall.

8       Q.   Governor Scott signed HB1355 on May 19, 2011;

9   correct?

10      A.   Yes.

11      Q.   What steps did your department take after signing to

12  implement the bill?

13      A.   Certainly, we had a press conference to answer any

14  questions that might come up regarding the implementation of

15  1355.  One of the questions being the dual process, the two

16  tiered system with preclearance and non-preclearance counties.

17  We also-- I issued a directive that day to the supervisors,

18  which was new authority given to the Secretary under 1355,

19  letting them know about how-- I believe it was dealing with

20  provisional ballots, because of the upcoming Miami election,

21  and also it had something to do with the address change

22  provisions as well.  I would have to see the document to know

23  for certain.

24      Q.   Who attended this press conference?

25      A.   A number of members of my staff, and a good amount of

LISA C. SNYDER, COURT REPORTER

1   press from the Capitol Press Corps.

2       Q.    Where did this press conference occur?

3       A.    Secretary's conference room at the Department of

4   State, RA Gray Building.

5       Q.    Were you asked specific questions about the two

6   tiered system you had in Florida now, because of the immediate

7   implementation in the non-covered counties?

8       A.    I don't recall, but I am confident the question had

9   come up.

10      Q.    How did you respond to the question?  What did you

11  say you were going to do about it?

12      A.    We were confident that we would be able to get-- we

13  would make the case to get the bill precleared before the

14  January, or what we supposed at that point was the January

15  primary.  We did not know at that time the date of our primary

16  because this particular bill, I believe, established a

17  presidential preference primary date selection committee, which

18  I chaired as a non-voting member.  So, it was later on, I

19  think, late October before that date was set.

20      Q.    Other than just sort of the general requirement of

21  uniformity in Florida law that you already testified about,

22  what other concerns could there be about having a two tiered

23  system?

24      A.    Certainly any time you have a two tiered system,

25  which we had never had before, to my recollection, was a

LISA C. SNYDER, COURT REPORTER

A6876

1    possibility of possible voter confusion.  You had five counties

2    that were going to be voting in a longer period of time, under

3    the old law, as opposed to the other 62 counties they were

4    going to have a shorter period of time, but possibly longer

5    hours in those counties.  We found that not to be the case

6    during the January 31 primary, or leading up to that primary.

7        Q.    What did you find to not be the case?

8        A.    Voter confusion.

9        Q.    Understood.  And, the January primary was the

10   presidential preference primary; correct?

11       A.    That is correct.

12       Q.    Just one party; correct?

13       A.    Yes, with the exception there were some counties that

14   had local issues on their ballot, which would have permitted

15   the Democrats, and the other voters, non-partisan voters, to

16   cast ballots in those counties.

17       Q.    Understood.  But, because it was a PPP, the turn-out

18   was significantly less than you would expect in a regular

19   primary?

20       A.    It was on probably on average, on par for normal

21   presidential preference primary, but not compared to a

22   state-wide fall primary or a general election.

23       Q.    That was my question.  Thank you.

24             What steps did your department take to

25   ameliorate any concerns from this two tiered system that you

LISA C. SNYDER, COURT REPORTER

1    had because of the immediate applicability in the non-covered

2    counties?

3        A.    I believe we-- I don't know.  I thought maybe we had

4    drafted a document that we sent to the supervisors.  We also

5    communicated with the supervisors, and I believe that we

6    prepared a section by section of the bill, and even in those

7    section that were not applicable to the five counties, we would

8    indicate that the sections were not applicable to the

9    preclearance counties, until such time as they were precleared.

10   They understand that.  They have done this for many, many

11   years.

