**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STATE OF FLORIDA,

        Plaintiff,

   v.

UNITED STATES OF AMERICA and
ERIC H. HOLDER, JR., in his official
capacity as Attorney General,

        Defendants, and

KENNETH SULLIVAN, *et al.*,

        Defendant-Intervenors.

No. 1:11-cv-1428-CKK-MG-ESH

---

**UNITED STATES' AND DEFENDANT-INTERVENORS' JOINT SUBMISSION
CONCERNING PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

      Defendants United States of America and Attorney General Eric H. Holder, Jr.

("United States") and Defendant-Intervenors (collectively "Defendants") respectfully

submit their joint (1) response to the State of Florida's ("Florida") proposed findings of

fact and conclusions of law (Dkt. No. 91), (2) additional proposed findings of fact and

conclusions of law, and (3) additional Appendix materials (within Volume 17).[1]

---

[1]   Pursuant to the Court's Order (Dkt. No. 87 at 3-4), Defendants respond to each
finding and conclusion proposed by Florida, in the order chosen by Florida, and add
additional or alternative related findings and conclusions as required.  Additional findings
and conclusions relating to relevant topics not addressed by Florida are included at the
end of each section.  *See* FF 117-122 and CL 96-110.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..............................................................................................iv

GLOSSARY ..................................................................................................................ix

PRELIMINARY STATEMENT ........................................................................................ 1

RESPONSE TO FLORIDA'S PROPOSED FINDINGS OF FACT ................................... 1

    I-II.     Introduction, Background, and Florida Election Law Generally................. 1

    III-IV.   The 2011 Act and Post-Act Regulations ....................................................... 3

    V.         Florida Cannot Carry Its Burden to Prove No Discriminatory Purpose ....... 7

          A.    The Record is Replete with Evidence of Discriminatory Intent ........ 7

               1.    Third-Party Changes ................................................................. 7

               2.    Inter-County Changes .......................................................... 14

               3.    Early Voting Changes .......................................................... 17

          B.    Contrary to Florida's Contention, There Were Multiple
               Assertions of Discrimination During the Legislative Process ......... 22

          C.    The Legislative Process Was Unfair, Severely Limited, and
               Unusual............................................................................................ 24

    VI.      The Voting Changes Will Have Discriminatory Effects on Minority
          Voters ........................................................................................................ 25

          A.    The Third-Party Changes Will Have Significant Retrogressive
               Effects........................................................................................... 25

          B.    The Inter-County Changes Will Have Significant Retrogressive
               Effects........................................................................................... 33

          C.    The Early Voting Changes Will Have Significant Retrogressive
               Effects........................................................................................... 38

               1.    Minority Voters' Significant Reliance on Early Voting,
                    and the Resulting Disparate Impact of the Early Voting
                    Changes .................................................................................. 42

2. Florida's Proffered Expert Admitted He Lacks Sufficient Expertise to Render Most of His Opinions and the Remainder Are Unreliable and Not Helpful to the Trier of Fact ....................................................................................... 45

3. Florida's Manipulation of Selected Voting Data Cannot Obscure the Retrogressive Impact of the Early Voting Changes ................................................................................. 47

ADDITIONAL PROPOSED FINDINGS OF FACT .......................................................... 52

RESPONSE TO FLORIDA'S PROPOSED CONCLUSIONS OF LAW ........................ 53

I. Florida's Proposed Conclusions of Law Misstate the Law and Misapply the Purpose and Effect Standards ................................................................. 53

A. Section 5 and Preclearance Obligations of Partially-Covered States ................................................................................. 53

B. Legal Standard for "Purpose" Prong ................................................. 54

C. Legislative History of the Proposed Changes .................................. 58

D. The Effect Standard and the 2006 Amendments.............................. 63

E. The Standards for Assessing the Effect Prong of the Act ............... 66

F. Applying the Effect Prong to the Facts of This Case ...................... 68

II. Florida Has Not Carried Its Section 5 Burden ........................................... 72

CONCLUSION ............................................................................................................. 78

# TABLE OF AUTHORITIES

## CASES

*Allen v. State Board of Elections*,
        393 U.S. 544 (1969) ....................................................................................*passim*

*Apache County High School District No. 90 v. United States*,
        No. 77-CV-1518 (D.D.C. June 13, 1980) ............................................................ 67

*Beer v. United States*,
        425 U.S. 130 (1976) ..................................................................... *passim*

*Burdick v. Takushi*,
        504 U.S. 428 (1992) .................................................................................. 70, 71

*Busbee v. Smith*,
        549 F. Supp. 494 (D.D.C. 1982), *aff'd mem.*, 459 U.S. 1166 (1983)......... 59, 60, 74

*City of Lockhart v. U.S.*,
        460 U.S. 125 (1983) ............................................................................. 69

*City of Mobile v. Bolden*,
        446 U.S. 55 (1980) ............................................................................. 55

*City of Port Arthur v. United States*,
        517 F. Supp. 987 (D.D.C 1981), *aff'd*, 459 U.S. 159 (1982) .................... 56, 57, 72

*City of Richmond v. United States*,
        422 U.S. 358 (1975) ....................................................................................*passim*

*City of Rome v. United States*,
        446 U.S. 156 (1980) ............................................................................. 67

*Crawford v. Marion County Election Board*,
        553 U.S. 181 (2008) ................................................................. 59, 60, 70

*Daubert v. Merrell Dow Pharmaceuticals, Inc..*,
        509 U.S. 579 (1993) ............................................................................. 78

*DeGrandy v. Weatherell*,
        794 F. Supp. 1076 (N.D. Fla. 1992) ................................................. 2, 67

iv

*Gaston County v. United States*,
    395 U.S. 285 (1969) ............................................................................ 68

*Georgia v. Ashcroft*,
    195 F. Supp. 2d 25 (D.D.C. 2002), *vacated on other*
    *grounds*, 39 U.S. 461 (2003) ............................................ 58, 60, 64, 65

*Holder v. Hall*,
    512 U.S. 874 (1994) ............................................................................ 69

*Hunter v. Hamilton County Board of Elections*,
    No. 1:10-cv-820, 2012 WL 404786 (S.D. Ohio Feb. 8, 2012) ............................. 61

*Indiana Democratic Party v. Rokita*,
    458 F. Supp. 2d 775 (S.D. Ind. 2006) .................................................. 59

*LULAC v. Perry*,
    548 U.S. 399 (2006) .............................................................. 67, 68, 74

*LWVF v. Browning*,
    575 F. Supp. 2d 1298 (S.D. Fla. 2008) .................................................. 8

*LWVF v. Cobb*,
    447 F. Supp. 2d 1314 (S.D. Fla. 2006) ........................................... 7, 8, 59

*LaRoque v. Holder*,
    No. 1:10-cv-0561-JDB, 2011 WL 6413850 (D.D.C. Dec. 22, 2011) ........ 54, 55, 66

*Lopez v. Monterey County*,
    525 U.S. 266 (1999) ...................................................................... 54, 67

*NAACP v. Hampton County Election Commission*,
    470 U.S. 166 (1985) ............................................................................ 54

*New York v. United States*,
    874 F. Supp. 394 (D.D.C. 1994) ................................................. *passim*

*Northwest Austin Municipal Utility District No. 1 v. Holder*,
    129 S. Ct. 2504 (2009) ................................................................ 56, 66, 67

*Personnel Administrator of Massachusetts v. Feeney*,
    442 U.S. 256 (1979) ................................................................ 55, 56, 57

*Reno v. Bossier Parish School Board ("Bossier I"),*
520 U.S. 471 (1997) ....................................................................................*passim*

*Riley v. Kennedy,*
553 U.S. 406 (2008) ................................................................... 66, 69, 70

*Rogers v. Lodge,*
458 U.S. 613 (1982) ................................................................................ 74

*Shelby County v. Holder,*
811 F. Supp. 2d 424 (D.D.C. 2011) ..............................................*passim*

*South Carolina v. Katzenbach,*
383 U.S. 301 (1966) ...................................................... 57, 67, 68, 73

*Storer v. Brown,*
415 U.S. 724 (1974) .......................................................................... 70, 71

*Tennessee v. Lane,*
541 U.S. 509 (2004) ................................................................................ 56

*Texas v. United States,*
No. 1:11-cv-1303-TBG, 2011 WL 6440006 (D.D.C. Dec. 22, 2011) ............. 73, 74

*UAW v. NLRB,*
459 F.2d 1329 (D.C. Cir. 1972) ............................................................ 77

*United States v. Day,*
524 F.3d 1361 (D.C. Cir. 2008) ............................................................ 78

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,*
429 U.S. 252 (1977) ..............................................................*passim*

**STATUTES**

42 U.S.C. 1973c(a) ....................................................................................*passim*

42 U.S.C. 1973*l*(c)(1) .................................................................... 64, 67

42 U.S.C. 1973gg ........................................................................................ 7

Fla. Laws ch. 1994-224 ............................................................................ 7

Fla. Laws ch. 2005-277 ................................................................ 7

Fla. Laws ch. 2007-30 ................................................................ 8

Fla. Stat. 95.0575 ........................................................... 29, 32, 70

Fla. Stat. 97.012 ........................................................................ 3

Fla. Stat. 97.021 ................................................................... 8, 70

Fla. Stat. 97.0575 .......................................................... 8, 10, 70

Fla. Stat. 101.045 (2005) ...................................................... 36, 70

Fla. Stat. 101.657 (2005) ........................................................... 70

Pub. L. No. 109-246, § 2(b)(6), 120 Stat. 577-581 ....................... 64

## RULES AND REGULATIONS

52 Fed. Reg. 486 (Jan. 6, 1987) ............................................... 70

66 Fed. Reg. 5,412 (Jan. 18, 2001) ........................................... 70

76 Fed. Reg. 7,470 (Feb. 9, 2011) ............................................ 69

76 Fed. Reg. 21,239 (Apr. 15, 2011) ......................................... 69

28 C.F.R. 51.2 ......................................................................... 58

28 C.F.R. 51.13 ......................................................... 63, 67, 73

28 C.F.R. 51.18 ....................................................................... 74

28 C.F.R. 51.23 ....................................................................... 54

28 C.F.R. 51.51 ....................................................................... 55

28 C.F.R. 51.54 ................................................................ *passim*

28 C.F.R. 51.57 ................................................................ *passim*

Fed. R. Evid. 702 ....................................................................................................... 78

Florida Administrative Code Rule 1S-2.042 (2010) ..................................................... 8, 10

Florida Administrative Code Rule 1S-2.042 (2011) ......................................................... 10

## LEGISLATIVE MATERIALS

H.R. Rep. 109-478 (2006) .......................................................................................... *passim*

# GLOSSARY

## Terms and Abbreviations

| | |
|---|---|
| 3PVRO | Third-Party Voter Registration Organization |
| CL | Proposed Conclusion of Law |
| CPS | Current Population Survey (prepared by the U.S. Census Bureau) |
| CVAP | Citizen Voting Age Population |
| DOE | Florida Department of State, Division of Elections |
| DOJ | United States Department of Justice |
| DOS | Florida Department of State |
| FF | Proposed Finding of Fact |
| FSASE | Florida State Association of Supervisors of Elections |
| FVRS | Florida Voter Registration System |
| HB 1355 | House Bill 1355 (2011) |
| LWVF | League of Women Voters of Florida (Defendant-Intervenor) |
| NCLR | National Council of La Raza (Defendant-Intervenor) |
| RPOF | Republican Party of Florida |
| SB 2086 | Senate Bill 2086 (2011) (companion to HB 1355) |
| SOE | Florida Supervisor of Elections |
| SOS | Florida Secretary of State |
| V | Volume of the Appendix (in which the cited material is located) |
| Voting Changes | The three sets of voting changes for which Florida seeks preclearance |
| VRA | Voting Rights Act of 1965 |

**Deponents and Declarants**

| | |
|---|---|
| Allen | Ophelia Allen (Defendant-Intervenor) |
| Browning | Former SOS Kurt Browning |
| Cate | DOS Communications Director Chris Cate |
| Coffee | Ella Kate Coffee (Defendant-Intervenor) |
| Cruz | Representative Janet Cruz (Defendant-Intervenor) |
| Edwards | Collier County ("COL") SOE Jennifer Edwards |
| Gronke | Professor Dr. Paul Gronke (Defendant-Intervenors' designated expert) |
| Holland | DOS Assistant General Counsel Gary Holland |
| Hood | Professor Dr. M.V. (Trey) Hood III (Florida's designated expert) |
| Joyner | Senator Arthenia Joyner (Defendant-Intervenor) |
| Lennard | Hillsborough County ("HIL") SOE Earl Lennard |
| Macnab | LWVF President Deirdre Macnab |
| Matthews | DOS Assistant General Counsel Maria Matthews |
| McKenzie | Reverend Charles McKenzie, Jr. (Defendant-Intervenor) |
| Mitchell | RPOF Co-General Counsel Emmett "Bucky" Mitchell |
| Salas | DOE Director Gisela Salas |
| Sancho | Leon County SOE Ion Sancho (Defendant-Intervenor) |
| Sawyer | Monroe County ("MON") SOE Harry Sawyer (Defendant-Intervenor) |
| Schuessler | DOS Legislation Liaison Pierce Schuessler |
| Scott | Reverend Tom Scott (Defendant-Intervenor) |
| Slater | Florida NAACP Second V.P. Cynthia Slater (Defendant-Intervenor) |

Sola            Former Miami-Dade County SOE Lester Sola

Stafford        Escambia County SOE and FSASE Officer[2] David Stafford

Stewart         Professor Dr. Charles Stewart III (United States' designated expert)

Strickland      Hendry County ("HEN") SOE Lucretia Strickland

Townsley        Miami-Dade County SOE Penelope Townsley

Ussery          Hardee County ("HAR") SOE Jeffery Ussery

---

[2]   SOE Stafford served as the Chair of the FSASE's Legislative Committee during the 2011 Florida legislative session and is currently the FSASE President.  V9 4991-92.

## PRELIMINARY STATEMENT

Florida has failed to carry its burden to prove that the Voting Changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority.  The evidence is compelling that each of the Voting Changes *was* passed for a discriminatory purpose and *will* lead to retrogression in the position of racial or language minorities.  As discussed in detail below, Florida repeatedly misstates the record, ignores binding precedent, and relies upon legal arguments that are unprecedented and without merit.  The Court should deny Florida's request for declaratory relief.

## RESPONSE TO FLORIDA'S PROPOSED FINDINGS OF FACT

**I-II.   Introduction, Background, and Florida Election Law Generally**

<u>1-4</u>.   FF 1-4 are undisputed.  Because Florida's introduction is incomplete and ignores facts critical to determining if Florida has carried its burden of proof, however, Defendants propose the following additional findings:

<u>1A</u>.   According to the 2010 Census, the Covered Counties have a combined population of 1,690,707, of which 13% is African American and 26% is Hispanic (other minorities constitute less than 3%).  V14 7677.  The Covered Counties' citizen voting age population ("CVAP") is 12% African American and 16% Hispanic (2010 Census).  V14 7683.  As of January 2012, 12% of the Covered Counties' registered voters self-identified on their registration forms as African American and 12% as Hispanic.  V14 7684.

<u>1B</u>.   Florida's statewide population in the 2010 Census is 18,801,310, and its CVAP is 14% African American and 15% Hispanic.  V14 7677, 7683.  As of January 2012,

statewide voter registration is 13% African American and 13% Hispanic.  V14 7684.

1C.    The African-American and Hispanic populations grew dramatically between the 2000 and 2010 Censuses, while the non-Hispanic white population remained static.  In the Covered Counties, the African-American population increased by 34% and the Hispanic population by 64%, while the white population increased by 5%.  V14 7679.  The Florida statewide figures, respectively, are 26%, 57%, and 4%.  *Id.*

1D.    Hillsborough County (including the City of Tampa) is the largest of the Covered Counties, constituting 73% of the Covered Counties' combined population (2010 Census).  V14 7677.  The other Covered Counties, in descending order of population, are Collier (19%), Monroe (4%), Hendry (2%), and Hardee (2%).  *Id.*

1E.    About one in six native-born Hispanics (16%) in the Covered Counties speaks English "less than very well."  V14 7697.

1F.    African-American and Hispanic populations in the Covered Counties have a substantially lower socioeconomic level than whites.  V14 7694-97.

1G.    Florida has a long history of racial discrimination in voting.  This includes poll taxes, *de facto* literacy tests, and segregation well into the 20th Century.  V17 9753-75.  This history led a Florida federal district court to conclude that "[a] longstanding general history of official discrimination against minorities has influenced Florida's electoral process," and "official state discrimination has adversely affected the ability of minorities to participate in the political process."  *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992).  *See also* V17 9252-95 (detailing post-1982 discrimination in Florida).

5.    FF 5 is undisputed.  The SOS is also responsible to "[o]btain and maintain

uniformity in the interpretation and implementation of the election laws." V13 7428 (Fla.

Stat. § 97.012(1)). *But see* FF 120-22 (non-uniform implementation of HB 1355).

<u>6</u>.      FF 6 is undisputed.  Florida Supervisors of Elections ("SOE") further "are elected

constitutional officers," V13 7407, and "required by law to report any instances of voting

fraud." V13 7076.

<u>7</u>.      Oppose.  Florida does not cite any authority for its proffered assertions,

particularly as to the alleged purpose(s) of past election legislation.

<u>8</u>.      Oppose, to the extent it analogizes HB 1355 (in purpose, scope, or effect) to prior

election legislation and mischaracterizes Salas's and Sola's testimony.

**III-IV.  The 2011 Act and Post-Act Regulations**

<u>9</u>.      FF 9 recites undisputed, but incomplete, facts.  Defendants propose the following:

<u>9A</u>.      As Florida admits, none of the Voting Changes was proposed by:  (a) any current

or former SOE; (b) the Florida Association of Supervisors of Elections ("FSASE"); (c)

the Florida Department of State ("DOS"); (d) then-Florida SOS Browning or his staff; or

(e) Florida Governor Rick Scott or his staff.  V15 8290.

<u>9B</u>.      Prior to the Florida Legislature's 2011 regular session, the FSASE solicited

feedback from its SOE members concerning election administration problems or changes

needed to Florida's election laws.  V9 4994-96, 4998; V2 751-52.  Neither any SOE nor

the FSASE identified or proposed any of the Voting Changes in response, and none of the

FSASE's 2011 legislative priorities addressed "voter fraud."  V9 4996-97, 5000, 5006-

07, 5011-12, 5142-43.  Escambia County SOE and FSASE President Stafford testified

that none of the Voting Changes was needed.  V9 5150-51; *see also* V5 2491.

