## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF FLORIDA,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA and ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States,<br><br>    Defendants,<br><br>v.<br><br>KENNETH SULLIVAN, *et. al.*,<br><br>    Defendant-Intervenors | Civil No. 1:11-cv-01428-CKK-MG-ESH |

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Daniel E. Nordby
Ashley E. Davis
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough Street
Tallahassee, FL 32399-0250
Tel: 850-245-6536

William S. Consovoy* (D.C. Bar 493423)
Brendan J. Morrissey (D.C. Bar 873809)
J. Michael Connolly  (D.C. Bar 995815)
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
Tel.: (202) 719-7000
Fax: (202) 719-7049

* *Counsel of Record*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   ARGUMENT ...................................................................................... 1

A.   Congress Failed in 2006 To Compile a Record Sufficient To Justify
     Imposing Preclearance on Language-Minority Jurisdictions ...................... 1

1.   Defendants Rely On Evidence That Is Not Probative of
     Voting Discrimination Against Language Minorities in 2006 .......... 2

2.   The Limited Probative Evidence Does Not Show Widespread
     Intentional Voting Discrimination Against Language
     Minorities ........................................................................................ 8

B.   Section 4(b)'s Language Minority Coverage Formula Is Not An
     "Appropriate" Means of Enforcing the Fourteenth Amendment ............... 14

1.   Section 4(b)'s Language Minority Coverage Formula Does
     Not Correlate to the Problem Congress Sought To Address .......... 15

2.   Section 4(b)'s Language Minority Coverage Formula Does
     Not Single Out for Coverage Those Jurisdictions Uniquely
     Interfering with the Right That Congress Is Seeking To
     Protect ............................................................................................ 17

C.   Section 5's Requirement of Preclearance for All Groups Without
     Regard to the Jurisdiction's Basis for Coverage is Neither a
     Congruent nor Proportional Response to Any Demonstrated History
     of Discrimination .................................................................................. 22

D.   Congress's 2006 Expansion of Section 5's Substantive Standard
     Cemented the Statute's Unconstitutionality .............................................. 25

III.  CONCLUSION ................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Beer v. United States*,
425 U.S. 130 (1976) ........................................................................................... 24, 29

*Board of Trustees v. Garrett*,
531 U.S. 356 (2001) ............................................................................................. 7, 25

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ............................................................................................ *passim*

*Coleman v. Court of Appeals of Maryland*,
132 S. Ct. 1327 (2012) .......................................................................................... 2, 7

*Gaston County, North Carolina  v. United States*,
395 U.S. 285 (1969) ................................................................................................. 6

*Georgia v. Ashcroft*,
539 U.S. 461 (2003) ............................................................................................ 27, 29

*Katzenbach v. Morgan*,
384 U.S. 641 (1966) ................................................................................................. 3

*LULAC v. Perry*,
548 U.S. 399 (2006) ................................................................................................. 3

*Lopez v. Monterey County*,
525 U.S. 266 (1999) ................................................................................................. 1

*Miller v. Johnson*,
515 U.S. 900 (1995) ............................................................................................... 28

*Northwest Austin Municipal Utililty District No. One v. Holder*,
557 U.S. 193 (2009) ............................................................................................ *passim*

*Oregon v. Mitchell*,
400 U.S. 112 (1970) ................................................................................................. 6

*Parents Involved in Community Schools  v. Seattle School District No. 1*,
551 U.S. 701 (2007) ................................................................................................. 3

\*   Authorities upon which we chiefly rely are marked with an asterisk.

*Reno v. Bossier Parrish School Board*,
520 U.S. 471 (1997) ................................................................................... 26

*Reno v. Bossier Parrish School Board*,
528 U.S. 320 (2000) ................................................................................... 26

*Rice v. Cayetano*,
528 U.S. 495 (2000) ..................................................................................... 4

*Shelby County, Alabama v. Holder*,
679 F.3d 848 (D.C. Cir. 2012) ............................................................. *passim*

*\*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) ............................................................................. *passim*

*TRW, Inc. v. Andrews*,
534 U.S. 19 (2001) ....................................................................................... 5

*Texas v. United States*,
831 F. Supp. 2d 244 (D.D.C. 2011) ........................................................... 28

**FEDERAL STATUTES**

42 U.S.C. § 1973(a) ....................................................................................... 4

42 U.S.C. § 1973b(e)(1) ............................................................................ 3, 7

42 U.S.C. § 1973b(f)(1) ............................................................................ 4, 5

42 U.S.C. § 1973b(f)(2) ................................................................................. 4

42 U.S.C. § 1973l(c) ................................................................................. 3, 4

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 109-478 (2006) ............................................................ 7, 13, 15

S. Rep. No. 94-295 (1975) ..................................................................... *passim*

S. Rep. No. 109-295 (2006) .......................................................................... 17

Fannie Lou Hamer, Rosa Parks, and Correta Scott King Voting Rights Act
Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, §2(b)(3),
120 Stat. 577 (2006) ..................................................................................... 7

Modern Enforcement of the Voting Rights Act: Hearing Before the Committee on
the Constitution of the House Comm. on the Judiciary, 109th Cong., 2d Sess.
(May 10, 2006)........................................................................................................ 8

Voting Rights Act: Section 5 of the Voting Rights Act-History, Scope, and
Purpose: Hearing Before the Subcomm. on the Constitution of the House
Comm. on the Judiciary, 109th Cong., 1st Sess. (Oct. 25, 2005) ................................ 16

**OTHER AUTHORITIES**

DOJ Voting Right Act Division, FAQ, *available at*
http://www.justice.gov/crt/about/vot/misc/faq.php ....................................................... 5

# GLOSSARY

| | |
|---|---|
| 1975 House Report | H.R. Rep. No. 94-196 (1975) |
| 1975 Senate Report | S. Rep. No. 94-295 (1975) |
| CL | Florida's Conclusions of Law |
| DCL | Defendants' Conclusions of Law |
| DFF | Defendants' Findings of Fact |
| DOJ | Department of Justice |
| DRCL | Defendants' Conclusions of Law |
| DRFF | Defendants' Reply Findings of Fact |
| FF | Florida's Findings of Fact |
| History, Scope | Voting Rights Act: Section 5 of the Voting Rights Act – History, Scope, and Purpose: Hearing Before the Subcomm. On the Constitution of the House Comm. On the Judiciary, 109th Cong., 1st Sess. (Oct. 25, 2005) |
| May 10 Hearing | Modern Enforcement of the Voting Rights Act: Hearing Before the Comm. On the Judiciary of the United States Senate, 109th Cong., 2d Sess. (May 10, 2006) |
| RCL | Reply Florida's Conclusions of Law |
| RFF | Reply Florida's Findings of Fact |
| RFRA | The Religious Freedom Restoration Act of 1993 |
| V | Volume of the Appendix |
| VRA | Voting Rights Act of 1965 |
| VRARAA | Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577 (2006) |

## I.   INTRODUCTION

*Shelby County, Ala. v. Holder*, 679 F.3d 848 (D.C. Cir. 2012), incorrectly upheld Section 5 and Section 4(b) with respect to those jurisdictions covered based on racial discrimination. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 212-229 (2009) (Thomas, J., concurring in the judgment in part, dissenting in part); *Shelby County*, 679 F.3d at 884-905 (Williams, J., dissenting). But that decision's reasoning is controlling here. Under it, the 2006 reauthorization of Section 5's preclearance obligation under Section 4(b)'s coverage formula based on evidence of language-minority discrimination was unconstitutional. Given that *Shelby County* considered the Section 5 issue "by no means unambiguous," *id.* at 884, and the Section 4(b) challenge "a close question," *id*. at 879, this is a comparatively easy case given how much less evidence of language-minority discrimination in the covered jurisdictions Congress compiled. The 2006 amendments to the substantive preclearance standard also render Section 5 unconstitutional for multiple reasons. Florida also preserves its challenge to *Lopez v. Monterey County*, 525 U.S. 266 (1999).