12       Q.    I'm showing you what's been marked as Exhibit 134.

13   (Document shown to witness)

14             Exhibit 134 appears to be email from yourself to

15   Ms. Ungru?

16       A.    Yes, sir.

17       Q.    Do you recall sending this email?

18       A.    Yes, sir.

19       Q.    Who is Jennifer Ungru again?

20       A.    She is the Deputy Chief of Staff for Governor Rick

21   Scott.

22       Q.    Who is Rick Figlio?

23       A.    At that point, he was the Governor's General Counsel.

24       Q.    And, why did you send this email?

25       A.    Well, as indicated in the email, House Bill 1355 was

```
1   being anticipated of being signed within the week, and that we
2   needed to be ready to go.  Again, a lot of this being driven
3   because of the City of Miami election the next week.  So, we
4   wanted to make sure that we weren't spending a lot of our time
5   drafting documents, or doing what we needed to do, when we
6   could do this now and get it all preapproved, cleared, and
7   word-smithed, so that in the event that bill was signed we
8   would be ready to pull the trigger.
9        Q.   It appears that you included a draft of a directive
10  that had been prepared to Ms. Ungru and Mr. Figlio.
11       A.   Yes.
12       Q.   And, do you recognize this has being the draft of the
13  directive that your department put together?
14       A.   It looks as though it is, yes.
15       Q.   Did Ms. Ungru and Mr. Figlio make any changes with
16  respect to the directive, or did they have any feedback?
17       A.   To my knowledge, there was none.
18       Q.   Now I am going to show you what's been previously
19  marked as Exhibit 7.  (Document shown to witness)
20            Is this the final directive that you sent to
21  supervisors of elections?
22       A.   That is correct.
23       Q.   If I look at this, I don't see any reference to the
24  fact that there is covered counties and non-covered counties;
25  is that correct?
```

LISA C. SNYDER, COURT REPORTER

A6879

1     A.    It appears to be correct.

2     Q.    Do you know why you didn't make that distinction in

3  this first directive?

4     A.    I don't recall.

5     Q.    Would it have been a better practice for you to make

6  that distinction in this directive?

7     A.    I am sure that something should have probably been

8  said to the five preclearance counties, whether it was an

9  assumption on our part that they knew, although we know they

10 knew that those sections of 1355 were not applicable to them,

11 it probably should have gone out in the directive.

12    Q.    Let me ask another question with respect to this.  It

13 appears that only two of the four sets of changes that are at

14 issue in this case, one the early voting change in the first

15 bullet point on the first page, and the second the moving

16 voters change.  Do you know why that is?

17    A.    I think that had everything to do with the impending

18 City of Miami election the next week.  Those were the two

19 changes that were going to be adversely affecting the City of

20 Miami.

21    Q.    Understood.  The other changes weren't as immediate

22 for that election for you to call it to their attention?

23    A.    That is correct.

24    Q.    Do you recall other memoranda being issued from your

25 office by other members of your staff about the four sets of

1    changes, like other directives?

2        A.    There was only one other directive that I issued.    I

3    only issued two directives under this law.

4              The second directive was recently issued prior

5    to the presidential preference primary, because the issue came

6    up about provisional ballots, and the out of county address

7    changes, and I held firmly to the understanding and the belief

8    that if you changed your address, or if you moved from one

9    county to another county and you change your address at the

10   polls on election day, that under 1355 you were required to

11   vote a provisional ballot.  I held very strong and fast to the

12   idea that it was the intent of the legislature to have the

13   provisional ballot cast in the new county, verified against the

14   old county to ensure that they had not cast a regular ballot in

15   that county as well.

16       Q.    Understood.  That's what this other directive was

17   about?

18       A.    Yes.  And some supervisors were looking for something

19   in writing that would help bolster their position.  Not all

20   supervisors took that opinion that I shared.

21       Q.    Do you recall which supervisors disagreed with that

22   opinion?

23       A.    Leon County for one.

24       Q.    Anybody else?

25       A.    That was the main county.  There may have been

LISA C. SNYDER, COURT REPORTER

1  others.

2      Q.   There may have been others?

3      A.   Yes.

4      Q.   When you say that you understood what the legislators

5  intent was, how do you know that?  Did you speak to them?

6      A.   You can read the law--

7      Q.   Is that the basis of your belief?

8      A.   It's always the basis of my intent, or my

9  understanding of the code is when you look at that, and I don't

10  recall because I don't have the code in front of me, but it was

11  pretty clear that they needed to make an effort to determine

12  the eligibility of that ballot.

13      Q.   When you say that was your belief about the

14  legislators' intent, that is just from reading the language of

15  the law itself?

16      A.   That's correct.

17      Q.   You are speaking about how that change was to work

18  mechanically; correct?