9C.     Similarly, none of the Voting Changes was included in the DOS's 2011 legislative proposal.  V1 119; V9 4643-44; V12 6789, 6796; V15 8290; V8 4126, 4129; V8 4511. That proposal was not "focused on attempting to eliminate voting fraud," V9 4646, *see also* V8 4132, because that was not a DOS legislative concern.  V12 6791; V8 4578-79.

9D.     Bucky Mitchell, co-general counsel of the Republican Party of Florida ("RPOF"), drafted the initial versions of the Third-Party and Inter-County Changes and sent them to the Legislature, V12 6589-90, 6593-95, 6600-03, 6615-16, 6644; V15 8337-42; V15 8343; V15 8344-49, a fact Florida claims not to know.  V9 4654-55; V12 6789; V8 4137.

9E.     As to the source of the Early Voting Changes, Florida cites to Sen. Diaz de la Portilla's representation that the reduction in early voting days originated from concerns voiced by Miami-Dade SOE Lester Sola.  V9 4654-55.  Mr. Sola refuted this, however, testifying that he would never have advocated to reduce the early voting time period, and that Miami-Dade County favored expanding the time period.  V13 7167, 7124.

9F.     The FSASE actively opposed the Early Voting and Inter-County Changes, through public statements, legislative testimony, and private communications with legislators seeking to persuade them to delete or modify aspects of the Voting Changes.  V13 7226-27; V13 7279-80; V13 7538-40; V15 8360; V9 5125-26; V14 7569-70.

9G.     Neither DOS nor the SOS advocated in favor of the Voting Changes.  V13 7457.

9H.     As Florida admits, "Florida has produced no factual information to verify that, prior to the 2011 legislative session, the Florida Legislature and its staff members conducted any analyses, surveys, or studies related to the need or impact of any of the [three] sets of voting changes at issue in this case."  V15 8288.

4

9I.     As Florida admits, "[n]o member of the public provided oral or written testimony

before the [Florida] legislature at any time during the legislative process in favor of any

of the [three] sets of voting changes at issue in this case."  V15 8289.  Instead, numerous

individuals testified against those changes.  V1 417-45; V2 740-71; V2 964-79, 986-99;

V3 1638-40; V9 5112-15.  Newspapers editorialized against the changes.  V17 9442-53.

9J.     Florida has offered no evidence of legislative intent beyond the prepared

comments of some legislative proponents.  There is *no* testimonial or documentary

evidence of the proponents' intent.  This is because Florida deliberately chose not to "put

forward any legislator testimony," V17 9364-65, and actively opposed the United States'

and Intervenors' effort to compel legislator testimony.[3]  V1 109; V1 113.

10-21. FF 10-21 are undisputed.  Florida's description of the legislative process, however,

is incomplete and ignores critical facts, including the following additional findings:[4]

10A.   Representatives repeatedly criticized the Voting Changes, and offered numerous

amendments to eliminate those changes or mitigate their effects; each was rejected. V2

772-73, 778-79; V3 1162-66, 1253-71, 1278-83, 1292-96; V3 1340-48, 1358-65, 1372-

80, 1390-1400, 1407-12; V5 2422-24, 2426-93.  *See also* FF 48A-C.

14A.   Senators repeatedly criticized the Voting Changes, and offered numerous

amendments to eliminate those changes or mitigate their effects; each was rejected.  V2

---

[3]     Namely from Reps. Baxley and McKeel and Sens. Diaz de la Portilla and Dockery.

[4]     Defendants oppose, however, the inaccurate statements: (a) in FF 20 that three
Representatives from the Covered Counties voted against HB 1355 (four did), V16 8949,
8954-57; and (b) in FF 16-17 that the proposed early voting changes, as initially
introduced, would have permitted "8 hours each day" during the reduced period (they
would have permitted only "8 hours in the aggregate each weekend"), V2 1082, V4 1707.

956-58, 980-81; V3 1594, 1597-1607, 1610-14; V4 1821-25, 1828-31, 1842-44, 1846-49, 1855-61, 1874-77, 1895-96; V4 2219-25, 2228-32, 2234-41, 2245-47, 2250-55.  *See also* FF 48A-B.

15A.   None of the Voting Changes was in the version of SB 2086 considered by the Senate Ethics and Elections Subcommittee.  V17 9244-45; *see also* V1 332; V2 631.

17A.   Public testimony at the April 26, 2011 Senate Budget Committee Hearing was restricted to a single speaker, who was permitted to speak for only three minutes before being cut off (after describing SB 2086 as "a creative way to disenfranchise voters"), even though at least 37 people had submitted written requests to speak.  V3 1638-40; *see also* V17 9176; V9 5112-14.  This was an unusual and unexplained limitation on public comment.  V17 9101; V17 9176.

19A.   Shortly before final passage of HB 1355, Sen. (and Senate President *Pro Tempore*) Mike Bennett made the following statement on the Senate floor, which Sen. Joyner believes "shows discriminatory purpose" behind the Voting Changes:

> You say it's [voting] inconvenient.  Ever read the stories about the people in Africa, the people of the desert who literally walk two and 300 miles so they can have an opportunity to do what we do?  And we want to make it more convenient?  How much more convenient do you want to make it?  We want to go to their house, take the polling booth with us?  This is a hard-fought privilege.  This is something people died for, and you want to make it convenient?  The guy who died to give you that right, it was not convenient.  Why would we make it any easier?  I want them to fight for it.  I want them to know what it's like.  I want them to go down there and have to walk across town to go over to vote.  I want them to at least know the date they're supposed to vote.  I'd like to have them actually know where they're supposed to go vote.  Is that too much to ask?  I don't think so.

V4 2242; *see also* V17 9102-04, 9114.

22-23. Oppose the suggestion that DOS modified its rules concerning the Third-Party

Changes to address all concerns raised by the public; it did not.  V17 9218, 9220.

## V.    Florida Cannot Carry Its Burden to Prove No Discriminatory Purpose

### A.    The Record is Replete with Evidence of Discriminatory Intent

#### 1.    Third-Party Changes

24.    FF 24 is undisputed; however, the cited history extends only to 1993, and thus

does not support Florida's erroneous assertion (CL 72-75) that the benchmark practices

were those in effect on November 1, 1972.  *See also* V16 8921-23.

25.    Oppose as incomplete and misleading and propose the following findings:

25A.   On January 1, 1995, Florida began implementing the National Voter Registration

Act of 1993, 42 U.S.C. § 1973gg, and, in so doing, began permitting private

organizations and individuals to transmit completed voter registration applications to

election officials.  *LWVF v. Cobb*, 447 F. Supp. 2d 1314, 1317 (S.D. Fla. 2006); *see also*

Ch. 1994-224, Fla. Laws ("AN ACT relating to implementation of the [NVRA]…").

"This expansion of means to register … gave unregistered citizens more choices as to

how they could register to vote."  *Cobb*, 447 F. Supp. 2d at 1317.

25B.   In 2005, Florida enacted Ch. 2005-277, Fla. Laws (§§ 2 & 7), to regulate the

conduct of 3PVROs.  This new law defined 3PVROs to include "all persons and

organizations that solicit or collect voter registration applications, except for political

parties."  *Id.* at 1322.  The new law imposed large fines on a strict liability basis for each

completed application delivered late to election officials or not turned in.  *Id.* at 1322-23.

25C.   On August 28, 2006, the court in *Cobb* enjoined implementation of the 2005 law,

holding that the law unconstitutionally "discriminate[d] in favor of political parties" and "chill[ed] [3PVROs'] First Amendment speech and association rights" through a "combination of heavy, strict, joint and several liability fines." *Id.* at 1316.

25D.   In 2007, while the *Cobb* injunction was on appeal, Florida amended the 2005 law. Ch. 2007-30, Fla. Laws (§§ 1-2).  The amendments: (a) deleted the political parties exception; (b) significantly reduced the fine amounts, instituted an annual cap on fines, and provided for a three-fourths reduction in fines for organizations that voluntarily registered with the State and submitted reports of ongoing activities; and (c) removed strict liability by providing that fines shall be waived where noncompliance is based on *force majeure* or impossibility of performance.  *LWVF v. Browning*, 575 F. Supp. 2d 1298, 1302, 1304-05, 1325 (S.D. Fla. 2008) (defining key terms of the law).

25E.   On February 26, 2009, DOE promulgated an administrative rule (Rule 1S-2.042) to implement the 2007 law, which was amended in 2010.  V1 293-95.

25F.   The 2005 and 2007 changes regarding 3PVROs were precleared by the Attorney General on Sept. 6, 2005, and Jan. 23, 2008.  V16 9002-03; V17 9467-68.

25G.   Accordingly, the benchmark law regarding 3PVROs is the 2005 law, as amended in 2007 (codified pre-HB 1355 at Fla. Stat. §§ 97.021(37) & 97.0575) and construed in *Cobb* and *Browning*, and Rule 1S-2.042 (2010).  *See also* V16 8921-23.

26.   Oppose the assertion that registration and reporting under the prior law was required.  *Browning*, 575 F. Supp. 2d at 1305 ("compliance … is not mandatory").

27.   Defendants do not oppose the assertion in FF 27 that, under prior law, 3PVROs were not obligated to track voter registration forms, but note that some did for internal

quality control purposes.  V17 9161-64.  Defendants oppose the balance of FF 27 as an

unsupported conclusion that cannot be reconciled with SOEs' obligation to report voting

fraud, Resp. to FF 6, and the following alternative findings:[5]

27A.   As Florida admits, "[a]t the time of the Florida Legislature's consideration of HB

1355, the State of Florida knew of no instance since January 1, 2006" (when the 2005 law

regulating 3PVROs went into effect) "in which a [3PVRO]" did any of the following:  (a)

"submitted a completed voter registration application to election officials after the book-

closing deadline for an election where the applicant had delivered the completed

registration to that organization before the book-closing deadline"; (b) "committed fraud

in soliciting or collecting completed voter registration applications"; or (c) "committed

fraud in delivering voter registration applications to election officials."  V15 8279.

27B.   Likewise, none of the Covered County SOEs has encountered any fraud,

misconduct, or late submission of voter registration forms by 3PVROs.  V7 3661-62,

3670, 3734-37, 3832, 3880 (HIL); V6 3373, 3386-87, 3433-34 (COL); V6 3193, 3255

(MON); V7 3521 (HEN); V7 3940 (HAR); *see also* V17 9249.

27C.   The FSASE similarly "did not see, as [it] said in [its] written materials,

widespread instances of voter fraud" in connection with voter registration.  V9 5120-21,

5080; *see also* V3 1363.  In fact, Escambia SOE and FSASE President Stafford does not

know of any fraud by 3PVROs.  V9 5143.

27D.   DOS staff also did not view 3PVRO-related fraud as a concern that needed to be

---

[5]   Defendants further oppose FF 27 because, under the pre-2011 law, at least the Hendry
County SOE can identify voter registration applications submitted by 3PVROs.  V7 3549.

addressed.  V8 4351-52; V8 4132; V12 6791; V12 6334, 6251-52; *see also* FF 9C, G.

Since at least September 2009, Florida had "processes in place to prevent fraudulent

[voter registration] applications getting through the system."  V15 8299-8300.

27E.   DOS Assistant General Counsel Holland's initial reaction to the Third-Party

Changes was: "it's not needed, it's unnecessary, and it's just going to lead to litigation."

V8 4347.  While Holland later sought to minimize his concern as merely a "selfish"

desire to avoid litigation, he confirmed he was "satisfied with the current [pre-HB 1355]

law" and did not see a need for further regulation of 3PVROs.  V8 4348-52.

28.   Oppose as incomplete.  A full statement of the Third-Party Changes is set forth in:

(a) the "redline" of Fla. Stat. § 97.0575 (pre- and post-HB 1355), V1 279-82; (b) the

"redline" of Rule 1S 2.042 (2010 and 2011), V1 301-05; and (c) a comparison of the

2010 and 2011 implementation forms.  Defendants propose the following findings to

more fully describe the Third-Party Changes:

28A.   Pre-2011 law requires 3PVROs to submit completed voter registration

applications within 10 days of receipt (and not later than the book-closing date for forms

obtained prior to that date).  The Third-Party Changes impose a 48-hour deadline,

requiring submission within 48 hours to the minute after an application is signed.

28B.   Pre-2011 law does not require that canvassers ("registration agents") submit any

form before engaging in voter registration activity.  The Third-Party Changes mandate

that registration agents sign a "Sworn Statement" (Form DS-DE-120) as a pre-condition

to any registration activities; that statement lists multiple felonies for voter registration

misconduct and accompanying financial penalties and imprisonment, but does not

adequately define these crimes or explain that they require intentional fraud.

28C.   Pre-2011 law does not require 3PVROs to register with the State before engaging in registration activity.  The Third-Party Changes mandate this.  Pre-2011 law provides for quarterly reporting of voter registration activity by registered 3PVROs.  The Third-Party Changes mandate ongoing electronic reporting.  Each 3PVRO must track all registration forms it handles, and report monthly the number of: (a) registration forms provided to registration agents; (b) blank forms received from agents; and (c) non-blank forms received from agents (separately for state and federal forms).  Each 3PVRO must also report every time a registration agent is added, changes his or her address, or stops volunteering or working for the 3PVRO.

28D.   Pre-2011 law does not specify the manner in which registered 3PVROs must submit forms to the State.  The Third-Party Changes require 3PVROs to submit all mandated forms electronically, either as PDF files or via facsimile.

28E.   Pre-2011 law provides for reduced fines for 3PVROs that pre-register with the State and prohibits strict liability.  FF 25D.  The Third-Party Changes re-institute strict liability fines, and delete the reduction in fines based on pre-registration.

29.   Oppose as an inaccurate and unsupported conclusion.  Florida's citations[6] do not establish that the Third-Party Changes "prevent and deter fraud and make [3PVROs] more accountable" – particularly as there was (and is) no evidence of fraud under the pre-2011 law, and that law already required 3PVROs to return registration forms before book-closing.  FF 27A-E, 28A.  Many (if not all) of the untimely 3PVRO submissions

---

[6]   Part of the "authority" Florida cites is its own interrogatory responses.

Florida cites would have been untimely under the pre-2011 law.  V8 4472; V13 7472.

30.    Oppose, because (a) there is no testimonial or documentary evidence from legislators that this was in fact their intent and (b) it cannot be reconciled with the fact that prior to HB 1355 there were no appreciable problems in Florida of 3PVROs failing timely to submit voter registration applications or engaging in fraud.  The alleged purposes of deterring 3PVRO fraud, holding 3PVROs accountable, and ensuring timely submission of voter registration applications are pretextual, and cannot be substantiated:

30A.   Rep. Baxley, the principal sponsor of HB 1355, was unable to provide any specific support for his repeated claim that "fraud" was occurring under the existing third-party voter registration law.  And when asked during the House debate if he had "found that there's been a lot of mismanagement with [third-party] voter registration applications," Rep. Baxley stated "I'm not ready to talk about anyone specific."  V3 1183-84.

30B.   Rep. Baxley claimed that the Third-Party Changes were needed to address "the Mickey Mouse and Donald Duck registrations."  V2 723; V2 688; V3 1382.

30C.   Neither "Mickey Mouse" nor "Donald Duck" has ever registered to vote or voted in Florida.  V5 2449; V1 437; V2 746-47.  And even if such a registration were submitted, it would be identified by the safeguards and quality controls built into Florida's computerized statewide voter registration system, FVRS.  V13 7046; V9 5081-82; V8 4201-03; V7 3738 (HIL); V6 3254 (MON); V17 9249.

30D.   As nothing in HB 1355 alters the obligation of 3PVROs to submit all completed voter registration forms to election officials regardless of the name listed on the form, even if Rep. Baxley's stated concern with "Mickey Mouse" or "Donald Duck"

registrations was well-founded, his legislation (HB 1355) did nothing to address it.

30E.   Like Rep. Baxley, statements by Sen. Diaz de la Portilla, the principal sponsor of SB 2086, reflect a clear hostility toward 3PVROs.  According to the Senator: "a lot of third party groups, not most but some third party groups, let's say, actually do manipulate the voter and take advantage of the voter, particularly the old, the poor, the most vulnerable."  V2 984-85.

30F.   Because Rep. Baxley and Sen. Diaz de la Portilla successfully resisted Defendants' efforts to take their depositions, FF 9J, there is no explanation for their comments such as what "Mickey Mouse" has to do with 3PVROs or how a 3PVRO "take[s] advantages of" anyone by asking individuals if they wish to register to vote.

30G.   Numerous legislators, as well as former Florida Governor Crist, noted that no proponent could cite any specific examples of fraud, and several described HB 1355 as "unwarranted" and "a solution in search of a problem."  V2 772; V3 1345, 1362; V4 2228-32, 2251; V17 9407; V17 9454.

30H.   3PVROs strongly opposed the Voting Changes.  For example, Brad Ashwell with the Florida Public Interest Research Group, a 3PVRO, described the 48-hour deadline and new reporting requirements as "unnecessary hardship[s] on [3PVROs]."  V1 431-33. He explained that "the 48-hour time line to turnaround a signed [voter registration application] just isn't workable logistically when you're dealing with a number of volunteers, citizens that span across entire states."  V2 996-97; *see also* V1 442-45; V2 740-50, 760-71; V2 986-87, 993-95, 998-99; V9 5112-15.

31.   Oppose, as the cited statements are from Rep. Baxley and Sen. Diaz de la Portilla,

13

whose purported concerns about "fraud" were unsubstantiated and pretextual, and the

pre-2011 law already required submission of applications by book-closing.  The lack of

any neutral justification for the 48-hour deadline is shown by the following findings:

31A.   When asked "[w]hat was the reasoning behind going from ten days to 48 hours"

for submission of voter registration applications, all Rep. Baxley could say was that

"[t]he longer you have these documents out floating around, the more likely they are to

be hazarded to mishap or mischief."  V3 1161.  Pressed to be specific about the number

of applications "floating around," Rep. Baxley demurred:  "Who knows how many things

slip through the system that were inadequate."  V3 1180.  When asked specifically "how

[he] came up with 48 hours versus five days or seven days" for the new deadline, Rep.