## II.   ARGUMENT

### A.   Congress Failed in 2006 To Compile a Record Sufficient To Justify Imposing Preclearance on Language-Minority Jurisdictions.

As explained, Mot. 30-34, Section 5 is no longer congruent and proportional because Congress did not document "a pattern of … discrimination in voting so serious and widespread that case-by-case litigation is inadequate." *Shelby County*, 679 F.3d at 864. Defendants attempt to paper over the deficient record with irrelevant evidence. But

once that evidence is cleared away, it becomes obvious that the record compiled to support the 2006 reauthorization of language minority coverage pales in comparison to the "[a]mbiguous" legislative record that, with "much deference," *Shelby County* relied on to uphold reauthorization of Section 5 based on racial discrimination. *Id.* at 884. Congress cannot fairly be said to have proved that the required pattern of serious discrimination exists in quantities sufficient to justify the need for Section 5.

      1.     <u>Defendants Rely On Evidence That Is Not Probative of Voting Discrimination Against Language Minorities in 2006.</u>

"In identifying past evils, Congress obviously may avail itself of information from any *probative* source." *South Carolina v. Katzenbach*, 383 U.S. 301, 330 (1966) (emphasis added). Cognizant that the 2006 record does not show widespread voting discrimination against language minorities, Defendants rely significantly on evidence that is not probative of voting discrimination against language minorities in 2006.

      a.    Defendants lay out evidence they believe justified Congress's original extension of Section 5 to language minority jurisdictions in 1975. AG 13-21; Int. 9-16. They point to "[o]fficial disregard for language- and literacy-related barriers in the targeted areas," as well as evidence of vote dilution. AG 14, 18; Int. at 12.[1] The evidence

---

[1]     Defendants also point to summary statements characterizing the kind of evidence in the record. *See, e.g.*, AG 15-19; Int. 23-24. Because these statements provide no insight whatsoever into why or under what circumstances the alleged underlying events took place, they are not probative evidence of discrimination. If such conclusory statements could dictate the probative value of the evidence, it would be "difficult to conceive of a principle that would limit congressional power." *City of Boerne v. Flores*, 521 U.S. 507, 529 (1997); *see also Coleman v. Court of Appeals of Md.*, 132 S. Ct. 1327, 1337 (2012) (stating that "Congress must rely on more than abstract generalities" when it invokes its enforcement power).

is far from sufficient, Mot. at 30-33, but more importantly it is irrelevant. Florida is not challenging the decision to extend the protections of Section 5 to language minorities in 1975; it challenges the 2006 reauthorization. *Cf.* Int. 11-16.  Florida discussed the 1975 record to show that the reauthorization is built on a weak foundation. But the 2006 reauthorization must rise or fall on its own record. *Nw. Austin*, 557 U.S. at 203 ("[C]urrent burdens … must be justified by current needs.").

b.  Defendants contend that "this Court may take into account evidence of voting discrimination against all covered racial and ethnic minority groups." Int. 18; AG 12 n.3. In their view, "voting discrimination against all minority groups constitutes the same discrimination on account of 'race [or] color' prohibited by the Fifteenth Amendment," Int. 19, because the "language minority groups" defined and separately protected by the VRA, 42 U.S.C. § 1973*l*(c) ("persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage"), are "racial" groups, AG 12 n.3.

To adopt this argument, however, this Court would take an unprecedented step in holding that the Fifteenth Amendment protects "language minorities." The Supreme Court has protected language minority groups only under the Fourteenth Amendment. *See Katzenbach v. Morgan*, 384 U.S. 641 (1966) (upholding Section 4(e)'s ban on conditioning the right to vote on the ability to communicate in English, 42 U.S.C. § 1973b(e)(1), on equal protection grounds). The Supreme Court cases cited by Defendants reflect nothing more than the well-established fact that there are races other than White and African American, *LULAC v. Perry*, 548 U.S. 399, 439 (2006); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 712 n.2 (2007), and that

3

the Fifteenth Amendment protects those races too, *Rice v. Cayetano*, 528 U.S. 495, 512 (2000). No case addresses discrimination toward members of a group (racial or otherwise) based on their inability to communicate in English. Nor does any case hold that the Fifteenth Amendment protects against such discrimination.

Further, Defendants' argument conflicts with the statute. When Congress amended the VRA in 1975, it defined four "language minorities," 42 U.S.C. § 1973*l*(c), and separately provided that "[n]o voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote *because he is a member of a language minority group*," *id.* § 1973b(f)(2) (emphasis added). Notably, the VRA already provided in nearly identical terms protection against discrimination "on account of race or color." *Id.* § 1973(a).

The statute includes express findings concerning the distinct discrimination faced by "language minorities" that the new provisions were intended to address.  Language minorities, Congress concluded, "are from environments in which the dominant language is other than English" and have limited English proficiency. *Id.* § 1973b(f)(1). Accordingly, "where State and local officials conduct elections only in English, language minority citizens are excluded from participating in the electoral process." *Id.* The new statutory provisions were directed at "eliminat[ing] such discrimination," not at remedying *racial* discrimination. In recognition of the difference between language minority and racial discrimination, Congress invoked the Fourteenth Amendment (in addition to the Fifteenth Amendment) as authority for statute's new provisions. *Id.*

4

As the legislative history confirms, Congress intended to "expand the protections of the Voting Rights Act" beyond race and color. 1975 Senate Report at 30. It sought to reach "the voting problems of minority citizens outside the current jurisdiction of the Act"—specifically, those "from environments in which the dominant language is other than English." *Id.* at 24.   The new provisions *added* to the original Act's coverage. Congress thus made clear that, for purposes of any court challenge, the language minority provisions are severable and should "be viewed independently." *Id.* at 37.[2]

Defendants simply ignore the 1975 expansion. But they must admit that if "language minority groups" are "racial" groups, those groups were always covered under the VRA, and the 1975 amendments are superfluous. This approach would, of course, violate the "cardinal principle" that statutory language not be rendered "superfluous, void, or insignificant."   *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotations omitted).   It would also fail to accord Congress the deference required by *Shelby County*. 679 F.3d at 861.