19      A.   That's correct.

20      Q.   You are not speaking about their intent with respect

21  to why this law was needed?

22      A.   That is more correct.

23      Q.   Okay.  I will show you what we will mark as Exhibit

24  135.  (Document shown to witness)

25          Do you recognize this email?

---

LISA C. SNYDER, COURT REPORTER

---

1      A.    Yes.

2      Q.    Who is Lester Sola?

3      A.    Lester Sola is the former supervisor of elections in

4  Miami-Dade County.

5      Q.    In this email you say, "Thank you so much for your

6  email.  I really appreciate all you have done to accommodate

7  HB1355".  What do you mean by that?

8      A.    He is the supervisor that had the upcoming election,

9  I think, the following Tuesday.  And, we had been in

10 conversations with him to make sure that any of the actions

11 that we were going to take in the department were not going to

12 have an adverse affect on his conduct of that election in

13 Miami.  All I meant by saying accommodating House Bill 1355 is

14 you know the effect of this date, it's going to be the law, and

15 you are going to need to make accommodations, and they signed

16 this later than sooner, which caused some challenges more so

17 for Mr. Sola, than for the department, but as the State's Chief

18 Election Official I bear some responsibility to make sure we

19 that provide to the supervisors whatever they need to implement

20 these laws, in a fashion that doesn't disrupt the process, even

21 within a week or two of an election.

22     Q.    Would it be fair to say that Mr. Sola had concerns

23 about implementing HB1355 immediately in his county?

24     A.    If I recall, I was a little taken aback that Lester

25 was very accommodating to us and 1355.  He had been in the

LISA C. SNYDER, COURT REPORTER

A6883

1  elections business a long time, and he comes from a very large

2  county, the largest county in the state, but he has also been

3  an outspoken critic, not personally but professionally, even if

4  it involved the Secretary, and I respected that with Mr. Sola.

5  Lester and I are good, good friends in the sense we always got

6  along with one another.  We presupposed that there was going to

7  be some push-back from Lester Sola, based on the timing that

8  the bill was going to be signed, and his pending election, but

9  we didn't get the push-back.  He knew what the mission was, and

10  he knew he had to take care of it, and that's exactly what he

11  did.

12      Q.   Did you get any push-back from him before the bill

13  was passed?  Do you know what his position was?

14      A.   I don't recall what his position was before the bill

15  was passed.

16      Q.   When you say you didn't get the push-back, do you

17  mean you didn't get the level of push-back you expected, or you

18  didn't get any push-back at all?

19      A.   If I recall correctly, I didn't get any push-back

20  from Lester.

21      Q.   Since the law had already been passed, what push-back

22  could he have effectively given you?

23      A.   Supervisors still have a tendency to, because I was

24  one once, they have a tendency to keep harping on things that

25  are fact, and I make no bones about that.  There was still some

LISA C. SNYDER, COURT REPORTER

 1   that didn't like the law, and my continued conversation with
 2   them was, it's the law, get over it, what are we going to do to
 3   get this thing implemented.  And, Lester's relationship with me
 4   has been a very healthy relationship, at times a tense
 5   relationship because of the position that I have had to take,
 6   and I felt that I needed to take, on certain pieces of
 7   legislation.  On this one, if I recall correctly, I was
 8   somewhat surprised that he was as accommodating as he was.
 9       Q.   Did you deal directly with Mr. Sola?
10       A.   I did.
11       Q.   Did anybody else on your staff deal with Mr. Sola on
12   this issue?
13       A.   I am sure that the Director of the Divisions of
14   Elections did.  Donald Palmer, I think at the time he was
15   there.
16       Q.   Or it could have been Dr. Salas?
17       A.   Dr. Salas was--
18       Q.   The date of this was May 19, 2011.
19       A.   I am not sure Dr. Salas was there yet.  I know she
20   wasn't.
21       Q.   Anybody else within your department that might have
22   been dealing with Mr. Sola on this issue?
23       A.   I am sure Jennifer Kennedy, the Assistant Secretary,
24   may have had some conversations with him, as well as my legal
25   staff, because we needed to make sure that with the pending