Baxley was unable to provide any explanation.  V2 723-24; *see also* V3 1161.

31B.   This inability to justify the 48-hour deadline is particularly significant in light of

the absence of problems with the prior 10-day deadline.  As Rep. Randolph explained,

"ten days has been reasonable.  Ten days has – you have heard no one complain, find

[me] one Supervisor of Elections that has complained, find [me] one staff person at the

Division of Elections that has complained.  And I think you will find no one because ten

days has been perfectly reasonable."  V3 1267; *see also* FF 27A-E.

### 2.    Inter-County Changes

32.   FF 32 is undisputed; however, the citations are to 2005 and 1969 laws, and thus do

not support Florida's erroneous assertion (CL 72-75) that the benchmark practices were

those in effect on November 1, 1972.  *See also* V16 8929-30.

33.   Defendants do not oppose FF 33, and add that the referenced 2005 changes were

14

precleared by the Attorney General on Sept. 6, 2005.  V16 9002-03.

34.    Oppose, as there is no evidence of "double voting" by inter-county movers under the prior law and any attempt would be detected, investigated, and prosecuted:

34A.    These is no evidence of "double-voting," where a voter casts more than one ballot in an election, by voters moving within Florida prior to enactment of HB 1355.  V13 7087.  As Florida admits, "[a]t the time of the Florida Legislature's consideration of HB 1355, the State of Florida knew of no instance in which a person who changed residences between Florida counties cast more than one ballot in the same election, where one ballot in that election was cast pursuant to the affirmation procedure set forth in Fla. Stat. § 101.045."  V15 8281; *see also* V15 8290.  Florida also admits that it has not identified any such double-voting after the enactment of HB 1355.  V15 8281.

34B.    SOEs confirmed there is no double voting by people moving within Florida.  V7 3648-49, 3771-72 (HIL); V13 7279 (COL); V6 3106-07, 3132, 3198-3200 (MON); V7 3937 (HAR); V7 3533 (HEN); V9 5030-32, 5034; *see also* V12 6817-18; V12 6323-24; V8 4174, 4182; V8 4401-02; V9 4804.

34C.    If double-voting, a third-degree felony, V13 7101, V7 3773, V6 3421, did occur, SOEs confirmed it would be detected and prosecuted.  V1 438; V9 5032-33, 5105-06, 5149-50; V7 3513-15 (HEN); V7 3935 (HAR); V6 3365-66, 3421 (COL); V7 3771-73 (HIL); V17 9183.  Florida and DOS agreed.  V13 7075-76; V8 4146-48; V12 6817.

34D.    Several SOEs and a DOS attorney testified that the Inter-County Changes were not needed.  V9 5028-29; V7 3791 (HIL); V6 3365, 3393, 3427 (COL); V7 3971 (HAR); V1 436-39; V8 4218.

35.     Oppose (a) the assertion that the changes "addressed [a] problem," which they did

not, FF 34A-D, and (b) the incomplete description, which ignores the stipulation that the

changes extend to voting "on election day and during early voting."  V5 2600.

36.     Oppose, as the cited material does not support the proffered assertion, ignores the

absence of any problem of double-voting and legislators' and the FSASE's repeated

rejections of the purported justification, and fails to address testimony by the original

drafter of the changes concerning the real motivations behind those changes, as follows:

36A.   During debate, Rep. Baxley was repeatedly unable to answer the question: "how

many times [has double voting occurred] in the past several years."  V3 1176-77, 1179,

1207-09; *see also* V3 1411-12.  Rep. Baxley likewise failed to offer any data in response

to Rep. Kriseman's observation that Florida's long-standing policy of permitting voters to

change their address and vote a regular ballot "seems to have been working after all these

years," or his question whether Rep. Baxley had "some data or something that led [him]

to believe that this long-standing policy wasn't working well…."[7]  V2 721-22.

36B.   This lack of any evidence of double-voting or that the Inter-County Changes

would prevent such conduct was highlighted – repeatedly – by the FSASE in its

opposition to those changes:  "There are no reports of widespread abuse or double

voting."  V13 7279-30; V15 8360; V13 7538-40; V13 7226-27; *see also* V13 7087.

36C.   This lack of evidence or justification led Rep. Clemens to state that address

changes at the polls "is something that people have been doing in the State of Florida for

---

[7]   Rep. Baxley admitted, however, that he "would like to discourage people from trying
to do registration activities at the voting booth…."  V2 739.

the past 40 years.  We heard absolutely no evidence today whatsoever that people are abusing this provision."  V3 1279-80.  Rep. Saunders similarly concluded that the Inter-County Changes are "trying to fix a problem that apparently doesn't exist."  V3 1340-41.

36D.   The absence of double-voting was also discussed by the initial drafter of the Inter-County Changes, Bucky Mitchell, RPOF co-general counsel, and RPOF employees.  Specifically, in response to SOE opposition, the RPOF Executive Director wrote: "Section 21 [the Inter-County Changes] needs to stay.  Even if there aren't massive cases of fraud…."  V13 7517; V15 8364; *see also* V12 6568.  Mitchell responded, "I would suggest we try to come up with at least some anecdotal evidence that there was abuse or double voting.  I seem to recall that Leon County and some FAMU [a historically black university] students were mentioned."  V13 7517; V15 8364; *see also* V12 6568, 6683; V15 8360.  Mitchell, however, was not able to identify any such "anecdotal evidence" of "abuse or double voting" to provide to the Florida Legislature.  V12 6684.

37.   Oppose, because while Rep. Baxley claimed the provisional ballot is "a real ballot," V2 715, V3 1156, such ballots are counted at a significantly lower rater than regular ballots, a fact recognized in debate on the Inter-County Changes:

37A.   As Rep. Baxley conceded and numerous legislators highlighted, provisional ballots are counted at a significantly lower rate than regular ballots, with as many as 50% or more invalidated.  V2 739-40; V3 1181; V3 1342; V13 7381 (HIL); V13 7283 (COL); V17 9407; V15 8371; *see also* V3 1412 (Rep. Clemens:  "Forcing people to vote provisionally disenfranchises Florida voters").

### 3.   Early Voting Changes

38.    FF 38 is undisputed; however the cited history extends only to 2001, and thus does

not support Florida's erroneous assertion (CL 72-75) that the benchmark practices were

those in effect on November 1, 1972. *See also* V16 8933.

39-41.  FF 39-41 are undisputed.  The referenced 2004 changes were precleared by the

Attorney General on July 12, 2004, and in effect during the 2004 election.  V17 9643.

42.    Oppose, as it makes unsupported assertions and generalizations about

unsubstantiated "problems with the prior law," which are contradicted by the record:

42A.   Throughout legislative consideration of the Early Voting Changes, the FSASE

repeatedly asserted that "maintaining the 15-day timeframe [for early voting] best serves

the voting public" and "is imperative to a smooth General Election in the state."  V13

7226-27; V13 7538-40; V9 5145.  The reduction in the number of early voting days,

therefore, was one of the FSASE's "significant concerns" with HB 1355 and SB 2086.

V13 7226-27; V13 7538-40.  The FSASE specifically warned that "not having the 15-day

[early voting] timeframe for the General Election could result in crowding and confusion

at early voting sites and on Election Day at the precincts," and that the Early Voting

Changes "will increase costs to counties," such as "overtime and other associated

expenses."  V13 7540; V13 7226.  Accordingly, the FSASE, "did not put forward a

proposal to throttle back on early voting."  V9 5146.

42B.   There is agreement among SOEs – who Florida recognizes as "the experts when it

comes to early voting," V9 4790-91 – and DOS that, before HB 1355, early in-person

voting was a "tremendous success" and did not need to be reduced.  V13 7226-27; V7

3743, 3769-70 (HIL); V6 3405-06 (COL); V6 3133 (MON); V7 3537 (HEN); V13 7140-

41; V6 2928-29; V8 4355; V12 6304; V17 9177-79.

42C.   SOEs testified that the prior law provides sufficient flexibility.  V6 3340 (COL);

V6 3196 (MON); V7 3605 (HIL); V7 3914 (HAR).  To the extent SOEs requested more

flexibility, they wanted the ability to offer early voting at additional locations.  V6 3339-

40 (COL); V7 3607-08 (HIL); V9 5061-62; V13 7226; V14 7569; V2 971-72; V17 9248.

This was not included in HB 1355.  V5 2461-66; V14 7569.  As to the claim that the

second week of early voting is allegedly "more popular with voters," FF 45B.

42D.   The only real problem with early voting prior to HB 1355 was heavy utilization

resulting in long lines during high-turnout elections.  Rep. Taylor commented, for

example, that HB 1355 does not address "the problems that occurred in my district in

2008, which was extremely long lines during early voting."  V1 403-04.  Sen. Margolis

similarly noted that, during the 2008 general election, early voting lines in Miami-Dade

County "were at least three hours long."  V3 1598.

43.   Oppose, as the description of the Early Voting Changes is incomplete.  *See instead*

FF 85.  FF 43 ignores the elimination of the first five days of the early voting period and

the new prohibition against early voting on the last Sunday before Election Day.  It also

incorrectly asserts that the changes "addressed … problems" and mischaracterizes the

effect of the changes, as the following alternative findings demonstrate:

43A.   Contrary to the implication in FF 43, and as Florida admits, "Florida has not

issued any rule, directive, or guidance to [SOEs] … regarding the manner in which

[SOEs] should exercise the discretion granted by HB 1355 to determine the number of

early voting hours per day…."  V15 8283.

<u>43B</u>.   The reduction in early voting days reduces the opportunity to vote early, notwithstanding the possibility that some counties' may offer longer hours during the fewer remaining days.  A substantial percentage of early voters have relied on the first five days of early voting, which HB 1355 eliminates.  V14 7884, 7901; V17 9240 (MON).  "[V]oters tend to go to the polls in clusters, particularly from 12 noon to 2 p.m. during their lunch hour, and between 5 p.m. and 6 p.m. immediately following business hours…."  V17 9179.  Voters generally do not vote outside of daytime hours.  V6 3143-45 (MON); FF 45B.  As such, "[f]ive longer weekdays do not provide a sufficient opportunity for the voters to vote, despite the longer poll hours, because it will limit the number of voters' opportunities to vote during the lunch hour and immediately after work to only five weekdays instead of ten weekdays."  V17 9179; *see also* V7 3765 (HIL). Intervenors' expert, Dr. Gronke, testified that he "know[s] of no empirical argument by which one could conclude that African American voters – or any voters for that matter – will successfully adjust to possible longer hours on one-third fewer days."  V14 7890; V17 9095; V11 6246-47.

<u>44</u>.    Oppose, as (a) there is no testimonial or documentary evidence from the legislators that this was their intent, (b) the purported intent to "increase early voting" is inconsistent with eliminating one-third of the early voting days, (c) SOEs opposed the Early Voting Changes, (d) SOEs generally believed they had sufficient flexibility under the prior law and the additional flexibility SOEs wanted was not provided, and (e) the changes eliminated SOE flexibility by prohibiting early voting on the last Sunday before Election Day.  V2 960.  *See also* FF 9J, 42B-C, 43B.

45.     Oppose, as the cited material does not support the proffered assertion, there is no

testimonial or documentary evidence from the legislators that this was in fact their intent,

and legislators had no basis for believing that the changes would save costs or that an

insignificant percentage of early voting occurs during the first portion of the early voting

period, as the following alternative findings establish:

45A.    Sen. Diaz de la Portilla, the principal sponsor of the Early Voting Changes, stated

that the sole reason for shortening the early voting period was that "the evidence is very,

very clear … that when you have that 15-day window, most of the early voting actually

takes place in the last seven days.  In essence, the initial week [of early voting] is really a

waste of money," and is a period "people just don't really avail themselves of."  V3 1595,

1612-13.  Thus, the reduction in early voting days "was an efficiency measure, and that's

why we put the change in there."  V2 957.

45B.    Florida election data demonstrates that voters use the first early voting week to a

significant degree.  In 2008 and 2010, between a third and a half of Florida's early in-

person ballots were cast during the first week, including approximately 35% in both the

2008 and 2010 general elections.  V14 7817.  SOEs confirmed this extensive usage of the

first five days of early voting.  V7 3769 (HIL); V6 3140, 3182-83 (MON); V7 3529

(HEN); V2 972; V9 5061-62; V6 2933.  Thus, it is not accurate that the first week is "a

waste of money" or "a throwaway."  V3 1595, 1602.

45C.    Sen. Diaz de la Portilla's claim that his concern regarding the first week of early

voting originated from complaints by SOE Sola is false.  FF 9E.

45D.    Because Sen. Diaz de la Portilla successfully resisted Defendants' efforts to take

21

his deposition, FF 9J, there is no explanation for his mischaracterization of Florida's early voting data or his misrepresentation regarding SOE Sola.

45E.   Contrary to legislators' claims that eliminating early voting days would reduce costs, Florida has conceded that "any cost savings resulting from the … Voting Changes would be minimal."  V15 8681-82; *see also* V12 6315-16 (DOE Director Salas "cannot see where there would be [cost] savings" from the Voting Changes).

45F.   And as was pointed out repeatedly to the Legislature, the Early Voting Changes will *increase* costs, particularly staff overtime costs associated with longer hours per early voting day.  V17 9179-80; V9 5104-05, 5117-18, 5145-46; V14 7554; V14 7560; V13 7226; V14 7569-70; V17 9242 (MON); V17 9247-48.

46.   Oppose, as untrue and unsupported by the record.  There is no testimonial or documentary evidence from the legislators concerning what they "wanted" with respect to this bill.  FF 9J.  Moreover, legislators could not have wanted to help SOEs by "ensur[ing] that early voting would not be required on the last Sunday before Election Day" because the pre-2011 law did not include any such requirement.  As Florida admits, "[p]rior to … HB 1355, each [SOE] had discretion whether to conduct early voting in federal and state elections on the Sunday two days before election day."  V15 8282.  The only effect of the change is to prohibit SOEs who want to conduct early voting on that final Sunday from doing so.  Previously, numerous SOEs offered final Sunday early voting, which minority voters used disproportionately.  FF 98B-G, I-M, 116B-C.

## B.   Contrary to Florida's Contention, There Were Multiple Assertions of Discrimination During the Legislative Process

47. Defendants do not oppose FF 47 to the extent it merely lists portions of the record.

48. Oppose, as it is inaccurate and misleading. Florida's contention that there were "only a few offhand, generalized claims" of discrimination during the legislative process is false. Opponents of the Voting Changes, including Sen. Joyner, criticized the changes as discriminatory to minorities, as the following alternative findings establish:

48A. Legislators repeatedly stated that the Voting Changes *would* discriminate against minorities. Sen. Joyner, an African-American legislator and Intervenor, referenced the necessity of "the Civil Rights Act to get to the point where my people could vote" in explaining her opposition to the Early Voting Changes. V3 1604; *see also* V17 9100-06, 9108. Rep. Stafford, an African-American legislator, analogized HB 1355 to the poll taxes, literacy tests, and other barriers to voting of the 1960s and concluded that, "[t]his bill will disenfranchise voters" and "the Floridians most harmed will be those who have been historically disenfranchised in this country, people of color, women and youth." V3 1372-75. Rep. Randolph labeled HB 1355, among other things, an "anti-minority bill." V3 1407; V17 9406. Rep. Bullard, an African-American legislator, explained his opposition to HB 1355, in part, by invoking Florida's history of "[v]oter suppression and/or disenfranchisement." V3 1377-78. Rep. Williams, also an African-American legislator, described himself as "the latest installment to carry the blood-stained banner of the civil rights movement" and urged rejection of HB 1355, which will "discourag[e] voter participation." V3 1398-99. *See also* V17 9118-20; V17 9175; V3 1358-61.

48B. As Florida admits, "[d]uring the 2011 Florida legislative session when HB 1355 was adopted, the five black members of the Florida Senate and the sixteen black

members of the Florida House … all voted against the adoption of HB 1355." V15 8291.

<u>48C</u>.   The Florida House Democratic Caucus thereafter urged the Attorney General to deny preclearance of HB 1355.  V5 2569-70.  The Representatives highlighted the significant negative consequences of each of the Voting Changes, which they asserted will disproportionately harm minorities.  *Id.*  SOS Browning could not remember any other instance of Florida legislators making such a request.  V12 6765-66.

<u>48D</u>.   Prior to passage of the Voting Changes, it was well known in Florida (and widely reported in the media) that African-American turnout in the 2008 general election exceeded prior elections and played a substantial role in the election results, and that African Americans relied upon early in-person voting at an exceedingly high rate in the 2008 general election, which was substantially higher than the rate for white voters.  V17 9415-41; *see also* FF 1C.

<u>49</u>.   Oppose, as it misleadingly suggests that opponents of the changes were concerned only with effects on young people, college students, military personnel, and the elderly. Opponents voiced serious concerns about the effects on minorities.  FF 48A-C.

<u>50</u>.   Oppose, because it is grossly inaccurate, FF 48A-C, and the cited material includes no legislator testimony to support the proffered assertion.

<u>51</u>.   Oppose, because the material cited (only FF cross-references) is misleading, inaccurate, and does not support the proffered assertion.

**C.    The Legislative Process Was Unfair, Severely Limited, and Unusual**

<u>52- 53</u>.  Defendants oppose FF 52-53 because they mischaracterize the legislative process.  As explained by Sen. Dockery, one of two Republicans to vote against the

Voting Changes:  "Florida's new election law [HB 1355] was another poorly vetted piece of legislative slop."  V17 9244-46.  "The Senate slid its election-law changes – a 40-page document with a few small issues – through the Ethics and Elections [Subc]ommittee with minimal debate."  *Id.*  While "the Ethics and Elections Subcommittee [is] where proper vetting should have occurred," that did not occur because the Voting Changes had not yet been grafted onto the bill.  *Id.*  Following later committee stops, "where [the bill] grew to 148 pages with one amendment that added [the Voting Changes, among others]," "the bill was rushed to the Senate floor" where "the bill's supporters offered unsupported allegations of voter fraud."  *Id.*  Sen. Dockery, thus, "question[s] both the process and policy," as well as "whether the four most controversial parts [of HB 1355: the Voting Changes] will survive the scrutiny of the courts…."  *Id.*  Moreover, several legislators and participants in the legislative process noted that the last minute appearance of drafts of the Voting Changes (via serial "late-filed" "strike-all" amendments) hindered their ability to fully review and challenge those changes.  V1 418, 428, 430, 451; V2 683, 741, 749-50; V2 945, 965; V9 5027, 5086-87; V17 9099-9100.  *See also* FF 10A & 14A (numerous ameliorative amendments rejected), 17A (limited public comment).