Defendants likewise ignore that Congress studied whether to extend the language-minority protections of Section 5 to German, French, Polish, and Russian speaking citizens. 1975 Senate Report at 31. In Defendants' view, these groups presumably also

---

[2]   Curiously, the Attorney General elsewhere acknowledges the difference between "language minority" discrimination and racial discrimination in voting. "The idea behind the Voting Rights Act's minority language provisions is to remove language as a barrier to political participation, and to prevent voting discrimination against people who speak minority languages… When we review voting changes from jurisdictions whose Section 5 coverage is for language minority voters, we look for discrimination (either in purpose or in effect) that voters in the language minority group suffer, no matter what their race." *See* DOJ Voting Right Act Division, FAQ, *available at* http://www.justice.gov/crt/about/vot/misc/faq.php.

would be considered racial minorities had Congress extended coverage to them. The Court should not accept a construction of Section 5 that not only betrays its text, but assumes that Congress intended an absurd result.

c. The Attorney General also points to evidence of illiteracy or limited English proficiency among language minority groups, allegedly made worse by state-sponsored discrimination in education. AG 33. But this evidence is not probative of intentional *voting* discrimination against language minorities. Mot. 30-31. Those conditions might make a group more vulnerable to voting discrimination, but their mere existence does not prove that any voting discrimination is occurring or has actually occurred.

To sustain a remedy as intrusive as Section 5, Congress needs "reliable evidence of actual voting discrimination" in the covered jurisdictions. *Katzenbach*, 383 U.S. at 329. But Defendants cite no evidence in the 2006 legislative record of jurisdictions purposefully taking advantage of such conditions to prevent language minority groups from participating in elections. The most they can muster is that Congress "rationally concluded" that jurisdictions *in 1975* were using English-only elections in conjunction with educational discrimination, in a manner similar to literacy tests, to deny minorities the right to vote. AG 15 (citing *Oregon v. Mitchell*, 400 U.S. 112 (1970)); Int. 10, 12.

As an initial matter, the comparison lacks merit. *Mitchell* upheld the nationwide ban on literacy tests because of their "long history" as a tool "to disfranchise voters on account of their race." 400 U.S. at 132 (Black, J.); *Gaston County, N.C. v. United States*, 395 U.S. 285, 291 (1969). Defendants point to no evidence from the 1975 record that English-only elections were similarly being used as a "discriminatory weapon." *Mitchell*,

400 U.S. at 147 (Douglas, J., dissenting). Indeed, the provision of English-only election materials can serve a variety of non-discriminatory purposes. Mot. 37. The comparison also is inapt. The correct comparison is between the ban on literacy tests and the ban on conditioning the right to vote on the "ability to read, write, understand, or interpret any matter in the English language." 42 U.S.C. § 1973b(e)(1).  In both instances, Congress outlawed a *de jure* barrier to voting with a discriminatory history that directly interfered with the right to vote.  *Mitchell*, 400 U.S. at 129 (Black, J.).

Moreover, that conclusion says nothing about the state of affairs in 2006. At most, the 2006 record shows that illiteracy or limited English proficiency may impose an "incidental burden[]" on language-minority voters. *Boerne*, 521 U.S. at 530. Congress cannot invoke its enforcement authority out of concern over neutral voting laws with a disparate impact or incidental burden on certain groups or individuals. *Coleman v. Court of Appeals of Md.*, 132 S. Ct. 1327, 1337 (2012); *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 373 (2001); *Boerne*, 521 U.S. at 534.

d.   The Attorney General turns next to racially polarized voting. AG 21, 32-33. But *Shelby County* did *not* rely on racially polarized voting as evidence probative of intentional, state-sponsored voting discrimination. Even though Congress described racially polarized voting in covered jurisdictions as "the clearest and strongest evidence" of the need to reauthorize Section 5, H.R. Rep. No. 109-478 at 34 (2006); VRARAA, § 2(b)(3), 120 Stat. at 577, *Shelby County* omitted it from the "categories of evidence in the record [that] support Congress's conclusion that intentional racial discrimination in

7

voting remains so serious and widespread in covered jurisdictions that section 5 preclearance is still needed," 679 F.3d at 866. That decision was correct. Mot. 18-19.

e. Last, the Attorney General directs this Court to evidence of "non-compliance with Section 203's language assistance provisions." AG 33. But this evidence is not a proxy for intentional voting discrimination. *Shelby County* viewed Section 2 litigation as a fair proxy because Section 2's "'results test' … requires consideration of factors very similar to those used to establish discriminatory intent based on circumstantial evidence." 679 F.3d at 686. In contrast, Section 203 does not.

Moreover, the record shows that the issue is mostly inadequate compliance with Section 203 rather than a refusal to comply. Mot. 35. The evidence thus more likely reflects mistaken or incomplete understanding of the VRA's requirements than the sort of widespread intentional discrimination that would justify preclearance. Also, the record shows that this problem can be resolved through case-by-case litigation. When they have been brought, Section 203 enforcement actions have been successful at bringing jurisdictions into compliance. *Id.*; May 10 Hearing at 29-30, 53.

2. The Limited Probative Evidence Does Not Show Widespread Intentional Voting Discrimination Against Language Minorities.

Setting the irrelevant evidence aside and examining the categories of evidence that *Shelby County* found probative, it is clear that the 2006 legislative record lacked sufficient evidence to support reauthorization of language minority coverage. The record pales in comparison to that in *Shelby County*, which itself was sufficient only when accorded significant deference.

8

Overt Discrimination. *Shelby County* first noted that "the record contain[ed] numerous 'examples of modern instances' of racial discrimination in voting." 679 F.3d at 865 (quoting *Boerne*, 521 U.S. at 530). The court identified seven specific examples of "flagrant racial discrimination." *Id.* at 866. One involved an attempt by Waller County, Texas, to reduce early voting at polling places near a historically black university, after two black students announced their intent to run for office.

Defendants do not even attempt to produce a similar list of overt discrimination against language minorities. Scattered throughout the two briefs are a handful of concrete examples, but none compare to the supposedly "flagrant" racial discrimination identified in *Shelby County. See, e.g.*, AG at 29-30 (describing instances in Texas and Arizona where "registered Hispanic voters were forced to provide proof of citizenship" and noting generally "the lack of Chinese-language assistance in New York and California"). Intervenors point to the Waller County example, but it did not concern discrimination against language minorities. Int. 25.

Section 5 Objections and More Information Requests (MIRs). Although the D.C. Circuit noted that the DOJ had interposed at least 626 objections between 1982 and 2004, *Shelby County*, 679 F.3d at 866, the vast majority of those objections applied to race jurisdictions. Looking solely at the absolute number of objections, six of the top seven jurisdictions are States covered on the basis of race. *See* Table 2.[3] Texas is the only

---

[3]    For purpose of analysis, North Carolina is classified as a jurisdiction partially covered on the basis of race because 39 of the 40 covered counties are subject to preclearance on that basis. There is no indication that relevant conduct occurred in North Carolina's one language-covered jurisdiction. *See* Table 4.

language minority jurisdiction in that group. Since 1982, the race jurisdictions as a group have had almost four times as many objections as the language minority jurisdictions (484 to 131). *See id.* Texas accounted for the overwhelming majority of the objections in language minority jurisdictions (105).