LISA C. SNYDER, COURT REPORTER

```
 1   signing of this bill, and his pending election within the next

 2   week or two, we needed to make sure there weren't any kinks,

 3   and that he was getting from us what he needed, to

 4   appropriately and accurately conduct that election.

 5             MR. FARR:  Understood.  Why don't we take our next

 6        break and I will see how we are doing.

 7                  Whereupon, a recess was taken at 10:59.

 8                  Testimony resumed at 11:13.

 9   BY MR. FARR:

10        Q.   Back on the record.  Thank you for your indulgence,

11   Secretary Browning.  Secretary Browning, during the break did

12   it occur to you that any of the testimony you have given up to

13   now needs to be changed, amended or supplemented in any way?

14        A.   No.

15        Q.   I am going to show you what's been previously marked

16   as Exhibit 42.  (Document shown to witness)

17                  Have you seen this document before?

18        A.   I believe I have.

19        Q.   What is it?

20        A.   It's some of our concerns with House Bill 1355.

21        Q.   Now, who did you express these concerns to?

22        A.   I do not know.

23        Q.   Okay.  So, would it be fair to say that,

24   notwithstanding the constraints that you testified about by

25   being a Governor's agency, that your department did have some
```

LISA C. SNYDER, COURT REPORTER

1   concerns with HB1355?

2       A.   There is very few bills that the legislature

3   considers, elections bills, that we don't thoroughly review.

4   We are required to give a financial impact statement, what it

5   would cost to implement the bill, that generates from your

6   department.  So, we would look at the bills, and we would voice

7   any concerns at the time.

8       Q.   Do you recall having questions and concerns about

9   HB1355 beyond the early voting change you testified about?

10      A.   No.

11      Q.   Did you prepare this document?

12      A.   I did not personally, no.

13      Q.   Did you have a role in its preparation?

14      A.   I don't believe I did.

15      Q.   Okay.  Do you know out of what process this document

16  emerged?  For example, were there meetings between members of

17  your staff?

18      A.   My guess is that our elections lawyers started

19  looking at 1355, at some point in time, when it was in some

20  format, I am not sure exactly what format it was in, and listed

21  their concerns.

22      Q.   Do you know whether those concerns were communicated

23  to the legislature?

24      A.   I don't know.

25      Q.   You weren't involved in whatever process emerged from

LISA C. SNYDER, COURT REPORTER

A6887

1    this set of DOS questions and concerns for HB1355?

2         A.   That's correct.

3              MR. FARR:  At this time I have nothing further.  I

4         pass the witness.  Thank you for your time.

5         A.   Thank you.

6              MR. MCFARLAND:  If it's okay with you, I will stay

7         here.

8                    EXAMINATION BY MR. MCFARLAND:

9         Q.   I want to follow-up on some of the things you were

10   previously asked and testified about, Secretary Browning.  To

11   circle back to your previous testimony regarding the Florida

12   State Association of Supervisors of Elections, do you know who

13   Ron Labasky is?

14        A.   Yes.

15        Q.   Who is Ron Labasky?

16        A.   He is the Executive Director, General Counsel, for

17   the Florida State Association of Supervisors of Elections.

18        Q.   Did you, or members of your staff, communicate with

19   Mr. Labasky about any of the provisions of House Bill 1355?

20        A.   I don't recall us communicating any of the concerns

21   with that bill to him.

22        Q.   Previously you testified that there were some third

23   party voter registration groups who were unhappy, or you knew

24   they were unhappy, or had some disdain for House Bill 1355;

25   what were their concerns or what did you believe were their

                    LISA C. SNYDER, COURT REPORTER

1  concerns?

2      A.    I believe it was regarding I think three of the four

3  sections in question; the third party voter registration

4  organizations and the decrease in time to turn those forms in,

5  early voting as it related to cutting back, or as they kept

6  saying truncating the number of days for early voting, and then

7  the out of county address change provision they had concerns

8  with.  I think they were implying that it would adversely

9  impact seniors and college students.

10     Q.    Do you think their concerns were valid?

11     A.    No.

12     Q.    Why do you think that?

13     A.    My positions are predicated on my 26 years as an

14 elections official in Pasco County, and having been in the

15 trenches, conducting elections on a day-to-day basis, with

16 voter registration, and election day vote counting processes.