## VI.    The Voting Changes Will Have Discriminatory Effects on Minority Voters

### A.    The Third-Party Changes Will Have Significant Retrogressive Effects

<u>54-55</u>.  FF 54-55 are undisputed.  *But see* V17 9409 (Florida Department of Veterans' Affairs suspending voter registration due to HB 1355).[8]

<u>56</u>.    Defendants do not oppose FF 56 except to note educational institutions are not

---

[8]    Defendants do not know the status of this suspension of voter registration activity.

required to offer voter registration opportunities, Fla. Stat. § 97.021(32), and Florida cites

no evidence to support the claim that "many" institutions offer such opportunities.

57.    Oppose.  A significant number of people use 3PVROs to register to vote (of whom

a disproportionate share are minorities); registering via a 3PVRO cannot simply be

discounted as a matter of "choice"; and 3PVROs operate in the Covered Counties, as the

following alternative findings establish.

57A.   According to Census data, voter registration drives are a relatively small, but

significant method of voter registration, which African Americans and Hispanics in

Florida utilize at higher rates than whites.  V14 7688-91.  In fact, in 2008 and 2010,

minority reliance on this method of voter registration was twice that of whites (African

Americans: 11% & 10%; Hispanics: 10% & 12%; whites: 5% & 5%).  V14 7688-89; *see

also* V8 4205-06.  Similar disparate rates exist nationally as well.  V14 7688-89.

57B.   In contrast, Florida's minority citizens usually register to vote at motor vehicle

offices at lower rates than white citizens, although this generally is the most frequently

used method of registration in Florida.  V14 7688-89.  The percentages of African-

American and Hispanic households without access to a vehicle, both statewide and in the

Covered Counties, is substantially higher than for white households.  V14 7693.

57C.   Numerous 3PVROs conduct voter registration activity in the Covered Counties.

V7 3715-18 (HIL); V10 5422 & V17 9206-07 (LWVF chapters in Hillsborough, Collier,

and formerly Monroe Counties); V17 9159-60 (NCLR registered approximately 8,000

Hillsborough residents in 2010); V17 9137-38, 9149-50 (Florida NAACP).

57D.   The efforts of 3PVROs, such as Intervenor NCLR, are "essential for registering

large numbers of Hispanic citizens in Florida" to vote.  V17 9158; *see also* V17 9122

(Rep. Cruz: "Citizens for whom Spanish is their primary language feel more comfortable

registering with 3PVROs, who come to the communities in which we live and often share

a common language and culture."); V17 9194-95; FF 1E.

57E.   During its registration drives, the LWVF "reaches out to underserved

communities," including "African-American, Hispanic, and … Haitian" communities.

V10 5423-24; *see also* V17 9202, 9206.

57F.   Likewise, the NAACP plays an important role in helping African Americans in

Hillsborough County, as well as throughout Florida, register to vote.  V7 3672, 3715,

3718 (HIL); *see also* V17 9131-35, 9137-40; V17 9234-35 (3PVROs "provide African-

American citizens who seek to register to vote with a level of comfort, familiarity, and

trust that may not be present at the local Supervisor of Elections office"); V17 9195.

Indeed, Sen. Joyner's constituents, many of whom reside in Hillsborough County, "feel

more comfortable registering to vote with the assistance of someone from their

community, instead of a state services office."  V17 9110.

57G.   Hillsborough County SOE Lennard similarly observed that some individuals

within minority communities "are less prone to view government as being friendly" and,

therefore, may prefer to register to vote with the help of someone of their same race or

ethnicity, rather than at a government facility.  V7 3885 (HIL); *see also* V17 9205-06.

For such individuals, SOE Lennard noted that NCLR's Democracia project, whose

representatives often speak Spanish and/or are members of the Hispanic community, "is

helpful" in registering Hispanics in Hillsborough County to vote.  V7 3716-18.

57H.   Escambia County SOE and FSASE President Stafford also testified that 3PVROs "[a]bsolutely" play an important role in "reach[ing] out to voters as another source of registration." V9 5129-31.  Numerous SOEs testified that reduced 3PVRO activity "is a bad thing, that has a negative impact on the voters of Florida."  V6 3430 (COL); *see also* V7 3714-21 (HIL); V7 4001 (HAR); V9 5131; V6 2908-11; V8 4206.

58-60.  Oppose because (a) they do not completely describe the Third-Party Changes, FF 28A-E, and (b) there is ample evidence, as the following alternative findings demonstrate, that those changes impose "heavy restrictions," V5 2562, and significant additional burdens, costs, and risks upon 3PVROs, which will substantially reduce voter registration activity in Florida (and Florida cites no 3PVRO testimony to the contrary).

58A.  In the Florida counties where the Third-Party Changes have gone into effect, several 3PVROs have found it necessary to suspend voter registration activities completely or restrict the scope of their activities and divert resources from conducting registration drives to managing compliance efforts.  V17 9136-40; V17 9233-35; V17 9164-68, 9170-71; V17 9219-21; V17 9749-51; V17 9110-11; V17 9121-22.

58B.   New burdens include the 48-hour deadline to turn in voter registration forms, the vague Sworn Statement that volunteers and others engaged in voter registration activity must sign, substantial additional record-keeping requirements, and the potential for significant strict-liability fines.  V10 5239-41, 5244-45, 5247-50; V17 9212-19; V17 9166-71; V17 9136-39; V17 9233; V17 9248-49.

58C.   The 48-hour deadline permits fines and civil penalties against 3PVROs that do not deliver completed forms to election officials "within 48 hours … or the next business day

if the appropriate office is closed for that 48-hour period." Fla. Stat. § 97.0575(3)(a).

Florida has provided no guidance as to when a closed office provides a grace period, if

any, and 3PVROs have had difficulty interpreting and complying with the confusing 48-

hour requirement.  V17 9213-14; V17 9136, 9140-41; V17 9169.

58D.   The 48-hour deadline allows no room for error, and 3PVROs are held strictly

liable for any forms submitted even a minute late, even where delay is due to events

outside 3PVROs' control, such as "impossibility of performance" or an "unclear"

postmark.  Fla. Stat. § 97.0575(3)(a) & (b); Rule 1S-2.042(7)(a); V17 9248-49.

58E.   Under LWVF's standard procedures, which have resulted in the successful

registration of thousands of Florida voters without incident or complaint, the submission

of completed voter registration forms takes anywhere from two to eight days after receipt.

V17 9210, 9213; *see also* V17 9164 (NCLR's quality control measures typically required

four to eight days prior to the Third-Party Changes).  Submitting forms within 48-hours

may be impossible for many volunteers.  V17 9210, 9213.  *See also* V17 9750-51.

58F.   For those 3PVROs that may be able to navigate compliance with the 48-hour rule,

doing so will divert scarce resources from registering voters and negatively impact the

scope of their registration activities.  Compliance requires more frequent (up to daily)

trips to an SOE office, which consume substantial time and resources.  V17 9167.  NCLR

has found that, based on its work in the non-covered counties, the 48-hour rule has

effectively limited its ability to conduct weekend voter registration drives. *Id.* at 9167-68.

58G.   Compliance with the 48-hour rule also negatively impacts 3PVROs' ability to

check completed applications for accuracy and completeness, and follow up with voters

when mistakes or omissions are found.  V17 9161-63, 9168-69.  The pre-2011 allowance

of 10 days to submit voter registration forms allowed 3PVROs, such as NCLR, to

implement quality control measures that "reduce[] not only the burden on [SOE]

office[s]," which must investigate incomplete or incorrectly completed voter registration

forms, but also "increase[] the likelihood that a voter will in fact be registered the first

time through."  V7 3885-86 (HIL); *see also* V6 2923-25.  The accelerated submission

deadline, however, eliminates (or at least significantly reduces) the opportunity to

perform such checks, even when additional personnel are diverted to conducting quality

control.  V17 9168-69; V4 1829; V5 2428.

58H.   As Hillsborough County SOE Lennard recognized, the 48-hour requirement

"certainly increases the amount of effort that [3PVROs] must do in order to comply,"

which increases the risk that 3PVROs will be fined for noncompliance if they do not

divert additional resources to compliance.  V7 3724-25, 3667, 3734 ("It takes great

effort" to comply with HB 1355); *see also* V17 9750-51.

58I.   The new requirement to submit numerous electronic filings before and while

engaging in voter registration activity places a heavy burden on volunteer 3PVROs like

the Florida NAACP and LWVF.  Many 3PVROs are run entirely or primarily by

volunteers, a significant number of whom "lack ready access to computers, scanners, or

fax machines," which are needed to submit required paperwork.  V17 9201, 9207, 9216

(LWVF's staff is "only two part-time employees"); V17 9131-33; V17 9749.  And for

3PVROs (like NCLR) run by paid staff, the new record-keeping requirements are time

consuming and divert resources from voter registration.  V17 9160-61, 9170-71.

58J.    Before assisting anyone to register to vote, the Third-Party Changes require all individuals to sign the Sworn Statement listing felony penalties for "false registration" (up to five years in prison) and warning that falsely swearing to the form is a felony.  The form neither adequately defines these offenses nor explains that they require intentional fraud.  FF 28B.  Volunteers are likely to find this form intimidating and believe it will involve them in an undesirable, complicated, and risky process, thereby hampering 3PVROs' efforts to attract volunteers.  V17 9215-16; V17 9139; V7 3667 (HIL).

58K.    After the Third-Party Changes were enacted, NCLR imposed an immediate moratorium on all voter registration activity in Florida.  V17 9165-66.  While NCLR subsequently restarted its registration activity, that effort has been reduced by the diversion of resources from registering voters to compliance efforts.  *Id.* at 9164-72.

58L.    The Third-Party Changes are having a "devastating impact on [the Florida NAACP's] ability to recruit NAACP branch units and individual members to participate in voter registration drives, and are crippling" the NAACP's registration efforts in Florida.  V17 9136-40.

58M.    On the day HB 1355 was signed into law (May 19, 2011), the LWVF instituted a moratorium and ceased all voter registration activity in Florida.  V10 5237, 5239-42.  The LWVF did this because the Third-Party Changes "created a mountain of risk and red tape that made it really impossible for [the LWVF] to ask [its] volunteers to continue the work that [it] ha[s] done since 1939."  V10 5240; *see also* V17 9212, 9219-21.

61.    Defendants oppose FF 61 to extent it mischaracterizes the potential fines as "minor," which they are not, especially to volunteer-led 3PVRO groups with limited

resources, FF 58B, D, I, and 62A, and minimizes the chilling nature of enforcement

actions, which may seek "to prevent a violation" via court order.  Fla. Stat. § 97.0575(4).

62.      Oppose, as the fines imposed by the Third-Party Changes are a major deterrent to

3PVRO activity, particularly in light of the heightened risk that such fines will be

imposed due to the strict new requirements created by those changes:

62A.     The fines for, among other things, turning in completed voter registration forms

after the 48-hour deadline are a major deterrent to 3PVROs.  V17 9137-39; V17 9234-35;

V17 9219-20; V17 9750-51.

63.      Oppose.  The conclusory assertions are not supported by the record and cannot be

reconciled with the facts set forth above.

64.      Oppose, as an unsupported conclusion that cannot be reconciled with the evidence

that: (a) numerous 3PVROs in Florida focus on registering minorities (and other

underserved populations) to vote, FF 57C-F; (b) minorities rely disproportionately on

3PVROs to register to vote, FF 57A, D-G; (c) minorities prefer to use 3PVROs to register

to vote, FF 57B, D, F-G; and (d) the Third-Party Changes will reduce 3PVRO activity,

FF 58A, E-M, 62A.  Hillsborough County SOE Lennard recognized this, noting that a

decision by the Hillsborough Chapter of the NAACP to stop voter registration activities

could have an "adverse effect on the number of registered voters" served by that group,

primarily African Americans in Hillsborough County.  V7 3671-72 (HIL).  Monroe

County SOE Sawyer likewise testified that he "see[s] an impact on minorities," namely

"that they may not have access to voter registration through [3PVROs] that they would

have had in the past."  V6 3313.

### B.     The Inter-County Changes Will Have Significant Retrogressive Effects

<u>65</u>.     Defendants do not oppose FF 65, as it recites undisputed facts, except to the extent it conflicts with the "three limited circumstances" in FF 69 where a provisional ballot allegedly will not be counted.

<u>66</u>.     Oppose, as the assertion that only a "few individuals" will be affected by the Inter-County Changes is contradicted by the evidence.  FF 68A-E.

<u>67</u>.     FF 67 is undisputed.

<u>68</u>.     Oppose.  The Inter-County Changes' provisional ballot requirement imposes substantial additional burdens on, and risks to, voters' ability to cast a ballot that is counted, as the following alternative findings establish:

<u>68A</u>.     Voting a provisional ballot takes longer to complete, involves more steps, is "confusing and frustrating" to voters, introduces additional opportunities for human error that results in ballot rejection, and causes polling place disruptions.  V13 7279 (COL); *see also* V6 3357-59, 3418-19 (COL); V7 3779-81, 3877-78 (HIL); V2 967-69; V9 5042, 5205; V17 9180-83; V1 439-41; V13 7385.  Thus, "[t]he more people that you have voting provisionally at the polling place, the more disruption that you're going to have at the polling place itself.  It's just a matter of fact.  It takes a long time for an individual to vote a provisional ballot."  V2 753.  As a result, Hillsborough County's "goal is to have zero" provisional ballots.  V7 3655-56, 3876 (HIL).

<u>68B</u>.     Increasing the number of provisional ballots cast will "increase the lines at the polling places," which may discourage or prevent voters from voting.  V13 7279 (COL); *see also* V6 3357-59, 3418-19 (COL); V17 9108-09; V5 2447; V17 9193.

<u>68C</u>.   The FSASE predicts that the Inter-County Changes "will result in thousands of additional provisional ballots."  V13 7227; *see also* V13 7279-80; V13 7539-40; V15 8360.  This is borne out by DOE data, which shows that in the 2008 and 2010 general elections an additional 33,900 and 19,235 Florida registered voters, respectively, would have been forced to vote a provisional (rather than regular) ballot had the Inter-County Changes been in place.  V13 7508; *see also* V9 5072-73, 5075.

<u>68D</u>.   "Voters [p]refer to vote a regular ballot [rather] than [a] provisional ballot."  V9 5205.  "[I]f a voter has to vote a provisional ballot, it does not leave a good feel [*sic*] with the voter."  V7 3778 (HIL).  Indeed, "the experience that somebody has when they go into a polling location and are told that they have to cast a provisional ballot is … extremely embarrassing and chilling on the people when it happens."  V10 5451.  And "if a voter has to vote a provisional ballot, then they're not as confident that their vote has been – their ballot has been cast and has been counted or will be counted."  V7 3778 (HIL).  "[W]hen you use that term [provisional], it has an effect upon the voter to think, well, you know, does my ballot count or not"?  V7 3878 (HIL); *see also* V17 9106 ("Voters believe that provisional ballots will not be counted, either at all or in the same way and at the same rate as regular ballots, and this perception decreases voters' willingness to take the time to vote"); V17 9121; V17 9191-92.  Consistent with these negative effects, DOS attorney Matthews testified that, during consideration of HB 1355, DOS staff was concerned the Inter-County Changes "would generate a lot more provisional ballots," and impose greater burdens on voters, such as having to "fill out an affidavit and a voter registration application and a provisional ballot certificate" and

34

thinking "that they had to bring additional information in to prove that they were now [living] in their new county."  V8 4067, 4069-70.

68E.   The Inter-County Changes also "have [an] impact on the precinct worker" and "on the back-end, post election" canvassing process.  V9 5189; *see also* V7 3648, 3876 (HIL); V2 753-55; V8 4212.  Accordingly, the FSASE is "concern[ed] that there's simply not enough time to canvass all those [additional provisional] ballots" resulting from the changes.  V2 967-69; *see also* V1 438-39 (MON); V17 9180-82.

69-70.  Oppose, as incomplete and irreconcilable with (a) the historical provisional ballot rejection rate of about 50%, FF 37A, and (b) the Collier County SOE's testimony that, if she reached the end of the canvassing period (either two and a half or three and a half days after Election Day) before completing her investigation of provisional ballots, she would reject and not tabulate all remaining provisional ballots.  V6 3423-24.

71.   Oppose, because it is not true.  FF 68A-B, D.

72.   Oppose to the extent it mischaracterizes the number of affected voters as "very few."  Based on available data (*see* Resp. to FF 74), the number of affected Covered County voters (had the Inter-County Changes been in effect) was 2,240 in the 2008 general election.  V16 8896, 8907-8909.  Even a small number of votes can alter an election (*see* n.9), the raw number of disenfranchised voters is legally irrelevant, and Florida fails to provide any data or calculations to support its claim concerning military families.

73.   Oppose because it is inaccurate and misleading, and the cited material, which is solely the report of Florida's proffered expert, Dr. Hood, is incomplete and should be

given no weight, as the following additional findings establish:

73A.   Dr. Hood is not an expert on the Inter-County Changes, and, in fact, admitted that he does not "consider [him]self an expert on the field of provisional ballots."  V11 5838.

73B.   The data Dr. Hood reviewed and analyzed – affirmation forms from only Collier, Hardee, and Hendry Counties – is incomplete.  V16 9069.  This data included just 10 of the past 40 elections (six from Collier and two each from Hardee and Hendry Counties).  V11 5949-51; V16 9069-73.  Dr. Hood did not review any data from Hillsborough or Monroe Counties – even though these counties contain 77% of the Covered Counties' total population (FF 1D).  V11 5949; V16 9069-73.  Moreover, the data Dr. Hood did review related only to change-of-address affirmations, but such affirmations are not the only way a voter can change an address at a polling place when voting.  V7 3552-53; *see also* Fla. Stat. § 101.045.  Instead, voters can complete and submit a voter registration form to effect an address change.  *Id.*  The Hendry County SOE uses only voter registration forms for this purpose.  V7 3552-53; *see also* V17 9403; V17 9404.

74.   Oppose to the extent it omits two categories of data (inter-county movers voting early and inter-county movers voting on election day), V16 8896, suggests the database query results are not the best available data regarding the number of affected voters, or that those results "are necessarily higher than the actual number" of affected voters, for which Florida offers no evidence.  *See* V16 8895-96; V9 5152-53; V16 9035.