Once population differences between jurisdictions are accounted for, *see Shelby County*, 679 F.3d at 874; *id.* at 893-94 (Williams, J., dissenting), the disparity between race jurisdictions and language minority jurisdictions objections is even starker. Of all fully covered states, the five with the highest number of Section 5 objections per million minority residents are race jurisdictions: Mississippi (103.1), Louisiana (59.6), South Carolina (51.2), Alabama (33.3), and Georgia (23.6). Texas, the highest language minority state, is a distant sixth (9.3). *See* Table 2; Figure 2-1. As a group, race jurisdictions had more than four times as many objections per million minority residents (37.7) than language jurisdictions (9.1). *See* Table 2; Figure 2-2.

MIRs issued between 1982 and 2005 follow the same pattern. *Shelby County*, 679 F.3d at 868. Only one of the top five jurisdictions in absolute numbers is covered on the basis of language (Texas). *See* Table 3. Adjusted for population, Alaska is the leading fully covered jurisdiction with 1,449.9 MIRs per million minority residents.  But the next five are race jurisdictions with an average of 818.4, and Texas is a distant seventh with 268.5.  *See* Table 3; Figure 3-1. As a group, the race jurisdictions had nearly two-and-a-half times as many MIRs per million minority residents (714.8) than the covered language jurisdictions (287.9). *See* Table 3; Figure 3-2.

Section 2 Litigation. The Katz study also shows a striking disparity between race jurisdictions and language jurisdictions. The number of successful Section 2 cases that originated in race jurisdictions (57) far outpaces the number that originated in language minority jurisdictions (12). Indeed, several language minority jurisdictions have no successful Section 2 suits at all: Alaska, Arizona, and the covered portions of California, and Michigan. *See* Table 4.

The same holds true relative to population. Excluding South Dakota, *see Shelby County*, 679 F.3d at 896 (Williams, J., dissenting), four of the top five jurisdictions in terms of successful Section 2 suits per million residents are race jurisdictions: Mississippi (6.20), Alabama (2.65), Louisiana (2.21), and North Carolina (2.00). *See* Table 4; Figure 4-1. The fifth is a non-covered jurisdiction. Language jurisdictions like Texas (0.40), the covered counties in Florida (0.65), and the covered counties in New York (0.26) fall in the middle of the distribution. Race jurisdictions as a group had four times as many successful Section 2 suits per million residents (1.34) as the language minority jurisdictions (0.34). *See* Table 4; Figure 4-2.[4]

But the disparity may actually be more severe than that. Even when a Section 2 lawsuit originates in a language minority jurisdiction, the suit may not involve discrimination against language minorities. For example, Intervenors single out as

---

[4]      *Shelby County* referenced state-by-state data from Peyton McCrary for published and unpublished Section 2 lawsuits, which was provided by the Attorney General through a supplemental declaration. 679 F.3d at 875. The Attorney General has not provided such data here. But even if it were available, the disparity between race and language minority jurisdictions still holds. Excluding South Dakota, the top jurisdictions are still race-based jurisdictions, with the lone exception of Texas. *See id*. at 876.

"notable" a case from Hillsborough County, Florida, but that case involved allegations of discrimination against "thousands of African-American voters." Int. 27. It is difficult to discern from the Katz study the precise allegations in each lawsuit, but it can be determined whether a case involved an African American, Latino, Asian American, or Native American plaintiff. That data suggests that the gap between instances of race discrimination and language discrimination is even more pronounced. Of the 57 successful Section 2 cases that originated in race jurisdictions, *all but one* involved an African-American plaintiff. Of the 12 cases from language minority jurisdictions, three had African-American plaintiffs only, three had language-minority plaintiffs only, and six had plaintiffs from both categories.

Federal Observers. The federal observer statistics from 1982-2004 bear out the same pattern. *Shelby County*, 679 F.3d at 869. Among covered jurisdictions,[5] race jurisdictions have drawn the bulk of observer deployments. *See* Table 5. In fact, Alaska and the covered counties in Florida have had *no* observer coverage during the relevant time period. Adjusted for population, DOJ has deployed observers to race jurisdictions more than eight times as often (32.4 observers per million minority residents) as to language jurisdictions (4.0). *See* Table 5; Figures 5-1, 5-2.

Section 5 Enforcement Actions. *Shelby County* also relied on the 105 successful Section 5 enforcement actions brought between 1982 and 2004, 679 F.3d at 870, but again the lion's share falls on the race jurisdictions. In absolute terms, more than twice as

---

[5]     Non-covered states are only eligible for observer coverage pursuant to court order or a Section 3 "bail-in" determination. *Shelby County*, 679 F.3d at 893-95 (Williams, J., dissenting). Table 5 includes observer coverage in several non-covered states.

many successful Section 5 enforcement actions took place in race jurisdictions (73) as in language minority jurisdictions (32). *See* Table 6. There were no successful Section 5 enforcement actions in Alaska, Michigan, Florida, or South Dakota, all States covered fully or partially on the basis of language. Relative to population, successful Section 5 enforcement actions occurred in race jurisdictions more than two and a half times as often (5.7 cases per million minority residents) as in language jurisdictions (2.2). *See* Table 6; Figure 6-1. The gap between the worst fully-covered race jurisdiction (15.9 in Alabama) and the worst fully-covered language jurisdictions (2.6 in Texas) is even more extreme. *See* Table 6; Figure 6-2.[6]

Registration and Turnout. Although *Shelby County* did not analyze registration and turnout statistics in detail, it considered them briefly. It noted Congress's recognition that "[r]acial disparities in voter registration and turnout have 'narrowed considerably' in covered jurisdictions and are now largely comparable to disparities nationwide." 679 F.3d at 862 (quoting H.R. Rep. No. 109-478, at 12-17). But it also observed that Congress found "'continued registration and turnout disparities' in both Virginia and South Carolina." *Id.* (quoting H.R. Rep. No. 109-478, at 25).

Although the data is sparse, relevant registration and turnout statistics here are similar to those in *Shelby County*. Because the Census Bureau only began systematic tracking of Hispanic registration and turnout figures in 1980, it is difficult to ascertain the

---

[6]     *Shelby County* also relied on the number of unsuccessful judicial preclearance actions. 679 F.3d at 870-71. The disparity between race and language jurisdictions turns up in this data as well. Only 7 of the 25 (less than one-third) occurred in language-minority jurisdictions. Int. 25.

level of improvement between 1975 and the present. However, the 1975 Senate Report found that, in 1972, 73.4% of Anglo citizens of voting age were registered to vote, whereas only 44.4% of "persons of Spanish origin" were registered to vote—a gap of 29%. S. Rep. 94-295, at 30. As for turnout, 22.9% of "persons of Spanish origin" actually voted in the presidential election of 1972, which was approximately half the Anglo rate. *Id.* The figures are much improved today. Nationwide, 57.86% of Hispanic citizens of voting age are registered, as compared to 75.13% of Anglos—a gap of 17.27%. *See* Table 7. As for turnout, the nationwide rate for Hispanics is 47.16%, a dramatic improvement from 22.9% in 1972. *See* Table 8. The 20% gap in turnout is also down from 1975.