17 When you look at the three provisions, the first dealing with

18 the out of county address changes, it was-- to me, any

19 elections official is concerned about ensuring that a voter is

20 casting a ballot, and only one ballot, and under 1355 the

21 change of address provision allows them to do just that, and

22 actually cast a provisional ballot that will otherwise be

23 counted if not determined to be invalid.  That goes back to my

24 directive that I had issued on May 19, of '11.  We want to make

25 sure that voters have the opportunity to cast the ballot, but

 1  we also want to make sure that voters don't have the
 2  opportunity to cast more than one ballot.  And, that's what the
 3  out of county address change provision did.

 4          One of the things that has gone in large part
 5  unreported in the newspapers, and in the media, is the
 6  additional changes made to that section of law, that actually
 7  makes it easier for voters to make changes of address.  And,
 8  that is that prior to election day you can call in, you can fax
 9  in, you can write, email, and change your address with the
10  supervisor, go to your polls on election day and you can vote a
11  regular ballot.  I think that the argument is unfounded that
12  this causes a hardship on voters, or that their ballot is not
13  going to be counted.

14          As it relates to early voting, I have conducted
15  early voting in my county, the 12th largest county in the state
16  out of 67.  Early voting is a first-line in that section of
17  code that has been precleared by the justice department.
18  Legislature put in there, as a convenience to voters.  So it's
19  not the sole methodology to cast the ballot.  It's a
20  convenience for voters to cast the ballot.  Another opportunity
21  for voters to cast the ballot.

22          My concern, as I have already voiced to
23  Mr. Farr, is that whatever scheme is arrived at under 1355,
24  that it doesn't cause a hardship for folks to be able, as a
25  convenience, to cast a ballot.

---

LISA C. SNYDER, COURT REPORTER

1           Under the old provision, the old law, you were
2    restricted.  The legislature restricted supervisors to eight
3    hours a day.  Period.  Eight hours a day.  Typically,
4    generally, almost without exception, that eight hours a day was
5    the work day.  There was no opportunity to cast the ballot
6    going to work, or coming home from work.  On your weekends, the
7    early voting provision said that eight hours in the aggregate,
8    meaning that you could do all eight on Saturday, and none on
9    Sunday, or you could do none on Saturday, and all on Sunday, or
10   you could do some combination between the two days, four and
11   four let's say.  That was through the two full weekends.  Under
12   the new provision, under 1355, you do have the opportunity, and
13   any county, and I don't know of a county in Florida that
14   warrants the 12 hours that would not use the 12 hours.  I don't
15   know of any county in Florida.

16           The nice thing about supervisors in Florida is
17   they are elected, and they want to keep getting re-elected, and
18   the way you keep getting re-elected is that you provide a high
19   quality of service back to your voters.

20           If you are in Miami-Dade, you are not going to
21   go to six hours.  You are not going to go eight hours.  You are
22   not going to use 10 hours.  You are going to use the full 12
23   hours because you want to make sure your voters are having the
24   maximum opportunity to cast the ballot.

25           Under the new provisions, under 1355, those

LISA C. SNYDER, COURT REPORTER

1    voters are permitted, because of the 12 hour day, to vote going

2    to work, or coming home from work, which was not afforded under

3    the old law.

4            Additionally, although the legislature removed

5    the last Sunday from the early voting period, you have three

6    days, the first full weekended and that Saturday, that you have

7    a maximum of 36 hours.  Under the old law you had a maximum of

8    16 hours.  It provides greater flexibility to the counties, and

9    it provides greater flexibility to voters when they are going

10   to cast the ballot under the early voting provisions.

11           The third provision, which was the third-party

12   voter registration organizations, using the presidential

13   general election as an example, the books in Florida close 29

14   days before the election.  Usually the busiest heaviest voter

15   registration day is the Saturday before election day, or book

16   closing day.  They are at libraries.  There are at parks.

17   There at plazas, malls, sitting in front of the post offices,

18   all of these groups taking voter registration applications.