75-76.  Oppose as irrelevant because Florida does not identify the racial makeup of the Inter-County Voters, without which the proffered information has no bearing on the discriminatory nature of the Inter-County Changes.  Further oppose for lack of

foundation, as Florida fails to explain how it derived the figures in Table 1.

77.     Oppose because it is directly contradicted by the data and the conclusion of the United States' expert, as well as predicated on erroneous and unsupported assertions, primarily FF 68, which are contrary to the facts (FF 37A, 68A-E), as the following alternative findings further establish:

77A.    The United States' expert, Dr. Stewart, concludes that "minority voters are more likely to avail themselves of the law that is still in effect in the five covered counties, which allows registered voters who have moved between counties to simultaneously change their address and vote a regular ballot in their new home county" – an option eliminated by HB 1355.  V16 8901, 8907-10.  Thus, if the Inter-County Changes took effect in the Covered Counties, both African-American and Hispanic voters would be required to vote a provisional ballot at a greater rate than white voters.

77B.    With regard to voters who do not update their address after they move and before they seek to vote, Escambia County SOE and FSASE Legislative Chair Stafford testified that, while SOEs would like "nothing more than to have every voter update their address the second that they move, … that's just not the way it works."  V2 755.  Therefore, because Florida has "a highly mobile population," "it's important that [voters] be allowed to update their address" at the polling place when they seek to vote.  *Id.*

78-79.  Oppose because it is irrelevant whether more whites, in absolute numbers, than minority voters would be affected by the Inter-County Changes, particularly as whites constitute a substantial majority of the Covered Counties' CVAP (FF 1A), registered voters (*id.*), and voters voting in each of the referenced elections (V14 7821).  V16 8907-

09; V14 7885 (Dr. Gronke explaining that "in order to isolate any differential impact of" a voting change, "the percentage of African American, Hispanic, and White voters" impacted by the change must be "calculated as a percentage of all votes cast by each racial group in each election"); *see* also V11 5839-42 (Dr. Hood conceding that tables based on absolute numbers disclose nothing about disproportionate racial impact).  Dr. Hood recognized that, in all but one of the Collier County elections, the inter-county mover rate of "some minority group is higher than the white rate and in most of [the elections] all of the minority rates are higher than the white rate."  V11 5958-59.

80-82.  Oppose because a substantial number of people are affected by the Inter-County Changes (FF 68A-E, 72), no amount of voter disenfranchisement is "*de minimis*," Florida elections have been decided by margins smaller than the number of affected voters,[9] and, as noted in response to FF 78-79, the absolute number of affected voters is irrelevant to whether the Inter-County Changes have a disproportionate racial impact, which they do.  V16 8901,  8907-10; V14 7885; V11 5839-42.  Further oppose for lack of foundation, as Florida fails to explain how it derived the figures in Table 3 or calculations in FF 81-82.

### C.     The Early Voting Changes Will Have Significant Retrogressive Effects

83-86.  FF 83-86 are undisputed (but FF 84 is irrelevant to the issues before the Court).

87.     Oppose as a mischaracterization of the severity of the Early Voting Changes' impacts, as described below, and object to the vague ("few individuals," "vast majority") and speculative ("will still vote") assertions that are not supported by the cited material.

---

[9]   For example, the 2000 presidential election in Florida was decided by 537 (or fewer) votes.  V17 9410-14.

88-89.  FF 88-89 are undisputed.

90.      Oppose because it is entirely unsupported – Florida does not even attempt a

citation – and hypothesizes only what "may" occur.

91.      Oppose to the extent it suggests anything more than SOEs may – but are not

required to – set early voting hours to minimize negative effects on voters.

92-93.  Oppose as untrue.  FF 92-93 ignore that the Early Voting Changes eliminate the

first five days of early voting, and eliminate the possibility of early voting on the last

Sunday before Election Day.  As noted above, this will decrease the opportunity to vote

early, notwithstanding the possibility that some SOEs might offer longer early voting

hours over the fewer remaining days.  FF 42A-D, 43B, 45B; V14 7890; V17 9095.

94-96.  Oppose.  FF 94-96 mischaracterize the scholarship concerning the effect of early

voting on voter turnout and the evidentiary record, as the following findings establish:[10]

94A.    Defendant-Intervenors jointly designated Dr. Paul Gronke, Professor of Political

Science at Reed College, as their expert.  The principal focus of Dr. Gronke's research

since 2006 has been early in-person and absentee voting, and he has published numerous

peer-reviewed articles and two academic book chapters analyzing these voting methods.

V14 7878-79.  The United States' expert, Dr. Stewart, and Florida's proffered expert, Dr.

Hood, respectively described Dr. Gronke as "the leading light" and "a leading scholar" in

the country on early voting.  V10 5489; V11 5835-36.

94B.    As Dr. Gronke explains, Florida's assertion (in FF 94 and 96) that there is a

"scholarly consensus" that "the availability of early in-person voting has little or no effect

---

[10]   Florida also misrepresents SOE Sancho's statements.  *See* V1 440.

on overall turnout" "does *not* accurately reflect the prevailing view in the field now."

V17 9094.  Florida's argument relies primarily on the testimony of Dr. Hood (who has

not studied the question), mischaracterizes Dr. Stewart's testimony, and ignores the more

recent scholarship analyzing elections from 2008 forward.  FF 94C-E.

94C.   Dr. Gronke also explains that the "first generation" studies Florida relies upon

were based on "limited elections and sparse data…. [A]s is common in new areas of

research, the sophistication of the studies and scientific conclusions have evolved.  With

the passage of time, there is simply now more data, from more states and of higher

quality than when the original papers, including my own early work, were written."  V17

9093-95; *see also* V10 5496-97 (Dr. Stewart: same).

94D.   As Dr. Gronke observes, even early studies "found some evidence of a positive

turnout effect," and his own comprehensive review of the literature up to 2008 confirmed

that early in-person voting (and other methods of voting other than at the polls on

Election Day) had a statistically significant positive impact in the 2%-4% range.  V17

9093-95.  Newer research, including regional and subgroup analysis, has shown

"substantially higher turnout among African Americans using the early voting option, and

that these behavior[s] continued *after* the 2008 presidential contest," and that "among

non-whites, early in-person [voting] had a positive impact on turnout in a number of

Southern states."  *Id.*

94E.   Florida's argument also ignores the critical fact that all the pre-2008 studies

considered whether *adding* days of early in-person voting increases voter turnout.  None

addressed whether *reducing* early voting days *negatively* impacts voter turnout.  As Dr.

40

Gronke explains: "it is not methodologically sound to assume there will likewise be little or no impact on overall turnout when voters (who have habituated to early in-person voting) face a loss of previously available voting days."  V17 9095.  *See also* FF 97A.

97.     Oppose the characterization in FF 97 that early in-person voting "is merely a *convenience* to voters" (emphasis in original); it is not, as FF 42A-C (noting, among other things, that the benchmark early voting period "is imperative to a smooth General Election"), 45B-C, 94D, and the following alternative finding establish:

97A.   For some citizens, "convenience" can impact the decision *whether* to vote.  As Dr. Gronke explains, recent scholarship finds that for frequent voters, "convenience influences when they vote (election day or before),"  but "[s]ince non-habitual voters are less likely to vote, early or on election day, convenience may have a significant and positive effect on their decision to vote, before or on election day."  V17 9094.

97B.   Leon County SOE (and Intervenor) Sancho testified that "the only reason [SOEs have] been successfully able to deal with the increase[] of millions of voters that we have now in the state of Florida has been early voting."  V2 976.  The massive voter turnout in "2008 was the limit"; Sancho "anticipate[s] a higher turnout in 2012"; and SOEs will "not be able to process record numbers of voters in this state without two weeks of early voting."  V2 977-78; *see also* V17 9177-79.

97C.   Although the Early Voting Changes permit (but do not require) SOEs to offer longer early voting hours over fewer days, it is Monroe County SOE (and Intervenor) Sawyer's "experience over the years that increasing [voting] hours into the evening … is not going to impact or make up the difference from shutting down the days."  V6 3143.

1.     **Minority Voters' Significant Reliance on Early Voting, and the Resulting Disparate Impact of the Early Voting Changes**

98.    Oppose, because it is incorrect, contradicted by the evidence, and based on unsupported conclusions (Florida's sole citation is a passing statement by SOE Ussery that he does not have a basis to believe that the Early Voting Changes will impact minorities), as the following alternative findings establish:

98A.   Dr. Gronke analyzed differential use of early in-person voting, by race, in the Covered Counties and statewide using the consolidated datasets assembled by Dr. Stewart, as well as data from the Census Bureau's Current Population Survey ("CPS"). V14 7883-84.  *See also* V11 5938-41; V10 5508, 5609-12.

98B.   According to the CPS, African-American usage of early in-person voting in Florida "has exceeded white usage of early in-person voting in four of five federal elections" and "substantially exceeded white usage in both the 2004 and 2008 presidential elections."  V14 7883, 7895; *see also* V11 6116.

98C.   According to Florida's election data, a remarkable 54% of all African Americans in Florida who voted in the 2008 general election did so by using early in-person voting. This is almost twice the white rate of 27%.  V14 7897; V14 7818.

98D.   The data also shows that, while both groups used early in-person voting less in the 2010 general election, the African-American usage rate in Florida still exceeded the white rate by ten percentage points (30% v. 20%).  (The Hispanic rates in 2008 and 2010 were 33% and 18%, respectively.)  V14 7887, 7897; V14 7818.

98E.   The early voting rates in the Covered Counties in 2008 mirrored the statewide

rates:  52% of all African-American voters in the Covered Counties cast an early in-person ballot, compared to 28% of whites.  V14 7886-87, 7896; V14 7821; V16 9041-42.

98F.    African-American rates of early in-person voting in the Covered Counties also "remained statistically significantly higher [than white rates] during the 2010 primary and general elections."  V14 7887, 7882-83, 7896; *see also* V14 7821; V16 9041-42.

98G.  Florida's proffered expert confirms this trend, finding that, of the seven statewide elections between 2006 and 2010 he analyzed, the majority – and each of the most recent elections – demonstrated that African Americans in the Covered Counties utilized early in-person voting at a rate higher than that of whites.  V16 9038-39, 9041-42; V11 5855.

98H.    All three experts (Drs. Gronke, Stewart, and Hood) agree that, in predicting future use of early in-person voting in Florida and the Covered Counties, it generally is best to rely on past presidential elections to predict the rates in future presidential elections, and best to look to past mid-term elections to predict rates in future mid-term elections (although other factors may be relevant as well).  Thus, the best data source for predicting the use of early in-person voting during the upcoming 2012 general election is the 2008 general election.  V14 7888-89; V10 5658-59; V11 5867-70, 5875-76.

98I.    The 2008 general election was marked by a "massive increase, of nearly 75%, in the use of early in-person voting by African Americans" in Florida.  V17 9090-91.  *See also* V11 6111-13; V10 5638.  The 2012 general election is expected also to see an increased African-American turnout and reliance on early in-person voting in Florida, as "many of the factors at play in 2008 – *e.g.*, increased get-out-the-vote efforts, and the intensity of interest in the African American community – will come into play again in

2012."  V17 9090-91.

98J.    The expectation that African Americans will continue to use early voting at increased rates is also supported by regional data from 2008 and later elections showing changing voting patterns in the South."  V14 7881-83; *see also* V11 6217-18, 6230, 6245. "[T]hroughout the South, the rate of early in-person voting among African Americans increased substantially in the 2008 presidential election and seems likely to continue. African American voters are using early voting at much higher rates than we would predict based on relevant socioeconomic characteristics."  V14 7881-83.

98K.    The overall trend over the past several election cycles also demonstrates that the African-American early in-person voting usage rates are increasing to a greater extent than the white rates.  V14 7883, 7895.  Comparing the 2004 and 2008 general elections, the CPS reported that the African-American rate in Florida nearly doubled (from 23% to 45%), while the white rate increased substantially less, by only two-thirds (from 15% to 25%).  *Id.*

98L.    Data compiled by Dr. Hood confirms that the increased usage of early in-person voting by African Americans as compared to whites is not limited to presidential elections or 2008.  Dr. Hood's analysis of Covered County data shows that from the 2006 to 2010 midterm elections, there was a "massive increase, of nearly 75%, in the use of early in-person voting by African Americans," that "dramatically exceeded the increase among White voters (13%)."  V17 9090-91; *see also* V16 9041; V14 7883, 7895.

98M.    All these "analyses provide strong evidence that African Americans prefer early in-person voting at rates that exceed White voters, both in the five covered counties and

statewide," V14 7886-87, V17 9090-91, and, as Dr. Gronke concludes, that in future elections "African Americans will continue to have a higher rate of usage for early in-person voting when compared to White voters."  *Id.*

98N.  Given the disparate rate at which African-American voters prefer early in-person voting, Dr. Gronke "conclude[s] that the changes to early in-person voting that would be made by the law [HB 1355] will have a differential and negative impact on the ability of African American throughout the State, and specifically in the five covered counties, to cast a ballot."  V14 7889-90; *see also* V11 6250-52.

98O.  The disproportionate negative impact of the Early Voting Changes likely will be most prominent in the context of presidential elections.  In the 2008 election in the Covered Counties, 17% of all African-American voters cast an early in-person ballot during the first five days of early voting – *i.e.*, the period eliminated by HB 1355 – compared to 9% of white voters.  V14 7888-89, 7898-99; V14 7821.

98P.  Dr. Gronke also concludes that the option, created by HB 1355, for SOEs to offer the same (or potentially fewer) hours of early in-person voting as available under the old law, albeit more on the weekend, will not prevent this differential, negative impact on African-American voters.  V14 7890; V17 9095; FF 43B.

      **2.**     **Florida's Proffered Expert Admitted He Lacks Sufficient Expertise to Render Most of His Opinions and the Remainder Are Unreliable and Not Helpful to the Trier of Fact**

99-100.  Defendants oppose the assertion in FF 99 regarding what "past voting turnout demonstrates."  Florida fails to cite *any* supporting authority, and the evidence establishes this assertion is entirely incorrect, FF 98A-P.  Defendants further oppose Florida's

attempt in FF 99-100 to paper over alleged "minor differences" between Dr. Stewart's and Dr. Hood's analyses.  Florida's conflation of those analyses improperly obscures the data, misappropriates Dr. Stewart's findings, and tries to rehabilitate Dr. Hood's inaccurate, irrelevant, and unsubstantiated conclusions, *see* Resp. to FF 101-04, 104A:

<u>99A</u>.   Florida conducted no studies or analysis to determine the effect of the Early Voting Changes; instead, its sole source of information concerning voters who use early in-person voting is the report of Dr. Hood.  V13 7070.

<u>99B</u>.   Dr. Hood admitted he is not "a leading expert in the field of early voting" and has published only one article on early voting (relating to early voting in Georgia in 2008) and one "conference paper in 1998."  V11 5835-36, 5710, 5832, 5834-35.

<u>99C</u>.   Dr. Hood provides no empirical data (a prerequisite to any valid conclusion, by his own admission) to support his conclusion that "[t]he Act [HB 1355] is likely to have little or no impact on overall voter turnout."  V16 9058-59; V11 5860-62, 5913-19, 5921-22. In addition, and also inconsistent with standards in the field, he fails to analyze the most recent relevant scholarship.  V17 9093-95.

<u>99D</u>.   Dr. Hood's conclusion that "[b]ecause the Act [HB 1355] offers night and weekend hours for early in-person voting that were previously unavailable, the Act is likely to increase early in-person voting" relies on factors neither affected by HB 1355 nor investigated or analyzed in this case, such as expanding early in-person voting locations (a change SOEs requested, but were denied, *see* FF 42C) and advertising early in-person voting by election administrators.  V16 9059; V11 5923-26.  The studies he cites do not support his conclusion, as they did not address changes comparable to those

of HB 1355 (potentially longer early voting hours over fewer days).  V17 9095.

99E.   Dr. Hood's conclusion that "[e]ven if the Act [HB 1355] did decrease early voting turnout and, as a consequence, overall turnout, there is no reason to believe it would affect minorities more than Anglos" relies on the fact that "[Anglos] comprise the greater share of total number of early votes cast."  V16 9061.  This is not "a scientifically valid method of comparing the different rates of usage of early in-person voting by race" and is thus meaningless to the question before the Court.  V17 9089.  Dr. Hood "violates a basic tenet of comparative analysis," by failing (as Dr. Hood admits) to consider the "*rate* of early in-person voting in different racial groups," and instead simply looking at the "relative size of the underlying groups."  *Id.*; V11 5838-42, 5926-28; *see also* FF 78-79.  "The correct comparison requires one to calculate early in-person votes as a proportion of votes *within* different racial groups," which demonstrates that African Americans utilize early in-person voting at higher rates than white voters.  V17 9089.

### 3.   Florida's Manipulation of Selected Voting Data Cannot Obscure the Retrogressive Impact of the Early Voting Changes

101-04. Oppose as irrelevant and misleading.  As explained in FF 99E, the fact that whites constitute a majority of early voters is irrelevant to the issue of retrogressive effect, particularly as white voters constitute a majority of Florida's CVAP and registered voters (FF 1A & B).  Florida's "TO" and "EV" figures are inaccurate and misleading because they (a) combine or "pool" data sets from Dr. Stewart's report, (b) do not represent totals across the entire population, but only sum the figures for whites, African Americans, and Hispanics (ignoring other demographic groups), and (c) round the

percentages, even where doing so obscures differences in Drs. Stewart's and Hood's findings and prevents the Court from fully evaluating the figures.  Further oppose for lack of foundation.  *See* Resp. to FF 75-76.

104A.  Florida's presentation of early voting and turnout data (FF 102-04) based on raw numbers rather than usage rates within different racial groups does not address differential use of early voting among racial groups.  Rather, it obscures the fact that, in recent elections (*i.e.*, 2008 general, 2010 primary, 2010 general), African Americans used early voting at a higher *rate* than in the past and at statistically significantly higher *rates* than whites.  V14 7886-87; V17 9089-90.

105-06.  Defendants oppose the assertion in FF 106 (based on Table 7 in FF 105) that whites, African Americans, and Hispanics are voting in "similar numbers."  This is inaccurate and unsupported.  Florida fails to specify the applicable voting method, cite any authority, or explain its use of the vague and non-scientific term "similar."