<u>Minority Elected Officials</u>. *Shelby County* noted "'significant increases'" in the number of African Americans serving in elected office, but that African Americans "continued to face barriers to election for statewide positions." 679 F.3d at 862 (quoting H.R. Rep. No. 109-478, at 18). Again, the data shows that success of language minorities in achieving elected office is at least on par with the record in *Shelby County*. Since 1996, the number of Hispanic elected federal representatives has increased 52.9%, and the number of elected state representatives has increased 52.6%. *See* Table 9; Figure 9. Language-minority jurisdictions have seen vast improvement: 28.6% in Texas; 18.8% in Arizona; 81.9% in Florida; 67.8% in California. *See* Table 10.

**B.**    **<u>Section 4(b)'s Language Minority Coverage Formula Is Not An "Appropriate" Means of Enforcing the Fourteenth Amendment.</u>**

Even if the preclearance obligation on language minority jurisdictions could be upheld as "appropriate" enforcement legislation, Section 4(b)'s language minority

coverage formula cannot. The statute's "disparate geographic coverage," *Nw. Austin*, 557 U.S. at 203, must be "rational in both practice and theory," *Katzenbach*, 383 U.S. at 330; Mot. 36-40  It is not.[7]

> 1.   Section 4(b)'s Language Minority Coverage Formula Does Not Correlate to the Problem Congress Sought To Address.

The language minority coverage formula is irrational in theory because the inputs for the formula are not tied to the specific problem sought to be addressed: intentional interference with the right of language minority citizens to access the ballot. To begin, the formula is triggered in part by decades-old election and population data. Continuing to use that data today makes no sense because the data do not represent the "current political conditions" in the covered jurisdictions. *Nw. Austin*, 557 U.S. at 203.

For example, Congress sought with the five-percent requirement to identify those areas "where language minorities reside in greatest concentrations." S. Rep. 94-295, at 32. But there is considerable evidence that language minority populations have shifted since 1975.  Florida exemplifies this problem:

> Since the 1975 Voting Rights Act … Latinos have supplanted African-Americans as the state's largest minority group[,] [and] [m]ost of Florida's Hispanic population lives in the southern part of the state. . . . [O]ver 48 percent live in Dade County, and over 62 percent (1,674,581) live in Dade, Broward, Collier, and Monroe. Florida's five Section 5 counties do not contain the bulk of the language minorities in the state.

History, Scope at 3111 (Bullock & Gaddie Report).

---

[7]    Intervenors argue that Florida's challenge to language minority coverage formula is foreclosed by *Shelby County* because the evidence relating to language minority discrimination cannot be distinguished from that relating to racial discrimination. Int. 29. This argument is no different from the contention that "language minority groups" are "racial" groups, and it fails for the same reasons. *Supra* at 3-6.

The formula also is triggered by the use of English-only voting materials or assistance even though that is not probative of intentional voting discrimination and, since 1975, bilingual elections have been required in the places that need it most: where a single-language minority actually lacks English proficiency. Mot. 37-38. And its methodology for identifying persons of Spanish heritage also is flawed in theory. *Id.* Defendants do not respond to *any* of these arguments.

They instead argue that the formula's triggers need not be rational in theory because, in their view, Section 4(b) is a "'reverse-engineer[ed]'" way of "captur[ing] [the] jurisdictions with a known history of intentional discrimination against minority voters" in 1975. AG 35; Int. 17. They are wrong.  The Supreme Court has expressly held that a coverage formula—and in particular, the statutory triggers—must be rational in theory. *Katzenbach*, 383 U.S. at 330. In any event, the record plainly shows that Congress did *not* reverse-engineer the formula in 1975. By its own admission, Congress "simply appl[ied] the Act's special remedies to jurisdictions where language minorities reside in greatest concentrations and where there is evidence of low voting participation." S. Rep. 94-295, at 32. Unlike in 1965, *see Shelby County*, 679 F.3d at 879. Congress did not in 1975 start with and specifically target a list of jurisdictions. Rather, "triggers were developed to identify areas [by their] magnitude of barriers to full participation by language minorities in the political process." S. Rep. 94-295, at 31.[8]

---

[8]     The record goes on to list the jurisdictions in which "coverage would be triggered" under then-"[c]urrently available data." S. Rep. 94-295, at 32. But that does not suggest that Congress started with and intended to target this list of jurisdictions.

The Attorney General argues that Congress sought specifically to cover Texas because it had "escaped Section 5 coverage despite its long history of intentional voting discrimination against blacks and Hispanics." AG 36.[9] But if Congress's goal in 1975 was to reverse-engineer a formula to cover Texas, it did a terrible job: two other States, twelve counties, and two townships were also swept in. *Id.* n.9. There is no evidence in the 1975 record that those jurisdictions were "the worst problems." Int. 18.

> 2.  Section 4(b)'s Language Minority Coverage Formula Does Not Single Out for Coverage Those Jurisdictions Uniquely Interfering with the Right That Congress Is Seeking To Protect.

Even if the formula accurately captured the correct jurisdictions in 1975, it does not do so today. The evidence of language-minority discrimination is not "concentrated" in the covered jurisdictions. *Nw. Austin*, 557 U.S. at 203. Indeed, for some covered jurisdictions, such as Florida's five covered counties, the record included little to no evidence of voting discrimination. S. Rep. 109-295, at 29 (2006) ("[N]one of [Florida's covered] counties were implicated by the accounts of discrimination[.]"). Intervenors' contention that the record reflects "some" evidence of discrimination in the covered jurisdictions, Int. 30, misses the point. To pass constitutional muster, the record must "contain[] sufficient evidence to demonstrate that the formula continues to target

---

[9]  The Attorney General's claim that Texas "escaped" coverage in 1965 because it used a poll tax instead of a literacy test squarely conflicts with the argument that he made in *Shelby County—i.e.*, that the 1965 formula was reverse engineered to capture particular jurisdictions. If Congress reverse engineered the 1965 coverage formula, no jurisdiction could have "escaped" anything. The Attorney General should explain why he is making contradictory arguments in parallel litigation.

17

jurisdictions with the most serious problems." *Shelby County*, 679 F.3d at 879 ; *see also id.* at 889.

Unlike *Shelby County*, this case does *not* present a "close question." *Id.* at 879. Every category of evidence considered for these purposes in *Shelby County* (by both the majority and the dissent) show that this coverage formula is constitutionally suspect.  For each category of evidence, the circumstances in the non-covered jurisdictions are equivalent to, if not worse than, those in the covered jurisdictions.