19   They know that in order for those registrations to be valid,

20   for that election, they have to be submitted to the supervisor

21   by Monday.  They have to be.  Book closing day.  That is two

22   days.  My argument has always been if they can do that on the

23   busiest voter registration day of the year, why is it

24   problematic to have voter registration applications turned in

25   in two days, in August, or April, or January, or December.  The

1    idea is not to impede someone's right to get registered, nor is

2    it our goal to impede someone's right from casting a ballot.

3              I have worked 26 years as a local elected

4    elections official, working very closely with the League of

5    Women Voters.  If it had not been for the League of Women

6    Voters in Pasco County we probably would not have been able to

7    staff the numbers of voter registration drives that we had,

8    back in the day.  And quite honestly, back in the day, prior to

9    the Motor Voter, the MVRA, which then provided that you provide

10   voter registration applications, and everybody was registered

11   then through Highway Safety, through driver's license, and by

12   mail.

13             My argument on those three sections is that, I

14   don't know what the objection is when someone wants the ability

15   to register to vote, and then make sure their ballot gets

16   counted, and we have gone to great lengths, I have, both as a

17   supervisor and as the Secretary, gone to great lengths to

18   ensure that voters are not harmed in Florida.

19        Q.   In your stint-- both your stint as the Secretary of

20   State, as well as in your capacity as the Pasco County

21   Supervisor of Elections, had you ever sought to propose these

22   four changes, or anything similar to these four changes at

23   issue in this case?

24        A.   No.

25        Q.   Is that because you didn't see a problem with them as

LISA C. SNYDER, COURT REPORTER

1    the old law was written?

2         A.   Supervisors have the understanding that they too are

3    not the ones that write policy.  They are not the ones that

4    write law.  Certainly we like to have input as to what that law

5    is going to look like, as does the Secretary and the Department

6    of State.  We know at the end of the day the policymakers for

7    the 120 House seats and the 40 Senate seats, they are the ones

8    that make the policy for the State.  As I did when I was a

9    supervisor, and now as a Secretary, and this is what I conveyed

10   to the supervisors to the day I left, it's the law.  We need to

11   implement it, whether you like it or not.

12             One example I use is in '07, when we had just

13   gone through the conversion of voting systems, in early 2000's,

14   and Governor Crist got elected in '06.  And one of the first

15   things he did was say, we are going to do away with touch

16   screen voting systems.  It had already been litigated.  I was

17   the leading proponent of touch screen voting systems in this

18   State.  I was appointed Secretary, and a month later I am

19   having to stand up there with the Governor, side by side,

20   saying, this is a good idea.  Hindsight tells me it was the

21   right thing to do, although it was incredibly painful because

22   counties had spent millions and millions of dollars on touch

23   screen voting systems.  But my point is, you had supervisors

24   that were still well in through the '08 election, and going

25   into the 2010 election, bemoaning the fact that they were

1   having to use a paper ballot, and were not using their touch

2   screen voting systems, and some of them just hang on to those

3   kind of things.  All we have said is, it's the law.  We need to

4   implement it.  Leave your personal opinion out of it.  There is

5   nothing your personal opinion is going to do to change this

6   law.  It's now up the next legislative session to make any

7   corrections to it.

8       Q.   In your capacity then as the President of FSASE, or

9   as the legislative chair, did you propose anything similar to

10  the changes that are at issue in this case?

11      A.   No.

12      Q.   Lastly, are you aware of any concerns that were

13  raised about the elimination of the first week of early voting,

14  and how it would negatively affect different groups of voters?

15      A.   Any time there is an elections change-- well, let me

16  restate that.  We look at an election law, not by how it's

17  going to impact any particular group of voters, but how it's

18  going to impact voters; white, African American, Latino, Asian,

19  whatever the case may be.  Male, female, Democrat, Republican;

20  it has made no difference to me in the last 36 years of doing

21  this in my life.

22          What we wanted to make sure of is that there

23  were no adverse impacts, or minimal adverse impacts to the

24  voters of Florida.