106A.  Assertions as in FF 106 that the early in-person voting rates are "similar" or "roughly comparable" wrongly suggest that the differences by race are not meaningful. V17 9090.  To the contrary, as Dr. Gronke explains, even beyond the 2008 general election, when looked at in relative terms (as is appropriate) the higher rates of early in-person voting among African Americans in both the 2010 primary and 2010 general elections are "statistically significantly higher" than among white voters and the "differences show a clear trend of higher usage over time by African Americans voters in the Covered Counties and statewide."  *Id.; see also* V11 6183-84; FF 98F-G, M.

107.    Oppose.  Florida mischaracterizes the 2008 general election as an "outlier," which

48

(a) is contradicted by Dr. Stewart's testimony, V10 5537, (b) cannot be reconciled with the consensus that the 2008 general election is the best predictor of the 2012 general election, FF 98H, and (c) fails to account for the fact that African-American early voting usage has been increasing over time, FF 98F-G, M, 106A, V11 5865, and "seems likely to continue."  V14 7883; *see also* V17 9090-91.

108.   Defendants oppose FF 108 because it is untrue, not established by the cited material, and disproven by Dr. Gronke's analysis.  FF 98F-O.

109-11.  Defendants oppose FF 109-11 because they improperly pool voting data across multiple elections while excluding the 2008 general election (FF 109 and Table 8) and across different demographic groups by combining African Americans and Hispanics into a single category of "Minorities" (FF 110-11 and Table 9).  Such selective pooling is inappropriate and "misleadingly" flattens the "clear trend of greater early in-person voting by African Americans compared to whites."  V17 9092-93; *see also* V11 5897-98. Defendants further oppose the mischaracterization of this aggregated data as "Professor Stewart's Findings," when it does not appear in Dr. Stewart's reports and does not reflect Dr. Stewart's analysis.

112.  Oppose because FF 112 improperly pools voting data across multiple elections, which masks the trend of increasing African-American usage of early in-person voting during the eliminated early voting week.  V17 9092-93; *see also* Resp. to FF 109-11; V10 5621-22.  Election-by-election data shows that in the 2008 general election, and again "in the primary election of 2010, African Americans in the five covered counties continue to vote at a higher rate during those first five days compared to Whites."  V14 7888.

113.   Oppose because FF 113 is predicated upon the manipulated data in FF 112, relies

on vague and unsupported conclusory statements (*e.g.,* "significant majority," "slow"),

and fails to recognize the substantial usage of early voting on the eliminated days, FF

42A-C, 43B, 45B, as well as the following consequences of the Early Voting Changes:

113A. Election officials anticipate that HB 1355's elimination of the first five days of

early in-person voting will result in increased lines, crowding, and confusion during the

remaining early voting days and on Election Day.  V6 3170-71, 3183-87 (MON); V7

3744-46, 3764-65 (HIL); V6 3396, 3408-09 (COL); V7 3543, 3564 (HEN); V9 5128;

V13 7198-99; V17 9177-79; *see also* V12 6800; V9 4713-15; V13 7226.

113B.  Longer lines at the polls may deter voters from voting and make voting more

difficult.  V7 3748-50, 3766-69; V6 3171; V9 5152; V17 9108-09; V17 9193; V17 9242.

113C.  The Early Voting Changes will result in additional costs, primarily overtime

associated with longer early voting days.  V7 3745-46; V6 3145-46, 3183-84; V7 3916;

V9 5056, 5145; V13 7142-43; V13 7226; V17 9179-80.

114-15.  Defendants oppose FF 114-15 because Florida's proffered expert could not

identify any empirical basis for the conclusion that voters would adjust to the elimination

of early voting days, FF 99A-E, 97A, 98P, 43B, and even if some voters did adjust, the

elimination of early voting days would cause significant lines, crowding, and confusion

during the remaining voting period, which may deter voters from voting and/or make

voting more difficult, FF 113A-C.

116.   Defendants oppose FF 116 because it relies on inappropriately pooled data that

masks recent elections with higher rates of African American early voting in the

eliminated days, Resp. to FF 112-13, and because eliminating the first five days of early

voting and prohibiting early voting on the final Sunday before Election Day will have

significant negative effects on minorities, as the following alternative findings establish:

116A. The Early Voting Changes will disrupt get-out-the-vote ("GOTV") efforts that

increase turnout among minority voters.  A two-week early voting period has "been

essential to coordinating the logistics of GOTV efforts in the African-American

community," as it provides enough time for volunteer groups, like the Florida NAACP, to

organize rides to the polls, which typically occur during the work day.  V17 9237; V17

9227-28; V17 9142-43.  The greater number of early voting days under the prior law "has

been essential for efforts to bring African-American voters to the polls, because African-

American voters frequently contend with issues such as lack of transportation or

inflexible work and family schedules, which make it difficult to reach the polls on

Election Day."  V17 9142-43; *see also* V17 9236-38; V17 9107-08; V17 9192.

116B. Prohibiting the possibility of early voting on the Sunday immediately preceding

Election Day will negatively affect African Americans.  In the African-American

community, "[t]here has been no more important day for voting in Florida than the last

Sunday before Election Day, when ministers can speak to their congregations about the

importance of voting," V17 9225, 9228-29, and when churches have organized "souls to

the polls" drives to transport members to early voting sites after services, V17 9144; V17

9109; V17 9193-94; V17 9222.  Although the Covered Counties do not currently offer

early voting on Sundays, Sen. Joyner has "discussed the possibility of offering Sunday

early voting with the past three Hillsborough County [SOEs]," the most recent two of

which "expressed a willingness to consider Sunday early voting in Hillsborough County" – so long as it is not forbidden by HB 1355.  V17 9109; V17 9193-94.

116C.  According to Dr. Gronke's analysis of the statewide data, "eliminating the last Sunday of early in-person voting impacts African-American voters at a far higher rate than White Voters."  V14 7889-90.

## ADDITIONAL PROPOSED FINDINGS OF FACT

117.    Florida concedes that none of the Voting Changes was "adopted for partisan political reasons."  V15 8680-81.

118.    HB 1355's provision that the Voting Changes "shall take effect upon [HB 1355] becoming a law," V1 217, is "highly unusual, if not unheard of, for elections bill[s]."  V8 4362; *see also* V13 4908; V12 6845; V9 5134-35; V6 3087-88; V12 6338.

119.    While Florida election legislation nearly always provides an effective date of July 1 or later, V8 4362, V9 5138-39, V14 7572, V13 7315, and DOS requested that SB 2086 be amended to provide, consistent with earlier versions of HB 1355, a July 1 effective date, V13 7536, V9 4907-09, Florida has offered no explanation for the Legislature's deviation from prior practice with regard to the effective date of the Voting Changes.

120.    Florida began implementing the Voting Changes in the non-covered counties immediately following HB 1355's signing on May 19, 2011.  V13 7269; V13 7263.

121.    Directing SOEs to implement HB 1355 immediately, rather than wait for preclearance, deviates from prior precedent that statewide election law changes must not be implemented anywhere until precleared, thus ensuring uniform implementation throughout Florida.  *Compare* V13 7269 (5/19/2011 SOS Directive) *with* V13 7415-22

(8/19/1998 DOE Opinion: "the effective date of any [new election] laws are delayed until preclearance is obtained") *and* V13 7423-24 (12/24/2007 DOS Mem.: uncleared portions of a 2007 elections law "**cannot be implemented in any county until DOJ pre-clears them**") (emphasis in original). *See also* V17 9242 (MON); V13 7475-76. This is based on Florida's statutory requirement that election law be applied *uniformly*, FF 5, and DOS's opinion that partial implementation "could violate Federal and State laws and both the Florida and United States Constitutions." V13 7416, 7420-21.

<u>122</u>.    Florida is not aware of any other instance where statewide election law changes were implemented immediately in the non-covered counties prior to preclearance in the Covered Counties. V13 6981; *see also* V8 4364-65; V12 6330-31; V6 3333-34 (COL). Florida has offered no legitimate explanation for this departure from past practice, or for the apparent "rush" to implement the Voting Changes. V8 4120-23, 4185; V8 4364-70.

## **RESPONSE TO FLORIDA'S PROPOSED CONCLUSIONS OF LAW**

Defendants agree to Florida's Proposed Conclusions of Law 1 to 3, and oppose CL 4 to 95. Defendants set forth additional Conclusions of Law in CL 96 to 110.

**I.    Florida's Proposed Conclusions of Law Misstate the Law and Misapply the Purpose and Effect Standards**

**A.    Section 5 and Preclearance Obligations of Partially-Covered States**

<u>4</u>.    Disputed. The constitutionality of Section 5 is not at issue in this phase of the case. *See also Shelby Cnty. v. Holder*, 811 F. Supp. 2d 424, 503 & 508 (D.D.C. 2011) (upholding Section 5's constitutionality); *LaRoque v. Holder*, No. 1:10-cv-561, 2011 WL 6413850, at *52 (D.D.C. Dec. 22, 2011) (upholding the 2006 Amendments to Section 5).

5.   Disputed.  Voting changes enacted by Florida that are to be administered in the

Covered Counties must be precleared before they may be implemented.  *Lopez v.*

*Monterey Cnty.*, 525 U.S. 266, 287 (1999); *see also* 28 C.F.R. 51.23(a) (partially covered

state has authority to submit voting changes on behalf of covered jurisdictions).

6-7.   Disputed.  Contrary to CL 6-7, *Lopez* and *Nw. Austin* do not stand for the

proposition cited regarding the "purpose" standard.  "[U]nder section 5's 'purpose'

analysis, the question is what *actually* motivated the legislators to make the changes for

which they seek preclearance."  *New York v. U.S.*, 874 F. Supp. 394, 399 (D.D.C. 1994)

(partially-covered state); *see also* 42 U.S.C. 1973c(a).  Limiting purpose inquiries to only

legislators from the Covered Counties would ignore the reasons the statute was adopted

by the majority.  Florida cannot cite any authority for the proposition that only the intent

of legislators from the Covered Counties is relevant.  Moreover, the Attorney General has

objected to changes enacted by partially covered states when the objection was based, in

part, on the failure to show the State acted without a discriminatory purpose.  *See, e.g.,*

V17 9647, 9678-98; *see also Lopez*, 525 U.S. at 281 (affording "substantial deference to

the Attorney General's interpretation of § 5"); *NAACP v. Hampton Cnty. Elec. Comm.*,

470 U.S. 166, 175-76 (1985) ("[t]o effectuate the congressional purpose, § 5 is to be

given broad scope.").  Resp. to CL 23-25.  Florida's *Boerne* constitutional argument is

not appropriate at this stage of the litigation.

### B.   Legal Standard for "Purpose" Prong

8.   Disputed.  Florida does not offer a complete description of the administrative

enforcement history of the purpose prong.  *See Shelby*, 811 F. Supp. 2d at 469-76

(discussing history of Section 5 objections); H.R. Rep. No. 109-478, at 67, n.176.

9-10.   Disputed.  *See Shelby*, 811 F. Supp. 2d at 436-37 (discussing *Bossier II* and 2006

reauthorization); *LaRoque*, 2011 WL 6413850, at *20; 28 C.F.R. 51.51 to 51.61

(substantive standards for reviewing Section 5 submissions).  Further, H.R. Rep. 109-478

at 68 discusses the term "purpose" and the *Bossier II* standard:  "Thus, by clarifying that

any voting change motivated by any discriminatory purpose is prohibited under Section

5, the Committee seeks to ensure that the 'purpose' prong remains a vital element to

ensuring that Section 5 remains effective."  Congress has the authority to legislatively

overrule a Supreme Court decision based on statutory interpretation if Congress believes

the decision to be in error.  *LaRoque*, 2011 WL 6413850, at *20.

11.   Disputed.  *See* Resp. to CL 12-19 (citing cases discussing discriminatory purpose

under Section 5).  *City of Mobile v. Bolden* is of limited relevance here due to its

distinctive facts.  446 U.S. 55, 58 (1980) (discussing adoption of at-large elections pre-

dating enactment of Section 5).

12-14.   Disputed.  The *Feeney* decision is not the operative standard for assessing

purpose here.[11]  442 U.S. 256 (1979).  Under Section 5, the burden is on the jurisdiction

to demonstrate that the proposed voting change does not have the purpose of denying or

abridging the right to vote on the basis of race, color, or membership in a language

---

[11]   *Feeney* held that, before a federal court finds that a state actor engaged in intentional
discrimination in violation of the Fourteenth Amendment, the challenged decision must
have been made, at least in part, "because of" its adverse impact, and not merely "in spite
of" it.  442 U.S. at 279.  *Feeney* did not, however, alter the burden of proof in a Section 5
declaratory judgment action such as this case, nor did it establish an analytical framework
for evaluating circumstantial evidence of intentional discrimination.

minority group.  *See Shelby*, 811 F. Supp. 2d at 436-37; H.R. Rep. No. 109-478, 66-68

(discussing Section 5's purpose prong); *Nw. Austin*, 129 S. Ct. at 2509 (recounting

"facially neutral tests" that were used to prevent African Americans from voting).

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977), is used

as the standard for assessing purpose in the context of Section 5.  *See* 28 C.F.R. 51.57(e);

*Reno v. Bossier Parish Sch. Bd. ("Bossier I")*, 520 U.S. 471, 488-89 (1997) ("In

conducting this inquiry, courts should look to our decision in *Arlington Heights* for

guidance.").  In a Section 5 action, "plaintiff must furnish some affirmative evidence that

the proposed changes were not motivated by a discriminatory purpose." *New York*, 874

F. Supp. at 400.  Only one case cited in CL 13 (*Tennessee v. Lane*, 541 U.S. 509 (2004))

addresses an issue of statutory construction (of the ADA).  Further, Section 5 cases such

as *City of Port Arthur v. U.S.* did not use *Feeney* as the analytical framework for reaching

the "purpose" findings.  517 F. Supp. 987 (D.D.C 1981), *aff'd*, 459 U.S. 159 (1982).  By

citing *Feeney*, which is not a Section 5 case, Florida is attempting to avoid its burden

under Section 5, which "flatly prohibits the adoption of any new voting procedure" unless

the jurisdiction can show that "the change will not have a discriminatory purpose or

effect."[12]  *Bossier I*, 520 U.S. at 501.

15-17.  Disputed.  Under Section 5, the burden is on the jurisdiction.  Resp. to CL 12-14.

Evidentiary sources to consider when assessing discriminatory purposes include, *but are*

*not limited to*, the *Arlington Heights* factors.  *Arlington Heights*, 429 U.S. at 268.  These

---

[12]   *Feeney* did recognize that "when a neutral law has a disparate impact upon a group
that has historically been the victim of discrimination, an unconstitutional purpose may
still be at work."  442 U.S. at 273.

factors are not a "checklist," as Florida suggests.  In addition, Section 5 "places the burden on covered jurisdictions to show their voting changes are nondiscriminatory *before* those changes can be put into effect."  *Shelby*, 811 F. Supp. 2d at 431; *South Carolina v. Katzenbach*, 383 U.S. 301, 328 (1966).

18-19.  Disputed.  In *City of Richmond*, the Supreme Court specified that an annexation that decreased the city's percentage of African-American population could satisfy the "effect" standard only after the city adopted a single-member district plan that "fairly reflect[ed]" African-American voting strength post-annexation.  *City of Richmond v. U.S.*, 422 U.S. 358, 370-71 (1975).  The Court, however, remanded for further review of the purpose issue.  *Id.* at 372-79.  In *Port Arthur,* 517 F. Supp. 987, this Court denied preclearance to an annexation until a method of election was adopted and precleared that "fairly reflect[ed]" minority voting strength within the enlarged city boundaries.  *Id.* at 1024.  This case does not involve annexation or such amelioration.

20.  Disputed.  This Court in *New York*, 874 F. Supp. at 400, required the submitting jurisdiction to furnish affirmative evidence that the proposed change was not motivated by a discriminatory purpose.  In that case, the State submitted "numerous affidavits from New York State legislators and other officials involved with the administration of New York's voting laws, some of whom are themselves minorities."  *Id.*  In contrast, Florida legislators supporting the law refused to provide deposition testimony, FF 9J, and Florida has failed to provide affirmative evidence addressing discriminatory purpose akin to that offered in *New York*.  *See* Resp. to CL 109.

21-22.  Disputed.  *See* Resp. to CL 15-17.  The referenced cases do not stand for the

asserted proposition.  *See* Resp. to CL 17-21.  Further, Section 5 does not present a

charge of intentional discrimination; put simply, Florida has failed to satisfy its burden.

### C.     Legislative History of the Proposed Changes

23- 25.  Disputed.  As outlined below, Florida has not met its burden to demonstrate that

the legislature's adoption of the proposed changes lacked discriminatory purpose.  *See*

Resp. to CL 6-7.  Further, *Feeney* has limited relevance to this case, and the Florida's

"presumptively constitutional" standard does not establish the framework for analyzing

discriminatory purpose under Section 5.  *See* Resp. to CL 12-17.

26-27.  Disputed.  The Attorney General analyzes each voting change in submitted

legislation separately as to purpose and to effect.  28 C.F.R. 51.2(a).  Indeed, the

Department of Justice ("Department") made no determination on the three changes at the

time Florida withdrew them from the administrative process.  V1 221.  Courts routinely

evaluate changes separately from other changes passed at the same time.  *See, e.g.,*

*Georgia v. Ashcroft*, 195 F. Supp. 2d 25 (D.D.C. 2002) (finding state senate plan

retrogressive but not Congressional and house plans), *vacated on other grounds*, 539 U.S.

461 (2003).  Florida has not met its burden regarding the purpose and effect of these

changes.  Resp. to CL 44-47, 53, 69, 74-94, 96-112.

28.  Disputed.  Florida has failed to show that the proposed changes do not have the

purpose of discriminating against minority voters.  Resp. to CL 26-27.  The "'important

starting point' for assessing discriminatory intent under *Arlington Heights* is 'the impact

of the official action [and] whether it 'bears more heavily on one race than another.'"

*Bossier I*, 520 U.S. at 489.  CL 107 details the application of *Arlington Heights* to the

facts of this case.  While *Crawford* – a facial challenge to Indiana's voter ID law –

recognized a State's legitimate interest in electoral integrity, the decision addressed

neither 3PVROs nor purposeful discrimination.  Moreover, *Crawford* was not a Section 5

case, *see* 553 U.S. 181 (2008), and the plaintiff there had not alleged race discrimination.

*Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006).[13]

29.  Disputed.  Florida fails to note that a 2005 version of the statute was enjoined as

unconstitutional.  FF 25B-C; *Cobb*, 447 F. Supp. 2d at 1339.  Florida cannot demonstrate

that the new, more burdensome 3PVRO requirements were necessary in light of the

adoption of the revised 2007 law, or that the legislature considered alternatives less

burdensome to minorities.  FF 27A-E, Resp. to 29-30, 31B; Resp. to CL 28.

30.  Disputed.  No one testified in favor of the bill except legislators, and some

opponents were not allowed to testify.  FF 9I, J, 17A.  Strike-all amendments were used,

and a committee was bypassed.  Resp. to FF 52-53.  The SOS did not propose these

changes in his legislative package, FF 9A, and Florida rejected SOEs' concerns that these

changes were unnecessary and discouraging of voter participation.  FF 9A-B, F.

31.  Disputed.  Florida mischaracterizes the legislative history of the Third-Party

Changes.  Resp. to FF 52-53.  Courts routinely look at legislators' statements in

determining whether discriminatory purpose exists.  *See Shelby*, 811 F. Supp. 2d at 464.

In this case, sponsors of the bill could not provide facts supporting the rationale for the

---

[13]   In addition, Florida has offered no evidence that the legislature took ameliorative
steps to prevent the heavy burden from falling on organizations that register minority
voters.  *See* Resp. to FF 30, FF 31B.  *See, e.g., City of Richmond*, 422 U.S. at 370-71
(consideration of ameliorative measures); *Busbee v. Smith*, 549 F. Supp. 494, 508, 517-18
(D.D.C. 1983), *aff'd mem.*, 459 U.S. 1166 (1983).

change.  FF 30A.  Key legislative proponents of the changes refused to testify in this case about the legislative process.  FF 9J; Resp. to CL 20.  Testimony from legislators has served as relevant, strong, and frequently decisive evidence in prior Section 5 actions. *See, e.g.*, *Georgia v. Ashcroft*, 195 F. Supp. 2d at 26; *Busbee*, 549 F. Supp. at 500-15; CL 107(f).

32-33.  Disputed.  The fact that citizens have other means of registering is irrelevant to the purpose analysis under Section 5.  The evidence shows that the Third-Party Changes will harm minority voters.  FF 57A-H, 58A-M.  Because of the law, 3PVROs have completely suspended voter registration activities or have diverted resources from registration drives to compliance efforts.  FF 58K-M.  *See* Resp. to CL 28-31.

34-35.  Disputed.  Florida admitted that at time of the adoption of the change, it had no evidence of double-voting related to inter-county movers, and election officials informed legislators that there was no problem requiring a legislative fix.  FF 34A, D.  *Crawford* is inapposite.  Resp. to CL 28.  The appropriate effect standard is *Beer v. U.S.*, 425 U.S. 130, 140-42 (1976), and the appropriate standard for discriminatory purpose is *Arlington Heights*, 429 U.S. at 268.  Regarding the historical background, Defendants dispute that the pre-2011 law did not allow counties to prevent double-voting.  FF 34C.

36.  Disputed.  The evidence demonstrates that there were departures from normal legislative procedures.  Resp. to CL 30, 34-35; Resp. to FF 52-53.

37.  Disputed.  Proposed changes were opposed by the SOEs, FF 9A, 34D, and Florida produced no evidence that this problem existed.  FF 34A-B, 36A-D.  The lobbyist who helped draft HB 1355 advised the legislature to "come up with at least some anecdotal

evidence that there was abuse or double voting," and proposed using a purported incident

at a historically black university, although he found no such evidence.  FF 36D.  Florida

has no evidence to support Representatives' statements regarding alleged double-voting.

FF 36A-C.  "Determining whether invidious discriminatory purpose was a motivating

factor demands a sensitive inquiry into such circumstantial and direct evidence of intent

as may be available."  *Arlington Heights*, 429 U.S. at 266.

38-39.  Disputed.  Dr. Stewart's supplemental report demonstrates that the Inter-County

Changes will have a disproportionate impact on minority voters in the Covered Counties,

since minority voters change their address at the polls at a higher rate than white voters.

FF 77A.  Casting a provisional ballot is not the same as casting a regular ballot, in that

the process takes longer, involves more steps, and is confusing and frustrating to voters.

FF 68A-D.  Provisional ballots introduce opportunities for human error that can result in

ballot rejection.  *See Hunter v. Hamilton Cnty. Bd. of Elec.*, No. 1:10-cv-820, 2012 WL

404786, at *36, *46 (S.D. Ohio Feb. 8, 2012) (concluding that board's decision not to

count some provisional ballots due to demonstrated poll worker error violated equal

protection).   The fact that a change may affect a large number of white voters is not

probative of whether the change disproportionately harms minority voters.  Resp. to CL

12-14.  Florida's interpretation would eviscerate Section 5, in that racial minorities are

frequently a numerical minority in covered jurisdictions.

40.  Disputed.  Florida has not met its burden that the proposed change neither has the

purpose nor the effect of discriminating against minority voters.  Resp. to CL 34-39.

41-42.  Disputed.  The principal sponsor of the Early Voting Changes misrepresented the

facts in justifying the change, FF 9E, 45C, and the legislative record shows that one purpose of the law was to make voting less convenient and more difficult for voters.  FF 19A; V4 2242 (quoting Senate President *Pro Tempore* that he wanted to make voting less convenient, like in "Africa").  The change does not *require* counties to have "the same maximum number of early voting hours" as the prior law, and it reduces the number of days permitted for early voting.  Resp. to FF 92-93.  The changes were opposed by SOEs as unnecessary, FF 9A, 9F, 42A-C, and Florida admitted that there would be minimal cost-savings.  FF 45E.  The fact that African-American voters dramatically increased their use of early voting in November 2008 was also well-publicized.  FF 48D.

43.  Disputed.  Resp. to CL 28, 30, 41-42; FF 17A, Resp. to FF 52-53

44.  Disputed.  FF 45D, 48C; Resp. to CL 41-42.  In addition, SOEs will spend more money on overtime if they provide the maximum hours.  FF 42A, 113C.

45-46.  Disputed.  African-Americans disproportionately relied on early voting in the 2004 general election, FF 98B, and voting patterns further shifted with the November 2008 election, FF 94B-D, when 52 percent of all African-American voters in the covered counties cast their ballots by early voting, FF 98E.  Early voting does increase turnout, FF 94B-E.  The fact that the change, numerically, affects more white voters does not show whether the change disproportionately affects minority voters.  Resp. to CL 38-39; FF 98A-P.  The change would disproportionately disadvantage African-American voters by reducing the number of early voting days.  Resp. to FF 114-115; FF 116A-B.  *Feeney* is not the operative legal standard in assessing purpose under Section 5.  *Beer*, 425 U.S. at 140-42; 28 C.F.R. 51.54(b).  Resp. to CL 12-17, 38-39.

47.  Disputed.  Florida has not met its burden that the Early Voting Changes do not have the purpose of denying or abridging the rights of African-American voters.  Resp. to CL 10, 27, 41-46.

### D.    The Effect Standard and the 2006 Amendments

48.  Disputed.  The Voting Changes have a retrogressive effect.  Resp. to CL 10. Procedures regarding voter registration, early voting, and change-of-address/provisional balloting are voting standards, practices, and procedures within the meaning of Section 5.  42 U.S.C. 1973c; 28 C.F.R. 51.13(a), (b); *Allen v. State Bd. of Elec.*, 393 U.S. 544, 564-565 (1969).  The 2006 Reauthorization Act did not change this, and thus did not exclude such changes from the Section 5 "effect" standard.

49.  Disputed.  It is an incomplete characterization of *City of Richmond*, which held, *inter alia*, that "[a]n official action, whether an annexation or otherwise, taken for the purpose of discriminating…on account of … race has no legitimacy at all under our Constitution or under [Section 5]."  422 U.S. at 378.  *City of Richmond* also considered that the City had altered its election system during the litigation to ameliorate the dilutive effects of the annexation.  422 U.S. at 370-71.  Resp. to CL 18-19.

50.  Disputed.  Under *Beer*, 425 U.S. at 141, the effect test prohibits any retrogression in the ability of racial minorities to participate in the political process or to elect their preferred candidates of choice.  *See also Shelby,* 811 F. Supp. 2d at 436-38.

51-54.  Disputed.  In order for minority voters to be able to elect candidates of choice, they must first be able to register to vote and to cast a ballot that will count.  *See* 42 U.S.C. 1973*l*(c)(1) (defining "vote" and "voting" to include "all action necessary to make

63

a vote effective in any primary, special, or general election, including, but not limited to,

registration, … or other action required by law prerequisite to voting, casting a ballot, and

having such ballot counted properly….").  The 2006 Amendments, however, do not make

the ability to elect candidates of choice the sole criterion for preclearance under the effect

test.  In 2006, Congress amended Section 5 to address *Georgia v. Ashcroft*'s statutory

construction of Section 5's effect prong in the context of redistricting; Congress

concluded that the Court "misconstrued Congress' original intent in enacting the [VRA]

and narrowed the protections afforded by section 5 of such Act."  Pub. L. No. 109-246,

§ 2(b)(6), 120 Stat. 577-581; *see generally*, H.R. Rep. No. 109-478, at 65-72.  Congress

added subsections (b) and (d) to legislatively overrule that portion of *Georgia v. Ashcroft*

that imposed a new standard for determining retrogression.[14]  *See id*.  The House Report

demonstrates that Congress's concern was limited to addressing the interpretation of the

retrogression standard in the vote dilution context, and that it was not seeking to alter the

retrogression standard as applied to other types of voting changes.  H.R. Rep. No. 109-

478, at 65-72.  Subsections (b) and (d) were not intended to limit Section 5 to

redistricting or other potentially dilutive practices, and did nothing to set aside or revoke

Section 5's broad application to various voting standards, practices, and procedures:

---

[14]   Contrary to Florida's assertion that subsections (b) and (d) preclude applying the "effect" prong to ballot access measures, the use of the word "any" in subsection (b) indicates that the "ability to elect" category of discriminatory voting changes is just one of the categories that violate Section 5.  Subsection (d) further explains subsection (b); however, it does not apply to subsection (a), in which the Section 5 "effect" test is set forth.  Pub. L. No. 109-246, §5(d), 120 Stat. 577-581.

"The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race … the Act gives a broad interpretation to the right to vote, recognizing that voting includes 'all action necessary to make a vote effective.'"  *Allen*, 393 U.S. at 565-66.

55-57.  Disputed.  Resp. to CL 51-54.  In addition, the 2006 Amendments sought to correct the potential harm caused by *Georgia v. Ashcroft* to Section 5's application in the redistricting context.  There is no evidence that Congress understood the "effect" prong to apply only to redistricting and not to ballot access measures.  H.R. Rep. No. 109-478, at 65-72.[15]  Since 1965, jurisdictions have submitted through the Section 5 administrative process 62,710 voting changes that affect a voter's access to the ballot.  V17 9646.  Since the 2006 Amendments, the Attorney General has interposed objections to voting changes pertaining to the manner of voting – including procedures for voter registration and the circumstances under which ballots are cast – based on discriminatory effect.[16]  *Id.*

58-59.  Disputed.  In *LaRoque*, Judge Bates found that nothing in the text of subsections (b) and (c) limits their application to districting and recognized that they could be applied to other potentially dilutive voting changes.  2011 WL 6413850, at *11-12, *27.

---

[15]   *See generally* Oversight Hearing on the Voting Rights Act: The Judicial Evolution of the Retrogression Standard, Subcom. on the Constitution, House Committee on the Judiciary, 109th Cong. 1 (Nov. 9, 2005).  V17 9469.

[16]   *See* State of Texas (photo voter identification, 2012); State of South Carolina (photo voter identification, 2011); Runnels County, Texas (bilingual procedures, 2010); Gonzales County, Texas (bilingual procedures, 2009); State of Georgia (voter registration procedures, 2009); and Buena Vista Township, Michigan (voter registration procedures and voter qualification procedures, 2007).  V17 9648-77.

*LaRoque* cannot be interpreted, however, to limit the effect prong only to changes related to minorities' ability to elect candidates of choice. *Id*. at *11-12, *38, *39. Neither *LaRoque* nor any other court has limited either the purpose or effect inquiry to the "diminishment of a group's ability to elect the candidate of its choice," as Florida alleges. The Supreme Court has interpreted both prongs of Section 5 "to apply not only to the ballot-access rights guaranteed by Section 4, but to drawing district lines as well." *Nw. Austin*, 129 S. Ct. at 2509; *Allen*, 393 U.S. at 564-565. The Three Voting Changes here are subject to both Section 5's purpose and effect prongs.

### E.    The Standards for Assessing the Effect Prong of the Act

<u>60-61</u>. Disputed. Contrary to Florida's CLs, there is no "ballot-access" exception to the effect prong. "[T]he Act gives a broad interpretation to the right to vote, recognizing that voting includes 'all action necessary to make a vote effective.'" *Allen*, 393 U.S. at 565-66; *see id.* at 570 (legal requirement changing procedures for casting write-in ballots was subject to Section 5); *Riley v. Kennedy*, 553 U.S. 406, 413 (2008) (noting Congress renewed Section 5 four times after "[f]inding continuing discrimination in access to the ballot"); *Nw. Austin*, 129 S. Ct. at 2509 (noting long-standing interpretation of Section 5 to "apply not only to ballot-access rights guaranteed by § 4" of the Act but also to drawing district lines); *Apache Cnty. High Sch. Dist. No. 90 v. U.S.*, 77-CV-1518, at 13 (D.D.C. Jun. 13, 1980) (three-judge court) (denying preclearance to reduction in number of polling places). Indeed, Section 5 was enacted in response to, *inter alia*, discriminatory ballot access and vote denial practices such as literacy tests. *Katzenbach*, 383 U.S. at 315. *See also* 28 C.F.R. 51.13(a) & (b).

62.   Disputed.  The plain language of the statute clearly covers ballot access voting

changes and no additional interpretation is required.  42 U.S.C. 1973c(a); 42 U.S.C.

1973*l*(c)(1); *Allen*, 393 U.S. at 566.

63.   Disputed.  Regardless of how a jurisdiction became subject to Section 5, once

covered, the statute provides by its terms that the jurisdiction must prove that new voting

changes do not discriminate on the basis of race, color, or membership in a language

minority group.  42 U.S.C. 1973c(a); *see DeGrandy*, 794 F. Supp. at 1079 (noting

"longstanding general history of official discrimination against minorities has influenced

Florida's electoral process," including African Americans); *LULAC v. Perry*, 548 U.S.

399, 439-40 (2006).

64-66.   Disputed.  Florida improperly cites non-voting cases for the meaning of Section

5, a statute consistently interpreted to prohibit changes with a retrogressive effect.  *See*

*Beer*, 425 U.S. at 140-42; 28 CFR 51.54(b); Resp. to CL 98.  Florida cites no case

holding that Section 5 includes a "but for" causation requirement or that Section 5

requires that race must be a "decisive role" in producing the effect.  The factors relevant

for assessing changes under Section 5 are well established.  28 C.F.R. 51.54 & 51.57.

67-69.   Disputed. Florida's argument conflates the purpose and effect tests, without

supporting authority.  The Supreme Court has affirmed that "under the Fifteenth

Amendment, Congress may prohibit voting practices that have only a discriminatory

effect."  *Lopez*, 525 U.S. at 283; *City of Rome v U.S.*, 446 U.S. 156, 158 & 175 (1980).

Requiring a jurisdiction to *intend* a retrogressive effect would eliminate the effect prong

from the statute.  Florida's arguments run contrary to decades of Supreme Court

precedent.  *See*, *e.g.*, *LULAC*, 548 U.S. at 440 (finding that even if politics, rather than race, motivated a voting change, the change "was damaging" to Latinos).  As set forth in *Beer*, the only causation requirement relating to the "effect" test is that the voting change at issue "would lead to … retrogression."  425 U.S. at 141.  Under Florida's arguments, a literacy test could survive Section 5 review if a State argued that a minority voter's inability to vote was not on account of race but rather socioeconomic status or the failure to learn to read.  *See Katzenbach*, 383 U.S. at 334; *Gaston Cnty. v. U.S.*, 395 U.S. 285, 293 (1969).  The Voting Changes will negatively harm the ability of minority voters to register through third-party voter registration drives, FF 58A-M, cast ballots during early voting, FF 98A-P, Resp. to FF 107-13, FF 113A-C, Resp. to FF 114-16, FF 116C**,** and have their ballot counted if they change their address at the polls, FF 77A-B.

### F.   Applying the Effect Prong to the Facts of This Case

<u>70</u>.   Disputed.  Resp. to CL 66 (citing 28 C.F.R. 51.57 & 51.54); Resp. to CL 61-69. Florida incorrectly describes the Department's position, which is to assess a proposed change's effect on minority voters *vis-a-vis* the existing practice.  The Department and courts consider whether a proposed change's negative impact on minority voters has been offset by ameliorative steps taken by the jurisdiction.  *City of Richmond*, 422 U.S. at 370-71; 28 C.F.R. § 51.57(d) (considering "[t]he extent to which the jurisdiction took the concerns of members of racial and language minority groups into account….").[17]

---

[17]   Florida's hypothetical in footnote 12 assumes a voting change that benefits white voters automatically burdens minorities.  Case law does not stand for this proposition. Changes have a discriminatory effect if they lead to retrogression in the position of minority voters.  *See Beer*, 425 U.S. at 140-42.  The Voting Changes, unlike the

Florida's claim that this standard would raise constitutional concerns is predicated on a misstatement of the effect test, which requires that voting changes be non-retrogressive, not that they be ameliorative. *City of Lockhart v. U.S.*, 460 U.S. 125, 134 & n.10 (1983).

71. Disputed. Consistent with *Beer*, 425 U.S. at 141, Section 5's effect prong prohibits any retrogression in the ability of racial minorities to participate in the political process or to elect their candidates of choice. *See also Shelby*, 811 F. Supp. 2d at 436-38. As set forth in Resp. to CL 10, 77-95, 106-107, Florida has not met its burden of demonstrating that the Voting Changes will not have a discriminatory effect.