Registration and Turnout.   In *Shelby County*, the dissent found "no positive correlation" between covered jurisdictions and low black registration or turnout. *Id.* at 891 (Williams, J., dissenting). It calculated, on a state-by-state basis, the ratio of white registration to black registration and the ratio of white turnout to black turnout. The numbers showed that the worst offenders—where whites turned out or registered in higher proportion than African Americans—were *non-covered* jurisdictions.

The same is true here with respect to Hispanic registration and turnout. A comparison of Anglo registration rates to Hispanic registration rates in 2004 reveals no correlation between covered Spanish-heritage jurisdictions and low Hispanic registration. The worst offenders were non-covered jurisdictions or race jurisdictions. Anglos in West Virginia registered at 3.38 times the rate of Hispanics in that state; in Alabama 3.02, in Idaho 2.06, in Tennessee 1.94, and in Utah 1.86. *See* Table 7. The States covered on the basis of Spanish heritage are scattered across the spectrum. *See* Table 7; Figure 7. Arizona is the worst fully-covered Spanish-heritage jurisdiction; Anglos registered at 1.36 times the rate of Hispanics. That is nearly the same as the national average of 1.30.

18

Turnout numbers similarly show no correlation between covered Spanish-heritage jurisdictions and low Hispanic turnout. *See* Figure 8. The top three offenders are two non-covered jurisdictions and a race jurisdiction. Tennessee is the worst with an Anglo turnout rate 2.96 times the Hispanic turnout rate; West Virginia follows at 2.88, and Alabama is at 2.55. *See* Table 8.  In contrast, Texas is the worst fully-covered Spanish-heritage jurisdiction, where Anglos turnout at 1.55 times the rate of Hispanics, only slightly above the national average of 1.43. *Id.*

Minority Elected Officials.  The *Shelby County* dissent also considered the number of black elected officials and found the "inverse" of the coverage formula. 679 F.3d at 892 (Williams, J., dissenting). "Covered jurisdictions have *far more* black officeholders as a proportion of the black population than do uncovered ones." *Id.* Statistics relating to Hispanic elected officials show the same pattern here. The states with the highest numbers of Hispanic elected officials per million Hispanic voting-age citizens are language minority jurisdictions. *See* Table 10; Figure 10. Three of the top six states are fully or partially covered language-minority states.

Section 2 Litigation. Both the *Shelby County* majority and the dissent concluded that the evidence of successful Section 2 litigation *could* support some sort of coverage formula for race jurisdictions. The majority found support for the formula as written, 679 F.3d at 874-78, and the dissent concluded that "a more narrowly tailored coverage formula—capturing only Mississippi, Alabama, and Louisiana, and possibly the covered portions of South Dakota and North Carolina—might be defensible," *id.* at 897 (Williams, J., dissenting).

In this case, however, the Katz data further confirms what the previous categories of evidence have shown: that there is no correlation at all between evidence of language discrimination and coverage under the language minority formula. In absolute numbers, language minority jurisdictions fall near the bottom of the distribution. *See* Table 4. Of the 21 jurisdictions with two or more successful Section 2 suits, 19 are either non-covered (12) or covered on the basis of race (7). Only 2 of the 21 are language-minority jurisdictions. *Id.* The same is true when the numbers are adjusted for population. While some of the race jurisdictions have comparatively high numbers of successful Section 2 suits per millions residents, the language-minority jurisdictions are all virtually indistinguishable from the crowd. *See* Figure 4-1. Aggregating the jurisdictions is even more telling. Race jurisdictions as a group had 1.34 successful Section 2 suits per million residents, language minority jurisdictions had 0.34, and non-covered jurisdictions had 0.31. Language minority jurisdictions and non-covered jurisdictions are identical.[10]

*Shelby County* suggested "that 5's deterrent and blocking effect screens out discriminatory laws before section 2 litigation becomes necessary." 679 F.3d at 880. But the Court acknowledged that the statute "could not stand based on claims of deterrence alone, nor could deterrence be used in some hypothetical case to justify renewal 'to the crack of doom.'" *Id.* at 871. Given the Section 2 statistics discussed above, Defendants'

---

[10]   Although the *Shelby County* majority referenced state-by-state data from Peyton McCrary, they have not been provided in this case. *Supra* note 4. But the McCrary numbers would not change the basic conclusion that the language-minority jurisdictions are virtually indistinguishable from the crowd. 679 F.3d at 876. The language minority jurisdictions in Michigan did not even make the chart. Only Texas and the covered portions of South Dakota stand out at all.

attempt to rely on the deterrence rationale to sustain the coverage formula (or the preclearance obligation itself for that matter) must be rejected. AG 10, 23, 37; Int. 20, 28-29. It would mean the statute was upheld on claims of deterrence alone.[11]

Federal Observers. The *Shelby County* dissent also examined federal observer statistics and found the data showed observers being sent more often to covered states. 679 F.3d at 894. But the dissent ultimately discounted the data because observer statistics will naturally skew toward covered jurisdictions. *Id.* Even so, the statistics still undermine the formula here. Between 1982 and 2004, 81 observers were sent to non-covered jurisdictions, 58 were sent to language jurisdictions, and 48 were sent to jurisdictions partially covered for language *and* race. Table 5; Figures 5-1, 5-2.

Bail-in and Bailout. *Shelby County* ultimately turned to the bail-in and bailout mechanisms to resolve the "close question" presented by the evidence, 679 F.3d at 879. But not even bail-in and bailout can salvage a formula that has "produced a remarkably bad fit," *id.* at 883 (quotation marks omitted), such as Section 4(b)'s language minority coverage formula. Unlike in *Shelby County*, all of the evidence confirms that the language minority coverage formula fails to identify with any precision jurisdictions in which there is voting discrimination. In each category of evidence, non-covered jurisdictions fared as well or worse than language minority jurisdictions. In these

---

[11]     The Section 203 litigation statistics also support Florida's challenge to the coverage formula. Between 1982 and 2004, there were more DOJ language-assistance enforcement actions per million minority residents in New Mexico, Utah, Washington, and Pennsylvania (non-covered jurisdictions) than there were in any jurisdiction covered on the basis of language. *See* Figure 1. In fact, DOJ did not bring any such actions in the following language-minority jurisdictions: Texas, Alaska, South Dakota, or Michigan. *See* Table 1.

circumstances, even the *Shelby County* court "would agree that [the formula] is no longer congruent and proportional." *Id.*

**C.    Section 5's Requirement of Preclearance for All Groups Without Regard to the Jurisdiction's Basis for Coverage is Neither a Congruent nor Proportional Response to Any Demonstrated History of Discrimination**

It is inappropriate to require language-minority jurisdictions to prove that voting changes will not discriminate against other minority groups. Mot. 40-41.[12] Importantly, the issue turns not on "*when* a jurisdiction became covered," AG at 39 (emphasis added), but *why* it became covered. Congress extended the preclearance obligation to these jurisdictions because of discrimination against language minorities, *supra* at 4-5, and "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end," *Boerne*, 521 U.S. at 508. The issue is whether requiring such jurisdictions to preclear voting changes based on criteria *beyond their basis for coverage* remedies discrimination against language minorities.