25          I keep going back to the whole idea of, if you

---

LISA C. SNYDER, COURT REPORTER

```
 1   want to register to vote in Florida, go get a voter
 2   registration application.  Get them from real estate offices,
 3   supervisors offices, post offices, download one off the
 4   division's website.  Fill it out, completely.  Turn it in,
 5   timely.  You are registered.  It's that simple.  It doesn't
 6   make any difference what color you are, or what nationality you
 7   are.  You are registered.  When you go to vote, we have three
 8   opportunities in Florida for folks to cast ballots.  They can,
 9   as a convenience, vote early, within that period of time,
10   whether it's the old law or a shorter period but longer hours.
11   Or, you can vote by absentee.  You don't want to go to the
12   polls, pick up the telephone, get on the email, request a
13   ballot.  It will be mailed to your home.  You can vote in the
14   privacy and convenience of your home.  It doesn't need to be
15   notarized.  Your wife doesn't have to sign it.  Your husband
16   doesn't have to sign it.  You vote.  You put a stamp on it and
17   you mail it back.  Or, you can go to the polls to cast a ballot
18   on election day.  We are open 12 hours a day.
19           MR. FARR:  I object and move to strike this answer,
20       with respect, Mr. Secretary, it's not responsive to the
21       question.
22   BY MR. MCFARLAND:
23       Q.  I was going to repeat my question.  Are you aware of
24   any concerns that the elimination of the first week of early
25   voting would negatively impact any group of voter?
```

LISA C. SNYDER, COURT REPORTER

1          A.    No.

2          Q.    You are not aware of concerns being raised?

3          A.    I misunderstood the question.  I am aware of concerns

4    being raised that it negatively impacts groups of voters, yes.

5          Q.    What groups of voters are those?

6          A.    African American, elderly, college students, so I

7    have read.

8                MR. MCFARLAND:  Thank you, Mr. Secretary.

9          A.    Thank you.

10

11                      EXAMINATION BY MR. NORDBY:

12         Q.    On that last question, do you believe that those

13   concerns you have read about are well founded?

14         A.    No.

15               MR. NORDBY:  I have no further questions.

16               MR. FARR:  I have one follow-up.

17

18                   FURTHER EXAMINATION BY MR. FARR:

19         Q.    Mr. Secretary, in response to one of counsel's

20   questions about the three changes, you said something to the

21   affect of, it's not the intent of these changes to harm any

22   voters.  Do you recall that?

23         A.    Yes.

24         Q.    When you said that, if I understood you correctly,

25   you were saying it's not your intent in terms of implementing

LISA C. SNYDER, COURT REPORTER

A6897

1    these to harm any voters; isn't that right?

2        A.    That's a fair assessment.

3        Q.    You don't know what the legislature's intent was in

4    passing these; do you?

5        A.    I do not.

6              MR. FARR:  I have nothing further.  Thank you for

7        your time.  Good luck in your election.

8        A.    Thank you.

9              Whereupon, the deposition concluded at 11:33.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LISA C. SNYDER, COURT REPORTER

1

2                        REPORTER'S CERTIFICATE

3

4    STATE OF FLORIDA
     COUNTY OF LEON
5

6            I, LISA C. SNYDER, Court Reporter, certify that I was

7    authorized to and did stenographically report the deposition of

8    KURT BROWNING; that a review of the transcript was requested;

9    and that the transcript is a true and complete record of my

10   stenographic notes.

11           I further certify that I am not a relative, employee,

12   attorney, or counsel of any of the parties, nor am I a relative

13   or employee of any of the parties' attorney or counsel

14   connected with the action, nor am I financially interested in

15   the action.

16           DATED this 7th day of March, 2012.

17

18                        /s/_____

19                            Lisa C. Snyder
                              Court Reporter/Notary Public
20

21

22

23

24

25

─────────────────────────────────────────────────────────
                 LISA C. SNYDER, COURT REPORTER

1

2                          CERTIFICATE OF OATH

3

4    STATE OF FLORIDA
     COUNTY OF LEON
5

6

7           I, the undersigned authority, certify that KURT

8    BROWNING personally appeared before me and was duly sworn.

9

10          WITNESS my hand and official seal this 7th day of

11   March, 2012.

12

13                              /s/_____
                                Lisa C. Snyder
14                              Court Reporter/Notary Public
                                COMMISSION EXPIRES: 3-31-2014
15                              COMMISSION NUMBER: DD943683

16

17

18

19

20

21

22

23

24

25

---

                    LISA C. SNYDER, COURT REPORTER

A6900