72-73. Disputed. Resp. to CL 5. The Supreme Court has defined the Section 5 benchmark "as the most recent practice that was both precleared and [is]'in force or effect'—or, absent any change since the jurisdiction's coverage date, the practice that was 'in force or effect' on that date." *Riley,* 553 U.S. at 421; *see also Bossier I*, 520 U.S. at 478; *Holder v. Hall*, 512 U.S. 874, 883 (1994); 28 CFR 51.54(c). The quoted question from the *Riley* oral argument does not provide a legal basis for the proposition cited. Florida's own Amended Complaint and Section 5 submission identify the benchmarks as changes made in recent years. V1 9-11, 16-17, 19; *see also* V16 8921-23, 8929-30.

74-75. Disputed; *see* Resp. to CL 72-73. The benchmark is defined as "the standard, practice, or procedure that has been: (1) Unchanged since the jurisdiction's coverage date; or (2) if changed since that date, found to comply with section 5 and 'in force or effect.'" 76 Fed. Reg. 21,239 (Apr. 15, 2011); 76 Fed. Reg. 7,470 (Feb. 9, 2011); *Riley,*

_____

hypothetical, make it *more* difficult for minority voters to (1) register to vote using a 3PVRO; (2) vote early; and (3) change their address at the polls.

553 U.S. at 421; 28 CFR 51.54.  In this instance, the benchmarks for the three sets of

voting changes at issue are identified in FF 25G (Fla. Stat. 97.021(37) & 95.0575, third

party voter registration regulations), FF 32-33 (Fla. Stat. 101.045, inter-county address

changes), and FF 39-41 (Fla. Stat. 101.657, early voting).  Florida's cited cases do not

alter the Supreme Court's interpretation of the benchmark in *Riley,* 553 U.S. at 421, or

other cases.  Contrary to Florida's CL, the Department has long-recognized that

preclearance may be warranted in certain circumstances despite a proposed change's

retrogressive effect.  Resp. to CL 18-19; 76 Fed. Reg. 7,470, 7,472 (Feb. 9, 2011); 66

Fed. Reg. 5,412, 5,413 (Jan. 18, 2001); 52 Fed. Reg. 486, 488 (Jan. 6, 1987).

76.  Disputed.  The cases relied on by Florida, including *Crawford* (facial constitutional

challenge to a photo ID requirement in a non-Section 5 covered state), *Burdick* (challenge

to Hawaii's prohibition on write-in candidates), and *Storer v. Brown* (1st and 14th

Amendment challenge to California requirements regarding registered political party

affiliations of independent candidates) are inapposite.  None dealt with Section 5 or

retrogression.  *See Crawford*, 553 U.S. 181 (2008); *Burdick*, 504 U.S. 428 (1992); *Storer*,

415 U.S. 724 (1974).

77-80.  Disputed.  *See* Resp. to CL 105-107.

81-82.  Disputed.  *See* Resp. to CL 105-107.  Florida has not met its burden.  In addition,

the Inter-County Changes force individuals to vote provisionally, which will discourage

and limit the opportunity to vote.  FF 37A, Resp. to FF 68, FF 68A-E, 77A-B.

83-84.  Disputed.  Florida does not explain how it derived the inter-county movers rates

it references.  *See also* FF 77A-B; V16 8895-8901.  Florida also fails to compare

minority rates to white rates.  Further, under Florida's legal theory, courts could no longer find retrogression in jurisdictions where minority voters remain a minority of the total number of voters and are negatively impacted by a voting change.  This theory would eviscerate Section 5.  *See* Resp. to CL 38-39.

85.  Disputed.  FF 98A-P; CL 106-107.

86.  Disputed.  *Burdick v. Takushi* is inapposite, as *Burdick* did not involve Section 5 or a change's retrogressive effect on minority voters.  504 U.S. 428 (1992).  The appropriate standard here is whether the change is retrogressive.  *Beer*, 425 U.S. at 140-42; Resp. to CL 41-46.  The Early Voting Changes are retrogressive.  FF 98A-P; CL 106-107.

87.  Disputed.  The proper category of voters at issue here is minority voters and whether their opportunity to cast an effective ballot has been diminished by Florida's reduction in the number of days of early voting.

88.  Disputed.  Dr. Stewart found that 71,670 voters in the five Covered Counties cast ballots during the first five days of early voting in November 2008, which is not "quite small" as Florida alleges.  V16 8904.  Florida has proffered no empirical evidence that reducing the early voting period to eight days will result in these 71,670 (and disproportionately minority) voters having the same access to early voting as they did prior to the proposed change.  Resp. to FF 112-116; *see also* Resp. to FF 80-82.

89-91.  Disputed.  *See* Resp. to CL 39, 84.  Florida offers no legal support for its contention that expanding early voting would be retrogressive to minority voters because more white voters would also benefit.  Florida mistakenly characterizes the November 2008 election as anomalous.  *See* Resp. to FF 107.  In the covered counties in November

2008, African-American voters disproportionately used early voting as compared to white voters, FF 98E, a fact well-publicized in Florida, FF 48D.  Dr. Gronke testified that this election represented a shift in the voting patterns of African-American voters, FF 94B-E, and that African-American voters will likely again disproportionately use early voting in November 2012, FF 98H-M.  African-American voters are disproportionately burdened by this change as compared to white voters.  FF 98A-P.

92.  Disputed.  The possibility of expanded evening and weekend hours is not mandatory under the new law, with the exception of two added weekend hours.  Rather than requiring counties to maintain 96 hours of early voting, counties may choose to have as few as 48 hours.  Resp. to FF 90-93.

93-94.  Disputed.  The factors relevant for assessing retrogression are clearly outlined in 28 C.F.R. 51.54 to 51.57.  Florida has not shown that any retrogressive impact on minority voters was unavoidable, or that Florida made adjustments that would ameliorate the retrogressive effect on minority voters.  *See, e.g., City of Richmond*, 422 U.S. at 370-71; *City of Port Arthur*, 459 U.S. at 166-67.

95.  Disputed.  The Court should not enter the requested declaratory judgment, as Florida has not met its burden to prove that the Voting Changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

## II.   Florida Has Not Carried Its Section 5 Burden

Defendants propose the following additional Conclusions of Law:

96.   The Voting Changes are subject to preclearance, since voter registration and

balloting methods are standards, practices, and procedures within the meaning of Section 5.  42 U.S.C. 1973c; 28 C.F.R. 51.13; *Allen v. State Bd.*, 393 U.S. 564-65.

97.     Florida bears the burden of proof in this case, *Katzenbach*, 383 U.S. at 335, and must demonstrate that the Voting Changes "neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or [membership in a language minority group]."  42 U.S.C. 1973c(a).

98.     A voting change has a discriminatory "effect" when the change "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."  *Beer*, 425 U.S. at 131.  In other words, a voting change is retrogressive when it "will make members of … a [minority] group worse off than they had been before the change."  28 C.F.R. 51.54(b).

99.     The retrogression standard requires the proposed change be compared to the existing practice, so long as that practice has been precleared, is not subject to preclearance because it is a federal court-ordered change, or pre-dates Section 5 coverage.  28 C.F.R. 51.18 & 51.54(c); *Bossier I*, 520 U.S. at 478-79; *Texas* v. *U.S.*, No. 1:11-cv-1303-TBG, 2011 WL 6440006, at *3  (D.D.C. Dec. 22, 2011).

100.    Discriminatory purpose under Section 5 "include[s] any discriminatory purpose." 42 U.S.C. 1973c(c).  A voting change that is the product of purposeful racial discrimination "has no legitimacy at all under our Constitution or under [Section 5]." *City of Richmond,* 422 U.S. at 378-379.

101.    Courts "assessing a jurisdiction's motivations in enacting voting changes … should look to [the Supreme Court's] decision in *Arlington Heights* for guidance."

*Bossier I*, 520 U.S. at 488-89.  This inquiry "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes" but that "discriminatory purpose has been a motivating factor in the decision." *Arlington Heights*, 429 U.S. at 265-66.

102.    "[D]iscriminatory purpose need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982).

103.    "The important starting point for assessing discriminatory intent under *Arlington Heights* is the impact of the official action [and] whether it 'bears more heavily on one race than another." *Bossier I*, 520 U.S. at 489 (internal quotation marks omitted).

104.    Additional evidentiary sources include, but are not limited to:  (a) "[t]he historical background of the decision"; (b) "the specific sequence of events leading up to the challenged decision," including "[d]epartures from the normal procedural sequence"; (c) "[s]ubstantive departures . . ., particularly if the factors usually considered important  by the decisionmaker strongly favor a decision contrary to the one reached"; (d) "[t]he legislative … history,"; and (d) trial testimony by members of the decisionmaking body "concerning the purpose of the official action." *Arlington Heights*, 429 U.S. at 266-68.

105.    The history of discrimination against minorities in Florida, and their continued depressed educational and economic status, FF 1F-G, are relevant in assessing whether the voting changes have a discriminatory purpose or effect.  *See Texas*, 2011 WL 6440006, at *16 (retrogression); *Busbee*, 549 F. Supp. at 499.  *See also LULAC*, 548 U.S. at 440.

106.    Florida has not carried its burden of demonstrating that the Voting Changes are

not retrogressive as compared to the current (pre-2011 law) practices, which have been precleared, FF 25F-G, Resp. to FF 33, 39-41.  Each set of changes bears more heavily on minority voters in the Covered Counties than white voters, and minority voters in the Covered Counties would be worse off if the Voting Changes were to be implemented.

a.  Minority citizens in the Covered Counties rely more heavily than white citizens on third-party registration, early voting, and changing one's address when voting as an inter-county mover, as the minority usage rates exceed the white usage rates.  FF 1E, 57A-H, Resp. to FF 64 (third-party); FF 94A-E, 98A-P, 99A-E, Resp. to FF 101-116C (early voting); FF 73A-B, Resp. to FF 74, FF 77A, Resp. to 78-82 (inter-county).

b.  The Voting Changes, as compared to the benchmark practices, impose significant new restrictions on ballot access.  FF 58A-M, 61-62A (impact on 3PVROs); FF 42A-D, 43A-B, 45B, Resp. to FF 92-93, FF 97A-C (loss of early voting days); FF 37A, 68A-E, 77B (inter-county movers and use of provisional ballots).

c.  Since minority citizens disproportionately rely on these ballot access mechanisms, the restrictions will retrogress the "the ability of minority groups to participate in the political process."  *Beer*, 425 U.S. at 131.

107.  Florida has not carried its burden of demonstrating that each of the Voting Changes was adopted for nondiscriminatory reasons, as demonstrated by the following:

a.  The "important starting point" is that each set of Voting Changes bears more heavily on minority citizens than white citizens.  CL 103, 106.

b.  Florida has a long history of discrimination in voting and other areas.  FF 1G. Florida's minority population growth is substantial, FF 1C, and, in November 2008,

African-American voters relied heavily on early voting, which was well-known in Florida.  FF 48D, 98C, 98E.  Florida began allowing 3PVROs without state-deputized members to collect registration forms only under the compulsion of the NVRA, and in 2005 sought to significantly restrict 3PVROs, which was enjoined by a federal court.  FF 25A-C.

c.  There was no elections-administration rationale for enacting the changes. Florida election officials, whose views "usually [would be] considered important" by the legislature, did not propose or support the Voting Changes, FF 9A-H, since there were no problems with the current practices.  The evidence shows that 3PVROs were not engaging in fraud, were timely submitting registration forms, and were otherwise being accountable.  FF 27A-E, Resp. to FF 29.  There was no reason to reduce the number of early voting days (or eliminate SOE discretion for early voting on the Sunday before Election Day).  FF 42A-D, 45A-F.  There was no evidence that inter-county movers were double voting, which would be identified by existing procedures.  FF 34A-D, 36A-D.

d.  Proponents made frequent use of lengthy strike-all amendments, bypassing the Senate committee assigned to consider election law changes, and disallowing testimony at a Senate committee hearing on the changes.  FF 15A, 17A, Resp. to FF 52-53.

e.  Election officials repeatedly communicated to the Legislature that the changes were not needed.  FF 9F-G, 36B, 42A-D.  In response, the sponsors offered generalized, non-specific allegations to justify the changes, and made claims that either, on their face, lacked any substantive validity or which were misleading and at variance with the actual facts.  FF 9E, 30A-G, 31A-B, 36A-D, Resp. to FF 37, FF 37A, 45A-F, Resp. to FF 46.  A

senate leader argued for passage of the Voting Changes saying that it is important for voting not to be overly convenient, discussing purported voting practices "in Africa."  FF 19A.  Minority legislators opposed the changes, asserting that they would be discriminatory.  FF 48A-C.  Ameliorative amendments were rejected.  FF 10A, 14A. Members of the public also opposed the changes.  FF 9I, 30H.

f.  Florida decided not to offer testimony from legislators, and actively opposed Defendants' efforts to obtain it, leaving unexplained the sponsors' facially inadequate rationales for the changes, and their mischaracterization of the facts.  The Court should draw a negative inference from Florida's conduct that, if offered and permitted, legislator testimony concerning intent would have been unfavorable.  *UAW v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972) (if party fails to produce relevant evidence in its control, that "failure gives rise to an inference that the evidence is unfavorable to him" ).

g.  The Voting Changes were immediately implemented in the non-covered counties, despite longstanding precedent that, to ensure uniform implementation of state election law, Florida will not implement voting changes anywhere until they have received preclearance.  FF 120-21.

h.   None of the rationales offered by Florida for the changes are supported by the evidence.  Florida concedes that none of the Voting Changes was "adopted for partisan political reasons."  FF 117.  The impact of the Voting Changes "bears more heavily on one race than another," CL 103, 106, the purported reasons for the changes are not supported by the evidence, FF 9J, Resp. to 30, FF 30A-H, Resp. to FF 31, FF 31A-B, 36- 37A, Resp. to 45, FF 45A-F, Resp. to 46, the legislative process was unusual and the

opportunity for public participation truncated, FF 17A, Resp. to 52-53, Florida chose not to offer testimony from any proponent of the changes and actively opposed any attempt to obtain such testimony, FF 9J, and the proponents failed to substantiate the purported reasons for the changes, FF 9E, 30A-G, 31A-B, 36A-D, Resp. to FF 37, FF 37A, 45A-F, Resp. to FF 46.  Florida has not satisfied its burden as to purpose.

108.    The Court should exclude testimony of Florida's expert, Dr. Hood, because his opinions fail to satisfy Fed. R. Evid. 702:  (a) Dr. Hood is not qualified to testify as an expert regarding the changes; (b) his methodology is not sufficiently reliable; and thus (c) his opinion would not assist the Court to understand the effect of the voting changes. *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 590-95 (1993); *United States v. Day*, 524 F.3d 1361, 1368-69 (D.C. Cir. 2008).  FF 73A-B, Resp. to 78-79, 94B, 99A-E.

109.    Florida has failed to provide sufficient affirmative evidence to meets its burden of proving lack of discriminatory purpose.  *See New York*, 874 F. Supp. at 400.

## CONCLUSION

110.   For all the reasons set forth above, Defendants urge this Court to deny the Section 5 declaratory judgment requested by the State of Florida, as the State has not met its burden to prove that the Third-Party, Early Voting, and Inter-County sets of voting changes have neither the purpose nor will have the effect of denying or abridging the right on account of race, color, or membership in a language minority group.

Respectfully submitted on May 3, 2012,

*For the United States:*

THOMAS E. PEREZ                          RONALD C. MACHEN JR.
Assistant Attorney General               United States Attorney
Civil Rights Division                    District of Columbia

 /s/ Elise S. Shore
T. CHRISTIAN HERREN, JR.
JOHN ALBERT RUSS IV
ELISE SANDRA SHORE
CATHERINE MEZA
ERNEST A. McFARLAND
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone:    (202) 305-0070
Facsimile:    (202) 307-3961

*For the Defendant-Intervenors:*

| /s/ Randall C. Marshall | /s/ Dale E. Ho | /s/ Daniel T. O'Connor |
|---|---|---|
| Randall Marshall | Debo P. Adegbile | Daniel C. Schwartz |
| **American Civil Liberties Union Foundation of Florida, Inc.** | Ryan P. Haygood | Rodney F. Page |
|  | Dale E. Ho | Alec W. Farr |
|  | Natasha M. Korgaonkar | James J. Murphy |
| 4500 Biscayne Blvd. Ste. 340 | **NAACP Legal Defense and Educational Fund, Inc.** | Daniel T. O'Connor |
| Miami, FL 33137 |  | Nicholas S. Sloey |
| Tel: (786) 363-2700 | 99 Hudson St., Ste. 1600 | Ian L. Barlow |
| Fax: (786) 363-1108 | New York, NY 10013 | **Bryan Cave LLP** |
| rmarshall@aclufl.org | Tel: (212) 965-2200 | 1155 F St. NW, Ste. 700 |
|  | dho@naacpldf.org | Washington, D.C. 20004 |
|  |  | Tel: (202) 508-6000 |
| Arthur B. Spitzer | *Counsel for the NAACP Group* | Fax: (202) 508-6200 |
| **American Civil Liberties Union of the Nation's Capital** |  | dcschwartz@bryancave.com |
| 1400 20th St. NW, Ste. 119 |  | Jon M. Greenbaum |
| Washington, D.C. 20036 |  | Mark A. Posner |
| Tel: 202-457-0800 |  | **Lawyers' Committee for** |

Fax: 202-452-1868
art@aclu-nca.org

M. Laughlin McDonald
**American Civil Liberties
Union Foundation, Inc.**
230 Peachtree St. NW
Ste. 1440
Atlanta, GA 30303-1227
Tel: (404) 523-2721
lmcdonald@aclu.org

Estelle H. Rogers
**Project Vote**
1350 Eye St., NW, Ste. 1250
Washington, DC 20005
Tel: 202-546-4173 x.310
Fax: 202-629-3754
erogers@projectvote.org

*Counsel for the Sullivan
Group*

**Civil Rights Under Law**
1401 New York Ave. NW
Ste. 400
Washington, D.C. 20005
Tel: (202) 662-8389
Fax: (202) 628-2858
mposner@lawyerscommittee.org

Wendy Weiser
Diana Kasdan
Lee Rowland
**The Brennan Center for
Justice at NYU School of Law**
161 Ave. of the Americas
Fl. 12
New York, NY 10013-1205
Tel: (646) 292-8310
Fax: (212) 463-7308
lee.rowland@nyu.edu

*Counsel for the NCLR Group*