Defendants argue that the extension of the preclearance requirement is justified because "Congress recognized that jurisdictions often subject different minority groups to the same discriminatory barriers to the full exercise of their voting rights." AG 39; Int. 31. But that would justify imposing an indiscriminate preclearance obligation only if the discrimination against those "different minority groups" was also so widespread that Section 2 provided insufficient protection. Defendants' argument that the formula was

---

[12]    The resolution of this constitutional claim could have a direct bearing on whether Florida obtains preclearance of the Early Voting Changes. *See, e.g.,* V16 8905-06 (showing higher early voting in the repealed days among Whites compared to Hispanics *in all seven elections analyzed*).

reverse-engineered, AG 36; Int. 29-30, suggests that there was not widespread discrimination against all minorities in the language-minority jurisdictions.

In any event, Congress drew no such conclusion in 1975. *Supra* at 4-6. Congress amended the coverage formula not because of some general propensity in these jurisdictions to discriminate against non-White voters, but because it believed there was a problem regarding language minorities. 1975 House Report at 27. Had Congress subscribed to Defendants' theory, there would have been no need for the 1975 amendments. It would have felt the need to protect language minorities under the original Act even though preclearance was only justified by the "magnitude of the voting problems confronting blacks." *Id*. In short, this general propensity argument is a construct of Defendants—not Congress.

Moreover, Defendants offer *no* citation from the 2006 legislative record showing that Congress still believes (if it ever did) that language-minority jurisdictions have an inherent propensity to discriminate against racial minorities. The most they are willing to assert is that the 2006 record shows *some* evidence of racial discrimination in those jurisdictions. AG 40; Int. 29-30. But like non-covered jurisdictions with *some* evidence of racial discrimination, Mot. at 25-27, 39-40, Section 2 is sufficient to address any such issues. *Shelby County*, 679 F.3d at 864.

Intervenors contend that "even if the record of discrimination … had been limited to language minorities alone, Congress is in no way prevented from enacting broad remedial legislation designed to protect members of all minority groups on that basis." Int. 32. They cast Florida as proposing a rule "under which all anti-discrimination

legislation must specify with precision the specific racial or ethnic groups that are intended as its beneficiaries, to the exclusion of all others[.]"  Int. 34. This argument is red herring. Not *all* anti-discrimination legislation must function this way. Under appropriate circumstances, Congress may broadly ban discrimination across multiple groups irrespective of whether the legislative record includes evidence (or the same degree of evidence) of discrimination against every group. But Section 5 is not like other anti-discrimination statutes. *Nw. Austin*, 557 U.S. at 198, 202; *Shelby County*, 679 F.3d at 861. It is an "uncommon exercise of congressional power" that would not be "appropriate" absent "exceptional conditions" and "unique circumstances." *Katzenbach*, 383 U.S. at 334-35; *Beer v. United States*, 425 U.S. 130, 140 (1976).  Accordingly, there must be a tighter fit between the injury to be prevented and the remedy chosen by Congress. "Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *Boerne*, 521 U.S. at 530.

There is no merit to Intervenors' suggestion that Florida's argument has "no logical stopping point" because Congress would be forced to adduce evidence for each "particular Latino or Asian-American subgroup." Int. 35 n.21. The statute already distinguishes between language and racial minorities. It is Defendants' argument that is unbounded. Under their rationale, Congress could extend the extraordinary protections of Section 5 to any category (*e.g.*, gender, disability, sexual orientation)—without any evidence of intentional voting discrimination against that group—as long as there was evidence of discrimination against other groups. Such an extension of the preclearance obligation could never be congruent and proportional. *See Garrett*, 531 U.S. at 371.

**D.**     **Congress's 2006 Expansion of Section 5's Substantive Standard Cemented the Statute's Unconstitutionality.**

Congress disregarded the serious constitutional problems with Section 5's preclearance standard when it amended the statute in 2006. Mot. 41-49. First, the revised statute is not congruent and proportional because, by making it more difficult to obtain preclearance, it increased Section 5's federalism burden beyond the breaking point and because (at least as interpreted by Defendants) it imposes a substantive preclearance test that deviates too far from the constitutional standard. The revised statute also violates the Equal Protection Clause by making race the decisive factor in all electoral decision-making.  Defendants' responses miss the mark.

Standing.  Defendants argue that Florida lacks standing to bring a facial challenge to the substantive standard. AG 41; Int. 4-5. As an initial matter, Florida may bring a facial challenge under *Boerne* to the increased federalism burden.  Mot. 41-48. The revised substantive standard issue merely adds a new dimension to the federalism equation. *Shelby County*, 679 F.3d at 886-88 (Williams, J., dissenting).

Florida's challenges to the standard itself (as opposed to the federalism burden of laboring under it) are not facial; they are classic as-applied challenges to the standard being used *in this case*. Although Defendants now also assert that Florida lacks standing to bring even an as-applied challenge because preclearance would have been denied under the displaced "retrogressive purpose" standard, AG 41; Int. 5, that argument comes too late. Defendants have alleged that Florida had *discriminatory* purpose, not simply a retrogressive purpose. DFF ¶¶ 24-53; DCL ¶¶ 8-47, 100-105, 107. This argument comes

for the first time, conveniently, in their constitutional briefs. Defendants have adduced no evidence to support this new theory, and the record is now closed.

Last, Defendants contest Florida's standing to challenge the "ability to elect" standard on the ground that it is inapplicable in ballot-access cases.  AG 41, 46; Int.  6-7. That issue has been fully briefed.  CL ¶¶ 53-59; DCL ¶¶ 51-59; RCL ¶¶ 48-59.  But even if the Court agrees with them, the federalism burden that this revised standard imposes must still be considered.  The Attorney General also suggests that Florida lacks standing because it cannot prevail under this standard. AG Br. 45. But he declined to make such an argument in his statutory filings, RCL ¶¶ 48-59, and is bound by that choice.

<u>Discriminatory Purpose</u>. Defendants incorrectly argue that the revised standard is valid because it adopts the constitutional test for intentional discrimination and meeting it "is not onerous" as Section 5 merely "shifts the burden of proof to the submitting jurisdiction." AG 43; Int. 6-7. To begin, the burden shifting alone is extraordinary. *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 480 (1997). Even when the law only imposed the relatively "trivial" burden of showing non-retrogressive purpose, *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 331 (2000), the Court had serious concerns and warned that the greater burden of disproving discriminatory purpose might be unconstitutional, *id*. at 336. This Court must now decide that question.

Though they disclaim it, AG 42, Defendants make the Court's task even more difficult by proposing a test *more burdensome* than the constitutional standard. They have said that jurisdictions not only have the burden of proving that the change is neutral and providing some legitimate reason for it (along with rebutting any affirmative evidence of

26

discrimination put forth by Defendants), CL ¶¶ 14-21; RCL ¶¶ 12-22, but also have the additional burden of persuasion on the *absence* of every conceivable kind of evidence that could be used to show discriminatory purpose, DCL ¶¶ 101-104, 107. Defendants must either admit that their standard is far more onerous than the constitutional one, RCL ¶¶ 48-80, 107, or abandon their argument that Florida: (1) must have compelling reasons for the change, DCL ¶¶ 12-14, 15-17, 107; and (2) must present legislative testimony or "risk … failing to meet its burden," AG 43 n.11; DCL ¶ 107(f).[13]

Defendants also contend that the equal protection challenge must fail because, "on its face," the purpose standard does not "authorize or permit the Attorney General to encourage or ratify such unconstitutional conduct." AG 44. But *in this case* Defendants claim that race must be decisive—for purely racial reasons, Florida cannot make non-discriminatory voting changes. That type of race-based decisionmaking would be unconstitutional absent Section 5. *Georgia v. Ashcroft*, 539 U.S. 461, 491 (2003) (Kennedy, J., concurring).

Ability-to-Elect. Defendants incorrectly argue this standard does not increase Section 5's federalism burden because Congress "merely restore[d] the preclearance standard long enforced by the Attorney General and lower courts" and the standard is easily met. AG 45; Int. 7. They ignore that before *Ashcroft* there was *no* settled retrogression standard, 539 U.S. at 479, and that the Court sought to minimize Section 5's

---

[13]    Defendants also argue that the purpose standard is congruent and proportional under *Boerne* without taking into account the improved conditions in the covered jurisdictions. *Nw. Austin*, 557 U.S. at 202-203. Instead of relaxing the standard for preclearance in recognition of this improvement, Congress made it more difficult. The legislative record did not justify this decision.

burden by refocusing retrogression on electoral opportunity instead of success, *id*. at 479-85 The Court understood the difficulty in proving that a voting change does not undermine a minority group's ability to elect a candidate of choice. Mot. 44-46. This substantial federalism burden must be taken into account.

Defendants also argue that the ability to elect standard bears a sufficient nexus to the Fifteenth Amendment because it "neither guarantee[s] electoral success nor ensure[s] particular electoral outcomes." AG 46; Int. 7. But they concede that it preserves "the number of districts from which [minority] voters are able to elect their candidates of choice" and prevents jurisdictions from "replacing [those districts] with districts in which [minorities] may do no more than potentially influence an election." AG 47. As *Ashcroft* demonstrated, there is far too much daylight between strict preservation of minority groups' ability to elect a candidate and the constitutional standard for the former to be congruent and proportional under *Boerne*. Mot. 47-49.

Relying on this same argument, Defendants deny that the amendment to the effect standard creates an equal protection problem. AG 46. But it requires covered jurisdictions to "essentially guarantee[] that, despite changes in voter turnout, registration, and other factors that affect participation at the polls, a cohesive minority group will be able to elect its candidate of choice." *Texas v. United States*, 831 F. Supp. 2d 244, 263 (D.D.C. 2011). This standard overtly requires discrimination against non-minorities in direct violation of the Fourteenth Amendment. *Miller v. Johnson*, 515 U.S. 900, 911-912, 922, 930 (1995); *Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring); Mot. 49.

"Worse off." The Attorney General is either unwilling or unable to squarely grapple with the consequences of his proposed retrogression standard, arguing that it follows directly from decisional law by merely evaluating whether a voting change makes minorities "worse off." AG 49 (citing *Beer*, 425 U.S. at 141). Those words do not appear in *Beer* or any other Section 5 case. *Beer* held that Section 5's effect prong protects against "retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." 425 U.S. at 141.

But that is not what Defendants mean by "worse off." They propose a test that protects minorities' access to their preferred means of voting *irrespective* of whether it interferes with the "effective exercise of the franchise." For example, they argue that the Early Voting Changes are retrogressive because of a negative "differential effect" on African-American voters' access to *early voting*, DRCL ¶ 97A-97P, even while conceding that it does not affect turnout, DRCL ¶ 94B-94E. If Defendants were truly concerned with minority voters' "effective exercise of the franchise," it should be meaningful that (on a statistical level) *all* early voters will adjust and cast a ballot irrespective of the availability of early voting. RCL ¶¶ 94E, 97A-97C.[14] But Defendants

---

[14]     Thus, the Early Voting Changes only could be retrogressive if they impair minority voting for other reasons. Defendants have suggested that the elimination of early voting days will cause crowding. DFF ¶¶ 113A, 113B; DRFF ¶¶ 113A-113C. But there is no factual support for this argument, RFF ¶¶ 113A-115, and it merely proves that early voters will adjust, RFF ¶¶ 97A-97C. Moreover, crowding is only material if, as Defendants have suggested: (1) it uniquely occurred at polling places heavily populated by minorities; and (2) these lines would disproportionally deter minorities from voting. June 21, 2012 Tr. of Oral Arg. at 139-41, 164-66 (Ms. Shore); *id.* at 207, 227 (Mr. Posner). The first argument has no record support and the second is a cynical, unfair, and unsubstantiated attack on minority voters' commitment to voting.

care only that African Americans purportedly use the repealed early voting days more than White voters. DRCL ¶¶ 97A-97P; *but see* FF ¶¶ 106, 116. It is irrelevant to them whether the Early Voting Changes will actually keep minorities from voting—let alone deny them a reasonable and fair opportunity to do so.

The *Boerne* problem is obvious. The Fifteenth Amendment protects the right to freely register and vote. Mot. 15-16; RCL ¶¶ 70-80. It does *not* protect the "right" to use early voting, or to register through a TPRO, or to make an address change at the polls and vote a regular ballot. Those are means that the State has provided to aid voters in their exercise of the franchise. Like any other State, Florida has full discretion to choose *any* lawful electoral regime so long as it does not deprive voters of a reasonable and fair opportunity to cast a ballot. By interpreting Section 5 to protect purported "gains minority voters have made" with regard to certain means of registering and voting, AG 49, Defendants' proposed retrogression standard divorces the statute from the Fourteenth and Fifteenth Amendments. "It appears, instead, to attempt a substantive change in constitutional protections." *Boerne*, 521 U.S. at 532.[15]

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Florida respectfully requests that this Court grant its motion for summary judgment.

---

[15]   Defendants' standard also requires Florida to devote substantial resources to complex statistical analysis, akin to what would be required in a Section 2 suit. Mot. 47-48.  This further increases the statute's federalism burden. *Supra* at 25-28.  Finally, any theory of retrogression that—for purely racial reasons—forbids a State from making a legitimate and non-discriminatory voting change violates the Equal Protection Clause for the reasons set forth above. *Supra* at 27-28.

Respectfully submitted,


/s/ William S. Consovoy

Daniel E. Nordby                        William S. Consovoy* (D.C. Bar 493423)
Ashley E. Davis                         Brendan J. Morrissey (D.C. Bar 873809)
FLORIDA DEPARTMENT OF STATE             J. Michael Connolly  (D.C. Bar 995815)
R.A. Gray Building                      WILEY REIN LLP
500 S. Bronough Street                  1776 K Street, NW
Tallahassee, FL 32399-0250              Washington, DC  20006
Tel: 850-245-6536                       Tel.: (202) 719-7000
                                        Fax: (202) 719-7049

Dated: July 9, 2012                     * *Counsel of Record*